**Case No. _____**

---

### UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

---

### WEBER MOTORS, FRESNO, INC., CJ's ROAD TO LEMANS CORP., AND CHRISTOPHER JOHN WILSON'

*Defendants-Petitioners*

*v.*

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION,

*Respondent District Court,*

v.

### FOUNDATION AUTO HOLDINGS, LLC; TEMPLETON MARSH, LTD.,

*Real Parties in Interest/Plaintiffs-Respondents*

---

### IN RE: WEBER MOTORS, FRESNO, INC; CJ'S ROAD TO LEMANS CORP.; AND CHRISTPOHER JOHN WILSON'S

### APPENDIX TO PETITION FOR WRIT OF MANDAMUS

David L. Allen (075673)
dla@jaburgwilk.com
Thomas S. Moring
tsm@jaburgwilk.com
**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
(602) 248-1000
Attorneys for Defendants/Petitioners

i

1.     First Amended Complaint filed November 1, 2022

2.     Defendants' Answer to First Amended Complaint and Demand for Jury Trial filed November 22, 2023.

3.     Order Granting Plaintiff Foundation Auto Holdings, LLC's Motion for Further Sanctions entered June 2, 2025

4.     Order Granting Plaintiff's Motion to Compel and Request for Sanctions entered October 29, 2024

5.     Plaintiff Foundation Auto Holdings, LLC's Motion for Leave to File Request for Further Sanctions filed December 5, 2024

6.     Defendants' Notice Re: Status of Discovery Compliance filed February 26, 2025

7.     Defendants' Updated Notice Re: Status of Discovery Compliance filed March 4, 2025

8.     Declaration of Christopher John Wilson filed March 4, 2025

9.     Defendants' Supplemental Opposition to Plaintiff's Request for Further Sanctions filed March 19, 2025

10.    Plaintiff Foundation Auto Holdings, LLC's Supplemental Reply in Support of Request for Further Sanctions filed April 4, 2025

1

2

11.     Defendants' Sur-Reply to Plaintiff's Reply in Support of Request for Further Sanctions filed April 10, 2025

12.     Defendant's Brief in Support of David L. Allen's and Thomas S. Moring's Response to Order to Show Cause filed May 5, 2025

13.     Brief in Support of Christopher John Wilson Declaration filed May 5, 2025

14.     Declaration of Christopher John Wilson filed May 5, 2025

15.     Defendants' Notice of Motion and Motion for Summary Judgment filed November 12, 2025

16.     Defendants' Statement of Undisputed Facts filed November 12, 2025

17.     Defendants' Request for Clarification of Order Granting Plaintiff's Motion for Further Sanctions filed November 21, 2025

24377-24377-00001\DLA\AMC\6857151v1

# App. 1

HOLLAND & KNIGHT LLP
David I. Holtzman (SBN 299287)
Daniel P. Kappes (SBN 303454)
50 California Street, Suite 2800
San Francisco, CA 94111
Telephone: 415-743-6900
Fax: 415-743-6910

Attorneys for Plaintiff
FOUNDATION AUTO HOLDINGS, LLC

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**FRESNO DIVISION**

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>Defendants. | Case No. 1:21-cv-00970-JLT-EPG<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(I) BREACH OF CONTRACT**<br><br>**(II) ANTICIPATORY BREACH OF CONTRACT**<br><br>JURY TRIAL DEMANDED |

Plaintiff, Foundation Auto Holdings, LLC ("Foundation" or "Plaintiff") for its First Amended Complaint against Defendants Weber Motors, Fresno, Inc. d/b/a BMW Fresno ("Weber"), CJ's Road to Lemans Corp. d/b/a Audi Fresno and Porsche Fresno ("Lemans"), and Christopher John Wilson ("Wilson" and, together with Weber and Lemans, the "Defendants"), alleges the following:

**JURISDICTION AND VENUE**

1.      This is an action for civil damages for breach of contract, arising out of a transaction to purchase certain BMW, Audi, and Porsche dealerships located in Fresno, California.

2.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00, exclusive of interest and costs, and there is complete diversity of citizenship amongst the parties.

1

FIRST AMENDED COMPLAINT                                         CASE NO: 1:21-CV-00970-JLT-EPG

3.     This Court has personal jurisdiction over the Defendants because they are citizens of and do business within this State, have engaged in acts or omissions within this State causing injury, and have otherwise established contacts with this State making the exercise of personal jurisdiction proper.

4.     Venue is proper under 28 U.S.C. § 1391(b)(1) because each of Wilson, Weber, and Lemans reside in the State of California and one or more of them reside in this District.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims herein occurred in this District.

<div align="center">

**THE PARTIES**

</div>

5.     Foundation Auto Holdings, LLC is a Delaware limited liability company.  The company's only member is Foundation Automotive U.S. Corp., a company formed under the laws of the State of Delaware and which maintains a principal place of business in Houston, Texas.  Foundation's mission is to provide modern automotive solutions across North America.  Today, Foundation has 23 stores across Canada and the United States, with plans to continue strategic growth across the continent.

6.     Defendant Weber Motors, Fresno, Inc. d/b/a BMW Fresno is a California corporation.  It owns and operates a BMW dealership located at 7171 N. Palm Ave., Fresno, California 93650.

7.     Defendants CJ's Road to Lemans Corp. d/b/a Audi Fresno and Porsche Fresno is a California corporation.  It owns and operates an Audi dealership and a Porsche dealership, each of which are located at 7121 N. Palm Ave., Fresno, California 93650.

8.     Defendant Christopher John Wilson is an individual and resident of the State of California.  Wilson is the trustee of the trust that is the primary owner of Defendants Weber and Lemans (herein, the "Trust").

<div align="center">

**GENERAL ALLEGATIONS**

</div>

**A.     Defendant Wilson seeks majority partner for his dealership businesses.**

9.     Upon information and belief, in early 2020, Wilson, on behalf of Weber and Lemans, engaged a firm named Templeton Marsh to assist in finding a partner to become the majority owner of the BMW dealership owned by Weber, and the Audi and Porsche dealerships owned by Lemans.

<div align="center">

2

</div>

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA  94111
Tel: 415.743.6900; Fax: 415.743.6910

10.     Templeton Marsh is a Canadian business that operates within several areas of the automotive industry, including new dealership brokerage and related consulting services, as well as consulting services associated with new dealership mergers and acquisitions.

11.     On or about May 1, 2020, Martin Couture, a Principal with Templeton Marsh, contacted Foundation's President and CEO, Kevin Kutschinski, regarding the opportunity for Foundation to become the majority owner of the BMW, Audi, and Porsche dealerships that Weber and Lemans own in Fresno.

12.     On or about May 6, 2020, Mr. Couture introduced Wilson to Mr. Kutschinski and other representatives of Foundation.  The parties subsequently held an introductory call, on or about May 8, 2020, to discuss the potential deal.

13.     At the time Wilson and Foundation were introduced, Foundation was also pursuing a potentially lucrative deal regarding certain dealerships located in the State of Oregon. By way of communications with Mr. Couture, Wilson asked Foundation to prioritize the subject transactions over the Oregon transaction.  Based on this request, and in good faith, Foundation agreed, and in the process lost and/or forewent the Oregon opportunity.

14.     With the assistance of Mr. Couture, over the next several months Foundation and the Defendants negotiated the terms of a deal for Foundation to purchase a majority stake in the subject dealerships.

15.      On or about July 24, 2020, the parties executed a Letter of Intent with respect to the deal.

**B.     Defendants and Foundation enter into Asset Purchase Agreement.**

16.     With the Letter of Intent in place, the parties began negotiating an Asset Purchase Agreement (herein, the "APA"), whereby Foundation would purchase from Defendants Weber and Lemans substantially all of the assets they used in connection with the subject BMW, Audi, and Porsche dealerships.

17.     On November 30, 2020, Foundation and Wilson, both individually and on behalf of Weber and Lemans, executed and entered into the APA.  Specifically, the APA provided as follows:

> Subject to the terms and conditions of this Agreement, on the Closing Date (as defined in Section 3.1), [Weber and Lemans] will sell to [Foundation], and

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA  94111
Tel: 415.743.6900; Fax: 415.743.6910

3

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

[Foundation] will purchase from [Weber and Lemans], all of the assets listed on Schedule 1.1 in accordance with Schedule 1.1 (collectively, the "Purchased Assets"), free and clear of all security interests, liens, restrictions, claims, encumbrances or charges of any kind ("Encumbrances"). [Foundation] and [Weber and Lemans] acknowledge and agree that the Purchased Assets shall include all of the assets determined in accordance with Schedule 1.1. For the avoidance of doubt, Purchased Assets shall include all of the goodwill associated with, and the assets used in the operation of, all of the Dealerships.

(APA at p. 1, § 1.1.)  The APA defines "Dealerships" as those "certain assets used or useful in the operation of BMW, Audi, and Porsche motor vehicle sales and service businesses … located at: (i) 7171 North Palm Avenue, Fresno, California 93650 (the "BMW Site"); and (ii) 7121 North Palm Avenue, Fresno, California 93650 (the "Audi/Porsche Site")."  (*Id.* at p. 1, Recital A.)

18.    Under the APA's terms, closing for the subject transactions was to "occur no later than January 30, 2021" provided, however, that the deadline would "automatically be extended without further action by either party for up to an additional one hundred fifty (150) days as may be necessary in connection with Manufacturer and State of California regulatory approvals as required" thereunder (*i.e.* June 29, 2021).  (*Id.* at p. 4, § 3.1(a).)

19.    Section 3.1, in its entirety, states the Closing Date is:

(a) Subject to the terms and conditions of this Agreement, the closing of the transactions (the "Closing") contemplated by this Agreement and any other agreement or instrument executed by the Parties pursuant to this Agreement (collectively, the "Related Agreements") will occur on a mutually agreeable date, at a mutually agreeable location, at 10:00 a.m. local time no later than thirty (30) days after all necessary Manufacturer (as defined below) and governmental approvals are received for the transactions contemplated under this Agreement so long as all other conditions set forth in this Agreement are satisfied (the date on which such Closing occurs, the "Closing Date"). The Closing Date shall occur no later than January 30, 2021 (the "Closing Date Deadline"); provided, however, the Closing Date Deadline shall automatically be extended without further action by either party for up to an additional one hundred fifty (150) days as may be necessary in connection with Manufacturer and State of California regulatory approvals as required under Section 6.1(c) and Section 6.1(e) below.

(b) Buyer and Seller acknowledge and agree that all profits, or losses, relating to the Dealerships on the Closing Date shall be the property and responsibility of Buyer.

(c) The Closing shall be deemed to be completed as of 12:01 a.m. on the applicable Closing Date.

4

20. Under the APA, "Manufacturer" refers to BMW of North America, LLC, with respect to Weber's BMW operations, and Audi of America, Inc. and Porsche Cars North America, Inc., with respect to Lemans' Audi and Porsche operations, respectively (*Id.* at p. 5, § 3.2(b).)

21. Section 3.2 of the APA outlines several actions that the parties had to take, and documents the parties had to deliver, ***at the closing***.  These section 3.2 actions are incorporated in APA § 6.1(a), and a failure to perform any 3.2 closing actions, is a failure to meet a condition precedent outlined in APA § 6.1(a) to Buyer's obligations. These include, but are not limited to:

a. Defendant Wilson executing and delivering a non-compete, non-solicitation and no-hire agreement in the form attached to the APA as Exhibit B (*id.*, § 3.2(d));

b. Defendant Wilson and Foundation executing and delivering an employment agreement with respect to Defendant Wilson in the form attached to the APA as Exhibit C (*id.*, § 3.2(k)); and

c. The parties taking such other actions, and executing and delivering such other instruments, documents and certificates, as required under the terms of the APA, or agreements related to the APA, or as may be reasonably requested by any party in connection with the consummation of the transactions contemplated under the APA (*id.* at p. 6, §3.2(o)).

22. The Closing, as a result of Defendants' conduct, did not occur. Defendants' conduct included a failure to undertake diligent efforts to obtain necessary approvals, provide necessary notices, and provide paperwork required to complete the deal, which prevented the Closing actions in APA § 3.2(a)-(o) from occurring. Separately, Defendants' terminated the APA on June 11, 2021, ***prior*** to the Closing date of June 29, 2021, which also prevented ***any*** Closing actions from taking place.

23. Defendants' actions also prevented conditions precedent from occurring, as described below.

24. The APA § 6.1 outlines several conditions precedent to Foundation's obligations under the APA.  It states: "Buyer's obligations under this Agreement are subject to the satisfaction,

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA  94111
Tel: 415.743.6900; Fax: 415.743.6910

5

on or prior to the Closing Date, of *each* of the following conditions[.]" (emphasis added). These include:

    a.    Seller will have fully complied with and performed all its obligations under this Agreement, including, but not limited to, Section 3.2 and the Related Agreements. Seller will also have caused the Seller Principal to have fully complied with and performed all of his obligations under this Agreement, including, but not limited to, Section 3.2 and the Related Agreements. (*id*. at p. 22, § 6.1(a));

    b.    Seller will have paid any and all current and delinquent contributions it or a member of Seller's controlled group is obligated to pay to the I.A.M. National Pension Fund and any other union pension plan. (*id*. § 6.1(b));

    c.    Seller will have paid any and all withdrawal liability it or a member of Seller's controlled group is obligated to pay as a result of withdrawal from the I.A.M. National Pension Fund or another multi-employer union pension fund where the withdrawal arose out of or relates to this transaction. (*id*. § 6.1(c));

    d.    All representations of Seller in this Agreement and the Related Agreements will be true and complete as of the date when given and on the Closing Date. (*id*., § 6.1(d));

    e.    Buyer will have received all necessary approvals from the Manufacturers including, but not limited to, the appointment of Buyer's representative as the dealer principal, and the execution and delivery by Buyer and the applicable Manufacturer of the appropriate dealer agreements and related documentation; and Buyer shall be satisfied in its sole discretion with any facility or relocation demands or obligations that any Manufacturer conditions approval of Buyer upon. Notwithstanding the foregoing, if one or more of the Manufacturers exercises its right of first refusal or option to purchase the applicable Dealership and the associated Purchased Assets, then, either: (1) with the consent of both Buyer and Seller, Buyer will purchase the remaining Dealerships and Purchased Assets at

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

6

new negotiated purchase prices if mutually agreed to by Buyer and Seller; or (2) this Agreement will be terminated. (*id.*, § 6.1(e));

f. Buyer will have secured the necessary financing required to complete the transactions contemplated hereby and by the Related Agreements, with the terms and structure to be deemed acceptable by Buyer in its sole discretion (*id.*, § 6.1(f));

g. Buyer will have received all necessary approvals from the State of California and any regulatory body thereof to operate the Dealerships (*id.*, § 6.1(g));

h. Buyer will have completed its due diligence investigations of the Dealerships, the Property and the Purchased Assets as of the Closing Date in accordance with Section 5.1 above and the relevant provisions of the Related Agreements, and will be satisfied with such investigations in its sole discretion and shall not have terminated this Agreement due to such due diligence investigations (*id.*, § 6.1(h));

i. Buyer shall be satisfied in its sole discretion that the operation of the Business and the Property complies with all applicable laws, including, without limitation, municipal by-laws and zoning by-laws, and that the Buyer may continue to operate the Business in compliance with such laws post-Closing (*id.*, § 6.1(i));

j. Buyer and the Seller Principal shall have executed and delivered a Non-Compete Agreement for Seller Principal (*id.* at p. 23, § 6.1(j));

k. Buyer and the applicable landlord(s) of the Property shall have executed and delivered the Lease Assignments (*id.*, § 6.1(k));

l. All of the Purchased Assets shall be transferred to Buyer, or a permitted Buyer assignee, simultaneously on the Closing Date (*id.*, § 6.1(l));

m. No material adverse change (as defined in Section 7.2 hereof) shall have occurred (*id.*, § 6.1(m));

n. All consents, approvals and waivers required to consummate the transactions contemplated by this Agreement and the Related Agreements and allow Buyer to operate the Business will have been obtained in writing by Buyer and Seller, as

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

FIRST AMENDED COMPLAINT                    CASE NO: 1:21-CV-00970-JLT-EPG

applicable, including, without limitation, any workers' compensation legislation (*id.*, § 6.1(n)).

25. Section 6.1 provides that Foundation's obligation to perform under the APA was contingent on Defendants' performance of each condition precedent listed under § 6.1. Any failure of Defendants' to perform *any* condition precedent thereunder excused all of Foundation's further performance.

26. With respect to § 6.1(a), Defendants, as sellers, did not perform their obligations as required under section 3.2. For example, as required in section 3.2(c), Defendants did not provide evidence of a voluntary termination of their dealer agreements with the applicable manufacturers. Such failure to perform excused Foundation's performance.

27. Moreover, Foundation's performance was further excused because it was not yet due. Foundation's performance was due on or before June 29, 2021, the date of Closing. Defendants terminated June 11, 2021, *prior* to the date of Closing, informing Foundation that "the APA is terminated and has no force or effect."

28. Defendants' repudiation of the APA on June 11, 2021, excused any remaining performance due by Foundation under the APA, both generally and as to any conditions precedent. *Cnty. of Solano v. Vallejo Redevelopment Agency*, 75 Cal.App.4th 1262, 1276 (1999) ("Due to the Agency's anticipatory breach, Solano County was excused from fulfilling any conditions, whether precedent or concurrent, under the contract"). Thus, at the time of Defendants' breach and termination of the APA, none of Foundation's performance was due.

29. Foundation's performance also was excused and not due because Defendants failed to perform their duties under the APA.

30. With respect to sections § 6.1(b) and (c), Defendants, as sellers, on information and belief, did not pay and become current on all delinquent contributions and withdrawal liability owed to the I.A.M. National Pension Fund or other union pension fund.

31. With respect to section § 6.1(d), given Defendants terminated prior to the closing date, Defendants never provided Foundation with true and complete representations on the closing date, excusing Foundation's performance under § 6.1(d).

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

8

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

32. With respect to section § 6.1(e), Foundation obtained all necessary approvals from each Manufacturer. It obtained approval from Audi on May 3, 2021, BMW on April 23, 2021, and Porsche on May 20, 2021. Each approval was conditional on the consummation of the APA (which Defendants prevented).

    a. For example, BMW stated, in its approval "BMW [] is pleased to advise Foundation Auto Holdings, LLC [] that it has approved Foundation Auto Holdings' purchase of the BMW passenger car and BMW light truck [] assets of Weber Motors, Fresno, Inc. dba BMW Fresno ('Weber Motors')."

    b. Audi stated, "AoA has concluded a management review of the Proposed Transaction. In reliance upon the representations, disclosures, and commitments made by Seller, Buyer, Assignee and their respective representatives, AoA is informing you that the Proposed Transaction is conditionally approved. This approval is contingent on there being no changes to the terms, conditions, or documentation for the Proposed Transaction submitted to us for our review." (i.e., the APA terms being adhered to).

    c. Like the other manufacturers, Porsche also confirmed that it had agreed to approve the parties' transfer, so long as the parties complied with the terms of the APA.

33. Foundation also obtained all necessary financing with BMO Harris Bank, under APA § 6.1(f), "in its sole discretion" as required by 6.1(f).

34. Foundation was in the process of obtaining all necessary approvals from the State of California pursuant to APA § 6.1(g), at the time of Defendants' termination. On January 18, 2021, Foundation submitted to the California DMV a draft dealer application for soft approval. Remaining obligations thereunder did not become due given Defendants' termination of the APA.

35. Pursuant to DMV guidance, formal DMV approval begins 5-10 days prior to closing, which here was to occur no later than June 29, 2021. *See* https://www.dmv.ca.gov/portal/vehicle-industry-services/occupational-licensing/occupational-licenses/vehicle-dealer-license/buy-sell-procedures-for-new-vehicle-dealers/. Thus, formal approval was to be sought by June 19, 2021.

FIRST AMENDED COMPLAINT                             CASE NO: 1:21-CV-00970-JLT-EPG

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

Foundation could not seek formal approval, however, because Defendants repudiated the APA eight days prior to the date on which formal DMV approval could be sought.

36.     Foundation completed its due diligence, and was satisfied with "such investigations in its sole discretion" under APA § 6.1(h).

37.     Foundation was satisfied with the "the operation of the Business" and its compliance with applicable laws under APA § 6.1(i).

38.     Defendants did not execute and deliver a non-compete agreement, as required by APA § 6.1(j). Defendants' failure to satisfy this condition precedent excused all of Foundation's performance under the APA.

39.     Foundation's performance under APA § 6.1(k) had not come due, as it was due at Closing on June 29, 2021, and Defendants terminated on June 11, 2021. Nevertheless, at the time of termination, Foundation was in discussions with the relevant landlords to timely assign all relevant leases and, on information and belief, would have completed such negotiations in compliance with APA § 6.1(k) on or before the Closing date.

40.     Foundation's performance under APA § 6.1(l) had not come due, as it was due at Closing on June 29, 2021, and Defendants terminated on June 11, 2021. Defendants did not transfer any Purchased Assets to Foundation at the time Defendants terminated, though Foundation stood ready and willing to receive such assets.

41.     No material adverse change had occurred under APA § 6.1(m) affecting the ability of Foundation to operate the Dealership, at the time Defendants terminated the APA on June 11, 2021.

42.     Foundation's performance under APA § 6.1(n) had not come due, as it was due at Closing on June 29, 2021, and Defendants terminated on June 11, 2021. Defendants did not transfer "all consents, approvals, and waivers required to consummate the transactions," instead Defendants repudiated the APA.

43.     Likewise, the APA outlines conditions precedent to Defendants' obligations under the agreement.  (*Id*., §§ 6.2(a)-(e).)  It states, "Seller's obligations under this Agreement are subject to the satisfaction, on or prior to the Closing Date, of the following conditions, which may be waived by Seller:"

FIRST AMENDED COMPLAINT                                    CASE NO: 1:21-CV-00970-JLT-EPG

a.    Buyer will have fully complied with and performed all its obligations under this Agreement, including, but not limited to, Section 3.2 and the Related Agreements. (id. at p. 23, § 6.2(a));

b.    All representations of Buyer in this Agreement and the Related Agreements will be true and complete as of the date when given and on the Closing Date (*id*. § 6.2(b));

c.    The New Buyer Entities shall issue the Membership Interests to the Seller Principal (*id*. § 6.2(c));

d.    All of the Purchased Assets shall be transferred to Buyer, or a permitted Buyer assignee, simultaneously on the Closing Date (*id*., § 6.2(d));

e.    All consents, approvals and waivers (including the approval by the Manufacturers) required to consummate the transactions contemplated by this Agreement and the Related Agreements will have been obtained in writing by Buyer and Seller, as applicable (*id*., § 6.2(e)).

44.    Section 6.2 provides that Defendants' obligations to perform under the APA were contingent on Foundation's performance of each condition precedent listed under § 6.2.

45.    With respect to section § 6.2, Foundation performed its obligations or was excused as Defendants delayed, hindered, or obstructed Foundation's performance. Additionally, Foundation's performance was excused because it was not yet due.

46.    Foundation's performance under APA § 6.2(a) had not come due, as each requirement in APA § 3.2(a)-(o) was due at Closing on June 29, 2021, and Defendants terminated on June 11, 2021, which prevented Foundation's performance of section 3.2.

47.    For example, Foundation could not complete APA § 3.2(a), delivery of a Bill of sale or Assignment and Assumption Agreement because Defendants terminated the APA.

48.    Pursuant to APA § 6.2(b) all representations made by Foundation were true and complete when given.

49.    Foundation's performance under APA § 6.2(c), was excused and had not come due, because its performance was due at Closing on June 29, 2021, and Defendants terminated on June

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

11

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

11, 2021, which prevented Foundation's performance of section 6.2(c). Moreover, Foundation stood ready and able to issue membership interests at the time of closing.

50.    Foundation had no obligations to perform under APA § 6.2(d), which imposed an obligation on Defendants to transfer assets. Defendants did not perform, however, as Defendants terminated the APA on June 11, 2021, despite Foundation standing ready to receive assets.

51.    Foundation's performance under APA § 6.2(e), was excused and had not come due, because its performance was due at Closing on June 29, 2021, and Defendants terminated on June 11, 2021, which prevented Foundation's performance of section 6.2(e). Moreover, Foundation had obtained all approvals from manufactuters, was diligently pursuing approvals from the State of California in accordance with DMV process, and was in negotiations with the relevant landord to secure leases. On information and belief, negotiations with the landord would have successfully concluded by the closing date.

52.    Foundation had performed all required obligations or was pursuing such obligations by the closing date to abide by APA § 6.2(e).

53.    Under the terms of the APA, Foundation, Weber, and Lemans all agreed to "execute and deliver any further instruments or documents, and take all further action, reasonably requested by the other Party to carry out the transactions contemplated by" the APA and the related agreements. (*Id*. at p. 21, § 5.23.)

54.    Further, in executing the APA, Weber and Lemans provided several representations and warranties to Foundation.  These include, but are not limited to:

    a.    That they would "have sufficient assets to pay," and, in fact, would "pay, all amounts owing" to their creditors as of the closing date, as to all obligations not assumed by Foundation (*id*. at p. 9, § 4.1(k)); and

    b.    That neither the APA, nor any other related agreement, schedule or other document, certificate or item that they delivered under the APA, or any other related agreement, contained any untrue statement of a material fact, or omitted a material fact necessary to make each statement contained in the APA, or any other related agreement, not misleading (*id*. at p. 11, § 4.1(r)).

12

55. Finally, the APA contains provisions governing its termination. Specifically, Foundation has the right to terminate prior to closing, upon appropriate notice to Weber and Lemans, if any of its conditions precedent have not been satisfied prior to the closing date or have become incapable of being satisfied by the closing date through no breach of Foundation. (*Id*. at p. 23, § 7.1(a).)

56. Weber and Lemans have similar rights to terminate under the APA. (*Id*., § 7.1(b).) Specifically, they each may terminate the APA, upon proper notice to Foundation, if any of their conditions precedent have not been satisfied prior to the closing date or have become incapable of being satisfied by the closing date through no breach of Weber or Lemans. (*Id*.)

57. With that said, none of the parties to the APA are "entitled to terminate" if the party's "willful breach" of the APA or any related agreement, or "intentional misrepresentation" under the APA or any related agreement "prevented the [c]losing from taking place before" the closing date deadline. (*Id*. at p. 24, § 7.1(c).)

**C.     Defendants express an unwillingness to comply with the APA.**

58. In December of 2020, following execution of the APA, Foundation began efforts to communicate with the associated manufacturers regarding the deal, and to introduce the manufacturers to the Foundation team, all toward obtaining the necessary manufacturer approvals contemplated under the APA.

59. Initially, Wilson participated in the process. Over time, however, Wilson became uncooperative and unresponsive to Foundation's communications and requests for information. Specifically, Wilson delayed, and in certain respects refused, to provide information necessary to complete the applications Foundation needed for manufacturer approvals.

60. During the month of January, 2021, Wilson began to express an unwillingness to move forward to close the transactions contemplated under the APA. Through text messages with Mr. Kutschinski, Wilson communicated concern regarding his ability to close the deal, and specifically his fear of being in a "cashless situation after closing" because of existing loans and tax related issues.

61. During the text exchange, Wilson for the first time communicated allegedly dire financial circumstances. Wilson suggested by text that he owed nearly $5,200,000.00 regarding a

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

13

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA  94111
Tel: 415.743.6900; Fax: 415.743.6910

private loan, owed BMW nearly $4,000,000.00, owed his landlord nearly $3,000,000.00, and, further, anticipated a tax liability with respect to the sale of the BMW dealership somewhere between $4,000,000.00 and $5,000,000.00.  Wilson mused to Mr. Kutschinski that instead of closing the deal, he might try to "piece together some personal loans" or "[w]ork it out with some friends or something" to continue operating the business himself.

62.    Mr. Kutschinski reiterated Foundation's desire to bring the deal to a close, and indicated his and Foundation's commitment to work with Wilson, Weber, and Lemans to do what is necessary to bring the deal to close.  That being said, Mr. Kutschinski also noted that under the existing circumstances in January of 2021 there was "not a chance" that Wilson would be able to "secure capital and get approval from the [manufacturers] before the end of the month" to bring the deal to a close by the original January 30 closing date deadline.

63.    Wilson responded to Mr. Kutschinski by suggesting that, rather than closing the deal, he should "just put [his] head down and operate the" subject dealerships, and "kick the can down the road" and "re-evaluate in 6+ months."

64.    In the end, Mr. Kutschinski informed Wilson that Foundation intended to honor the APA as executed, and if Wilson was indeed intent on choosing a path other than bringing the deal to a close, he asked that his attorney contact Foundation's counsel because the company would view such a change as a breach of contract.  Wilson, unfortunately, did not provide a meaningful response.

65.    As the parties approached the original closing date of January 30, 2021,  manufacturer and regulatory approval remained the primary hurdle to clear for closing.  Accordingly, the automatic extension of up to an additional one hundred fifty (150) days applied to accommodate the circumstances and the need for approval, and set the outside closing date deadline for the subject transactions at June 29, 2021.

66.    Despite Wilson's previous indications, in late January and early February of 2021, Mr. Kutschinski continued his attempts to communicate with Wilson in an effort to obtain the information necessary to obtain both manufacturer and regulatory approval.  Wilson responded by reiterating his concerns about closing, primarily due to his alleged economic circumstances.    Moreover, Wilson, in his capacity as a projected partner with Foundation in the proposed post-closing operating entities,

FIRST AMENDED COMPLAINT                                    CASE NO: 1:21-CV-00970-JLT-EPG

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

refused to provide information necessary for Foundation to complete and submit the respective manufacturer applications for approval, again, pointing to his alleged economic troubles.

67.   As a result of Wilson's conduct, the tenor and substance of his communications, and his increasing propensity to not respond to Foundation's communications, by letter dated February 15, 2021, Foundation made a demand under Section 5.23 of the APA for Weber and Lemans to provide written assurances of their intent to honor the terms of the APA.

68.   Specifically, Foundation demanded assurances from Weber and Lemans regarding their compliance with their obligations to (a) timely respond to all information requests; (b) submit timely and complete applications for all necessary manufacturer and State of California regulatory approval; and (c) proceed in good faith toward closing.

69.   Although Weber, Lemans, and Wilson did not respond in writing, Wilson's attorney subsequently initiated communications with Foundation.

70.   Following those communications, the parties appeared to create some momentum to move the deal along, including the required manufacturer approvals. On April 23, 2021, BMW of North America, LLC provided its approval for Foundation's purchase of Weber's BMW assets. On May 3, 2021, Audi of America, Inc. provided its conditional approval for the proposed Audi transaction with Lemans. Finally, on May 20, 2021, Porsche Cars North America, Inc. provided its conditional approval as to the associated transaction with Lemans. Unfortunately, the positive momentum did not last for long.

71.   On May 24, 2021, Chris Beaton, Foundation's Vice President of Mergers and Acquisitions, contacted Wilson's attorney, Reggie Borkum, to inform him that Foundation had received the conditional approval letter from Porsche, that Foundation had at least conditional manufacturer approval on all three of the contemplated transactions, and that Foundation was moving to close.

72.   Mr. Beaton and Mr. Borkum had a follow up call approximately one week later, on June 1, 2021, regarding the push to close the deal. At that time Mr. Borkum indicated that Wilson had concerns regarding the level of trust between the parties, and, as a result, he had no intention of executing and delivering certain documents required for closing under the APA, including his

15

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

employment agreement and the operating agreements for the post-closing operating entities.

73.     Mr. Beaton addressed Wilson's concerns by reiterating to Mr. Borkum Foundation's intent to close the transactions contemplated under the APA and, further, to fulfil its obligations of having Wilson as an operating partner in the subsequent business.  Nevertheless, Mr. Beaton once again made clear that Foundation needed immediate assurances from Wilson that he, Weber, and Lemans intended to move forward and close the deal.  Mr. Borkum indicated that Wilson was "busy" attending to multiple other civil lawsuits, but that he would relay the information.

74.     Regrettably, Wilson made no attempt to respond to Foundation's request for assurances of compliance.

75.     By letter dated June 8, 2021, Foundation provided notice to Wilson, Weber, and Lemans that it considered them in breach of the APA.  Specifically, Foundation noted the following failures of Wilson, Weber, and Lemans to meet their various obligations under the agreement:

   a.  Weber and Lemans' failure to disclose Wilson's pledge, in his capacity as trustee, of the Trust's equity ownership in Weber and Lemans to a creditor, in breach of applicable dealer sales and service agreements with the manufacturers;

   b.  Wilson's failure to provide information with respect to his trust and his net worth as required by the manufacturers in connection with their approval of the subject transactions;

   c.  Wilson's refusal to agree to the non-compete agreement and the employment agreement, as attached to the APA;

   d.  Their failure to engage in any negotiations in good faith with respect to the form of amended and restated limited liability company agreements for each of the new entities, to be agreed to by the parties under Section 3.2(j) of the APA;

   e.  Weber and Lemans' apparent lack of sufficient assets to pay all amounts owing to creditors outstanding as of the closing date for all obligations not assumed by Foundation, as suggested in statements made by Wilson and Mr. Borkum to Foundation; and

   f.  Wilson and Lemans' failure to take all action reasonably requested by Foundation to

16

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

carry out the transactions contemplated under the APA, including, without limitation, (i) failing to pay all current and delinquent contributions it or a member of Seller's controlled group are obligated to pay to the I.A.M. National Pension Fund, and (ii) failing to obtain an estimate of the withdrawal liability that it or a member of Seller's controlled group will be obligated to pay as a result of withdrawal from the I.A.M. National Pension Fund.

76.    Foundation requested that Wilson, Weber, and Lemans provide an acceptable response to their June 8, 2021 letter by Thursday, June 10, 2021.

**D.    Defendants purport to terminate the APA.**

77.    Unfortunately, the Defendants chose not to communicate directly with Foundation regarding the issues raised in the June 8, 2021 letter.  Rather, on June 10, 2021, Wilson exchanged several communications with Martin Couture, the broker that he engaged and that introduced Wilson to Foundation.

78.    Specifically, Wilson accused Mr. Couture of "bringing these foxes"--*i.e.*, Foundation--"into [his] henhouse."  Wilson stated that threats would not work on him, and, rather, he would be "serving" Mr. Couture's firm "as a result of [F]oundation attempting to extort" him.

79.    Wilson went on to indicate that he was "firing" Mr. Couture, claiming that it was clear that "the client" Templeton Marsh produced had sent him "outright threats, and now has filed a formal breach action against me."  Wilson then indicated to Mr. Couture that he would "not be selling the dealership to Kevin [Kutschinski] and his team" as a result of certain unidentified "dishonest actions" on their part.

80.    On June 11, 2021, attorneys for Weber and Lemans served a letter on Foundation purporting to terminate the APA, and declaring the agreement without force or effect.

81.    As the circumstances show, however, Wilson, Weber, and Lemans' have engaged in willful and intentional breaches of the APA, which, taken together, to date have prevented the subject transactions from closing, and now make concluding the subject transactions by the APA's outside closing date deadline of June 29, 2021 impossible.  As a result, under Section 7.1(c) of the APA neither Wilson, Weber, nor Lemans are entitled to terminate the APA or any related agreement.

17

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

Accordingly, Foundation now seeks to enforce the terms of the APA, and obtain relief regarding the Defendants' breaches of its terms.

82.    Defendants' express repudiation on June 11, 2021, evidenced a clear and unequivocal refusal to perform. An express repudiation "is a clear, positive, unequivocal refusal to perform." *Hewlett-Packard Co. v. Oracle Corp.*, 65 Cal.App.5th 506, 550 (2021). Defendants issued a clear and express repudiation through their June 11, 2021, letter to Foundation in which Defendants stated that the APA was terminated. "[I]f a party to a contract expressly or by implication repudiates the contract before the time for his or her performance has arrived, an anticipatory breach is said to have occurred. *Hewlett-Packard Co. v. Oracle Corp.*, 65 Cal.App.5th 506, 550 (2021).

83.    Final performance of Defendants was due June 29, 2021, at the Closing Date. Here, Defendants repudiated performance on June 11, 2021, prior to the time for final performance.

<div align="center">

**FIRST CAUSE OF ACTION**

**(BREACH OF CONTRACT AS TO EACH DEFENDANT)**

</div>

84.    Plaintiff hereby incorporates by this reference paragraphs 1-83 as though set forth in this First Cause of Action.

85.    Foundation, Wilson, Weber, and Lemans entered into the APA on November 30, 2020.

86.    The APA is a valid and enforceable contract as a matter of California law.

87.    At all relevant times herein, Foundation proceeded in good faith with respect to its obligations under the APA and, further, timely performed its obligations under the APA.

88.    Weber and Lemans, however failed to perform their obligations under the APA. These breaches include, but are not necessarily limited to:

    a.    Failure to provide written assurances of their intent to proceed to closing in good faith, and to comply with their obligations under the APA, in violation of Section 5.23 of the APA;

    b.    Weber and Lemans' failure to disclose Wilson's pledge, in his capacity as trustee, of the Trust's equity ownership in Weber and Lemans to a creditor, in breach of

<div align="center">18</div>

applicable dealer sales and service agreements with the manufacturers;

c. Failure to cause Wilson to agree to the non-compete agreement and the employment agreement, as attached to the APA;

d. Failure to engage in any negotiations in good faith with respect to the form of amended and restated limited liability company agreements for each of the new entities, to be agreed to by the parties under Section 3.2(j) of the APA;

e. The apparent lack of sufficient assets necessary to pay all amounts owing to creditors outstanding as of the closing date for all obligations not assumed by Foundation; and

f. Wilson's failure to provide information with respect to his trust and his net worth as required by the manufacturers in connection with their approval of the subject transactions.

g. Likewise, Wilson failed to perform certain obligations he individually had under the APA. These breaches include, but are not necessarily limited to:

a. His refusal to agree to the non-compete agreement and the employment agreement, as attached to the APA;

b. His failure to engage in any negotiations in good faith with respect to the form of amended and restated limited liability company agreements for each of the new entities, to be agreed to by the parties under Section 3.2(j) of the APA; and

c. His discussions with other individuals regarding a potential deal for the BMW dealership, in violation of Section 5.13 of the APA.

89. Defendants' breaches of their obligations under the APA have caused Foundation to suffer significant monetary damages in an amount that Foundation will prove at trial, but that Foundation believes likely exceeds $30,000,000.00.

90. Foundation will also seek specific performance of the APA, as allowed for under California law, and as authorized under Section 7.2 of the agreement.

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

FIRST AMENDED COMPLAINT                    CASE NO: 1:21-CV-00970-JLT-EPG

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: 415.743.6900; Fax: 415.743.6910

## SECOND CAUSE OF ACTION

### (ANTICIPATORY BREACH AS TO EACH DEFENDANT)

91.    Plaintiff hereby incorporates by this reference paragraphs 1-90 as though set forth in this Second Cause of Action.

92.    Foundation, Wilson, Weber, and Lemans entered into the APA on November 30, 2020.

93.    The APA is a valid and enforceable contract as a matter of California law.

94.    At all relevant times herein, Foundation proceeded in good faith with respect to its obligations under the APA and, further, timely performed its obligations under the APA.

95.    Final performance of Defendants and Foundation was due June 29, 2021, at the Closing Date.

96.    Defendants repudiated performance and terminated the APA on June 11, 2021, prior to the Closing Date.

97.    Defendants' repudiation frustrated Foundation's performance. Defendants' anticipatory breach of the APA caused Foundation to suffer significant monetary damages in an amount that Foundation will prove at trial, but that Foundation believes likely exceeds $30,000,000.00.

## CONCLUSION

WHEREFORE Plaintiff Foundation Auto Holdings, LLC prays for relief from the Court as follows:

A.    For expectation and reliance damages to be proved at trial;

B.    For special damages in an amount to be proved at trial;

C.    For the attorney fees and costs incurred in pursuing this action, and seeking Defendants' compliance with the APA, as authorized under Section 7.2 of the APA;

D.    Specific performance of the APA as allowed under California law, and as authorized under Section 7.2 of the APA; and

E.    For such other relief as the court may deem just and proper.

20

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA  94111
Tel: 415.743.6900; Fax: 415.743.6910

## JURY DEMAND

Foundation hereby demands a jury trial under Fed. R. Civ. P. 38(b) on all claims, issues, or defenses triable by right.


Dated: November 1, 2022.                    HOLLAND & KNIGHT LLP


/s/ Daniel Kappes
Daniel P. Kappes

Attorneys for Plaintiff
FOUNDATION AUTO HOLDINGS, LLC

FIRST AMENDED COMPLAINT                    CASE NO: 1:21-CV-00970-JLT-EPG

# App. 2

Jonathan A. Michaels, Esq. – State Bar No. 180455
(jmichaels@defectattorney.com)
John M. Whelan, Esq. – State Bar No. 174928
(jwhelan@defectattorney.com)
**MLG, ATTORNEYS AT LAW, APLC**
600 Anton Blvd., Suite 1240
Costa Mesa, CA 92626
T. (949) 581-6900
F. (949) 581-6908

Attorneys for Defendants,
Weber Motors Fresno, Inc. d/b/a BMW Fresno
CJ's Road to Lemans Corp. d/b/a Audi Fresno and Porsche Fresno
and Christopher John Wilson

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA – FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware Limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>Defendants. | Case No. 1:21-cv-00970-JLT-EPG<br><br>**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT [DKT. 42] AND DEMAND FOR JURY TRIAL** |
| TEMPLETON MARSH, LTD.,<br><br>Intervenor,<br><br>vs.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>Defendants | |

1

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

Defendants, Weber Motors, Fresno, Inc. d/b/a BMW Fresno, CJ's Road to Lemans Corp. d/b/a Audi Fresno and Porsche Fresno, and Christopher John Wilson ("Defendants"), hereby respond to the First Amended Complaint filed by Plaintiff Foundation Auto Holdings, LLC. Defendants' responses are set forth in the paragraph number corresponding to the paragraphs of Plaintiff's First Amended Complaint.

## JURISDCTION AND VENUE

1.      Defendants admit the material allegations in this paragraph of the FAC.

2.      Defendants admit the material allegations in this paragraph of the FAC.

3.      Defendants deny having engaged in acts or omissions within this State causing injury. Defendants admit the remaining material allegations in this paragraph of the FAC.

4.      Defendants admit the material allegations in this paragraph of the FAC.

## THE PARTIES

5.      Defendants admit that Plaintiff Foundation Auto Holdings, LLC is a Delaware limited liability company. Defendants lack sufficient knowledge and information to allow them to admit or deny the remaining material allegations in this paragraph of the FAC and deny them on that basis.

6.      Defendants admit the material allegations in this paragraph of the FAC.

7.      Defendants admit the material allegations in this paragraph of the FAC.

8.      Defendants admit that Christopher John Wilson is the trustee of the Trust which is the primary owner of Defendant Weber Motors, Fresno, Inc. and Defendant CJ's Road to Lemans Corp. d/b/a Audi Fresno and Porsche Fresno. Defendants deny the remaining material allegations in this paragraph of the FAC.

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

## GENERAL ALLEGATIONS

9. Defendants admit that on or about April 30, 2020, Defendants entered into a representation agreement with intervenor Templeton Marsh LTD. Defendants deny the remaining material allegations in this paragraph of the FAC.

10. Defendants admit the material allegations in this paragraph of the FAC.

11. Defendants lack sufficient knowledge and information to allow them to admit or deny the material allegations in this paragraph of the FAC and deny them on that basis.

12. Defendants admit that Templeton Marsh LTD introduced Wilson to Foundation. Defendants deny the remaining material allegations in this paragraph of the FAC.

13. Defendants deny the material allegations in this paragraph of the FAC.

14. Defendants deny the material allegations in this paragraph of the FAC.

15. Defendants admit the material allegations in this paragraph of the FAC.

16. Defendants admit the material allegations in this paragraph of the FAC.

17. Defendants admit the material allegations in this paragraph of the FAC.

18. Defendants admit the material allegations in this paragraph of the FAC.

19. Defendants admit the material allegations in this paragraph of the FAC.

20. Defendants admit the material allegations in this paragraph of the FAC.

21. Defendants admit the allegations concerning the terms of the APA in this paragraph of the FAC. Defendants deny the remaining material allegations in this paragraph of the FAC.

22. Defendants admit that the closing did not occur. Defendants deny that the closing did not occur as a result of Defendants' conduct.

23. Defendants deny the material allegations in this paragraph of the FAC.

24. Defendants admit the allegations concerning the terms of the APA in this paragraph of the FAC. Defendants deny the remaining material allegations in this paragraph of the FAC.

3

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

25. Defendants deny the material allegations in this paragraph of the FAC.

26. Defendants deny the material allegations in this paragraph of the FAC.

27. Defendants deny the material allegations in this paragraph of the FAC.

28. Defendants deny the material allegations in this paragraph of the FAC.

29. Defendants deny the material allegations in this paragraph of the FAC.

30. Defendants deny the material allegations in this paragraph of the FAC.

31. Defendants deny the material allegations in this paragraph of the FAC.

32. Defendants lack sufficient knowledge and information to allow them to admit or deny the material allegations in this paragraph of the FAC and deny them on that basis.

33. Defendants lack sufficient knowledge and information to allow them to admit or deny the material allegations in this paragraph of the FAC and deny them on that basis.

34. Defendants lack sufficient knowledge and information to allow them to admit or deny the material allegations in this paragraph of the FAC and deny them on that basis.

35. Defendants lack sufficient knowledge and information to allow them to admit or deny the material allegations in this paragraph of the FAC and deny them on that basis.

36. Defendants lack sufficient knowledge and information to allow them to admit or deny the material allegations in this paragraph of the FAC and deny them on that basis.

37. Defendants lack sufficient knowledge and information to allow them to admit or deny the material allegations in this paragraph of the FAC and deny them on that basis.

38. Defendants deny the material allegations in this paragraph of the FAC.

39. Defendants lack sufficient knowledge and information to admit or deny the allegations concerning Foundation's discussions with relevant landlords in this paragraph of the FAC and deny them on that basis. Defendants deny the remaining material allegations in this paragraph of the FAC.

40. Defendants deny the material allegations in this paragraph of the FAC.

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

41.    Defendants deny the material allegations in this paragraph of the FAC.

42.    Defendants deny the material allegations in this paragraph of the FAC.

43.    Defendants admit the allegations concerning the terms of the APA in this paragraph of the FAC.  Defendants deny the remaining material allegations in this paragraph of the FAC.

44.    Defendants admit the material allegations in this paragraph of the FAC.

45.    Defendants deny the material allegations in this paragraph of the FAC.

46.    Defendants deny the material allegations in this paragraph of the FAC.

47.    Defendants deny the material allegations in this paragraph of the FAC.

48.    Defendants deny the material allegations in this paragraph of the FAC.

49.    Defendants deny the material allegations in this paragraph of the FAC.

50.    Defendants deny the material allegations in this paragraph of the FAC.

51.    Defendants deny the material allegations in this paragraph of the FAC.

52.    Defendants deny the material allegations in this paragraph of the FAC.

53.    Defendants admit the material allegations in this paragraph of the FAC.

54.    Defendants admit the allegations concerning the terms of the APA in this paragraph of the FAC.  Defendants deny the remaining material allegations in this paragraph of the FAC.

55.    Defendants deny the material allegations in this paragraph of the FAC.

56.    Defendants deny the material allegations in this paragraph of the FAC.

57.    Defendants deny the material allegations in this paragraph of the FAC.

58.    Defendants lack sufficient knowledge and information to allow them to admit or deny the material allegations in this paragraph of the FAC and deny them on that basis.

59.    Defendants deny the material allegations in this paragraph of the FAC.

60.    Defendants deny the material allegations in this paragraph of the FAC.

61.    Defendants deny the material allegations in this paragraph of the FAC.

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

62.     Defendants deny the material allegations in this paragraph of the FAC.

63.     Defendants deny the material allegations in this paragraph of the FAC.

64.     Defendants deny the material allegations in this paragraph of the FAC.

65.     Defendants deny the material allegations in this paragraph of the FAC.

66.     Defendants deny the material allegations in this paragraph of the FAC.

67.     Defendants lack sufficient knowledge and information to allow them to admit or deny the material allegations in this paragraph of the FAC and deny them on that basis.

68.     Defendants deny the material allegations in this paragraph of the FAC.

69.     Defendants deny the material allegations in this paragraph of the FAC.

70.     Defendants deny the material allegations in this paragraph of the FAC.

71.     Defendants deny the material allegations in this paragraph of the FAC.

72.     Defendants deny the material allegations in this paragraph of the FAC.

73.     Defendants deny the material allegations in this paragraph of the FAC.

74.     Defendants deny the material allegations in this paragraph of the FAC.

75.     Defendants deny the material allegations in this paragraph of the FAC.

76.     Defendants deny the material allegations in this paragraph of the FAC.

77.     Defendants deny the material allegations in this paragraph of the FAC.

78.     Defendants deny the material allegations in this paragraph of the FAC.

79.     Defendants deny the material allegations in this paragraph of the FAC.

80.     Defendants deny the material allegations in this paragraph of the FAC.

81.     Defendants deny the material allegations in this paragraph of the FAC.

82.     Defendants deny the material allegations in this paragraph of the FAC.

83.     Defendants deny the material allegations in this paragraph of the FAC.

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

**FIRST CAUSE OF ACTION**

84.    Defendants are unable to admit or deny the material allegations of this paragraph of the FAC because it contains no allegations of fact.

85.    Defendants admit the material allegations in this paragraph of the FAC.

86.    Defendants admit the material allegations in this paragraph of the FAC.

87.    Defendants deny the material allegations in this paragraph of the FAC.

88.    Defendants deny the material allegations in this paragraph of the FAC.

89.    Defendants deny the material allegations in this paragraph of the FAC.

90.    Defendants are unable to admit or deny the material allegations of this paragraph of the FAC because it contains no allegations of fact.

**SECOND CAUSE OF ACTION**

91.    Defendants are unable to admit or deny the material allegations of this paragraph of the FAC because it contains no allegations of fact.

92.    Defendants admit the material allegations in this paragraph of the FAC.

93.    Defendants admit the material allegations in this paragraph of the FAC.

94.    Defendants deny the material allegations in this paragraph of the FAC.

95.    Defendants deny the material allegations in this paragraph of the FAC.

96.    Defendants deny the material allegations in this paragraph of the FAC.

97.    Defendants deny the material allegations in this paragraph of the FAC.

**AFFIRMATIVE DEFENSES**

98.    The following affirmative defenses are asserted by these answering Defendants without admitting that Plaintiff has sustained any damages or detriments, or that Defendants are liable to Plaintiff whatsoever.  These answering Defendants reserve their right to assert additional affirmative defenses at such time and to such extent as warranted by discovery and the factual developments in this

7

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

case. To the extent any of the following defenses may be more properly characterized as elements of Plaintiff's claims that Plaintiff cannot meet its burden to prove, by asserting such defenses herein, these answering Defendants do not assume the burden of proof thereof.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

99.     The first amended complaint fails to state facts sufficient to constitute a claim or causes of action upon which relief may be granted against Defendants.

## SECOND AFFIRMATIVE DEFENSE

### (Assumption of Risk)

100.     The first amended complaint, and each cause of action against Defendants therein, is barred, in whole or in part, by the fact that Defendants did not make any misrepresentation of any material fact to Plaintiff in connection with the transaction complained of in the complaint.

## THIRD AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

101.     Defendants are informed and believe, and thereon allege that Plaintiff failed to mitigate or avoid its damages or other alleged consequences, if any, as required by law.

## FOURTH AFFIRMATIVE DEFENSE

### (Parol Evidence)

102.     The first amended complaint, and each cause of action against Defendants therein, is barred, in whole or in part, by the Parol Evidence Rule.

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

## FIFTH AFFIRMATIVE DEFENSE

### (Breach by Plaintiff)

103.    Defendants are informed and believe, and thereon allege that Plaintiff materially breached the representation agreement in question, thereby exempting Defendants from their obligations under said representation agreement, if any.

## SIXTH AFFIRMATIVE DEFENSE

### (Recission)

104.    Defendants are informed and believe, and thereon allege that because Plaintiff materially breached the representation agreement in question, the agreement must be nullified and voided.

## SEVENTH AFFIRMATIVE DEFENSE

### (Condition Precedent)

105.    Defendants are informed and believe, and thereon allege that the representation agreement in question contained a condition precedent which was not met, thereby exempting Defendants from their obligations under said agreement, if any.

## EIGHTH AFFIRMATIVE DEFENSE

### (Misrepresentation)

106.     Defendants are informed and believe, and thereon allege that Defendants' assent to the representation agreement in question was induced by negligent and/or deliberate misrepresentation(s) on the part of Plaintiff.

## NINTH AFFIRMATIVE DEFENSE

### (Deceit)

107.     Defendants are informed and believe, and thereon allege that Defendants' assent to the representation agreement in question was induced by deceit on the part of Plaintiff.

9

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

## TENTH AFFIRMATIVE DEFENSE

### (Laches)

108.     Defendants are informed and believe, and thereon allege that Plaintiff delayed inexcusably and unreasonably in filing this action, causing substantial prejudice to Defendants and thus, Plaintiff's claims are barred by the equitable doctrine of laches.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Estoppel)

109.     Defendants are informed and believe, and thereon allege that Plaintiff engaged in conduct by which the first amended complaint is barred by the equitable doctrine of estoppel.

## TWELFTH AFFIRMATIVE DEFENSE

### (Waiver)

110.     Defendants are informed and believe, and thereon allege that Plaintiff engaged in conduct by which the first amended complaint is barred by the equitable doctrine of waiver.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

111.     Defendants are informed and believe, and thereon allege that Plaintiff engaged in conduct by which the first amended complaint is barred by the equitable doctrine of unclean hands.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Failure to Plead Facts to Support Damages)

112.     Defendants are informed and believe, and thereon allege that the first amended complaint, and the purported causes of action alleged therein, fail to allege facts sufficient to support recovery of the damages claimed by Plaintiff.

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

## FIFTEENTH AFFIRMATIVE DEFENSE

### (No Actual Injury)

113.    Defendants are informed and believe, and thereon allege that Plaintiff did not suffer any actual injuries and therefore cannot recover any damages or statutory penalties.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Lack of Causation)

114.    Defendants are informed and believe, and thereon allege that Defendants' complained of conduct was not the proximate cause of Plaintiff's damages and/or injuries, if any.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Lack of Willful Conduct)

115.    Defendants are informed and believe, and thereon allege that assuming arguendo that any conduct alleged by Plaintiff occurred, such conduct was not the result of purposeful, bad faith, knowing, willful, intentional, oppressive, fraudulent, malicious, despicable, or callous motive by Defendants.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Contributory Fault)

116.    Defendants are informed and believe, and thereon allege that Plaintiff, by want of ordinary care and good faith, has brought the injuries complained of in the first amended complaint upon themselves and is the proximate and direct cause of their own damages, if any. As such, the damages, if any, suffered by Plaintiff should be diminished in proportion to the amount of fault attributable to their conduct.

11

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

### NINETEENTH AFFIRMATIVE DEFENSE

### (Ratification)

117.    Defendants are informed and believe, and thereon allege that Plaintiff ratified and confirmed the acts and/or omissions of which they now complain, and therefore is not entitled to the relief prayed for or any relief whatsoever.

### TWENTIETH AFFIRMATIVE DEFENSE

### (Good Faith)

118.    Defendants, at all times, acted in good faith and did not, directly or indirectly, know, induce, or in any way participate in any wrongful act or acts as alleged in the first amended complaint.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Legitimate Business Purpose)

119.    Defendants are informed and believe, and thereon allege that any and all conduct of which Plaintiff complains, and which is attributed to Defendants, was a just and proper exercise of management's discretion on the part of Defendants, undertaken for lawful, fair, and honest reasons under the circumstances then existing and was the substantial motivating factor for the actions taken, if any.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Business Necessity)

120.    Defendants are informed and believe, and thereon allege that the actions and/or omissions of Defendants were based on a business necessity, including requirements to follow industry standards and practices, and not for any illegal or fraudulent reason(s) as set forth in the first amended complaint.

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Independent Act)

121.    Defendants are informed and believe, and thereon allege that any alleged violation(s) were committed by Plaintiff's own independent and unauthorized acts falling outside the course and scope of the applicable agreement.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

122.    The relief prayed for and the causes of action set forth in the first amended complaint are barred by the applicable statute of limitations or other time requirements relative to the giving of notice or the filing of such claims.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Lack of Mutuality)

123.    The first amended complaint, and each cause of action against Defendants therein, is barred in whole or in party, to the extent that Plaintiff and Defendants did not achieve a meeting of the mind.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (Excuse)

124.    The first amended complaint, and each cause of action against Defendants, is barred, in whole or in part, to the extent that Defendants' performance, if any, was excused by Plaintiff's acts and omissions.

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (Good Cause/Good Faith/Justification)

125.     Any acts or omission alleged to have been committed by Defendants were committed in the exercise of good faith, with good cause, and therefore were reasonable and justified under the circumstances.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Reservation)

126.     Defendants reserve the right to assert additional defenses in the event that discovery reveals that additional defenses are available to Defendants.

## PRAYER

WHEREFORE Defendants pray for judgment on the First Amended Complaint as follows:

1.     That Plaintiff takes nothing by its Complaint;

2.     That Defendants be awarded costs incurred in this action;

3.     For such other and further relief as the Court may deem fit and proper.

## JURY DEMAND

Defendants hereby demand a jury trial under Fed. R. Civ. P. 38(b) on all claims, issues, or defenses triable by right.

MLG, ATTORNEYS AT LAW APLC

Dated: November 22, 2023          By: _____
Jonathan A. Michaels, Esq.
John M. Whelan, Esq.
Attorneys for Defendants,
Weber Motors Fresno, Inc. d/b/a BMW Fresno
CJ's Road to Lemans Corp. d/b/a Audi Fresno and
Porsche Fresno
And Christopher John Wilson

14

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

## CERTIFICATE OF SERVICE
### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA

I hereby certify under penalty of perjury that on this 22st day of November, 2023, a copy of the foregoing:

1)  **DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT [DKT. 42] AND DEMAND FOR JURY TRIAL**

was filed electronically.

✓ This filing was served electronically to all parties by operation of the Court's electronic filing system.

/s/ *Sonya Vasquez*

# App. 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC., | CASE NO.   1:21-CV-00970-JLT-EPG |
| PLAINTIFF, | |
| V. | ORDER GRANTING PLAINTIFF FOUNDATION AUTO HOLDINGS, LLC'S MOTION FOR FURTHER SANCTIONS |
| WEBER MOTORS, FRESNO, INC., *et al.*, | |
| DEFENDANTS. | (ECF No. 107) |
| TEMPLETON MARSH, LTD., | |
| INTERVENOR PLAINTIFF, | |
| V. | |
| WEBER MOTORS, FRESNO, INC., *et al.*, | |
| DEFENDANTS. | |

In this civil action, filed on June 18, 2021, Plaintiff Foundation Auto Holdings, LLC. ("Plaintiff"), and Intervenor Plaintiff Templeton Marsh, LTD., assert claims for breach of contract and anticipatory breach of contract against Defendants Weber Motors, Fresno, Inc., CJ's Road to Lemans Corp., and Christopher John Wilson, related to Defendants' failure to proceed with an Asset Purchase Agreement for car dealerships in Fresno, California.  (ECF Nos. 27, 42).

1

Previously, on October 29, 2024, the Court granted Plaintiff's motion to compel production of documents, and ordered Defendants to produce: (1) the requested documents, and (2) a privilege log, if any, reflecting privileged documents post-dating the commencement of this action on June 18, 2021, no later than 30 days from the date of that order, i.e., November 28, 2024. (ECF No. 101). On December 5, 2024, Plaintiff filed "Plaintiff Foundation Auto Holdings, LLC's Motion for Leave to File; Request for Further Sanctions," claiming that Defendants failed to comply with the Court's order and requesting sanctions. (ECF No. 107).

For the reasons stated below, the Court will grant the motion.

## I. BACKGROUND

### A. Plaintiff's Complaint

This case has been pending since June 18, 2021. (ECF No. 1). Plaintiff filed its complaint on that date, naming as Defendants Weber Motors, Fresno, Inc., CJ's Road to Lemans Corp., and Christopher John Wilson. (*Id.* at 2). After Plaintiff's original complaint was dismissed without prejudice, Plaintiff was granted leave to file an amended complaint. (ECF No. 37 at 9-10).

Plaintiff's amended complaint contains two claims: one claim for breach of contract and one claim for anticipatory breach of contract. (ECF No. 42 at 18-20). According to the amended complaint, Plaintiff Foundation Auto Holdings and Defendants entered into an Asset Purchase Agreement whereby Foundation would become the majority owner of car dealerships owned by Defendants Weber Motors, Fresno, Inc., and CJ's Roads to Lemans Corp. (*Id.* at 3, 4). Plaintiff alleges that Defendants agreed to the Asset Purchase Agreement. (*Id.* at 4). However, on June 11, 2021, Defendants notified Plaintiff that Defendant would not proceed with the deal. (*Id.* at 13). In its amended complaint, Plaintiff seeks (1) expectation and reliance damages; (2) special damages; (3) attorney fees; (4) specific performance; and (5) any other relief the Court may deem proper. (*Id.* at 20).

### B. Discovery Schedule

The scheduling of the case and opening of discovery was initially delayed due to Defendants' motion to dismiss. (ECF No. 8). After this initial delay, the parties submitted a Stipulated Discovery Plan Pursuant to FRCP 26 on March 1, 2022. (ECF No. 28). The Court held a scheduling conference shortly thereafter. (ECF No. 30). The Court issued a scheduling order on April 1, 2022, setting the non-expert discovery deadline for March 10, 2023. (ECF No. 35).

After Defendants filed their second motion to dismiss, this Court ordered that discovery remain open.  (ECF No. 47).  On October 24, 2023, the then-assigned district judge denied Defendants' second motion to dismiss.  (ECF No. 55).  Plaintiff filed its First Amended Complaint on November 1, 2022.  (ECF No. 42).

About a month later, this Court extended the non-expert discovery deadline to July 9, 2024.  (ECF No. 62).

**C. Discovery Dispute Resulting In Court's Order Compelling Discovery**

**1. Informal Discovery Dispute Conference**

Plaintiff's first notified the Court of the dispute regarding the discovery at issue in the present motion in April 2024, when Plaintiff requested an informal discovery conference.  (ECF No. 73).  The Court held an informal conference on April 26, 2024.  (ECF No. 78).  Plaintiff generally argued that Defendants did not timely serve objections and responses to Plaintiff's Requests for Production of Documents (RFPs), Defendants belatedly and improperly objected to certain requests, and Defendants failed to produce any responsive documents in response to Plaintiff's RFPs.  (ECF. No. 76).  Defendants took the position that the RFPs were objectionable.  (ECF No. 75).

Following the informal discovery conference, the Court directed the parties to meet and confer regarding the discovery issues raised at the conference, and gave Plaintiff permission to file a motion to compel by May 17, 2024, in advance of the non-expert discovery cut-off of July 9, 2024.  (ECF No. 79).  The Court also ordered Defendants to "provide Plaintiff a date certain for the production of documents and privilege log," and ordered the parties to "meet and confer regarding any necessary changes to the Court's scheduling order, and by no later than May 10, 2024, file a joint stipulation to modify the scheduling order or a statement regarding any disagreement."  (ECF No. 79)

**2. Defendants Stipulate to Waive all Objections to RFPs**

On May 10, 2024, the parties filed a Joint Stipulation Regarding Discovery Schedule.  (ECF No. 81).  That joint stipulation stated in part:

> The Parties met and conferred on May 3, 2024, and May 10, 2024, and agreed upon the following:
> 1. Defendants withdraw all objections to Foundation's Requests for Production, and will produce documents by July 1, 2024. As such, no Motion to Compel should be necessary at this time.

(ECF No. 81, at 2).  The parties also proposed a brief extension of the non-expert discovery deadline until September 15, 2024.  (*Id.*).

Notably, the parties' stipulation did not propose a date for Defendants to provide a privilege log, or otherwise indicate any intention by Defendants' to withhold documents based on privilege.

The Court subsequently granted the proposed order, extending the non-expert discovery deadline to September 15, 2024.  (ECF No. 84).

### 3. Plaintiff's Motion to Compel and Request for Sanctions

On July 12, 2024, Plaintiff filed a motion to compel and request for sanctions, claiming that Defendants had still failed to produce any documents to the RFPs, notwithstanding the parties' joint stipulation to produce all documents by July 1, 2024.  (ECF No. 91) (""Defendants did not produce documents responsive to Foundation's February 2, 2024, Requests for Production of Documents . . . Foundation made several attempts to resolve this without Court intervention . . . Though Defendants continually promised to timely produce documents, they did not timely object to any request and did not produce documents.").  Specifically, Plaintiff moved to compel Defendants to produce all documents responsive to RFP Nos. 18, 19, 21, 31, 32, 33, 35, 37, 38, 42, and 43, which concern financial documents and documents concerning the reason for Defendants' decision to terminate the APA.  (ECF No. 91 at 7-9).  Plaintiff described the requests as follows:

> Foundation issued RFPs 18, 19, and 21 to seek Defendants' audited financial statements, profit and loss statements, and evidence of liabilities. These documents are relevant to determining damages as Defendants' financial information is the best available evidence of what Foundation would have earned had Defendants not repudiated the APA. (ECF No. 91, at p. 7).

> RFPs 31-33 seek the identity of persons or entities with an equity interest in Defendants Weber or Lemans. Section 3.2(f) of the APA requires Defendants to deliver to Foundation all consents and approvals necessary for Defendants to enter into agreements and consummate the transaction. This discovery will show the identities of other parties whose consents were necessary to ensure compliance with the APA, whether Defendants agreed to sell equity to persons other than Foundation, and potential witnesses with knowledge of case facts, allegations, and defenses. (ECF No. 91, at p. 8).

> RFP 35 seeks communications regarding Defendants' decision to "terminate and/or not perform under the agreement." Given this case is premised on Defendants' refusal to perform, Defendants' objection to producing responsive documents in response to an RFP seeking documents related to that decision lacks merit. Foundation is entitled to Defendants' communications regarding its decision to terminate the APA and must disclose individuals with whom they shared decision-making. (ECF No. 91, at p. 8)

RFPs 37 and 38 seek records related to Defendants' planned relocation of the dealerships Foundation agreed to purchase. After Defendants breached the APA, Foundation learned that Mr. Wilson had purchased land in Fresno for the potential relocation of the dealerships. Here, one of Defendants' defenses is based on the contention Foundation did not obtain landlord approval prior to the planned sale date and therefore Defendants could terminate the APA. ECF 43, Motion to Dismiss First Amended Complaint ("MTD"), at 6-7. Accordingly, these documents are plainly relevant if Defendants ultimately planned to relocate the dealerships, as such plans may have mooted any requirement under the APA to reach agreement with Defendants' landlord or may be a reason Mr. Wilson prematurely terminated the APA. (ECF No. 91, at p. 8-9)

RFPs 42 and 43 seek documents related to Audi's attempt to terminate Defendants' dealership agreement. During this litigation, Foundation learned that Audi sought to terminate its dealership agreement with Defendants given Mr. Wilson's mismanagement. Foundation seeks these records to show that manufacturers, contrary to Defendants' claims, were in favor of Defendants' sale to Foundation. Defendants cannot hide evidence that manufacturers sought to terminate his ownership, and at the same time argue to the Court that Foundation was unable to obtain manufacturer approval as required by the Agreement. . . . Further, Defendants were also obligated under the APA to obtain approvals from manufacturers, and thus their communications with Audi are relevant to their satisfaction of their obligation.  (ECF No. 91, at p. 9)

Plaintiff also sought sanctions under Federal Rule of Civil Procedure 37.  (ECF No. 91, at p. 10).

On July 26, 2024, Defendants filed their opposition to Plaintiff's motion to compel.  (ECF No. 93).   Defendants did not contest that they had failed to produce any documents or privilege log in response to the RFPs.  Instead, Defendants argued that they "properly objected to Plaintiff's Requests for Production that are the subject of this motion."  (ECF No. 93 at 3).  Regarding RFP 25, concerning communications regarding Defendants' decision to "terminate and/or not perform under the agreement," Defendants asserted that all such communications were "protected from disclosure by the attorney-client privilege and work product doctrine."  (ECF No. 93, at p. 4).  Notably, Defendants' opposition did not acknowledge in any way their previous stipulation to waive all objections and produce all documents by July 1, 2024.

On August 1, 2024, Plaintiff filed a reply in support of its motion to compel, arguing that Defendants had waived objections to the RFPs and expressly waiving all objections in the May 10 stipulation.  (ECF No. 94).  Any privilege objections had also been waived because "Defendants have not produced a privilege log or *any* non-privileged documents."  (ECF No. 94, at p. 4).

\\\

5

**4. Hearing and Order on Plaintiff's Motion to Compel**

On October 24, 2024, the Court held a hearing on the motion to compel. (ECF No. 100).

The Court began by addressing Defendants' previous stipulation to withdraw all objections and citing Ninth Circuit case law enforcing such stipulations. (ECF No. 114, p. 4, *citing CDN Inc. v. Kapes* 197 F.3d 1256, 1258 (9th Cir. 1999) ("Because stipulations serve both judicial economy and the convenience of the parties, courts will enforce them absent indications of involuntary or uninformed consent."). In response, defense counsel stated "Your Honor, the only response I have to that Stipulation is my client certainly did not and I did not intend to stipulate to withdrawing all objections. The attorney-client objections that were discussed among counsel, I did not intend to waive. I realize based on the terms of the Stipulation that I failed to make that clear, and so that's the only comment I have, Your Honor." (ECF No. 114, at p. 4-5). The Court then asked if Defendants had produced a privilege log, and defense counsel said they had not. (ECF No. 114, at p. 5).

The Court then heard argument on the issue of whether the stipulation waived the attorney-client privilege. Plaintiff's counsel pointed to the plain language of the stipulation, which purported to "withdraw all objections," represented that the parties had not separately discussed withholding documents based on the attorney-client privilege, and argued that the documents at issue concerning Defendants' communications at the time regarding their reasons for terminating the APA were likely not privileged in any event. (ECF No. 114, at p. 6). After substantial discussion regarding this issue, the Court gave the following ruling:

> Okay. I'm going to grant the Motion To Compel and find that per the Joint Stipulation, Document 81, Page 2, Defendants have withdrawn all objections to Foundation's Requests For Production. And I do find that that includes work product and attorney-client privilege.

> However, to the extent, and I don't know if there are any documents that would fall within the scope of this after the filing of the Complaint, I find that privilege has not been waived as to that time. And my basis is because that's a clear statement of the Stipulation. It is all objections.

> Also, Defendants did not provide a privilege log. And in not doing so, that also has been a waiver of any privilege to the extent that it has not been produced. It also appears that even as of today, they are not prepared to do a privilege log or to identify specific privileged communication.

I also find that based on the description of the documents that Defendants wish to now withhold, those documents are not a side or an oversight or something that they would have not anticipated when they spoke about objections. They are really central to the request. The central requests go to what was the reason why Defendants decided to withdraw from the deal.

So hearing now that Defendants wish to carve out communications and claim privilege over communications about why they were withdrawn because there were lawyers who were involved in that decision, I think, was clearly anticipated by the objections and are addressed by the Stipulation. That's a big carveout. That's not a side issue or something that would not be anticipated or something that would not be expected. That's a big part of those communications.

And also, frankly, I think if there's any issue here, it goes to Plaintiff. I am aware of the history, including that there are multiple informal conferences, that there is a Stipulation back in May that says that you will produce documents. And this was not something that Defendants acted properly in good faith and are entitled to the benefit of the doubt that they intended to act properly and produce documents and maintain this privilege.

Instead, the history is that Defendants did not produce documents after they said they did, after they told the Court they were going to. We are now several months after Defendants said that they were going to produce documents. I don't think that they are entitled to have the benefit of the doubt that they get to withhold those.

Additionally, I find that it would be prejudicial because my intuition is that this would pose very difficult privilege calls. And if this were done properly, timely, with a privilege log, I think that we could work through those issues and sort through which of these communications were more for business purposes.

For example, I anticipate that there are probably counsel that are on email communications, and there would be difficult calls about which ones are for attorney-client privilege and not. But we don't have the time to litigate that anymore because there has been no document production for several months when it was supposed to be and when you told the Court it was going to be.

So while I am sympathetic and I am very respectful of a properly identified privilege, I find that Defendants' request to carve out parts of central communications regarding this case with what I think are going to be difficult privilege calls, I think the time for that has passed and that this waiver included those documents, as well.

So I am granting the Motion To Compel in full except to the extent that I find that Defendants have not waived any attorney-client or work-product privilege regarding any documents from the filing of this litigation on.

(*Id.* at 12-15).

\\\

On October 29, 2024, the Court issued a written order in accordance with its oral order. (ECF No. 101). The Court repeated that it found "Defendant[s] had waived all objections to that discovery in [their] stipulation stating 'Defendants withdraw all objections to Foundation's Requests for Production, and will produce documents by July 1, 2024.'" (ECF No. 101 at 4 (citations omitted)). The Court ordered that "[b]y no later than thirty (30) days from [October 29, 2024], Defendants must produce: (1) the requested documents, and (2) a privilege log, if any, reflecting privileged documents post-dating the commencement of this action on June 18, 2021." (*Id.* at 4). The Court also ordered that "[b]y no later than November 7, 2024, Plaintiff shall file a statement identifying reasonable expenses, including attorney fees, that they incurred in filing the motion to compel." (*Id.*). [1]

### 5. Lack of Objection or Request for Extension of Deadline

Defendants did not file any request for reconsideration of the Court's order.

Defendants also did not file any objections to the Court's order to the then-assigned District Judge. Fed. R. Civ. P. 72(a) (describing procedures for filing objections with the district judge to a magistrate judge's non-dispositive orders, and stating "[a] party may not assign as error a defect in the order not timely objected to").

Defendants also did not file any request for extension of time to comply with the Court's order.

### D. Motion for Sanctions

### 1. Plaintiff's Motion and Supporting Brief

On December 5, 2024, Plaintiff filed "Plaintiff Foundation Auto Holdings, LLC's Motion for Leave to File; Request for Further Sanctions," which is now before the Court. (ECF No. 107).

In its motion, Plaintiff claims that Defendants failed to produce any documents or privilege log, as ordered by the Court's October 29 order. (*Id.* at 8). Plaintiff argues that negative inferences and evidentiary sanctions against Defendant are warranted under Federal Rule of Civil Procedure 37(b)(2)(A)(i) and 37(b)(2)(A)(ii). (*Id.*). Plaintiff also argues that the requirements for issuing these sanctions are met: specifically, that the sanctions would be just and related to the particular claim. (*Id.*

---

[1] On November 4, 2024, Plaintiff filed a Declaration in support of its request for Attorneys' fees for bringing the motion to compel. (ECF No. 102). The Court granted reasonable attorneys' fees in the amount of $12,463.13 for Plaintiff's efforts in bringing the motion to compel. (ECF No. 131). Plaintiff's original request for attorneys' fees was $29,129.50. For reasons explained in its order, the Court lowered total attorneys' fees to $12,463.13.

at 9).

### 2. Defendants' Response

On December 19, 2024, Defendants filed its opposition to Plaintiff's motion for sanctions. (ECF No. 118).[2] Defendants concede that they failed to comply with the Court's order, but state that they "believe that all documents in their possession, custody, and control will be produced." (ECF No. 118, p. 2-3). Defendants note that lead counsel left, and new counsel was added to the case. (*Id.* at 3). Defendants argue that they "have been working to locate and coordinate all responsive documents within [their] possession, custody, and control." (*Id.* at 7). Defendants argue that "[t]erminating sanctions and negative inferences can deprive parties of the right to have their case heard on the merits, making it essential to reserve such measures for extreme situations[.]" (*Id.*). Defendants also state that "there is no evidence that [they] have engaged in egregious conduct or been grossly negligent." (*Id.* at 7-8).

### 3. Plaintiff's Reply

In its reply, Plaintiff points out that "[t]here is no dispute that Defendants had a duty to produce documents without objection. . ." (ECF No. 120 at 2). Plaintiff also argues that (1) "Defendants' defiance of multiple Court Orders is exactly the kind of conduct requiring sanctions, especially in cases like this where the requested documents are core to the issues of the case;" and (2) "[n]or is it even true that Defendants continuously changed counsel—Jonathan Michaels was counsel from the inception of the case." (*Id.*). Plaintiff also argues that "Defendants' second claim, that they are 'working hard' to produce the documents, is both too late and patently false." (*Id.* at 5).

Although Plaintiff states that Defendants have produced some documents in response to the Court's order after Plaintiff filed its motion for sanctions, Plaintiff argues that Defendants' production is still deficient, stating:

> To the extent Defendants have produced documents subsequent to the filing of Foundations Second Sanctions Motion, those productions are deficient and show a continued effort to disobey the Court. On December 13, 2024, Defendants produced what it purported are documents in response to the at-issue discovery here. Holtzman Decl. at ¶ 3. The production totaled 24 documents, consisting of 13 heavily redacted emails and their

---

[2] It appears that Defendants inadvertently filed their opposition to Plaintiff's motion for sanctions twice. (*See* ECF Nos. 118, 119).

attachments. *Id.* Accompanying this production was a privilege log detailing various withheld documents dating prior to June 17, 2021. *Id.* at ¶ 2, Exh. 1. The Court specifically Ordered that all documents prior to this date could not be withheld on the basis of privilege. ECF 101. However, it appears Defendants withheld **94** such documents. Holtzman Decl. at ¶ 4. The privilege log further asserts attorney-client and work product protections on the 24 documents actually produced, all also dating prior to the Court-Ordered cutoff for such objections. *Id.* at ¶ 5. Incredibly, Defendants' privilege log runs from the start of the negotiation of the Asset Purchase Agreement up until the initiation of the case. *Id.* at ¶ 5. This means Defendants assert privilege over ***all*** and ***only*** those documents that would defy this Court's Order and have still not produced a privilege log as ordered for post-initiation documents.

(ECF No. 120, at p.6).  Plaintiff's reply attached Defendants' privilege log listing 94 documents dated from January 28, 2021 through June 17, 2021, all listing the basis as the attorney-client privilege, with relatively few also listing the work-product privilege.  (ECF No. 120-1, at p. 6-8).  A supplemental privilege log identified another 13 documents dated March 1, 2021 through June 11, 2021 as withheld.  (ECF No. 120-1, at p. 9-10).  Descriptions of withheld documents included "correspondence regarding conditional approvals," "correspondence re APA and demand for compliance."  Notably, all of the documents withheld as privileged were dated on or before the date when Defendants notified Plaintiff that they were terminating the APA.

### 4.   The January 24, 2025 Hearing regarding Plaintiff's Motion for Sanctions

On January 24, 2025, the Court held its first hearing on the motion for sanctions.  (ECF No. 127, 133).  During that hearing, Plaintiff stated that "[b]ased on [its counsels'] preliminary review of the documents that were produced [during the previous week], Defendants produced the financial documents requested. No other documents have been produced in accordance with [the Court's] order."  (ECF No. 133 at 5).  Plaintiff also stated that "Defendants went so far as to produce a privilege log that included all and only those documents for which [the Court] had already said privilege was waived."  (*Id.*).  Plaintiff stated that the "privilege log that ran from the date of negotiation of the APA up until June 18th and that did not include any documents thereafter."  (*Id.* at 8-9).

The Court questioned Defendants' then-counsel, Attorney Schenck, regarding Defendants' late production of documents, and asked whether it included any documents other than financial documents.  Defense counsel could not identify any document produced by Defendants other than financial

documents. (ECF No. 133, at p. 7-9) (COURT: "So have Defendants produced any documents responsive to any other request other than requests for financial documents? MR. SCHENCK: My understanding is that we have, Your Honor. But --THE COURT: Do you have an example of any of them? . . . Do you want to take a look and tell me any document that you produced that was responsive to any of the requests? MR. SCHENCK: Yeah. I wouldn't be able to at this time, Your Honor." . . . THE COURT: "Can you name a single document that was produced on any category other than requests for financial documents? MR. SCHENCK: Not at this time.").

During the hearing, the Court also reviewed the privilege log that Defendants provided Plaintiff. (*Id.* at 11 (citing ECF No. 120-1)). When asked about the privilege log, Defendants' counsel represented that he was "unaware" that documents were withheld as privileged. (*Id.* at 11, 12). Thereafter, Defendants' counsel promised to "go back through and identify everything that's in that, the privilege log that [Plaintiff] identified and put those documents together and get them to [opposing] Counsel as soon as possible." (ECF No. 133 at 19).

Plaintiff responded that, at this point, Defendants' promise to produce documents was too late. (*Id.*). Plaintiff specified that "[a] lot of the categories of documents such as those related to the termination and reasons for termination, such as those related to the relocation to Clovis of the dealerships, these are directly to elements necessary to prove [the] foundation of the case." (*Id.* at 20). Plaintiff stated that it did not believe it's possible for the case to move forward without those documents or evidentiary sanctions or at least a need for those documents." (*Id.*).

The Court then asked whether Plaintiff wanted "specific negative inferences versus finding for the Plaintiff on breach but leaving open to damages at this point?" (*Id.* at 20). Plaintiff clarified that it "would be fine with a finding for the Plaintiff foundation on breach and leaving open damages." (*Id.*).

**E. Supplemental Filings Regarding Communications Between Defendants and Previous Defense Counsel**

Following completed briefing and the hearing on the motion for sanctions, newly retained defense counsel made a number of filings concerning Defendants' communications about discovery issues with previous defense counsel, and Defendants' continued production of documents.

\\\

11

**1.    Defendants' First Notice Claiming Defendants Were Never Informed of Court's Order and Discovery Requests**

Defendants' newly retained counsel from Jaborg and Wilk, P.C. substituted into this case on February 14, 2025. (ECF No. 140 at 2). On February 26, 2025, that counsel filed a notice claiming that previous defense counsel had never told Defendants that their document production was incomplete or that there was a court order requiring further production, stating in part:

> Defendants were never provided with any of the specific Requests for Production. Defendants were never asked additional questions about any of the specific requests. Defendants were unaware of any of the pending sanctions motions and were unaware that a monetary award had been entered against the Defendants. . . . . Defendants were not aware of any claims that the prior production was incomplete, non-responsive, or otherwise deficient.

> Upon review of the file, and immediately following the unsuccessful Settlement Conference on February 25, 2025, Counsel contacted Plaintiffs' counsel to explain the foregoing and to commit to a rolling production of documents as fast as they can be assembled and reviewed for the limited privilege remaining following the Court's recent rulings related to discovery issues . . . .

(*Id.* at 2-3).

Defendants' filing attached a Declaration from Defendant Christopher John Wilson, the majority owner and President of a BMW dealership held by Weber Motors, Fresno, Inc. dba BMW Fresno and an Audi and Porche dealership held by CJ's Road to Lemans Corp. dba Audi Fresno and Porche Fresno. (ECF No. 148-1). Wilson's declaration, signed under penalty of perjury, stated in part:

> At no time did MLG ever provide to me or to any other representative of Defendants copies of any specific Requests for Production of Documents served by Plaintiff or Intervenor; nor did any MLG attorney ever ask me or any other representative of Defendants any questions about any specific document request. Further, neither I nor any other representative of were ever asked by MLG to provide any documents in addition to those that I had already provided to them. . . .

> Until I terminated MLG and at that time learned of the pending discovery issues, neither I nor any other representative of Defendants was aware of any motions to compel the production of documents or motions for sanctions in this matter.

> I was not aware that the Plaintiff and Intervenor had requested specific documents, and that they were claiming the documents had not been provided.

> I was not aware that Plaintiff and Intervenor had filed Motions to Compel and were seeking sanctions against Defendants.

> Neither I nor any other representative of Defendants was made aware that a monetary sanctions award had been entered against Defendants until I was informed of the Court's February 6, 2025 sanctions Order by Defendants' current counsel, Jaburg & Wilk, P.C., on or around February 27, 2025. . . .
>
> In fact, until recently being informed by Defendants' current defense counsel, on or about February 25, 2025, I was not aware that Plaintiff and/or Intervenor ever claimed any prior production of documents was incomplete, non-responsive, or otherwise deficient.
>
> MLG never provided to me, nor was I ever aware of the existence of the Court Order Granting Plaintiff's Motion to Compel and Request for Sanctions, filed on 10/29/24 (Document 101) or the Court Order Awarding Attorneys' Fees filed on 2/6/25 (Document 131). I did not learn of the existence of these two Orders until I was just recently provided with copies of them by my new counsel.

(ECF No. 148-1 at 2-4).

**5.  Defendants' March 4, 2025 Notice**

On March 4, 2025, Defendants provided the Court with an updated notice.  (ECF No. 148). Defendants indicated that their new counsel was in the process of reviewing previous discovery productions and verifying that all documents Defendants turned over to prior counsel were produced. (*Id* .at 2-4).  Defendants reiterated their claim that Defendants were never asked about any specific requests for documents and were unaware of the ongoing dispute with Plaintiff regarding discovery. (ECF No. 148, at p. 3) ("None of these attorneys communicated to Mr. Wilson the pending motions and the serious nature of the failure to comply with discovery requests; nor was he even aware of the various discovery disputes in the case. Defendants were not aware of any claims that the prior production was incomplete, non-responsive, or otherwise deficient.").

The filing included another declaration of Defendant Chris Wilson generally stating that he was not aware that prior document production was incomplete.  (ECF No. 148-1, at p. 7-10) ("In fact, until recently being informed by Defendants' current defense counsel, on or about February 25, 2025, I was not aware that Plaintiff and/or Intervenor ever claimed any prior production of documents was incomplete, non-responsive, or otherwise deficient. . . . MLG never provided to me, nor was I ever aware of the existence of the Court Order Granting Plaintiff's Motion to Compel and Request for Sanctions, filed on 10/29/24 . . . .").

**6. The March 4, 2025, Status Conference**

In response to Defendants' Declaration (ECF No. 140), the Court held a status conference on March 4, 2025. (ECF No. 149). During the hearing, the Court addressed the new filings and the procedure for addressing those issues. Defendants requested the opportunity to file a supplemental opposition. The Court also granted the parties leave to propound discovery on the attorney-client communications addressed in Defendants' recent notices and declarations reflected in ECF No. 140, 146, 148. (*Id.* at 25-26; *see also* ECF No. 150).

**7. Defendants' Supplemental Response**

Defendants filed a supplemental opposition to Plaintiff's motion for sanctions on March 19, 2025. (ECF No. 164). Defendants argue that "[s]uch drastic sanctions are unwarranted because Defendants have now produced to Plaintiff all existing responsive documents within their possession, custody, or control." (*Id.* at 2). Defendants state that these documents include "a number of documents already included within the over 6,000 pages of documents previously produced to Plaintiff by Defendants' prior counsel, as well as an additional 1,034 documents, Bates Nos. WIL006236-WIL07270, produced by Defendants on March 18, 2025, after Defendants retained their current counsel." (*Id.*). Defendants state that "any delay in the production of responsive documents was not a result of [their] dilatory conduct. Indeed, Defendants were not even aware there was a dispute over the production of documents or that Plaintiff was seeking sanctions of any type until after they retained current counsel." (*Id.*). Defendants request that "[t]o the extent the Court believes a further sanction is appropriate, . . . the Court impose a further monetary sanction rather than the numerous negative inferences and evidentiary sanctions sought by Plaintiff." (*Id.* at 3).

**8. Plaintiff's Supplemental Reply and Communications Between Prior Defense Counsel and Defendants**

On April 2, 2025, Plaintiff filed its supplemental reply in support of its motion for sanctions. (ECF No. 166). Plaintiff argues that (1) "Defendant CJ Wilson ("Mr. Wilson") misrepresented his knowledge of his and Defendants Weber Motors, Fresno, Inc.'s and CJ's Road to Lemans Corp.'s ongoing discovery failures for the purpose of inducing the Court to grant Defendants yet another chance to comply;" (2) "Defendants produced only 83 additional documents, leaving many categories

14

unproduced entirely;" (3) "MLG Notified Mr. Wilson of Foundation's Requests;" (4) "MLG Notified Defendants about Foundation's Motion to Compel;" (5) "Defendants still have not produced all documents." (*Id.* at 2, 3, 5, 6).

Plaintiff attached email correspondence between previous defense counsel and Defendant Wilson and Defendants' representatives explaining the need for Defendants to provide additional documents for the case. For example, on December 6, 2024 (more than two months before Mr. Wilson said he first learned that Plaintiff was claiming Defendants' document production was incomplete), previous defense counsel wrote to one of Defendants' corporate attorneys, Reggie Borkum, and Defendant Wilson himself, stating:

> Reggie and CJ,
>
> Good evening. I left a VM for both of you earlier today. We will need to respond to additional discovery requests propounded by Foundation and provide some available dates for CJ's deposition.
>
> Do you have the following documents in your possession that you can provide:
> 1. Audited financial statements from January 1, 2020 to present.
> 2. Profit and loss statements from January 1, 2020 to present.
> 3. Aside from I.A.M. National Pension Fund, any documents relating to liability to any other multi-employer union pension fund.
> 4. Documents to identify all shareholders/owners (and the number of shares) with equity interest in CJ's Road to Lemans Corp. dba Audi Fresno and Porsche Fresno.
> 5. Documents to show equity ownership of CJ's Road to Lemans Corp. dba Audi Fresno and Porsche Fresno by any Trust.
> 6. Documents regarding relocation of the dealership to Clovis.
> 7. Settlement agreement with Audi in CJ's Road to Lemans Corp. v. VWGoA, Inc., and documents submitted to CA New Motor Vehicle Board in connection with the matter.
>
> CJ—Please provide 2-3 dates in January that are available at this time.
>
> Please send documents and dates to our office early next week.

(ECF NO. 166-1, at p. 13). Defendant Wilson responded on December 9. 2024: "Julie, John I am not sure why I am being asked to provide all of these things. I am comfortable with the following statements and backing them up. . . ." (ECF No. 166-1, at p. 12).

Plaintiff also attached an email from former defense counsel to Mr. Wilson, among others, from December 11, 2024 stating in part that "a Motion to Compel has been filed by Foundation." (ECF No. 166-1, at p. 26). Mr. Borkum, Defendants' corporate counsel, writes elsewhere in the same email chain

"Just trying to determine what is absolutely necessary to turn over and what can be objected to," (ECF No. 166-1, at p. 25), and in another email "I read through the Judge's order and it seems to imply that somehow the Judge in the case is saying the attorney/client privilege for communications/work product prior to the state or litigation was waived—how is that the case." (ECF No. 166-1, at p. 23). Another email shows that on December 27, 2024, former defense counsel wrote to Defendant Wilson and others about the status of the case, including what would be addressed "at the January 24, 2025, hearing on Plaintiff's motion for request for sanctions," and how he planned to discuss with Plaintiff's counsel "the discovery issues in this case and the Court orders that Magistrate Judge Erica P. Grosjean has put in place." (ECF No. 166-1, at p. 35).

Plaintiff's reply also claims that Defendants still have not produced all documents ordered by the Court. For example, Defendants did not produce any documents reflecting Mr. Wilson's ownership of the land or an address of the new Clovis dealerships in response to a request for "All DOCUMENTS regarding YOUR decision to relocate YOUR dealerships to Clovis as identified in the Fresno Bee article dates November 20, 2023," and similar requests. (ECF No. 166, at p. 10). Defendant also failed to produce the settlement agreement with Audi, requested in RFP 32. (ECF No. 166, at p. 11).

Plaintiff concludes by requesting that "the Court issue terminating sanctions and award monetary damages in an amount according to proof for (1) the costs of briefing this Reply, and (2) the costs of discovery related to investigating Mr. Wilson's false claims of ignorance." (*Id.* at 11).

### 9. Defendants' Sur-reply

After being granted leave by the Court, Defendants filed a sur-reply on April 10, 2025. (ECF No. 172). Regarding Plaintiff's claim that Defendants still had not produced all ordered documents, Defendants argue that Plaintiff failed to adequately meet and confer. (ECF No. 172, at p. 3). Regarding the emails showing that, contrary to recent representations to the Court, Defendants did in fact know about Plaintiff's requests for additional production, the Court's order compelling production, and the pending motion for sanctions, Defendants merely state: "Moreover, Plaintiff's assertions about what was communicated to Defendants by their prior counsel and when it was communicated is really just a red herring, aimed at deflecting from the key issue the Court asked the parties to address in this supplemental briefing." (ECF No. 172, at p. 6).

16

**10. The Court's April 24 Hearing**

On April 24, 2025, the Court held another hearing on the motion for sanctions.  (ECF. No. 183) The Court began by questioning Defendant Wilson about his email communications with his prior counsel regarding discovery and the motion to compel, which appear to contradict statements made under penalty of perjury that previous counsel never told him about the outstanding discovery requests. The Court also questioned current defense counsel about their failure to correct similar statements given to the Court that appear to be false.  The Court gave Mr. Wilson and his new counsel until May 5, 2025, to show cause why sanctions should not issue for making false statements to the Court.  (ECF No. 179).

The Court also questioned Defendants regarding their continued withholding of pre-litigation documents on the basis of work-product privilege.  Defense counsel stated that he believed the Court's order only held that the attorney-client privilege had been waived, and thus that Defendants may continue to withhold documents under the work-product privilege.  (ECF NO. 183, at p. 21-22). Defense counsel then explained that he went through all documents that previous defense counsel had withheld under the attorney-client privilege, redesignated many of them under the work-product privilege in a revised privilege log, and continued to withhold them from production. (ECF No. 183, at p. 27-30).

Plaintiff's counsel argued that Defendants still have not produced several categories of documents, including discussions between Defendants and their landlord and documents related to relocation.  Plaintiff's counsel argued indicated that such documents are relevant to determining whether the reason Defendants provided for terminated the APA was in fact a pretext, and that the Court should find that Defendants breached the APA and only allow the case to proceed on the question of damages, stating:

> So, your Honor is correct that there was an assertion by Defendants that they did not need to go forward with the APA. They sent a letter to Foundation on June -- June 11th, excuse me -- 2021 in which they cited three reasons. Those reasons were the assignment and assumption of the lease required consents of the landlord, the financing necessary to complete the transaction and the obtaining of the manufacturer and State of California regulatory approvals.
>
> And, so, we directed our discovery, for example, our request for documents related to discussions with the landlord, to obtaining the landlord approvals.. . .

The documents that we requested go directly to the pretextual reasons for terminating the APA. The APA could only be terminated, according to its terms, if the conditions could not be met as of the closing date. The termination letter we received from Defendants was 14 days before the closing date. So, it is our contention that he terminated the APA because he was reaching the closing date, that he didn't have any actual basis for doing so, and that he put forth these bases as essentially pretext for his real reasons for terminating the APA, which were to make his own deal and move the dealerships to Clovis.

The discovery that we have requested goes directly to these issues. We're asking for documents related to the decision to terminate the APA, which will tell us whether or not these bases were, in fact, pretextual. We asked for documents related to communications with the landlord, which is one of the very bases cited by Defendants in their June 11th letter. We asked for documents related to Clovis so we could figure out when those plans began and if they did, in fact, as we suspect, begin prior to the closing date deadline.

All of these documents are necessary to have a full and fair trial on the matter. The only category of documents that has been produced following all of this motion practice, your Honor, are the financials, which is why we updated the Court prior to I believe it was a motion for sanctions. We filed an update with the Court letting the Court know that we have now received financial documents.

So, we do think that the sanction your Honor proposed is appropriate. We do think trial is possible on the issue of damages.

(ECF No. 183, at p. 47-49).  Defense counsel argued, in contrast, that the case should at least proceed on Defendants' claim that Plaintiff failed to comply with its obligations under the APA, stating:

To say that the -- to say that Mr. Wilson terminated the contract on -- on 6/11, whenever it was, June 11th of '21, which was, what, about I think a couple of weeks or -- two or three weeks prior to the termination date, when it would have terminated automatically anyways, but at that point, he was allowed to terminate it. At least it's his position he's allowed to terminate it because it was clear that the Plaintiff, Foundation, was not going to be able to satisfy his conditions and, therefore, he was allowed to terminate it.

Again, it's up to the Plaintiff. You know, a very clear condition is to say that they had to obtain the approvals of the manufacturers. That's -- you know, it's clear cut. It's stated clearly in the APA. That's one of their obligations. They did not obtain approval of the manufacturers. They were unable to obtain approval of the manufacturers. And, so, I'd also point out the whole -- this whole Clovis thing, there's no mention anywhere in the APA of Clovis. There's no obligation, you know, that relates to Clovis that somehow is connected. You know, they can say that you can look at the APA and see what that obligation is, and I would -- I would invite the Court if the Court wants to, I can reference you to where the APA is located. It's in Document 43-2, filed on 11/22/22, and the APA is an 88-page document.

(ECF No. 183, p. 56-57).  The parties then argued their positions as to what the APA stated regarding

Plaintiff's independent obligations and whether Defendants continued to withhold documents relevant to those issues.

### 12. Defense Counsels' Response to the Show Cause Order

On May 6, 2025, Defendants' Counsel responded to the Court's order to show cause. (ECF No. 185). Defense counsel argued that their representations to the Court about what had been told to Defendants was true because, though prior defense counsel had summarized the categories of documents Plaintiff requested, it had not given Defendants a copy of the actual document requests. (ECF No. 185, at p. 3) ("That review revealed that Mr. Wilson had not received a copy of Foundation Auto Holdings, LLC's Second Set of Requests for Production ("RFP"), served on MLG on February 2, 2024. . . . Ms. Chang acknowledged in her deposition that she summarized categories of responsive documents in an email to Mr. Wilson but did not transmit the actual discovery requests or advise him of the Court's rulings. Critically, the client file originally provided to Mr. Moring by MLG did not include the RFP or responses to RFP served by MLG."). Defense counsel also argued that it had not intended to mislead the Court or otherwise act in bad faith, and that "Under both federal and California rules, honest mistakes or inherited oversights, promptly addressed upon discovery, do not amount to ethical violations, much less sanctionable misconduct."

### 13. Defendant Wilson's Response to the Show Cause Order

On May 5, 2025, Defendant Wilson responded to the Court's order to show cause why sanctions should not issue for making false statements to the Court. (ECF No. 186). Mr. Wilson similarly argues that his statements to the Court were true because he did not receive the actual underlying documents, such as the requests for production and orders from the Court, and thus lacked the complete picture of the situation. (ECF No. 186, at p. 3) ("MLG employees testified that they did not recall sending him these pleadings or discovery requests, and he does not remember getting them. In in the December emails, he is not provided with a full picture of the serious nature of the discovery issues."). Although he concedes that the emails show that defense counsel transmitted the Court's actual order on the motion to compel, he explains that the order itself was sent to Defendants' corporate counsel, Mr. Borkum, rather than Mr. Wilson himself, and appeared to concern a dispute over the attorney-client privilege. (ECF No. 186, at p. 3) ("Of particular note, a December 11, 2024 email from Ms. Chang does reference

a "Motion to Compel," but that message (copied to Mr. Wilson), was addressed to Reggie Borkum, corporate counsel for Mr. Wilson's companies, and appeared to involve an attorney-client privilege dispute—not a general failure of Defendants to comply with discovery obligations."). Mr. Wilson argues "the law does not require perfection or clairvoyance. It requires honesty. Mr. Wilson's statements were made in good faith, were based on his understanding, and were not knowingly false." (ECF No. 186, at p. 10).

Plaintiff's motion for sanctions is now before the Court.

## II.    ANALYSIS

### A.  Legal Standards

Pursuant to the Federal Rules of Civil Procedure 37(b)(2), a Court may issue sanctions against a party:

> (A) *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)— fails to obey an order to provide or permit discovery, including an order under Rule 26(f) , 35 , or 37(a), the court where the action is pending may issue further just orders. [Just orders] may include the following:
>
> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is obeyed;
>
> (v) dismissing the action or proceeding in whole or in part;
>
> (vi) rendering a default judgment against the disobedient party; or
>
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.
>
> . . .
>
> (C) *Payment of Expenses.* Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii), (C).

"Rule 37(b)(2) contains two standards—one general and one specific—that limit a district court's discretion. First, any sanction must be 'just'; second, the sanction must be specifically related to

the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 707 (1982). "The decision to impose sanctions under rule 37 is in the trial court's discretion." *Forro Precision, Inc. v. IBM*, 673 F.2d 1045, 1053 (9th Cir. 1982).

Rule 37(b) sanctions apply to all discovery related orders. *See Sali v. Corona Reg'l Med. Ctr.*, 884 F.3d 1218, 1222 (9th Cir. 2018). Notably, "sanctions may be imposed even for negligent failure to provide discovery." *Fjelstad v. Am. Honda Motor Co.,* 762 F.2d 1334, 1343 (9th Cir.1985), *citing Lew v. Kona Hosp.,* 754 F.2d 1420, 1427 (9th Cir.1985); *Marquis v. Chrysler Corp.,* 577 F.2d 624, 642 (9th Cir.1978). However, the Ninth Circuit has also advised that "[i]t is appropriate to reject lesser sanctions where the court anticipates continued deceptive misconduct." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007).

Furthermore, under Federal Rule of Civil Procedure 37(b)(2)(C) "the court *must* order disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added). The fact that a defendant eventually responds to the discovery requests does not preclude imposition of monetary sanctions. *N. Am. Watch Corp*, 786 F.2d at 1451 ("Belated compliance with discovery orders does not preclude the imposition of sanctions.").

**B. Whether Defendants Violated a Court Order**

With these standards in mind, the Court first looks to whether Defendants failed to obey an order under Rule 26 to provide or permit discovery.

On October 24, 2024, the Court held a hearing on Plaintiff's Motion to Compel and Request for Sanctions. (ECF No. 100, 91). During that hearing, and in its subsequent written order, the Court granted Plaintiff's motion to compel and request for sanctions (ECF No. 91). Specifically, the Court's written order stated in relevant part:

> For the reasons given above, **IT IS ORDERED** as follows:
>
> Plaintiff's motion to compel and request for sanctions (ECF No. 91) is **GRANTED** in full, except insofar as Defendants have not waived objections based on attorney client privilege or work product regarding any documents filed since the commencement of this action on June 18, 2021. By no later than thirty (30) days from the date of this order,

21

> Defendants must produce: (1) the requested documents, and (2) a privilege log, if any, reflecting privileged document post-dating the commencement of this action on June 18, 2021.

(ECF No. 101, at p. 4).

It is undisputed that Defendants failed to obey the Court's October 29 order. Defendants did not produce any of the requested documents by thirty days from the date of that order, i.e., November 28, 2024. Nor did they provide any privilege log by that date. Nor did Defendants request an extension of the time to do so.

Therefore, the Court concludes that Defendants failed to obey an order to provide discovery.

## C. Defendants' Claim that Prior Counsel Failed to Tell Them of the Court Order or Plaintiff's Requests for Documents

Defendants' filings starting in February 2025, four months after the Court's order granting the motion to compel, concede that Defendants were in violation of this Court's order. (*See* ECF No. 140) ("Defendants recognize that this production is long overdue."). However, Defendants ask that their lack of compliance be excused because prior defense counsel did not inform Defendants of the Court's order or Plaintiff's request for additional documents. (ECF No. 140).

As an initial matter, Defendants do not cite any rule or case law that a party should be excused from compliance with a court order because their attorneys of record failed to notify them of the order. (*See generally* ECF No. 164). On the contrary, it is settled law that "each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962) (affirming dismissal of lawsuit for failure to prosecute where plaintiff's counsel failed to appear, and stating "[t]here is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation . . . ."). *See also N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO* 568 F.2d 628, 633 (9th Cir. 1977) (relying in *Link* and holding "When the order was served on Sequoia's attorney, the union was clearly bound to abide by it."). "[I]f an attorney's conduct falls substantially below what is

reasonable under the circumstances, the client's remedy is against the attorney in a suit for malpractice." *Link*, 370 U.S. at 634, n. 10.

Moreover, emails subsequently produced between Defendants' prior counsel and Defendants refute Defendants' claim that they did not know about the discovery requests or the Court's order.   On December 13, 2024, Reggie Borkum, corporate counsel for Defendants, wrote to Defendant Chris Wilson, among others, "I read through the Judge's order and it seems to imply that somehow the Judge in this case is saying the attorney/client privilege for communications/work product prior to the state of litigation was waived . . . ." (ECF No. 166-1, at p. 23).  This email shows that prior defense counsel sent the Court's order to Defendants, that Defendants' corporate counsel reviewed the order, and that Mr. Wilson was aware of the order long before he claimed to have first learned of the order.

Those emails also contradict Defendants' claim that they were unaware that there was a pending motion for sanctions until after new counsel was retained in February 2025.  (ECF No. 140, at p. 3) ("None of these attorneys communicated to him the pending motions and the serious nature of the failure to comply with discovery requests . . . ."); (ECF No. 148-1, at p. 9) ("Until I terminated MLG and at that time learned of the pending discovery issues, neither I nor any other representative of Defendants was aware of any motions to compel the production of documents or motions for sanctions in this matter.").  On the contrary, prior defense counsel Douglas Schenck's email to Defendant Chris Wilson, among others, on December 27, 2024 refers to the "January 24, 2025, hearing on Plaintiff's motion for sanctions," and his intention to "reach[] out to opposing counsel to discuss the discovery issues in this case and the Court orders that Magistrate Judge Erica P. Grosjeans [sic] has put in place." (ECF No. 166-1, at p. 35).

Thus, Defendants' argument that they should be excused from lack of compliance because they were not informed of the Court order is unsupported by the law and the facts.

Moreover, Defendants' filings on this issue show a lack of honesty and good faith, which further support the imposition of sanctions.  Defendants' filings contain multiple statements that are clearly false.  For example, Defendant Chris Wilson repeatedly said that he was not aware that Plaintiffs were requesting additional documents from Defendants.  *See, e.g.*, (ECF No. 148-1, at p. 8) ("neither I nor any other representative of Defendants were ever asked by MLG to provide any documents in addition to those that I had already provided to them."); (ECF No. 148-1, at p. 10) ("In fact, until recently being

informed by Defendants' current defense counsel, on or about February 25, 2025, I was not aware that Plaintiff and/or Intervenor ever claimed any prior production of documents was incomplete, non-responsive, or otherwise deficient."); (ECF No. 164-1, at p. 10) ("Other than the request for financial documents in December 2024, I was unaware that specific requests for documents were being made."). But this was not true.  On December 6, 2024, prior defense counsel wrote to Mr. Wilson and other representatives of defendants informing them that Defendants "will need to respond to additional discovery requests," including 7 very specific categories of documents such as "Settlement agreement with Audi in CJ's Road to Lemans Corp. v. VWGoA, Inc., and documents submitted to CA New Motor Vehicle Board in connection with the matter."   (ECF NO. 166-1, at p. 13).  Defendant Wilson responded on December 9. 2024:  "Julie, John I am not sure why I am being asked to provide all of these things.  I am comfortable with the following statements and backing them up. . . ."  (ECF No. 166-1, at p. 12).  These emails show, contrary to Mr. Wilson's representation to the Court, that prior defense counsel did in fact ask Defendants to provide documents in addition to those already provided to them, and that Mr. Wilson was aware that Plaintiff claimed that Defendants' production was incomplete months before February 25, 2025.

In Mr. Wilson's response to the Court's order to show cause, he attempts to explain this apparent falsehood by stating "The point I was attempting to make here is that I was never provided copies of any of the formal Document Requests, which is absolutely true. While Ms. Chang set forth in the MLG Emails a list of 7 categories of documents being requested (Exhibit A at JC20), those categories are not tied to any specific Document Request, and I was not aware of the context of the requests."  (ECF No. 186-1, at p. 6).  But Mr. Wilson's statement to the Court did not refer to "formal document requests"—it referred to the need to "provide any documents in addition to those that I had already provided," which is exactly what prior defense counsel's email communicated.  Moreover, Mr. Wilson's statements to the Court were made in the context of claiming that he was unaware of the need to provide documents—not that he was unaware of the formal document requests.  This context makes clear that Mr. Wilson intended his statements to create the false impression that Defendants were entirely unaware that they had an obligation to produce additional documents in this case.

Similarly, Mr. Wilson stated in his declaration to this Court, under penalty of perjury "I do not recall speaking with anyone at MLG regarding my deposition . . . ." (ECF No. 164-1, at p. 11).  But in

24

fact, prior defense counsel wrote in an email on December 6, 2024 to Mr. Wilson among others: "We will need to . . . provide some available dates for CJ's deposition. . . . CJ—Please provide 2-3 dates in January 2025 that are available at this time," (ECF No. 166-1, at p. 13), to which Mr. Wilson responds "January I would aim for second week of availability." (ECF No. 166-1, at p. 12). In response to the order to show cause, Mr. Wilson claims his statement to the Court was not false because "In the MLG Emails, I was asked to, and promptly did provide potential dates for my deposition. To the best of my recollection, there were no follow-up communications, and I never spoke with anyone at MLG regarding my deposition." (ECF No. 186-9, at p. 9). The Court finds Mr. Wilson's distinction between "speaking" and "emailing" unconvincing. Again, Mr. Wilson's statement to the Court was in the context of claiming that he was unaware of his discovery obligations, and whether the communication occurred through speaking or email was clearly not relevant to that issue.

Additionally, the Court does not find Defendants' argument that they were completely unaware of their discovery obligations to be convincing. This argument also requires the Court to believe that prior counsel took positions on discovery, in objections and responses, informal discovery letters, a stipulation to withdraw all objections, an opposition to a motion to compel, an appearance at the hearings on the motion to compel and motion for sanctions, all without any knowledge of or input from their client. Given the lengthy time that this dispute was occurring, and the importance of this case, this is not credible.

Thus, the Court also finds that Defendants' false statements about their prior counsel's communication do not excuse their non-compliance with the Court's order. Instead, their lack of good faith and candor to the Court further warrants imposition of sanctions.

**D. Whether Defendant is Currently in Compliance with the Court's Order**

The Court next turns to whether Defendants have now produced all documents that were ordered by the Court. While belated compliance would not excuse Defendants' failure to abide by the Court's order, it is relevant to the prejudice to Plaintiff and the extent of any sanctions under Rule 37.

Plaintiff claims that numerous documents are still missing. In Plaintiff's supplemental reply in support of its motion for sanctions, Plaintiff claims:

> Of the missing documents, Defendants did not produce a June, 2021, email exchange concerning the at-issue termination letter. Klair Decl. at ¶ 11. Nor did they produce a late-January to early-February, 2021, email exchange retaining MLG to terminate the APA. Klair Decl. at ¶ 12. They did not produce a mid-February, 2021, email exchange concerning

the APA. Klair Decl. at ¶ 13. They have not produced an early-March, 2021, exchange regarding communications with the landlord of the at-issue businesses. Klair Decl. at ¶ 14. And they produced unredacted versions of only three of the thirteen improperly redacted documents. Klair Decl. at ¶ 10.

(ECF No. 166 at 7).  Notably, Defendants' sur-reply did not respond to this declaration or otherwise represent that such documents have been produced.  (*See* ECF No. 172).  Moreover, although Defendants filed a notice on April 25, 2025 purporting to show their late compliance with the Court's order, (ECF No. 184), it is far from clear.  The notice attached a 95-page exhibit including Supplemental Objections and Responses to Each Document Request.  (ECF No 184-1).  After each request for production, Defendants list a computer link for responsive documents already produced, a link for documents newly produced, and a commitment to supplement production if additional documents are located, such as the following:

> **REQUEST NO. 2.**
>
> All DOCUMENTS between YOU and TEMPLETON relating to the AGREEMENT.
>
> **RESPONSE: Documents responsive to this request were previously produced. See spreadsheet labeled "CJ Wilson RFPs identified WIL000001-WIL006235." Additional responsive documents are being produced herewith. See spreadsheet labeled "CJ Wilson RFPs identified WIL006236_007270." If additional documents are located, Defendant will supplement its productions.**

(ECF No. 184-1, at p. 3).  But the document does not describe what documents were actually produced in response to the request, or confirm that all such documents have now been produced.

What is clear is that Defendants continue to withhold responsive documents on the basis of privilege, despite the Court's order that any claims of privilege had been waived.  At the very end of the document, Defendants include a privilege log, listing sixty-two documents dated before the start of this case, that Defendants continue to withhold from production on the basis of work-product privilege. Defendants' continued withholding of these documents violates the Court's order, which found that Defendants had waived any attorney-client or work-product privilege before June 18, 2021.  (ECF No. 101 at 4 ("Plaintiff's motion to compel is granted in full except that Defendants may assert the attorney client privilege or work product regarding any documents filed since the commencement of this action

26

on June 18, 2021. The Court found that Defendant had waived all objections to that discovery. . . . Plaintiff's motion to compel and request for sanctions (ECF No. 91) is **GRANTED** in full, except insofar as Defendants have not waived objections based on attorney client privilege or work product regarding any documents filed since the commencement of this action on June 18, 2021.").

At the last hearing on the motion for sanctions, defense counsel justified this withholding on the basis that he thought the Court's order only held that the attorney-client privilege had been waived, and thus that Defendants could continue to withhold documents under the work-product privilege. (ECF NO. 183, at p. 21-22). But the Court's order makes no such distinction. Moreover, the Court stated explicitly during the hearing on the motion to compel, as reflected in the transcript available on the docket: "I'm going to grant the Motion To Compel and find that per the Joint Stipulation, Document 81, Page 2, Defendants have withdrawn all objections to Foundation's Requests For Production. And I do find that that includes work product and attorney-client privilege." (ECF No. 114, at p. 12). The Court also made this ruling clear at the last hearing on the motion for sanctions. (ECF No. 183, p. 25) ("I don't think that's in any way consistent with my order, either my statements in the hearing, in the written order. So, what I think is happening is that Defendants are continuing to withhold documents that were compelled."). Yet Defendants still have not produced these documents.[3]

These documents, which Defendants continue to withhold in violation of the Court's order, are central to the dispute regarding whether Defendants had a valid basis to withdraw from the APA, and thus whether Defendants breached the contract. Although Defendants have not included a subject matter or description of any of the withheld communications, it is very likely that these documents reflect the internal communications among Defendants regarding the APA at the time. After all, in

---

[3] Separate from the Court's order on waiver, there are reasons to doubt Defendants' claim that all of these documents are properly subject to the work-product privilege. The attorney work-product privilege protects from discovery in litigation "mental impressions, conclusions, opinions, or legal theories of a party's attorney" that were "prepared in anticipation of litigation or for trial." *American Civil Liberties Union of Northern California v. United States Department of Justice*, 880 F.3d 473, 483 (9th Cir. 2018). Here, there was no litigation pending, and Defendants had not yet withdrawn from the APA. Moreover, many of the withheld documents indicate they were written by Mr. Wilson himself, who is not a lawyer. Additionally, the only lawyer on some of the documents was Reggie Borkum, who is Defendants' corporate counsel, not litigation counsel. The log also does not include any description of the subject matter of the communications that would indicate they concern mental impressions related to litigation. And many of the documents had previously been withheld under the attorney-client privilege, only to be redesignated as work-product after Defendants agreed to provide all documents withheld on the basis of attorney-client privilege.

opposition to Plaintiff's motion to compel, Defendants took the position that every document responsive to Plaintiff's request for communications regarding Defendants' decision to "terminate and/or not perform under the agreement," were "protected from disclosure by the attorney-client privilege and work product doctrine." (ECF No. 93, at p. 4). These documents thus almost certainly contain Defendants' contemporary communications regarding their decision to terminate the APA.

Thus, Defendants have still not complied with the Court's order, and continue to withhold documents ordered by the Court concerning the central question of whether Defendants had a legitimate basis to withdraw from the APA.

**E. What Sanctions Should Issue**

Having found that Defendants disobeyed the Court's October 29 order, that Defendants' excuses based on lack of notice are without merit, that Defendants submitted false statements in opposition to the motion for sanctions, and that Defendants continue to withhold documents compelled by the Court that are central to the case, the Court turns to what sanctions should issue.

Again, Federal Rules of Civil Procedure 37(b)(2), states:

(A) *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)— fails to obey an order to provide or permit discovery, including an order under Rule 26(f) , 35 , or 37(a), the court where the action is pending may issue further just orders. [Just orders] may include the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

. . .

(C) *Payment of Expenses*. Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii), (C).

As an initial matter, because Defendants clearly disobeyed the Court's prior discovery orders, without substantial justification, the Court is obligated to order Defendants pay the reasonable expenses, including attorney's fees, of the Motion for Sanctions. Fed. R. Civ. P. 37(b)(2)(C).

Having considered the parties' arguments, the Court also finds that Defendants shall also be prohibited from opposing Plaintiff's claims for breach of contract and anticipatory breach of contract. The case will proceed only on the question of damages and/or remedy for those claims.

The Court finds that this sanction is just and specifically related to the particular claim that was at issue in the order to provide discovery. In this case, it is undisputed that Defendants terminated the APA. The central question in dispute is whether Defendants had valid, contractually permissible, reasons to do so. If not, their termination was a breach of the contract. The discovery at issue in the motion to compel and motion for sanctions go directly to that question, including documents supporting or refuting Defendants' purported reasons for terminating the APA.

Moreover, the documents that Defendants continue to withhold as privileged under the work-product doctrine, in violation of the Court's order, concern Defendants' internal communications regarding why they were terminating the contract. Thus, Defendants' failure to comply with their discovery obligations and this Court's discovery order have prevented Plaintiff from obtaining evidence needed to prove their claims and try the merits of the breach of contract claims based on the evidence.

Nor does the Court find that, as argued by defense counsel at the last hearing on this motion, Defendants should still be entitled to pursue their defense that Plaintiff independently failed to meet its obligations under the contract. For one thing, the discovery at issue in this order also concerns this issue, such as Defendants' communications on the reason for termination, which would include Defendants' opinions regarding Plaintiff's performance. Additionally, it appears that Defendants' and Plaintiff's performance under the deal were interrelated. Specifically, in the Section outlining the Buyer's obligations, the APA states that "Seller shall provide its best efforts to assist Buyer's efforts under this Section 5.7(b)." (ECF No. 43-2 at 19). Finally, it would also be unjust to permit Defendants to take further discovery and otherwise oppose the Plaintiff's claim for breach of contract on the merits. Defendants' failure to provide documents and comply with the Court's order has stalled all discovery efforts. The non-expert discovery deadline has long since passed. The trial date has been vacated. To

the Court's knowledge, substantial discovery remains on the issues of breach, including depositions. Allowing further discovery and motion practice would further delay the case. Moreover, given the Defendants' conduct, including false and misleading statements to the Court in opposition to this motion, even after the Court imposed monetary sanctions, the Court has little confidence that Defendants would comply with its discovery obligations and court orders going forward.

The Court has also considered the "dismissal factors" discussed in the *Malone* test. *Malone v. United States Postal Service*, 833 F.2d 128, 130 (9th Cir. 1982) ("A district court must weigh five factors in determining whether to dismiss a case for failure to comply with a court order[.]"). Under the *Malone* test, the Court must look to: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions. (*Id.*).

The first factor, the public's interest in expeditious resolution of the case, weighs in favor of these sanctions because the discovery delays and failure to comply has substantially delayed the case, and allowing Defendants to pursue their defense to the breach of contract claim would delay it even further. After all, the non-expert discovery deadline has long since expired and all dates have been vacated a ruling on this motion. The second factor, the Court's need to manage its docket, also supports these sanctions because Defendants' conduct has thwarted this Court's attempts to move the case forward. The third factor, the risk of prejudice to the other party, is neutral because although this order prevents Defendants from pursuing their defense to the breach of contract claims based on the evidence, Defendants' own withholding of documents also prevents such a determination. Moreover, Defendants' decision to continue to withhold their own contemporary communications regarding their decision to terminate the APA, against the Court's clear court orders, suggests that those documents do not support Defendants' defense, and that Plaintiff would likely prevail on its breach of contract claims on the merits if Plaintiff obtained all the documents ordered by the Court. As to the fourth factor, the public policy favoring disposition of cases on their merits, while this sanction prevents the breach of contract claims from being resolved on the evidence available, Defendant's own actions in withholding ordered documents are largely to blame for the claims not being determined on their merits. Finally, as to the fifth factor, the Court has previously issued lesser monetary sanctions, which did not result in

Defendants' compliance.  Additionally, this sanction falls short of full resolution of the action by permitting the case to proceed on the question of damages.

The Court thus finds that this sanction is warranted under Rule 37.  *See AmTrust Bank v. Lewis* 687 Fed.Appx. 667, 671 (9th Cir. 2017) ("The district court did not clearly err in finding that Lewis willfully violated a prior discovery order by refusing to make necessary disclosures regarding his interest in the residence, or in finding that Lewis repeatedly evaded and hindered the post-judgment discovery process in order to frustrate the judgment creditors' execution. The district court could reasonably anticipate continued deceptive conduct, and "[i]t is appropriate to reject lesser sanctions where the court anticipates continued deceptive misconduct." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007). Lewis's deception and evasion created a high risk of prejudice to the appellees, and under these circumstances it was not an abuse of discretion to treat these factors as dispositive."); *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787-89 (9th Cir. 2011) (holding that district court did not abuse its discretion by imposing sanction of default for discovery violations, where defendants delayed resolution of case, interfered with court's management of its docket in "one of the busiest districts in country" actions of defendants made it impossible for plaintiff to adequately prepare itself for trial, and prior order to produce documents and answer interrogatories represented first, lesser sanction than default); *Adriana Intern. Corp. v. Thoeren,* 913 F.2d 1406 (9th Cir. 1990) (corporation's repeated failure to appear at scheduled depositions compounded by noncompliance with court orders to produce documents warranted default).

**III.    ORDER**

For the reasons set forth above, IT IS ORDERED as follows:

   a.  Plaintiff's Motion for Sanctions (ECF No. 107) is GRANTED.

   b.  Defendants shall pay the reasonable expenses, including attorney's fees, of the Motion for Sanctions.

   c.  Defendants shall be prohibited from opposing Plaintiff's claims for breach of contract and anticipatory breach of contract.  The case will proceed only on the question of damages and/or remedy for those claims.

   d.  The parties are directed to meet and confer regarding the amount of attorney fees and other costs to be awarded to Plaintiff for bringing this motion.  Should the parties be unable to agree on the amount to be awarded, Plaintiff's counsel may file a declaration of

reasonable costs and attorney fees by no later than June 27. 2025.  Plaintiff's counsel shall also submit an affidavit attesting to the reasonableness of the costs and attorney fees.  Defendants may file any objections to Plaintiff's statement of expenses within seven (7) days of the filing of Plaintiff's statement. Objections are limited only to the amount(s) claimed by Plaintiff and/or to specific line items.

IT IS SO ORDERED.

Dated:    **May 30, 2025**                    /s/ _Erica P. Grosjean_
                                        UNITED STATES MAGISTRATE JUDGE

# App. 4

**App. 4**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC., <br><br> Plaintiff, <br><br> v. <br><br> WEBER MOTORS, FRESNO, INC., *et al.*, <br><br> Defendants. | Case No.   1:21-cv-00970-JLT-EPG <br><br><br> ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL AND REQUEST FOR SANCTIONS <br><br> (ECF No. 91) |
| TEMPLETON MARSH, LTD., <br><br> Intervenor Plaintiff, <br><br> v. <br><br> WEBER MOTORS, FRESNO, INC., *et al.*, <br><br> Defendants. | |

In this civil action, Plaintiff Foundation Auto Holdings, LLC. ("Plaintiff"), and Intervenor Plaintiff Templeton Marsh, LTD., assert claims for breach of contract against Defendants Weber Motors, Fresno, Inc., CJ's Road to Lemans Corp., and Christopher John Wilson. (ECF Nos. 27, 42). Before the Court is Plaintiff's motion to compel seeking an order requiring Defendants to produce various documents, and request for sanctions, brought pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure, and Local Rule 251. (ECF No. 91). For the reasons given below and stated on the record during the hearing on this matter, the Court grants Plaintiff's motion to

1

compel and request for sanctions.

**I.      BACKGROUND**

Upon the request of the parties, the Court held an informal discovery dispute conference on April 26, 2024. (ECF No. 78). Following the conference, the Court granted Plaintiff permission to file a motion to compel and request for sanctions regarding Defendants' response to Plaintiff's Requests for Production of Documents. (ECF No. 79). The parties were directed to meet and confer regarding ongoing discovery disputes, and Defendant was ordered to provide Plaintiff with a date certain to produce documents, a privilege log, and dates for a deposition (*Id.*). The parties were also ordered to file a joint stipulation to make any necessary modifications to the Court's scheduling order. (*Id.*).

On May 10, 2024, the parties filed a joint stipulation to modify the Court's scheduling order. (ECF No. 81). In addition to proposing changes to the schedule, the stipulation included the following statement:

> At the IDC, the Court <u>Ordered</u> the parties to meet and confer regarding: a date certain for the production of documents in response to the Requests, a privilege log thereto, and any changes to the Court's scheduling order (ECF 79). The Parties met and conferred on May 3, 2024, and May 10, 2024, and agreed upon the following:
>
> 1. Defendants withdraw all objections to Foundation's Requests for Production, and will produce documents by July 1, 2024. As such, no Motion to Compel should be necessary at this time.

(*Id.* at 2).[1] On July 12, 2024, Plaintiff filed a motion to compel and request for sanctions. (ECF No. 91). Plaintiff's motion asserted that, despite the stipulation, Defendants have failed to produce any requested documents or timely object to the requests. (*Id.* at 6-7). Defendants filed an opposition on July 26, 2024, contending that their objections to the requests were proper. (ECF No. 93). Plaintiff filed a reply on August 1, 2024. (ECF No. 94). The Court held a hearing on Plaintiff's motion on October 24, 2024. (ECF No. 100).[2]

\\\

---

[1] Cited page numbers refer to the pagination at the bottom of each document, not the blue page numbers generated by the CM/ECF system.

[2] In advance of the hearing, the Court ordered Plaintiff to file a supplement to the motion to compel containing the text of each request at issue, followed by Defendants' objections and responses to each request. (ECF No. 97). Plaintiff filed the supplement on October 4, 2024. (ECF No. 99).

## II.    LEGAL STANDARDS

Federal Rule of Civil Procedure 34(a) permits a party to issue requests for documents that are in the responding party's possession, custody, or control and "within the scope of Rule 26(b)." In turn, Rule 26(b)(1) provides as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

Rule 37 permits "a party seeking discovery [to] move for an order compelling an answer, designation, production, or inspection," among other options, if "a party fails to produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iv).

Generally, "the moving party [must] inform the Court which discovery requests are the subject of the motion to compel, and, for each disputed response, why the information sought is relevant and why the responding party's objections are not meritorious." *Taylor v. O'Hanneson*, No. 1:11-CV-00538-LJO, 2014 WL 2696585, at *2 (E.D. Cal. June 13, 2014) "Broad discretion is vested in the trial court to permit or deny discovery. . . ." *Sablan v. Dep't of Fin. of Com. of N. Mariana Islands*, 856 F.2d 1317, 1321 (9th Cir. 1988) (internal citation and quotation marks omitted).

Rule 37(a)(5)(A) generally provides that if a motion to compel discovery is granted (or if disclosure or discovery is provided after filing the motion), then "the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A).

## III.    ANALYSIS

For the reasons stated at the October 24, 2024, hearing, Plaintiff's motion to compel is granted in full except that Defendants may assert the attorney client privilege or work product regarding any documents filed since the commencement of this action on June 18, 2021.  The

Court found that Defendant had waived all objections to that discovery in its stipulation stating "Defendants withdraw all objections to Foundation's Requests for Production, and will produce documents by July 1, 2024. As such, no Motion to Compel should be necessary at this time." (ECF No. 81 at 2; *see also CDN Inc. v. Kapes*, 197 F.3d 1256, 1258 (9th Cir. 1999) ("Because stipulations serve both judicial economy and the convenience of the parties, courts will enforce them absent indications of involuntary or uninformed consent") (citing *United States v. McGregor*, 529 F.2d 928, 931 (9th Cir. 1976)). Moreover, Defendants have not provided any privilege log in this case.

Thus, for the reasons stated at the hearing, the Court finds that sanctions for Plaintiff's reasonable expenses, including attorney fees, incurred in preparing the motion to compel are appropriate under Federal Rule of Civil Procedure 37(a)(5)(A).

## III.   CONCLUSION AND ORDER

For the reasons given above, **IT IS ORDERED** as follows:

1.  Plaintiff's motion to compel and request for sanctions (ECF No. 91) is **GRANTED** in full, except insofar as Defendants have not waived objections based on attorney client privilege or work product regarding any documents filed since the commencement of this action on June 18, 2021.

    a.  By no later than thirty (30) days from the date of this order, Defendants must produce: (1) the requested documents, and (2) a privilege log, if any, reflecting privileged document post-dating the commencement of this action on June 18, 2021.

    b.  By no later than November 7, 2024, Plaintiff shall file a statement identifying reasonable expenses, including attorney fees, that they incurred in filing the motion to compel. This statement should not include fees and costs related to Rule 30(b)(6) depositions or meet and confer efforts, such as discussions leading to the stipulation at ECF No. 81, but it may include fees and costs related to the October 24, 2024, hearing. Defendants may file any objections to Plaintiff's statement of expenses within seven (7) days of the filing of Plaintiff's statement. Objections are limited only to the amount(s) claimed by Plaintiff and/or to specific line items

Defendants believe are unrelated to the motion to compel.

2. Defendants shall coordinate with their three outstanding witnesses to secure dates for depositions. The depositions are to be held promptly following Defendants' production of documents pursuant to this order and Plaintiff's motion to compel.

3. By no later than November 7, 2024, Defendants shall file a status report with the Court regarding the status of scheduling these depositions.

IT IS SO ORDERED.

Dated:    **October 29, 2024**             /s/ *Erica P. Grosjean*
UNITED STATES MAGISTRATE JUDGE

# App. 5

HOLLAND & KNIGHT LLP
David I. Holtzman (SBN 299287)
Daniel P. Kappes (SBN 303545)
Andrew Klair (SBN 334960)
Isabella Granucci (SBN 351957)
560 Mission Street, Suite 1900
San Francisco, CA  94105
Telephone:  415.743.6900
Fax:  415.743.6910
E-mail: david.holtzman@hklaw.com
          daniel.kappes@hklaw.com
          andrew.klair@hklaw.com
          isabella.granucci@hklaw.com

Attorneys for Plaintiff
FOUNDATION AUTO HOLDINGS, LLC

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>Defendants.<br><br>TEMPLETON MARSH, LTD.,<br><br>Intervenor,<br><br>vs.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>Defendants. | Case No.: 1:21-cv-00970-JLT-EPG<br><br>**PLAINTIFF FOUNDATION AUTO HOLDINGS, LLC'S MOTION FOR LEAVE TO FILE; REQUEST FOR FURTHER SANCTIONS**<br><br>Date:      January 10, 2025<br>Time:     10:00 am<br>Dept.:     Courtroom 10<br>Judge:   Hon. Erica P. Grosjean<br><br>First Amended Complaint Filed: November 11, 2022<br>Trial Date: June 3, 2025 |

- 1 -

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS                                    CASE NO: 1:21-CV-00970-JLT-EPG

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on January 10, 2025, at 10:00 a.m., or as soon thereafter as may be heard in Department 10 of the abovementioned Court, located at 2500 Tulare Street, Fresno, CA 93721, Plaintiff Foundation Auto Holdings, LLC ("Foundation"), will, and hereby does, request leave to file, pursuant to Civil Local Rule 251(a) of the United States District Court for the Eastern District of California and Federal Rules of Civil Procedure Rule 37, a Request for Further Sanctions for Defendants Weber Motors, Fresno, Inc.'s, CJ's Road to Lemans Corp.'s, and Christopher John Wilson's (the "Defendants") failure to comply with the Court's Order of October 29, 2024 (ECF 101).

Due to Defendants' collective refusal to comply with the Court's Order, and the settled nature of the instant discovery dispute, Foundation believes that the meet and confer requirements of this Court's Standing Order are applicable to this request, but would be futile. Foundation therefore requests leave to file this Request absent an informal discovery conference as otherwise required by the Standing Orders. Good cause exists to grant Foundation leave to file this Request. Despite multiple meet and confers, an Informal Discovery Conference before this Court, and a stipulation and Order to withdraw objections and produce documents no later than July 1, 2024 (ECF 81), Defendants did not produce documents responsive to Foundation's February 2, 2024, Requests for Production of Documents ("RFPs").

Foundation accordingly filed a motion to compel on July 12, 2024. (ECF 91). After hearing arguments, the Court issued its Order granting the motion to compel, holding that Defendants had waived all objections, including attorney-client privilege prior to the filing of the Complaint, ordering sanctions for Foundation's costs in bringing the motion to compel, and directing Defendants to produce documents **no later than November 27, 2024**. (ECF 101). Defendants have still refused to comply with the Court's Order and have not produced any documents or a privilege log to Foundation.[1] *See* Declaration of Andrew Klair (the "Klair Decl.") at ¶ 2.

---

[1]   Defendants' counsel produced a privilege log with respect to a separate subpoena on December 2, 2024. That privilege log asserted privilege over all and only those documents for which privilege was waived, and this Court Ordered Defendants to produce. *See* Klair Decl. at ¶ 3, Exh. 1.

- 2 -

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS                                              CASE NO: 1:21-CV-00970-JLT-EPG

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Defendants failed to produce documents as ordered by the Court. Foundation believes that an additional informal discovery conference would not be an efficient use of time and accordingly requests leave to file the Request for Sanctions attached hereto.

Dated: December 5, 2024

/s Andrew Klair
HOLLAND & KNIGHT LLP
David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci

Attorneys for Plaintiff FOUNDATION AUTO
HOLDINGS, LLC

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

- 3 -

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS                                    CASE NO: 1:21-CV-00970-JLT-EPG

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ...........................................................................................................7

II.    BACKGROUND ............................................................................................................7

III.   NEGATIVE INFERENCES AND EVIDENTIARY SANCTIONS ARE
       WARRANTED UNDER FRCP 37(B)(2) ....................................................................8

       A.     STANDARD OF REVIEW ...................................................................................9

       B.     RULE 37(B)(2)(A)(I) NEGATIVE INFERENCE SANCTIONS ARE NECESSARY.......................9

              1.     The Public Interest Favors Expeditious Resolution of Litigation..............................11

              2.     The Court's Need to Manage its Docket Favors a Negative Inference .....................12

              3.     Foundation is Prejudiced by Defendants' Refusal to Produce..................................12

              4.     The Public Policy Favoring Adjudication on the Merits is Neutral and Insufficient
                     to Warrant Denying Sanctions ...............................................................................12

              5.     There Are No Less Drastic Sanctions Available .......................................................13

       C.     RULE 37(B)(2)(A)(II) EVIDENTIARY SANCTIONS ARE NECESSARY.................................14

IV.    REQUESTED NEGATIVE INFERENCES..............................................................................15

       A.     REQUESTED NEGATIVE INFERENCES FOR RFP NOS. 18, 19, AND 21 ..............................15

       B.     REQUESTED NEGATIVE INFERENCE FOR RFP NOS. 31-33......................................17

       C.     REQUESTED NEGATIVE INFERENCE FOR RFP NO. 35 ......................................................17

       D.     REQUESTED NEGATIVE INFERENCES FOR RFP NOS. 36-38 .............................................18

       E.     REQUESTED NEGATIVE INFERENCES FOR RFP NOS. 42 AND 43 ....................................19

V.     REQUESTED EVIDENTIARY SANCTIONS.........................................................................20

       A.     FIRST EVIDENTIARY SANCTION REQUEST......................................................................20

       B.     SECOND EVIDENTIARY SANCTION REQUEST..................................................................21

       C.     THIRD EVIDENTIARY SANCTION REQUEST.....................................................................21

       D.     FOURTH EVIDENTIARY SANCTION REQUEST..................................................................22

       E.     FIFTH EVIDENTIARY SANCTION REQUEST......................................................................22

       F.     SIXTH EVIDENTIARY SANCTION REQUEST .....................................................................23

VI.    CONCLUSION...............................................................................................................244

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

- 4 -

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS                                    CASE NO: 1:21-CV-00970-JLT-EPG

<div style="text-align: right; font-style: italic;">Holland &amp; Knight LLP<br>560 Mission Street, Suite 1900<br>San Francisco, CA 94105<br>Tel: 415.743.6900<br>Fax: 415.743.6910</div>

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adriana Int'l Corp. v. Thoeren*,
   913 F.2d 1406 (9th Cir. 1990) ....................................................................................9, 11, 12

*Bland v. Rodriguez*,
   2021 WL 3857673 (2021)............................................................................................................22

*Fjelstad v. American Honda Motor Co., Inc.*,
   762 F.2d 1334, 1338 (9th Cir.1985) ......................................................................................10

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
   456 U.S. 694 (1982).....................................................................................................................9

*Lanier v. San Joaquin Valley Offs. Ass'n*,
   2016 WL 4764669 (E.D. Cal. Sept. 12, 2016)..............................................................14, 15, 20

*M.R. Swanson, Inc. v. Burlington N. &amp; Santa Fe Ry. Co.*,
   2001 WL 201378 (E.D. Cal. 2001)..........................................................................................10

*Malone v. U.S. Postal Serv.*,
   833 F.2d 128 (9th Cir. 1987) ...................................................................................................13

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
   427 U.S. 639 (1976)......................................................................................................................8

*Puckett v. County of Sacramento*,
   2024 WL 4014373 (E.D. Cal. 2024)...............................................................................9, 11, 12, 13

*Roadway Exp., Inc. v. Piper*,
   447 U.S. 752 (1980).......................................................................................................................9

*Tacori Enters. v. Beverlly Jewellery Co. Ltd.*,
   253 F.R.D. 577 (C.D. Cal. 2008)..............................................................................................15

*Tuggle v. City of Tulare*,
   2021 WL 3472274 (E.D. Cal. 2021)........................................................................................23

*U.S. for Use &amp; Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co.*,
   857 F.2d 600 (9th Cir. 1988) .............................................................................................9, 10

*Welenco, Inc. v. Corbell*,
   2015 WL 1136468 (E.D. Cal. 2015)........................................................................................20

- 5 -

**Other Authorities**

FRCP 37................................................................................................................................14

FRCP 37(b) ......................................................................................................................8, 9

FRCP 37(b)(2)(A) ......................................................................................................9, 14, 23

FRCP 37(b)(2)(A)(i) ..............................................................................................9, 10, 15, 23

FRCP 37(b)(2)(A)(ii) ...................................................................................................14, 23

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

- 6 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

## REQUEST FOR SANCTIONS

### I.    Introduction

The Court issued two Orders directing Defendants Weber Motors, Fresno, Inc., CJ's Road to Lemans Corp., and Christopher John Wilson (the "Defendants") to produce documents in response to Plaintiff Foundation Auto Holdings, LLC's ("Foundation") requests for production of documents issued February 2, 2024. The first, a stipulation signed by the Court on May 10, 2024 (ECF 81), stated that Defendants had withdrawn all objections to the requests. The second, the Court's Order of October 29, 2024 (ECF 101) (the "October 29 Order"), specifically ordered Defendants to produce documents within 30 days, ordered Defendants to pay sanctions in an amount to be determined by proof, ordered Defendants to timely meet and confer regarding deposition scheduling, and found that all objections prior to the filing of the instant Complaint were waived. Despite this, Defendants have produced no documents, no privilege log, and did not provide any response to Foundation's deposition scheduling efforts until further ordered by the Court. Defendants have now repeatedly, for nearly a year, flouted the discovery process, ignored this Court's Orders, and delayed the adjudication of this case. Even monetary sanctions and Court-Ordered deadlines have done nothing to prompt Defendants to participate. As such, stronger evidentiary sanctions must be issued.

### II.    Background

In deference to the Court's time, Foundation does not repeat the factual and procedural events leading to the Court's October 29 Order. Foundation refers to the October 29 Order and the underlying Motion to Compel (ECF 91) for a recitation of the facts and circumstances preceding the October 29 Order.

Subsequent to the October 29 Order, Foundation promptly emailed counsel for Defendants regarding deposition scheduling, as ordered by the Court, and timely filed a declaration demonstrating its costs and fees associated with the Motion to Compel (ECF 102). Defendants neither responded to Foundation's email about the depositions nor filed a status report thereto as ordered. Instead, the Court issued a Minute Order on November 19, 2024, ordering Defendants to file the report and explain their failure to comply with the earlier Order. (ECF 105). The next day,

- 7 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

November 20, 2024, Defendants finally filed its report—notably remaining silent on any explanation for its prior violation of the Court's Order. (ECF 106).

The October 29 Order granted Foundation's Motion to Compel, including a finding that Defendants had waived all objections to Foundation's requests except attorney-client privileged documents dating from the filing of the Complaint (ECF 1). The Court further Ordered that "[b]y no later than thirty (30) days from the date of this order, Defendants must produce: (1) the requested documents, and (2) a privilege log, if any, reflecting privileged document post-dating the commencement of this action on June 18, 2021." (ECF 101). Defendants have not produced any documents. *See* Klair Decl. at ¶ 2. Defendants have not produced a privilege log. *Id*. As of the filing of this Request, Defendants have not directly communicated with Foundation in any capacity, including to respond to its scheduling emails except to serve a privilege log in response to a separate subpoena. *Id.* at ¶¶ 3, 4, Exhs. 1, 2. As part of its Order, the Court also directed Defendants to pay monetary sanctions in an amount to be determined by the Court. This did not motivate Defendants to produce documents or a privilege log. Monetary sanctions are therefore plainly insufficient to ensure compliance with this Court's Order. As such, stronger sanctions are needed.

## III.     Negative Inferences and Evidentiary Sanctions are Warranted Under FRCP 37(b)(2)(A)

Defendants already flouted the Court's first and second attempts to enforce compliance with the discovery process, which included monetary sanctions. Accordingly, stiffer penalties must be assessed in the form of both inferences taking as established those facts sought by the Requests (FRCP 37(b)(2)(A)(i)) and evidentiary sanctions prohibiting Defendants from introducing any evidence otherwise responsive to the at-issue Requests (FRCP 37(b)(2)(A)(ii)).

The Court is empowered to issue these sanctions: "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). Further, "Federal Rule of Civil Procedure 37(b) authorizes sanctions for failure to comply with discovery orders. The District Court may bar the disobedient party from introducing certain evidence, or it may direct that certain facts

- 8 -

shall be 'taken to be established for the purposes of the action. . . .'" *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 763 (1980) (quoting Fed. Rule of Civ. Proc. Rule 37(b)).

### a.   Standard of Review

FRCP 37(b)(2)(A) provides that the Court may issues sanctions "(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; [and] (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence…."

"Sanctions under Rule 37(b) serve three general purposes: 1) to ensure that a party will not be able to profit from its own failure to comply, 2) to serve as a deterrent and to secure compliance with the particular order at hand, and 3) to consider the general deterrent effect the court's order may have on the instant case and on other litigation, provided that the party on whom they are imposed is, in some sense, at fault." *Puckett v. County of Sacramento*, 2024 WL 4014373 at * 8 (E.D. Cal. 2024) (quoting *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir. 1980)) (internal quotations and citations omitted).

There are two requirements for these sanctions: "First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 707 (1982). Further, "in evaluating the propriety of sanctions, we look at all incidents of a party's misconduct." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1411 (9th Cir. 1990); *see also, U.S. for Use & Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co.*, 857 F.2d 600, 601-2 (9th Cir. 1988). In other words, "[a] court may consider prior misconduct when weighing a subsequent sanction motion." *Id.* (citing *Halaco Engineering Co. v. Costle*, 843 F.2d 376, 381, n. 2 (9th Cir. 1988)). The facts at issue here merit both subsection (i) and (ii) sanctions here.

### b.   Rule 37(b)(2)(A)(i) Negative Inference Sanctions Are Necessary

Several of the Requests seek information for which Foundation has the burden of proof but Defendants are the only source of information. For example, request no. 35 requests Defendants' communications concerning its decision to either terminate and/or not perform under the Asset Purchase Agreement. Foundation must establish this failure to prove breach, but only Defendants

- 9 -

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS                                          CASE NO: 1:21-CV-00970-JLT-EPG

have access to this information. *See M.R. Swanson, Inc. v. Burlington N. & Santa Fe Ry. Co.,* 2001 WL 201378 at \*6 (E.D. Cal. 2001) ("in breach of contract cases the burden is on the plaintiff to demonstrate that the defendant had a duty under the contract, the defendant breached the contract, and the defendant's breach caused damages."). As such, the only sanction other than production that can satisfy Foundation's obligation is a negative inference. Mere evidentiary sanctions would not be sufficient, because a sanction prohibiting Defendants from introducing contrary evidence will not overcome the initial problem that it is Foundation, not Defendants, that must overcome the burden, and Foundation lacks the information to do so *because* of Defendants' misconduct.

Sanctions under subsection (i), often referred to as negative inferences, allow the Court to take as established those facts relating to the at-issue discovery violations. FRCP 37(b)(2)(A)(i). In some instances, this can be tantamount to a dismissal, so Courts reserve negative inferences for "extreme circumstances." *U.S. for Use and Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co., Inc.*, 857 F.2d 600, 603 (9th Cir. 1988) (quoting *Fjelstad v. American Honda Motor Co., Inc.*, 762 F.2d 1334, 1338 (9th Cir.1985)). This is precisely the sort of circumstance warranting negative inferences.

First the Court must look to whether the failure to comply with the Court's Order was "due to willfulness, bad faith, or fault of the party." *U.S. for Use*, 857 F.2d at 603. Here, that is apparent. Defendants were evidently capable of complying with the Court's Order: they did in fact ultimately file a status report, though it failed to account for the previous failure to comply, and did serve a privilege log in response to a separate subpoena, though it claimed privilege exclusively over documents this Court ordered were not privileged. Defendants have also never represented in any briefing that they *cannot* comply, but rather objected to compliance. The sheer time since Foundation's requests first issued also evidences bad faith, as these delays required the Court to continue case deadlines not once, but twice. Defendants' latest refusal to comply with this Court's Orders will almost certainly require a third continuance. Accordingly, Defendants' failure to comply could not be due to lack of capacity, only to lack of motivation.

//

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

- 10 -

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS                                      CASE NO: 1:21-CV-00970-JLT-EPG

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Second, the Court must apply a five factor test. *Id.* Under the five factor test, known as the *Malone* test, the Court must look to: "'(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions.'" *Puckett*, 2024 WL 4014373 at *9 (quoting *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990)).[2] When, as in here, "a court order is violated, the first two factors support sanctions" but "the fourth factor cuts against a default." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990). "Therefore, it is the third and fifth factors that are decisive." *Id.* Here, when analyzing the factors, specifically focusing on the third and fifth factors, negative inferences are warranted.

### 1.    The Public Interest Favors Expeditious Resolution of Litigation

The Public Interest factor weighs strongly in favor of a negative inference. Indeed, "the public interest in expeditious resolution of litigation, which has been delayed in part by defendants' actions, weighs in favor of a sanction." *Id.* at *11. The instant case is over three years old and is still mired in discovery. These delays are due in no small part to Defendants' routine stonewalling of the discovery process. Most notably, the parties are still litigating Foundation's requests for production issued February 2, 2024, based solely on Defendants' refusal to comply with their own agreements and this Court's Orders. Indeed, even after twice being ordered by the Court to produce documents, Defendants have yet to produce any documents. Further evidentiary hearings as to the existence of documents to prove or disprove the relevant facts or as to Defendants' willfulness in ignoring the Court's orders would only further the delay. *Id.* As such, the public's interest in expeditious resolution favors a negative inference here.

//

//

---

[2]    Foundation has not found any authority establishing a lesser standard for negative inferences that are not tantamount to a dismissal, such as those here. Given the recent decision in *Pucket* applying the standard five factor test to less-than-dismissal negative inferences, Foundation applies the five factor test in *Pucket* but notes that the *Pucket* court specifically acknowledged that the factors may be over and above the standard necessary for less-than-dismissal negative inferences. *Pucket*, 2024 WL 4014373 at *11 ("Although the sanction is not tantamount to default . . . the court nevertheless considers the factors courts must weigh when imposing such harsh sanctions.").

- 11 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

**2.     The Court's Need to Manage its Docket Favors a Negative Inference**

Court resources are limited and the need for repeated motions and hearings on this discovery dispute have cluttered the Court's docket. Given Defendants have shown no inclination to cooperate or produce documents, it is necessary to order a negative inference to conserve judicial resources and foreclose further delays. Similarly, the parties have expended ample resources already, just dealing with what should have been routine document requests. *Puckett*, 2024 WL 4014373, at *11 (finding this element met when defendant's actions "have already prompted the expenditure of limited court resources by obstructing discovery and unduly cluttered the court's docket."). There is no reason for Foundation or for this Court to devote further time and effort to cajoling Defendants to meet their obligations.

**3.     Foundation is Prejudiced by Defendants' Refusal to Produce**

The third factor, prejudice to Foundation, is one of the two critical factors identified by the Ninth Circuit when analyzing whether to issue a negative inference. *Adriana*, 913 F.2d at 1412. In this case, the prejudice to Foundation is clear and simple. While "[d]elay alone has been held to be insufficient prejudice. . . . Failure to produce documents as ordered, however, is considered sufficient prejudice." *Id.* Here, Defendants have, repeatedly, failed to produce documents as ordered. This is especially egregious here, where multiple categories of documents are necessarily exclusively in Defendants' control. For example, Defendants have exclusive control over their financial statements and profit and loss statements as requested by RFP nos. 18 and 19, which are necessary for Foundation to prove damages and compliance with the at-issue agreement (the "APA"). As another example, RFP no. 37 seeks documents relating to Defendants' internal decision to relocate the at-issue dealerships, which affects Defendants' defense regarding obtaining landlord approvals. As such, there is sufficient prejudice to Foundation to merit a negative inference based on Defendants' willful failure to comply with this Court's Orders.

**4.     The Public Policy Favoring Adjudication on the Merits is Neutral and Insufficient to Warrant Denying Sanctions**

As noted by the *Adriana* court, this factor necessarily cuts against sanctions. *Id.* However, as here where no other factors cut against sanctions, this alone is not enough to justify a denial of a

- 12 -

negative inference. The "public policy favoring the disposition of cases on their merits is neutral . . . when opposing party 'caused significant delay and prevented th[e] case from progressing towards resolution on the merits.'" *Pucket*, 2024 WL 4014373 at *11 (quoting *White v. Gonzales*, 2024 WL 1659896, at *5 (N.D. Cal. 2024). This factor is a non-issue here where Defendants caused significant delays and intentionally and without any explanation disobeyed this Court's Orders.

### 5.     There Are No Less Drastic Sanctions Available

The Court has already issued an Order without sanctions and an Order with monetary sanctions. Neither has prompted Defendants' compliance. More extensive sanctions are therefore necessary to obviate the issue and prevent Defendants taking advantage of their own refusals to comply. To determine whether less drastic sanctions are available, the Ninth Circuit looks to three factors: "(1) Did the court explicitly discuss the feasibility of less drastic sanctions and explain why alternative sanctions would be inadequate? (2) Did the court implement alternative methods of sanctioning or curing the malfeasance before ordering dismissal? (3) Did the court warn the plaintiff of the possibility of dismissal before actually ordering dismissal?" *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 132 (9th Cir. 1987). Although again it is worth noting that this test is not strictly relevant—there is no request to order a dismissal—it is nevertheless the test used for negative inferences and so is addressed here. As with *Puckett*, the negative inferences requested here are **not** dispositive and therefore are not the most-drastic sanctions (*i.e.*, terminating sanctions). *Puckett*, 2024 WL 4014373 at *11 ("The court's sanction is not case-dispositive . . . the court finds less drastic sanctions will not be effective given the protracted history of the discovery litigation in this case.").

With respect to the first factor, the Court in its order must explicitly discuss the feasibility of less drastic sanctions. Here that analysis is straightforward, since it in fact ordered less drastic sanctions and they were not effective. The Court, after an Informal Discovery Conference, issued an Order on the parties' stipulation without sanctions. (ECF 81) That was not effective. The Court then held a motion to compel hearing and again ordered production, this time with monetary sanctions in an amount to be determined by the Court. This also was not effective in producing compliance.

- 13 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Lastly, given Defendants' multiple discovery delays and disobedience for nearly a year, it is clear that further, less drastic sanctions would be inadequate.

Regarding the second factor, whether the Court tried alternative methods of sanctioning, the analysis is the same. Indeed, Defendants received <u>three</u> opportunities to produce documents, not counting the numerous extensions and concessions made by Foundation to accommodate Defendants. They responded to none of them.

The third factor, whether the Court warned of the possibility of further sanctions, the Court did so. Defendants had an informal discovery conference with the Court in which the Court warned that, should this proceed to a motion to compel, it was the type of situation in which the Court would award sanctions and referred to Rule 37 in doing so. Defendants further knew of the possibility of further sanctions in that, having failed to comply with this Court's first order, a motion to compel followed again citing to Rule 37 and asking for sanctions. The Court discussed those sanctions with counsel at the hearing on the motion to compel. Thus, Defendants knew, and disregarded, the risk of further sanctions in choosing to defy the Court's second Order.

Accordingly, the fifth factor weighs toward a negative inference: less drastic sanctions will not work— Defendants have already been sanctioned and said lesser sanctions have not produced results. All five factors either favor a negative inference or are neutral. As such, negative inferences taking as established those facts favorable to Foundation as contemplated by the at-issue Requests must be ordered by the Court. The specific requested inferences are described in Section IV, *infra*.

**c.      Rule 37(b)(2)(A)(ii) Evidentiary Sanctions Are Necessary**

For many of the requests, evidentiary sanctions—a lesser form of sanction than a negative inference—is a possible remedy for Defendants' failure to produce. "Rule 37(b)(2)(A) also allows the issuance of evidentiary sanctions 'prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.'" *Lanier v. San Joaquin Valley Offs. Ass'n*, 2016 WL 4764669 at *8 (E.D. Cal. Sept. 12, 2016). "Under this rule, trial courts are entitled to preclude the introduction of evidence or issues following a failure to comply with discovery orders." *Id.* (citing *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 843 (9th Cir. 1976)). The failure to produce documents or otherwise cooperate in discovery is sufficient to

- 14 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS                                          CASE NO: 1:21-CV-00970-JLT-EPG

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

justify the issuance of evidentiary sanctions. *Id.* (citing *Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 393-394 (N.D. Cal. 2012); *Tacori Enters. v. Beverlly Jewellery Co. Ltd.*, 253 F.R.D. 577, 584 (C.D. Cal. 2008) (citing *Nike, Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 647-49 (Fed. Cir. 1994).

Here, Defendants stipulated that they had waived all objections and promised to produce all documents nearly six months ago. Defendants then defied the Court's two Orders to produce documents. Defendants further failed to comply with the Court's Order to provide a status report until after a <u>second</u> Order. (ECF 105). Defendants' repeated disobedience of the Court's Orders justify precluding Defendants "from introducing further facts or evidence in response to" the issues contemplated by the discovery at issue here. *Lanier*, 2016 WL 4764669 at *8. Foundation requests that the Court order that Defendants cannot offer or introduce into evidence facts, documents or other evidence, either during summary judgment or at trial, that should have been produced pursuant to the October 29 Order. A list of requested evidentiary sanctions is below in Section V, *infra*.

**IV.    Requested Negative Inferences[3]**

Foundation requests that the Court make the following inferences pursuant to FRCP 37(b)(2)(A)(i):

**a.    Requested Negative Inferences for RFP Nos. 18, 19, and 21**

Defendants terminated the APA to avoid tax liability.  Defendants terminated the APA to take advantage of increased car prices during COVID-19.  Defendants failed to comply with their financial obligations under the APA.

**1.    Why Negative Inferences are Necessary for Requests for Production ("RFP") Nos. 18, 19, and 21**

RFP No. 18 requests Defendants' "audited financial statements from January 1, 2020, until the present." RFP No. 19 requests Defendants' profit and loss statements from the same time

---

[3]    Foundation filed a supplement (ECF 99) to its Motion to Compel (ECF 91) consisting of all discovery requests at issue here, as requested by the Court. Foundation's Motion to Compel further details the relevance and scope of each of the at-issue discovery requests here.

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS                                                    CASE NO: 1:21-CV-00970-JLT-EPG

period. RFP No. 21 requests all documents relating to Defendants' liabilities to "other multi-employer union pension fund(s) pursuant to section 6.1(c) of the [APA]."

RFP Nos. 18, 19, and 21 all deal with the financial stability and performance of Defendants. Beyond the need for these documents to establish the extent of Foundation's monetary damages, these requests also relate to several of Defendants' breaches.

Foundation contends that Defendants breached the APA by, in part, by refusing to fulfill its obligations under the APA and refusing to disclose sufficient financial information to assure Foundation of Defendants' compliance with pre-closing obligations under the APA. ECF 42 at ¶ 75. During the course of discovery, Foundation learned of various references to liabilities Defendants had to various non-parties, including potential tax liabilities. Foundation also contends the dramatic change in fortunes for car retailers due to the COVID-19 pandemic led Defendants to breach the APA to take advantage of increased vehicle prices.

These reasons for Defendants' breach can only be fully determined by Defendants' documents, specifically their financial documents. RFP Nos 18 and 19 are the only reasonable means for Foundation to determine whether Defendants' held outstanding tax liabilities and whether Defendants' revenue increased due to COVID-19. Defendants' refusal to produce these documents, despite multiple Court Orders to do so, has unduly harmed Foundation and prevented it from developing the allegations brought in the Complaint. As such, negative inferences relating to Defendants' reasons for breaching the APA are necessary.

Additionally, the APA requires Defendants to make certain financial disclosures relating to withdrawal liability. ECF 43-2, Asset Purchase Agreement ("APA") § 6.1(c) ("Seller [Defendants] will have paid any and all withdrawal liability it or a member of Seller's controlled group is obligated to pay as a result of withdrawal from the I.A.M. National Pension Fund or another multi-employer union pension fund where the withdrawal arose out of or relates to this transaction"). RFP No. 21 specifically asks for those documents (documents relating to "other multi-employer union pension fund(s) pursuant to section 6.1(c) of the [APA]"). There is no alternative means for Foundation to discover whether or not Defendants complied with this section of the APA. As such,

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

- 16 -

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS                                    CASE NO: 1:21-CV-00970-JLT-EPG

a negative inference is necessary to establish as given the fact that Defendants breached the APA by failing to discharge any and all liability under APA section 6.1(c).

**b.    Requested Negative Inference for RFP Nos. 31-33**

Defendants Weber and Lemans both have additional persons or entities with equity interests and both, individually, failed to disclose those parties as required by Section 3.2(f) of the APA.

**1.    Why a Negative Inference is Necessary for RFP Nos. 31-33**

RFP No. 31 requests documents "sufficient to show the identity of all persons who are shareholders, owners, or otherwise have an equity interest in [Defendants]." No. 32 requests the number of shares held by any of the people identified in response to No. 31. RFP No. 33 requests documents and communications "sufficient to show any equity ownership of [Defendants] by any Trust."

APA Section 3.2(f) requires Defendants to deliver to Foundation all consents and approvals necessary for Defendants to enter into agreements and consummate the APA. ECF 43-2, APA § 3.2(f). Here, Foundation alleges that Defendants failed to disclose certain Trust ownership interests in Defendants. FAC at ¶¶ 75(a), 88(b). RFP Nos. 31-33 were issued to determine if, and if so, who possessed equity ownership of Defendants as they may have knowledge or information which caused Defendants to terminate the APA. Defendants are the only parties known or reasonably knowable to Foundation who would have that information. Yet Defendants refused multiple Orders to produce these documents. There is no way for Foundation, through no fault of its own, to determine whether or not Defendants breached the APA by failing to disclose equity ownership. As such, a negative inference finding that there was such equity ownership, and that Defendants failed to disclose the ownership is necessary.

**c.    Requested Negative Inference for RFP No. 35**

Defendants refused to perform under the APA without any justification or prior breach by Foundation and terminated the APA without cause.

**1.    Why a Negative Inference is Necessary for RFP No. 35**

RFP No. 35 requests all communications "regarding [Defendants'] decision to terminate and/or not perform under the [APA]."

- 17 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

RFP 35 seeks communications regarding Defendants' decision to "terminate and/or not perform under the agreement." Given this case is premised on Defendants' refusal to perform, Defendants' objection to producing responsive documents in response to an RFP seeking documents related to that decision has irreparable harmed Foundation's case in chief. Foundation is entitled to Defendants' communications regarding its decision to terminate the APA and thus, given Defendants continue to refuse to produce such documents, Foundation is entitled to a negative inference that Defendants had no cause or reason to terminate the APA.

### d.     Requested Negative Inferences for RFP Nos. 36-38

Defendants' conduct relating to the acquisition of land in Fresno mooted any requirement under the APA to reach an agreement with Defendants' landlord. Defendants prematurely terminated the APA because Defendants' acquired alternate locations for the at-issue dealerships.

### 1.     Why Negative Inferences are Necessary for RFP Nos. 36-38

RFP No. 36 requests all documents and communications Defendants "had with any landlord as contemplated by the [APA] from November 30, 2020 until the present." No. 37 requests all documents "regarding [Defendants'] decision to relocate [Defendants'] dealerships to Clovis as identified in The Fresno Bee article dated November 20, 2023." RFP No. 38 seeks documents "sufficient to identify all partners in [Defendants'] relocation to Clovis."

One of Defendants' defenses is based on the contention Foundation did not obtain landlord approval prior to the planned sale date and therefore Defendants could terminate the APA. ECF 43 at 6-7. However, as noted in these requests, it appears Defendants planned to move locations to a different site, which would necessarily obviate the need for landlord approval. Further, because the referenced news article in RFP No. 38 indicates Defendants may have themselves acquired the land, and were not renting, there is a strong likelihood that Defendants terminated the APA pretextually because they decided to continue running the dealerships themselves, now that they would no longer be paying rent. Foundation is left with no way of confirming whether this is true because Defendants refused to produce documents relating to their plans to move the dealerships. Further, Defendants refused to produce documents identifying other partners in this move—foreclosing any

- 18 -

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS

CASE NO: 1:21-CV-00970-JLT-EPG

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

opportunity to depose those individuals. As such, a negative inference is necessary establishing as given the fact that Defendants' terminated the APA because they wanted out of the deal to effectuate their real estate plans, and that the obligation under the APA to obtain landlord approval was mooted by Defendants' actions to obtain new land for the dealerships.

**e.       Requested Negative Inferences for RFP Nos. 42 and 43**

Non-party Audi attempted to terminate Defendants' dealership agreement due to Defendant Christopher Wilson's mismanagement of the dealership. Non-parties Audi, Porsche, and BMW each, individually, approved of and were in favor of Foundation's acquisition of the at-issue dealerships.

**1.       Why Negative Inferences are Necessary for RFP Nos. 42 and 43**

RFP No. 42 requests Defendants' "settlement agreement with Audi in CJ's Road to Lemans Corp. v. VWGoA, Inc., Protest No. PR-2788-22, before the California New Motor Vehicle Board." No. 43 requests all documents Defendants "submitted to the California New Motor Vehicle Board in CJ's Road to Lemans Corp. v. VWGoA, Inc., Protest No. PR-2788-22."

RFP Nos. 42 and 43 seek documents related to non-party Audi's attempt to terminate Defendants' dealership agreement. During this litigation, Foundation learned that Audi sought to terminate its dealership agreement with Defendants given Mr. Wilson's mismanagement. Foundation seeks these records to show that manufacturers (of which Audi is one), contrary to Defendants' claims, were in favor of Defendants' sale to Foundation. Defendants cannot hide evidence that manufacturers sought to terminate his ownership in favor of Foundation, and at the same time argue to the Court that Foundation was unable to obtain manufacturer approval as required by the APA. ECF 43 at 12 (Foundation "was incapable of satisfying full approval from Audi by June 29, 2021 and therefore Defendants rightfully terminated the ADA."). Further, Defendants were also obligated under the APA to obtain approvals from manufacturers, and thus their communications with Audi are relevant to their satisfaction of their obligation. *See* APA § 6.2 (describing Defendants' obligation that "All consents, approvals and waivers (including the approval by the Manufacturers) required to consummate the transactions contemplated by this

- 19 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Agreement and the Related Agreements will have been obtained in writing by Buyer and Seller, as applicable").

Defendants refused multiple Court Orders to produce these documents. Without these documents, Foundation is prejudiced and cannot establish the facts necessary to prove that its performance under the APA was not jeopardized by potential denials by the manufacturers. As such, the Court should grant negative inferences finding that the manufacturers of the vehicles sold by each of the at-issue dealerships approved of the APA, that Audi attempted to rescind its approval of Defendants, and that Audi intended to deny Defendants' permission to sell the dealership.

## V. Requested Evidentiary Sanctions

### a. First Evidentiary Sanction Request

Defendants cannot offer or introduce into evidence facts, documents or other evidence, either during summary judgment or at trial, which were not specifically identified and disclosed to Defendants in discovery as of October 29, 2024.

#### 1. Why this Evidentiary Sanction is Necessary

This evidentiary sanction is warranted because Defendants should not be rewarded for their dilatory tactics. It is well established by case law that refusals to comply with Court-ordered document productions are properly addressed by an order forbidding the refusing party from bringing any such evidence in the case. *See, e.g., Welenco, Inc. v. Corbell*, 2015 WL 1136468 at *3 (E.D. Cal. 2015) (finding that "[h]aving failed to comply with the court's order to produce responsive documents . . . plaintiffs should be precluded from introducing documentary evidence not previously provided to defendants."). Here, Defendants were ordered, twice, to produce documents in response to Foundation's requests. Defendants have refused, twice. As such, it would offend justice and fairness to allow Defendants to subsequently use any evidence that should have been produced. *See, e.g., Lanier*, 2016 WL 4764669 at *8 ("Under this rule, trial courts are entitled to preclude the introduction of evidence or issues following a failure to comply with discovery orders.").

//

//

- 20 -

b.      **Second Evidentiary Sanction Request**

Defendants cannot offer or introduce into evidence facts, documents or other evidence, including witness testimony, either during summary judgment or at trial, relating to any individuals not disclosed by Defendants that were requested by Foundation's RFPs.

1.      **Why this Evidentiary Sanction is Necessary**

This evidentiary sanction is warranted because Defendants refused to provide documents identifying specific individuals in response to RFP No. 31 (identify of any shareholders, owners, or others holding equity interests in Defendants), RFP No. 38 (individuals relating to the dealership relocation). By failing to produce these documents, and thereby identifying potential witnesses, Defendants cannot be allowed to later rely on such individuals at trial or in a motion for summary judgment or adjudication.

c.      **Third Evidentiary Sanction Request**

Defendants cannot offer or introduce into evidence facts, documents or other evidence, including witness testimony, either during summary judgment or at trial, relating to any individuals who shared in the decision-making process, other than Mr. Wilson and Ms. Zimmerman, surrounding the decision to terminate the APA.

1.      **Why this Evidentiary Sanction is Necessary**

This evidentiary sanction is warranted because Defendants refused to provide documents relating to communications regarding Defendants' decision to terminate the APA in response to RFP No. 35. Defendant failed to produce these documents, which would have necessarily provided information on and the identifies of potential witnesses. Defendants cannot be allowed to later rely on such individuals at trial or in a motion for summary judgment or adjudication nor should Defendants be allowed to use any documents relating to the same. Defendants contend they were permitted under the APA to terminate the agreement (ECF 43 at p. 8), but, when asked to produce documents substantiating this authority, have refused and stalled for months.

//

//

//

- 21 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

**d.      Fourth Evidentiary Sanction Request**

Defendants cannot offer or introduce into evidence facts, documents or other evidence, either during summary judgment or at trial, relating to Defendants' defense that Foundation did not obtain landlord approval prior to the planned sale date.

**1.      Why this Evidentiary Sanction is Necessary**

This evidentiary sanction is warranted because Defendants' refused to produce any documents in response to RFP No. 36 which requests all documents and communications Defendants "had with any landlord as contemplated by the Agreement from November 30, 2020 until present." To allow Defendants to use any evidence relating to landlord approval would be improper. Defendants had the opportunity to produce the documents that support their defense and have, repeatedly, failed to do so. They cannot later use those documents, or any other evidence, to support their defenses relating to landlord approvals. *See, e.g., Bland v. Rodriguez,* 2021 WL 3857673 at *5 (2021) (granting evidentiary sanctions precluding use of documents when party failed to comply with court order).

**e.      Fifth Evidentiary Sanction Request**

Defendants cannot offer or introduce into evidence facts, documents or other evidence, including witness testimony, either during summary judgment or at trial, relating to any approval by non-party Audi relating to the at-issue dealerships.

**1.      Why this Evidentiary Sanction is Necessary**

This evidentiary sanction is warranted because Defendants' base their defense in part on an argument that Foundation could not receive approval from Audi. ECF 43 at p. 8. RFP Nos. 42 and 43 specifically request Defendants' documents relating to its prior litigation against Audi. Defendants failed to produce <u>any</u> of the requested documents despite two Court Orders to do so. It would be unjust to allow Defendants to make an allegation relating to Audi's approval, and then refuse to produce documents that relate to Foundation's counterargument. As such, Defendants cannot be allowed to use any evidence relating to approvals from Audi—the opportunity to do so was lost once Defendants repeatedly withheld these documents. *See Bland*, 2021 WL 3857673 at *5.

- 22 -

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS

CASE NO: 1:21-CV-00970-JLT-EPG

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

**f.    Sixth Evidentiary Sanction Request**

Defendants nevertheless must produce all requested documents. Nothing herein precludes Foundation from offering or introducing into evidence facts, documents or other evidence, including witness testimony, either during summary judgment or at trial, relating to these records and Defendants.

**1.    Why this Evidentiary Sanction is Necessary**

This evidentiary sanction is warranted because the preceding requested sanctions would be rendered irrelevant were Defendants allowed to otherwise use documents introduced by Foundation. FRCP 37(b)(2)(A) states that the sanctions are intended to prohibit "the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." As such, Defendants cannot be allowed to use <u>any</u> documents relating to Defendants' failure to comply with discovery, whether in support or in opposition to any claims. Further, the imposition of evidentiary sanctions here does not foreclose Defendants' duty to still produce the documents and Defendants' should still be held to comply with the Court's previous Orders directing Defendants' to produce all responsive documents with objections waived (except as to the attorney-client privilege post filing of the Complaint). *Tuggle v. City of Tulare*, 2021 WL 3472274 at *1 (E.D. Cal. 2021) (finding that "evidentiary sanctions do not absolve [parties] from their duty to supplement incomplete or incorrect disclosures, or to supplement with changed information, however, any supplementation will remain as subject to the evidentiary sanctions and exclusions specified herein, as far as their ability to utilize such evidence in advancing the specified claims, or offering documents produced after [the date of last production]").

//

//

//

//

//

//

//

- 23 -

PLAINTIFF'S REQUEST FOR
FURTHER SANCTIONS                                          CASE NO: 1:21-CV-00970-JLT-EPG

## VI.    Conclusion

Foundation requests that the Court Order sanctions in the form of negative inferences pursuant to FRCP 37(b)(2)(A)(i) as described in Section IV, *supra*, and evidentiary sanctions pursuant to FRCP 37(b)(2)(A)(ii) as described in Section V, *supra*.

Dated: December 5, 2024

*/s/ Andrew Klair*
HOLLAND & KNIGHT LLP
David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci

Attorneys for Plaintiff FOUNDATION AUTO
HOLDINGS, LLC

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

- 24 -

# App. 6

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring
tsm@jaburgwilk.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-JLT-EPG |
| Plaintiff, | **NOTICE RE: STATUS OF DISCOVERY COMPLIANCE** |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | (Assigned to Hon. Erica P. Grosjean) |
| Defendants. | |
| TEMPLETON MARSH, LTD., | |
| Plaintiff-in-Intervention, | |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |

24377-24377-00001\TSM\AMC\6387405v2

Defendants, by and through undersigned counsel, hereby provide this Court and the Parties notice regarding the progress of discovery compliance and document productions. Undersigned counsel ("Counsel") substituted into this case as counsel of record for Defendants on February 14, 2025. At that time Counsel requested that prior counsel, MLG Attorneys at Law ("MLG"), provide a full copy of their file to Counsel.

Despite repeated requests, Counsel did not obtain a digital copy of the MLG's file until after hours on Friday, February 21, 2025. Counsel immediately began to review the file and on Saturday, February 22, 2025, contacted MLG to inquire whether any documents were ever produced to Plaintiff and Intervenor. Counsel was unable to independently verify whether anything had been produced from the review of the file. In response, MLG was unable to confirm what had been produced, or when such production had taken place.

At the same time, Counsel asked its client, Defendant Christopher John Wilson what documents he and the other Defendants had provided to MLG. On behalf of all Defendants, Mr. Wilson immediately provided Counsel with several FTP links to documents that he had previously sent to MLG. A review of the files indicates that these documents, which were responsive to the Requests for Production, were provided by Defendants to MLG on August 12, 2022. Mr. Wilson also directed the IT department of each of the Defendants to review the Defendants' email servers and data servers for anything containing or referencing "Foundation" or "Templeton Marsh," and to provide those documents to MLG.

Defendants uploaded these materials at the request of MLG, which indicated that the documents were generally needed as part of the litigation. Defendants were never provided with any of the specific Requests for Production. Defendants were never asked additional questions about any of the specific requests. Defendants were unaware of any of the pending sanctions motions and were unaware that a monetary award had been entered against the Defendants. Mr. Wilson had only periodic contact with MLG, largely triggered when one attorney left the practice, and a new MLG attorney was assigned to the defense of this matter. In total, Mr. Wilson recalls

2

24377-24377-00001\TSM\AMC\6387405v2

dealing with at least four different attorneys, with each proceeding lawyer being dismissed, usually within 60-90 days of being introduced to Mr. Wilson. None of these attorneys communicated to him the pending motions and the serious nature of the failure to comply with discovery requests, or indicated to him why the documents Defendants had provided to MLG in August, 2022 were not produced to Plaintiff and Intervenor in response to pending document requests. Defendants were not aware of any claims that the prior production was incomplete, non-responsive, or otherwise deficient.

Upon review of the file, and immediately following the unsuccessful Settlement Conference on February 25, 2025, Counsel contacted Plaintiffs' counsel to explain the foregoing and to commit to a rolling production of documents as fast as they can be assembled and reviewed for the limited privilege remaining following the Court's recent rulings related to discovery issues. *See* **Exhibit A**, email from Thomas Moring to all counsel dated February 25, 2025.

Defendants recognize that this production is long overdue. Counsel is not presently able to explain why MLG did not timely produce the documents responsive to the second set of Requests for Production from Plaintiff. Defendants also commit to working with counsel for Plaintiff and Intervenor to schedule the remaining depositions in the case, which were timely noticed but later continued due to a lack of document production. Defendants believe that this discovery process will not prejudice Plaintiff or Intervenor, as the matter is not set for trial until October, 2025. Defendants are also amenable to a meet and confer regarding any modification to the existing scheduling order, as requested by the other Parties or as ordered by this Court.

DATED this 26th day of February, 2025

**Jaburg & Wilk, P.C.**

David L. Allen
Thomas Moring
Attorneys for Defendants

3

24377-24377-00001\TSM\AMC\6387405v2

**CERTIFICATE OF SERVICE**

I hereby certify that on 26th day of February, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci
HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
david.holtzman@hklaw.com
daniel.kappes@hklaw.com
andrew.klair@hklaw.com
isabella.granucci@hklaw.com

Forrest Booth
forrest.booth@kennedyslaw.com
Susan F. Dent
susan.dent@kennedyslaw.com
KENNEDYS CMK LLP
101 California Street, Suite 1225
San Francisco, CA 94111

/s/

4

24377-24377-00001\TSM\AMC\6387405v2

# EXHIBIT A

**From:** Tom Moring
**Sent:** Tuesday, February 25, 2025 4:01 PM
**To:** 'David.Holtzman@hklaw.com' <David.Holtzman@hklaw.com>; Andrew.Klair@hklaw.com;
Daniel.Kappes@hklaw.com; Isabella.Granucci@hklaw.com; 'Camille Zuber' <Camille.Zuber@kennedyslaw.com>; Forrest
Booth <Forrest.Booth@kennedyslaw.com>
**Cc:** David L. Allen <dla@jaburgwilk.com>; David I. Weissman <DIW@jaburgwilk.com>; Brenda Ruiz
<BXR@jaburgwilk.com>
**Subject:** Foundation v Weber

Counsel- It was nice to see you all on Zoom today.  As you know, David Allen and I have just recently come on to
the file in this case.  We were only provided the MLG files on Friday, February 21, 2025, after 6 PM local time.  This
was done via a FTP link, and we are still in the process of undertaking our initial review of the documents we
obtained from that file transfer.

While we asked for a complete copy of the MLG files we are not confident that we have everything from that
file.  For example, we are unable to see any transmittals to you, or documentation showing that any documents
that were produced.  We do see in the transcripts from the various hearings that there were references to what are
described as "financial documents," and we see a reference to a privilege log, but were not able to find the
privilege log in their files.  Can you please provide us with a copy of the production that you have already?

In addition, we have from Mr. Wilson and his dealerships a number of documents that he produced to MLG during
the representation. It appears that those documents were never transmitted to you, despite Mr. Wilson and his
staff providing them to MLG.  Our intention is to organize, Bates, and provide you with copies of those documents
as soon as possible.  We have reviewed the Court's rulings on the ability for Defendants to assert a privilege and
we will comply with those orders.  Our anticipation is that we will have the documents to you in the next two
weeks, and we will commit to production on a rolling basis so that you receive the documents as soon as possible.

We look forward to continuing a discussion with you as we move through the remaining discovery in the
case.  Please do not hesitate to call me or David should you wish to discuss this matter.

1



**Tom Moring**

**Partner** | Jaburg Wilk

1850 North Central Avenue, Suite 1200 Phoenix, Arizona 85004

602.248.1049 | 602.248.1000 | 602.248.0522

Bio Page | tsm@jaburgwilk.com | www.jaburgwilk.com



This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. Dissemination, distribution, or copying of this communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone at (602)248-1000, or via e-mail, and delete this message and all attachments thereto.

# App. 7

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **DEFENDANTS' UPDATED NOTICE RE: STATUS OF DISCOVERY COMPLIANCE** |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | (Assigned to Hon. Erica P. Grosjean) |
| Defendants. | |
| TEMPLETON MARSH, LTD., | |
| Plaintiff-in-Intervention, | |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |

JABURG WILK
LAW FIRM

24377-24377-00001\TSM\AMC\6392801v2

Defendants, by and through undersigned counsel, hereby provide this Court and the Parties this update regarding the progress of discovery compliance and document productions, in advance of the hearing set by the Court for March 5, 2025.

As previously noted, Undersigned Counsel first obtained a digital copy of the prior counsel MLG's file at approximately 8:00 PM on Friday, February 21, 2025. *See* Declaration of Thomas S. Moring ("Moring Declaration") attached as **Exhibit A**. The transfer of MLG's file was accomplished through a file sharing program known as Filevine, which allowed Mr. Moring to access the materials that were uploaded by MLG. Mr. Moring immediately began to review the file and on Saturday, February 22, 2025, contacted MLG to inquire whether any documents were ever produced by MLG to Plaintiff and Intervenor. Ex. A. Based on his review of the PACER docket and the transcripts of the discovery dispute hearings in October, 2024 and January, 2025, Mr. Moring was not able to determine what documents had been produced and what discovery Plaintiff and Intervenor claimed was still outstanding, as opposed to non-responsive. The hearing transcripts contain references to "financial documents" produced by Defendants, but Mr. Moring was unable to identify any documents that were produced based on his review of the Filevine MLG materials.

Mr. Moring also requested that Defendants confirm what materials had been provided by them to MLG. Defendant Christopher John Wilson was able to provide access to another file transfer link, showing that a significant number of documents (some 6,000+ pages) had been provided by Defendants to MLG. *See* Declaration of CJ Wilson ("Wilson Declaration") attached as **Exhibit B**. Those documents were provided by Defendants to MLG on or about August 12, 2022. Ex B. Mr. Wilson also at that time directed the IT department of each of the Defendants to review the Defendants' email servers and data servers for anything containing or referencing "Foundation" or "Templeton Marsh," and to provide those documents to MLG. Ex B.

24377-24377-00001\TSM\AMC\6392801v2

It therefore appeared that MLG had Defendants' documents, but over that weekend MLG was unable to confirm what had been produced or when such production had taken place. The MLG Filevine site did not show any Bates numbered production by Defendants.

Defendants were never provided with any of the specific Requests for Production served in this matter by Plaintiff or Intervenor. Defendants were never asked additional questions about any of the specific requests. Defendants were unaware of any of the filed sanctions motions and were unaware that monetary sanctions had been entered against the Defendants. Ex B. Mr. Wilson had only periodic contact with MLG, largely triggered when one attorney left the practice, and a new MLG attorney was assigned to the defense of this matter. Ex B. In total, Mr. Wilson recalls dealing with at least four different MLG attorneys, with each proceeding lawyer being dismissed, usually within 60-90 days of being introduced to Mr. Wilson. Ex B.

None of these attorneys communicated to Mr. Wilson the pending motions and the serious nature of the failure to comply with discovery requests; nor was he even aware of the various discovery disputes in the case. Defendants were not aware of any claims that the prior production was incomplete, non-responsive, or otherwise deficient. Ex B.

In order to confirm what had been produced, Defendants' new counsel also contacted Plaintiff's counsel and requested that said counsel provide to Defendant's new counsel all documents it had been provided by MLG. In response Plaintiff provided a copy of MLG's prior production, consisting of over 6,000 pages of documents. Defendants are in the process of reviewing these documents to determine if they match what Defendants previously supplied to MLG, and to determine what, if any, further documents need to be provided in response to Plaintiff's requests. Of course, it is possible that Defendants do not have responsive documents responsive to some of the specific requests, in which event that fact needs to be made clear to Plaintiff. For example, RFP #16 to Defendant Weber Motors asks for "All DOCUMENTS demonstrating that any representations made by YOU [defined as Weber Motors] in the AGREEMENT were false as of June 11, 2021." It is likely that Weber did not make false

3

24377-24377-00001\TSM\AMC\6392801v2

representations, and there would be no documents to demonstrate something that never happened. It is incumbent on Defendants to issue such responses, of course, a process that is currently underway.

Defendants have continued working with counsel for Plaintiff and Intervenor to provide complete responses to discovery, including explaining that no documents exist where none were found. This will allow the parties to schedule the remaining depositions in the case, which were timely noticed but later continued due to a lack of document production. Defendants remain available for a meet and confer regarding any modification to the existing scheduling order, as requested by the other Parties or as ordered by this Court.

On February 6, 2025, the Court issued its Order Awarding Attorneys' Fees, ordering Defendants to pay to Plaintiff $12,463.13 by no later than April 7, 2025, for Plaintiff's attorney's fees relating to their first Motion for Sanctions (Doc. 131). As set forth in the Wilson Declaration, until very recently Defendants were unaware of either the Motion itself or the Court's Order awarding attorney's fees as sanctions. Now that Defendants are aware of the Order, they will promptly pay to Plaintiff the amount ordered.

At the hearing on Plaintiff's second Motion for Sanctions (Doc. 107) held on January 24, 2025, the Court took the matter under advisement and has not yet issued its Order either awarding or declining to award any further sanctions against Defendants. For the reasons set forth herein, including the Declarations attached hereto, Defendants respectfully urge the Court not to punish them by awarding any non-monetary sanctions against Defendants which will impede their ability to defend themselves on the merits in this matter.

DATED this 4th day of March, 2025

Jaburg & Wilk, P.C.

David L. Allen
Thomas Moring
Attorneys for Defendants

4

24377-24377-00001\TSM\AMC\6392801v2

**CERTIFICATE OF SERVICE**

I hereby certify that on 4th day of March, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci
HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
david.holtzman@hklaw.com
daniel.kappes@hklaw.com
andrew.klair@hklaw.com
isabella.granucci@hklaw.com

Forrest Booth
forrest.booth@kennedyslaw.com
Susan F. Dent
susan.dent@kennedyslaw.com
KENNEDYS CMK LLP
101 California Street, Suite 1225
San Francisco, CA 94111

/s/ _____

5

24377-24377-00001\TSM\AMC\6392801v2

# EXHIBIT A

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (SBN 075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **DECLARATION OF THOMAS S. MORING** |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | (Assigned to Hon. Erica P. Grosjean) |
| Defendants. | |
| TEMPLETON MARSH, LTD., | |
| Plaintiff-in-Intervention, | |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |

24377-24377-00001\TSM\AMC\6392709v6

I, Thomas S. Moring hereby depose and state under penalty of perjury:

1.      I am over the age of 18.

2.      I am competent to testify to the matters set forth herein.

3.      If called to testify I would testify in conformity with the information contained herein.

4.      The matters set forth herein are true and correct, and based on my personal knowledge.

5.      I make and sign this declaration freely and voluntarily.

6.      I, along with my partner David Allen of the law firm of Jaburg & Wilk, am counsel (admitted pro hac vice) for Defendants in this case.

7.      On or about February 12, 2025, I began communication with Defendants' prior counsel, MLG Attorneys at Law ("MLG") regarding a transfer to Jaburg & Wilk of counsel's entire file in this matter.

8.      I communicated with several of the attorneys and staff at MLG to obtain a digital transfer of the files from MLG Attorneys.

9.      Finally, in the late evening of Friday, February 21, 2025, at approximately 8:42PM, I received notice from MLG Attorneys that the file materials were available for download.

10.     That same night I communicated via email with attorney Douglas Schenck, who encouraged me to call him over the weekend if I had questions based on my review of the file.

11.     On Sunday, February 23, I indicated to Mr. Schenk that the link that was produced did not have any indication of a document production made by Defendants, and I was not able to determine what, if any, documents had been provided to Plaintiff and Intervenor.

12.     At that time, I was unable to find any Bates numbered documents from Defendants in the MLG Attorneys file, and no indication of what documents had been produced by Defendants, or the date of that production.

2

24377-24377-00001\TSM\AMC\6392709v6

13.    On February 23 I emailed Mr. Schenck, who agreed that he would communicate with others at MLG Attorneys and let me know what had been produced, whether that production was a formal response to discovery or an informal production, and the date(s) when documents had been produced.

14.    I also reviewed the hearing transcripts from 10/24/2024 and 1/24/2025, where the Court and counsel discussed the issue of document production, privilege logs, and the exchange of what is referred to in the transcripts under the general description of "financial documents."

15.    It was unclear from the information available to me on February 26, 2025, the amount and extent of production by Defendants encompassed in these "financial documents," and whether any of those documents were responsive to the subsequent requests for production served Plaintiff and Intervenor.

16.    On February 25, 2025, I emailed all counsel to request their help in determining what responses they believed were still delinquent or insufficient, and asked for their help in determining what had already been produced by MLG on behalf of Defendants.

17.    Plaintiffs' counsel was very helpful in helping us obtain a link to the documents that Plaintiffs had received from Defendants' counsel. We now know exactly what was previously produced to Plaintiffs/Intervenors.

18.    When I first reviewed the documents from MLG Attorneys, I was unable to find any documents that had been produced by MLG responsive to Plaintiff.

19.    It now appears that MLG has updated the file share, and that there were thousands of pages of documents purportedly produced to Plaintiff.

20.    We are in the process of reviewing the file materials obtained from MLG's file share, and comparing them to the documents Plaintiff has indicated were already produced to Plaintiff, in order to provide to Plaintiff and Intervenor a supplemental production as needed.

3

24377-24377-00001\TSM\AMC\6392709v6

I HEREBY CERTIFY that the foregoing is true and correct, based on my own personal knowledge.

DATED: _03/04/2025_

_____
Thomas S. Moring

24377-24377-00001\TSM\AMC\6392709v6

JABURG WILK
LAW FIRM

# EXHIBIT B

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (SBN 075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **DECLARATION OF CHRISTOPHER JOHN WILSON** |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | (Assigned to Hon. Erica P. Grosjean) |
| Defendants. | |
| TEMPLETON MARSH, LTD., | |
| Plaintiff-in-Intervention, | |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |

24377-24377-00001\DIW\AMC\6391959v2

I, Christopher John Wilson, hereby declare under penalty of perjury:

1. I am over the age of 18.

2. I am competent to testify to the matters set forth herein.

3. If called to testify I would testify in conformity with the information contained herein.

4. The matters set forth herein are true and correct, and based on my personal knowledge.

5. I make and sign this declaration freely and voluntarily.

6. I am a Defendant in Case No. 1:21-cv-00970-JLT-EPG.

7. I am the majority owner and President of a BMW dealership held by Weber Motors, Fresno, Inc. dba BMW Fresno and an Audi and Porche dealership held by CJ's Road to Lemans Corp. dba Audi Fresno and Porche Fresno. Those entities are also Defendants in this case.

8. At my direction, after being served with the Complaint in this matter, all Defendants retained MLG Attorneys at Law ("MLG") to serve as defense counsel in this litigation. Defendants dismissed MLG as defense counsel and retained current counsel Jaburg & Wilk on or about February 12, 2025.

9. On or about August 12, 2022, at MLG's request, I provided documents relevant to this lawsuit to MLG through several FTP links. In particular, at that time, I directed the IT department of each of the Defendants to review each dealership's email servers and data servers for any and all information containing or referencing the terms "Foundation" or "Templeton Marsh" and to provide all of the documents resulting from such search to MLG.

10. At no time did MLG ever provide to me or to any other representative of Defendants copies of any specific Requests for Production of Documents served by Plaintiff or Intervenor; nor did any MLG attorney ever ask me or any other representative of Defendants any questions about any specific document request. Further, neither I nor any other representative of

2

Defendants were ever asked by MLG to provide any documents in addition to those that I had already provided to them.

11.     At no time did MLG ask me or any other representative of Defendants to review a draft of responses or objections to any Requests for Production, nor did MLG ever provide me with a copy of any such responses or objections, in either draft form or final form.

12.     Until I terminated MLG and at that time learned of the pending discovery issues, neither I nor any other representative of Defendants was aware of any motions to compel the production of documents or motions for sanctions in this matter.

13.     I was not aware that the Plaintiff and Intervenor had requested specific documents, and that they were claiming the documents had not been provided.

14.     I was not aware that Plaintiff and Intervenor had filed Motions to Compel and were seeking sanctions against Defendants.

15.      Neither I nor any other representative of Defendants was made aware that a monetary sanctions award had been entered against Defendants until I was informed of the Court's February 6, 2025 sanctions Order by Defendants' current counsel, Jaburg & Wilk, P.C., on or around February 27, 2025.

16.     Throughout this litigation, I have had only periodic contact with attorneys at MLG, largely triggered when one attorney left the firm and a new MLG attorney was assigned to the defense of this matter.  I believe that I have dealt with at least four different MLG attorneys who were "in charge" of my case, with each proceeding attorney usually being dismissed by MLG within 60 to 90 days of being introduced to me.

17.     None of these MLG attorneys informed or otherwise communicated with me regarding any pending motions to compel production of documents, nor was I ever informed of the serious nature of the failure to comply with discovery requests.

18.     Further, none of these attorneys indicated to me why the documents Defendants had provided to MLG in or around August 2022 were not produced to Plaintiff and/or Intervenor

3

24377-24377-00001\DIW\AMC\6391959v2

in response to document requests; nor was I informed of any claim that documents produced were incomplete, insufficient, or non-responsive.

19.    In fact, until recently being informed by Defendants' current defense counsel, on or about February 25, 2025, I was not aware that Plaintiff and/or Intervenor ever claimed any prior production of documents was incomplete, non-responsive, or otherwise deficient.

20.    MLG never provided to me, nor was I ever aware of the existence of the Court Order Granting Plaintiff's Motion to Compel and Request for Sanctions, filed on 10/29/24 (Document 101) or the Court Order Awarding Attorneys' Fees filed on 2/6/25 (Document 131). I did not learn of the existence of these two Orders until I was just recently provided with copies of them by my new counsel.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: March 3, 2025

Christopher John Wilson

4

24377-24377-00001\DIW\DLA\6391959v2

# App. 8

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (SBN 075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **DECLARATION OF CHRISTOPHER JOHN WILSON** |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | (Assigned to Hon. Erica P. Grosjean) |
| Defendants. | |

| |
|---|
| TEMPLETON MARSH, LTD., |
| Plaintiff-in-Intervention, |
| vs. |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, |
| Defendants. |

24377-24377-00001\DIW\AMC\6391959v2

I, Christopher John Wilson, hereby declare under penalty of perjury:

1.    I am over the age of 18.

2.    I am competent to testify to the matters set forth herein.

3.    If called to testify I would testify in conformity with the information contained herein.

4.    The matters set forth herein are true and correct, and based on my personal knowledge.

5.    I make and sign this declaration freely and voluntarily.

6.    I am a Defendant in Case No. 1:21-cv-00970-JLT-EPG.

7.    I am the majority owner and President of a BMW dealership held by Weber Motors, Fresno, Inc. dba BMW Fresno and an Audi and Porche dealership held by CJ's Road to Lemans Corp. dba Audi Fresno and Porche Fresno. Those entities are also Defendants in this case.

8.    At my direction, after being served with the Complaint in this matter, all Defendants retained MLG Attorneys at Law ("MLG") to serve as defense counsel in this litigation. Defendants dismissed MLG as defense counsel and retained current counsel Jaburg & Wilk on or about February 12, 2025.

9.    On or about August 12, 2022, at MLG's request, I provided documents relevant to this lawsuit to MLG through several FTP links. In particular, at that time, I directed the IT department of each of the Defendants to review each dealership's email servers and data servers for any and all information containing or referencing the terms "Foundation" or "Templeton Marsh" and to provide all of the documents resulting from such search to MLG.

10.    At no time did MLG ever provide to me or to any other representative of Defendants copies of any specific Requests for Production of Documents served by Plaintiff or Intervenor; nor did any MLG attorney ever ask me or any other representative of Defendants any questions about any specific document request. Further, neither I nor any other representative of

2

JABURG WILK
LAW FIRM

Defendants were ever asked by MLG to provide any documents in addition to those that I had already provided to them.

11.    At no time did MLG ask me or any other representative of Defendants to review a draft of responses or objections to any Requests for Production, nor did MLG ever provide me with a copy of any such responses or objections, in either draft form or final form.

12.    Until I terminated MLG and at that time learned of the pending discovery issues, neither I nor any other representative of Defendants was aware of any motions to compel the production of documents or motions for sanctions in this matter.

13.    I was not aware that the Plaintiff and Intervenor had requested specific documents, and that they were claiming the documents had not been provided.

14.    I was not aware that Plaintiff and Intervenor had filed Motions to Compel and were seeking sanctions against Defendants.

15.    Neither I nor any other representative of Defendants was made aware that a monetary sanctions award had been entered against Defendants until I was informed of the Court's February 6, 2025 sanctions Order by Defendants' current counsel, Jaburg & Wilk, P.C., on or around February 27, 2025.

16.    Throughout this litigation, I have had only periodic contact with attorneys at MLG, largely triggered when one attorney left the firm and a new MLG attorney was assigned to the defense of this matter.  I believe that I have dealt with at least four different MLG attorneys who were "in charge" of my case, with each proceeding attorney usually being dismissed by MLG within 60 to 90 days of being introduced to me.

17.    None of these MLG attorneys informed or otherwise communicated with me regarding any pending motions to compel production of documents, nor was I ever informed of the serious nature of the failure to comply with discovery requests.

18.    Further, none of these attorneys indicated to me why the documents Defendants had provided to MLG in or around August 2022 were not produced to Plaintiff and/or Intervenor

3

24377-24377-00001\DIW\AMC\6391959v2

in response to document requests; nor was I informed of any claim that documents produced were incomplete, insufficient, or non-responsive.

19.    In fact, until recently being informed by Defendants' current defense counsel, on or about February 25, 2025, I was not aware that Plaintiff and/or Intervenor ever claimed any prior production of documents was incomplete, non-responsive, or otherwise deficient.

20.    MLG never provided to me, nor was I ever aware of the existence of the Court Order Granting Plaintiff's Motion to Compel and Request for Sanctions, filed on 10/29/24 (Document 101) or the Court Order Awarding Attorneys' Fees filed on 2/6/25 (Document 131). I did not learn of the existence of these two Orders until I was just recently provided with copies of them by my new counsel.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


DATED: March 3, 2025

Christopher John Wilson

4

24377-24377-00001\DIW\DLA\6391959v2

# APPENDIX 9

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **DEFENDANTS' SUPPLEMENTAL OPPOSITION TO PLAINTIFF'S REQUEST FOR FURTHER SANCTIONS** |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | (Assigned to Hon. Erica P. Grosjean) |
| Defendants. | |
| TEMPLETON MARSH, LTD., | |
| Plaintiff-in-Intervention, | |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |

1

## I.    **INTRODUCTION**

Plaintiff Foundation Auto Holdings, LLC ("Plaintiff") has moved this Court to sanction Defendants Weber Motors, Fresno, Inc., CJ's Road to Lemans Corp., and Christopher John Wilson ("Defendants") by making certain negative inferences and imposing certain evidentiary sanctions pursuant to Federal Rule of Civil Procedure 37(b)(2)(A). *See* Plaintiff's Request for Further Sanctions (ECF 107) (the "Sanctions Motion"). Plaintiff's requested sanctions would effectively eliminate Defendants' ability to introduce evidence in support of their defenses and would result in a finding for Plaintiff on liability. Such drastic sanctions are unwarranted because Defendants have now produced to Plaintiff all existing responsive documents within their possession, custody, or control. This includes a number of documents already included within the over 6,000 pages of documents previously produced to Plaintiff by Defendants' prior counsel, as well as an additional 1,034 documents, Bates Nos. WIL006236-WIL07270, produced by Defendants on March 18, 2025, after Defendants retained their current counsel. *See* Exhibit A, Declaration of Thomas S. Moring at ¶¶ 16, 18, 19, 30.

Moreover, any delay in the production of responsive documents was not a result of Defendants' dilatory conduct. Indeed, Defendants were not even aware there was a dispute over the production of documents or that Plaintiff was seeking sanctions of any type until after they retained current counsel. *See* Exhibit B, Declaration of Christopher John Wilson at ¶¶ 13, 14, 22-25, 28. Upon learning of the pending Sanctions Motion, Defendants diligently searched their records for additional responsive documents, all of which have now been produced or identified as privileged. Defendants did not at any time intentionally withhold any documents because they were not helpful to their defense or are potentially helpful to Plaintiff's case. Rather, Defendants did not know what specific requests had been made, so Defendants took no steps to search for and produce specific documents responsive to the requests. *See* Exhibit B at ¶¶ 35, 36. During the past two weeks, Defendants have reviewed all of Plaintiff's Requests for Production, have provided responses showing where in the prior production the responsive documents can be found, and searched again for any responsive documents not previously produced. *See* Exhibit B

2

JABURG WILK
LAW FIRM

at ¶¶ 18-20, 38. Defendants have now produced all existing, non-privileged[1] responsive documents in their control, without regard to the impact those documents may have on the parties' claims and/or defenses. *See* Exhibit A at ¶¶ 30, 31.

Accordingly, the sanctions requested by Plaintiff – which are effectively terminating sanctions – are not appropriate or necessary under the circumstances. Instead, Plaintiff's claims should be evaluated on their merits. To the extent the Court believes a further sanction is appropriate, Defendants request the Court impose a further monetary sanction rather than the numerous negative inferences and evidentiary sanctions sought by Plaintiff.

## II.    THE DISCOVERY DISPUTE

The discovery dispute in this matter stems from Requests for Production of Documents ("RFP") propounded by Plaintiff on each Defendant on February 2, 2024. This was Plaintiff's second RFP to Defendants. Plaintiff had propounded its first RFP on each Defendant on March 28, 2022. In response to the first RFP, Defendants produced over 5700 documents to Plaintiff in September 2022, bearing Bates Nos. WIL000001 through WIL005713. (*See* ECF 146 at 3:1-8; *see also* Exhibit B at ¶ 17.

Specifically, the parties' dispute over Plaintiff's February 2, 2024 RFP relates to the following requests:

- RFP Nos. 18-19: seeking Defendants' audited financial statements and profit and loss statements from January 1, 2020 to the present.
- RFP No. 21: seeking evidence of liabilities to multi-employer union pension funds.
- RFP Nos. 31-33: seeking the identity of persons or entities with an equity interest in Defendants Weber or Lemans.
- RFP No. 35: seeking communications regarding Defendants' decision to "terminate and/or not perform under the agreement."

---

[1] Defendants are mindful of the Court's Order that responsive documents pre-dating the filing of this action on June 18, 2021 may not be withheld based on assertions of privilege. All such documents have now been produced, and any documents withheld based on privilege are post-June 18, 2021 and have been identified in a privilege log.

3

- RFP No. 36: seeking documents and communications "with any landlord as contemplated by the agreement from November 30, 2020 until present."
- RFP Nos. 37-38: seeking records related to Defendants' planned relocation of their dealerships.
- RFP Nos. 42-43: seeking documents related to a settlement agreement with Audi in a matter before the California New Motor Vehicle Boad.

(*See* ECF 91, 101).

Following several extensions, meet and confer conferences, and an Informal Discovery Conference with the Court, on July 12, 2024 Plaintiff filed its initial Motion to Compel (ECF 91). On October 29, 2024, the Court granted the Motion and ordered Defendants to produce the requested documents and a privilege log reflecting any withheld privileged documents post-dating the filing of this lawsuit on June 18, 2021. (ECF 101). Defendants were also ordered to coordinate deposition dates and file a status report with the Court regarding deposition scheduling. (*Id.*) Mr. Wilson was never consulted about any deposition dates. *See* Exhibit B at ¶¶ 29-30.

On December 5, 2024, Plaintiff filed its second Sanctions Motion (ECF 107), arguing that Defendants had not produced the required documents or a privilege log, and that Defendants' (previous) counsel had been unresponsive to communications regarding the status of depositions. Plaintiff asserted that more drastic sanctions were necessary than the previous monetary sanctions imposed by the Court,[2] and requested negative inferences related to the categories of documents described above and evidentiary sanctions preventing Defendants from offering or introducing various categories of evidence in their defense. Defendants filed their Opposition to the Sanctions Motion (ECF 118) on December 19, 2024. Plaintiff filed a Reply in Support of the

---

[2] The Court's October 29, 2024 Order did not set an amount for monetary sanctions but ordered further briefing on that issue. Following that briefing, in an Order dated February 6, 2025, the Court ordered Defendants to pay monetary sanctions of $12,463.13 within 60 days. (ECF 131). Defendants were not made aware of this monetary sanction by their previous counsel. (*See* ECF 146 at 4:9-14). Defendants have paid this amount in full. *See* Exhibit B at ¶ 26, *see also* Exhibit C, copy of sanctions payment and FedEx receipt showing transmission to Plaintiff's counsel.

JABURG WILK
LAW FIRM

4

Sanctions Motion (ECF 120) on December 30, 2024. On January 24, 2025, the Court held a hearing on the Sanctions Motion and took it under advisement. Most notably, Defendants' prior counsel, MLG Attorneys at Law ("MLG"), never informed Defendants that the second Sanctions Motion had been filed and fully briefed, as well as orally argued before this Court. *See* Exhibit B at ¶¶ 31-33.

On February 14, 2025, undersigned counsel ("New Counsel") substituted as counsel of record for Defendants, replacing MLG. On February 26, 2025, following New Counsel's review of the discovery issues raised by the second Sanctions Motion and the previous Motion to Compel, Defendants filed a Status Report (ECF 140) with the Court regarding the status of discovery compliance. Defendants filed an update to that Report (ECF 148) on March 4, 2025, which included supporting declarations (those filings are referred to collectively as the "Discovery Reports"). Defendants' Discovery Reports explained the reasons for Defendants' prior failure to produce certain documents and informed the Court of Defendants' and New Counsel's efforts to remedy any outstanding document production issues raised in the second Sanctions Motion and Motion to Compel. *See* Exhibit A at ¶¶ 20-31.

On March 5, 2025, the Court held a status conference to address the issues raised by Defendants' Discovery Reports. Following a discussion on the record regarding New Counsel's efforts both to review documents previously produced by Defendants and to produce additional documents responsive to Plaintiff's February 2, 2024 production requests, the Court ordered that Defendants be provided the opportunity to file a motion seeking leave to file this Supplemental Opposition to the second Motion for Sanctions, explaining the current status of Defendants' document production and why evidentiary sanctions against Defendants are not appropriate. Defendants' Motion for Leave to File this Supplemental Opposition has been filed separately.

**III.    DEFENDANTS' RECENT DOCUMENT PRODUCTIONS**

As explained in Defendants' Discovery Reports and on the record at the March 5, 2025 status conference, New Counsel received from MLG approximately 6,000 pages of Bates-stamped documents that were previously produced by Defendants, which includes but is not limited to financial documents. *See* Exhibit A at ¶¶ 16-19. This includes the documents stamped

<div align="center">5</div>

JABURG WILK
LAW FIRM

as Bates Nos. WIL000001 through WIL005713 produced by Defendants in September 2022, as well as additional responsive documents produced by Defendants in December 2024 bearing Bates Nos. WIL005714 through WIL005934. *Id.* There was a subsequent production in January 2025 bearing Bates Nos. WIL005935 through WIL006235. *See* <u>Exhibit A</u> at ¶ 19.

Having now reviewed all of those documents, it appears some of those previously produced documents are responsive to some of the disputed categories of documents contained in Plaintiff's February 2, 2024 RPF. Specifically, the responsive documents (identified by Bates number), and the categories to which they respond, are identified on the spreadsheets attached as <u>Exhibits D, E, F, G, H & I</u>.

In addition, some of those previously produced documents are responsive to other requests in the February 2, 2024 RFP, as well as other RFPs dated March 28, 2022 and November 8, 2024. Specifically, those responsive documents (identified by Bates number) are identified in <u>Exhibits D, E, F, G, H & I</u>.

Defendants have also identified additional responsive documents for production, and produced those documents to Plaintiff on March 18, 2025. Specifically, those responsive documents (identified by Bates number) are identified in <u>Exhibits D, E, F, G, H & I</u>. *See also* Exhibit A at ¶¶ 27-30. These documents include the documents pre-dating the filing of the lawsuit, previously withheld by Defendants' prior counsel based on privilege and identified in the privilege log provided by Defendants prior counsel.

Defendants believe they have now produced all documents responsive to all of Plaintiffs' RFPs, including those propounded on March 28, 2022, February 2, 2024, and November 8, 2024.[3] Of course, Defendants will continue to supplement their production to the extent that any additional responsive documents are discovered.

---

[3] Plaintiff propounded additional RFPs on March 5, 2025 seeking communications between Defendants and prior counsel at MLG relating to document production issues, as permitted by the Court's March 5, 2025 Order. Defendants are currently preparing responses to those requests and will produce responsive documents, subject to any appropriate objections, on or before the response due date of April 4, 2025.

DEFENDANTS' SUPPLEMENTAL OPPOSITION TO                    CASE NO. 1:21-CV-00970-EPG
PLAINTIFF'S REQUEST FOR FURTHER SANCTIONS

## IV.    NEGATIVE INFERENCES AND EVIDENTIARY SANCTIONS ARE NOT WARRANTED

Federal Rule of Civil Procedure 37(b)(2)(A) provides that "where a party fails to obey an order to provide or permit discovery," a court may "prohibit[ ] the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." *Lakes v. Bath & Body Works*, 2019 WL 2124523 at *3 (E.D. Cal. May 19, 2019). The appropriateness of a sanction under Rule 37 is within the discretion of the Court. *Raygoza v. City of Fresno*, 297 FRD 603, 606 (E.D. Cal. 2014). The Ninth Circuit has identified factors that the courts should consider in determining the appropriateness of discovery sanctions: "1) [T]he public's interest in expeditious resolution of litigation; 2) the court's need to manage its docket; 3) the risk of prejudice to the [propounding party]; 4) the public policy favoring disposition of cases on their merits; [and] 5) the availability of less drastic sanctions." *Id*. (quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir.1997). In addition, because a terminating sanction is very severe it is only justified by "willfulness, bad faith, and fault." *Reddy v. Precyse Solutions*, 2015 WL 3407447 at *6 (E.D. Cal. May 26, 2015) (quoting *Connecticut General Life Ins. Co. v. New Images of Beverly Hills,* 482 F.3d 1091, 1096 (9th Cir.2007)).

Applying these factors, courts have declined to impose severe sanctions such as negative inferences or evidentiary sanctions if the prejudice caused by the late production of documents can be mitigated through other means, or if the delay does not significantly impact the litigation process. *See, e.g., Raygoza*, 297 FRD at 607 (declining to impose evidentiary sanctions where "prejudice to Defendants from Plaintiffs' dilatory conduct can be remedied by allowing Defendants (only) additional time to complete discovery at no extra expense to Defendants and by having Plaintiffs reimburse the defense for the expense of having had to bring this motion"); *Matrix Motor Co. v. Toyota Motor Sales, USA*, 2003 WL 22466218 at *3 (C.D. Cal. May 8, 2003) (noting that "Exclusion sanctions based on alleged discovery violations are generally improper absent undue prejudice to the opposing side" and finding there was not undue prejudice when party eventually produced documents and witnesses in compliance with the court's order, with adequate time to prepare for trial); *Vecron Exim Ltd. v. Stokes*, 2018 WL 3830916 at *3-4

7

(C.D. Cal. July 9, 2018) (motion for terminating sanctions denied when party did not know discovery was propounded against him and any delay in responding to discovery did not sufficiently impede opposing party's ability to go to trial).

Here, the severe, potentially case-terminating sanctions sought by Plaintiff are not warranted. First, any delay in the production of responsive documents was not willful or the result of bad faith conduct by Defendants. Until Defendants retained New Counsel on or around February 14, 2025, they were not even aware there was a dispute over document production, that they had been ordered to produce documents, or that they had been sanctioned by the Court. (*See* ECF 148; Exhibit B at ¶¶ 21-28.) Immediately upon learning of the dispute, Defendants and New Counsel diligently took steps to remedy the issues. Since that time, all responsive documents have been produced and the monetary sanction previously ordered has been paid.

Moreover, the application of the Ninth Circuit's five factor test cuts against imposing the negative inferences and evidentiary sanctions requested by Plaintiff. When a court order has been violated, the first two factors – expeditious resolution of litigation and docket management – generally support sanctions, and the fourth factor – public policy favoring resolution on the merits – militates against case-dispositive sanctions. *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990). Accordingly, the third and fifth factors – the risk of prejudice and the availability of less drastic sanctions – are decisive in the analysis. *Id*.

"What is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations 'threaten to interfere with the rightful decision of the case.'" *Raygoza*, 297 FRD at 607 (quoting *Valley Engineers Inc. v. Electric Engineering Co.*, 158 F.3d 1051, 1057 (9th Cir.1998)). Any risk of prejudice to Plaintiff here has been remedied. In addition to the over 6,000 documents Defendants previously produced, an additional 1,032 pages of documents were produced on March 18, 2025. All documents responsive to Plaintiff's March 28, 2022, February 2, 2024, and November 8, 2024 document request have been produced. *See* Exhibit A at ¶ 31. Trial in this case is not currently scheduled and the Court has vacated (to be potentially reset) all present deadlines in the case. Defendants have agreed to allow Plaintiff to conduct any necessary depositions of Defendants' witnesses at

8

JABURG WILK
LAW FIRM

an agreed upon time convenient for all counsel and the deponent. *See* Exhibit B at ¶¶ 29-30. Any delays in the production up to this point do not justify denying Defendants the opportunity to have this case decided on the merits. Under these circumstances, the requested case dispositive sanctions are not appropriate. *See Raygoza*, 297 FRD at 607 ("The delay to date, though troublesome and needlessly work-producing for an already too busy Court, has not been so significant as to entirely frustrate the public's interest in expeditious resolution of cases or the Court's management of its docket."). Moreover, less drastic sanctions are available that would not interfere with the decision of the case, such as payment by Defendants of Plaintiff's attorneys' fees in bringing the Sanctions Motion. *Id*. (terminating sanctions not imposed when less drastic measures could cure any prejudice caused by a delay in producing documents); *Vecron Exim*, 2018 WL 3830916 at *4 (terminating sanction not warranted when party had already complied with discovery order and the court concurrently imposed a monetary sanction for failure to previously comply).

## V.    CONCLUSION

The imposition of negative inferences and evidentiary sanctions as a sanction for Defendants' delay in producing certain responsive documents is neither necessary nor appropriate in this case. First, Defendants did not intentionally delay producing documents or withhold any responsive documents. In fact, over thousands of pages of documents were produced before any Motion to Compel was ever filed and additional documents have been produced since that time, including 1,032 documents since Defendants retained current counsel. All responsive documents have now been produced, to the extent they exist and are not privileged. Defendants and their current counsel have displayed a clear intention to move this case forward, and not to delay. Accordingly, Defendants respectfully request that the Court not impose the severe negative inferences and evidentiary sanctions requested by Plaintiff and instead allow this case to be decided on its merits.

/ / /

/ / /

/ / /

9

DATED this 19th day of March, 2025.

**Jaburg & Wilk, P.C.**

_____
David L. Allen
Thomas Moring
Attorneys for Defendants

**JABURG WILK**
LAW FIRM

DEFENDANTS' SUPPLEMENTAL OPPOSITION TO                    CASE NO. 1:21-CV-00970-EPG
PLAINTIFF'S REQUEST FOR FURTHER SANCTIONS

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of March, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci
HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
david.holtzman@hklaw.com
daniel.kappes@hklaw.com
andrew.klair@hklaw.com
isabella.granucci@hklaw.com

Forrest Booth
Camille Zuber
KENNEDYS CMK LLP
455 Market Street, Suite 1900
San Francisco, CA 94105
forrest.booth@kennedyslaw.com
camille.zuber@kennedyslaw.com

/s/ _____

24377-24377-00001\DLA\BXR\6409725v9

DEFENDANTS' SUPPLEMENTAL OPPOSITION TO          CASE NO. 1:21-CV-00970-EPG
PLAINTIFF'S REQUEST FOR FURTHER SANCTIONS

# EXHIBIT A

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (SBN 075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **DECLARATION OF THOMAS S. MORING** |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | (Assigned to Hon. Erica P. Grosjean) |
| Defendants. | |
| TEMPLETON MARSH, LTD., | |
| Plaintiff-in-Intervention, | |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |

JABURG WILK
LAW FIRM

24377-24377-00001\TSM\TSM\6392709v10

I, Thomas S. Moring hereby depose and state under penalty of perjury:

1. I am over the age of 18.

2. I am competent to testify to the matters set forth herein.

3. If called to testify I would testify in conformity with the information contained herein.

4. The matters set forth herein are true and correct, and based on my personal knowledge.

5. I make and sign this declaration freely and voluntarily.

6. I, along with my partner David Allen of the law firm of Jaburg & Wilk, am counsel (admitted pro hac vice) for Defendants in this case.

7. On or about February 12, 2025, I began communication with Defendants' prior counsel, MLG Attorneys at Law ("MLG") regarding a transfer to Jaburg & Wilk of counsel's entire file in this matter.

8. I communicated with several of the attorneys and staff at MLG to obtain a digital transfer of the files from MLG Attorneys.

9. Finally, in the late evening of Friday, February 21, 2025, at approximately 8:42PM, I received notice from MLG Attorneys that the file materials were available for download.

10. That same night I communicated via email with MLG Attorneys attorney Douglas Schenck, who encouraged me to call him over the weekend if I had questions based on my review of the file.

11. On Sunday, February 23, I indicated to Mr. Schenk that the link that was produced did not have any indication of a document production made by Defendants, and I was not able to determine what, if any, documents had ever been provided by Defendants to Plaintiff and Intervenor.

2

24377-24377-00001\TSM\TSM\6392709v10

12.	At that time, I was unable to find any Bates numbered documents from Defendants in the MLG Attorneys file, and no indication of what documents had ever been produced by Defendants, or the date of an such production.

13.	On February 23 I emailed Mr. Schenck, who agreed that he would communicate with others at MLG Attorneys and let me know what had been produced, whether that production was a formal response to discovery or an informal production, and the date(s) when documents had been produced.

14.	Subsequently we determined that over 6,000 pages had been produced to Plaintiff and Intervenor by MLG.

15.	Foundation had served two sets of Requests for Production ("RFP") on Defendants. For each set of RFP, Foundation served virtually identical Requests on all three Defendants, CJ's Road to Lemans, Weber Motors, and Mr. Wilson personally.

16.	In response to the first set of Requests for Production, Defendants produced to Plaintiff documents bearing Bates Nos. WIL000001WIL05713.

17.	The current dispute centers around several RFP's contained in the second set of RFP's from Foundation to Defendants.

18.	The production received by Jaburg Wilk from MLG Attorneys through a file transfer also contains documents Bates Nos. WIL05714-WIL05934. These were produced by MLG Attorneys to Foundation in December, 2024.

19.	In addition to the December, 2024 production, MLG Attorneys also produced documents Bates Nos. WIL05935-WIL06235 in January, 2025.

20.	I reviewed the hearing transcripts from 10/24/2024 and 1/24/2025 hearing, where the Court and counsel discussed the issue of document production, privilege logs, and the exchange of what is referred to in the transcripts under the general description of "financial documents."

3

24377-24377-00001\TSM\TSM\6392709v10

21. It was unclear from the information available to me on February 26, 2025, the amount and extent of production by Defendants encompassed in these "financial documents," and whether any of those documents were responsive to the subsequent requests for production served by Plaintiff and Intervenor.

22. On February 25, 2025, I emailed all counsel to request their help in determining what responses they believed were still delinquent or insufficient, and asked for their help in determining what had already been produced by MLG Attorneys on behalf of Defendants.

23. Plaintiffs' counsel was very helpful in helping us obtain a link to the documents that Plaintiffs had received from Defendants' counsel. We now know exactly what was previously produced by Defendants to Plaintiffs/Intervenors.

24. When I first reviewed the documents in the file share from MLG Attorneys, I was unable to find any documents that had been produced by MLG responsive to Plaintiff's RFP's.

25. It now appears that MLG has updated the file share, and that there were actually thousands of pages of documents produced to Plaintiff.

26. We have continued reviewing the file materials obtained from MLG's file share, and comparing them to the documents Plaintiff has indicated were already produced to Plaintiff, in order to provide to Plaintiff and Intervenor a supplemental production as needed.

27. We served on Plaintiff and Intervenor on March 18, 2025, a complete set of Responses to Requests for Production, along with a spreadsheet indicating the Bates number(s) of all responsive documents with an index showing to which RFP they are responsive. A copy of the spreadsheets (without the accompanying responses, which are voluminous) is attached as Exhibits A-C to this Declaration.

28. To the extent that there are no responsive documents, that fact has been noted in the Responses served on March 18, 2025.

29. To the extent Defendants had not been notified by prior counsel of the specific requests, the March 18 Responses contain a reference to all known documents, and a notation

4

24377-24377-00001\TSM\TSM\6392709v10

JABURG WILK
LAW FIRM

that to the extent further responsive documents are subsequently discovered they will be promptly produced to the Parties as supplements to this document production.

30.    Along with the March 18, 2025, production Defendants turned over as additional documents those Bates Nos. WIL006236-WIL007270.

31.    It is my belief that as of today all documents within Defendants' possession responsive to all of Plaintiff's Requests for Production of Documents (with the exception of Plaintiff's latest RFP served on March 5, 2025 for which Defendants' responses are not due until April 4, 2025, have now been provided to Plaintiff.

I HEREBY CERTIFY that the foregoing is true and correct, based on my own personal knowledge.

DATED: __3 – 19 – 25__     _____
Thomas S. Moring

5

24377-24377-00001\TSM\TSM\6392709v10

JABURG WILK
LAW FIRM

# EXHIBIT B

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (SBN 075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **DECLARATION OF CHRISTOPHER JOHN WILSON** |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | (Assigned to Hon. Erica P. Grosjean) |
| Defendants. | |
| TEMPLETON MARSH, LTD., | |
| Plaintiff-in-Intervention, vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |

I, Christopher John Wilson, hereby declare under penalty of perjury:

1.  I am over the age of 18.

2.  I am competent to testify to the matters set forth herein.

3.  If called to testify I would testify in conformity with the information contained herein. ·

4.  The matters set forth herein are true and correct, and based on my personal knowledge.

5.  I make and sign this declaration freely and voluntarily.

6.  I am a Defendant in Case No. 1:21-cv-00970-EPG.

7.  I am the majority owner and President of a BMW dealership held by Weber Motors, Fresno, Inc. dba BMW Fresno and an Audi and Porche dealership held by CJ's Road to Lemans Corp. dba Audi Fresno and Porche Fresno. Those entities are also Defendants in this case.

8.  At my direction, after being served with the Complaint in this matter, all Defendants retained MLG Attorneys at Law ("MLG") to serve as defense counsel in this litigation. Defendants dismissed MLG as defense counsel and retained its current counsel, Jaburg & Wilk, P.C. ("Jaburg Wilk), on or about February 12, 2025.

9.  On or about August 12, 2022, at MLG's request, I provided documents relevant to this lawsuit to MLG through several FTP links. In particular, at that time, I directed the IT department of each of the Defendants to review each dealership's email servers and data servers for any and all information containing or referencing the terms "Foundation" or "Templeton Marsh" and to provide all of the documents resulting from such search to MLG.

10. In this production Defendants provided MLG with over 5,000 pages of documents we identified as relevant to the lawsuit.

2

11. In December 2024, MLG instructed Defendants to provide financial documents relating to the operations of the dealerships. Defendants provided MLG with that financial information.

12. At no time did MLG ever provide to me or to any other representative of Defendants copies of any specific Requests for Production of Documents served by Plaintiff or Intervenor; nor did any MLG attorney ever ask me or any other representative of Defendants any questions about any specific document request.

13. Other than the request for financial documents in December 2024, I was unaware that specific requests for documents were being made. I was aware from MLG that we needed to provide evidence relevant to the case, including all documents within a certain time period. I understood this to mean all documents that were responsive, regardless of whether they might be seen as detrimental to my case.

14. At no time did MLG ask me or any other representative of Defendants to review a draft of responses or objections to any Requests for Production, nor did MLG ever provide me with a copy of any such responses or objections, in either draft form or final form.

15. I am unaware of whether MLG produced formal responses to the written discovery, or merely provided documents and indicated that they were generally responsive to the open requests.

16. I understand that the current discovery dispute relates to Requests for Production of Documents dated February 2, 2024.

17. Prior to this set of requests it appears that MLG produced to Plaintiff documents BATES WIL00001-05713.

18. Once the Defendants were represented by Jaburg Wilk, I have worked with Jaburg Wilk to review all discovery requests and have provided information showing where the documents Defendants have already produced are responsive to the open discovery.

3

19. I have also conducted an additional search related to the open Requests for Production and determined that Defendants have additional responsive documents.

20. I have provided the additional responsive documents to Jaburg Wilk.

21. Until I terminated MLG I was not aware of the pending discovery issues.

22. Neither I nor any other representative of Defendants was aware of any motions to compel the production of documents or motions for sanctions in this matter.

23. I was not aware that the Plaintiff and Intervenor had requested specific documents, and that they were claiming the documents had not been provided.

24. I was not aware that Plaintiff and Intervenor had filed Motions to Compel and were seeking sanctions against Defendants.

25. Neither I nor any other representative of Defendants was made aware that a monetary sanctions award had been entered against Defendants until I was informed of the Court's February 6, 2025 sanctions Order by Defendants' current counsel, Jaburg Wilk, on or around February 27, 2025.

26. The Court's Order requires that Defendants make payment of monetary sanctions, and payment has been sent.

27. Throughout this litigation, I have had only periodic contact with attorneys at MLG, largely triggered when one attorney left the firm and a new MLG attorney was assigned to the defense of this matter. I believe that I have dealt with at least four different MLG attorneys who were "in charge" of my case, with each proceeding attorney usually being dismissed by MLG within 60 to 90 days of being introduced to me.

28. None of these MLG attorneys informed or otherwise communicated with me regarding any pending motions to compel production of documents, nor was I ever informed of the serious nature of the failure to comply with discovery requests.

29. I do not recall speaking with anyone at MLG regarding my deposition, or the depositions of any representative of Defendants or anyone on behalf of Plaintiff or Intervenor.

4

30.    I have agreed to work with counsel to arrange the depositions of Defendants.

31.    I was not aware that the Court had set hearings on these issues and was not invited to attend these hearings.

32.    Until the change in counsel, I was not aware that the Court had issued rulings on the Motions to Compel, or had entered the Sanctions Order.

33.    Defendants never received copies of any of the Orders in this case related to discovery.

34.    Further, none of the MLG attorneys indicated to me whether the documents Defendants had provided to MLG in or around August 2022 were not produced to Plaintiff and/or Intervenor in response to document requests; or to confirm with me that responses had been filed.

35.    Until the change in counsel I was not informed of any claim that documents produced were incomplete, insufficient, or non-responsive, or that specific additional documents had been requested.

36.    In fact, until recently being informed by Defendants' current counsel, on or about February 25, 2025, I was not aware that Plaintiff and/or Intervenor ever claimed any prior production of documents was incomplete, non-responsive, or otherwise deficient.

37.    MLG never provided to me, nor was I ever aware of the existence of the Court Order Granting Plaintiff's Motion to Compel and Request for Sanctions, filed on 10/29/24 (Document 101) or the Court Order Awarding Attorneys' Fees filed on 2/6/25 (Document 131). I did not learn of the existence of these two Orders until I was just recently provided with copies of them by my new counsel.

38.    Since obtaining this information, Defendants have been working diligently to prepare and produce any additional responsive documents.

5

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: March 18, 2025

Christopher John Wilson

6

24377-24377-00001\DIW\DIW\6391959v5

# EXHIBIT C

NON-NEGOTIABLE    NON-NEGOTIABLE    NON-NEGOTIABLE    NON-NEGOTIABLE    NON-NEGOTIABLE    NON-NEGOTIABLE    NON-NEGOTIABLE    NON-NEGOTIABLE

CHECK#  15841

**Porsche Fresno**
**Audi Fresno**
7121 N. Palm • Fresno, CA 93650
(559) 860-4000

**Audi**

PREMIER
VALLEY BANK

255 East River Park Circle  Ste 180
Fresno, California 93720

90-4327
——
1211

PAY **TWELVE THOUSAND FOUR HUNDRED SIXTY THREE DOLLARS AND 13/100**

| DATE | AMOUNT |
|---|---|
| 03/18/25 | $12,463.13 |

TO THE
ORDER
OF

FOUNDATION AUTO HOLDINGS LLC
C/O HOLLAND & KNIGHT
560 MISSION STREET 19TH FLOOR
SAN FRANCISCO CA 94105

**VOID AFTER 90 DAYS**

| NAME | NUMBER | DATE |
|---|---|---|
| FOUNDATION AUTO HOLDINGS LLC | 32021 | 03/18/25 |

CREATED BY: ADMIN

FOUNDATION AUTO HOLDINGS LLC
COURT-ORDERED SANCTIONS
8220A      12463.13 32021

COURT ORDERED SANCTION

SF692982 Q (06/17)    ERAINTAPCE    The Reynolds and Reynolds Company

| REMITTANCE ADVICE DETACH AND RETAIN | **Porsche Fresno** **Audi Fresno** 7121 N. Palm • Fresno, CA 93650 (559) 860-4000 | CHECK NO. 15841 | NET AMOUNT | $12,463.13 |
|---|---|---|---|---|

ORIGIN ID:TRMA     (559) 447-6700
CONTRACTS DESK.
BMW FRESNO
7171 N PALM AVE

FRESNO, CA 93650
UNITED STATES US

SHIP DATE: 18MAR25
ACTWGT: 1.00 LB
CAD: 105859194/INET4535

BILL SENDER

TO  **ATTN: DANIEL KAPPES**

**HOLLAND & KNIGHT LLP**

**560 MISSION STREET 19TH FLOOR**

**SAN FRANCISCO CA 94105**

(415) 743-6962          REF:
INV:
PO:                          DEPT:

58CJ3/5027/C6C4

 

FedEx. Express

**WED - 19 MAR 10:30A**
**PRIORITY OVERNIGHT**

TRK#
0201   **7728 0552 9244**

**94105**

# WA JCCA

CA-US   **SFO**



After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# EXHIBIT D

CLWilson RFPs identified WIL000001-WIL006235

| doc_beg_bates | doc_end_bates | rfp_matches |
|---|---|---|
| WIL000001 | WIL000002 | [2] |
| WIL000003 | WIL000010 | [2, 8] |
| WIL000011 | WIL000012 | [1, 2] |
| WIL000013 | WIL000013 | [1, 2] |
| WIL000014 | WIL000017 | [1, 2] |
| WIL000018 | WIL000022 | [1, 2] |
| WIL000023 | WIL000024 | [1] |
| WIL000025 | WIL000027 | [1, 3] |
| WIL000028 | WIL000032 | [1, 3, 14, 24] |
| WIL000033 | WIL000035 | [1] |
| WIL000036 | WIL000040 | [1, 24] |
| WIL000041 | WIL000043 | [1, 14] |
| WIL000044 | WIL000047 | [1, 14] |
| WIL000048 | WIL000051 | [1, 8, 24] |
| WIL000052 | WIL000053 | [1] |
| WIL000055 | WIL000056 | [1] |
| WIL000058 | WIL000058 | [1] |
| WIL000059 | WIL000060 | [1] |
| WIL000061 | WIL000063 | [1] |
| WIL000064 | WIL000066 | [1] |
| WIL000067 | WIL000070 | [1] |
| WIL000071 | WIL000074 | [1] |
| WIL000075 | WIL000078 | [1] |
| WIL000079 | WIL000083 | [1] |
| WIL000084 | WIL000088 | [1] |
| WIL000089 | WIL000093 | [1] |
| WIL000094 | WIL000094 | [1] |
| WIL000095 | WIL000097 | [1] |
| WIL000098 | WIL000102 | [1, 6, 7, 23, 24, 25, 26, 34, 43] |
| WIL000103 | WIL000108 | [1, 6, 23] |
| WIL000110 | WIL000114 | [1, 6, 23, 24] |
| WIL000115 | WIL000119 | [36] |
| WIL000120 | WIL000123 | [36] |
| WIL000124 | WIL000128 | [36] |
| WIL000129 | WIL000131 | [1, 3, 14, 18, 19] |
| WIL000132 | WIL000138 | [6, 8] |
| WIL000139 | WIL000143 | [8] |
| WIL000144 | WIL000148 | [1, 6] |
| WIL000149 | WIL000151 | [8] |
| WIL000152 | WIL000152 | [1, 8] |
| WIL000153 | WIL000180 | [1, 8] |
| WIL000181 | WIL000184 | [1, 8] |
| WIL000185 | WIL000187 | [1, 6, 24, 25, 26, 43] |
| WIL000188 | WIL000188 | [1, 3, 7] |
| WIL000189 | WIL000227 | [1] |

CLWilson RFPs identified WIL000001-WIL006235

| WIL000228 | WIL000228 | [1, 6] |
| WIL000229 | WIL000241 | [1, 6, 8] |
| WIL000242 | WIL000243 | [1] |
| WIL000244 | WIL000271 | [1] |
| WIL000277 | WIL000278 | [1, 42] |
| WIL000279 | WIL000306 | [1] |
| WIL000312 | WIL000313 | [8] |
| WIL000314 | WIL000318 | [8, 36] |
| WIL000319 | WIL000319 | [1, 6] |
| WIL000320 | WIL000406 | [1, 7] |
| WIL000407 | WIL000408 | [1, 3] |
| WIL000409 | WIL000495 | [1, 7] |
| WIL000496 | WIL000497 | [1, 3, 6, 7, 8] |
| WIL000499 | WIL000503 | [1, 6, 7, 8, 23, 24, 25, 26, 43] |
| WIL000504 | WIL000504 | [1, 6] |
| WIL000505 | WIL000515 | [1, 6] |
| WIL000516 | WIL000516 | [1] |
| WIL000517 | WIL000518 | [1] |
| WIL000519 | WIL000520 | [1, 8] |
| WIL000521 | WIL000522 | [1, 6, 8] |
| WIL000523 | WIL000527 | [1, 3, 6, 7, 8, 23, 24, 25, 26, 27, 43] |
| WIL000528 | WIL000533 | [1, 3, 6, 7, 8, 23, 24, 25, 26, 34, 43] |
| WIL000534 | WIL000539 | [1, 3, 6, 7, 8, 23, 24, 25, 26, 34, 35, 43] |
| WIL000540 | WIL000540 | [1] |
| WIL000541 | WIL000542 | [1, 6] |
| WIL000543 | WIL000545 | [1, 6] |
| WIL000546 | WIL000548 | [1, 6] |
| WIL000549 | WIL000552 | [1, 6] |
| WIL000553 | WIL000554 | [1, 6] |
| WIL000555 | WIL000557 | [1, 6, 24] |
| WIL000558 | WIL000560 | [1, 6] |
| WIL000562 | WIL000567 | [1] |
| WIL000568 | WIL000570 | [1] |
| WIL000571 | WIL000571 | [6, 8] |
| WIL000572 | WIL000574 | [14, 18, 19] |
| WIL000575 | WIL000577 | [8, 14, 31] |
| WIL000578 | WIL000579 | [1, 6] |
| WIL000580 | WIL000582 | [5, 14, 18, 19] |
| WIL000583 | WIL000585 | [14, 18, 19] |
| WIL000586 | WIL000587 | [1, 6] |
| WIL000588 | WIL000588 | [1, 6, 24] |
| WIL000589 | WIL000590 | [6] |
| WIL000591 | WIL000591 | [6] |
| WIL000592 | WIL000593 | [6] |
| WIL000594 | WIL000604 | [1] |
| WIL000605 | WIL000606 | [1, 3, 6, 7, 8, 23, 24, 25, 26, 27, 43] |

CL Wilson RFPs identified WIL000001-WIL006235

| WIL000607 | WIL000649 | [1, 3, 6, 7, 8, 23, 24, 25, 26, 27, 43] |
|---|---|---|
| WIL000698 | WIL000698 | [1, 3, 6, 8, 24] |
| WIL000699 | WIL000785 | [1, 7] |
| WIL000806 | WIL000807 | [1, 6] |
| WIL000808 | WIL000809 | [1, 6] |
| WIL000810 | WIL000811 | [1, 6] |
| WIL000812 | WIL000824 | [1, 6] |
| WIL000825 | WIL000826 | [1, 3, 6, 8, 23, 24, 25, 43] |
| WIL000827 | WIL000828 | [6, 8] |
| WIL000829 | WIL000829 | [6, 8] |
| WIL000830 | WIL000831 | [6, 8] |
| WIL000832 | WIL000842 | [8] |
| WIL000843 | WIL000843 | [1, 6] |
| WIL000844 | WIL000845 | [6] |
| WIL000846 | WIL000847 | [14] |
| WIL000848 | WIL000848 | [6] |
| WIL000849 | WIL000850 | [6] |
| WIL000851 | WIL000861 | [1] |
| WIL000862 | WIL000863 | [1, 3, 8] |
| WIL000864 | WIL000864 | [14, 18] |
| WIL000865 | WIL000866 | [1, 3, 35] |
| WIL000867 | WIL000890 | [14, 24, 37, 38] |
| WIL000891 | WIL000932 | [1, 37, 38] |
| WIL000933 | WIL000935 | [1, 6, 24, 25, 26, 43] |
| WIL000936 | WIL000946 | [1] |
| WIL000947 | WIL000948 | [1, 6, 24] |
| WIL000949 | WIL000950 | [6, 25, 43] |
| WIL000951 | WIL000953 | [14] |
| WIL000954 | WIL000954 | [6] |
| WIL000955 | WIL000956 | [1, 6, 7, 14, 24, 25, 26, 43] |
| WIL000957 | WIL000959 | [1, 6, 24, 25, 26, 43] |
| WIL000960 | WIL000962 | [1, 24] |
| WIL000963 | WIL000973 | [8, 24] |
| WIL000974 | WIL000976 | [1, 24] |
| WIL000977 | WIL000979 | [1, 24] |
| WIL000980 | WIL000981 | [1, 3, 5, 8] |
| WIL000982 | WIL000987 | [1, 3, 6, 7, 8, 23, 24, 25, 26, 43] |
| WIL000988 | WIL000994 | [6] |
| WIL000995 | WIL000996 | [1, 4, 9] |
| WIL000997 | WIL000998 | [1, 8, 36] |
| WIL000999 | WIL001000 | [1, 8, 36] |
| WIL001001 | WIL001002 | [1, 4, 8, 36] |
| WIL001003 | WIL001003 | [1, 4, 8, 36] |
| WIL001004 | WIL001005 | [1, 4, 8, 36] |
| WIL001006 | WIL001006 | [1, 4, 8, 36] |
| WIL001007 | WIL001007 | [1, 4, 8, 24] |

3

| | | |
|---|---|---|
| WIL001008 | WIL001008 | [4, 8, 15, 25, 26, 36, 43] |
| WIL001009 | WIL001010 | [4, 8, 15, 25, 26, 36, 37, 38, 43] |
| WIL001011 | WIL001011 | [1, 4, 8, 36] |
| WIL001012 | WIL001013 | [1, 4, 8, 36] |
| WIL001014 | WIL001015 | [1, 3, 4, 6, 8, 14, 24, 25, 26, 35, 36, 45, 43] |
| WIL001016 | WIL001016 | [1, 4, 8, 35, 36, 37, 38] |
| WIL001017 | WIL001018 | [4, 8, 36, 37, 38] |
| WIL001019 | WIL001020 | [1, 3, 4, 6, 7, 8, 14, 23, 24, 25, 26, 35, 36, 37, 38, 43, 45] |
| WIL001021 | WIL001022 | [4, 8, 36, 37, 38] |
| WIL001023 | WIL001025 | [4, 8, 15, 36, 37, 38] |
| WIL001026 | WIL001026 | [1, 4, 9, 35] |
| WIL001027 | WIL001027 | [1, 6] |
| WIL001028 | WIL001028 | [1, 6] |
| WIL001029 | WIL001029 | [1] |
| WIL001030 | WIL001030 | [1] |
| WIL001031 | WIL001031 | [1, 5] |
| WIL001032 | WIL001033 | [5, 14, 37, 38] |
| WIL001034 | WIL001036 | [1, 4, 5, 6, 9, 14, 23, 24, 25, 26, 28, 29, 35, 39, 40, 41, 42, 43, 45] |
| WIL001037 | WIL001037 | [1, 4, 7, 9, 34, 35, 45] |
| WIL001038 | WIL001039 | [1, 4, 7, 9, 34, 35, 45] |
| WIL001040 | WIL001041 | [1, 4, 7, 9, 24, 25, 26, 34, 35, 45, 43] |
| WIL001042 | WIL001043 | [1, 4, 7, 9, 24, 25, 26, 34, 35, 45, 43] |
| WIL001044 | WIL001045 | [1, 8] |
| WIL001046 | WIL001048 | [1, 4, 6] |
| WIL001049 | WIL001051 | [5, 7, 14, 37, 38] |
| WIL001052 | WIL001054 | [1, 4, 5, 7, 9, 10, 11, 12, 28, 29, 34, 37, 38, 39, 40, 41, 45] |
| WIL001055 | WIL001056 | [5, 7, 14, 18, 19, 37, 38] |
| WIL001057 | WIL001057 | [1] |
| WIL001058 | WIL001066 | [1] |
| WIL001067 | WIL001067 | [1, 4, 9] |
| WIL001068 | WIL001068 | [4, 6, 8, 25, 26, 45, 43] |
| WIL001069 | WIL001069 | [1, 4, 9, 35] |
| WIL001070 | WIL001072 | [1, 6, 24, 25, 26, 43] |
| WIL001073 | WIL001074 | [1, 6, 8, 14, 24, 25, 26, 31, 32, 33, 43] |
| WIL001075 | WIL001083 | [4, 8, 15, 25, 26, 36, 37, 38, 43] |
| WIL001084 | WIL001085 | [33] |
| WIL001086 | WIL001086 | [1] |
| WIL001087 | WIL001088 | [6, 33] |
| WIL001089 | WIL001090 | [1, 22, 23] |
| WIL001091 | WIL001136 | [1] |
| WIL001183 | WIL001198 | [1, 3, 10, 11, 12, 22, 23] |
| WIL001199 | WIL001215 | [1, 3, 22, 23] |
| WIL001233 | WIL001234 | [1, 6, 24, 25, 26, 45, 43] |
| WIL001235 | WIL001238 | [1, 6, 8, 23, 24, 25, 26, 28, 29, 45, 43] |
| WIL001239 | WIL001240 | [1, 4, 6, 9, 35, 42] |
| WIL001241 | WIL001247 | [4, 6, 25, 26, 45, 43] |

4

CL Wilson RFPs identified WIL000001-WIL006235

| | | |
|---|---|---|
| WIL001248 | WIL001251 | [4, 6, 25, 26, 45, 43] |
| WIL001252 | WIL001263 | [1] |
| WIL001264 | WIL001264 | [1] |
| WIL001265 | WIL001275 | [4, 6, 25, 26, 45, 43] |
| WIL001276 | WIL001276 | [1, 6] |
| WIL001277 | WIL001278 | [1, 4, 7, 9, 15, 20, 22, 23, 24, 25, 26, 27, 28, 29, 34, 35, 36, 39, 40, 41, 44, 45, 43] |
| WIL001279 | WIL001282 | [1, 4, 7, 9, 15, 20, 22, 23, 24, 25, 26, 27, 28, 29, 34, 35, 36, 39, 40, 41, 44, 45, 43] |
| WIL001283 | WIL001284 | [4, 8, 36, 39, 41] |
| WIL001285 | WIL001286 | [1, 4, 9, 35] |
| WIL001287 | WIL001289 | [1, 4, 9, 28, 29, 35, 39, 40, 41] |
| WIL001290 | WIL001291 | [2, 8] |
| WIL001292 | WIL001299 | [2, 8, 37, 38] |
| WIL001300 | WIL001301 | [2, 4, 9, 28, 29, 35, 39, 41, 42] |
| WIL001302 | WIL001302 | [1, 4, 6, 9, 35, 39] |
| WIL001303 | WIL001303 | [1, 4, 6, 9, 35] |
| WIL001304 | WIL001304 | [1, 4, 6, 9, 35, 39] |
| WIL001305 | WIL001305 | [1, 4, 6, 9, 35, 39] |
| WIL001306 | WIL001307 | [6, 8, 35] |
| WIL001308 | WIL001309 | [6, 8, 35] |
| WIL001310 | WIL001311 | [6, 35] |
| WIL001312 | WIL001312 | [8] |
| WIL001313 | WIL001313 | [8] |
| WIL001314 | WIL001314 | [1] |
| WIL001315 | WIL001317 | [1] |
| WIL001318 | WIL001320 | [1, 6, 9, 35] |
| WIL001321 | WIL001321 | [1, 3, 7] |
| WIL001322 | WIL001381 | [1, 42] |
| WIL001382 | WIL001384 | [1] |
| WIL001385 | WIL001610 | [2, 8, 37, 38, 42] |
| WIL001611 | WIL001612 | [1] |
| WIL001613 | WIL001614 | [1] |
| WIL001615 | WIL001616 | [1] |
| WIL001617 | WIL001618 | [1] |
| WIL001619 | WIL001621 | [1, 3] |
| WIL001622 | WIL001626 | [1, 3, 14] |
| WIL001627 | WIL001629 | [1, 3] |
| WIL001630 | WIL001634 | [1, 3, 14, 24] |
| WIL001635 | WIL001637 | [1, 14] |
| WIL001638 | WIL001641 | [1, 3, 14] |
| WIL001642 | WIL001645 | [1, 14] |
| WIL001646 | WIL001647 | [1, 14] |
| WIL001648 | WIL001649 | [1, 3, 8] |
| WIL001650 | WIL001652 | [1] |
| WIL001653 | WIL001655 | [1, 3, 8] |
| WIL001656 | WIL001658 | [1] |
| WIL001659 | WIL001662 | [1, 3, 8] |

5

CI Wilson RFPs identified WIL000001-WIL006235

| | | |
|---|---|---|
| WIL001663 | WIL001666 | [1, 3, 8] |
| WIL001667 | WIL001667 | [1, 3, 14, 24] |
| WIL001668 | WIL001673 | [1, 3, 14, 24] |
| WIL001674 | WIL001674 | [1, 3, 24] |
| WIL001675 | WIL001680 | [1, 3, 14, 24] |
| WIL001681 | WIL001682 | [1, 3] |
| WIL001683 | WIL001684 | [1, 3, 8] |
| WIL001685 | WIL001686 | [1, 3] |
| WIL001687 | WIL001704 | [6, 31, 32, 33] |
| WIL001705 | WIL001705 | [14] |
| WIL001706 | WIL001711 | [14] |
| WIL001712 | WIL001713 | [8, 14] |
| WIL001714 | WIL001715 | [14, 24] |
| WIL001716 | WIL001718 | [1, 14] |
| WIL001719 | WIL001721 | [6, 8] |
| WIL001722 | WIL001722 | [14] |
| WIL001723 | WIL001723 | [14] |
| WIL001724 | WIL001724 | [14] |
| WIL001725 | WIL001729 | [14] |
| WIL001730 | WIL001732 | [14] |
| WIL001733 | WIL001733 | [1, 5] |
| WIL001734 | WIL001735 | [5, 31, 32, 33] |
| WIL001736 | WIL001737 | [14] |
| WIL001738 | WIL001745 | [14, 18, 19] |
| WIL001746 | WIL001746 | [14] |
| WIL001747 | WIL001747 | [1, 14, 18, 24] |
| WIL001748 | WIL001749 | [14] |
| WIL001750 | WIL001757 | [14] |
| WIL001758 | WIL001759 | [14] |
| WIL001760 | WIL001760 | [1] |
| WIL001761 | WIL001762 | [14] |
| WIL001763 | WIL001763 | [1, 14, 18, 24] |
| WIL001764 | WIL001765 | [1, 8] |
| WIL001766 | WIL001766 | [14] |
| WIL001767 | WIL001777 | [1, 14, 18, 24, 31] |
| WIL001778 | WIL001786 | [1, 14, 18, 24, 31] |
| WIL001787 | WIL001795 | [1, 14, 18, 24, 31] |
| WIL001796 | WIL001797 | [14] |
| WIL001798 | WIL001945 | [14, 18, 19] |
| WIL001946 | WIL002064 | [14, 18, 19] |
| WIL002065 | WIL002176 | [14, 18, 19] |
| WIL002177 | WIL002178 | [14] |
| WIL002179 | WIL002179 | [14] |
| WIL002180 | WIL002180 | [1, 14, 18, 24] |
| WIL002181 | WIL002181 | [14] |
| WIL002182 | WIL002182 | [1, 14, 18, 24] |

CI Wilson RFPs identified WIL000001-WIL006235

| WIL002183 | WIL002184 | [8] |
| WIL002185 | WIL002185 | [6, 8] |
| WIL002186 | WIL002187 | [6, 8] |
| WIL002188 | WIL002189 | [14] |
| WIL002190 | WIL002190 | [1, 14, 18, 24] |
| WIL002191 | WIL002192 | [1] |
| WIL002193 | WIL002194 | [8] |
| WIL002195 | WIL002197 | [1] |
| WIL002198 | WIL002198 | [1, 14, 18, 24] |
| WIL002199 | WIL002201 | [14] |
| WIL002202 | WIL002202 | [1, 14, 18, 24] |
| WIL002203 | WIL002205 | [1] |
| WIL002206 | WIL002206 | [1, 3] |
| WIL002207 | WIL002207 | [1, 14, 18, 24] |
| WIL002208 | WIL002208 | [14] |
| WIL002209 | WIL002209 | [1, 14, 18, 24] |
| WIL002210 | WIL002211 | [1] |
| WIL002212 | WIL002213 | [1] |
| WIL002214 | WIL002214 | [1, 8] |
| WIL002215 | WIL002216 | [1, 3, 8, 23, 24] |
| WIL002217 | WIL002218 | [1, 3, 6, 8, 23, 24, 25, 26, 43] |
| WIL002219 | WIL002220 | [1, 6, 23, 24] |
| WIL002221 | WIL002222 | [1, 6, 23, 24] |
| WIL002223 | WIL002223 | [14] |
| WIL002224 | WIL002234 | [1, 14, 18, 24, 31] |
| WIL002235 | WIL002243 | [1, 14, 18, 24, 31] |
| WIL002244 | WIL002391 | [14] |
| WIL002392 | WIL002503 | [14] |
| WIL002504 | WIL002512 | [1, 14, 18, 24, 31] |
| WIL002513 | WIL002631 | [14] |
| WIL002632 | WIL002633 | [14] |
| WIL002634 | WIL002634 | [20] |
| WIL002635 | WIL002635 | [20] |
| WIL002636 | WIL002639 | [1, 2, 3, 23] |
| WIL002640 | WIL002640 | [1, 6] |
| WIL002641 | WIL002666 | [1] |
| WIL002667 | WIL002670 | [1, 2, 3, 23] |
| WIL002671 | WIL002674 | [1, 2, 3, 23] |
| WIL002675 | WIL002675 | [1] |
| WIL002676 | WIL002676 | [1] |
| WIL002677 | WIL002678 | [1, 3, 6, 8, 22, 23, 24] |
| WIL002679 | WIL002680 | [1, 3, 23, 24] |
| WIL002681 | WIL002683 | [1, 3, 23] |
| WIL002684 | WIL002686 | [1, 3, 22, 23] |
| WIL002687 | WIL002690 | [1, 3, 22, 23] |
| WIL002691 | WIL002697 | [1, 3, 7, 8, 22, 23, 24] |

C I Wilson RFPs identified WIL000001-WIL006235

| | | |
|---|---|---|
| WIL002698 | WIL002761 | [1, 7] |
| WIL002863 | WIL002871 | [1, 3, 22, 23] |
| WIL002872 | WIL002880 | [1, 3, 22, 23] |
| WIL002881 | WIL002882 | [1] |
| WIL002883 | WIL002883 | [1, 14, 18, 24] |
| WIL002884 | WIL002884 | [1] |
| WIL002885 | WIL002886 | [1] |
| WIL002887 | WIL002887 | [1] |
| WIL002888 | WIL002889 | [1] |
| WIL002890 | WIL002891 | [1] |
| WIL002892 | WIL002900 | [1, 3, 7, 22, 23] |
| WIL002901 | WIL002964 | [1, 3, 7, 8, 24] |
| WIL003027 | WIL003036 | [1, 3, 22, 23, 24] |
| WIL003037 | WIL003046 | [1, 3, 22, 23, 24] |
| WIL003047 | WIL003056 | [1, 22, 23] |
| WIL003057 | WIL003100 | [1] |
| WIL003157 | WIL003157 | [14] |
| WIL003158 | WIL003168 | [1] |
| WIL003169 | WIL003317 | [14] |
| WIL003318 | WIL003326 | [14] |
| WIL003327 | WIL003445 | [14] |
| WIL003446 | WIL003454 | [14] |
| WIL003455 | WIL003567 | [14] |
| WIL003568 | WIL003568 | [14] |
| WIL003569 | WIL003569 | [14, 20, 21] |
| WIL003570 | WIL003570 | [14, 20] |
| WIL003571 | WIL003572 | [14, 20] |
| WIL003573 | WIL003575 | [20] |
| WIL003576 | WIL003576 | [1] |
| WIL003577 | WIL003578 | [1] |
| WIL003579 | WIL003579 | [1, 6] |
| WIL003580 | WIL003581 | [1, 3, 8, 23, 24] |
| WIL003582 | WIL003582 | [1] |
| WIL003583 | WIL003584 | [1, 3, 8, 23, 24] |
| WIL003585 | WIL003585 | [1, 6] |
| WIL003587 | WIL003587 | [8] |
| WIL003588 | WIL003589 | [1] |
| WIL003590 | WIL003592 | [1] |
| WIL003594 | WIL003595 | [1] |
| WIL003596 | WIL003597 | [1] |
| WIL003598 | WIL003599 | [1] |
| WIL003600 | WIL003602 | [1, 6] |
| WIL003603 | WIL003615 | [6] |
| WIL003616 | WIL003628 | [6] |
| WIL003629 | WIL003630 | [6] |
| WIL003631 | WIL003643 | [1, 3, 6, 8] |

CLWilson RFPs identified WIL000001-WIL006235

| | | |
|---|---|---|
| WIL003644 | WIL003646 | [1] |
| WIL003647 | WIL003649 | [1, 6] |
| WIL003650 | WIL003736 | [1, 7] |
| WIL003737 | WIL003739 | [1, 23] |
| WIL003740 | WIL003826 | [1, 7] |
| WIL003827 | WIL003827 | [1, 8] |
| WIL003829 | WIL003831 | [1, 6] |
| WIL003832 | WIL003835 | [1, 6] |
| WIL003836 | WIL003848 | [1, 6] |
| WIL003849 | WIL003861 | [1, 6] |
| WIL003862 | WIL003863 | [1, 8] |
| WIL003864 | WIL003867 | [1, 6] |
| WIL003868 | WIL003869 | [1] |
| WIL003870 | WIL003873 | [1, 6] |
| WIL003874 | WIL003874 | [1, 6, 23] |
| WIL003875 | WIL003887 | [1, 6] |
| WIL003888 | WIL003888 | [1, 6, 23] |
| WIL003889 | WIL003889 | [1, 3, 6, 22, 23, 24] |
| WIL003890 | WIL003976 | [1, 7] |
| WIL003977 | WIL003978 | [1, 6, 23, 24, 25, 26, 43] |
| WIL003979 | WIL003979 | [14] |
| WIL003980 | WIL003990 | [1, 14, 18, 24, 31] |
| WIL003991 | WIL004139 | [14] |
| WIL004149 | WIL004149 | [1, 14, 18, 24] |
| WIL004272 | WIL004272 | [14] |
| WIL004273 | WIL004275 | [1] |
| WIL004276 | WIL004276 | [1, 3] |
| WIL004277 | WIL004277 | [1, 3] |
| WIL004278 | WIL004278 | [1, 6, 7, 24] |
| WIL004279 | WIL004279 | [1, 6, 7, 24] |
| WIL004280 | WIL004284 | [1, 6] |
| WIL004285 | WIL004285 | [1] |
| WIL004286 | WIL004313 | [1] |
| WIL004318 | WIL004318 | [1, 24] |
| WIL004319 | WIL004319 | [1, 14, 18, 24] |
| WIL004320 | WIL004320 | [1] |
| WIL004321 | WIL004321 | [1] |
| WIL004322 | WIL004323 | [1, 23] |
| WIL004324 | WIL004326 | [1, 3, 23, 24] |
| WIL004327 | WIL004329 | [1, 23] |
| WIL004330 | WIL004332 | [1, 10, 11, 12, 23, 24] |
| WIL004333 | WIL004333 | [1, 6, 24, 25, 26, 43] |
| WIL004334 | WIL004341 | [1, 6, 24, 25, 26, 43] |
| WIL004342 | WIL004342 | [1] |
| WIL004343 | WIL004343 | [1, 8] |
| WIL004344 | WIL004344 | [1] |

CLWilson RFPs identified WIL000001-WIL006235

| WIL004345 | WIL004352 | [1] |
| WIL004353 | WIL004353 | [1] |
| WIL004354 | WIL004356 | [1, 3, 6, 8] |
| WIL004357 | WIL004392 | [14, 18, 19, 24, 37, 38] |
| WIL004393 | WIL004395 | [1, 6, 8] |
| WIL004396 | WIL004396 | [8, 36] |
| WIL004397 | WIL004401 | [8, 36] |
| WIL004402 | WIL004402 | [8, 36] |
| WIL004403 | WIL004403 | [6, 8] |
| WIL004404 | WIL004404 | [8, 24] |
| WIL004405 | WIL004406 | [6, 8] |
| WIL004407 | WIL004408 | [8, 24, 37, 38] |
| WIL004409 | WIL004411 | [1, 8, 37, 38] |
| WIL004412 | WIL004412 | [8] |
| WIL004413 | WIL004413 | [1] |
| WIL004415 | WIL004415 | [1] |
| WIL004416 | WIL004441 | [1] |
| WIL004442 | WIL004445 | [1, 6] |
| WIL004446 | WIL004447 | [8] |
| WIL004448 | WIL004449 | [1] |
| WIL004450 | WIL004450 | [1] |
| WIL004451 | WIL004452 | [1] |
| WIL004453 | WIL004454 | [8, 24] |
| WIL004455 | WIL004456 | [1, 8, 24] |
| WIL004457 | WIL004457 | [1, 14, 18, 24] |
| WIL004458 | WIL004458 | [1, 24] |
| WIL004459 | WIL004459 | [8] |
| WIL004460 | WIL004461 | [1] |
| WIL004462 | WIL004463 | [1] |
| WIL004464 | WIL004465 | [1] |
| WIL004466 | WIL004485 | [1] |
| WIL004486 | WIL004486 | [1] |
| WIL004487 | WIL004488 | [1] |
| WIL004489 | WIL004489 | [6, 8] |
| WIL004490 | WIL004491 | [6, 8] |
| WIL004492 | WIL004493 | [14] |
| WIL004494 | WIL004495 | [14] |
| WIL004496 | WIL004498 | [14] |
| WIL004499 | WIL004500 | [14] |
| WIL004501 | WIL004501 | [1, 24] |
| WIL004502 | WIL004502 | [1, 24] |
| WIL004503 | WIL004503 | [1] |
| WIL004504 | WIL004504 | [1, 24] |
| WIL004505 | WIL004506 | [1] |
| WIL004507 | WIL004507 | [6, 8] |
| WIL004508 | WIL004509 | [6, 8] |

| WIL004510 | WIL004511 | [1] |
| WIL004512 | WIL004512 | [1, 24] |
| WIL004513 | WIL004529 | [1] |
| WIL004530 | WIL004530 | [14] |
| WIL004531 | WIL004531 | [8] |
| WIL004532 | WIL004533 | [8] |
| WIL004534 | WIL004535 | [1] |
| WIL004536 | WIL004536 | [1, 6] |
| WIL004537 | WIL004539 | [1, 6, 8] |
| WIL004540 | WIL004540 | [1, 3] |
| WIL004541 | WIL004541 | [1, 34] |
| WIL004542 | WIL004542 | [1, 8] |
| WIL004543 | WIL004543 | [1] |
| WIL004544 | WIL004544 | [23] |
| WIL004545 | WIL004548 | [6, 8] |
| WIL004549 | WIL004550 | [6, 8] |
| WIL004551 | WIL004555 | [8] |
| WIL004556 | WIL004557 | [8] |
| WIL004558 | WIL004562 | [6, 8] |
| WIL004563 | WIL004564 | [1] |
| WIL004565 | WIL004566 | [1] |
| WIL004567 | WIL004569 | [1] |
| WIL004570 | WIL004571 | [1] |
| WIL004572 | WIL004574 | [1] |
| WIL004575 | WIL004575 | [1] |
| WIL004576 | WIL004576 | [1] |
| WIL004577 | WIL004577 | [1, 8, 24] |
| WIL004578 | WIL004578 | [4, 8, 24] |
| WIL004579 | WIL004579 | [4, 8, 24] |
| WIL004580 | WIL004580 | [14] |
| WIL004581 | WIL004730 | [14, 18, 19] |
| WIL004994 | WIL004995 | [14] |
| WIL004996 | WIL004996 | [1] |
| WIL004997 | WIL004997 | [1, 8] |
| WIL004998 | WIL004998 | [1] |
| WIL004999 | WIL004999 | [1, 24] |
| WIL005000 | WIL005000 | [1, 24] |
| WIL005001 | WIL005001 | [1, 8] |
| WIL005002 | WIL005002 | [1] |
| WIL005003 | WIL005003 | [1] |
| WIL005004 | WIL005004 | [1] |
| WIL005005 | WIL005007 | [1] |
| WIL005008 | WIL005008 | [1] |
| WIL005009 | WIL005013 | [1] |
| WIL005014 | WIL005017 | [1, 24] |
| WIL005018 | WIL005018 | [1, 24] |

CLWilson RFPs identified WIL000001-WIL006235

| | | |
|---|---|---|
| WIL005019 | WIL005019 | [1, 24] |
| WIL005020 | WIL005020 | [1, 24] |
| WIL005021 | WIL005021 | [1, 24] |
| WIL005022 | WIL005022 | [1] |
| WIL005023 | WIL005023 | [1, 24] |
| WIL005024 | WIL005024 | [1, 24] |
| WIL005025 | WIL005025 | [1, 24] |
| WIL005026 | WIL005026 | [1, 24] |
| WIL005027 | WIL005027 | [1] |
| WIL005028 | WIL005028 | [14] |
| WIL005029 | WIL005030 | [14] |
| WIL005031 | WIL005040 | [14] |
| WIL005041 | WIL005050 | [14] |
| WIL005051 | WIL005052 | [1] |
| WIL005053 | WIL005054 | [5, 14] |
| WIL005055 | WIL005058 | [5, 14] |
| WIL005059 | WIL005060 | [5] |
| WIL005061 | WIL005064 | [8] |
| WIL005065 | WIL005066 | [1] |
| WIL005067 | WIL005069 | [1] |
| WIL005070 | WIL005071 | [1] |
| WIL005072 | WIL005072 | [1, 5, 7, 9] |
| WIL005073 | WIL005073 | [1, 24, 37, 38] |
| WIL005074 | WIL005077 | [8] |
| WIL005078 | WIL005130 | [8] |
| WIL005138 | WIL005142 | [8] |
| WIL005143 | WIL005143 | [8] |
| WIL005144 | WIL005145 | [8] |
| WIL005146 | WIL005146 | [1] |
| WIL005147 | WIL005147 | [1, 24] |
| WIL005148 | WIL005148 | [1] |
| WIL005149 | WIL005153 | [4, 8, 15, 36, 37, 38] |
| WIL005154 | WIL005160 | [4, 8, 36, 37, 38] |
| WIL005161 | WIL005162 | [14] |
| WIL005163 | WIL005195 | [14] |
| WIL005196 | WIL005224 | [14] |
| WIL005225 | WIL005225 | [14] |
| WIL005226 | WIL005236 | [1, 14, 18, 24, 31] |
| WIL005237 | WIL005245 | [1, 14, 18, 24, 31] |
| WIL005246 | WIL005254 | [1, 14, 18, 24, 31] |
| WIL005255 | WIL005256 | [14] |
| WIL005257 | WIL005257 | [8] |
| WIL005258 | WIL005258 | [1, 23, 24] |
| WIL005259 | WIL005269 | [8, 23, 24] |
| WIL005270 | WIL005271 | [1, 4, 8, 24] |
| WIL005272 | WIL005273 | [1, 4, 8, 23, 24] |

CI Wilson RFPs identified WIL000001-WIL006235

| | | |
|---|---|---|
| WIL005274 | WIL005275 | [6, 8] |
| WIL005276 | WIL005277 | [6, 45] |
| WIL005278 | WIL005284 | [4, 8, 36, 37, 38] |
| WIL005285 | WIL005290 | [6, 8] |
| WIL005291 | WIL005291 | [14] |
| WIL005292 | WIL005306 | [14] |
| WIL005307 | WIL005316 | [14] |
| WIL005317 | WIL005318 | [1] |
| WIL005319 | WIL005319 | [1] |
| WIL005320 | WIL005328 | [1] |
| WIL005329 | WIL005330 | [1, 6] |
| WIL005331 | WIL005366 | [6] |
| WIL005367 | WIL005377 | [6] |
| WIL005378 | WIL005385 | [6] |
| WIL005386 | WIL005389 | [6] |
| WIL005390 | WIL005391 | [1, 24] |
| WIL005392 | WIL005392 | [4, 8, 24] |
| WIL005393 | WIL005399 | [4, 8, 36, 37, 38] |
| WIL005400 | WIL005401 | [1, 8] |
| WIL005402 | WIL005408 | [4, 8, 15, 36, 37, 38] |
| WIL005409 | WIL005409 | [1, 4, 5] |
| WIL005410 | WIL005410 | [1, 24, 37, 38] |
| WIL005411 | WIL005411 | [1, 3] |
| WIL005412 | WIL005412 | [8] |
| WIL005413 | WIL005413 | [1, 4, 8, 9, 35] |
| WIL005414 | WIL005414 | [1, 8] |
| WIL005415 | WIL005415 | [1] |
| WIL005416 | WIL005416 | [1, 4, 8, 35] |
| WIL005417 | WIL005417 | [1, 4, 6, 8, 9, 35, 41, 45] |
| WIL005418 | WIL005418 | [1, 4, 6, 8, 9, 35, 41, 45] |
| WIL005419 | WIL005425 | [8] |
| WIL005426 | WIL005426 | [8] |
| WIL005427 | WIL005433 | [4, 8, 15, 36, 37, 38] |
| WIL005434 | WIL005434 | [1, 4, 6, 8, 9, 35, 45] |
| WIL005435 | WIL005442 | [4, 8, 15, 36, 37, 38] |
| WIL005443 | WIL005444 | [8, 24] |
| WIL005445 | WIL005445 | [1] |
| WIL005446 | WIL005446 | [1] |
| WIL005447 | WIL005448 | [1] |
| WIL005449 | WIL005450 | [1, 8] |
| WIL005451 | WIL005452 | [1, 8] |
| WIL005453 | WIL005453 | [1] |
| WIL005454 | WIL005454 | [1, 36] |
| WIL005455 | WIL005456 | [1] |
| WIL005457 | WIL005457 | [1] |
| WIL005458 | WIL005518 | [1] |

13

| WIL005519 | WIL005520 | [8] |
| WIL005521 | WIL005528 | [4, 8, 36, 37, 38, 39, 40] |
| WIL005529 | WIL005529 | [1] |
| WIL005530 | WIL005531 | [1] |
| WIL005532 | WIL005532 | [1] |
| WIL005533 | WIL005533 | [6] |
| WIL005534 | WIL005544 | [1] |
| WIL005545 | WIL005546 | [1] |
| WIL005548 | WIL005548 | [1] |
| WIL005549 | WIL005574 | [1] |
| WIL005575 | WIL005577 | [8] |
| WIL005578 | WIL005578 | [1] |
| WIL005579 | WIL005582 | [8, 24] |
| WIL005583 | WIL005583 | [1, 8] |
| WIL005584 | WIL005584 | [1] |
| WIL005585 | WIL005586 | [1] |
| WIL005587 | WIL005587 | [1] |
| WIL005588 | WIL005588 | [6, 24] |
| WIL005589 | WIL005599 | [6] |
| WIL005600 | WIL005601 | [6, 24] |
| WIL005602 | WIL005612 | [1] |
| WIL005613 | WIL005614 | [4, 6, 8, 45] |
| WIL005615 | WIL005615 | [1, 4, 6, 8, 9, 35, 41, 45] |
| WIL005616 | WIL005616 | [1, 8, 35, 45] |
| WIL005617 | WIL005617 | [1, 8] |
| WIL005618 | WIL005618 | [1, 8] |
| WIL005619 | WIL005620 | [14] |
| WIL005621 | WIL005631 | [1, 14, 18, 24, 31] |
| WIL005632 | WIL005640 | [1, 14, 18, 24, 31] |
| WIL005641 | WIL005649 | [1, 14, 18, 24, 31] |
| WIL005650 | WIL005660 | [1, 14, 18, 24, 31] |
| WIL005661 | WIL005669 | [1, 14, 18, 24, 31] |
| WIL005670 | WIL005678 | [1, 14, 18, 24, 31] |
| WIL005679 | WIL005689 | [1, 14, 18, 24, 31] |
| WIL005690 | WIL005700 | [1, 14, 18, 24, 31] |
| WIL005701 | WIL005709 | [1, 14, 18, 24, 31] |
| WIL005710 | WIL005711 | [14] |
| WIL005712 | WIL005712 | [1, 4, 6, 8, 35, 41, 45] |
| WIL005713 | WIL005713 | [1, 8, 35] |
| WIL005714 | WIL005724 | [1, 4, 9, 35] |
| WIL005725 | WIL005727 | [1, 4, 9, 35] |
| WIL005728 | WIL005730 | [1, 4, 6, 9, 28, 35, 39, 41, 45] |
| WIL005731 | WIL005733 | [1, 4, 6, 9, 24, 25, 26, 35, 39, 40, 41, 43, 45] |
| WIL005734 | WIL005740 | [4, 6, 24, 25, 26, 41, 45, 43] |
| WIL005741 | WIL005744 | [4, 6, 24, 25, 26, 41, 45, 43] |
| WIL005745 | WIL005756 | [1] |

14

| | | |
|---|---|---|
| WIL005757 | WIL005767 | [4, 6, 24, 25, 26, 41, 45, 43] |
| WIL005768 | WIL005787 | [1, 3, 23] |
| WIL005788 | WIL005790 | [4, 9, 28, 29, 35, 39, 40, 41] |
| WIL005791 | WIL005793 | [1, 2, 3, 22, 23] |
| WIL005794 | WIL005839 | [1, 3, 7, 24] |
| WIL005886 | WIL005901 | [1, 3, 22, 23] |
| WIL005902 | WIL005904 | [1, 4, 6, 8, 24, 25, 26, 45, 43] |
| WIL005905 | WIL005906 | [1, 4, 6, 7, 8, 25, 26, 45, 43] |
| WIL005907 | WIL005908 | [1, 4, 9] |
| WIL005909 | WIL005910 | [1, 4, 7, 9, 24, 25, 26, 34, 35, 42, 43, 45] |
| WIL005911 | WIL005918 | [4, 8, 15, 36, 37, 38] |
| WIL005919 | WIL005926 | [4, 8, 15, 36, 37, 38] |
| WIL005927 | WIL005930 | [1, 4, 5, 7, 8, 9, 24, 28, 29, 34, 35, 37, 38, 39, 40, 42, 43] |
| WIL005931 | WIL005931 | [1, 14, 18, 24, 37, 38] |
| WIL005932 | WIL005934 | [1, 24, 25, 26, 43] |
| WIL005935 | WIL005935 | [1, 14, 18, 24, 31] |
| WIL006224 | WIL006224 | [1, 14, 18, 24] |
| WIL006225 | WIL006225 | [1, 14, 18, 24] |
| WIL006226 | WIL006226 | [1, 14, 18, 24] |
| WIL006227 | WIL006227 | [1, 14, 18, 24] |
| WIL006228 | WIL006228 | [1, 14, 18, 24] |
| WIL006229 | WIL006229 | [1, 14, 18, 24] |
| WIL006230 | WIL006230 | [1, 14, 18, 24] |
| WIL006231 | WIL006231 | [1, 14, 18, 24] |
| WIL006232 | WIL006232 | [1, 14, 18, 24] |
| WIL006233 | WIL006233 | [1, 14, 18, 24] |
| WIL006234 | WIL006234 | [1, 14, 18, 24] |
| WIL006235 | WIL006235 | [1, 14, 18, 24] |

| | | |
|---|---|---|
| SUMMARY_ROW | UNIQUE_VALUES | [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45] |

# EXHIBIT E

CJ Wilson RFPs identified WIL006236-WIL007270

| doc_beg_bates | doc_end_bates | rfp_matches |
|---|---|---|
| WIL006236 | WIL006236 | [1, 2] |
| WIL006237 | WIL006282 | [1] |
| WIL006283 | WIL006284 | [1] |
| WIL006285 | WIL006286 | [1] |
| WIL006287 | WIL006303 | [1, 3, 8, 37, 38] |
| WIL006304 | WIL006320 | [1, 3, 8, 37, 38] |
| WIL006321 | WIL006322 | [1] |
| WIL006323 | WIL006323 | [2, 5] |
| WIL006324 | WIL006326 | [6, 8, 36] |
| WIL006327 | WIL006354 | [1] |
| WIL006355 | WIL006358 | [1, 3] |
| WIL006359 | WIL006362 | [1, 3, 8] |
| WIL006363 | WIL006449 | [1, 3, 6, 7, 11, 12, 22, 23, 24, 25, 26, 27, 45, 46, 43] |
| WIL006450 | WIL006453 | [1, 6] |
| WIL006454 | WIL006454 | [1, 3, 24] |
| WIL006455 | WIL006455 | [1, 3, 7, 24] |
| WIL006456 | WIL006457 | [1] |
| WIL006458 | WIL006483 | [1] |
| WIL006484 | WIL006487 | [1] |
| WIL006488 | WIL006489 | [1, 3, 6, 7, 24, 25, 26, 43] |
| WIL006490 | WIL006490 | [1] |
| WIL006491 | WIL006495 | [6, 8, 24, 25, 26, 27, 43] |
| WIL006496 | WIL006497 | [1, 6] |
| WIL006498 | WIL006498 | [1, 24] |
| WIL006499 | WIL006499 | [1, 8, 31] |
| WIL006500 | WIL006501 | [1, 3] |
| WIL006502 | WIL006588 | [1, 3, 6, 7, 11, 12, 22, 23, 24, 25, 26, 27, 45, 46, 43] |
| WIL006589 | WIL006675 | [1, 3, 6, 7, 11, 12, 22, 23, 24, 25, 26, 27, 45, 46, 43] |
| WIL006676 | WIL006677 | [1] |
| WIL006678 | WIL006678 | [1, 6, 24, 25, 26, 45, 43] |
| WIL006679 | WIL006680 | [6, 24, 25, 26, 43] |
| WIL006681 | WIL006686 | [1, 4, 6, 9, 24, 25, 26, 35, 39, 41, 45, 43] |
| WIL006687 | WIL006687 | [1, 6, 8, 24, 25, 26, 36, 37, 38, 43] |
| WIL006688 | WIL006688 | [31, 32, 33] |
| WIL006689 | WIL006690 | [6, 8, 25, 26, 43] |
| WIL006691 | WIL006692 | [4, 8, 15, 36] |
| WIL006693 | WIL006694 | [1, 4, 7, 8, 9, 24, 25, 26, 34, 35, 45, 43] |
| WIL006695 | WIL006696 | [1, 4, 7, 9, 25, 26, 34, 35, 45, 43] |
| WIL006697 | WIL006698 | [1, 3, 4, 9, 15, 23, 24, 25, 26, 35, 43] |
| WIL006699 | WIL006702 | [8] |
| WIL006703 | WIL006708 | [8] |
| WIL006709 | WIL006710 | [8] |
| WIL006711 | WIL006713 | [1] |

1

CJ Wilson RFPs identified WIL006236-WIL007270

| | | |
|---|---|---|
| WIL006714 | WIL006752 | [1] |
| WIL006753 | WIL006753 | [5, 8] |
| WIL006754 | WIL006754 | [1, 3, 4, 9, 35, 39, 40] |
| WIL006755 | WIL006755 | [1, 3, 4, 9, 35, 37, 38, 39, 40] |
| WIL006756 | WIL006757 | [1, 5, 31, 32, 33] |
| WIL006758 | WIL006758 | [1, 4, 9] |
| WIL006759 | WIL006763 | [1, 4, 6, 9, 34, 35] |
| WIL006764 | WIL006764 | [1, 4, 6, 7, 9, 23, 24, 25, 26, 35, 45, 43] |
| WIL006765 | WIL006765 | [1, 4, 6, 7, 9, 23, 24, 25, 26, 35, 37, 38, 43, 45] |
| WIL006766 | WIL006767 | [4, 6, 41, 45] |
| WIL006768 | WIL006769 | [4, 6, 41, 45] |
| WIL006770 | WIL006771 | [1, 42] |
| WIL006772 | WIL006776 | [1, 42] |
| WIL006777 | WIL006783 | [1, 42] |
| WIL006784 | WIL006825 | [1, 42] |
| WIL006826 | WIL006828 | [4, 6, 9, 41, 45] |
| WIL006829 | WIL006841 | [1, 4, 9, 35, 42] |
| WIL006842 | WIL006842 | [1, 4, 6, 9, 28, 35, 39, 41] |
| WIL006843 | WIL006843 | [1, 4, 6, 9, 35, 39, 41, 42] |
| WIL006844 | WIL006859 | [1, 4, 9, 35, 42] |
| WIL006860 | WIL006862 | [8, 35] |
| WIL006863 | WIL006866 | [8] |
| WIL006867 | WIL006870 | [8] |
| WIL006871 | WIL006873 | [4, 8, 9, 35] |
| WIL006874 | WIL006877 | [4, 8, 9, 35] |
| WIL006878 | WIL006881 | [4, 8, 9, 35] |
| WIL006882 | WIL006884 | [4, 6, 8, 9, 35, 39, 41] |
| WIL006885 | WIL006925 | [1] |
| WIL006926 | WIL006966 | [1] |
| WIL006967 | WIL006968 | [1] |
| WIL006969 | WIL006985 | [4, 9, 39, 40, 41] |
| WIL006986 | WIL006986 | [1] |
| WIL006987 | WIL006989 | [1] |
| WIL006990 | WIL006991 | [1] |
| WIL006992 | WIL006994 | [1] |
| WIL006995 | WIL006997 | [8] |
| WIL006998 | WIL006998 | [2, 8] |
| WIL006999 | WIL006999 | [1] |
| WIL007000 | WIL007003 | [1, 6, 8, 25, 26, 45, 43] |
| WIL007004 | WIL007270 | [2] |

# EXHIBIT F

Lemans RFPs identified WIL000001-WIL006235

| doc_beg_bates | doc_end_bates | rfp_matches |
|---|---|---|
| WIL000001 | WIL000002 | [2, 8, 10] |
| WIL000003 | WIL000010 | [2, 8, 10] |
| WIL000011 | WIL000012 | [1, 2, 3] |
| WIL000013 | WIL000013 | [1, 2, 3] |
| WIL000014 | WIL000017 | [1, 3] |
| WIL000018 | WIL000022 | [1, 3, 8, 10] |
| WIL000023 | WIL000024 | [1, 3] |
| WIL000025 | WIL000027 | [1, 3, 8, 10] |
| WIL000028 | WIL000032 | [1, 3, 8, 10, 14, 18, 19] |
| WIL000033 | WIL000035 | [1, 3] |
| WIL000036 | WIL000040 | [1, 3, 6, 8, 10, 14, 15, 18, 19, 20, 21, 24, 25, 26, 27, 31, 32, 33, 34, 36, 45, 46, 48] |
| WIL000041 | WIL000043 | [1, 3, 6, 8, 10, 14] |
| WIL000044 | WIL000047 | [1, 3, 6, 8, 10] |
| WIL000048 | WIL000051 | [1, 14] |
| WIL000052 | WIL000053 | [1, 3, 6, 8, 10] |
| WIL000055 | WIL000056 | [1, 3] |
| WIL000058 | WIL000058 | [1, 3] |
| WIL000059 | WIL000060 | [1, 3] |
| WIL000061 | WIL000063 | [1, 3, 8, 10] |
| WIL000064 | WIL000066 | [1, 3] |
| WIL000067 | WIL000070 | [1, 3] |
| WIL000071 | WIL000074 | [1, 3] |
| WIL000075 | WIL000078 | [1, 3] |
| WIL000079 | WIL000083 | [1, 3] |
| WIL000084 | WIL000088 | [1, 3] |
| WIL000089 | WIL000093 | [1, 3] |
| WIL000094 | WIL000094 | [14] |
| WIL000095 | WIL000097 | [1, 3] |
| WIL000098 | WIL000102 | [1, 3, 6, 8, 10, 23, 34, 45] |
| WIL000103 | WIL000108 | [1, 3, 6] |
| WIL000110 | WIL000114 | [1, 3, 6, 23] |
| WIL000115 | WIL000119 | [3, 8, 10, 36] |
| WIL000120 | WIL000123 | [3, 8, 10, 36] |
| WIL000124 | WIL000128 | [3, 8, 10, 36] |
| WIL000129 | WIL000131 | [1, 3, 14] |
| WIL000132 | WIL000138 | [6, 8, 10] |
| WIL000139 | WIL000143 | [6, 8, 10] |
| WIL000144 | WIL000148 | [1, 3, 6, 8, 10] |
| WIL000149 | WIL000151 | [1, 3, 8, 10] |
| WIL000152 | WIL000152 | [1] |
| WIL000153 | WIL000180 | [1] |
| WIL000181 | WIL000184 | [1] |
| WIL000185 | WIL000187 | [1, 3, 6] |
| WIL000189 | WIL000227 | [6] |
| WIL000228 | WIL000228 | [1, 6] |
| WIL000229 | WIL000241 | [1, 6, 11] |
| WIL000242 | WIL000243 | [1, 3] |
| WIL000244 | WIL000271 | [1] |
| WIL000277 | WIL000278 | [1, 3] |
| WIL000279 | WIL000306 | [1, 3] |
| WIL000312 | WIL000313 | [1] |
| WIL000314 | WIL000318 | [36] |
| WIL000319 | WIL000319 | [1, 6] |
| WIL000320 | WIL000406 | [1, 8] |
| WIL000407 | WIL000408 | [1, 3, 6] |

| WIL000409 | WIL000495 | [1, 8] |
|---|---|---|
| WIL000496 | WIL000497 | [1, 3, 6, 8, 10] |
| WIL000499 | WIL000503 | [1, 3, 6, 8, 10] |
| WIL000504 | WIL000504 | [1, 3] |
| WIL000505 | WIL000515 | [1] |
| WIL000516 | WIL000516 | [1, 3] |
| WIL000517 | WIL000518 | [1, 3] |
| WIL000519 | WIL000520 | [1, 3] |
| WIL000521 | WIL000522 | [1, 3] |
| WIL000523 | WIL000527 | [1, 3, 6, 8, 10] |
| WIL000528 | WIL000533 | [1, 3, 6, 8, 10] |
| WIL000534 | WIL000539 | [1, 3, 6, 8, 10] |
| WIL000540 | WIL000540 | [1, 3, 6, 8, 10] |
| WIL000541 | WIL000542 | [1, 3, 6] |
| WIL000543 | WIL000545 | [1, 3, 6, 8, 10] |
| WIL000546 | WIL000548 | [1, 3, 6, 8, 10] |
| WIL000549 | WIL000552 | [1, 3, 6, 8, 10] |
| WIL000553 | WIL000554 | [1, 3, 6, 8, 10] |
| WIL000555 | WIL000557 | [1, 3, 6, 8, 10] |
| WIL000558 | WIL000560 | [1] |
| WIL000562 | WIL000567 | [1] |
| WIL000568 | WIL000570 | [1, 3] |
| WIL000571 | WIL000571 | [6, 48] |
| WIL000572 | WIL000574 | [14, 18, 19] |
| WIL000575 | WIL000577 | [14, 18, 19] |
| WIL000578 | WIL000579 | [1, 6] |
| WIL000580 | WIL000582 | [14, 18, 19] |
| WIL000583 | WIL000585 | [14, 18, 19] |
| WIL000586 | WIL000587 | [1, 6] |
| WIL000588 | WIL000588 | [1, 3, 6] |
| WIL000589 | WIL000590 | [6] |
| WIL000591 | WIL000591 | [6] |
| WIL000592 | WIL000593 | [6] |
| WIL000594 | WIL000604 | [1] |
| WIL000605 | WIL000606 | [34] |
| WIL000607 | WIL000649 | [34] |
| WIL000698 | WIL000698 | [1, 3] |
| WIL000699 | WIL000785 | [1, 8] |
| WIL000806 | WIL000807 | [1, 6, 8, 10] |
| WIL000808 | WIL000809 | [1, 6, 8, 10] |
| WIL000810 | WIL000811 | [1, 6, 8] |
| WIL000812 | WIL000824 | [1, 6, 8] |
| WIL000825 | WIL000826 | [1, 3, 6, 8, 10] |
| WIL000827 | WIL000828 | [6] |
| WIL000829 | WIL000829 | [6] |
| WIL000830 | WIL000831 | [6] |
| WIL000832 | WIL000842 | [1] |
| WIL000843 | WIL000843 | [1, 6] |
| WIL000844 | WIL000845 | [6] |
| WIL000846 | WIL000847 | [14] |
| WIL000848 | WIL000848 | [6] |
| WIL000849 | WIL000850 | [6] |
| WIL000851 | WIL000861 | [1] |
| WIL000862 | WIL000863 | [1] |
| WIL000864 | WIL000864 | [1] |
| WIL000865 | WIL000866 | [1, 3, 7] |

Lemans RFPs identified WIL000001-WIL006235

| WIL000867 | WIL000890 | [14, 15, 18, 19] |
| WIL000891 | WIL000932 | [14, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48] |
| WIL000933 | WIL000935 | [1, 3, 6, 8, 10] |
| WIL000936 | WIL000946 | [1] |
| WIL000947 | WIL000948 | [1, 3, 6] |
| WIL000949 | WIL000950 | [3, 6] |
| WIL000951 | WIL000953 | [14, 18, 19] |
| WIL000954 | WIL000954 | [6] |
| WIL000955 | WIL000956 | [1, 3, 6, 8, 10] |
| WIL000957 | WIL000959 | [1, 3, 6, 8, 10] |
| WIL000960 | WIL000962 | [1, 6, 8] |
| WIL000963 | WIL000973 | [14] |
| WIL000974 | WIL000976 | [1, 3, 6, 8, 10] |
| WIL000977 | WIL000979 | [1, 3, 6, 8, 10] |
| WIL000980 | WIL000981 | [1, 3, 8, 10] |
| WIL000982 | WIL000987 | [1, 3, 6, 8, 10] |
| WIL000988 | WIL000994 | [6, 8, 10] |
| WIL000995 | WIL000996 | [1, 3, 8, 10] |
| WIL000997 | WIL000998 | [1, 3, 8, 10, 36] |
| WIL000999 | WIL001000 | [1, 3, 8, 10, 36] |
| WIL001001 | WIL001002 | [1, 3, 8, 10, 36] |
| WIL001003 | WIL001003 | [1, 3, 8, 10, 36] |
| WIL001004 | WIL001005 | [1, 3, 8, 10, 36] |
| WIL001006 | WIL001006 | [1, 3, 8, 10, 36] |
| WIL001007 | WIL001007 | [1, 3, 6, 8, 10] |
| WIL001008 | WIL001008 | [1, 15, 36] |
| WIL001009 | WIL001010 | [15, 36] |
| WIL001011 | WIL001011 | [1, 3, 8, 10, 15, 36] |
| WIL001012 | WIL001013 | [1, 15, 36] |
| WIL001014 | WIL001015 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001016 | WIL001016 | [1, 3, 8, 10, 15, 36] |
| WIL001017 | WIL001018 | [1, 3, 8, 10, 15, 36] |
| WIL001019 | WIL001020 | [1, 3, 6, 8, 10, 14, 15, 36] |
| WIL001021 | WIL001022 | [1, 15, 36] |
| WIL001023 | WIL001025 | [1, 3, 8, 10, 15, 36] |
| WIL001026 | WIL001026 | [1, 3] |
| WIL001027 | WIL001027 | [6] |
| WIL001028 | WIL001028 | [6] |
| WIL001029 | WIL001029 | [1, 3] |
| WIL001030 | WIL001030 | [1, 3] |
| WIL001031 | WIL001031 | [1, 5] |
| WIL001032 | WIL001033 | [5] |
| WIL001034 | WIL001036 | [1, 3, 5, 6, 9, 14, 23, 35, 39, 40] |
| WIL001037 | WIL001037 | [1, 3, 4, 6, 7, 8, 10, 25, 26, 27, 35, 39, 41, 45] |
| WIL001038 | WIL001039 | [1, 3, 4, 6, 7, 8, 10, 25, 26, 27, 35, 39, 41, 45] |
| WIL001040 | WIL001041 | [1, 3] |
| WIL001042 | WIL001043 | [1, 3, 4, 7, 35] |
| WIL001044 | WIL001045 | [1, 3] |
| WIL001046 | WIL001048 | [1, 3, 6, 8, 10] |
| WIL001049 | WIL001051 | [5, 14, 18, 19, 20, 21, 46, 47] |
| WIL001052 | WIL001054 | [1, 3, 5, 7, 9, 11, 12, 15, 28, 29, 34, 35, 39, 40, 45, 47] |
| WIL001055 | WIL001056 | [5, 7, 14, 18, 19, 46] |
| WIL001057 | WIL001057 | [1] |
| WIL001058 | WIL001066 | [14] |
| WIL001067 | WIL001067 | [1, 3] |

3

Lemans RFPs identified WIL000001-WIL006235

| | | |
|---|---|---|
| WIL001068 | WIL001068 | [1, 6, 8, 10, 45] |
| WIL001069 | WIL001069 | [1, 3, 6, 8, 10, 36] |
| WIL001070 | WIL001072 | [1, 3, 6, 7, 8, 10, 25, 26, 27, 34, 45, 48] |
| WIL001073 | WIL001074 | [1, 3, 6, 7, 8, 10, 14, 15, 18, 19, 20, 21, 24, 25, 26, 27, 31, 32, 33, 34, 36, 45, 46, 48] |
| WIL001075 | WIL001083 | [1, 15, 36] |
| WIL001084 | WIL001085 | [33] |
| WIL001086 | WIL001086 | [1] |
| WIL001087 | WIL001088 | [6, 33] |
| WIL001089 | WIL001090 | [1, 3, 34] |
| WIL001091 | WIL001136 | [34] |
| WIL001183 | WIL001198 | [1, 3, 23] |
| WIL001199 | WIL001215 | [23] |
| WIL001233 | WIL001234 | [1, 3, 6, 7, 8, 10, 26, 28, 29, 34, 39, 41, 45, 48] |
| WIL001235 | WIL001238 | [1, 3, 6, 7, 8, 10, 26, 28, 29, 34, 39, 41, 45, 48] |
| WIL001239 | WIL001240 | [1, 3, 6, 7, 8, 9, 10, 35, 45, 47, 48] |
| WIL001241 | WIL001247 | [1, 6, 8, 10, 45, 48] |
| WIL001248 | WIL001251 | [1, 3, 6, 8, 10, 23, 24, 25, 26, 27, 45, 48] |
| WIL001252 | WIL001263 | [47] |
| WIL001264 | WIL001264 | [1] |
| WIL001265 | WIL001275 | [1, 3, 6, 8, 10, 24, 25, 26, 27, 45, 48] |
| WIL001276 | WIL001276 | [1, 3, 6, 8, 10] |
| WIL001277 | WIL001278 | [1, 3, 9, 35] |
| WIL001279 | WIL001282 | [1, 3, 4, 6, 7, 9, 15, 20, 22, 23, 28, 29, 30, 33, 34, 35, 36, 39, 41, 45] |
| WIL001283 | WIL001284 | [15, 36] |
| WIL001285 | WIL001286 | [1, 3, 4, 9, 35] |
| WIL001287 | WIL001289 | [1, 3, 4, 9, 15, 28, 29, 35, 39, 40, 41] |
| WIL001290 | WIL001291 | [2, 9] |
| WIL001292 | WIL001299 | [2] |
| WIL001300 | WIL001301 | [1, 2, 3, 4, 9, 35, 39, 41] |
| WIL001302 | WIL001302 | [1, 3, 6, 9, 35, 39] |
| WIL001303 | WIL001303 | [1, 3, 4, 6, 9, 35, 39, 41] |
| WIL001304 | WIL001304 | [1, 3, 4, 6, 9, 35, 39, 41] |
| WIL001305 | WIL001305 | [1, 3, 4, 6, 9, 35, 39, 41] |
| WIL001306 | WIL001307 | [6, 8, 9, 10, 35, 39] |
| WIL001308 | WIL001309 | [6, 8, 10] |
| WIL001310 | WIL001311 | [1, 3, 6, 8, 9, 10, 35, 39, 41, 45] |
| WIL001312 | WIL001312 | [3, 8, 10] |
| WIL001313 | WIL001313 | [3, 8, 10] |
| WIL001314 | WIL001314 | [1] |
| WIL001315 | WIL001317 | [1] |
| WIL001318 | WIL001320 | [1, 3, 6, 9, 35] |
| WIL001322 | WIL001381 | [1, 3, 6, 8, 10, 35, 36] |
| WIL001382 | WIL001384 | [1] |
| WIL001385 | WIL001610 | [2, 8, 10] |
| WIL001611 | WIL001612 | [1, 3] |
| WIL001613 | WIL001614 | [1, 3] |
| WIL001615 | WIL001616 | [1, 3] |
| WIL001617 | WIL001618 | [1, 3] |
| WIL001619 | WIL001621 | [1, 14] |
| WIL001622 | WIL001626 | [1, 14, 18, 19] |
| WIL001627 | WIL001629 | [1, 14] |
| WIL001630 | WIL001634 | [1, 14, 18, 19] |
| WIL001635 | WIL001637 | [1, 14] |
| WIL001638 | WIL001641 | [1, 3, 8, 10, 14, 18, 19] |
| WIL001642 | WIL001645 | [1, 3, 8, 10] |
| WIL001646 | WIL001647 | [1, 3, 6, 8, 10, 14, 18, 19] |

| | | |
|---|---|---|
| WIL001648 | WIL001649 | [1, 3, 6, 8, 10] |
| WIL001650 | WIL001652 | [1, 3, 6, 8, 10] |
| WIL001653 | WIL001655 | [1, 3, 8, 10] |
| WIL001656 | WIL001658 | [1, 3] |
| WIL001659 | WIL001662 | [1, 3] |
| WIL001663 | WIL001666 | [1, 3, 8, 10] |
| WIL001667 | WIL001667 | [1, 3, 14] |
| WIL001668 | WIL001673 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001674 | WIL001674 | [1, 3, 6, 8, 10] |
| WIL001675 | WIL001680 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001681 | WIL001682 | [1] |
| WIL001683 | WIL001684 | [1] |
| WIL001685 | WIL001686 | [1] |
| WIL001687 | WIL001704 | [6, 8, 48] |
| WIL001705 | WIL001705 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001706 | WIL001711 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001712 | WIL001713 | [1, 14] |
| WIL001714 | WIL001715 | [1, 14] |
| WIL001716 | WIL001718 | [1, 14] |
| WIL001719 | WIL001721 | [6, 8] |
| WIL001722 | WIL001722 | [14] |
| WIL001723 | WIL001723 | [14] |
| WIL001724 | WIL001724 | [14] |
| WIL001725 | WIL001729 | [14] |
| WIL001730 | WIL001732 | [1, 6, 14, 18, 19] |
| WIL001733 | WIL001733 | [1, 3, 5] |
| WIL001734 | WIL001735 | [5, 31, 32, 33] |
| WIL001736 | WIL001737 | [1, 14, 18, 19] |
| WIL001738 | WIL001745 | [1, 14, 18, 19] |
| WIL001746 | WIL001746 | [1, 14, 18, 19] |
| WIL001747 | WIL001747 | [1, 14, 18, 24] |
| WIL001748 | WIL001749 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001750 | WIL001757 | [3, 14, 18, 19] |
| WIL001758 | WIL001759 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001760 | WIL001760 | [1] |
| WIL001761 | WIL001762 | [14, 18, 19] |
| WIL001763 | WIL001763 | [1, 14, 18, 24] |
| WIL001764 | WIL001765 | [1, 3] |
| WIL001766 | WIL001766 | [14] |
| WIL001767 | WIL001777 | [1] |
| WIL001778 | WIL001786 | [1] |
| WIL001787 | WIL001795 | [1] |
| WIL001796 | WIL001797 | [1, 14] |
| WIL001798 | WIL001945 | [14] |
| WIL002177 | WIL002178 | [14] |
| WIL002179 | WIL002179 | [1, 14, 18, 19] |
| WIL002180 | WIL002180 | [1, 14, 18, 24] |
| WIL002181 | WIL002181 | [1, 6, 14, 18, 19] |
| WIL002182 | WIL002182 | [1, 14, 18, 24] |
| WIL002183 | WIL002184 | [1, 3, 6, 8, 10] |
| WIL002185 | WIL002185 | [1, 6] |
| WIL002186 | WIL002187 | [1, 6, 8, 10] |
| WIL002188 | WIL002189 | [1, 6, 14] |
| WIL002190 | WIL002190 | [1, 14, 18, 24] |
| WIL002191 | WIL002192 | [1, 6, 8, 10] |
| WIL002193 | WIL002194 | [1, 6] |

Lemans RFPs identified WIL000001-WIL006235

| | | |
|---|---|---|
| WIL002195 | WIL002197 | [1, 14] |
| WIL002198 | WIL002198 | [1, 14, 18, 24] |
| WIL002199 | WIL002201 | [1, 3, 14, 18, 19] |
| WIL002202 | WIL002202 | [1, 14, 18, 24] |
| WIL002203 | WIL002205 | [1, 3, 6, 8, 10] |
| WIL002206 | WIL002206 | [1, 14] |
| WIL002207 | WIL002207 | [1, 14, 18, 24] |
| WIL002208 | WIL002208 | [1, 14] |
| WIL002209 | WIL002209 | [1, 14, 18, 24] |
| WIL002210 | WIL002211 | [1] |
| WIL002212 | WIL002213 | [1] |
| WIL002214 | WIL002214 | [1, 3] |
| WIL002215 | WIL002216 | [1, 3] |
| WIL002217 | WIL002218 | [1, 3, 6, 8, 10, 23, 24, 34] |
| WIL002219 | WIL002220 | [1, 3, 6, 8, 10, 23, 24, 34, 36] |
| WIL002221 | WIL002222 | [1, 3, 6, 8, 10, 34] |
| WIL002223 | WIL002223 | [1, 14] |
| WIL002224 | WIL002234 | [1] |
| WIL002235 | WIL002243 | [1] |
| WIL002244 | WIL002391 | [14] |
| WIL002632 | WIL002633 | [14] |
| WIL002634 | WIL002634 | [20, 21] |
| WIL002635 | WIL002635 | [20, 21] |
| WIL002636 | WIL002639 | [1, 3, 23] |
| WIL002640 | WIL002640 | [1, 3, 6] |
| WIL002641 | WIL002666 | [6] |
| WIL002667 | WIL002670 | [1, 3, 23] |
| WIL002671 | WIL002674 | [1, 3, 23] |
| WIL002675 | WIL002675 | [1, 3] |
| WIL002676 | WIL002676 | [1, 3] |
| WIL002677 | WIL002678 | [1, 3, 6, 8, 10, 22, 23, 34, 36] |
| WIL002679 | WIL002680 | [1, 3, 6, 8, 10, 22, 23, 34, 36] |
| WIL002681 | WIL002683 | [1, 3, 6, 8, 10, 22, 23, 34, 36, 45] |
| WIL002684 | WIL002686 | [1, 3, 6, 7, 8, 10, 22, 23, 24, 25, 26, 27, 34, 36, 45, 46] |
| WIL002687 | WIL002690 | [1, 3, 22, 23, 34] |
| WIL002691 | WIL002697 | [1, 3, 14] |
| WIL002698 | WIL002761 | [1, 8] |
| WIL002863 | WIL002871 | [1, 3, 23] |
| WIL002872 | WIL002880 | [1, 3, 23, 34] |
| WIL002881 | WIL002882 | [1] |
| WIL002883 | WIL002883 | [1, 14, 18, 24] |
| WIL002884 | WIL002884 | [1] |
| WIL002885 | WIL002886 | [1] |
| WIL002887 | WIL002887 | [1] |
| WIL002888 | WIL002889 | [1] |
| WIL002890 | WIL002891 | [1] |
| WIL002892 | WIL002900 | [1, 3, 22, 23] |
| WIL002901 | WIL002964 | [1, 8] |
| WIL003027 | WIL003036 | [1, 3, 23] |
| WIL003037 | WIL003046 | [1, 3, 23, 34] |
| WIL003047 | WIL003056 | [1, 3, 34] |
| WIL003057 | WIL003100 | [34] |
| WIL003157 | WIL003157 | [1, 14] |
| WIL003158 | WIL003168 | [1] |
| WIL003169 | WIL003317 | [14] |
| WIL003318 | WIL003326 | [14] |

| | | |
|---|---|---|
| WIL003327 | WIL003445 | [14] |
| WIL003446 | WIL003454 | [14] |
| WIL003455 | WIL003567 | [14] |
| WIL003568 | WIL003568 | [14] |
| WIL003569 | WIL003569 | [14, 20, 21] |
| WIL003570 | WIL003570 | [5, 14, 20, 21] |
| WIL003571 | WIL003572 | [20, 21] |
| WIL003573 | WIL003575 | [20, 21] |
| WIL003576 | WIL003576 | [1, 3, 6, 8, 10] |
| WIL003577 | WIL003578 | [1, 3, 6, 8, 10] |
| WIL003579 | WIL003579 | [1, 3, 6] |
| WIL003580 | WIL003581 | [1, 3, 6, 8, 10, 34] |
| WIL003582 | WIL003582 | [1, 3] |
| WIL003583 | WIL003584 | [1, 3, 7, 8, 10, 23, 24, 34, 36] |
| WIL003585 | WIL003585 | [1, 3, 6] |
| WIL003587 | WIL003587 | [1] |
| WIL003588 | WIL003589 | [1, 3, 6] |
| WIL003590 | WIL003592 | [1, 3, 6] |
| WIL003594 | WIL003595 | [1, 3, 6, 8, 10] |
| WIL003596 | WIL003597 | [1, 3, 6, 8, 10] |
| WIL003598 | WIL003599 | [1, 3, 6, 8, 10] |
| WIL003600 | WIL003602 | [1, 3, 6] |
| WIL003603 | WIL003615 | [6] |
| WIL003616 | WIL003628 | [6] |
| WIL003629 | WIL003630 | [1, 3, 6, 23] |
| WIL003631 | WIL003643 | [6] |
| WIL003644 | WIL003646 | [1, 3, 6, 8, 10] |
| WIL003647 | WIL003649 | [1, 3, 6] |
| WIL003650 | WIL003736 | [1, 8] |
| WIL003737 | WIL003739 | [1, 3, 6] |
| WIL003740 | WIL003826 | [1, 8] |
| WIL003827 | WIL003827 | [1, 3, 8] |
| WIL003829 | WIL003831 | [1, 3, 6, 8, 10] |
| WIL003832 | WIL003835 | [1, 3, 6] |
| WIL003836 | WIL003848 | [1, 6, 8] |
| WIL003849 | WIL003861 | [1, 3, 6, 8] |
| WIL003862 | WIL003863 | [1] |
| WIL003864 | WIL003867 | [1, 3, 6, 8, 10] |
| WIL003868 | WIL003869 | [1] |
| WIL003870 | WIL003873 | [1, 3, 6, 8, 10] |
| WIL003874 | WIL003874 | [1, 3, 6, 8, 10, 23, 34, 36] |
| WIL003875 | WIL003887 | [1, 6, 8, 10] |
| WIL003888 | WIL003888 | [1, 3, 6, 8, 10, 23, 34, 36] |
| WIL003889 | WIL003889 | [1, 3, 6] |
| WIL003890 | WIL003976 | [1, 8] |
| WIL003977 | WIL003978 | [1, 3, 6, 23] |
| WIL003979 | WIL003979 | [1, 14] |
| WIL003980 | WIL003990 | [1] |
| WIL003991 | WIL004139 | [14, 18, 19] |
| WIL004272 | WIL004272 | [1, 14] |
| WIL004273 | WIL004275 | [1, 3] |
| WIL004276 | WIL004276 | [1] |
| WIL004277 | WIL004277 | [1] |
| WIL004278 | WIL004278 | [1, 3, 6, 8, 10] |
| WIL004279 | WIL004279 | [1, 3, 6, 8, 10] |
| WIL004280 | WIL004284 | [1, 3, 6, 8, 10] |

| | | |
|---|---|---|
| WIL004285 | WIL004285 | [1] |
| WIL004286 | WIL004313 | [1] |
| WIL004314 | WIL004317 | [1] |
| WIL004318 | WIL004318 | [1] |
| WIL004319 | WIL004319 | [1, 14, 18, 24] |
| WIL004320 | WIL004320 | [1, 3] |
| WIL004321 | WIL004321 | [1, 3] |
| WIL004322 | WIL004323 | [1, 3] |
| WIL004324 | WIL004326 | [1, 3] |
| WIL004327 | WIL004329 | [1, 3] |
| WIL004330 | WIL004332 | [1, 3, 23, 24] |
| WIL004333 | WIL004333 | [1, 3, 6, 8, 10, 24, 25, 26, 27, 45, 46, 48] |
| WIL004334 | WIL004341 | [1, 3, 6, 8, 10, 24, 25, 26, 27, 45, 46, 48] |
| WIL004342 | WIL004342 | [1, 3] |
| WIL004343 | WIL004343 | [1, 3] |
| WIL004344 | WIL004344 | [1, 3] |
| WIL004345 | WIL004352 | [1, 3, 31, 32] |
| WIL004353 | WIL004353 | [1, 3] |
| WIL004354 | WIL004356 | [1, 3, 6] |
| WIL004357 | WIL004392 | [14, 15, 18, 19, 20, 21, 24, 25, 26, 27, 31, 32, 33, 34, 36, 45, 46, 48] |
| WIL004393 | WIL004395 | [1, 6] |
| WIL004396 | WIL004396 | [1, 3, 8, 10, 36] |
| WIL004397 | WIL004401 | [3, 8, 10, 36] |
| WIL004402 | WIL004402 | [1, 8, 10, 36] |
| WIL004403 | WIL004403 | [1, 6, 8, 10] |
| WIL004404 | WIL004404 | [1, 8] |
| WIL004405 | WIL004406 | [1, 6, 8, 10] |
| WIL004407 | WIL004408 | [1, 3, 8, 10] |
| WIL004409 | WIL004411 | [1, 3, 8, 10] |
| WIL004412 | WIL004412 | [1] |
| WIL004413 | WIL004413 | [1, 14] |
| WIL004415 | WIL004415 | [14] |
| WIL004416 | WIL004441 | [14] |
| WIL004442 | WIL004445 | [1, 3, 6, 8, 10] |
| WIL004446 | WIL004447 | [1] |
| WIL004448 | WIL004449 | [1] |
| WIL004450 | WIL004450 | [1] |
| WIL004451 | WIL004452 | [1, 14] |
| WIL004453 | WIL004454 | [1] |
| WIL004455 | WIL004456 | [1] |
| WIL004457 | WIL004457 | [1, 14, 18, 24] |
| WIL004459 | WIL004459 | [1] |
| WIL004460 | WIL004461 | [1] |
| WIL004462 | WIL004463 | [1] |
| WIL004464 | WIL004465 | [1] |
| WIL004466 | WIL004485 | [1] |
| WIL004486 | WIL004486 | [1] |
| WIL004487 | WIL004488 | [1, 3] |
| WIL004489 | WIL004489 | [1, 6, 8, 10] |
| WIL004490 | WIL004491 | [1, 3, 6, 8, 10] |
| WIL004492 | WIL004493 | [1, 14] |
| WIL004494 | WIL004495 | [14] |
| WIL004496 | WIL004498 | [14] |
| WIL004499 | WIL004500 | [14] |
| WIL004501 | WIL004501 | [1] |
| WIL004502 | WIL004502 | [1, 24] |

| WIL004503 | WIL004503 | [1] |
|---|---|---|
| WIL004504 | WIL004504 | [1, 24] |
| WIL004505 | WIL004506 | [1, 6] |
| WIL004507 | WIL004507 | [1, 6, 8, 10] |
| WIL004508 | WIL004509 | [1, 6, 8, 10] |
| WIL004510 | WIL004511 | [1, 8] |
| WIL004512 | WIL004512 | [1, 24] |
| WIL004513 | WIL004529 | [1] |
| WIL004530 | WIL004530 | [1, 3, 6, 8, 10, 14] |
| WIL004531 | WIL004531 | [1, 8] |
| WIL004532 | WIL004533 | [1, 8] |
| WIL004534 | WIL004535 | [1, 6, 8, 10] |
| WIL004536 | WIL004536 | [1, 3] |
| WIL004537 | WIL004539 | [3, 6, 8, 10, 48] |
| WIL004540 | WIL004540 | [1, 3] |
| WIL004541 | WIL004541 | [1, 3, 34] |
| WIL004542 | WIL004542 | [1, 3] |
| WIL004543 | WIL004543 | [1, 3] |
| WIL004544 | WIL004544 | [1] |
| WIL004545 | WIL004548 | [6, 8] |
| WIL004551 | WIL004555 | [1, 6, 8, 10] |
| WIL004556 | WIL004557 | [6, 8, 10, 48] |
| WIL004558 | WIL004562 | [6, 8, 10] |
| WIL004563 | WIL004564 | [1] |
| WIL004565 | WIL004566 | [1] |
| WIL004567 | WIL004569 | [1] |
| WIL004570 | WIL004571 | [1] |
| WIL004572 | WIL004574 | [1] |
| WIL004575 | WIL004575 | [1, 8] |
| WIL004576 | WIL004576 | [1, 8] |
| WIL004577 | WIL004577 | [1, 3, 6, 8, 10] |
| WIL004578 | WIL004578 | [1, 6, 8, 10] |
| WIL004579 | WIL004579 | [1, 6, 8, 10] |
| WIL004580 | WIL004580 | [1, 14] |
| WIL004581 | WIL004730 | [14] |
| WIL004994 | WIL004995 | [1, 14] |
| WIL004996 | WIL004996 | [1] |
| WIL004997 | WIL004997 | [1] |
| WIL004998 | WIL004998 | [1] |
| WIL004999 | WIL004999 | [1, 24] |
| WIL005000 | WIL005000 | [1, 24] |
| WIL005001 | WIL005001 | [1, 14] |
| WIL005002 | WIL005002 | [1] |
| WIL005003 | WIL005003 | [1] |
| WIL005004 | WIL005004 | [1] |
| WIL005005 | WIL005007 | [1] |
| WIL005008 | WIL005008 | [6, 8] |
| WIL005009 | WIL005013 | [6, 8] |
| WIL005014 | WIL005017 | [6, 8] |
| WIL005018 | WIL005018 | [1, 24] |
| WIL005019 | WIL005019 | [1, 24] |
| WIL005020 | WIL005020 | [1, 24] |
| WIL005022 | WIL005022 | [1, 14] |
| WIL005023 | WIL005023 | [1, 24] |
| WIL005024 | WIL005024 | [1, 24] |
| WIL005025 | WIL005025 | [1, 24] |

| | | |
|---|---|---|
| WIL005026 | WIL005026 | [1, 24] |
| WIL005027 | WIL005027 | [1, 6] |
| WIL005028 | WIL005028 | [1] |
| WIL005029 | WIL005030 | [14] |
| WIL005031 | WIL005040 | [14] |
| WIL005041 | WIL005050 | [14] |
| WIL005051 | WIL005052 | [1] |
| WIL005053 | WIL005054 | [5, 14] |
| WIL005055 | WIL005058 | [5, 14] |
| WIL005059 | WIL005060 | [5, 14] |
| WIL005061 | WIL005064 | [1, 8] |
| WIL005065 | WIL005066 | [1] |
| WIL005067 | WIL005069 | [1] |
| WIL005070 | WIL005071 | [1] |
| WIL005072 | WIL005072 | [1, 5] |
| WIL005073 | WIL005073 | [1, 24] |
| WIL005074 | WIL005077 | [1, 6, 8, 10] |
| WIL005078 | WIL005130 | [1] |
| WIL005131 | WIL005132 | [1] |
| WIL005133 | WIL005135 | [1] |
| WIL005136 | WIL005137 | [1] |
| WIL005138 | WIL005142 | [1, 3, 6, 8, 10] |
| WIL005143 | WIL005143 | [1, 8] |
| WIL005144 | WIL005145 | [1, 6, 8, 10] |
| WIL005146 | WIL005146 | [1] |
| WIL005147 | WIL005147 | [1, 24] |
| WIL005148 | WIL005148 | [1] |
| WIL005149 | WIL005153 | [15, 36] |
| WIL005154 | WIL005160 | [15] |
| WIL005161 | WIL005162 | [1] |
| WIL005163 | WIL005195 | [1] |
| WIL005196 | WIL005224 | [1] |
| WIL005225 | WIL005225 | [14] |
| WIL005226 | WIL005236 | [1] |
| WIL005237 | WIL005245 | [1] |
| WIL005246 | WIL005254 | [1] |
| WIL005255 | WIL005256 | [1, 14] |
| WIL005257 | WIL005257 | [1, 6] |
| WIL005258 | WIL005258 | [1] |
| WIL005259 | WIL005269 | [1] |
| WIL005270 | WIL005271 | [1, 3, 8, 10] |
| WIL005272 | WIL005273 | [1, 3, 6, 8, 10, 36] |
| WIL005274 | WIL005275 | [1, 6, 8] |
| WIL005276 | WIL005277 | [1, 6] |
| WIL005278 | WIL005284 | [1, 15, 36] |
| WIL005285 | WIL005290 | [6, 8, 10] |
| WIL005291 | WIL005291 | [1, 14] |
| WIL005292 | WIL005306 | [14] |
| WIL005307 | WIL005316 | [14] |
| WIL005317 | WIL005318 | [1] |
| WIL005319 | WIL005319 | [1] |
| WIL005320 | WIL005328 | [1] |
| WIL005329 | WIL005330 | [1, 3, 6] |
| WIL005331 | WIL005366 | [6] |
| WIL005367 | WIL005377 | [6] |
| WIL005378 | WIL005385 | [6] |

| | | |
|---|---|---|
| WIL005390 | WIL005391 | [1, 3, 8, 10] |
| WIL005392 | WIL005392 | [1, 6, 8, 10] |
| WIL005393 | WIL005399 | [1, 15, 36] |
| WIL005400 | WIL005401 | [1, 3] |
| WIL005402 | WIL005408 | [15, 36] |
| WIL005409 | WIL005409 | [1, 3, 5, 6] |
| WIL005410 | WIL005410 | [1, 24] |
| WIL005411 | WIL005411 | [1, 3, 8, 10] |
| WIL005412 | WIL005412 | [1, 3, 8, 10] |
| WIL005413 | WIL005413 | [1, 3, 8, 10] |
| WIL005414 | WIL005414 | [1] |
| WIL005415 | WIL005415 | [1] |
| WIL005416 | WIL005416 | [1, 3] |
| WIL005417 | WIL005417 | [1, 6] |
| WIL005418 | WIL005418 | [1, 6] |
| WIL005419 | WIL005425 | [1, 6, 8, 10] |
| WIL005426 | WIL005426 | [1, 6, 8, 10] |
| WIL005427 | WIL005433 | [15, 36] |
| WIL005434 | WIL005434 | [1, 3, 6, 8, 10] |
| WIL005435 | WIL005442 | [1, 15, 36] |
| WIL005443 | WIL005444 | [1, 3] |
| WIL005445 | WIL005445 | [1, 3] |
| WIL005446 | WIL005446 | [1, 3] |
| WIL005447 | WIL005448 | [1, 3] |
| WIL005449 | WIL005450 | [1, 3, 8, 10] |
| WIL005451 | WIL005452 | [1, 3] |
| WIL005453 | WIL005453 | [1] |
| WIL005454 | WIL005454 | [1] |
| WIL005455 | WIL005456 | [1] |
| WIL005457 | WIL005457 | [1] |
| WIL005458 | WIL005518 | [1] |
| WIL005519 | WIL005520 | [1, 6, 8] |
| WIL005521 | WIL005528 | [15, 36] |
| WIL005529 | WIL005529 | [1] |
| WIL005532 | WIL005532 | [1, 6, 8] |
| WIL005533 | WIL005533 | [1, 6, 8, 10] |
| WIL005534 | WIL005544 | [6] |
| WIL005545 | WIL005546 | [1] |
| WIL005548 | WIL005548 | [1] |
| WIL005549 | WIL005574 | [1] |
| WIL005575 | WIL005577 | [1, 6, 8, 10] |
| WIL005578 | WIL005578 | [5, 14, 18, 19] |
| WIL005579 | WIL005582 | [1, 3, 6, 8, 10] |
| WIL005583 | WIL005583 | [1] |
| WIL005584 | WIL005584 | [1] |
| WIL005585 | WIL005586 | [1] |
| WIL005587 | WIL005587 | [1] |
| WIL005588 | WIL005588 | [1, 6] |
| WIL005589 | WIL005599 | [6] |
| WIL005600 | WIL005601 | [1, 6] |
| WIL005602 | WIL005612 | [6] |
| WIL005613 | WIL005614 | [1, 14] |
| WIL005615 | WIL005615 | [1, 6] |
| WIL005616 | WIL005616 | [1, 6] |
| WIL005617 | WIL005617 | [1] |
| WIL005618 | WIL005618 | [1] |

Lemans RFPs identified WIL000001-WIL006235

| | | |
|---|---|---|
| WIL005619 | WIL005620 | [1, 14] |
| WIL005621 | WIL005631 | [1] |
| WIL005632 | WIL005640 | [1] |
| WIL005641 | WIL005649 | [1] |
| WIL005650 | WIL005660 | [14, 18, 19] |
| WIL005661 | WIL005669 | [1] |
| WIL005670 | WIL005678 | [1] |
| WIL005679 | WIL005689 | [1] |
| WIL005690 | WIL005700 | [1] |
| WIL005701 | WIL005709 | [1] |
| WIL005710 | WIL005711 | [14] |
| WIL005712 | WIL005712 | [1, 6, 9, 35, 36, 39, 40, 41, 45] |
| WIL005713 | WIL005713 | [1, 6, 9, 35, 36, 39, 40, 41, 45] |
| WIL005714 | WIL005724 | [1, 3, 9, 35] |
| WIL005725 | WIL005727 | [1, 3, 9, 35] |
| WIL005728 | WIL005730 | [1, 3, 6, 9, 35, 45, 47] |
| WIL005731 | WIL005733 | [1, 3, 6, 9, 35, 41, 45, 47] |
| WIL005734 | WIL005740 | [1, 6, 8, 41, 45, 48] |
| WIL005741 | WIL005744 | [1, 3, 6, 8, 23, 24, 25, 26, 27, 41, 45, 48] |
| WIL005745 | WIL005756 | [47] |
| WIL005757 | WIL005767 | [1, 3, 6, 8, 24, 25, 26, 27, 41, 45, 48] |
| WIL005768 | WIL005787 | [1, 3, 22, 23, 34] |
| WIL005788 | WIL005790 | [4, 15, 35, 39, 40, 41] |
| WIL005791 | WIL005793 | [1, 3] |
| WIL005794 | WIL005839 | [1] |
| WIL005886 | WIL005901 | [1, 3, 7, 22, 23, 34] |
| WIL005902 | WIL005904 | [1, 3, 6, 8, 10, 26, 45, 48] |
| WIL005905 | WIL005906 | [1, 3, 6, 8, 10, 26, 45, 48] |
| WIL005907 | WIL005908 | [1, 3] |
| WIL005909 | WIL005910 | [1, 3, 4, 7, 35] |
| WIL005911 | WIL005918 | [15, 36] |
| WIL005919 | WIL005926 | [15, 36] |
| WIL005927 | WIL005930 | [1, 3, 5, 9] |
| WIL005931 | WIL005931 | [1, 14, 18, 24] |
| WIL000188 | WIL000188 | [1, 3, 7] |
| WIL001321 | WIL001321 | [1, 3, 7] |
| WIL004149 | WIL004149 | [1, 14, 18, 24] |
| WIL004458 | WIL004458 | [1, 24] |
| WIL005021 | WIL005021 | [1, 24] |
| WIL005932 | WIL005934 | [1, 24, 25, 26] |
| WIL005935 | WIL005935 | [1, 14, 18, 24, 31] |
| WIL006224 | WIL006224 | [1, 14, 18, 24] |
| WIL006225 | WIL006225 | [1, 14, 18, 24] |
| WIL006226 | WIL006226 | [1, 14, 18, 24] |
| WIL006227 | WIL006227 | [1, 14, 18, 24] |
| WIL006228 | WIL006228 | [1, 14, 18, 24] |
| WIL006229 | WIL006229 | [1, 14, 18, 24] |
| WIL006230 | WIL006230 | [1, 14, 18, 24] |
| WIL006231 | WIL006231 | [1, 14, 18, 24] |
| WIL006232 | WIL006232 | [1, 14, 18, 24] |
| WIL006233 | WIL006233 | [1, 14, 18, 24] |
| WIL006234 | WIL006234 | [1, 14, 18, 24] |
| WIL006235 | WIL006235 | [1, 14, 18, 24] |
| SUMMARY_ROW | UNIQUE_VALUES | [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48] |

# EXHIBIT G

Lemans RFPs identified WIL006236_007270

| doc_beg_bates | doc_end_bates | rfp_matches |
|---|---|---|
| WIL006236 | WIL006236 | [1] |
| WIL006237 | WIL006282 | [1] |
| WIL006283 | WIL006284 | [1] |
| WIL006285 | WIL006286 | [1] |
| WIL006287 | WIL006303 | [1] |
| WIL006304 | WIL006320 | [1] |
| WIL006321 | WIL006322 | [1, 4] |
| WIL006323 | WIL006323 | [1, 2, 4] |
| WIL006324 | WIL006326 | [7, 36] |
| WIL006327 | WIL006354 | [1] |
| WIL006355 | WIL006358 | [1] |
| WIL006359 | WIL006362 | [1, 4] |
| WIL006363 | WIL006449 | [1, 8] |
| WIL006450 | WIL006453 | [1, 4, 7] |
| WIL006454 | WIL006454 | [1, 4] |
| WIL006455 | WIL006455 | [1, 4] |
| WIL006456 | WIL006457 | [1] |
| WIL006458 | WIL006483 | [1] |
| WIL006484 | WIL006487 | [1] |
| WIL006488 | WIL006489 | [1, 4, 7] |
| WIL006490 | WIL006490 | [1] |
| WIL006491 | WIL006495 | [1, 4, 7] |
| WIL006496 | WIL006497 | [1, 4, 7] |
| WIL006498 | WIL006498 | [1, 4] |
| WIL006499 | WIL006499 | [1, 8, 9] |
| WIL006500 | WIL006501 | [1, 4] |
| WIL006502 | WIL006588 | [1, 8] |
| WIL006589 | WIL006675 | [1, 8] |
| WIL006676 | WIL006677 | [1] |
| WIL006678 | WIL006678 | [1, 7, 25, 26, 45] |
| WIL006679 | WIL006680 | [7, 25, 26, 45] |
| WIL006681 | WIL006686 | [1, 4, 7, 8, 9, 25, 26, 27, 34, 39, 41, 45, 48] |
| WIL006687 | WIL006687 | [1, 4, 7, 15, 36] |
| WIL006688 | WIL006688 | [33] |
| WIL006689 | WIL006690 | [7, 33, 48] |
| WIL006691 | WIL006692 | [15, 36] |
| WIL006693 | WIL006694 | [1, 4, 5, 7, 8, 25, 26, 27, 35, 39, 41, 45] |
| WIL006695 | WIL006696 | [1, 4, 5, 7, 8, 25, 26, 27, 35, 45] |
| WIL006697 | WIL006698 | [1, 4, 7, 15, 36] |
| WIL006699 | WIL006702 | [7] |
| WIL006703 | WIL006708 | [4] |
| WIL006709 | WIL006710 | [4] |
| WIL006711 | WIL006713 | [1] |
| WIL006714 | WIL006752 | [1] |
| WIL006753 | WIL006753 | [4] |
| WIL006754 | WIL006754 | [1, 4, 47] |
| WIL006755 | WIL006755 | [1, 8, 9] |

Lemans RFPs identified WIL006236_007270

| | | |
|---|---|---|
| WIL006756 | WIL006757 | [47] |
| WIL006758 | WIL006758 | [1, 4, 11, 12] |
| WIL006759 | WIL006763 | [1, 4, 5, 7, 10, 35, 39, 40, 41] |
| WIL006764 | WIL006764 | [1, 4, 7] |
| WIL006765 | WIL006765 | [1, 8, 9] |
| WIL006766 | WIL006767 | [5, 7, 41] |
| WIL006768 | WIL006769 | [1, 4, 7] |
| WIL006770 | WIL006771 | [1] |
| WIL006772 | WIL006776 | [1] |
| WIL006777 | WIL006783 | [1] |
| WIL006784 | WIL006825 | [1] |
| WIL006826 | WIL006828 | [1, 4, 7, 11, 12, 34, 35, 39, 41, 45] |
| WIL006829 | WIL006841 | [1, 4, 5, 10, 35, 39, 40, 41] |
| WIL006842 | WIL006842 | [1, 4, 5, 7, 10, 35, 39, 41] |
| WIL006843 | WIL006843 | [1, 4, 5, 7, 10, 35] |
| WIL006844 | WIL006859 | [1, 4, 5, 10, 35] |
| WIL006860 | WIL006862 | [5, 10] |
| WIL006863 | WIL006866 | [1] |
| WIL006867 | WIL006870 | [1] |
| WIL006871 | WIL006873 | [5, 10] |
| WIL006874 | WIL006877 | [5, 10] |
| WIL006878 | WIL006881 | [5, 10] |
| WIL006882 | WIL006884 | [5, 10, 35, 39, 41] |
| WIL006885 | WIL006925 | [1] |
| WIL006926 | WIL006966 | [1] |
| WIL006967 | WIL006968 | [1] |
| WIL006969 | WIL006985 | [5] |
| WIL006986 | WIL006986 | [1] |
| WIL006987 | WIL006989 | [1] |
| WIL006990 | WIL006991 | [1] |
| WIL006992 | WIL006994 | [1, 4, 5, 8, 10, 35, 39, 40, 41, 44] |
| WIL006995 | WIL006997 | [9] |
| WIL006998 | WIL006998 | [2] |
| WIL006999 | WIL006999 | [1, 4, 7, 9] |
| WIL007000 | WIL007003 | [1, 4, 7, 9, 15, 25, 26, 27, 34, 45] |
| WIL007004 | WIL007270 | [2] |
| SUMMARY_ROW | UNIQUE_VALUES | [1, 2, 4, 5, 7, 8, 9, 10, 11, 12, 15, 25, 26, 27, 33, 34, 35, 36, 39, 40, 41, 44, 45, 47, 48] |

# EXHIBIT H

| doc_beg_bates | doc_end_bates | rfp_matches |
|---|---|---|
| WIL000001 | WIL000002 | [2, 8, 10] |
| WIL000003 | WIL000010 | [2, 8, 10] |
| WIL000011 | WIL000012 | [1, 2, 3] |
| WIL000013 | WIL000013 | [1, 2, 3] |
| WIL000014 | WIL000017 | [1, 3] |
| WIL000018 | WIL000022 | [1, 3, 8, 10] |
| WIL000023 | WIL000024 | [1, 3] |
| WIL000025 | WIL000027 | [1, 3, 8, 10] |
| WIL000028 | WIL000032 | [1, 3, 8, 10, 14, 18, 19] |
| WIL000033 | WIL000035 | [1, 3] |
| WIL000036 | WIL000040 | [1, 3, 6, 8, 10, 14, 15, 18, 19, 20, 21, 24, 25, 26, 27, 31, 32, 33, 34, 36, 45, 46, 48] |
| WIL000041 | WIL000043 | [1, 3, 6, 8, 10, 14] |
| WIL000044 | WIL000047 | [1, 3, 6, 8, 10] |
| WIL000048 | WIL000051 | [1, 14] |
| WIL000052 | WIL000053 | [1, 3, 6, 8, 10] |
| WIL000055 | WIL000056 | [1, 3] |
| WIL000058 | WIL000058 | [1, 3] |
| WIL000059 | WIL000060 | [1, 3] |
| WIL000061 | WIL000063 | [1, 3, 8, 10] |
| WIL000064 | WIL000066 | [1, 3] |
| WIL000067 | WIL000070 | [1, 3] |
| WIL000071 | WIL000074 | [1, 3] |
| WIL000075 | WIL000078 | [1, 3] |
| WIL000079 | WIL000083 | [1, 3] |
| WIL000084 | WIL000088 | [1, 3] |
| WIL000089 | WIL000093 | [1, 3] |
| WIL000094 | WIL000094 | [14] |
| WIL000095 | WIL000097 | [1, 3] |
| WIL000098 | WIL000102 | [1, 3, 6, 8, 10, 23, 34, 45] |
| WIL000103 | WIL000108 | [1, 3, 6] |
| WIL000110 | WIL000114 | [1, 3, 6, 23] |
| WIL000115 | WIL000119 | [3, 8, 10, 36] |
| WIL000120 | WIL000123 | [3, 8, 10, 36] |
| WIL000124 | WIL000128 | [3, 8, 10, 36] |
| WIL000129 | WIL000131 | [1, 3, 14] |
| WIL000132 | WIL000138 | [6, 8, 10] |
| WIL000139 | WIL000143 | [6, 8, 10] |
| WIL000144 | WIL000148 | [1, 3, 6, 8, 10] |
| WIL000149 | WIL000151 | [1, 3, 8, 10] |
| WIL000152 | WIL000152 | [1] |
| WIL000153 | WIL000180 | [1] |
| WIL000181 | WIL000184 | [1] |
| WIL000185 | WIL000187 | [1, 3, 6] |
| WIL000189 | WIL000227 | [6] |
| WIL000228 | WIL000228 | [1, 6] |
| WIL000229 | WIL000241 | [1, 6, 11] |
| WIL000242 | WIL000243 | [1, 3] |
| WIL000244 | WIL000271 | [1] |
| WIL000277 | WIL000278 | [1, 3] |
| WIL000279 | WIL000306 | [1, 3] |
| WIL000312 | WIL000313 | [1] |

1

| | | |
|---|---|---|
| WIL000314 | WIL000318 | [36] |
| WIL000319 | WIL000319 | [1, 6] |
| WIL000320 | WIL000406 | [1, 8] |
| WIL000407 | WIL000408 | [1, 3, 6] |
| WIL000409 | WIL000495 | [1, 8] |
| WIL000496 | WIL000497 | [1, 3, 6, 8, 10] |
| WIL000499 | WIL000503 | [1, 3, 6, 8, 10] |
| WIL000504 | WIL000504 | [1, 3] |
| WIL000505 | WIL000515 | [1] |
| WIL000516 | WIL000516 | [1, 3] |
| WIL000517 | WIL000518 | [1, 3] |
| WIL000519 | WIL000520 | [1, 3] |
| WIL000521 | WIL000522 | [1, 3] |
| WIL000523 | WIL000527 | [1, 3, 6, 8, 10] |
| WIL000528 | WIL000533 | [1, 3, 6, 8, 10] |
| WIL000534 | WIL000539 | [1, 3, 6, 8, 10] |
| WIL000540 | WIL000540 | [1, 3, 6, 8, 10] |
| WIL000541 | WIL000542 | [1, 3, 6] |
| WIL000543 | WIL000545 | [1, 3, 6, 8, 10] |
| WIL000546 | WIL000548 | [1, 3, 6, 8, 10] |
| WIL000549 | WIL000552 | [1, 3, 6, 8, 10] |
| WIL000553 | WIL000554 | [1, 3, 6, 8, 10] |
| WIL000555 | WIL000557 | [1, 3, 6, 8, 10] |
| WIL000558 | WIL000560 | [1] |
| WIL000562 | WIL000567 | [1] |
| WIL000568 | WIL000570 | [1, 3] |
| WIL000571 | WIL000571 | [6, 48] |
| WIL000572 | WIL000574 | [14, 18, 19] |
| WIL000575 | WIL000577 | [14, 18, 19] |
| WIL000578 | WIL000579 | [1, 6] |
| WIL000580 | WIL000582 | [14, 18, 19] |
| WIL000583 | WIL000585 | [14, 18, 19] |
| WIL000586 | WIL000587 | [1, 6] |
| WIL000588 | WIL000588 | [1, 3, 6] |
| WIL000589 | WIL000590 | [6] |
| WIL000591 | WIL000591 | [6] |
| WIL000592 | WIL000593 | [6] |
| WIL000594 | WIL000604 | [1] |
| WIL000605 | WIL000606 | [34] |
| WIL000607 | WIL000649 | [34] |
| WIL000698 | WIL000698 | [1, 3] |
| WIL000699 | WIL000785 | [1, 8] |
| WIL000806 | WIL000807 | [1, 6, 8, 10] |
| WIL000808 | WIL000809 | [1, 6, 8, 10] |
| WIL000810 | WIL000811 | [1, 6, 8] |
| WIL000812 | WIL000824 | [1, 6, 8] |
| WIL000825 | WIL000826 | [1, 3, 6, 8, 10] |
| WIL000827 | WIL000828 | [6] |
| WIL000829 | WIL000829 | [6] |
| WIL000830 | WIL000831 | [6] |
| WIL000832 | WIL000842 | [1] |
| WIL000843 | WIL000843 | [1, 6] |

Weber Motors RFPs identified WIL000001-WIL006235

| | | |
|---|---|---|
| WIL000844 | WIL000845 | [6] |
| WIL000846 | WIL000847 | [14] |
| WIL000848 | WIL000848 | [6] |
| WIL000849 | WIL000850 | [6] |
| WIL000851 | WIL000861 | [1] |
| WIL000862 | WIL000863 | [1] |
| WIL000864 | WIL000864 | [1] |
| WIL000865 | WIL000866 | [1, 3, 7] |
| WIL000867 | WIL000890 | [14, 15, 18, 19] |
| WIL000891 | WIL000932 | [1, 8] |
| WIL000933 | WIL000935 | [1, 3, 6, 8, 10] |
| WIL000936 | WIL000946 | [1] |
| WIL000947 | WIL000948 | [1, 3, 6] |
| WIL000949 | WIL000950 | [3, 6] |
| WIL000951 | WIL000953 | [14, 18, 19] |
| WIL000954 | WIL000954 | [6] |
| WIL000955 | WIL000956 | [1, 3, 6, 8, 10] |
| WIL000957 | WIL000959 | [1, 3, 6, 8, 10] |
| WIL000960 | WIL000962 | [1, 6, 8] |
| WIL000963 | WIL000973 | [14] |
| WIL000974 | WIL000976 | [1, 3, 6, 8, 10] |
| WIL000977 | WIL000979 | [1, 3, 6, 8, 10] |
| WIL000980 | WIL000981 | [1, 3, 8, 10] |
| WIL000982 | WIL000987 | [1, 3, 6, 8, 10] |
| WIL000988 | WIL000994 | [6, 8, 10] |
| WIL000995 | WIL000996 | [1, 3, 8, 10] |
| WIL000997 | WIL000998 | [1, 3, 8, 10, 36] |
| WIL000999 | WIL001000 | [1, 3, 8, 10, 36] |
| WIL001001 | WIL001002 | [1, 3, 8, 10, 36] |
| WIL001003 | WIL001003 | [1, 3, 8, 10, 36] |
| WIL001004 | WIL001005 | [1, 3, 8, 10, 36] |
| WIL001006 | WIL001006 | [1, 3, 8, 10, 36] |
| WIL001007 | WIL001007 | [1, 3, 6, 8, 10] |
| WIL001008 | WIL001008 | [1, 15, 36] |
| WIL001009 | WIL001010 | [15, 36] |
| WIL001011 | WIL001011 | [1, 3, 8, 10, 15, 36] |
| WIL001012 | WIL001013 | [1, 15, 36] |
| WIL001014 | WIL001015 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001016 | WIL001016 | [1, 3, 8, 10, 15, 36] |
| WIL001017 | WIL001018 | [1, 3, 8, 10, 15, 36] |
| WIL001019 | WIL001020 | [1, 3, 6, 8, 10, 14, 15, 36] |
| WIL001021 | WIL001022 | [1, 15, 36] |
| WIL001023 | WIL001025 | [1, 3, 8, 10, 15, 36] |
| WIL001026 | WIL001026 | [1, 3] |
| WIL001027 | WIL001027 | [6] |
| WIL001028 | WIL001028 | [6] |
| WIL001029 | WIL001029 | [1, 3] |
| WIL001030 | WIL001030 | [1, 3] |
| WIL001031 | WIL001031 | [1, 5] |
| WIL001032 | WIL001033 | [5] |
| WIL001034 | WIL001036 | [1, 3, 5, 6, 9, 14, 23, 35, 39, 40] |
| WIL001037 | WIL001037 | [1, 3, 4, 6, 7, 8, 10, 25, 26, 27, 35, 39, 41, 45] |

| | | |
|---|---|---|
| WIL001038 | WIL001039 | [1, 3, 4, 6, 7, 8, 10, 25, 26, 27, 35, 39, 41, 45] |
| WIL001040 | WIL001041 | [1, 3] |
| WIL001042 | WIL001043 | [1, 3, 4, 7, 35] |
| WIL001044 | WIL001045 | [1, 3] |
| WIL001046 | WIL001048 | [1, 3, 6, 8, 10] |
| WIL001049 | WIL001051 | [5, 14, 18, 19, 20, 21, 46, 47] |
| WIL001052 | WIL001054 | [1, 3, 5, 7, 9, 11, 12, 15, 28, 29, 34, 35, 39, 40, 45, 47] |
| WIL001055 | WIL001056 | [5, 7, 14, 18, 19, 46] |
| WIL001057 | WIL001057 | [1] |
| WIL001058 | WIL001066 | [14] |
| WIL001067 | WIL001067 | [1, 3] |
| WIL001068 | WIL001068 | [1, 6, 8, 10, 45] |
| WIL001069 | WIL001069 | [1, 3, 6, 8, 10, 36] |
| WIL001070 | WIL001072 | [1, 3, 6, 7, 8, 10, 25, 26, 27, 34, 45, 48] |
| WIL001073 | WIL001074 | [1, 8] |
| WIL001075 | WIL001083 | [1, 15, 36] |
| WIL001084 | WIL001085 | [33] |
| WIL001086 | WIL001086 | [1] |
| WIL001087 | WIL001088 | [6, 33] |
| WIL001089 | WIL001090 | [1, 3, 34] |
| WIL001091 | WIL001136 | [34] |
| WIL001183 | WIL001198 | [1, 3, 23] |
| WIL001199 | WIL001215 | [23] |
| WIL001233 | WIL001234 | [1, 3, 6, 7, 8, 10, 26, 28, 29, 34, 39, 41, 45, 48] |
| WIL001235 | WIL001238 | [1, 3, 6, 7, 8, 10, 26, 28, 29, 34, 39, 41, 45, 48] |
| WIL001239 | WIL001240 | [1, 3, 6, 7, 8, 9, 10, 35, 45, 47, 48] |
| WIL001241 | WIL001247 | [1, 6, 8, 10, 45, 48] |
| WIL001248 | WIL001251 | [1, 3, 6, 8, 10, 23, 24, 25, 26, 27, 45, 48] |
| WIL001252 | WIL001263 | [47] |
| WIL001264 | WIL001264 | [1] |
| WIL001265 | WIL001275 | [1, 3, 6, 8, 10, 24, 25, 26, 27, 45, 48] |
| WIL001276 | WIL001276 | [1, 3, 6, 8, 10] |
| WIL001277 | WIL001278 | [1, 3, 9, 35] |
| WIL001279 | WIL001282 | [1, 3, 4, 6, 7, 9, 15, 20, 22, 23, 28, 29, 30, 33, 34, 35, 36, 39, 41, 45] |
| WIL001283 | WIL001284 | [15, 36] |
| WIL001285 | WIL001286 | [1, 3, 4, 9, 35] |
| WIL001287 | WIL001289 | [1, 3, 4, 9, 15, 28, 29, 35, 39, 40, 41] |
| WIL001290 | WIL001291 | [2, 9] |
| WIL001292 | WIL001299 | [2] |
| WIL001300 | WIL001301 | [1, 2, 3, 4, 9, 35, 39, 41] |
| WIL001302 | WIL001302 | [1, 3, 6, 9, 35, 39] |
| WIL001303 | WIL001303 | [1, 3, 4, 6, 9, 35, 39, 41] |
| WIL001304 | WIL001304 | [1, 3, 4, 6, 9, 35, 39, 41] |
| WIL001305 | WIL001305 | [1, 3, 4, 6, 9, 35, 39, 41] |
| WIL001306 | WIL001307 | [6, 8, 9, 10, 35, 39] |
| WIL001308 | WIL001309 | [6, 8, 10] |
| WIL001310 | WIL001311 | [1, 3, 6, 8, 9, 10, 35, 39, 41, 45] |
| WIL001312 | WIL001312 | [3, 8, 10] |
| WIL001313 | WIL001313 | [3, 8, 10] |
| WIL001314 | WIL001314 | [1] |
| WIL001315 | WIL001317 | [1] |
| WIL001318 | WIL001320 | [1, 3, 6, 9, 35] |

| | | |
|---|---|---|
| WIL001322 | WIL001381 | [1, 3, 6, 8, 10, 35, 36] |
| WIL001382 | WIL001384 | [1] |
| WIL001385 | WIL001610 | [2, 8, 10] |
| WIL001611 | WIL001612 | [1, 3] |
| WIL001613 | WIL001614 | [1, 3] |
| WIL001615 | WIL001616 | [1, 3] |
| WIL001617 | WIL001618 | [1, 3] |
| WIL001619 | WIL001621 | [1, 14] |
| WIL001622 | WIL001626 | [1, 14, 18, 19] |
| WIL001627 | WIL001629 | [1, 14] |
| WIL001630 | WIL001634 | [1, 14, 18, 19] |
| WIL001635 | WIL001637 | [1, 14] |
| WIL001638 | WIL001641 | [1, 3, 8, 10, 14, 18, 19] |
| WIL001642 | WIL001645 | [1, 3, 8, 10] |
| WIL001646 | WIL001647 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001648 | WIL001649 | [1, 3, 6, 8, 10] |
| WIL001650 | WIL001652 | [1, 3, 6, 8, 10] |
| WIL001653 | WIL001655 | [1, 3, 8, 10] |
| WIL001656 | WIL001658 | [1, 3] |
| WIL001659 | WIL001662 | [1, 3] |
| WIL001663 | WIL001666 | [1, 3, 8, 10] |
| WIL001667 | WIL001667 | [1, 3, 14] |
| WIL001668 | WIL001673 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001674 | WIL001674 | [1, 3, 6, 8, 10] |
| WIL001675 | WIL001680 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001681 | WIL001682 | [1] |
| WIL001683 | WIL001684 | [1] |
| WIL001685 | WIL001686 | [1] |
| WIL001687 | WIL001704 | [6, 8, 48] |
| WIL001705 | WIL001705 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001706 | WIL001711 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001712 | WIL001713 | [1, 14] |
| WIL001714 | WIL001715 | [1, 14] |
| WIL001716 | WIL001718 | [1, 14] |
| WIL001719 | WIL001721 | [6, 8] |
| WIL001722 | WIL001722 | [14] |
| WIL001723 | WIL001723 | [14] |
| WIL001724 | WIL001724 | [14] |
| WIL001725 | WIL001729 | [14] |
| WIL001730 | WIL001732 | [1, 6, 14, 18, 19] |
| WIL001733 | WIL001733 | [1, 3, 5] |
| WIL001734 | WIL001735 | [5, 31, 32, 33] |
| WIL001736 | WIL001737 | [1, 14, 18, 19] |
| WIL001738 | WIL001745 | [1, 14, 18, 19] |
| WIL001746 | WIL001746 | [1, 14, 18, 19] |
| WIL001747 | WIL001747 | [1, 14, 18, 24] |
| WIL001748 | WIL001749 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001750 | WIL001757 | [3, 14, 18, 19] |
| WIL001758 | WIL001759 | [1, 3, 6, 8, 10, 14, 18, 19] |
| WIL001760 | WIL001760 | [1] |
| WIL001761 | WIL001762 | [14, 18, 19] |
| WIL001763 | WIL001763 | [1, 14, 18, 24] |

| | | |
|---|---|---|
| WIL001764 | WIL001765 | [1, 3] |
| WIL001766 | WIL001766 | [14] |
| WIL001767 | WIL001777 | [1] |
| WIL001778 | WIL001786 | [1] |
| WIL001787 | WIL001795 | [1] |
| WIL001796 | WIL001797 | [1, 14] |
| WIL001798 | WIL001945 | [14] |
| WIL002177 | WIL002178 | [14] |
| WIL002179 | WIL002179 | [1, 14, 18, 19] |
| WIL002180 | WIL002180 | [1, 14, 18, 24] |
| WIL002181 | WIL002181 | [1, 6, 14, 18, 19] |
| WIL002182 | WIL002182 | [1, 14, 18, 24] |
| WIL002183 | WIL002184 | [1, 3, 6, 8, 10] |
| WIL002185 | WIL002185 | [1, 6] |
| WIL002186 | WIL002187 | [1, 6, 8, 10] |
| WIL002188 | WIL002189 | [1, 6, 14] |
| WIL002190 | WIL002190 | [1, 14, 18, 24] |
| WIL002191 | WIL002192 | [1, 6, 8, 10] |
| WIL002193 | WIL002194 | [1, 6] |
| WIL002195 | WIL002197 | [1, 14] |
| WIL002198 | WIL002198 | [1, 14, 18, 24] |
| WIL002199 | WIL002201 | [1, 3, 14, 18, 19] |
| WIL002202 | WIL002202 | [1, 14, 18, 24] |
| WIL002203 | WIL002205 | [1, 3, 6, 8, 10] |
| WIL002206 | WIL002206 | [1, 14] |
| WIL002207 | WIL002207 | [1, 14, 18, 24] |
| WIL002208 | WIL002208 | [1, 14] |
| WIL002209 | WIL002209 | [1, 14, 18, 24] |
| WIL002210 | WIL002211 | [1] |
| WIL002212 | WIL002213 | [1] |
| WIL002214 | WIL002214 | [1, 3] |
| WIL002215 | WIL002216 | [1, 3] |
| WIL002217 | WIL002218 | [1, 3, 6, 8, 10, 23, 24, 34] |
| WIL002219 | WIL002220 | [1, 3, 6, 8, 10, 23, 24, 34, 36] |
| WIL002221 | WIL002222 | [1, 3, 6, 8, 10, 34] |
| WIL002223 | WIL002223 | [1, 14] |
| WIL002224 | WIL002234 | [1] |
| WIL002235 | WIL002243 | [1] |
| WIL002244 | WIL002391 | [14] |
| WIL002632 | WIL002633 | [14] |
| WIL002634 | WIL002634 | [20, 21] |
| WIL002635 | WIL002635 | [20, 21] |
| WIL002636 | WIL002639 | [1, 3, 23] |
| WIL002640 | WIL002640 | [1, 3, 6] |
| WIL002641 | WIL002666 | [6] |
| WIL002667 | WIL002670 | [1, 3, 23] |
| WIL002671 | WIL002674 | [1, 3, 23] |
| WIL002675 | WIL002675 | [1, 3] |
| WIL002676 | WIL002676 | [1, 3] |
| WIL002677 | WIL002678 | [1, 3, 6, 8, 10, 22, 23, 34, 36] |
| WIL002679 | WIL002680 | [1, 3, 6, 8, 10, 22, 23, 34, 36] |
| WIL002681 | WIL002683 | [1, 3, 6, 8, 10, 22, 23, 34, 36, 45] |

6

| | | |
|---|---|---|
| WIL002684 | WIL002686 | [1, 3, 6, 7, 8, 10, 22, 23, 24, 25, 26, 27, 34, 36, 45, 46] |
| WIL002687 | WIL002690 | [1, 3, 22, 23, 34] |
| WIL002691 | WIL002697 | [1, 3, 14] |
| WIL002698 | WIL002761 | [1, 8] |
| WIL002863 | WIL002871 | [1, 3, 23] |
| WIL002872 | WIL002880 | [1, 3, 23, 34] |
| WIL002881 | WIL002882 | [1] |
| WIL002883 | WIL002883 | [1, 14, 18, 24] |
| WIL002884 | WIL002884 | [1] |
| WIL002885 | WIL002886 | [1] |
| WIL002887 | WIL002887 | [1] |
| WIL002888 | WIL002889 | [1] |
| WIL002890 | WIL002891 | [1] |
| WIL002892 | WIL002900 | [1, 3, 22, 23] |
| WIL002901 | WIL002964 | [1, 8] |
| WIL003027 | WIL003036 | [1, 3, 23] |
| WIL003037 | WIL003046 | [1, 3, 23, 34] |
| WIL003047 | WIL003056 | [1, 3, 34] |
| WIL003057 | WIL003100 | [34] |
| WIL003157 | WIL003157 | [1, 14] |
| WIL003158 | WIL003168 | [1] |
| WIL003169 | WIL003317 | [14] |
| WIL003318 | WIL003326 | [14] |
| WIL003327 | WIL003445 | [14] |
| WIL003446 | WIL003454 | [14] |
| WIL003455 | WIL003567 | [14] |
| WIL003568 | WIL003568 | [14] |
| WIL003569 | WIL003569 | [14, 20, 21] |
| WIL003570 | WIL003570 | [5, 14, 20, 21] |
| WIL003571 | WIL003572 | [20, 21] |
| WIL003573 | WIL003575 | [20, 21] |
| WIL003576 | WIL003576 | [1, 3, 6, 8, 10] |
| WIL003577 | WIL003578 | [1, 3, 6, 8, 10] |
| WIL003579 | WIL003579 | [1, 3, 6] |
| WIL003580 | WIL003581 | [1, 3, 6, 8, 10, 34] |
| WIL003582 | WIL003582 | [1, 3] |
| WIL003583 | WIL003584 | [1, 3, 7, 8, 10, 23, 24, 34, 36] |
| WIL003585 | WIL003585 | [1, 3, 6] |
| WIL003587 | WIL003587 | [1] |
| WIL003588 | WIL003589 | [1, 3, 6] |
| WIL003590 | WIL003592 | [1, 3, 6] |
| WIL003594 | WIL003595 | [1, 3, 6, 8, 10] |
| WIL003596 | WIL003597 | [1, 3, 6, 8, 10] |
| WIL003598 | WIL003599 | [1, 3, 6, 8, 10] |
| WIL003600 | WIL003602 | [1, 3, 6] |
| WIL003603 | WIL003615 | [6] |
| WIL003616 | WIL003628 | [6] |
| WIL003629 | WIL003630 | [1, 3, 6, 23] |
| WIL003631 | WIL003643 | [6] |
| WIL003644 | WIL003646 | [1, 3, 6, 8, 10] |
| WIL003647 | WIL003649 | [1, 3, 6] |
| WIL003650 | WIL003736 | [1, 8] |

7

| WIL003737 | WIL003739 | [1, 3, 6] |
| WIL003740 | WIL003826 | [1, 8] |
| WIL003827 | WIL003827 | [1, 3, 8] |
| WIL003829 | WIL003831 | [1, 3, 6, 8, 10] |
| WIL003832 | WIL003835 | [1, 3, 6] |
| WIL003836 | WIL003848 | [1, 6, 8] |
| WIL003849 | WIL003861 | [1, 3, 6, 8] |
| WIL003862 | WIL003863 | [1] |
| WIL003864 | WIL003867 | [1, 3, 6, 8, 10] |
| WIL003868 | WIL003869 | [1] |
| WIL003870 | WIL003873 | [1, 3, 6, 8, 10] |
| WIL003874 | WIL003874 | [1, 3, 6, 8, 10, 23, 34, 36] |
| WIL003875 | WIL003887 | [1, 6, 8, 10] |
| WIL003888 | WIL003888 | [1, 3, 6, 8, 10, 23, 34, 36] |
| WIL003889 | WIL003889 | [1, 3, 6] |
| WIL003890 | WIL003976 | [1, 8] |
| WIL003977 | WIL003978 | [1, 3, 6, 23] |
| WIL003979 | WIL003979 | [1, 14] |
| WIL003980 | WIL003990 | [1] |
| WIL003991 | WIL004139 | [14, 18, 19] |
| WIL004272 | WIL004272 | [1, 14] |
| WIL004273 | WIL004275 | [1, 3] |
| WIL004276 | WIL004276 | [1] |
| WIL004277 | WIL004277 | [1] |
| WIL004278 | WIL004278 | [1, 3, 6, 8, 10] |
| WIL004279 | WIL004279 | [1, 3, 6, 8, 10] |
| WIL004280 | WIL004284 | [1, 3, 6, 8, 10] |
| WIL004285 | WIL004285 | [1] |
| WIL004286 | WIL004313 | [1] |
| WIL004314 | WIL004317 | [1] |
| WIL004318 | WIL004318 | [1] |
| WIL004319 | WIL004319 | [1, 14, 18, 24] |
| WIL004320 | WIL004320 | [1, 3] |
| WIL004321 | WIL004321 | [1, 3] |
| WIL004322 | WIL004323 | [1, 3] |
| WIL004324 | WIL004326 | [1, 3] |
| WIL004327 | WIL004329 | [1, 3] |
| WIL004330 | WIL004332 | [1, 3, 23, 24] |
| WIL004333 | WIL004333 | [1, 3, 6, 8, 10, 24, 25, 26, 27, 45, 46, 48] |
| WIL004334 | WIL004341 | [1, 3, 6, 8, 10, 24, 25, 26, 27, 45, 46, 48] |
| WIL004342 | WIL004342 | [1, 3] |
| WIL004343 | WIL004343 | [1, 3] |
| WIL004344 | WIL004344 | [1, 3] |
| WIL004345 | WIL004352 | [1, 3, 31, 32] |
| WIL004353 | WIL004353 | [1, 3] |
| WIL004354 | WIL004356 | [1, 3, 6] |
| WIL004357 | WIL004392 | [14, 15, 18, 19, 20, 21, 24, 25, 26, 27, 31, 32, 33, 34, 36, 45, 46, 48] |
| WIL004393 | WIL004395 | [1, 6] |
| WIL004396 | WIL004396 | [1, 3, 8, 10, 36] |
| WIL004397 | WIL004401 | [3, 8, 10, 36] |
| WIL004402 | WIL004402 | [1, 8, 10, 36] |
| WIL004403 | WIL004403 | [1, 6, 8, 10] |

| | | |
|---|---|---|
| WIL004404 | WIL004404 | [1, 8] |
| WIL004405 | WIL004406 | [1, 6, 8, 10] |
| WIL004407 | WIL004408 | [1, 3, 8, 10] |
| WIL004409 | WIL004411 | [1, 3, 8, 10] |
| WIL004412 | WIL004412 | [1] |
| WIL004413 | WIL004413 | [1, 14] |
| WIL004415 | WIL004415 | [14] |
| WIL004416 | WIL004441 | [14] |
| WIL004442 | WIL004445 | [1, 3, 6, 8, 10] |
| WIL004446 | WIL004447 | [1] |
| WIL004448 | WIL004449 | [1] |
| WIL004450 | WIL004450 | [1] |
| WIL004451 | WIL004452 | [1, 14] |
| WIL004453 | WIL004454 | [1] |
| WIL004455 | WIL004456 | [1] |
| WIL004457 | WIL004457 | [1, 14, 18, 24] |
| WIL004459 | WIL004459 | [1] |
| WIL004460 | WIL004461 | [1] |
| WIL004462 | WIL004463 | [1] |
| WIL004464 | WIL004465 | [1] |
| WIL004466 | WIL004485 | [1] |
| WIL004486 | WIL004486 | [1] |
| WIL004487 | WIL004488 | [1, 3] |
| WIL004489 | WIL004489 | [1, 6, 8, 10] |
| WIL004490 | WIL004491 | [1, 3, 6, 8, 10] |
| WIL004492 | WIL004493 | [1, 14] |
| WIL004494 | WIL004495 | [14] |
| WIL004496 | WIL004498 | [14] |
| WIL004499 | WIL004500 | [14] |
| WIL004501 | WIL004501 | [1] |
| WIL004502 | WIL004502 | [1, 24] |
| WIL004503 | WIL004503 | [1] |
| WIL004504 | WIL004504 | [1, 24] |
| WIL004505 | WIL004506 | [1, 6] |
| WIL004507 | WIL004507 | [1, 6, 8, 10] |
| WIL004508 | WIL004509 | [1, 6, 8, 10] |
| WIL004510 | WIL004511 | [1, 8] |
| WIL004512 | WIL004512 | [1, 24] |
| WIL004513 | WIL004529 | [1] |
| WIL004530 | WIL004530 | [1, 3, 6, 8, 10, 14] |
| WIL004531 | WIL004531 | [1, 8] |
| WIL004532 | WIL004533 | [1, 8] |
| WIL004534 | WIL004535 | [1, 6, 8, 10] |
| WIL004536 | WIL004536 | [1, 3] |
| WIL004537 | WIL004539 | [3, 6, 8, 10, 48] |
| WIL004540 | WIL004540 | [1, 3] |
| WIL004541 | WIL004541 | [1, 3, 34] |
| WIL004542 | WIL004542 | [1, 3] |
| WIL004543 | WIL004543 | [1, 3] |
| WIL004544 | WIL004544 | [1] |
| WIL004545 | WIL004548 | [6, 8] |
| WIL004551 | WIL004555 | [1, 6, 8, 10] |

| | | |
|---|---|---|
| WIL004556 | WIL004557 | [6, 8, 10, 48] |
| WIL004558 | WIL004562 | [6, 8, 10] |
| WIL004563 | WIL004564 | [1] |
| WIL004565 | WIL004566 | [1] |
| WIL004567 | WIL004569 | [1] |
| WIL004570 | WIL004571 | [1] |
| WIL004572 | WIL004574 | [1] |
| WIL004575 | WIL004575 | [1, 8] |
| WIL004576 | WIL004576 | [1, 8] |
| WIL004577 | WIL004577 | [1, 3, 6, 8, 10] |
| WIL004578 | WIL004578 | [1, 6, 8, 10] |
| WIL004579 | WIL004579 | [1, 6, 8, 10] |
| WIL004580 | WIL004580 | [1, 14] |
| WIL004581 | WIL004730 | [14] |
| WIL004994 | WIL004995 | [1, 14] |
| WIL004996 | WIL004996 | [1] |
| WIL004997 | WIL004997 | [1] |
| WIL004998 | WIL004998 | [1] |
| WIL004999 | WIL004999 | [1, 24] |
| WIL005000 | WIL005000 | [1, 24] |
| WIL005001 | WIL005001 | [1, 14] |
| WIL005002 | WIL005002 | [1] |
| WIL005003 | WIL005003 | [1] |
| WIL005004 | WIL005004 | [1] |
| WIL005005 | WIL005007 | [1] |
| WIL005008 | WIL005008 | [6, 8] |
| WIL005009 | WIL005013 | [6, 8] |
| WIL005014 | WIL005017 | [6, 8] |
| WIL005018 | WIL005018 | [1, 24] |
| WIL005019 | WIL005019 | [1, 24] |
| WIL005020 | WIL005020 | [1, 24] |
| WIL005022 | WIL005022 | [1, 14] |
| WIL005023 | WIL005023 | [1, 24] |
| WIL005024 | WIL005024 | [1, 24] |
| WIL005025 | WIL005025 | [1, 24] |
| WIL005026 | WIL005026 | [1, 24] |
| WIL005027 | WIL005027 | [1, 6] |
| WIL005028 | WIL005028 | [1] |
| WIL005029 | WIL005030 | [14] |
| WIL005031 | WIL005040 | [14] |
| WIL005041 | WIL005050 | [14] |
| WIL005051 | WIL005052 | [1] |
| WIL005053 | WIL005054 | [5, 14] |
| WIL005055 | WIL005058 | [5, 14] |
| WIL005059 | WIL005060 | [5, 14] |
| WIL005061 | WIL005064 | [1, 8] |
| WIL005065 | WIL005066 | [1] |
| WIL005067 | WIL005069 | [1] |
| WIL005070 | WIL005071 | [1] |
| WIL005072 | WIL005072 | [1, 5] |
| WIL005073 | WIL005073 | [1, 24] |
| WIL005074 | WIL005077 | [1, 6, 8, 10] |

10

| | | |
|---|---|---|
| WIL005078 | WIL005130 | [1] |
| WIL005131 | WIL005132 | [1] |
| WIL005133 | WIL005135 | [1] |
| WIL005136 | WIL005137 | [1] |
| WIL005138 | WIL005142 | [1, 3, 6, 8, 10] |
| WIL005143 | WIL005143 | [1, 8] |
| WIL005144 | WIL005145 | [1, 6, 8, 10] |
| WIL005146 | WIL005146 | [1] |
| WIL005147 | WIL005147 | [1, 24] |
| WIL005148 | WIL005148 | [1] |
| WIL005149 | WIL005153 | [15, 36] |
| WIL005154 | WIL005160 | [15] |
| WIL005161 | WIL005162 | [1] |
| WIL005163 | WIL005195 | [1] |
| WIL005196 | WIL005224 | [1] |
| WIL005225 | WIL005225 | [14] |
| WIL005226 | WIL005236 | [1] |
| WIL005237 | WIL005245 | [1] |
| WIL005246 | WIL005254 | [1] |
| WIL005255 | WIL005256 | [1, 14] |
| WIL005257 | WIL005257 | [1, 6] |
| WIL005258 | WIL005258 | [1] |
| WIL005259 | WIL005269 | [1] |
| WIL005270 | WIL005271 | [1, 3, 8, 10] |
| WIL005272 | WIL005273 | [1, 3, 6, 8, 10, 36] |
| WIL005274 | WIL005275 | [1, 6, 8] |
| WIL005276 | WIL005277 | [1, 6] |
| WIL005278 | WIL005284 | [1, 15, 36] |
| WIL005285 | WIL005290 | [6, 8, 10] |
| WIL005291 | WIL005291 | [1, 14] |
| WIL005292 | WIL005306 | [14] |
| WIL005307 | WIL005316 | [14] |
| WIL005317 | WIL005318 | [1] |
| WIL005319 | WIL005319 | [1] |
| WIL005320 | WIL005328 | [1] |
| WIL005329 | WIL005330 | [1, 3, 6] |
| WIL005331 | WIL005366 | [6] |
| WIL005367 | WIL005377 | [6] |
| WIL005378 | WIL005385 | [6] |
| WIL005390 | WIL005391 | [1, 3, 8, 10] |
| WIL005392 | WIL005392 | [1, 6, 8, 10] |
| WIL005393 | WIL005399 | [1, 15, 36] |
| WIL005400 | WIL005401 | [1, 3] |
| WIL005402 | WIL005408 | [15, 36] |
| WIL005409 | WIL005409 | [1, 3, 5, 6] |
| WIL005410 | WIL005410 | [1, 24] |
| WIL005411 | WIL005411 | [1, 3, 8, 10] |
| WIL005412 | WIL005412 | [1, 3, 8, 10] |
| WIL005413 | WIL005413 | [1, 3, 8, 10] |
| WIL005414 | WIL005414 | [1] |
| WIL005415 | WIL005415 | [1] |
| WIL005416 | WIL005416 | [1, 3] |

| | | |
|---|---|---|
| WIL005417 | WIL005417 | [1, 6] |
| WIL005418 | WIL005418 | [1, 6] |
| WIL005419 | WIL005425 | [1, 6, 8, 10] |
| WIL005426 | WIL005426 | [1, 6, 8, 10] |
| WIL005427 | WIL005433 | [15, 36] |
| WIL005434 | WIL005434 | [1, 3, 6, 8, 10] |
| WIL005435 | WIL005442 | [1, 15, 36] |
| WIL005443 | WIL005444 | [1, 3] |
| WIL005445 | WIL005445 | [1, 3] |
| WIL005446 | WIL005446 | [1, 3] |
| WIL005447 | WIL005448 | [1, 3] |
| WIL005449 | WIL005450 | [1, 3, 8, 10] |
| WIL005451 | WIL005452 | [1, 3] |
| WIL005453 | WIL005453 | [1] |
| WIL005454 | WIL005454 | [1] |
| WIL005455 | WIL005456 | [1] |
| WIL005457 | WIL005457 | [1] |
| WIL005458 | WIL005518 | [1] |
| WIL005519 | WIL005520 | [1, 6, 8] |
| WIL005521 | WIL005528 | [15, 36] |
| WIL005529 | WIL005529 | [1] |
| WIL005532 | WIL005532 | [1, 6, 8] |
| WIL005533 | WIL005533 | [1, 6, 8, 10] |
| WIL005534 | WIL005544 | [6] |
| WIL005545 | WIL005546 | [1] |
| WIL005548 | WIL005548 | [1] |
| WIL005549 | WIL005574 | [1] |
| WIL005575 | WIL005577 | [1, 6, 8, 10] |
| WIL005578 | WIL005578 | [5, 14, 18, 19] |
| WIL005579 | WIL005582 | [1, 3, 6, 8, 10] |
| WIL005583 | WIL005583 | [1] |
| WIL005584 | WIL005584 | [1] |
| WIL005585 | WIL005586 | [1] |
| WIL005587 | WIL005587 | [1] |
| WIL005588 | WIL005588 | [1, 6] |
| WIL005589 | WIL005599 | [6] |
| WIL005600 | WIL005601 | [1, 6] |
| WIL005602 | WIL005612 | [6] |
| WIL005613 | WIL005614 | [1, 14] |
| WIL005615 | WIL005615 | [1, 6] |
| WIL005616 | WIL005616 | [1, 6] |
| WIL005617 | WIL005617 | [1] |
| WIL005618 | WIL005618 | [1] |
| WIL005619 | WIL005620 | [1, 14] |
| WIL005621 | WIL005631 | [1] |
| WIL005632 | WIL005640 | [1] |
| WIL005641 | WIL005649 | [1] |
| WIL005650 | WIL005660 | [14, 18, 19] |
| WIL005661 | WIL005669 | [1] |
| WIL005670 | WIL005678 | [1] |
| WIL005679 | WIL005689 | [1] |
| WIL005690 | WIL005700 | [1] |

| | | |
|---|---|---|
| WIL005701 | WIL005709 | [1] |
| WIL005710 | WIL005711 | [14] |
| WIL005712 | WIL005712 | [1, 6, 9, 35, 36, 39, 40, 41, 45] |
| WIL005713 | WIL005713 | [1, 6, 9, 35, 36, 39, 40, 41, 45] |
| WIL005714 | WIL005724 | [1, 3, 9, 35] |
| WIL005725 | WIL005727 | [1, 3, 9, 35] |
| WIL005728 | WIL005730 | [1, 3, 6, 9, 35, 45, 47] |
| WIL005731 | WIL005733 | [1, 3, 6, 9, 35, 41, 45, 47] |
| WIL005734 | WIL005740 | [1, 6, 8, 41, 45, 48] |
| WIL005741 | WIL005744 | [1, 3, 6, 8, 23, 24, 25, 26, 27, 41, 45, 48] |
| WIL005745 | WIL005756 | [47] |
| WIL005757 | WIL005767 | [1, 3, 6, 8, 24, 25, 26, 27, 41, 45, 48] |
| WIL005768 | WIL005787 | [1, 3, 22, 23, 34] |
| WIL005788 | WIL005790 | [4, 15, 35, 39, 40, 41] |
| WIL005791 | WIL005793 | [1, 3] |
| WIL005794 | WIL005839 | [1] |
| WIL005886 | WIL005901 | [1, 3, 7, 22, 23, 34] |
| WIL005902 | WIL005904 | [1, 3, 6, 8, 10, 26, 45, 48] |
| WIL005905 | WIL005906 | [1, 3, 6, 8, 10, 26, 45, 48] |
| WIL005907 | WIL005908 | [1, 3] |
| WIL005909 | WIL005910 | [1, 3, 4, 7, 35] |
| WIL005911 | WIL005918 | [15, 36] |
| WIL005919 | WIL005926 | [15, 36] |
| WIL005927 | WIL005930 | [1, 3, 5, 9] |
| WIL005931 | WIL005931 | [1, 14, 18, 24] |
| WIL000188 | WIL000188 | [1, 3, 7] |
| WIL001321 | WIL001321 | [1, 3, 7] |
| WIL004149 | WIL004149 | [1, 14, 18, 24] |
| WIL004458 | WIL004458 | [1, 24] |
| WIL005021 | WIL005021 | [1, 24] |
| WIL005932 | WIL005934 | [1, 24, 25, 26] |
| WIL005935 | WIL005935 | [1, 14, 18, 24, 31] |
| WIL006224 | WIL006224 | [1, 14, 18, 24] |
| WIL006225 | WIL006225 | [1, 14, 18, 24] |
| WIL006226 | WIL006226 | [1, 14, 18, 24] |
| WIL006227 | WIL006227 | [1, 14, 18, 24] |
| WIL006228 | WIL006228 | [1, 14, 18, 24] |
| WIL006229 | WIL006229 | [1, 14, 18, 24] |
| WIL006230 | WIL006230 | [1, 14, 18, 24] |
| WIL006231 | WIL006231 | [1, 14, 18, 24] |
| WIL006232 | WIL006232 | [1, 14, 18, 24] |
| WIL006233 | WIL006233 | [1, 14, 18, 24] |
| WIL006234 | WIL006234 | [1, 14, 18, 24] |
| WIL006235 | WIL006235 | [1, 14, 18, 24] |

SUMMARY_ROW  UNIQUE_VALUES  [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 39, 40, 41, 45, 46, 47, 48]

13

# EXHIBIT I

Weber Motors RFPs identified WIL006236_007270

| doc_beg_bates | doc_end_bates | rfp_matches |
|---|---|---|
| WIL006236 | WIL006236 | [1, 3] |
| WIL006237 | WIL006282 | [1] |
| WIL006283 | WIL006284 | [1, 3] |
| WIL006285 | WIL006286 | [1, 3] |
| WIL006287 | WIL006303 | [1, 3, 6] |
| WIL006304 | WIL006320 | [1, 3, 6] |
| WIL006321 | WIL006322 | [1, 3, 6, 8, 10] |
| WIL006323 | WIL006323 | [1, 2, 3, 5, 6, 7, 8, 10, 22, 23, 24, 35, 36, 45, 46] |
| WIL006324 | WIL006326 | [6, 8, 10, 36] |
| WIL006327 | WIL006354 | [1] |
| WIL006355 | WIL006358 | [1] |
| WIL006359 | WIL006362 | [1, 3] |
| WIL006363 | WIL006449 | [1, 8] |
| WIL006450 | WIL006453 | [1, 3, 6, 8, 10] |
| WIL006454 | WIL006454 | [1, 3] |
| WIL006455 | WIL006455 | [1, 3] |
| WIL006456 | WIL006457 | [1] |
| WIL006458 | WIL006483 | [1] |
| WIL006484 | WIL006487 | [1] |
| WIL006488 | WIL006489 | [1, 3, 6] |
| WIL006490 | WIL006490 | [1, 3] |
| WIL006491 | WIL006495 | [1, 3, 6, 7, 8, 10, 35] |
| WIL006496 | WIL006497 | [1, 3, 6, 8, 10] |
| WIL006498 | WIL006498 | [1, 3] |
| WIL006499 | WIL006499 | [1, 8, 9] |
| WIL006500 | WIL006501 | [1, 3] |
| WIL006502 | WIL006588 | [1, 8] |
| WIL006589 | WIL006675 | [1, 8] |
| WIL006676 | WIL006677 | [1] |
| WIL006678 | WIL006678 | [1, 3, 6, 8, 10, 36] |
| WIL006679 | WIL006680 | [6, 8, 10] |
| WIL006681 | WIL006686 | [1, 3, 6, 7, 8, 10, 25, 26, 27, 34, 35, 41, 45, 48] |
| WIL006687 | WIL006687 | [1, 3, 6, 8, 10, 15, 25, 26, 27, 36] |
| WIL006688 | WIL006688 | [33] |
| WIL006689 | WIL006690 | [6, 8, 10, 48] |
| WIL006691 | WIL006692 | [15, 36] |
| WIL006693 | WIL006694 | [1, 3, 4, 6, 7, 8, 10, 25, 26, 27, 35, 39, 41, 45] |
| WIL006695 | WIL006696 | [1, 3, 4, 7, 35] |
| WIL006697 | WIL006698 | [1, 3, 7, 15] |
| WIL006699 | WIL006702 | [3, 6, 8] |
| WIL006703 | WIL006708 | [3, 8] |
| WIL006709 | WIL006710 | [1, 8] |
| WIL006711 | WIL006713 | [1] |
| WIL006714 | WIL006752 | [1] |
| WIL006753 | WIL006753 | [1, 3, 5] |
| WIL006754 | WIL006754 | [1, 3, 7] |
| WIL006755 | WIL006755 | [1, 8, 9] |
| WIL006756 | WIL006757 | [1, 3, 47] |
| WIL006758 | WIL006758 | [1, 3, 8, 10] |

Weber Motors RFPs identified WIL006236_007270

| | | |
|---|---|---|
| WIL006759 | WIL006763 | [1, 3, 6] |
| WIL006764 | WIL006764 | [1, 3, 6] |
| WIL006765 | WIL006765 | [1, 8, 9] |
| WIL006766 | WIL006767 | [1, 6, 41] |
| WIL006768 | WIL006769 | [1, 3, 6, 8, 10] |
| WIL006770 | WIL006771 | [1] |
| WIL006772 | WIL006776 | [1] |
| WIL006777 | WIL006783 | [1] |
| WIL006784 | WIL006825 | [1] |
| WIL006826 | WIL006828 | [1, 3, 6, 45] |
| WIL006829 | WIL006841 | [1, 3, 4, 6, 9, 35, 39, 40, 41] |
| WIL006842 | WIL006842 | [1, 3, 6, 9, 35, 39, 41] |
| WIL006843 | WIL006843 | [1, 3, 6, 9, 35, 39, 41] |
| WIL006844 | WIL006859 | [1, 3, 4, 6, 7, 9, 15, 23, 35, 36, 39, 40, 41, 45] |
| WIL006860 | WIL006862 | [6, 8, 9] |
| WIL006863 | WIL006866 | [6, 8] |
| WIL006867 | WIL006870 | [6, 8] |
| WIL006871 | WIL006873 | [6, 9] |
| WIL006874 | WIL006877 | [6] |
| WIL006878 | WIL006881 | [6] |
| WIL006882 | WIL006884 | [9] |
| WIL006885 | WIL006925 | [1, 3] |
| WIL006926 | WIL006966 | [1] |
| WIL006967 | WIL006968 | [1] |
| WIL006969 | WIL006985 | [1, 3, 4, 11, 12, 15, 35, 39, 40, 41] |
| WIL006986 | WIL006986 | [1] |
| WIL006987 | WIL006989 | [1] |
| WIL006990 | WIL006991 | [1, 3, 8, 10] |
| WIL006992 | WIL006994 | [1, 3, 7] |
| WIL006995 | WIL006997 | [8, 10] |
| WIL006998 | WIL006998 | [2] |
| WIL006999 | WIL006999 | [1] |
| WIL007000 | WIL007003 | [1, 3, 6, 7, 8, 10, 23, 24, 25, 26, 27, 34, 39, 41, 45, 48] |
| WIL007004 | WIL007270 | [2, 3] |

| | | |
|---|---|---|
| SUMMARY_ROW | UNIQUE_VALUES | [1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 22, 23, 24, 25, 26, 27, 33, 34, 35, 36, 39, 40, 41, 45, 46, 47, 48] |

# APPENDIX 10

HOLLAND & KNIGHT LLP
David I. Holtzman (SBN 299287)
Daniel P. Kappes (SBN 303545)
Andrew Klair (SBN 334960)
Isabella Granucci (SBN 351957)
560 Mission Street, Suite 1900
San Francisco, CA  94105
Telephone:  415.743.6900
Fax:  415.743.6910
E-mail: david.holtzman@hklaw.com
        daniel.kappes@hklaw.com
        andrew.klair@hklaw.com
        isabella.granucci@hklaw.com

Attorneys for Plaintiff
FOUNDATION AUTO HOLDINGS, LLC

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br>vs.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>Defendants.<br><br>_____<br><br>TEMPLETON MARSH, LTD.,<br><br>Intervenor,<br>vs.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>Defendants. | Case No.: 1:21-cv-00970-EPG<br><br>**PLAINTIFF FOUNDATION AUTO HOLDINGS, LLC'S SUPPLEMENTAL REPLY IN SUPPORT OF REQUEST FOR FURTHER SANCTIONS**<br><br><br>First Amended Complaint Filed: November 11, 2022 |

- 1 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

## I.    Introduction

Defendant CJ Wilson ("Mr. Wilson") misrepresented his knowledge of his and Defendants Weber Motors, Fresno, Inc.'s and CJ's Road to Lemans Corp.'s (collectively, "Defendants") ongoing discovery failures for the purpose of inducing the Court to grant Defendants yet another chance to comply. Defendants produced only 83 additional documents, leaving many categories unproduced entirely. These efforts are far short of actual compliance and, as usual for Defendants, remain defiant of the Court's Order. The Court must enforce its previous Order and grant in full the sanctions requested by Plaintiff Foundation Auto Holdings, LLC ("Foundation").

## II.    Argument

After months of delay and defiance of a Court Order commanding Defendants to produce documents to Foundation's Requests for Production, Set Two, and with a sanctions motion briefed, argued, and pending, Defendants acquired new counsel with a new theory: Defendants were not to blame, their former lawyers were. Defendants filed two status reports with the Court in support of this claim, including a declaration from Mr. Wilson. Mr. Wilson, in no uncertain terms, claimed "neither I nor any other representative of Defendants were ever asked by MLG to provide any documents in addition to those that I had already provided to them." ECF 148-1, Exh. B at ¶ 10.

The Court held a hearing regarding Defendants' status reports on March 5, 2025 (ECF 149). At the hearing, counsel for Defendants reinforced Mr. Wilson's claims: "Mr. Wilson had no idea that there were discovery requests that were outstanding, that were not being responding to." Declaration of Andrew Klair (hereinafter the "Klair Decl.") at ¶ 2, Exh. 1 at p. 10:5-10. But, as Foundation pointed out, Mr. Wilson's claim to have known nothing of any discovery was inconsistent with his actual production of financial records. *See* ECF 126. How was it that neither he nor any of his companies knew of any need for production and yet also produced?

Defendants, having unequivocally claimed that neither Mr. Wilson nor the corporate Defendants ever knew of the discovery, attempted to evade this problem. Mr. Wilson, with his Supplemental Opposition, proffered a new declaration rewriting his earlier claims. ECF 164-1, Exh. B. Now, he *had* heard of the discovery… but only the financial requests. *Id.* at ¶ 13. He also quietly modified his claim to never "receiving **copies** of any specific Requests for Production of

- 2 -

Documents." ECF 164-1, Exh. B at ¶ 12 (emphasis added). The reason for this change is critical: Mr. Wilson not only knew of the discovery, he **personally directed** responses to it.

Nor do Defendants' belated attempts to categorize previously produced documents as responsive, or their production of 83 new documents, cure any prejudice or comply with the Court's Order. Defendants repeat their typical behavior: they claim a fulsome production, while leaving whole categories of documents unaddressed. Defendants compound willful failures to comply with the Court's Orders with further misrepresentations. Sanctions must issue.

**A.    MLG Notified Mr. Wilson of Foundation's Requests**

On December 6, 2024, nearly **two months** before the hearing on January 24, 2025, MLG attorney Julie Chang ("Ms. Chang") sent an email to Mr. Wilson, Defendants' agent and corporate lawyer Reggie Borkum ("Mr. Borkum), and Defendants' employee Ann Zimmerman ("Ms. Zimmerman"), stating: "I left a VM for both of you earlier today. *We will need to respond to additional discovery requests propounded by Foundation* and provide some available dates for CJ's deposition." Klair Decl. at ¶ 3, Exh. 2 at JC39 (emphasis added). In the same email, Ms. Chang described the discovery needed:

From: "Julie Chang" <jchang@defectattorney.com>
To: "Reggie Borkum" <rborkum@btadvisor.com>, "CJ Wilson" <cj.wilson@porschefresno.com>
Cc: "Ann Zimmerman" <ann.zimmerman@bmwfresno.com>, "John Whelan" <Jwhelan@defectattorney.com>, "Drew Morgan" <dmorgan@defectattorney.com>, "Sabrina Markarian" <smarkarian@defectattorney.com>, "MLG LC" <LC@defectattorney.com>
Sent: Friday, December 6, 2024 6:08:11 PM
Subject: Foundation v. Wilson - Additional Documents & Depo Date

Reggie and CJ,

Good evening.  I left a VM for both of you earlier today.  We will need to respond to additional discovery requests propounded by Foundation and provide some available dates for CJ's deposition.

Do you have the following documents in your possession that you can provide:
1. Audited financial statements from January 1, 2020 to present.
2. Profit and loss statements from January 1, 2020 to present.
3. Aside from I.A.M. National Pension Fund, any documents relating to liability to any other multi-employer union pension fund.
4. Documents to identify all shareholders/owners (and the number of shares) with equity interest in CJ's Road to Lemans Corp. dba Audi Fresno and Porsche Fresno.
5. Documents to show equity ownership of CJ's Road to Lemans Corp. dba Audi Fresno and Porsche Fresno by any Trust.
6. Documents regarding relocation of the dealership to Clovis.
7. Settlement agreement with Audi in CJ's Road to Lemans Corp. v. VWGoA, Inc.  and documents submitted to CA New Motor Vehicle Board in connection with the matter.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

- 3 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Klair Decl. at ¶ 3, Exh. 2 at JC39. Ms. Chang's numbered requests line up perfectly with Foundation's Requests for Production numbers 18, 19, 21, 31, 37, 38, 42, and 43 (the exact requests subject to Foundation's Motion to Compel). *Compare* Klair Decl. at ¶ 4, Exh. 3 *with* ECF 91.

Although Mr. Wilson now claims he never knew of any discovery, Mr. Wilson responded to Ms. Chang's email three days later on December 9, 2024:

## Re: Foundation v. Wilson - Additional Documents & Depo Date

**From: CJ Wilson <cj.wilson@porschefresno.com>**     Mon, Dec 9, 2024 at 6:07 PM PST (GMT-08:00)
To: Julie Chang <jchang@defectattorney.com>
Cc: Reggie Borkum <rborkum@btadvisor.com>; Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan <Jwhelan@defectattorney.com>; Drew Morgan <dmorgan@defectattorney.com>; Sabrina Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>

Julie, John  I am not sure why I am being asked to provide all of these things- I am comfortable with the following statements and backing them up:

I am the sole shareholder/person of control for all the dealerships.  I have no financial partners, equity partners, or additional shareholders.

The BMW technicians are the only unionized employees on our payroll.

Regarding the relocation, we have been approved by the city of Clovis to relocate.   We have purchased the land, gotten entitlements and are in the initial phases of construction grading.

We have been approved by Audi, BMW and Porsche to relocate.  We have submitted various plans to the manufacturers and have had them approved and will be relocating ASAP.

Klair Decl. at ¶ 3, Exh. 2 at JC38. MLG then provided Mr. Wilson's statements to Foundation as part of Defendants' supplemental responses to RFP Set Two as seen in Klair Decl. ¶ 4, Exh. 3:

## RESPONSE TO REQUEST NO. 37:

Weber responds as follows: the relocation has been approved by the City of Clovis. Christopher John Wilson purchased the land, got entitlements, and are in the initial phases of construction grading. Audi, BMW, and Porsche approved Defendants' planned relocation of the dealerships. Defendants have submitted various plans to the manufacturers and have had them approved and will be relocating as soon as possible.

## RESPONSE TO REQUEST NO. 38:

Weber responds as follows: Christopher John Wilson is the sole shareholder/person of control for all the dealerships. Christopher John Wilson has no financial partners, equity partners, or additional shareholders.

- 4 -

Further highlighting Mr. Wilson's involvement, Ms. Chang followed up on December 10, 2024, urging Mr. Wilson that "we need to respond to the request for production of documents […] Please send us documentation as to approval to relocate to Clovis; any documentation is acceptable." Klair Decl. at ¶ 5, Exh. 4 at JW12. Mr. Wilson did not provide the documents. *See* Klair Decl. at ¶ 6, Exh. 5 at p. 34:9-18.

The evidence is clear. Despite Mr. Wilson's under-oath statements that he never knew of any discovery, he not only knew *at least* two months[1] before the January 24, 2025, hearing, but personally directed Defendants' responses.

### B.    MLG Notified Defendants About Foundation's Motion to Compel

Not only did Mr. Wilson know of Foundation's discovery, he also knew about Foundation's Motion to Compel. Mr. Wilson repeatedly testified he had no such knowledge:

- "Until I terminated MLG and at that time learned of the pending discovery issues, neither I nor any other representative of Defendants was aware of any motions to compel the production of documents or motions for sanctions in this matter" (ECF 148-1, Exh. B at ¶ 12);

- "I was not aware that Plaintiff and Intervenor had filed Motions to Compel and were seeking sanctions against Defendants" (ECF 148-1, Exh. B at ¶ 14);

- "None of these MLG attorneys informed or otherwise communicated with me regarding any pending motions to compel production of documents" (ECF 148-1, Exh. B at ¶17); and

- "MLG never provided to me, nor was I ever aware of the existence of the Court Order Granting Plaintiffs Motion to Compel and Request for Sanctions, filed on 10/29/24 […] or the Court Order Awarding Attorneys' Fees filed on 2/6/25 […]. I did not learn of the existence of these two Orders until I was just recently provided with copies of them by my new counsel." (ECF 148-1, Exh. B at ¶20).

---

[1]    Due to time limitations, Foundation was not able to obtain discovery from Defendants' former counsel, John Whelan, who had since left MLG. Klair Decl. at ¶ 29. From the email record, Foundation knows Mr. Whelan set zoom meetings with Defendants on, *e.g.*, May 9, 2021, the day before the parties' discovery stipulation (ECF 81) filed on May 10, 2021. *Id.* at ¶ 30, Exh. 11. The timing certainly suggests these calls were to discuss Foundation's discovery.

- 5 -

PLAINTIFF'S SUPPLEMENTAL REPLY
ISO REQUEST FOR FURTHER SANCTIONS                    CASE NO: 1:21-CV-00970-EPG

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Defendants' counsel affirmed these representations: "He had no idea that any motion had ever been filed to compel further discovery or any motion for sanctions had been filed.... He didn't know any of this until a couple weeks ago when our office got involved in the case, and [we] reviewed the file and started obtaining information from MLG and then was able to inform him what [] was going on. Needless to say, he was horrified by the whole thing." Klair Decl. at ¶ 2, Exh. 1 at p. 10:10-17.

However, Mr. Wilson and Mr. Borkum (as an agent for each Defendant) were aware of Foundation's Motion to Compel. On December 11, 2024, Ms. Chang sent an email to Mr. Borkum and Mr. Wilson, in which she explicitly stated: "We have objected on the grounds of attorney client privilege and *a Motion to Compel has been filed by Foundation.*" Klair Decl. 5, Exh. 4 at JW10 (emphasis added). Just two days later, on December 13, Mr. Borkum responded: "Also, **I read through the Judge's order** and it seems to imply that somehow the Judge in the case is saying the attorney/client privilege for communications/work product prior to the start of litigation was waived - how is that the case?" *Id.* at JW7-8 (emphasis added). Mr. Wilson was also on the email.

On December 27, 2024, MLG attorney Douglas Schenck sent an email to Mr. Wilson and Mr. Borkum advising them, in relevant part: "the joint request for continuance of the discovery cutoff (ECF No. 112) will be held in abeyance to be addressed at *the January 24, 2025, hearing on Plaintiffs motion for request for sanctions*. . ." Klair Decl., ¶ 7, Exh. 6 (emphasis added). Defendants knew of the requests, knew of Foundation's Motion to Compel, knew of the Court's Order compelling production, and knew of the pending sanctions motion. Still, they did nothing. Nothing, that is, except pretend not to have known any of it.

**C.      Defendants Still Have Not Produced All Documents**

Compounding Defendants' failure, their second supplemental production is still woefully short of compliance. Defendants misrepresent the extent of their most recent production, have not produced an updated privilege log, and, despite a representation to the contrary, have not even produced the documents from their previous privilege log.

On that point, Defendants' brief states Defendants produced 1,034 additional documents on March 18, 2025, and provides a Bates range of WIL006236 - WIL07270. ECF 164 at p. 2.

- 6 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

However, as the Bates range makes clear, 1,034 is the number of <u>pages</u> produced by Defendants in their newest production. In reality, the new production consists of only 83 documents. Klair Decl. at ¶ 8. Counting the newest production, Defendants produced only 795 documents in total. *Id.* at ¶ 9.

### 1. Defendants Have Not Produced a New Privilege Log and Have Not Produced All Documents from the Previously Produced Privilege Log

The Court ordered that Defendants must produce documents relating to Defendants' termination of the APA, and further ordered that Defendants waived privilege for all documents prior to the initiation of the litigation on July 18, 2021. [ECF 101]. Ignoring the Order, on December 13, 2024, Defendants produced a privilege log listing 94 documents withheld for privilege (all dated prior to the start of this litigation) and 13 documents redacted for privilege (also all prior to the start of this litigation) totaling 107 individually identified documents. ECF 120-1 at ¶¶ 2, 4-5. The Court raised this plain defiance of the Court's Order at the hearing on January 24, 2025. Defendants now claim to have rectified this. ECF 164 at p. 3, fn. 1. They have not.

Defendants' new production consists of just 83 documents, and does not include the full 107 documents identified (redacted or withheld) on Defendants' privilege log. **51 of the 94 withheld documents remain unproduced**. Klair Decl. at ¶ 10. A marked version of the privilege log, showing those documents produced and those remaining outstanding, is attached as Exhibit 8 to the Klair Decl. Of the missing documents, Defendants did not produce a June, 2021, email exchange concerning the at-issue termination letter. Klair Decl. at ¶ 11. Nor did they produce a late-January to early-February, 2021, email exchange retaining MLG to terminate the APA. Klair Decl. at ¶ 12. They did not produce a mid-February, 2021, email exchange concerning the APA. Klair Decl. at ¶ 13. They have not produced an early-March, 2021, exchange regarding communications with the landlord of the at-issue businesses. Klair Decl. at ¶ 14. And they produced unredacted versions of only three of the thirteen improperly redacted documents. Klair Decl. at ¶ 10.

Nor did Defendants produce a privilege log accompanying their latest production, leaving Foundation with no way of knowing if documents were withheld on the basis of privilege or the basis for that privilege, if any. Klair Decl. at ¶ 15. Even more concerning, at least one of the 83 newly-produced documents contains a redaction with no explanation given. Klair Decl. at ¶ 16.

- 7 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

**2.    Defendants Did Not Produce Responsive Documents to Six of Foundation's Requests for Production of Documents**

Defendants correctly note that this dispute concerns 12 requests for production ("RFPs"), propounded on each of the Defendants. Of those 12 requests, it appears that of the 795 documents produced (including the 83 new documents produced on March 18, 2025), Defendants produced documents sufficient to potentially satisfy only 6 of the requests. Defendants have produced various spreadsheets (ECF 164-1 Exhs. D through I) that purport to identify which documents, whether newly produced or previously produced, are responsive to each RFP. However, after a review of all documents denoted by these spreadsheets, significant defects in six requests remain.

**a.    RFP No. 35 – Communications Relating to Defendants' Decision to Terminate the APA**

RFP No. 35 seeks "All COMMUNICATIONS regarding YOUR decision to terminate and/or not perform under the AGREEMENT."[2] As part of their supplemental production on December 13, 2025, Defendants provided a privilege log of 94 withheld documents. Klair Decl. at ¶ 10. The majority of the documents listed in the privilege log date from the months immediately preceding Defendants' termination of the APA. Klair Decl. at ¶ 10, Exh. 8. The privilege log describes some of these documents as "comments on draft letter" and "Forward draft letter, request comments." *Id.* at Doc IDs 87, 89. These emails are dated June 11, 2021, the very date the Defendants' anticipatorily breached the APA through a termination letter. *Id.* As discussed above, of the 94 previously withheld documents identified by the privilege log, Defendants have produced only 43—none of which are the emails from June 11, 2021, that are irrefutably responsive to RFP No. 35. *Id.* Even when Defendants know Foundation and the Court are aware of responsive documents, they continue to withhold those documents. Further, it is worth noting that Foundation knows of the non-production of these documents only because their existence was disclosed. It is unknown how many other documents Defendants withheld. Defendants have had numerous opportunities to comply with this Court's Order (ECF 101), but ***still*** refuse to comply.

---

[2]    RFP No. 33 as it relates to Defendant Wilson.

- 8 -

b.    **RFP No. 36 – Documents Relating to Defendants'**

**Communications with the Property Landlord**

Defendants had an obligation, under section 5.7(a) of the APA, to obtain Mr. Monjazeb's (Defendant's landlord) consent to the transfer to Foundation. ECF 43-2, Exh. 1 at p. 18. Moreover, he was Defendants' landlord for this entire time (while they contemplated a move to Clovis) and they owed him a substantial sum. For all of these reasons, one would expect substantial communications with Mr. Monjazeb related to repayment, to termination of their lease (to Clovis), and to obtaining approvals. Yet, Defendants produced <u>**zero**</u> written communications with him.

RFP No. 36 requested "All DOCUMENTS and COMMUNICATIONS YOU had with any landlord as contemplated by the Agreement from November 30, 2020 until present." [3] Defendants allege that 73 of the documents produced are responsive to this request. Klair Decl. at ¶ 17. Of these, 16 are actually emails to or from landlord's counsel. *Id.* at ¶ 18. Of these 16 emails with Mr. Monjazeb's counsel, the latest document is dated March 18, 2021, nearly three years prior to RFP Set Two. *Id.* It is not credible that there are no further documents after March of 2021. The remaining 57 allegedly responsive documents consist of irrelevant APA-related documents, emails with the vehicle manufacturers, and emails with Foundation. Klair Decl. at ¶ 19. For example, one of the allegedly responsive documents is a text chain between Mr. Wilson and an employee of Foundation, inarguably ***not*** a communication with Mr. Monjazeb. *Id.*

Defendants conceded in Mr. Wilson's declaration that their initial document collection efforts consisted of only those documents that hit on the terms "Foundation" or "Templeton Marsh." ECF 148-1, Exh. B at ¶ 9. This simplistic search was insufficient to bring in documents such as those requested in RFP No. 36. Nor did Defendants' alleged latest efforts yield more fruit: only one of the 16 emails with landlord's counsel came in the newest production, and that email included Foundation already. Klair Decl. at ¶ 20. Additionally, as Defendants' prior privilege log indicates, there are at <u>least</u> two improperly redacted emails relating to communications with the landlord that have still not been produced. *See* Klair Decl. at ¶ 10, Exh. 8 at Doc IDs WIL005919-WIL005926; WIL005911-WIL005918.

---

[3]    RFP No. 34 as it relates to Defendant Wilson.

- 9 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

### iii.     RFP Nos. 37-38 – Documents and Communications Relating to Defendants' Relocation to Clovis, CA

Foundation learned from an article posted in the Fresno Bee that, all while Defendants purported to further the APA with Foundation, they actually sought to relocate to land in Clovis purchased by Mr. Wilson. The documents back this up. *See, e.g.*, Klair Decl. at ¶ 21, Exh. 9 at WIL006492-93.

RFP No. 37 sought "ALL DOCUMENTS regarding YOUR decision to relocate YOUR dealerships to Clovis as identified in The Fresno Bee article dated November 20, 2023" and RFP No. 38 sought "DOCUMENTS sufficient to identify all partners in YOUR relocation to Clovis."[4] Defendants claim 97 documents as responsive to these requests. Klair Decl. at ¶ 22.

The majority of the identified documents relate to the APA and the existing locations for each dealership. *Id.* at ¶ 23. Only <u>one</u> of the 97 documents even contains the word "Clovis." *Id.* at ¶ 24. As with the landlord documents, the most recent document produced is dated September 9, 2021, and consists of an email from a representative at BMW requesting Mr. Wilson hire an architect. *Id.* at ¶ 25. Foundation knows more documents exist. For example, Mr. Wilson stated in an email to his counsel that "[r]egarding the relocation, we have been approved by the city of Clovis to relocate. We have purchased the land, gotten entitlements and are in the initial phases of construction grading." Klair Decl. at ¶ 3, Exh. 2 at JC38. Defendants produced no documents reflecting any of Mr. Wilson's list—nor documents showing Mr. Wilson's *ownership* of the land or a single document that gives even the *address* of the new Clovis dealerships.

### iv.     RFP Nos. 42-43 – Documents Relating to a Lawsuit and Settlement with Audi

As part of the APA, Foundation agreed to take on construction requirements that Audi imposed upon Defendants. When Defendants breached the APA, they also defaulted on Audi's requirements. Audi moved to terminate Defendants, who filed a protest with the California New Motor Vehicle Board. The Audi suit concerned the same subject matter as the APA and therefore was plainly discoverable.

---

[4]     RFP Nos. 35 and 36, respectively, as it relates to Defendant Wilson.

- 10 -

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

RFP No. 42 sought Defendants' "settlement agreement with Audi in CJ's Road to Lemans Corp. v. VWGoA, Inc., Protest No. PR-2788-22, before the California New Motor Vehicle Board" and RFP No. 43 sought "All DOCUMENTS YOU submitted to the California New Motor Vehicle Board in CJ's Road to Lemans Corp. v. VWGoA, Inc., Protest No. PR-2788-22."[5] Defendants claim 30 produced documents responsive to these two requests. Klair Decl. at ¶ 26, Exh. 10. Defendants did not produce the settlement agreement with Audi and did not produce a *single* filing submitted to the New Motor Vehicle Board. *Id.* at ¶ 27. The 30 documents to which Defendants cite are irrelevant and not responsive. For example, one document is a Schedule from the APA. Klair Decl. at ¶ 28. The other 29 documents all concern the APA, Foundation, or Mr. Monjazeb. *Id*. None of the documents specifically deal with the California New Motor Vehicle Board Case nor is there even an apparent connection. *Id.* at ¶ 27.

## III.    Conclusion

This Court provided Defendants ample opportunity to remediate their discovery failures. Defendants begged one last chance, based on Mr. Wilson's representations that he never knew of the discovery. In fact, the email record shows Mr. Wilson was well aware of all aspects of the discovery—he simply chose not to answer. Defendants used the extra time granted by the Court to further obfuscate their discovery failures and claim compliance.

Defendants' refusal to timely produce documents, their violation of the Parties' stipulation (ECF 81), granted by the Court (ECF 84), and their violation of this Court's Order (ECF 101) commanding production are alone sufficient bases to grant terminating or extensive evidentiary sanctions. With Defendants' material misrepresentations now added, there is even more reason.

Foundation requests that the Court issue terminating sanctions and award monetary damages in an amount according to proof for (1) the costs of briefing this Reply, and (2) the costs of discovery related to investigating Mr. Wilson's false claims of ignorance.

//

//

---

[5]     RFP Nos. 40 and 41, respectively, as it relates to Defendant Wilson.

- 11 -

Dated: April 2, 2025

/s/ Andrew Klair
HOLLAND & KNIGHT LLP
David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci

Attorneys for Plaintiff FOUNDATION AUTO HOLDINGS, LLC

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

- 12 -

# APPENDIX 11

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **DEFENDANTS' SUR-REPLY TO PLAINTIFF'S REPLY IN SUPPORT OF REQUEST FOR FURTHER SANCTIONS** |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | (Assigned to Hon. Erica P. Grosjean) |
| Defendants. | |
| TEMPLETON MARSH, LTD., | |
| Plaintiff-in-Intervention, | |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |

1

## I.    **<u>INTRODUCTION</u>**

Plaintiff's Supplemental Reply in Support of its Request for Further Sanctions (ECF 166) ("Supplemental Reply") makes clear that Plaintiff's strategy is to avoid a resolution of this case on its merits and instead simply continue to argue about alleged discovery deficiencies, without making any effort to resolve any purported issues directly with Defendants, even when Defendants have made a good faith effort to fully comply with their discovery obligations and have produced many thousands of pages of documents to Plaintiff. Plaintiff also devotes much of its Supplemental Reply to arguing over the extent to which Defendants were made aware by prior defense counsel of the pending discovery dispute and Request for Further Sanctions (ECF 107) ("Sanctions Motion") filed by Plaintiff, choosing to ignore and not acknowledge Defendants' current diligent efforts to fully comply with their discovery obligations and this Court's Orders in this case.

As discussed in Defendants' Supplemental Opposition to Plaintiff's Request for Further Sanctions (ECF 164) ("Supplemental Opposition"), the fact is that since retaining new counsel on or around February 14, 2025, Defendants have made diligent efforts to fully comply with all outstanding discovery and this Court's Orders in this case. On March 18, 2025, less than two weeks after the parties' March 5, 2025 Status Conference with the Court, Defendants produced over 1,000 pages of documents to Plaintiff, supplementing the more than 6,000 pages of documents previously produced by Defendants' prior counsel, while indicating with specificity what documents were responsive to which of the prior requests. With their recent production, Defendants provided detailed spreadsheets to Plaintiff indicating which documents were responsive to which of Plaintiff's 166 total individual production requests.[1]

Despite Defendants' diligent efforts to fully comply and produce all responsive documents in their possession, custody, or control, Plaintiff's Supplemental Reply complains that

---

[1] This includes three sets of requests issued to each of the three Defendants on March 20, 2022, February 2, 2024, and November 8, 2024. Also, on April 9, 2025, Defendants timely produced 622 pages of documents responsive to production requests issued by Plaintiff on March 5, 2025, and on April 10, 2025 Defendants produced 261 pages of additional documents previously withheld as privileged.

JABURG WILK
LAW FIRM

Defendants have still not fully complied, pointing out various alleged deficiencies in Defendants' production. However, during the two-week time period from Defendants' March 18, 2025 production of documents to the date Plaintiff filed its Supplemental Reply on April 2, 2025, Plaintiff's counsel never once contacted Defendants' counsel to discuss any purported concerns with Defendants' production, despite acknowledging on the record that a meet and confer was required. While Defendants disagree with the characterization of their production in the Supplemental Reply as deficient, and instead believe all responsive documents have been produced, Defendants certainly were (and remain) open to discussing any of Plaintiff's concerns and taking any steps that may be necessary to remedy any such concerns. But they were never provided with that opportunity by Plaintiff.

At the same time it argues that Defendants have not done enough to comply with their discovery obligations, Plaintiff also takes the curious position that terminating sanctions should issue because Defendants did *too much* in response to Plaintiff's production requests by providing financial documents and other responsive information to prior defense counsel for production to Plaintiff. Plaintiff further argues without any factual basis that Defendants were aware of the pending discovery disputes and Sanctions Motions despite taking multiple depositions of attorneys and staff of Defendants' prior counsel, none of whom stated that they informed Defendants of these issues.

Instead of proactively attempting to resolve any purported concerns with Defendants' document production through counsel, Plaintiff chose to lie in wait and argue in its Supplemental Reply that Defendants failed to comply, despite Defendants' comprehensive production. Clearly, Plaintiff's end game is to prevent this case from being resolved on its merits, regardless of Defendants' exhaustive compliance efforts. However, neither the facts nor the law justifies the imposition of the case-terminating sanctions sought by Plaintiff, and Plaintiff's Sanctions Motion should be denied.

II. **DEFENDANTS HAVE MADE GOOD FAITH EFFORTS TO COMPLY WITH DISCOVERY AND PLAINTIFF HAS MADE NO ATTEMPT TO RESOLVE ANY PURPORTED DEFICIENCIES**

3

DEFENDANTS' SUR-REPLY TO PLAINTIFF'S REPLY IN                    CASE NO. 1:21-CV-00970-EPG
SUPPORT OF REQUEST FOR FURTHER SANCTIONS

At the March 5, 2025 Status Conference, Defendants' counsel represented to the Court that Defendants would fully respond to Plaintiff's outstanding production requests no later than March 19, 2025. *See* Transcript of March 5, 2025 Status Conference, attached as **Exhibit A**, at p. 22 lines 17-19. Consistent with that representation, on March 18, 2025, following a thorough search of their records, Defendants produced 1,034 pages of additional documents to Plaintiff. *See* ECF 164-1 at 6:3-4. This was in addition to the over 6,000 pages of documents already produced by Defendants to Plaintiff. *See* ECF 164-1 at 4:8-9. Along with the production, Defendants also provided Plaintiff with detailed spreadsheets indicating which documents, by Bates number, are responsive to which production request. *See* ECF 164-1 at 5:18-22.

Despite Defendants' compliance efforts – which go above and beyond – the Supplemental Reply attempts to discredit those efforts and make it appear that Defendants are somehow evading their discovery obligations. To the contrary, Defendants are committed to full compliance with their discovery obligations and all of this Court's Orders, and believe that their March 18, 2025 production provides Plaintiff with all responsive documents within their possession, custody, or control. *See* ECF 164-1 at 6:5-8.

To the extent Plaintiff had concerns regarding Defendants' production, it never expressed any such concerns to Defendants prior to filing the Supplemental Reply, to allow Defendants a fair opportunity to respond to any perceived incompleteness or deficiencies. This is despite the fact that Plaintiff's counsel expressly acknowledged at the March 5, 2025 Status Conference that any such concerns should be addressed with Defendants prior to filing the Supplemental Reply. *See* Exhibit A at p. 23 lines 7-10. Specifically, when the Court asked Plaintiff's counsel if two weeks would be sufficient time for a reply to Defendants' Supplemental Opposition, counsel stated: "I think two weeks for a reply *that will give us enough time to meet and confer, potentially, about what's included in the supplemental opposition*." *Id*. (emphasis added).

Despite acknowledging this meet and confer obligation, Plaintiff made no effort to communicate any purported concerns to Defendants prior to filing its Supplemental Reply, choosing instead to complain to the Court about alleged deficiencies, rather than actually resolve those issues so the case can proceed on the merits. Regardless, any issues raised by Plaintiff in

4

JABURG WILK
LAW FIRM

its Supplemental Reply have now been resolved by Defendants. For example, Plaintiff raises the idea that certain emails that had previously been withheld by Defendants' prior counsel, MLG Attorneys at Law ("MLG") under claims of privilege were not produced. In fact, the March 18, 2025 production included a number of documents that had previously been withheld on privilege claims, in the form of complete email threads. The production therefore is more manageable and informative, as it does not label each intermediate email as a separate document but provides the full context in a complete email string, along with certain additional documents (261 pages) that were previously retained under work product privlege. Defendants have also provided a privilege log indicating any documents not produced, such as attorney/client communications after the lawsuit was commenced, and documents subject to work product privilege. In addition, Defendants provided an additional supplemental production of items that were previously withheld on claims of privilege, along with a log indicating exactly what documents had not been produced and the reasons for the production. Finally, the Supplemental Reply does not mention that Plaintiff obtained additional documents directly from MLG in response to subpoenas issued to MLG, for which Defendants issued a limited waiver of the attorney/client privilege to allow discovery on the narrow topic of efforts of Defendants to comply with prior discovery requests.

**III.    DEFENDANTS WERE NOT AWARE OF THE PENDING DISCOVERY DISPUTE UNTIL RETAINING NEW COUNSEL**

As explained in Defendants' Supplemental Opposition, any prior delay by Defendants in producing all responsive documents was not the result of dilatory or evasive conduct by Defendants. Instead, Defendants were not made aware of the discovery dispute and/or Sanctions Motions by prior counsel. *See* ECF 164-1 at p. 10 ¶¶13, 14, p. 11 ¶¶22-25, 28. Following the March 5, 2025 Status Conference, Plaintiff took the depositions of three attorneys and one paralegal at MLG solely for the purpose of learning what was communicated to Defendants regarding the pending discovery issues. Significantly, none of those deponents, in response to questions from Plaintiff's counsel, testified that they made Defendants aware of the discovery dispute or the Sanctions Motion; nor did they testify that they knew Defendants were aware of these issues. *See* Excerpts of Jonathan Michaels Deposition Transcript, attached as **Exhibit B**, at pp. 15:15-19, 17:3-17; excerpts of Julie Chang Deposition Transcript, attached as **Exhibit C**, at

JABURG WILK
LAW FIRM

pp. 25:4-25, 26:1-24; excerpts of Sabrina Markarian Deposition Transcript, attached as **Exhibit D**, at pp. 15:15-25, 16:1-25, 19:22-25, 20:1-11, 32:2-18, 33:16-25, 34:1-5; and excerpts of Douglas Schenck Deposition Transcript, attached as **Exhibit E**, at pp. 13:15-25, 14:6-24, 19:11-25, 20:1-2, 38:6-22. Moreover, those witnesses also made clear that when Defendants were asked for updated financial information for production to Plaintiff in "native format," Defendants readily complied. *See* Exhibit C at pp. 19:12-25, 23:4-23; Exhibit D at pp. 14:11-20, 24:20-25, 25:1-2, 27:18-21; Exhibit E at p. 27:19-24. This is consistent with Defendants' current approach regarding these discovery issues, *i.e.*, now that they are aware of the extent and nature of the discovery dispute, Defendants have made every effort to ensure full compliance. In addition to the depositions, Plaintiff also issued a subpoena duces tecum to MLG Attorneys and received documents directly from MLG.

Moreover, Plaintiff's assertions about what was communicated to Defendants by their prior counsel and when it was communicated is really just a red herring, aimed at deflecting from the key issue the Court asked the parties to address in this supplemental briefing: Defendants' current efforts to comply with Plaintiff's discovery and the status of the production of documents. As detailed in the Defendants' Supplemental Opposition, more than 7,000 pages of documents have now been produced by Defendants, and Defendants believe this production comprises all responsive documents in their control. Witnesses have been made available for depositions. All pending dates in this case have been vacated, including the trial date, subject to being rescheduled following the Court's ruling. There is no prejudice to Plaintiff and there is no reason for this case not to proceed on the merits, as public policy and fairness would dictate.

## IV. CONCLUSION

For all the reasons stated above and in Defendants' Supplemental Opposition, terminating sanctions are not warranted in this case. Defendants respectfully request that the Court deny Plaintiff's Sanctions Motion and allow this case to be decided on its merits.

6

JABURG WILK
LAW FIRM

DATED this 10th day of April, 2025.

                                        **Jaburg & Wilk, P.C.**

                                        _____
                                        David L. Allen
                                        Thomas Moring
                                        Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of April, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci
HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
david.holtzman@hklaw.com
daniel.kappes@hklaw.com
andrew.klair@hklaw.com
isabella.granucci@hklaw.com
*Attorneys for Plaintiff*

Forrest Booth
Camille Zuber
KENNEDYS CMK LLP
455 Market Street, Suite 1900
San Francisco, CA 94105
forrest.booth@kennedyslaw.com
camille.zuber@kennedyslaw.com
*Attorneys for Plaintiff-in-Intervention*

/s/ _____

8

24377-24377-00001\DLA\TSM\6440607v4

# EXHIBIT A

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ERICA P. GROSJEAN

| | | |
|---|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, A Delaware Limited Liability Company, | ) ) ) | 1:21-cr-00970-EPG |
| | ) | STATUS CONFERENCE |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| WEBER MOTOR, FRESNO, INC. d/b/a, BMW Fresno, a California corporation; CJ's ROAD TO LEMANS CORP, d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California. | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Fresno, California                    Wednesday, March 5, 2025

TRANSCRIPT OF ELECTRONICALLY RECORDED PROCEEDINGS

TRANSCRIBED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

 Proceedings recorded by electronic recording, transcript produced by certified shorthand reporter.

22

of claims that they requested discovery for, and they then do the discovery about it. And without -- and it's been a bit since I've looked at the actual language, something in terms of they -- the contract was breached and it was breached in a way that -- that was ulterior purposes. That's not the actual finding but something like that.

And if it turns out, I guess, it would be relevant to me if they say, no, actually, we have not produced all the documents on this. That's a different call for the Court about whether plaintiffs are still entitled to these evidentiary sanctions. I'd like to consider that they are, but I'd at least like to hear it.

So -- okay. I think I'm going to give another week then. So I will change that defendants have until March 19, 2025 to file a motion for leave for supplemental opposition. And let's put in the notes, we are also on the record, this is because it has been represented that the defendants believe they will make this complete production and be able to describe that production by March 19th, 2025.

Now with that in mind, I'll turn to plaintiffs how long they want to reply. And I guess, I don't know -- I don't know. I'll leave it to you how long you want for reply. I'll overlap, if you want to start requesting discovery on attorney-client communications or if you want to meet and confer about that. I don't think that this precludes that.

Alternatively, if you say in a reply if the Court is inclined to do this, we seek an evidentiary hearing, you can.  Those are all potential outcomes.  But I think we just need to come up with a date for reply if they file an opposition on March 19th.

So plaintiffs counsel, want do you want?

MR. HOLTZMAN:  Thank you, Your Honor.  This is David Holtzman.  I think two weeks for a reply that will give us enough time to meet and confer, potentially, about what's included in the supplemental opposition.

Again, I'm just looking at the timing of it's going to depend on what's in it.  If it's a schedule we've produced so far for documents, we should be able to get something in pretty quickly.  But if they are raising the substance of communications, that's something we're going to need to take discovery on.

THE COURT:  Okay, okay.  And if they do, if the defendants do file a supplemental opposition, then any reply will be due no later than April 20 -- I'm sorry, April 2, 2025.

Okay.  I think that's what we need to do.  Then I will rule on that, and then based on the ruling, we'll have another schedule.  And this gives us enough to do -- I mean, I appreciate there's discovery that needs to be done.  I probably won't -- except for the document production, probably

# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA FRESNO DIVISION

FOUNDATION AUTO HOLDINGS, LLC, a       )
Delaware limited liability company,    )
                                       )
        Plaintiff,                     )
                                       )
vs.                                    )
                                       )
WEBER MOTORS, FRESNO, INC. D/b/a       )
BMW Fresno, a California               )
corporation, et al.,                   )
                                       )
            Defendants.                )
_____      )
TEMPLETON MARCH, LTD.,                 )
                                       )
            Intervenor,                )
vs.                                    )
                                       )
WEBER MOTORS, FRESNO, INC. D/b/a       )
BMW Fresno, a California               )
corporation, et al.,                   )
                                       )
            Defendants.                )

No. 1:21-cv-00970-JLT-EPG

DEPOSITION OF JONATHAN MICHAELS

Via Zoom

March 24, 2025

Reported by:  Dana Peabody, RDR, CRR, CSR No. 6332

Pages 1 through 28

Job No. 7264471

Page 1

Q.   Did you file any documents on behalf of defendants through the court's PACER ECF system?

A.   Did I personally, no.  Did our firm, yes.

Q.   So I take it from your prior answer, you did not appear before the Court on December 17, 2024, for a status conference?

A.   Yeah, I don't -- that date doesn't sound familiar whatsoever.

Q.   Okay.  And how about on January 24, 2025, for a hearing on Foundation's motion for further sanctions?

A.   No, I mean, I think -- well, let me say it this way:  I'm certain that we had people from the firm appear, but was I personally at either, no.

Q.   To your knowledge, was Mr. Wilson aware of either of those hearings?

A.   I couldn't tell you one way or another.  I was not really in contact with him on any of these issues.

Q.   Okay.  And who would know?

A.   Well, that would call for speculation, so -- you know, I don't know.  I think that the people that were really in contact with him were John Whelan, Douglas Schenck, and Julie Chang.

Q.   Mr. Michaels, did you or anyone else at

Page 15

Q.    How about in the last -- starting in January of 2024, since then?

A.    No, I don't think I've spoken to them in 2024 or 2025.

Q.    Okay.  Thank you.  I'll just check some of these boxes just to, you know, avoid some doubt.

Did you have any email communications with the defendants since January of 2024?

A.    No, none whatsoever.

Q.    Text messages?

A.    No.

Q.    Phone calls, not Zoom, but just like pick up the cell phone?

A.    Yeah, I've had no phone calls, no emails, no text messages with any of the defendants since 2024 or during 2024 or 2025.  Other people from here have but not me.

Q.    Okay.  And those other people, that would be Douglas Schenck, Julie Chang, John Whelan?

A.    Correct.  And I don't know, but I would expect -- again, we've got -- we have, you know, these full-fledged trial teams, and so there's paralegals and what we call case managers as well; and they're oftentimes in contact with the clients. You know, I couldn't speak directly as to who spoke

Page 17

# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA FRESNO DIVISION

FOUNDATION AUTO HOLDINGS, LLC, a )

Delaware limited liability company, )

    Plaintiff, )

vs. ) Case No.

WEBER MOTORS, FRESNO, INC. D/b/a ) 1:21-cv-00970-JLT-EPG

BMW Fresno, a California )

corporation, et al., )

    Defendants. )

_____ )

TEMPLETON MARCH, LTD., )

    Intervenor, )

vs. )

WEBER MOTORS, FRESNO, INC. D/b/a )

BMW Fresno, a California )

corporation, et al., )

    Defendants. )

_____

VIDEOTAPED DEPOSITION OF JULIE CHANG

Via Zoom

Thursday, March 25, 2025

Reported by:

Dana Peabody, RDR, CRR, CSR No. 6332

Job No. SF 7264475

Pages 1 through 44

Page 1

response to your December 6th email?

A. It appears to be.

Q. What is this email about?

A. The additional documents and depo date.

Q. So Mr. Wilson provides a couple of          11:29:46AM
statements, one, two, three, four, five various
statements, which he -- and it says:

"I am comfortable with the following
statements and backing them up."

Do you see that, Ms. Chang?          11:30:11AM

A. Yes.

Q. Other than these five italicized
statements, did Mr. Wilson send you any documents in
response to the document requests in your December
6th email?          11:30:26AM

A. Yes.

Q. What documents did he send?

A. Financial statements. Sorry. However,
they were not sent by him directly with regard to
the financial statements.          11:30:56AM

Q. Who sent -- who sent the financial
statements?

A. I believe it was Ann.

Q. Ann Zimmerman?

A. I believe so.          11:31:07AM

Page 19

Mr. Wilson, or Reggie with regards to these document production requests after this email?

A.   I don't know.

Q.   And it was your testimony that Ann Zimmerman provided financial documents on behalf of CJ Wilson, correct?     11:38:31AM

A.   Yes.

Q.   Of the documents that you received -- of the financial documents that you received from CJ Wilson, did you send Foundation a complete set of the financial statements for fiscal year 2020 through the present?     11:38:43AM

A.   I don't know.

Q.   Who would know?

A.   I don't know.  Whatever was sent to us was sent to Foundation is my understanding.  Whether they're complete or not, I could not tell you.     11:38:52AM

Q.   Are you aware -- let me rephrase that.
     Of the financial documents that you received from Mr. Wilson, are you aware of any financial documents that were withheld by your office?     11:39:29AM

A.   No.

Q.   Of the financial documents that you received from Mr. Wilson, are you aware of any     11:39:42AM

Page 23

A.   I don't recall.

Q.   Is there anyone who would know?

A.   I don't know.

Q.   Did you tell Mr. Wilson, Ms. Zimmerman, or Mr. Borkum the results of the Court's order to the motion to compel?          11:46:45AM

A.   No.

Q.   Why not?

A.   I believe we have attorneys on the case that would do that.          11:47:01AM

Q.   Do you know who the attorneys on the case at that time were?

A.   No.

Q.   Do you know who would know?

A.   I don't know.  There were several.          11:47:11AM

Q.   And it's your testimony that you can't recall which of the several attorneys were on the case at that time?

A.   Correct.  I don't know the timeframe that you're talking about.          11:47:26AM

Q.   It would have been in January 2025.

A.   It could have been Doug Schenck.

Q.   Did you tell Mr. Wilson, Ms. Zimmerman, or Mr. Borkum about the motion for further sanctions also in January of 2025?          11:48:08AM

Page 25

A.    No.

Q.    And why not?

A.    Because we have attorneys that handle the case.

Q.    And is that same attorney Doug Schenck?    11:48:20AM

A.    I'm not sure the timeframe that you're talking about.  There was a time when the motion was filed, and then there was a lot of hearings, I believe, that happened, so you're not giving me a timeframe.  That's why I'm having a hard time    11:48:38AM following your line of questioning.

Q.    Okay.  Let me rephrase that.

The Court's order for the motion to compel happened in January 2025.

Did you ever communicate with Mr. Wilson,    11:49:24AM Ms. Zimmerman, or Mr. Borkum the results of the Court's order for that motion to compel?

A.    No.

Q.    To follow up on that, the motion for further sanctions was also in January of 2025.    11:49:47AM

Did you ever communicate the motion for further sanctions to either Mr. Wilson, Ms. Zimmerman, or Mr. Borkum?

A.    No.

Q.    Why not?    11:50:05AM

Page 26

# EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA FRESNO DIVISION

FOUNDATION AUTO HOLDINGS, LLC, a    )

Delaware limited liability company, )

      Plaintiff,                 )

vs.                             ) Case No.

WEBER MOTORS, FRESNO, INC. D/b/a   ) 1:21-cv-00970-JLT-EPG

BMW Fresno, a California         )

corporation, et al.,             )

        Defendants.           )

_____ )

TEMPLETON MARCH, LTD.,          )

        Intervenor,           )

vs.                             )

WEBER MOTORS, FRESNO, INC. D/b/a   )

BMW Fresno, a California         )

corporation, et al.,              )

        Defendants.           )

_____

VIDEOTAPED DEPOSITION OF SABRINA MARKARIAN

Via Zoom

Tuesday, March 25, 2025

Reported by:

Dana Peabody, RDR, CRR, CSR No. 6332

Job No. SF 7264475

Pages 1 through 49

Page 1

attorneys, MLG and anyone, either of the co-defendants?

A.   Solely just Reggie and/or Mr. Wilson.

Q.   Okay.  Did you ever attend any of those meetings with Mr. Wilson, Mr. Borkum, or Ms. Zimmerman?                                    02:12:25PM

A.   Not to my knowledge.

Q.   Do you recall the dates of any of these meetings?

A.   I do not.                                        02:12:35PM

Q.   Did you ever collect documents from Mr. Wilson?

A.   Not directly from Mr. Wilson, but from Ann Zimmerman, yes.

Q.   Okay.  How did you collect those              02:12:46PM
documents?

A.   I asked her via email for those documents, for certain documents.

Q.   And which documents did you ask her for?

A.   I asked her for financial records.            02:12:59PM

Q.   So what, did you only collect documents from Ann Zimmerman, nobody else?

A.   To my knowledge, it was just from Ann Zimmerman.

Q.   Okay.  How did you store those documents?     02:13:15PM

Page 14

A.   I saved them in our -- I received them via email from her, and then I saved them into my company's software platform that we use, which is called FileByte.

Q.   So then once you saved them into the    02:13:34PM
FileByte, then what would you do next?  Would you assist in producing them to Foundation?

A.   I would -- once, you know, whether they were in response to discovery or anything like that, I would help the attorney drafting the responses    02:13:54PM
serve them to, in this case, plaintiffs.

Q.   Are you aware that the Court held a status conference in this matter on December 17, 2024?

A.   Yes.

Q.   Are you aware that the Court held a    02:14:12PM
hearing on Foundation's motion for further sanctions on January 24th, 2025?

A.   Yes.

Q.   Was Mr. Wilson aware of these hearings?

MR. GURWELL:  Objection.  Calls for    02:14:28PM
speculation.

THE WITNESS:  I do not know.

BY MS. GRANUCCI:

Q.   To your knowledge, were any employees of Mr. Wilson or his co-defendants aware?    02:14:39PM

Page 15

A.    I do not know.

Q.    Did you or anyone else at MLG communicate either the December 17th, 2024, hearing or January 24, 2025, hearing dates to Mr. Wilson or anyone at either of the co-defendants, including    02:14:57PM
Reggie Borkum?

MR. GURWELL:  Objection.  Calls for speculation.

MR. ALLEN:  Objection.

MR. GURWELL:  Speculation and compound.    02:15:04PM

You can answer.

THE WITNESS:  I will only speak as to myself.  I do not know if anyone at MLG ever communicated that information to Mr. Wilson or to Mr. Borkum or Ms. Zimmerman.    02:15:16PM

BY MS. GRANUCCI:

Q.    Did you or anyone at MLG communicate the results of either of those hearings to Mr. Wilson or anyone at either of the co-defendants?

MR. GURWELL:  Objection.  Calls for    02:15:28PM
speculation.

MR. ALLEN:  Join.

THE WITNESS:  Again, I will only speak to myself.  I personally did not notify anyone, but I do not know if anyone at MLG did.    02:15:37PM

Page 16

Q.   Okay.  I'm going to show you a series of exhibits.  I'll share my screen again.

Okay.  Can you see this?

A.   I can see it.

Q.   Okay.                                    02:18:27PM

MS. GRANUCCI:  So I'd like to mark as Exhibit 2, Foundation's Request for the Production of Documents to CJ Wilson, Set Number 2.

(Exhibit 2 marked for identification.)

MS. GRANUCCI:  And then I'd like to mark     02:18:41PM as Exhibit 3, Foundation's Request for the Production of Documents to CJ's Road to Le Mans, Set Number 2.

(Exhibit 3 marked for identification.)

MS. GRANUCCI:  And I'd like to mark as       02:18:56PM Exhibit 4, Foundation's Request for the Production of Documents to Weber Motors, Set Number 2.

(Exhibit 4 marked for identification.)

BY MS. GRANUCCI:

Q.   Have you seen exhibits 2 through 4 before?     02:19:07PM

A.   I believe I have, yes.

Q.   Okay.  To your knowledge, were Mr. Wilson or any employees of either of the defendants, including Reggie Borkum, aware of Exhibits 2 through 4?                                              02:19:22PM

Page 19

A.    I'm not sure.

Q.    I'm going to stop sharing my screen now.

Did you ever personally send Mr. Wilson or any employees of other the defendants, including Reggie Borkum, copies of Exhibits 2 through 4?    02:19:38PM

A.    Not to my knowledge, no.

Q.    Did you have any Zoom calls with Mr. Wilson or any employees of either of the other defendants, including Reggie Borkum, where you discussed Exhibits 2 through 4?    02:19:51PM

A.    No.

Q.    Did you assist in the preparation of responses and objections to any discovery requests propounded by Foundation?

A.    The only thing that I did was serve the    02:20:03PM responses.  Responses for this matter were drafted normally by the handling attorney.

Q.    Okay.

MS. GRANUCCI:  I'd like to mark as Exhibit 5, Weber Motor's Responses, served December    02:20:19PM 13, 2024, in response to Foundation's Request for Production of Documents, Set 2.

(Exhibit 5 marked for identification.)

BY MS. GRANUCCI:

Q.    I'm going to share my screen again.    02:20:31PM

Page 20

A.    I have reviewed them, but not in extreme detail.

Q.    Okay.

MS. GRANUCCI:  I'd like to mark this document as Exhibit 6, which is a document produced by defendants to Foundation on January 3, 2025.

(Exhibit 6 marked for identification.)

BY MS. GRANUCCI:

Q.    Can you see my screen?

A.    I can.

Q.    Okay.  Please take a moment to review this document.  It is 289 pages, so I won't go through all of them unless you prefer that I do.  I'll just scroll through the first few, and then as I ask questions, you can let me know if you need to see more.

A.    Okay.

Q.    Have you seen Exhibit 6 before?

A.    I have.

Q.    To your knowledge, did MLG make another production on behalf of defendants on January 3rd, 2025, in response to Foundation's second set of discovery requests?

A.    I recall January 3rd being a day we served documents; and if I'm not mistaken, I remember them

02:25:06PM

02:25:20PM

02:25:36PM

02:25:49PM

02:26:06PM

Page 24

being the Excel native versions of this document of Exhibit 6.

Q. To your knowledge, did MLG also produce another privilege log on January 3rd, 2025?

A. I don't remember off the top of my head if that was the exact date.    02:26:23PM

Q. To your knowledge, who provided the documents to MLG for the January 3rd, 2025, production?

A. I believe it was Ms. Zimmerman.    02:26:34PM

Q. Is Exhibit 6 what was produced by MLG on behalf of defendants on January 3rd, 2025?

A. Yes, I remember Ms. Zimmerman produced this PDF, these PDFs of all of the financial records of, you know, certain amount of years.    02:26:54PM

Q. Did you help prepare Exhibit 6 for production?

A. I did.

Q. What was your role in preparing Exhibit 6 for production?    02:27:05PM

A. I remember that I Bates-stamped and then -- yeah, that was about it.

Q. Who else helped prepare Exhibit 6 for production?

A. To my knowledge, it was just me, along    02:27:16PM

Page 25

BY MS. GRANUCCI:

Q.    Can you see this spreadsheet?

A.    I do.

Q.    Okay.  Have you seen Exhibit 7 before?

A.    I have.                                                                    02:28:45PM

Q.    To your knowledge, did MLG make a production on behalf of the defendants on January 17, 2025, in response to Foundation's second set of discovery requests, Exhibit 2 through 4?

A.    That sounds accurate, yes.                                                02:29:01PM

Q.    Okay.  And to your knowledge, who provided the documents to MLG for the January 17, 2025, production?

A.    Ms. Zimmerman.

Q.    And do you have an understanding of what documents were produced on January 17, 2025?                                                        02:29:12PM

A.    Yes.

Q.    Can you describe the documents that were produced on January 17, 2025?

A.    Yes, I believe they were financial statements for several different years.                                  02:29:25PM

Q.    Is Exhibit 7 one of the documents that was produced by MLG on behalf of defendants on January 17, 2025?

A.    I cannot 100 percent say yes, but it looks                                02:29:39PM

Page 27

A.    Yes.

Q.    In those communications, did you or anyone from MLG tell Ms. Zimmerman about the document requests in Set 2 of Foundation's Request for Production?                                          02:34:41PM

A.    I did not personally, but I do not know if anyone else at MLG did.

Q.    In what communications did you or someone at MLG discuss the Court's order regarding Foundation's motion to compel?                        02:34:53PM

A.    I personally did not speak to Ms. Zimmerman about that.

Q.    In what communication did you discuss any of the outstanding document requests?

A.    With Ms. Zimmerman?                                02:35:10PM

Q.    Yes.

A.    I personally do not believe I did.  I did not speak to her about any of that.

Q.    Did you attempt to obtain deposition dates from Mr. Wilson?                                        02:35:25PM

A.    Yes.

Q.    In what manner did you attempt this?

A.    Via email.

Q.    And did Mr. Wilson ever provide you with any deposition dates?                                        02:35:36PM

Page 32

A.    No.

Q.    Okay.

MS. GRANUCCI:  Can we go off the record for just about five minutes?

MR. ALLEN:  Sure.                                    02:35:49PM

MS. GRANUCCI:  Coming back on the record at 2:40.

THE VIDEOGRAPHER:  This ends Media 1. We're now going off the record.  The time is 2:35.

(Recess.)                                            02:35:59PM

THE VIDEOGRAPHER:  This begins Media 2. We're now back on the record.  The time is 2:40.

BY MS. GRANUCCI:

Q.    I just have a few more questions for you.

A.    Okay.                                          02:40:30PM

Q.    Are you aware of any emails in which Mr. Whelan communicated RFP Set 2 to Mr. Wilson?

A.    I am not aware.

Q.    Are you aware of any emails in which any MLG Attorneys communicated RFP Set 2 to Mr. Wilson?                                          02:40:43PM

A.    I'm not aware.

Q.    Are you aware of any emails in which Mr. Whelan or any other MLG Attorneys communicated RFP Set 2 to Mr. Borkum?

A.    I'm not aware.                                 02:40:58PM

Page 33

Q.    Are you aware of any emails in which Mr. Wilson -- excuse me -- Mr. Whelan or any other MLG attorneys communicated RFP Set 2 to Ms. Zimmerman?

A.    No, I don't know.                    02:41:11PM

Q.    What was the first time you recall anyone at MLG speaking to Mr. Wilson about RFP Set 2?

A.    I don't know off the top of my head.

Q.    Are there any documents that MLG received from Mr. Wilson or anyone employed by either of the    02:41:29PM co-defendants that were not produced?

A.    To my knowledge --

MR. GURWELL:  Calls for speculation. Speculation.

Go ahead, you can answer.                    02:41:40PM

THE WITNESS:  To my knowledge, I do not know of any documents that have not been produced to plaintiffs.

MS. GRANUCCI:  Okay.  I think that's it for me then.  Thank you.                    02:41:51PM

THE WITNESS:  No problem.

MR. ALLEN:  I have a few questions.

///

///

///

Page 34

# EXHIBIT E

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| AUTO HOLDINGS, LLC, a Delaware limited liability company, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. ) 1:21-cv-00970-JLT- |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | ) EPG ) ) ) ) ) ) ) ) |
| Defendants. | ) ) __ ) |

REMOTE VIDEO-RECORDED DEPOSITION

OF

DOUGLAS SCHENCK

MONDAY, MARCH 31, 2025

Stenographically Reported By:

JENNIFER L. SMITH, CA CSR NO. 10358, RMR, CRR, CRC

Job Number: 7270322

Page 1

A.  I did.                                                    10:10:40

Q.  Did you appear on December 17, 2024, before              10:10:41
the Court for a status conference?                           10:10:47

A.  I -- I may have.  I -- I don't, off the top              10:10:48
of my head, recall what date it was.  I think I -- I         10:10:50
appeared twice, maybe three times, in front of the          10:10:53
magistrate.                                                  10:10:57

Q.  Did you appear on January 24, 2025, before              10:10:59
the Court for a hearing on Foundation's motion for           10:11:02
further sanctions?                                           10:11:05

MR. ALLEN:  I think you meant '24 -- '24.                    10:11:10

MR. KLAIR:  Apologies.  Restate the                          10:11:13
question.  Strike the previous question, please.             10:11:14

BY MR. KLAIR:                                                10:11:14

Q.  Did you hear on January -- did you appear on            10:11:16
January 24, 2025, before the Court for a hearing on          10:11:16
Foundation's motion for further sanctions?                   10:11:19

A.  I believe I did.                                         10:11:22

Q.  To your knowledge, was Mr. Wilson aware of              10:11:27
either of those hearings?                                    10:11:31

A.  To my knowledge -- to my knowledge, no, I               10:11:34
don't -- I don't know that he was aware.                     10:11:36

Q.  Were any employees of either of Mr. Wilson's           10:11:43
companies aware of those hearings?                           10:11:46

A.  I don't know.                                            10:11:49

Page 13

MR. GURWELL:  Objection.  Calls for    10:11:49
speculation.    10:11:51

You can answer.    10:11:51

THE WITNESS:  I don't -- I don't know.    10:11:53

BY MR. KLAIR:    10:11:53

Q.  Did you or anyone else at MLG communicate    10:11:57
either the December 17, 2024, hearing or January 24,    10:12:00
2025, hearing to Mr. Wilson or anyone at either of    10:12:05
the companies?    10:12:08

A.  I don't know.    10:12:09

MR. GURWELL:  Objection.  Calls for    10:12:10
speculation.    10:12:11

THE WITNESS:  Sorry.    10:12:12

I -- I do not know.    10:12:13

BY MR. KLAIR:    10:12:13

Q.  Mr. Schenck, I know it's tempting, but just    10:12:15
give time for Mr. Gurwell to object.  That way we    10:12:19
don't have the cross-talk, and Jennifer doesn't end    10:12:22
up killing both of us.    10:12:25

Mr. Schenck, did you or anyone else at MLG    10:12:29
communicate the results of the December 17 or January    10:12:33
24 hearings to Mr. Wilson or anyone at his company,    10:12:37
to your knowledge?    10:12:40

A.  I -- I don't know.    10:12:43

Q.  Did you or anyone else at MLG, to your    10:12:48

Page 14

BY MR. KLAIR:                                          10:17:13

Q.   This is Exhibit 3, and the date of Exhibit 3     10:17:16
on the last page.  Apologies.  Third to last page.    10:17:23

A.   Okay.                                            10:17:29

Q.   And this is Exhibit 4.  First page and then      10:17:31
the date appears on the third to last page here.      10:17:38

A.   Okay.                                            10:17:44

Q.   Mr. Schenck, have you seen any of                10:17:48
Exhibits 2, 3, or 4 before?                           10:17:51

A.   I don't recall.                                  10:17:53

Q.   To your knowledge, were Mr. Wilson or any        10:17:57
employees of either of his companies, including       10:18:00
Reggie Borkum, aware of Exhibits 2, 3, or 4?          10:18:02

A.   I don't know that.                               10:18:06

Q.   Did you ever personally send Mr. Wilson or       10:18:10
any employees of his companies, including Reggie      10:18:13
Borkum, Exhibits 2, 3, or 4?                          10:18:16

A.   Me personally?                                   10:18:19

Q.   Yes, sir.                                        10:18:21

A.   No.                                              10:18:21

Q.   To your knowledge, did anyone at MLG send        10:18:24
Exhibits 2, 3, or 4 to Mr. Wilson or anyone employed  10:18:26
by his companies?                                     10:18:29

A.   I -- I don't recall.                             10:18:30

Q.   Did the Zoom calls that you had with             10:18:37

Page 19

Mr. Wilson concern or discuss Exhibits 2, 3, or 4?    10:18:40

A.  I -- I don't believe so.    10:18:47

Q.  To your knowledge, who would have    10:18:53

communicated these documents to Mr. Wilson?    10:18:55

MR. GURWELL:  Objection.  Calls for    10:19:01

speculation.    10:19:01

THE WITNESS:  Yeah, I don't know.  It could    10:19:03

be any number of people.    10:19:04

BY MR. KLAIR:    10:19:04

Q.  Mr. Schenck, who at MLG primarily    10:19:08

represented Mr. Wilson and his companies before you    10:19:10

got on to the case?    10:19:13

A.  I -- I don't know.  I -- I know that John    10:19:16

Whelan worked on the file, but I -- I don't -- there    10:19:20

were probably several other lawyers before I got    10:19:24

here.    10:19:26

Q.  Have you ever met Mr. Whelan?    10:19:28

A.  Yes.    10:19:32

Q.  Does he still work at MLG?    10:19:35

A.  No.    10:19:37

Q.  To your knowledge, when did Mr. Whelan leave    10:19:39

MLG?    10:19:41

A.  I don't know.    10:19:42

Q.  Who is Julie Chang?    10:19:47

A.  She works here.  I believe her title is    10:19:51

Page 20

document produced by defendants to Foundation on      10:28:50

January 17, 2025.  Please take a moment to review the  10:28:53

document, and let me know when you're finished         10:28:57

reviewing it.                                          10:28:59

A.  Okay.                                          10:29:10

Q.  Have you seen Exhibit 7 before?               10:29:12

A.  I may have.  I -- I really don't recall.      10:29:17

Q.  To your knowledge, did MLG make production    10:29:20

on behalf of Mr. Wilson and his companies on January   10:29:22

17, 2025, in response to Foundation's second set of    10:29:26

discovery requests?                                    10:29:30

A.  I'm not sure.                                 10:29:32

Q.  To your knowledge, who provided this          10:29:35

document to MLG?                                       10:29:37

A.  I don't know.                                 10:29:41

Q.  Was this document one of the documents        10:29:52

produced on January 17, 2025?                          10:29:53

A.  I'm not sure.                                 10:29:56

Q.  Do you have an understanding of what          10:29:58

documents were produced on January 17, 2025?           10:29:59

A.  Very generally.                              10:30:05

Q.  Okay.  Can you --                             10:30:07

A.  I know there were some financial statements   10:30:08

and documents.                                         10:30:11

Q.  And was this one of those documents?          10:30:13

Page 27

A.   My understanding -- well, yeah, I do know, and he's CJ's personal counsel.

Q.   Okay.  And you know who Mr. Robin is?

A.   No.  I mean, I remember communicating, but I don't know what his title or position is.

Q.   Okay.  And then if you go to the last paragraph of that email, which is DS2, it says, "I have reached out to opposing counsel to discuss the discovery issues in this case and the Court orders that Magistrate Judge Erica Grosjean has put in place and will advise you once I have that telephone conference."

But you don't explain here or say anything about what discovery issues exist or what Court orders were made.  Is that accurate?

A.   That's accurate.

Q.   And there's nothing in which you ever -- in all the documents you've produced, there is nothing in which you ever actually provided CJ Wilson, your client, with any information regarding those discovery issues and Court orders; correct?

A.   Correct.

MR. ALLEN:  Let me check my notes.  One moment, please.

I have nothing further.  Thank you.

Page 38

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

# APPENDIX 12

JABURG & WILK, P.C.
David L. Allen (SBN 075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
Telephone: 602.248.1000
Facsimile:   602.248.0522

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>Defendants.<br>———————————————<br>TEMPLETON MARSH, LTD.,<br><br>Plaintiff-in-Intervention,<br><br>vs.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>Defendants. | Case No. 1:21-CV-00970-EPG<br><br>First Amended Complaint Filed: November 11, 2022<br><br>**DEFENDANT'S BRIEF IN SUPPORT OF DAVID L. ALLEN AND THOMAS S. MORING'S RESPONSE TO ORDER TO SHOW CAUSE**<br><br>[Filed concurrently with Declarations of Thomas Moring and David Allen; Submitted For Determination Pursuant to Minute Order (Dkt.#178)]<br><br><br>The Honorable Erica P. Grosjean<br><br>DATE:       May 5, 2025<br>CTRM:       10, 6th Floor |

## I.    INTRODUCTION

Defendants' Attorneys have made all filings in good faith, based on reasonable legal analysis and review of the facts in the record, or as developed by discussions with representatives of Defendants. None of Defendants' actions were made to delay the proceedings, or to gain any strategic advantage in litigation. Under the stringent standards for sanctionable conduct under 28 U.S.C. § 1927, the Court's inherent authority, and the Federal Rule of Civil Procedure, and the applicable rules governing the conduct of counsel, the conduct in this case of David L. Allen and Thomas Moring is not sanctionable. This Brief is supported by the Court's record in this matter, as well as the Declaration of David Allen (Attached as **Exhibit A**) and the Declaration of Thomas Moring (attached as **Exhibit B**).

## II.    STATEMENT OF FACTS

This case has been pending for several years, but current counsel – Thomas Moring and David Allen – only recently substituted in as attorneys of record for Defendants. They filed their application on February 20, 2025, which was granted March 5, 2025. Even before their formal appearance, both attorneys have acted with diligence, professionalism, and good faith in seeking to correct prior deficiencies, complying with all outstanding discovery obligations, and provide the Court and opposing counsel with full transparency. This process began with a review of the case with the client, even before the substitution of counsel was filed. Neither Mr. Moring nor Mr. Allen has ever been personally sanctioned in any jurisdiction, and the record does not support a finding of lack of candor to the tribunal in this action.

Mr. Thomas Moring is an Arizona-based attorney, admitted pro hac vice in this matter. He has been licensed in Arizona since 2001 and has extensive litigation experience, including over ten jury trials and more than thirty bench trials. Mr. Moring previously represented Defendant Christopher John Wilson in a 2020 civil action in Los Angeles County Superior Court, where discovery obligations were fully and appropriately met. At no point during that prior representation was there any indication that Mr. Wilson failed to produce documents or acted in bad faith.

Mr. David Allen is a senior attorney licensed in California since 1977 and in Arizona since 2000. He has remained continuously in good standing in both jurisdictions and has never been subject to discipline, probation, or censure. Mr. Allen works in the same firm as Mr. Moring and was first approached by Mr. Wilson in late January 2025 regarding potential substitution of counsel in this case. Mr. Wilson had conveyed growing concern about the quality of his prior representation by MLG Lawyers ("MLG") and expressed that he felt uninformed about the status of the case and MLG's strategy for defending him and his entities.

Shortly after first appearing in the case, on February 25, 2025, Mr. Wilson, Mr. Allen, and Mr. Moring appeared for the Court's mandatory settlement conference via Zoom. During a break in proceedings, Mr. Moring inquired about the status of discovery and any pending disputes. Mr. Wilson indicated that he had not been made aware of any motions to compel or any orders regarding discovery. He expressed genuine surprise and concern about the existence of unresolved discovery issues. This prompted Mr. Allen and Mr. Moring to undertake a comprehensive review of the docket, including ECF Nos. 91, 101, 107, 118, 120, and 131. Later, after some of the filings made by Mr. Allen and Mr. Moring, those counsel were able to review the deposition transcripts of MLG attorneys Julie Chang, Douglas Schenk, John Michael, and paralegal Sabrinia Markarian. That testimony echoed and reinforced what counsel had learned from discussions with representatives of Defendants regarding what information had, and had not been, provided to Defendants.

That review revealed that Mr. Wilson had not received a copy of Foundation Auto Holdings, LLC's Second Set of Requests for Production ("RFP"), served on MLG on February 2, 2024. Mr. Wilson's statement that he had not been served with the two motions to compel or the Court's related orders was also confirmed by the MLG depositions. Ms. Chang acknowledged in her deposition that she summarized categories of responsive documents in an email to Mr. Wilson but did not transmit the actual discovery requests or advise him of the Court's rulings. Critically, the client file originally provided to Mr. Moring by MLG did not include the RFP or responses to RFP served by MLG. Mr. Moring requested information from MLG as to when Responses were served, and whether and when Mr. Wilson had received copies of the discovery

JABURG WILK
LAW FIRM

pleadings or Orders. Despite multiple follow-up requests, MLG was unable to confirm that these documents were ever sent to Mr. Wilson. Mr. Wilson testified that he never saw any specific RFPs and was not asked to review Responses.

On March 5, 2025, Mr. Moring transmitted the full RFPs to Mr. Wilson for the first time and provided clear instructions regarding their scope. Mr. Wilson responded promptly and in good faith, reviewing his records and producing several hundred pages of responsive documents, which were served on March 18, 2025. Mr. Moring simultaneously reviewed and corrected prior privilege designations, removing or revising any assertions that were not fully supported under applicable law and the Court's prior orders regarding what he understood to be a waiver of the attorney/client privilege in this case. Documents previously withheld on the basis of attorney-client privilege were either reclassified or produced, and privilege was asserted only where Mr. Moring understood it to be appropriate given the limited protection provided to these communications in the Court's Order regarding waiver of privilege (DKT#101).

At the Court's recent hearing on April 24, 2025, questions arose concerning Mr. Wilson's knowledge of discovery obligations as of December 2024. There were also questions related to his prior discovery responses, and whether Mr. Wilson had been informed by his counsel that the Court had issued rulings and the Court had found those responses to be deficient or incomplete. While it is undisputed that Mr. Wilson received an email from Ms. Chang summarizing general discovery categories, that record also shows he did not receive the actual RFP, motions to compel, or the Court orders, including those that were pending when Ms. Chang began her email exchange. Based on their independent review and personal interactions with Mr. Wilson, both Mr. Moring and Mr. Allen found his lack of knowledge credible and consistent with the record. Mr. Allen, in particular, emphasized that Mr. Wilson appeared genuinely unaware of the underlying disputes during their conversations at and after the settlement conference.

Since entering the case, Mr. Moring and Mr. Allen have made every effort to correct the record, fulfill all discovery obligations, and comply with all pleading requirements and other Orders of the Court. Neither counsel has found evidence of any intentional misconduct or intentional misstatements by Mr. Wilson. Rather, the fact is that prior counsel failed to adequately

BRIEF IN SUPPORT OF RESPONSE OF                                    CASE NO. 1:21-CV-00970-EPG
DAVID L. ALLEN AND THOMAS S. MORING        4
TO ORDER TO SHOW CAUSE                                          24377-24377-00001\RLC\TSM\6475483v0

communicate with Mr. Wilson or to keep him adequately informed. Once new counsel was retained, Defendants moved swiftly to address all outstanding issues and bring the case into compliance, including providing Mr. Wilson with copies of the served discovery and open Orders.

In sum, this matter involves a substitution of counsel into a complex, long-standing case where discovery disputes predated their involvement. Since their appearance, counsel have worked professionally and diligently to resolve all deficiencies and attempt to address disputes. Throughout this process his current attorneys have acted with integrity, diligence, and respect for this Court's authority at every stage.

## III.    LEGAL STANDARDS

Within the federal system, "each district court is authorized to govern and discipline its own bar." *United States v. Hayes*, 2:24-CR-0280-DJC, 2025 WL 235531, at *6 (E.D. Cal. Jan. 17, 2025), *reconsideration denied*, 2:24-CR-0280-DJC, 2025 WL 1067323 (E.D. Cal. Apr. 9, 2025) (quoting *Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1198 (9th Cir. 1999). The district court may issue sanctions for violating federal rules, its local rules, and also under its inherent authority. *See Fink v. Gomez*, 239 F.3d 989, 991-92 (9th Cir. 2001); *Zambrano v. City of Tustin*, 885 F.2d 1473, 1480 (9th Cir. 1989). "Broad deference is given to a district court's interpretation of its local rules." *Bias v. Moynihan*, 508 F.3d 1212, 1223 (9th Cir. 2007) (citing *Christian v. Mattel, Inc.*, F.3d 1118, 1129 (9th Cir. 2002)).

Attorneys practicing in the United States District Court for the Eastern District of California are subject to the ethical standards established by the California State Bar. Local Rule 180(e) incorporates these standards, including the California Rules of Professional Conduct. Rule 3.3 governs an attorney's duty of candor to the tribunal and applies to all lawyers.

### A.    28 U.S.C. § 1927

Under 28 U.S.C. 1927, a court has the authority to issue sanctions where an attorney's conduct (i) is unreasonable and vexatious, (ii) multiplies the proceedings, and (iii) results in excess costs, expenses, or attorney's fees. 28 U.S.C. § 1927 (West 2005). Counsel's conduct must multiply the proceedings in both an "unreasonable and vexatious manner." *B.K.B. v. Maui*

BRIEF IN SUPPORT OF RESPONSE OF                           CASE NO. 1:21-CV-00970-EPG
DAVID L. ALLEN AND THOMAS S. MORING          5
TO ORDER TO SHOW CAUSE                                      24377-24377-00001\RLC\TSM\6475483v0

*Police Dep't*, 276 F.3d 1091, 1107 (9th Cir. 2002). "The key term in the statute is 'vexatiously'; carelessly, negligently, or unreasonably multiplying the proceedings is not enough." *In re Girardi*, 611 F.3d 1027, 1060–61 (9th Cir. 2010).

The Ninth Circuit consistently holds that sanctions pursuant to § 1927 must be supported by a finding of **subjective bad faith**. *See Estate of Blas ex rel. Chargualaf v. Winkler*, 792 F2d 858, 860 (9th Cir. 1986); *see also Barnd v. City of Tacoma*, 664 F.2d 1339, 1343 (9th Cir. 1982). "Subjective bad faith" is present when an attorney "knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *In re Keegan Mgmt. Co., Sec. Lit.*, 78 F.3d 431, 436 (9th Cir. 1996) (internal quotations omitted). Accordingly, because sanctions are an "extraordinary remedy," they should be imposed with extreme caution. *Id.* (reversing an order of sanctions where sanctions were imposed due to "perceived misconduct").

Thus, "[f]or sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass . . . . [R]eckless nonfrivolous filings, without more, may not be sanctioned." *Id.*; *see also Edwards v. Alameda-Contra Costa Transit Dist.*, 796 F. App'x 461, 462 (9th Cir. 2020) (imposition of any sanction under 28 U.S.C. § 1927 must be accompanied by a finding that the sanctioned attorney acted recklessly or in bad faith or committed intentional misconduct).

In the context of § 1927, frivolousness "should be understood as referring to legal or factual contentions so weak as to constitute objective evidence of improper purpose." *In re Girardi*, 611 F.3d 1027, 1062 (9th Cir. 2010) (a frivolous filing subject to sanctions under § 1927 is one "that is both baseless and made without a reasonable and competent inquiry"). If a filing is frivolous, it need only be submitted recklessly, with knowledge. *In re Keegan*, 78 F.3d at 436; *see also Estate of Blas*, 792 F.2d at 860 (denying request for sanctions because "a frivolous argument is insufficient to support an award of sanctions" under § 1927").

BRIEF IN SUPPORT OF RESPONSE OF                                       CASE NO. 1:21-CV-00970-EPG
DAVID L. ALLEN AND THOMAS S. MORING              6
TO ORDER TO SHOW CAUSE                                              24377-24377-00001\RLC\TSM\6475483v0

**B.     Federal Rules of Civil Procedure**

**1.     Rule 11**

Rule 11 authorizes the imposition of sanctions for filings that are not well-grounded in fact or law or that are submitted for an improper purpose. *See* Fed. R. Civ. P. 11(b). Attorneys must conduct a reasonable inquiry into the factual and legal basis of their representations. *See Islamic Shura Council of S. Cal. v. F.B.I.*, 757 F.3d 870, 872 (9th Cir. 2014); *Business Guides, Inc. v. Chromatic Comm. Enters., Inc.*, 498 U.S. 533, 551 (1991).

Although Rule 11 is a potent remedy, courts emphasize that it should be applied only in "rare and exceptional" circumstances. *See Operating Eng'rs Pension Tr. v. A-C Co.*, 859 F.2d 1336, 1344–45 (9th Cir. 1988); *McAllister v. Adecco Grp. N.A.*, 2017 WL 11151055, at *2 (D. Haw. Feb. 16, 2017). Rule 11 does not apply to discovery conduct, which is governed by Federal Rules of Civil Procedure 26(g) and 37. Sanctions under Rule 26(g) are mandatory for violations, but the court retains discretion over the type of sanction imposed.

**2.     Rule 37**

Rule 37 provides that, "[i]f a party or a party's officer, director, or managing agent fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders." Fed.R.Civ.P. 37(b)(2)(A). This Rule gives the Court broad discretion in reviewing whether sanctions are appropriate in a particular case, and if there is a finding that sanctions are appropriate provides the Court the ability to decide the appropriate sanction. Prior to deciding whether to issue sanctions, the Court should consider whether the party subject to the sanction has violated a particular Court order.  Fed.R.Civ.P. 37(b)(2)(A); *Wanderer v. Johnston*, 910 F.2d 652, 657 (9th Cir.1990). even if there is a finding of a particular violation of one or more Court Orders, the  "district court has great latitude in imposing sanctions for discovery abuse." *Dahl v. City of Huntington Beach*, 84 F.3d 363, 367 (9th Cir.1996)

**3.     Rule 26(g)**

Rule 26 (g) applies to signing discovery responses, and applies a similar requirement to discovery as that imposed on pleading sunder Rule 11, Federal Rules of Civil Procedure. *See*

Fed.R.Civ.P. Rule 26(g)((1)(B)(i) and (ii).  The Court has the power under this Rule to issue appropriate sanctions for an improper certification.  Fed.R.Civ.P. Rule 26(g)(3).

### C.    The Court's Inherent Authority

Federal courts possess broad inherent authority to impose sanctions for litigation conduct undertaken in bad faith, including willful misrepresentations, obstruction of judicial proceedings, or abuse of the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991). However, the exercise of this inherent power requires a specific finding that the party acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Id.*

The Ninth Circuit has clarified that "[b]efore imposing sanctions, the court must find that the conduct constituted or was tantamount to bad faith." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997). A party "demonstrates bad faith by delaying or disrupting the litigation or hampering the enforcement of a court order." *Id*. at 649; *see also Braunstein v. Arizona Dep't of Transp.*, 683 F.3d 1177, 1189 (9th Cir. 2012) ("Recklessness suffices for § 1927 sanctions, but sanctions imposed under the district court's inherent authority require a bad faith finding.").

This standard may be satisfied where a party knowingly misrepresents facts to the court. *See Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001); *see also Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) ("Courts are invested with inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'").

Importantly, "[b]ecause of their very potency, [the court's] inherent powers must be exercised with restraint and discretion." *Chambers* at 44; *see also Primus*, 115 F.3d at 650 ("Because the district court's inherent powers are so potent, we require courts levying sanctions to assess an attorney's individual conduct and to make an explicit finding that he or she acted in bad faith.").

## IV.    ARGUMENT

Sanctions of counsel for making false statements of fact to the tribunal and failing to correct false statements of material fact previously made to the tribunal are inappropriate in this

case because there is no evidence that any such statements of counsel were knowingly false, materially misleading, or made in bad faith, and in compliance with their professional obligations.

**A.    Neither Counsel Acted with Intent, Recklessness, or in Bad Faith**

None of Mr. Allen's or Mr. Moring's conduct rises to the level of bad faith, recklessness, or intentional misconduct necessary to justify sanctions. Their filings, declarations, and representations to the Court were based on a diligent, good-faith investigation of the record and a reasonable understanding of federal law. Mr. Moring was admitted pro hac vice and formally substituted into the case on February 20, 2025 – less than two months ago – despite this litigation having been ongoing for years. Upon assuming representation, Mr. Moring and Mr. Allen promptly requested and began reviewing the client file, identified gaps in the prior discovery record, and took immediate remedial steps to ensure compliance with outstanding obligations. These steps included reviewing prior privilege designations, serving additional document production on March 18, 2025, and ensuring that previously withheld documents were produced in accordance with the Court's orders.

At all times, Mr. Allen and Mr. Moring acted with transparency and diligence. There is no evidence to suggest they attempted to harass, delay, or obstruct these proceedings. Their efforts stand in stark contrast to the conduct at issue in *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 948 (9th Cir. 1992), where the court found sanctions appropriate due to repeated violations of court orders and a pattern of obstruction that stalled the case's progression to trial. Here, no such pattern exists. Instead, new counsel has worked in earnest to assist the Court in resolving discovery disputes inherited from prior counsel, and to ensure full compliance moving forward.

As the Ninth Circuit has made clear, sanctions are not warranted where an attorney's conduct, viewed objectively, reflects a good-faith effort to comply with the Court's expectations and not an attempt to mislead. *See Yagman v. Republic Ins.*, 987 F.2d 622, 628 (9th Cir. 1993) (vacating sanctions where there was no evidence of bad faith or intent to mislead). That principle applies squarely here.

BRIEF IN SUPPORT OF RESPONSE OF                    CASE NO. 1:21-CV-00970-EPG
DAVID L. ALLEN AND THOMAS S. MORING      9
TO ORDER TO SHOW CAUSE                              24377-24377-00001\RLC\TSM\6475483v0

**B.    The Ninth Circuit Refuses to Impose Sanctions in Parallel Cases**

The Ninth Circuit has consistently declined to impose sanctions in cases involving alleged misrepresentations or errors unless there is clear evidence of bad faith, recklessness, or an improper purpose.

In *Miller v. City of Los Angeles*, the court emphasized that sanctions are warranted only for "a clear-cut or egregious violation" rather than a "minor or ambiguous transgression." *Miller v. City of Los Angeles*, 661 F.3d 1024, 1026 (9th Cir. 2011). The court stated that it will not sustain a district court's finding imposing sanctions unless the record clearly shows "what line [the attorney] crossed and how far he crossed it." *Id.*

Similarly, in *Harris v. Polskie Linie Lotnize*, the Ninth Circuit refused to impose sanctions under either § 1927 or the Federal Rules for alleged misrepresentations in a brief. *Harris v. Polskie Linie Lotnize*, 820 F.2d 1000, 1005 (9th Cir. 1987). The court noted that the appellant had raised substantial issues regarding the district court's choice, and although some arguments were "less weighty" and "inaccurate", they were not wholly without merit and therefore the alleged misrepresentations did not constitute recklessness or bad faith. *Id.*

Likewise, in *Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Loc. 996*, the Ninth Circuit discarded an employer's argument for sanctions based on a theory that a union's denials of allegations in employer's complaint were false and misleading and had the effect of unreasonably and vexatiously multiplying proceedings. *Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Loc. 996*, 302 F.3d 998, 1012 (9th Cir. 2002). The court held that employer had not demonstrated the required recklessness or bad faith on union's part, had not shown how union's conduct unreasonably multiplied proceedings, and failed to provide adequate factual support for its Case. *Id.*; *see also Oliver v. In-N-Out Burgers*, 945 F. Supp. 2d 1126, 1130–31 (S.D. Cal. 2013) (court declined sanctions where defendant failed to establish that plaintiff made fraudulent misrepresentations or falsified evidence; defendant offered no actual evidence supporting its allegations; "Court will not sanction a party based on speculation.").

The Court must find concrete support for the proposition that Defendant's counsel intentionally and in bad faith made false statements or intended to mislead the Court. *see Zambrano*, 885 F.2d 1473 (negligently failing to comply does not support sanctions); *MGIC Indem. Corp. v. Moore*, 952 F.2d 1120, 1121-22 (9th Cir. 1991) (reversal of sanctions required where district court's observations were as consistent with negligence as with bad faith).

Nor is recklessness alone sufficient to justify sanctions. In *Gomez v. Vernon*, the Ninth Circuit outlined the level of egregious conduct necessary for a court to invoke its inherent authority to impose sanctions. *Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001), overruled on other grounds by *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) (en banc). The court made clear that "[r]ecklessness, of itself, does not justify the imposition of sanctions, [but] sanctions are available when recklessness is combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Id.* at 994 (cites omitted). In *Gomez*, sanctions were upheld only because the attorneys had knowingly disregarded advice from bar counsel, attempted to circumvent ethical obligations to gain an advantage in litigation, and failed to disclose their possession of privileged materials for eight months. *Id.*

By contrast, in *Mendez v. City of San Bernardino*, the Ninth Circuit declined to impose sanctions where plaintiff's counsel failed to appear at an order to show cause hearing. *Mendez v. City of San Bernardino*, 540 F.3d 1109, 1131–32 (9th Cir. 2008). Although the district court described the attorney's conduct as "totally frivolous," "outrageous," and "appalling," the Ninth Circuit held that the behavior did not satisfy the high threshold necessary for sanctions under the court's inherent powers. As the court emphasized, such powers "must be exercised with restraint and discretion." *Id.*

**C.     Neither Counsel Violated the Rules of Professional Conduct.**

Mr. Allen and Mr. Moring have not violated any ethical obligations under the ABA Model Rules of Professional Conduct, the California Rules of Professional Conduct, or the California Business and Professions Code. Rule 3.3(a)(1) of the ABA Model Rules, which governs candor toward the tribunal, prohibits a lawyer from ***knowingly*** making false statements of fact or law to the court, or failing to correct a false statement previously made. Similarly, California Rule of

Professional Conduct 5-200(B) provides that an attorney "shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law." These obligations are echoed in California Business and Professions Code § 6068(d), which requires attorneys to pursue their client's causes "only as are consistent with truth," and never to mislead the Court.

There is no evidence that Mr. Allen or Mr. Moring knowingly made false statements or attempted to mislead this Court. On the contrary, upon assuming representation just weeks ago, Mr. Moring – working with Mr. Allen – took prompt action to review the case file, address outstanding discovery issues, and ensure compliance with the Court's orders. The record demonstrates that any prior inconsistencies or omissions in discovery predate their involvement, and that they have diligently worked to correct the record and provide accurate information. Their conduct reflects an effort to clarify, not obfuscate.

This case is nothing like *In re Girardi*, 611 F.3d 1027, 1035 (9th Cir. 2010), where the court sanctioned an attorney who knowingly made false representations to a federal tribunal. Nor is it comparable to *Mendez v. Superior Court*, 162 Cal. App. 4th 827, 834 (2008), where counsel was found to have intentionally misled the judge. Here, there has been no showing – let alone a clear one – of ***any falsehood***, much less one made knowingly. As the California Court of Appeal explained in *State Comp. Ins. Fund v. WPS, Inc.*, 70 Cal. App. 4th 644, 656 (1999), the ABA Model Rules may be used as persuasive guidance on matters of professional conduct in California, but even under that standard, the evidence falls well short of demonstrating a violation.

Moreover, this matter aligns closely with *Miller v. City of Los Angeles*, 661 F.3d 1024 (9th Cir. 2011). As the Ninth Circuit held, a party's failure to disclose or correct an alleged falsehood cannot support sanctions unless the omitted or misstated fact is both false and material to a pending issue. *Id.* at 1029. Here, as in *Miller*, Defendants' counsel cannot be sanctioned for allegedly failing to disclose material facts or failing to correct a false statement of material fact when, regardless of Plaintiffs' belief, no representation to the Court was (1) false and (2) material to any live issue before the Court.

BRIEF IN SUPPORT OF RESPONSE OF                                    CASE NO. 1:21-CV-00970-EPG
DAVID L. ALLEN AND THOMAS S. MORING                 12
TO ORDER TO SHOW CAUSE

24377-24377-00001\RLC\TSM\6475483v0

Likewise, *In re Aguilar*, 97 P.3d 815, 820 (Cal. 2004), involved intentional falsehoods made directly to the tribunal. In contrast, any inaccurate or outdated discovery responses in this case were promptly addressed by new counsel, and there is no indication of intent to deceive. Under both federal and California rules, honest mistakes or inherited oversights, promptly addressed upon discovery, do not amount to ethical violations, much less sanctionable misconduct.

## V.    CONCLUSION

For the reasons set forth above, counsel for Defendants, David L. Allen and Thomas Moring, respectfully request that the Court decline to impose sanctions for alleged false statements of fact to the tribunal or for any alleged failure to correct prior statements in connection with this matter.

**DATED** this 5th day of May, 2025.

**Jaburg & Wilk, P.C.**

*/s/ Thomas S. Moring*
David L. Allen
Thomas Moring
Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on 5th day of May, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci
HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
david.holtzman@hklaw.com
daniel.kappes@hklaw.com
andrew.klair@hklaw.com
isabella.granucci@hklaw.com
*Attorneys for Plaintiff*

Forrest Booth
forrest.booth@kennedyslaw.com
Camille Zuber
Camille.Zuber@Kennedyslaw.com
KENNEDYS CMK LLP
101 California Street, Suite 1225
San Francisco, CA 94111
*Attorneys for Plaintiff-in-Intervention*

*/s/ Ana M. Canby*

BRIEF IN SUPPORT OF RESPONSE OF
DAVID L. ALLEN AND THOMAS S. MORING
TO ORDER TO SHOW CAUSE

14

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\RLC\TSM\6475483v0

# EXHIBIT A

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (SBN 075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com
Roger L. Cohen (SBN 065489)
rlc@jaburgwilk.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, <br><br> Defendants. | Case No. 1:21-cv-00970-EPG <br><br> **DECLARATION OF DAVID ALLEN** <br><br> (Assigned to Hon. Erica P. Grosjean) |
| TEMPLETON MARSH, LTD., <br><br> Plaintiff-in-Intervention, <br><br> vs. <br><br> WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, <br><br> Defendants. | |

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG
24377-24377-00001\TSM\DLA\6474006v4

I, David L. Allen, hereby declare under penalty of perjury:

1.     I am over the age of 18.

2.     I am competent to testify to the matters set forth herein.

3.     If called to testify I would testify in conformity with the information contained herein.

4.     The matters set forth herein are true and correct, and based on my personal knowledge.

5.     I make and sign this declaration freely and voluntarily.

6.     I am a licensed attorney in the States of California and Arizona, and along with Thomas Moring and Roger Cohen am counsel for the Defendants in this action.

**Background and Bar Admissions**

7.     I was admitted to practice law in California in 1977, and have remained continuously licensed in the state and in good standing with the California Bar since that time.

8.     I was admitted to the Arizona Bar in 2000, and have remained continuously licensed in the state and in good standing with the Arizona Bar since that time.

9.     I have not been subject to probation, censure, or discipline in either of these States since my admission.

**History with the Defendant CJ Wilson**

10.     I have previously represented CJ Wilson and another of his entities in a case in the Superior Court of Ventura County, California.

11.     The nature of that case was a commercial landlord/tenant dispute.

12.     I was hired in that case to represent the defense.  As part of my role, among other things, I prepared an Answer, participated in written and oral discovery, defended Mr. Wilson's deposition, and represented him at a settlement conference. The case was eventually settled shortly before it was scheduled for trial.

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

13. As part of that process, I spent considerable time with and got to know Mr. Wilson.

14. Through that case, I was obligated to provide disclosures and discovery to the other side.

15. As part of that process, I regularly communicated with Mr. Wilson and his assistant/accountant Ann Zimmerman regarding the discovery process, including requesting certain documents, and going through answers to specific interrogatories or requests for admission.

16. I spoke to Mr. Wilson on the phone regarding the discovery requests in that case, and he and I discussed how to respond to discovery.

17. When I asked Mr. Wilson for documents, I found him to be responsive and cooperative and I understood that he was providing me with documents relevant to the requests, without regard to whether they were beneficial to his case or our theory of the defense.

18. I never had a situation where I asked Mr. Wilson for documents and he refused to provide them to me.

19. On occasion, I would ask for documents and was told that those documents did not exist. I never had occasion to question his statements that documents did not exist if that is what he told me.

20. I consistently turned over to Plaintiff in that litigation all documents provided to me by Mr. Wilson, except where there was a claim of privilege. In that instance I would create a privilege log and provide that along with a description of documents not produced.

21. While the case was contentious, there was never any allegation by the other side of any discovery violations.

3

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

22. In that case there were never any motions filed related to discovery matters. Thus, I never had occasion to discuss such motions with Mr. Wilson, or discuss with him the potential sanctions for failing to produce information, or any form of discovery sanctions.

**History of the Present Action**

23. On or about February 5, 2025, I was contacted by Mr. Wilson's corporate counsel, Reggie Borkum, regarding my possible appearance in this action.

24. I knew Mr. Borkum though my work in the prior case referenced above.

25. Mr. Borkum explained that Mr. Wilson, and two of Mr. Wilson's entities, were defendants in a lawsuit related to the failed sale of three of his automobile dealerships in Fresno, California.

26. Mr. Borkum informed me that the case had been filed in 2021 and that Mr. Wilson had retained the law firm of MLG Attorneys at Law ("MLG") located in Costa Mesa, California, to represent the defendants.

27. Mr. Borkum further informed me that over the years MLG had repeatedly changed the lawyer at their firm in charge of the case, mostly because the MLG lawyers that were getting assigned repeatedly left the law firm. Based on my later review of the billing records, it appears MLG billed time for ten separate lawyers during the time MLG had the case

28. On February 5, 2025, Mr. Borkum asked me if I would sit in (without talking) on a zoom call scheduled for late that day with MLG attorney Douglas Schenck, who had just recently become the latest MLG attorney assigned to handle the case, to discuss the status of the case the and strategy going forward, which I agreed to do and did in fact do. During that call it was readily apparent that Mr. Schenck had very little knowledge about the facts of the case; he was unable to provide an adequate explanation of the status of the case; nor was he able to explain any strategy going forward.

4

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

29. Immediately following that zoom call with Mr. Schenck, I had a telephone call with Mr. Borkum and Mr. Wilson in which we all agreed that Mr. Schenck had very little knowledge about the case and appeared to be unqualified to handle a case of this nature. Mr. Borkum and Mr. Wilson then asked me if I would be willing to take over the case. I said that I would; however, in that there was then pending a settlement conference scheduled for February 25 with Magistrate Judge Baker, I told them that they should ask Mr. Schenck to file the Settlement Conference Statement before deciding to move on from representation by MLG, and that I would then attend the Settlement Conference with Mr. Wilson, to which they agreed.

30. Following that February 5 telephone call, I asked my partner, Tom Moring, an experienced trial attorney, to become admitted in California *pro hac vice*, and to work on this case with me, which he agreed to do. Mr. Moring had previously worked on another case involving Mr. Wilson in California which culminated in a several day trial in the Superior Court of Los Angeles County, so he and Mr. Wilson were already familiar with each other.

31. Mr. Moring and I proceeded to review the Court's docket, and at that time became aware of the ongoing discovery issues, including the filing of two motions to compel and the issuance of a Court Order on the first motion. I then asked Mr. Wilson if he had been informed by MLG about the existence and nature of the disputes and/or the issuance of the Court Order, and he told me that he had not.

32. The Order granting our substitution occurred on March 5, 2025 (DKT #153).

### Initial Conversations With Mr. Wilson

33. As part of the process of learning about the case, I reviewed the Court's docket.

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

34.    From my review of the docket, I saw that there were several discovery motions that had taken place and some that were still pending.

35.    I asked Mr. Wilson about his knowledge of these filings.  He indicated to me that he was not aware of any of the specific filings.

36.    I asked him if he had seen copies of any of the pleadings or orders in the docket, and he indicated he had not.

37.    Mr. Wilson's statements in this regard was corroborated by the deposition of Douglas Schenk at P.14 Line 6-P. 17 Line 12, when Mr. Schenk described his communications with Mr. Wilson and Defendants.  Mr. Schenck was also asked if he had sent the Foundation RFP to Mr. Wilson or his employees or Mr. Borkum- those were marked as Exhibits 2-4 in Mr. Schenk's deposition.  Mr. Schenk confirmed he never sent those RFP, and was not aware if anyone at MLG did.  Deposition of Douglas Schenk at P.18 Line 7-P. 19 Line 24. *See* **Exhibit B**, Deposition of Douglas Schenk conducted March 31, 2025.

38.    Counsel at MLG reinforced my understanding of Mr. Wilson's lack of awareness in a series of emails dated December 6 to 11, 2024, among Julie Chang, Chief Legal Officer of MLG, Mr. Borkum and Mr. Wilson (the "Chang Emails"), which show, among other things, that Ms. Chang provided a list of seven categories of documents and mentioned that a Motion to Compel had been filed, but did not attach any specific pleadings, orders, or even copies of the original discovery requests. At the time Ms. Chang sent her emails, Foundation's Motion for Leave to File: Request for Further Sanctions (DKT #107) was already pending, and a hearing had been set for January 10, 2025.  Ms. Chang's email does not mention that filing or the forthcoming hearing, and the filing was not attached to her email. A copy of the Chang Emails, which was marked as Exhibit 2 to her deposition, is attached hereto as **Exhibit A**.

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

JABURG WILK

LAW FIRM

39.     In my discussions with Mr. Wilson, it was clear to me that no one at MLG had ever explained to him the precise nature of the supposed discovery violations, the potential sanctions – monetary and otherwise, or the full extent of the potential adverse consequences of failure to comply with the discovery orders that had never been provided to him.

### Mr. Wilson Receives Specific Requests from Jaburg Wilk

40.     Only when Jaburg Wilk appeared as counsel of record did Mr. Wilson understand that there was a claim that document requests were deficient, incomplete, or otherwise not in compliance with the Federal Rules of Civil Procedure or any prior Court Orders.

41.     I believe that this conclusion is again supported by Mr. Wilson's responses in the Chang Emails, Ex. A.  For example, in Mr. Wilson's response to Ms. Chang,  he noted that MLG, who had been his counsel for the New Motor Vehicle Board matter, had in their possession all of the requested documents regarding that case.  His specific response was "I am confused as to the request for settlement documents with AoA/VW- as your firm was the one that handled all these negotiations."

42.     I explained to Mr. Wilson that Defendants had been ordered to pay a monetary sanction.  He told me that he was unaware of the Order to pay $12,463.13, or that the Court had issued that Order on February 6, 2025 (DKT# 131).

43.     I explained that the Order came after a contested hearing, and asked if he had attended that hearing on October 24, 2024 (DKT# 100).  He indicated that he did not attend it and that he did not even know about it.

44.     Mr. Wilson indicated that, prior to my involvement, he was not told of the specific date(s) of any hearings in this case, and was never advised that he should or could attend any such hearings.

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

45.    He indicated to me that during the representation by MLG, he had many lawyers assigned to his file, and that he would often feel like he was starting over when a new lawyer was assigned.

46.    Based on discovery propounded by Foundation, I came to learn that during their representation, from 2021-2024, Mr. Wilson had ten different lawyers at MLG who worked on his file in some capacity, along with additional staff.

47.    Mr. Wilson indicated to me his high degree of frustration that he did not have a single point of contact with MLG, had a difficult time obtaining information at all, and was rarely provided documents from the case, even when he would ask for information obtained by MLG regarding production from Foundation, for example, as he was requested from Ms. Chang in the Chang Emails, Ex A.

48.    These statements are corroborated by the Declaration and deposition testimony of Douglas Schenk, who testified that he did not inform Mr. Wilson of the hearings in December 2024 and January 2025, and that Mr. Schenk, who was then lead counsel,  was unaware of anyone at MLG communicating either the date of the hearings, or the results of those hearings.  *See* Exhibit B, Deposition of Douglas Shchenk taken March 31, 2025, at pages 13:15-14:24.

**Emails To/From MLG**

49.    At the recent hearing on April 24, 2025, the Court asked specific questions regarding the Chang Emails.

50.    The Court has asked me to explain why my statements to the Court, including in ECF #140, ECF # 148, ECF # 156, and ECF #164 were not materially false, or if known to be materially false statements to the tribunal were not correct.

51.    My belief was, and remains, that the statements were not materially false.

52.    For the Court's ease I have set out a chart of the statements mentioned in ECF # 178, and my response to each.

8

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

| | Statement | Comments |
|---|---|---|
| A. | "Defendants were never provided with any of the specific Requests for Production" | Ms. Chang's email only sets forth seven general categories of information, but does not attach the specific Requests for Production, of which Foundation served a nearly identical copy on each Defendant. Until my office sent it to him, Mr. Wilson had not been provided with a copy of the actual RFP in dispute. He did receive Ms. Chang's summary request in December 2024, to which he promptly responded. Based on the response email from Mr. Wilson on December 9, 2024, MLG produced and served on December 13, 2024 responses to Foundations RFP, Set Two related to these requests. *See* DKT#166-1 (Declaration of A. Klair) Pages 16-21 of 210. |
| B. | "Defendants were never asked additional questions about the specific requests" | As detailed above, I believed and believe that the Defendants were not provided with the specific requests prior to my appearance in the case. However, I agree that my office did provide the specific requests to Defendants, and asked Defendants to conduct a further review of their files to be sure all responsive documents were produced. To the extent that this statement was interpreted to mean that at no time, including after my office took over the defense of the case did Defendants **ever** receive the requests, I acknowledge that is not accurate. My intent was to communicate that *prior to my involvement* in the case prior counsel had never provided Mr. Wilson the actual requests, or instructions to search for responsive documents. This statement should be qualified to reflect that Defendants were not asked additional questions about specific requests prior to Jaburg Wilk's involvement. This is illustrated by review of Ex A, and Mr. Wilson's Response December 9, 2024 By way of illustration, in her email of December 6, 2024, Ms. Chang asks about "7. Settlement agreement with Audi in CJ's |

9

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

| | Statement | Comments |
|---|---|---|
| | | Road to Lemans Corp v. VWGoA, Inc. and documents submitted to the CA New Motor Vehicle Board in connection with the matter." Mr. Wilson responded on December 9, 2024, in regard to that statement that "I am confused as to the request for settlement documents with AoAVW- as your firm was the one that handled all of these negotiations." <br><br> Apparently, based on this response, MLG believed they had enough information to provide responses dated December 13, 2024 to Foundations RFP, Set Two related to these requests. *See* DKT#166-1 (Declaration of A. Klair) Pages 16-21 of 210. It is my understanding that there were no additional questions asked by MLG to Mr. Wilson regarding this, or any other, request. |
| C. | "None of the attorneys communicated to him the pending motions and the serious nature of the failure to comply with discovery requests" | On December 10, 2024, Ms. Chang communicated to Mr. Wilson that a failure to produce "the financial statements (audited), and profit and loss statements, may lead to contempt proceedings. I just want you to be aware of that risk. So, if you are able to provide *audited* financials, then please send." Mr. Wilson did produce audited financials, a fact confirmed by Foundation. Mr. Wilson was not told that the failure to produce other information could lead to contempt proceedings. In any event, in his response to Ms. Chang on December 9, 2024, he provides responses to all seven categories of information. This lead to the December 13, 2024, Response to Foundation RFP served by MLG. The only further request by Ms. Chang was for audited financials, on December 10, 2024. <br><br> It is correct that in that same December 11, 2024, email there is a single reference in the MLG Emails to a "Motion to Compel." Read in context, Ms. Chang's reference to that Motion appears to relate to subpoenas issued |

10

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

| | Statement | Comments |
|---|---|---|
| | | to MLG and to Reggie Borkum, not to the Defendants.  Ms. Chang states "If I am not mistaken, the subpoena to you was the same as the subpoena to MLG.  We have objected on the grounds of attorney client privilege and a Motion to Compel has been filed by Foundation." This email, directed to Mr. Borkum, does not indicate any Motion filed against Defendants, although there was in fact a Motion for further sanctions filed on December 5, 2025 (DKT#107) Ms. Chang did not specifically reference or include a copy of that Motion against Defendants in her email.  According to deposition testimony of MLG representatives, no copy of DKT#107 was ever provided to Mr. Wilson by MLG. EX B, deposition of Mr. Schenk. |
| D. | "Mr. Wilson had no idea that there were discovery requests that were outstanding, that were not being responded to" | See Items A, B and C, above. Mr. Wilson never received from MLG the actual RFP Set 2 that was later provided to him by Jaburg Wilk.  He was aware from Ms. Chang that there were seven general categories requests, and he promptly responded to MLG on each of these.  That lead to MLG's December 13, 2024 Response to RFP Set #2 and the issue was not brought to Mr. Wilson's attention again.  The exception to this statement was the audited financials, which he did provide. |
| E. | "He had no idea that any motion had been filed to compel further discovery" | Again, this statement considered in context is true and correct.  Mr. Wilson was not aware that there were motions to compel filed against **Defendants**. Ms. Chang indicated that a failure to provided audited financials could result in a contempt finding. Mr. Wilson provided the audited financials, and therefore had no reason to be concerned about any possible contempt.  Mr. Wilson was also aware, from the Chang Emails, that a Motion to Compel had been filed against MLG, related to a subpoena served on MLG to which it had objected. To the extent that |

11

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

| Statement | Comments |
|---|---|
| | he understood the impact of that proceeding, Mr. Wilson was not informed that the proceeding was against him, and was in fact told it was against MLG and ***not*** Defendants. At the time Ms. Chang sent that email there was in fact a second Motion to Compel (DKT #107) that she failed to mention or attach. MLG was certainly aware of it, since they filed a Response to the second Motion to Compel (DKT #118), although they did not provide Mr. Wilson a copy of either the Motion or Response. Mr. Wilson also was not made aware of the oral argument on this second Motion to Compel, held January 24, 2025 (DKT #120). |
| F. "Defendants were not even aware that there was a dispute over the production of documents" | See Items A-E above. Ms. Chang made clear that a refusal to produce audited financials could lead to contempt proceedings. Mr. Wilson produced them, following her email. MLG did not notify Mr. Wilson of the allegations in, or provide a copy of DKT #107, where Foundation asserted that the lack of financials warranted terminating sanctions. That document, styled "Plaintiff Foundation Auto Holdings, LLC's Motion for Leave to File; Request for Further Sanctions" was pending when Ms. Chang began emailing on December 6, 2024 with Mr. Wilson, but she neither provided it nor made reference to it.<br><br>Based on my discussions with Mr. Wilson, my prior litigation experience with him, and his response when I explained the significance of DKT # 107, I believe that he was unaware of this and prior motions. |
| G. "Defendants did not know what specific requests had been made" | Jaburg Wilk suppled Mr. Wilson, via email, with the full Set 2 of Foundation's RFP on March 5, 2025. In follow up discussions with him, he explained that he had never seen this RFP. I found that statement to be |

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

| Statement | Comments |
|---|---|
| | credible, based on my exposure to the case at that time. My office specifically asked MLG for information on when the actual discovery was provided to the client, or when specific requests were sent. We never received an answer, or a copy of a transmittal email. Even after reviewing Ms. Chang's email, I believed that the specific requests were not provided, and I did not see (even when I requested it) any evidence that would show the specific requests had been delivered to Mr. Wilson. I consider Ms. Chang's December, 2024 emails to be a listing of general categories, as opposed to the specific discovery requested by Plaintiff and Intervenor, or the items called out by number in the various Motions to Compel. |

53.    I telephonically attended the April 24, 2025, hearing, and have reviewed the transcript of the hearing, as well as the Minute Order of this Court issued on April 24, 2025, directing me to "show cause why sanctions should not issue for making false statements of fact to the tribunal and failing to correct false statements of material fact previously made to the tribunal."

54.    Based upon the Minute Order and the transcript of the Hearing held April 24, 2025, I understand that the Court's concerns pertain to a number of statements in pleadings signed by me, with both my name and Mr. Moring's name on them, which the Court believes are false, based in part on the Chang Emails.

55.    I first received the Chang Emails on February 22, 2025, a Saturday.

56.    I reviewed the Chang emails contemporaneously with such receipts.

57.    Following that review, I participated in the depositions of four employees of MLG, being MLG attorneys Jonathan Michaels, Julie Chang and Douglas Schenck, as well as of MLG paralegal Sabrina Makarian. At all four depositions, each of the

13

DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

deponents testified that they had never provided to Mr. Wilson the actual Request for Production of Documents, copies of the two Motions to Compel or any other pleadings related thereto, or the Court Order granting the first Motion to Compel.

58.    I did not learn anything in my review of the Chang Emails or in those depositions that made me believe that the statements made in prior pleadings were false or misleading.

59.    Rather, the information I obtained made me more convinced that MLG had not kept Mr. Wilson informed of the progress of the case or of the serious allegations regarding discovery violations, or the existing and pending sanctions orders.

60.    That belief was bolstered in Ms. Chang's deposition, when she stated she did not advise Mr. Wilson or Mr. Borkum of the Order on the Motion to Compel (Depo of Julie Chang on March 22, 2025, DKT 172-1 at Page 13-14 of 35.

61.    In general, and as shown by all of the foregoing, I never intentionally mislead the Court by providing any information that I understood at the time to be false, or by failing to later correct any information that I later learned to be false, and I apologize to the Court if it appears for any reason that I have done so.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: May 5, 2025              /s/ David L. Allen
                               David L. Allen

14
DECLARATION OF DAVID L. ALLEN ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\6474006v4

# EXHIBIT A

## RE: Foundation v. Wilson - Additional Documents

**From: Julie Chang <jchang@defectattorney.com>**          Wed, Dec 11, 2024 at 1:52 PM PST (GMT-08:00)
To: Reggie Borkum <rborkum@btadvisor.com>; CJ Wilson <cj.wilson@porschefresno.com>
Cc: Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan <Jwhelan@defectattorney.com>; Sabrina
Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>; Henry Huang
<hhuang@defectattorney.com>

Reggie,
As mentioned, I believe the subpoenas issued to you/ your firm were not objected to by our office since MLG
does not represent you/your firm.

Clovis relocation – Foundation is contending that CJ planned to relocate the dealerships prior to termination
of the APA.  Foundation's argument for the reason for CJ's premature termination of the APA.

Financial statements – These documents are sough to determine damages and to determine CJ's
compliance with financial obligations under the APA.  Again, if there is a privacy concern we can move for
protective order.

The email you provided yesterday is helpful and we will produce to Foundation.

████████████████████████████████

Thank you,
Julie


|  |  |
|---|---|
| **MLG**<br>Attorneys at<br>Law Logo | **Julie C. Chang, Esq. \| Chief Legal Officer**<br>DefectAttorney.com<br>**MLG Attorneys at Law**<br>600 Anton Blvd. \| Suite 1200 \| Costa Mesa, CA 92626<br>M. 949.284.9047 \| T. 949.581.6900 \| F. 949.581.6908<br>PRACTICE AREAS   LOCATIONS   TEAM   RESULTS |

**From:** Reggie Borkum <rborkum@btadvisor.com>
**Sent:** Wednesday, December 11, 2024 12:19 PM
**To:** Julie Chang <jchang@defectattorney.com>; CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan <Jwhelan@defectattorney.com>; Sabrina Markarian
<smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>; Henry Huang <hhuang@defectattorney.com>
**Subject:** Re: Foundation v. Wilson - Additional Documents

Why is MLG not objecting on behalf of CJ and the dealerships regarding the subpoenas issued to me and my firm?

███████████████████████████

Also, regarding financial statements, would they only be relevant if the court were to determine CJ was in breach?  Is this
something relevant to the current claimed breach?

Just trying to determine what is absolutely necessary to turn over and what can be objected to.

JC15

JC15

**EXHIBIT**

**2**

I am also curious if you feel the email I provided yesterday is something we would want to give to Foundation's counsel now

Please let me know a good time for a call to discuss all of this

--

Reggie Borkum, Esq.


BT Advisors
3021 McGraw Street
San Diego, California 92117
E-Mail: rborkum@btadvisor.com

Cellular:    (619) 857-2710
Facsimile:   (858) 815-4575


---

NOTICE: This e-mail (including any files transmitted with it) is being sent by a law firm. It is intended only for the individual or entity to which it is addressed and may contain information that is proprietary, privileged, confidential or otherwise exempt from disclosure under applicable Federal or State Law. If you are not the named addressee or the employee or agent responsible for delivering this e-mail to the named addressee, be advised that you have received this e-mail in error and you are prohibited from any dissemination, distribution or copying of this e-mail. If you have received this e-mail in error, please immediately contact the sender by reply e-mail, telephone, or facsimile.

--


**From:** Julie Chang <jchang@defectattorney.com>
**Date:** Wednesday, December 11, 2024 at 11:13 AM
**To:** Reggie Borkum <rborkum@btadvisor.com>, CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Ann Zimmerman <ann.zimmerman@bmwfresno.com>, John Whelan <Jwhelan@defectattorney.com>, Sabrina Markarian <smarkarian@defectattorney.com>, MLG LC <LC@defectattorney.com>, Henry Huang <hhuang@defectattorney.com>
**Subject:** RE: Foundation v. Wilson - Additional Documents

Reggie,
This follows my VM today.  Sorry we are playing phone tag.

Please let me introduce attorney Henry Huang (Drew is working on another team) who will be assisting on the case.

If I am not mistaken, the subpoena to you was the same as the subpoena to MLG.  We have objected on the grounds of attorney client privilege and a Motion to Compel has been filed by Foundation. We will provide you with our documents that are responsive.

As mentioned in my VM, what are your thoughts in filing a Motion for Protective Order regarding audited financial statements and profit and loss statements to address CJ's privacy concerns.

Here are a few other documents that we need:

JC16

1. Initial consents, approvals or waivers from any Manufacturer relating to the acquisition, opening or transfer of any automotive dealerships in or around Fresno, CA.

Sincerely,
Julie

**Julie C. Chang, Esq. | Chief Legal Officer**

Image removed by sender. DefectAttorney.com

**MLG Attorneys at Law**
600 Anton Blvd. | Suite 1200 | Costa Mesa, CA 92626
M. 949.284.9047 | T. 949.581.6900 | F. 949.581.6908
PRACTICE AREAS  LOCATIONS  TEAM  RESULTS

**From:** Reggie Borkum <rborkum@btadvisor.com>
**Sent:** Tuesday, December 10, 2024 9:37 AM
**To:** Julie Chang <jchang@defectattorney.com>; CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan <Jwhelan@defectattorney.com>; Drew Morgan <dmorgan@defectattorney.com>; Sabrina Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>
**Subject:** Re: Foundation v. Wilson - Additional Documents & Depo Date

Julie:

We are trying to determine how these requests are relevant to whether or not CJ breached the PSA or if Foundation failed to perform under the PSA.

Regarding the discovery request propounded on me and my firm, do you, as CJ and the dealerships' counsel, not want to object on the grounds of attorney/client privilege?  Have you received what they are asking me to produce? I have been given until December 19 by opposing counsel in which to respond.

Reggie

--

Reggie Borkum, Esq.

BT Advisors
3021 McGraw Street

JC17

San Diego, California 92117
E-Mail: rborkum@btadvisor.com

Cellular:   (619) 857-2710
Facsimile:  (858) 815-4575

---

NOTICE: This e-mail (including any files transmitted with it) is being sent by a law firm. It is intended only for the individual or entity to which it is addressed and may contain information that is proprietary, privileged, confidential or otherwise exempt from disclosure under applicable Federal or State Law. If you are not the named addressee or the employee or agent responsible for delivering this e-mail to the named addressee, be advised that you have received this e-mail in error and you are prohibited from any dissemination, distribution or copying of this e-mail. If you have received this e-mail in error, please immediately contact the sender by reply e-mail, telephone, or facsimile.

--

**From:** Julie Chang <jchang@defectattorney.com>
**Date:** Tuesday, December 10, 2024 at 9:24 AM
**To:** CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Reggie Borkum <rborkum@btadvisor.com>, Ann Zimmerman <ann.zimmerman@bmwfresno.com>, John Whelan <Jwhelan@defectattorney.com>, Drew Morgan <dmorgan@defectattorney.com>, Sabrina Markarian <smarkarian@defectattorney.com>, MLG LC <LC@defectattorney.com>
**Subject:** RE: Foundation v. Wilson - Additional Documents & Depo Date

CJ,
Thank you for your email and response. John is out of the office this week, and we need to respond to the request for production of documents so this is where I'm trying to pick up the pieces. Please send us documentation as to approval to relocate to Clovis; any documentation is acceptable.

If we do not produce the financial statements (audited), and profit and loss statements, this may be lead to contempt proceedings. I just want you to be aware of that risk. So, if you are able to provide *audited* financials, then please send.

████████████████████████████████

Thank you for your availability in January 2025; we will advise the other side.

Sincerely,
Julie

**Julie C. Chang, Esq. | Chief Legal Officer**
Image removed by sender. DefectAttorney.com
**MLG Attorneys at Law**
600 Anton Blvd. | Suite 1200 | Costa Mesa, CA 92626
M. 949.284.9047 | T. 949.581.6900 | F. 949.581.6908
PRACTICE AREAS   LOCATIONS   TEAM   RESULTS

**From:** CJ Wilson <cj.wilson@porschefresno.com>
**Sent:** Monday, December 9, 2024 6:08 PM
**To:** Julie Chang <jchang@defectattorney.com>
**Cc:** Reggie Borkum <rborkum@btadvisor.com>; Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan

JC18

JC15

<whelan@defectattorney.com>; Drew Morgan <dmorgan@defectattorney.com>; Sabrina Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>

**Subject:** Re: Foundation v. Wilson - Additional Documents & Depo Date

Julie, John  I am not sure why I am being asked to provide all of these things- I am comfortable with the following statements and backing them up:

*I am the sole shareholder/person of control for all the dealerships.  I have no financial partners, equity partners, or additional shareholders.*

*The BMW technicians are the only unionized employees on our payroll.*

*Regarding the relocation, we have been approved by the city of Clovis to relocate.   We have purchased the land, gotten entitlements and are in the initial phases of construction grading.*

*We have been approved by Audi, BMW and Porsche to relocate.  We have submitted various plans to the manufacturers and have had them approved and will be relocating ASAP.*

*I am confused as to the request for settlement documents with AoA/VW- as your firm was the one that handled all of those negotiations.   The main driver of that settlement was my willingness or request to move into the new facilities.  I am on a completely accelerated timeline on a much larger spend because of Audi's insistence on this.*

I am not comfortable sending foundation or anyone my financials at this time- in one of the other (among many) lawsuits that foundation is involved in- the court unsealed, or refused to seal, many financial documents.  I do not want my information becoming public.   I don't consent to that, and I think it's plain to say that this is a completely malicious attempt to make me and my family targets for bad actors.   I cannot believe I have to justify that statement in writing.

For that matter- I am STILL waiting for the access I requested months ago- which is everything you have on Foundation.  I have paid your firm hundreds of thousands of dollars and I should own all of that discovery so that I can conduct my own private investigation into the fraudulent nature of their business and financing.  How much did they borrow from BMO Harris?  Who else do they owe millions of dollars to?  Did they produce the documents that they submitted to the DMV?  Did they produce the documents that they sent to Porsche, Audi, BMW?

How is MLG ensuring that they are producing the proper documentation?   I have it on good authority from within the industry that Foundation is completely getting torn apart from their recent legal issues and bad operation.

The fact that they are in a lawsuit with Chuck Kramer (who was their former Chief Operating Officer 'genius insider' when we were talking) is wild.

January I would aim for the 2nd week for availability.

--------------------------------------------------------------------------------

**From:** "Julie Chang" <jchang@defectattorney.com>
**To:** "Reggie Borkum" <rborkum@btadvisor.com>, "CJ Wilson" <cj.wilson@porschefresno.com>
**Cc:** "Ann Zimmerman" <ann.zimmerman@bmwfresno.com>, "John Whelan"

JC19

<Jwhelan@defectattorney.com>, "Drew Morgan" <dmorgan@defectattorney.com>, "Saluma Markarian"
<smarkarian@defectattorney.com>, "MLG LC" <LC@defectattorney.com>
**Sent:** Friday, December 6, 2024 6:08:11 PM
**Subject:** Foundation v. Wilson - Additional Documents & Depo Date

Reggie and CJ,

Good evening.  I left a VM for both of you earlier today.  We will need to respond to additional discovery requests propounded by Foundation and provide some available dates for CJ's deposition.

Do you have the following documents in your possession that you can provide:
1. Audited financial statements from January 1, 2020 to present.
2. Profit and loss statements from January 1, 2020 to present.
3. Aside from I.A.M. National Pension Fund, any documents relating to liability to any other multi-employer union pension fund.
4. Documents to identify all shareholders/owners (and the number of shares) with equity interest in CJ's Road to Lemans Corp. dba Audi Fresno and Porsche Fresno.
5. Documents to show equity ownership of CJ's Road to Lemans Corp. dba Audi Fresno and Porsche Fresno by any Trust.
6. Documents regarding relocation of the dealership to Clovis.
7. Settlement agreement with Audi in CJ's Road to Lemans Corp. v. VWGoA, Inc.  and documents submitted to CA New Motor Vehicle Board in connection with the matter.

CJ – Please provide 2-3 dates in January 2025 that are available at this time.

Please send the documents and dates to our office early next week.

Thank you and have a great weekend.

Best regards,
Julie

**Julie C. Chang, Esq. | Chief Legal Officer**

**MLG Attorneys at Law**
600 Anton Blvd. | Suite 1200 | Costa Mesa, CA 92626
M. 949.284.9047 | T. 949.581.6900 | F. 949.581.6908
PRACTICE AREAS   LOCATIONS   TEAM   RESULTS

--
**CJ Wilson**
Owner/ Collector Car Specialist
BMW Fresno



| | |
|---|---|
| tel: 559.447.6700 | BMW Fresno |
| m: 602.918.3626 | 7171 N. Palm Ave. |
| CJ.Wilson@bmwfresno.com | Fresno, CA 93650 |

JC20

map | yelp | instagram | facebook

bmwfresno.com

JC21

# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

AUTO HOLDINGS, LLC, a Delaware )
limited liability company, )
)
       Plaintiff, )
)
vs. )Case No.
)1:21-cv-00970-JLT-
WEBER MOTORS, FRESNO, INC. )EPG
d/b/a BMW Fresno, a California )
corporation; CJ'S ROAD TO )
LEMANS CORP. d/b/a Audi Fresno )
and Porsche Fresno, a )
California corporation; and )
CHRISTOPHER JOHN WILSON, an )
individual and resident of the )
State of California, )
)
       Defendants. )
__ )

REMOTE VIDEO-RECORDED DEPOSITION

OF

DOUGLAS SCHENCK

MONDAY, MARCH 31, 2025

Stenographically Reported By:

JENNIFER L. SMITH, CA CSR NO. 10358, RMR, CRR, CRC

Job Number: 7270322

Page 1

APPEARANCES


FOR THE PLAINTIFF:
        HOLLAND & KNIGHT LLP
        By: Andrew Klair, Esq.
            David I. Holtzman, Esq.
            Isabella Granucci, Esq.
        560 Mission Street, Suite 1900
        San Francisco, CA 94105
        (415) 743-6900
        andrew.klair@hklaw.com
        david.holtzman@hklaw.com
        isabella.granucci@hklaw.com

FOR THE DEFENDANTS:
        JABURG WILK
        By: David Allen, Esq.
        1850 North Central Avenue, Suite 1200
        Phoenix, AZ 85004
        (602) 248-1000
        dla@jaburgwilk.com

FOR THE WITNESS:
        LAW OFFICE Of KYLE GURWELL
        By: Kyle Gurwell, Esq.
        10055 Slater Avenue, Suite 250
        Fountain Valley, CA 92708
        (562) 600-9989
        kng@lawofficekg.com


ALSO PRESENT:

        Jeff Nichols, Videographer

Page 2

INDEX

EXAMINATIONS:                                      PAGE
  DOUGLAS SCHENCK
        Examination By Mr. Klair              7
        Examination By Mr. Allen             31

                        EXHIBITS

No.                 Description                 Identified
  Exhibit 1    SUBPOENA                            8
  Exhibit 2    PLAINTIFF FOUNDATION AUTO          18
               HOLDINGS, LLC'S REQUEST FOR
               PRODUCTION OF DOCUMENTS TO
               C.J. WILSON, SET NO. TWO

  Exhibit 3    PLAINTIFF FOUNDATION AUTO          18
               HOLDINGS, LLC'S REQUEST FOR
               PRODUCTION OF DOCUMENTS TO
               CJ'S ROAD TO LEMANS CORP.
               D/B/A AUDI FRESNO AND PORSCHE
               FRESNO, SET NO. TWO
  Exhibit 4    PLAINTIFF FOUNDATION AUTO          18
               HOLDINGS, LLC'S REQUEST FOR
               PRODUCTION OF DOCUMENTS TO
               WEBER MOTORS, FRESNO, INC.
               D/B/A/ BMW FRESNO, SET NO. TWO
  Exhibit 5    DEFENDANT WEBER MOTORS,            21
               FRESNO, INC. D/B/A/ BMW'S
               RESPONSE TO PLAINTIFF
               FOUNDATION AUTO HOLDINGS,
               LLC'S MOTION TO COMPEL REQUEST
               FOR PRODUCTION OF DOCUMENTS,
               SET TWO, AND REQUEST FOR
               SANCTIONS

                                           Page 3

A.  I did.                                          10:10:40

Q.  Did you appear on December 17, 2024, before     10:10:41
the Court for a status conference?                  10:10:47

A.  I -- I may have.  I -- I don't, off the top     10:10:48
of my head, recall what date it was.  I think I -- I   10:10:50
appeared twice, maybe three times, in front of the  10:10:53
magistrate.                                         10:10:57

Q.  Did you appear on January 24, 2025, before      10:10:59
the Court for a hearing on Foundation's motion for  10:11:02
further sanctions?                                  10:11:05

MR. ALLEN:  I think you meant '24 -- '24.   10:11:10

MR. KLAIR:  Apologies.  Restate the         10:11:13
question.  Strike the previous question, please.    10:11:14

BY MR. KLAIR:                                        10:11:14

Q.  Did you hear on January -- did you appear on    10:11:16
January 24, 2025, before the Court for a hearing on  10:11:16
Foundation's motion for further sanctions?          10:11:19

A.  I believe I did.                             10:11:22

Q.  To your knowledge, was Mr. Wilson aware of      10:11:27
either of those hearings?                           10:11:31

A.  To my knowledge -- to my knowledge, no, I       10:11:34
don't -- I don't know that he was aware.            10:11:36

Q.  Were any employees of either of Mr. Wilson's    10:11:43
companies aware of those hearings?                  10:11:46

A.  I don't know.                               10:11:49

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

MR. GURWELL:  Objection.  Calls for    10:11:49
speculation.    10:11:51

You can answer.    10:11:51

THE WITNESS:  I don't -- I don't know.    10:11:53

BY MR. KLAIR:    10:11:53

Q.  Did you or anyone else at MLG communicate    10:11:57
either the December 17, 2024, hearing or January 24,    10:12:00
2025, hearing to Mr. Wilson or anyone at either of    10:12:05
the companies?    10:12:08

A.  I don't know.    10:12:09

MR. GURWELL:  Objection.  Calls for    10:12:10
speculation.    10:12:11

THE WITNESS:  Sorry.    10:12:12

I -- I do not know.    10:12:13

BY MR. KLAIR:    10:12:13

Q.  Mr. Schenck, I know it's tempting, but just    10:12:15
give time for Mr. Gurwell to object.  That way we    10:12:19
don't have the cross-talk, and Jennifer doesn't end    10:12:22
up killing both of us.    10:12:25

Mr. Schenck, did you or anyone else at MLG    10:12:29
communicate the results of the December 17 or January    10:12:33
24 hearings to Mr. Wilson or anyone at his company,    10:12:37
to your knowledge?    10:12:40

A.  I -- I don't know.    10:12:43

Q.  Did you or anyone else at MLG, to your    10:12:48

Page 14

knowledge, have any Zoom calls with Mr. Wilson or anyone employed by either of his companies?    10:12:51 10:12:53

A. Yes.    10:12:57

Q. Did you personally have any Zoom calls with Mr. Wilson or any employees of his companies?    10:13:02 10:13:05

A. Yes.    10:13:07

Q. Did you have a Zoom call with Mr. Wilson?    10:13:10

A. Yes.    10:13:13

Q. Did you --    10:13:15

A. I had a -- if you want me to expand, I can. But, yes. I just answered twice yes.    10:13:15 10:13:19

Q. Do you know the dates of -- strike that.    10:13:22

What dates did you have Zoom calls with Mr. Wilson?    10:13:23 10:13:26

A. I -- as I sit here today, I don't recall what the exact dates were.    10:13:27 10:13:28

Q. Did you have any Zoom calls with Mr. Wilson in November of 2024?    10:13:30 10:13:32

A. No.    10:13:35

Q. Did you have any Zoom calls with Mr. Wilson in December of 2024?    10:13:35 10:13:37

A. I -- I don't believe so. I don't think I was working on the file yet.    10:13:40 10:13:42

Q. Did you -- did you have any Zoom calls with Mr. Wilson in January of 2025?    10:13:44 10:13:47

Page 15

A.  My recollection is that we had a Zoom call in -- in January.  Yes.  Me, him, CJ, and his attorney, Reggie Borkum.

Q.  Can you describe the nature of that Zoom call?

A.  It was basically, I think, a status update. We were -- I -- I don't really recall the exact nature of the call.  I think it was basically a status report.

Q.  Do you recall what the status report was regarding when it comes to the case?

A.  I -- I don't.

MR. GURWELL:  Mr. Schenck, Mr. Schenck, I'm going to remind you that, my understanding of the judge's order in this case is that the privilege has been waived as to discovery.  But any strategy remains confidential and protected by the attorney-client privilege.  Please keep that in mind as you respond.

THE WITNESS:  Okay.

BY MR. KLAIR:

Q.  Did you or anyone else at MLG, to your knowledge, have any phone calls, besides Zoom, with Mr. Wilson or anyone employed by his companies?

A.  I don't believe so.

10:13:50
10:13:53
10:13:57
10:14:00
10:14:02
10:14:04
10:14:09
10:14:12
10:14:16
10:14:19
10:14:21
10:14:23
10:14:24
10:14:27
10:14:29
10:14:32
10:14:36
10:14:38
10:14:40
10:14:41
10:14:41
10:14:44
10:14:48
10:14:50
10:14:55

Page 16

Q. Did you or anyone else at MLG, to your knowledge, exchange any emails with Mr. Wilson or anyone at his companies relating to this case?    10:14:57 10:15:00 10:15:02

A. I can't speak to others, but, yes.    10:15:07

Q. Did you email Mr. Wilson in December of 2024?    10:15:11 10:15:14

A. No.    10:15:17

Q. Did you email Mr. Wilson in January of 2025?    10:15:19

A. I -- I'm sure I did.    10:15:24

Q. Did Mr. Wilson respond to your emails in January of 2025?    10:15:27 10:15:30

A. I don't recall.    10:15:31

Q. Did he send you any emails that weren't a response? Just sending you an email?    10:15:33 10:15:37

A. I -- I don't know.    10:15:39

Q. Did you or anyone else at MLG, to your knowledge, have any text communications with Mr. Wilson or anyone employed by his companies?    10:15:44 10:15:46 10:15:49

A. No.    10:15:51

Q. Did you or anyone else at MLG, to your knowledge, have any Instant Messenger conversations with Mr. Wilson or anyone employed by his companies?    10:15:52 10:15:55 10:15:57

A. No.    10:16:00

Q. Did you or anyone else at MLG, to your knowledge, have any other contact by any means, not    10:16:06 10:16:08

Page 17

already discussed here, with Mr. Wilson or anyone    10:16:10
employed by his companies?    10:16:13

    A.    I don't believe so.    10:16:14

    Q.    Did you have any face-to-face meetings with    10:16:15
Mr. Wilson?    10:16:24

    A.    No.    10:16:24

    Q.    Changing gears here.  I'm going to show you    10:16:30
three exhibits.    10:16:33

        We'll label them Exhibits 2, 3, and 4.    10:16:33

        (Exhibit 2 was identified.)    10:16:37

        (Exhibit 3 was identified.)    10:16:38

        (Exhibit 4 was identified.)    10:16:38

BY MR. KLAIR:    10:16:38

    Q.    This first exhibit, Exhibit 2, I am showing    10:16:39
you now.    10:16:41

        Please take a moment to review this document    10:16:41
and let me know if you need me to scroll down, and    10:16:49
let me know once you've reviewed the document.    10:16:51

    A.    I mean, I've reviewed it, what you're    10:16:55
showing me.    10:16:57

        MR. ALLEN:  Can you please scroll to show    10:17:01
the date?    10:17:03

        MR. KLAIR:  Absolutely.  The date would be    10:17:04
on the last page.  Here is the date.    10:17:05

        THE WITNESS:  Okay.    10:17:13

Page 18

BY MR. KLAIR:                                          10:17:13

Q.  This is Exhibit 3, and the date of Exhibit 3      10:17:16
on the last page.  Apologies.  Third to last page.    10:17:23

A.  Okay.                                             10:17:29

Q.  And this is Exhibit 4.  First page and then       10:17:31
the date appears on the third to last page here.      10:17:38

A.  Okay.                                             10:17:44

Q.  Mr. Schenck, have you seen any of                 10:17:48
Exhibits 2, 3, or 4 before?                           10:17:51

A.  I don't recall.                                   10:17:53

Q.  To your knowledge, were Mr. Wilson or any         10:17:57
employees of either of his companies, including       10:18:00
Reggie Borkum, aware of Exhibits 2, 3, or 4?          10:18:02

A.  I don't know that.                                10:18:06

Q.  Did you ever personally send Mr. Wilson or        10:18:10
any employees of his companies, including Reggie      10:18:13
Borkum, Exhibits 2, 3, or 4?                          10:18:16

A.  Me personally?                                    10:18:19

Q.  Yes, sir.                                         10:18:21

A.  No.                                               10:18:21

Q.  To your knowledge, did anyone at MLG send         10:18:24
Exhibits 2, 3, or 4 to Mr. Wilson or anyone employed  10:18:26
by his companies?                                     10:18:29

A.  I -- I don't recall.                              10:18:30

Q.  Did the Zoom calls that you had with              10:18:37

Page 19

# EXHIBIT B

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring
tsm@jaburgwilk.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **Declaration of Thomas S. Moring** |
| vs. | (Assigned to Hon. Erica P. Grosjean) |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |
| TEMPLETON MARSH, LTD., | |
| Plaintiff-in-Intervention, | |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |

JABURG WILK
LAW FIRM

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG
24377-24377-00001\DLA\TSM\6475326v4

1.      I am an attorney licensed by the Arizona State Bar admitted pro hac vice in this case.

2.      I am over 18 years of age and qualified to give this declaration.

3.      The matters set forth herein are true and correct and of my own personal knowledge, and if called to testify I would testify in conformity with the information contained herein.

4.      I was admitted to the practice of law in October, 2001. Since that time I have tried over 10 civil juries and over 30 bench trials.

5.      I consider myself experienced in all phases of litigation, including discovery and discovery disputes.

### Background with CJ Wilson and his Dealerships

6.      I first met Christopher John Wilson in 2020, when my firm was retained as counsel for him and his entity CJ's Road to Lemans in the matter in Los Angeles County Superior Court styled *Harrison Gray v. Christopher John Wilson, et al.,* Case No. 20SMCV01182.

7.      I filed an Answer in that case, and proceeded through depositions, discovery, and disclosure.

8.      During the representation, I was able to request and receive documents from Mr. Wilson directly. In the event that he was unable to provide documents, he directed me to others in his organization who could help us with any requested discovery and with preparing our own disclosures.

9.      I never had cause for concern that Mr. Wilson was withholding or not providing the documents in his possession, and if documents did not exist that were responsive to a particular request or category of requests, he told me that and I indicated that to the opposing counsel.

2

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

10. I am aware that David Allen of my office also worked with Mr. Wilson on another piece of litigation, although I was not involved in that lawsuit.

**Involvement in the Present Action**

11. On or about February 6 2025. Mr. Allen approached me and indicated that he had been requested to substitute in as counsel in a case in which Mr. Wilson, CJ's Road to Lemans, and Weber Motors were Defendants.

12. At that time, Mr. Allen and I did not discuss any of the specifics of the case. He told me that it related to the sale of Mr. Wilson's dealerships in Fresno, California and that Mr. Wilson was dissatisfied with the services of his current lawyers at that time, which was the law firm of MLG Attorneys at Law ("MLG") located in Costa Mesa, California.

13. When we were requested to get involved, the court had already set a Settlement Conference, which was rapidly approaching.

14. The Settlement Conference was conducted before Magistrate Christopher Baker on February 25, 2025.

15. Because the Settlement Conference was so close in time, we decided that it would be best to substitute in the case after the Settlement Conference brief had been filed by MLG, but before the Settlement Conference itself.

16. I, along with Mr. Allen, attended the Settlement Conference virtually. Mr. Wilson also participated virtually.

17. During the time that the settlement judge was in discussions with the other parties, Mr. Allen, Mr. Wilson and I had a chance to discuss the status of the case, the potential for settlement, and the work to be done if no settlement were reached.

18. At that time I recall the conversation focused largely on retention of an expert witness. This was because there was an expert witness deadline that was some 45 days away based on the Scheduling Order in place at the time.

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

19.     Mr. Wilson and I discussed the need for depositions, and we discussed the key documents that would be used in trying to demonstrate the defense in this case.

20.     From those conversations, I came to understand that Mr. Wilson had not been informed of either the motions that had been filed by Plaintiff Foundation related to its RFPs Set Two, or the request for limiting/terminating sanctions that had been filed by Foundation on December 5, 2024.

21.     I later reviewed the deposition transcripts of Julie Chang, Douglas Schenk, and Sabrinia Markarian, employees of MLG.  The testimony of all three was consistent in indicating that none of them, or anyone else at MLG, had provided Mr. Wilson copies of discovery requests.

22.     Mr. Wilson repeatedly told me  that he "did not know what was going on" and indicated to me that he had not seen any of the documents that were filed in this matter related to discovery issues.

23.     Based upon the foregoing, I concluded that Mr. Wilson in fact had not seen, and was unaware of, relevant filings and Orders entered by the Court in this matter

24.     Mr. Wilson informed me that he had produced a number of documents to MLG in August, 2022.  He indicated that there were recently requests from MLG regarding certain financial documents.  Although he was reluctant to provide those, MLG indicated that it was a requirement of the lawsuit, and so Mr. Wilson agreed to and did promptly produce those documents.

25.     Mr. Wilson also told me that he responded to requests for certain categories of documents from someone at MLG.  Based on the email exhibits to Mr. Chang's deposition, I now believe the MLG person to be Julie Chang.

26.     My subsequent review of the docket shows that on December 13, 2024, MLG provided supplemental responses to Foundation RFP #2, which appeared to include documents requested in Ms. Chang's email.

4

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

27.    This was consistent with my personal experience with Mr. Wilson from the document request that I made in the Harry Gray litigation.

28.    The Settlement Conference concluded without the parties reaching a settlement.

### Docket Review

29.    When it became apparent that the case was not going to settle, I began a thorough review of the docket in this case.

30.    Upon my review of the docket, I identified certain critical documents that I wanted to review in their entirety. Those documents included DKT#101, DKT#107, and the hearing transcript from the October hearing on the Motion to Compel.

31.    Based on that review, which occurred on or around February 26, 2025, I began to better understand the status of discovery, the status of Foundation's and Templeton Marsh's claims that discovery remained outstanding, and the serious nature of the sanctions request in this case.

32.    Specifically, I was unaware until my review of the docket that monetary sanctions had been awarded against the Defendants and the Court had set a deadline to pay those monetary sanctions.

33.    I brought this to Mr. Wilson's attention and asked him if he had been told about either the sanction award or the requirement to pay that particular award. He indicated he had not.

34.    On February 20, 2025, Intervenor Templeton Marsh filed a Notice of No Opposition" to their Motion to Compel and Request for Sanctions, dated January 31, 2025 (DKT#129). Based on the lack of opposition, the Court granted that Motion, by Order dated March 6, 2025 (DKT#155).

35.    I had a conversation with Mr. Wilson regarding the entry of the Order on Templeton Marsh's Motion to Compel, and the impact of the Order on the case.

5

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

Specifically, I asked him if he was aware that the Templeton Marsh Motion to Compel had been pending. I also asked whether there was a discussion with him regarding any decision not to file a Response to that Motion. He indicated he was unaware both of the existence of the Motion and he did not know prior to my telling him that the Motion was not responded to as required. I also explained the required monetary sanctions.

36.    Mr. Wilson seemed to me to be surprised by the information I was sharing with him. It seemed that he had not been told anything about important events in the case as the case was progressing, although that he had asked for updates several times. Based on my several years' prior experience with him, I did not have any reason to doubt that he had been uninformed by his prior counsel, or to believe that he had been part of discussions related to these purported discovery violations.

**Relevant Timeline for Discovery Disputes**

37.    As part of my review I prepared the following timeline of discovery disputes:

A.    The initial service on MLG of Foundation's RFP Set No. 2 – 2/24/24

B.    The filing by Foundation of the first Motion to Compel – 7/12/2 (Doc. 91)

C.    The issuance of the Court Order granting the first Motion to Compel (including privilege waiver) – 10/29/24  (Doc. 101)

D.    The filing by Foundation of its second Motion to Compel – 12/5/24 (Doc. 107)

E.    The filing by MLG of Defendants' Response to the second Motion to Compel – 12/19/24 (Doc. 118)

F.    The filing by Foundation of its Reply in support of the second motion to compel – 12/30/24 (Doc. 120)

6

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

G.    The service by MLG of Defendants' documents responsive to RFP Set No. 2 – No specific Notice of Service appears to exist. Based on correspondence and MLG filings, it appears that MLG produced some responsive documents (approximately 520 pages) in December 2024 and January 2025. They also produced 5713 pages of documents in September 2022, responsive to RFP Set No. 1.

H.    The date of the oral argument (attended by MLG) on Defendants' second Motion to Compel – 1/24/25

I.    The issuance of the Court Order awarding a certain amount of sanctions based upon its granting of the first Motion to Compel – 2/6/25 (Doc. 131)

J.    My firm's service of Defendants' further documents responsive to RFP Set No. 2– 3/18/25 (See Docs. 160, 161, 162 – Notices of Service)

38.    I discussed this timeline of events in general terms with Mr. Wilson, and either Mr. Allen or I, or one of our assistants or paralegals, provided copies of Court Orders, and the discovery requests served by Foundation and Templeton Marsh.

39.    Mr. Wilson and I discussed his understanding that there had been several productions by Defendants, with the latest being documents turned over in either late December 2024 or early 2025, but following his email exchanges with Ms. Chang in December, 2024.

40.    At the time Mr. Wilson discussed the document productions with MLG, he did not understand that there were already Orders related to his supposed failure to turn over documents in the past, and was not aware of Foundation's December 5, 2024 Motion.

41.    Conversely, I believe that, based on his communications with MLG in December 2024, he became aware of the potential impact of failing to produce financial documents, and that was why he agreed to, and did, turn them over.

42.    I now see that in addition, Mr. Wilson's response to the Chang email provided other substantive responses to the categories set forth in Ms. Chang's email,

JABURG WILK
LAW FIRM

7

including the ownership structure of the two dealerships, information regarding the union contract (which was limited to the BMW mechanics) and the process of moving to Clovis. His response to the request for documents related to the Audi dispute was to authorize MLG, who acted as his lawyers in that dispute, to turn over the settlement documents they had in their possession.

43.     I also believe Mr. Wilson was unaware, having produced financial documents as requested, of any claims that the documents he had identified and responses provided to Ms. Chang in December, 2024 were insufficient.

44.     My discussions with Mr. Wilson made me believe he was surprised to learn that there were additional documents that had been requested beyond what was in the December emails, and that Foundation and Templeton Marsh believed the responses MLG had provided to be incomplete. I also believe Mr. Wilson did not see copies of any responses filed by MLG on his behalf, so he was not aware what was or was not produced.

45.     I do not believe that Mr. Wilson knew that there were no responses issued to the discovery from Templeton Marsh.

46.     Prior to my advising him, I do not believe Mr. Wilson was aware Templeton Marsh had moved to compel responses to their discovery, or even that their discovery had been served.  I also do not think he was aware of the monetary sanctions until I told him about that portion of the Order.

47.     I worked with Mr. Wilson to provide responses to the Templeton Marsh discovery, and he was a full participant in that review and response.

**Jaburg Wilk Received File From MLG**

48.     I was in regular communication with MLG personnel following our appearance in the case. I had several phone calls and follow-up emails with the attorney I understood to be lead counsel at the time, Douglas Schenk.

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

49. I inquired of Mr. Schenk about specific discovery requests that had been responded to, when those responses were filed, and asked him for information regarding what had been filed.

50. Mr. Schenk indicated that he had not been working on the file since its inception. He also indicated that there were several lawyers who had worked on the defense of this case prior to his involvement. Therefore, he helped me coordinate with other MLG staff who could provide information contained in the MLG files.

51. As stated in Mr. Schenk's Declaration, his office provided a file link for my office to download the file materials.

52. On February 22, 2025, I began the process of downloading and reviewing the MLG files.

53. I was surprised to find what appeared to be missing documents and I inquired further of Mr. Schenk to see if he could help me identify whether the documents that I expected to see, but did not, were maintained elsewhere in the file, or simply had not been produced or provided.

54. I asked Mr. Schenk for copies of specific papers that had been served, such as Responses to Requests for Production, and asked for the dates those had been served.

55. MLG never sent me copies of any formal discovery responses. Yet, during the course of my representation, I became aware that some responsive discovery papers had been served by MLG. For example, in his Declaration (DKT#166-1) Mr. Klair provided copies of Responses to RFP Set No. 2, dated December 13, 2024.

56. Mr. Schenk indicated that he was looking into the matter. At no time, however, did he forward me, for example, any emails between MLG and Mr. Wilson where Mr. Wilson was provided copies of pleadings or responses.

57. The lack of any demonstrated emails from MLG sending copies of the specific document requests confirmed the statements by Mr. Wilson to me that he did not

9

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

JABURG WILK

LAW FIRM

know (aside from financial statements requested in Ms. Chang's December email chain) what specific documents had been requested. In making my prior statements to the Court, I was attempting to highlight my belief and understanding that, that until my involvement, Mr. Wilson had not seen the actual requests propounded to him and his company.

58.    I did not mean to suggest that Mr. Wilson was not aware that Foundation had made requests for documents, or even that MLG did not describe in general terms certain of the categories of requested documents. Nor did I mean to suggest that Mr. Wilson was unaware of the need to produce documents, or that he was unaware that obligation was a continuing one.

59.    It was my intent to show that Defendants had not seen either Foundation's Request for Further Sanctions, (DKT#107) or the underlying Request for Production, and did not know of the specific assertions of non-compliance raised in the Request.

60.    In so doing, I was trying to illustrate to the Court my belief that Mr. Wilson did not intentionally withhold or fail to produce any documents, or categories of documents, that had been requested.

61.    I knew from my discussions with Mr. Wilson that he was aware of the need to participate in discovery, For example, he explained that he produced, either at the end of 2024 or early 2025, the financial documents requested on the three dealerships. In that instance, although he did not want to do so, MLG explained the danger of not doing so, and he provided them.

62.    With regard to the other information sought in DKT#107, Ms. Chang described the categories in general, but did not send over any of the pleadings related to the prior Motions to Compel, the actual discovery requests previously served, the Orders on those prior motions, or DKT#107 itself.

63.    Mr. Wilson indicated to me generally that he had provided additional information in response to Ms. Chang's emails. That included information on the

10

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

JABURG WILK LAW FIRM

ownership of the entities and confirmation that the BWM workers were the only unionized employees in the three dealerships; he also reminded MLG that, as his attorneys, they already had all the documents related to the Audi dispute that were being requested.

64.    I did not and do not believe that Mr. Wilson knew of the discovery fights, and the Orders related to those fights, prior to my involvement in the case.

65.    That belief was supported by the MLG depositions, where no MLG employee could specifically say that either they had provided Mr. Wilson important documents, or that they were aware of anyone else at MLG who did or would have done so.

66.    For example, Mr. Schenk indicated that he had "not yet" explained to Mr. Wilson the sanctions order, the requirement to pay monetary sanctions, or discussed the pending motions to compel and motions for further sanctions with Mr. Wilson. Declaration of Douglas Schenk dated March 3, 2025 (DKT#146) at ¶15.

67.    This was consistent with what I learned from my discussions with Mr. Wilson, who indicated that he had not been informed of these matters by MLG. Mr. Schenk's Declaration lists several dates of production between May11, 2022 and January 17, 2025. (DKT#146), but does not indicate that Mr. Wilson was told about these productions, or that he was sent copies of the responses served on opposing counsel.

68.    I continued my review of the file and identified a number of Bates numbered documents that were in the MLG file. It was my understanding and belief that those Bates numbered documents have already been produced to the Foundation and Templeton Marsh.

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

**Document Production By Jaburg Wilk**

69.    I requested MLG send me copies of any paper, such as a formal response to request for production by which the defense had identified, by Bates number or range, documents responsive to the various requests for production that were propounded.

70.    In reviewing the discovery requests, I noted that Foundation typically would send nearly identical Requests for Production to all three Defendants, roughly 48 requests for production to each defendant, which when sent to all three defendants totaled over 140 individual document requests.

71.    Templeton Marsh had done something similar, propounding 35 document requests on each entity Defendant, and 43 RFP to Mr. Wilson, for a total of 113 unique document requests.

72.    When I asked Mr. Wilson if he had ever received these actual discovery papers comprising the requests originally issued by the propounding parties, he indicated he had not.

73.    I instructed my office to provide Mr. Wilson with copies of RFP Set No. 2 from Foundation, so he could see each specific request and address whether he had provided responsive documents to each specific request to each specific Defendant, or confirm that there were no responsive documents.

74.    By email dated March 5, 2025 I provided Mr. Wilson a copy of each of the unique individual document requests, along with instructions that he review each one of them and determine whether he had produced documents responsive to that particular request. I also asked him to perform new searches to determine if any responsive documents needed to be produced based on his then understanding of each specific document request.

75.    Mr. Wilson apparently completed that review and sent me additional documents, which I produced in response to Foundation's requests.

12

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

76. Based on that review, on March 18, 2025 we produced additional responses to Foundation's RFP Set #2.

77. Those responses are now on file with the Court, (DKT#184). It was and is my understanding that as of the March 18, 2025 document production, Defendants had produced to Foundation all documents requested by RFP Set #2 (except for the few documents withheld on the basis of the attorney work product privilege, addressed below).

78. I was aware when making these responses that the Court had entered an Order regarding a waiver of attorney/client privilege covering communications between lawyer and client that would ordinarily be protected.

79. I believed, however, that the work product privilege would still apply to mental impressions of lawyers or work done in anticipation of litigation, even though I understood Defendants could not assert attorney/client privilege for those documents.

80. Foundation has suggested that in some cases Defendants simply changed the designation of a particular documents in order to continue to withhold those documents.

81. I personally reviewed all of the documents that had been marked for protection, and the reason to be asserted in the privilege log.

82. To the extent a document had not been produced by MLG, and the sole basis for the retention of the document was attorney client privilege, that document was produced on March 18, 2025.

83. Where a document included attorney client communications and discussed litigation strategy, defense theories, or the mental impressions of the lawyer, I did not produce those, relying on the protection of work product privilege. If such a document had previously been retained on an assertion of attorney client privilege, which I

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

JABURG WILK
LAW FIRM

understood from review of the Court's Order was not permitted, I changed the designation to show that I believed the work product protection would apply.

84.    As a result, there were documents previously retained under the grounds of attorney client privilege that I believed were still protected from turnover even though they could not be retained on the basis of attorney client privilege.  This was done based on my reading of the Court's prior Order (DKT#101) related to what privilege had been waived and what had been retained.  Specifically, on Page 3, Lines 25-28 the Court stated "Defendants may assert the attorney client privilege or work product regarding any documents filed since the commencement of this action on June 18, 2021." I further believed that it was appropriate to withhold documents and produce "a privilege log, if any, reflecting privileged documents post-dating the commencement of this action on June 18, 2021" (DKT#101, Page 4 Lines 18-20. I believe that the production I made, and the privilege log I provided, comport with this Order.

### Response To Order To Show Cause

85.    At the recent hearing on April 24, 2025, the Court asked specific questions regarding an email chain dated December 6-11, 2024, among Julie Chang of MLG, Mr. Wilson and Mr. Borkum (the "Chang Emails"). Ex A.

86.    The Court, referring to the Chang Emails, has asked me to explain why my statements to the Court, including in ECF #140, ECF # 148, ECF # 156, and ECF #164 were not materially false, or if known to be materially false statements to the tribunal were not correct.

87.    My belief was, and remains, that the statements were not materially false.

88.    For the Court's ease I have set out a chart of the statements mentioned in ECF # 178, and my response to each.

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

| | Statement | Explanation |
|---|---|---|
| A. | "Defendants were never provided with any of the specific Requests for Production" | Ms. Chang's email only sets forth seven general categories of information, but does not attach the specific Requests for Production, of which Foundation served a nearly identical copy on each Defendant. Until my office sent it to him, Mr. Wilson had not been provided with a copy of the actual RFP in dispute. He did have a copy of Ms. Chang's summary request, to which he promptly responded. Based on the response email from Mr. Wilson on December 9, 2024, MLG produced and served on December 13, 2024 responses to Foundations RFP, Set Two related to these requests. *See* DKT#166-1 (Declaration of A. Klair) Pages 16-21 of 210. |
| B. | "Defendants were never asked additional questions about the specific requests" | As detailed above, I believed and believe that the Defendants were not provided with the specific requests prior to my appearance in the case. However, I agree that my office did provide the specific requests to Defendants, and asked Defendants to conduct a further review of their files to be sure all responsive documents were produced. To the extent that this statement was interpreted to mean that at no time, including after my office took over the defense of the case did Defendants **ever** receive the requests, I acknowledge that is not accurate. My intent was to communicate that ***prior to my involvement*** in the case prior counsel had never provided Mr. Wilson the actual requests, or instructions to search for responsive documents. This statement should be qualified to reflect that Defendants were not asked additional questions about specific requests prior to Jaburg Wilk's involvement. This is illustrated by review of Ex A, including Mr. Wilson's responsive email dated December 9, 2024. For example in her email of December 6, 2024, Ms. Chang asks about "7. Settlement agreement with Audi in |

15

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

| | Statement | Explanation |
|---|---|---|
| | | CJ's Road to Lemans Corp v. VWGoA, Inc. and documents submitted to the CA New Motor Vehicle Board in connection with the matter." Mr. Wilson responded on December 9, 2024, in regard to that statement that "I am confused as to the request for settlement documents with AoAVW- as your firm was the one that handled all of these negotiations."<br><br>Apparently, based on this response, MLG believed they had enough information to provide responses dated December 13, 2024 to Foundations RFP, Set Two related to these requests. *See* DKT#166-1 (Declaration of A. Klair) Pages 16-21 of 210. It is my understanding that there were no additional questions asked by MLG to Mr. Wilson regarding this, or any other, request. |
| C. | "None of the attorneys communicated to him the pending motions and the serious nature of the failure to comply with discovery requests" | On December 10, 2024, Ms. Chang communicated to Mr. Wilson that a failure to produce "the financial statements (audited), and profit and loss statements, may lead to contempt proceedings. I just want you to be aware of that risk. So, if you are able to provide *audited* financials, then please send." Mr. Wilson did produce audited financials, a fact confirmed by Foundation. Mr. Wilson was not told that the failure to produce other information could lead to contempt proceedings. In any event, in his response to Ms. Chang on December 9, 2024, he provides responses to all seven categories of information. This lead to the December 13, 2024, Response to Foundation RFP served by MLG. The only further request by Ms. Chang was for audited financials, on December 10, 2024.<br><br>It is correct that in that same December 11, 2024, email there is a single reference in the MLG Emails to a "Motion to Compel." Read in context, Ms. Chang's reference to that Motion appears to relate to subpoenas issued |

16

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

JABURG WILK

LAW FIRM

| | Statement | Explanation |
|---|---|---|
| | | to MLG and to Reggie Borkum, not to the Defendants. Ms. Chang states "If I am not mistaken, the subpoena to you was the same as the subpoena to MLG. We have objected on the grounds of attorney client privilege and a Motion to Compel has been filed by Foundation." This email, directed to Mr. Borkum, does not indicate any Motion filed against Defendants, although there was in fact a Motion for further sanctions filed on December 5, 2025 (DKT#107) Ms. Chang did not specifically reference or include a copy of that Motion against Defendants in her email. According to the MLG depositions, no copy of DKT#107 was ever provided to Mr. Wilson by MLG. |
| D. | "Mr. Wilson had no idea that there were discovery requests that were outstanding, that were not being responded to" | See Items A, B and C, above. Mr. Wilson never received from MLG the actual RFP Set No. 2 that was later provided to him by Jaburg Wilk. He was aware from Ms. Chang that there were seven general categories requests, and he promptly responded to MLG on each of these. That lead to MLG's December 13, 2024 Response to RFP Set No. 2 and the issue was not brought to Mr. Wilson's attention again. The exception to this statement was the audited financials, which he did provide. |
| E. | "He had no idea that any motion had been filed to compel further discovery" | Again, this statement considered in context is true and correct. Mr. Wilson was not aware that there were motions to compel filed against **Defendants**. Ms. Chang indicated that a failure to provided audited financials could result in a contempt finding. Mr. Wilson provided the audited financials, and therefore had no reason to be concerned about any possible contempt. Mr. Wilson was also aware, from the Chang emails, that a Motion to Compel had been filed against MLG, related to a subpoena served on MLG to which it had objected. To the extent that he understood the impact of that proceeding, |

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

| | Statement | Explanation |
|---|---|---|
| | | Mr. Wilson was not informed that the proceeding was against him, and was in fact told it was against MLG and **not** Defendants. At the time Ms. Chang sent that email there was in fact a second Motion to Compel (DKT #107) that she failed to mention or attach. MLG was certainly aware of it, since they filed a Response to the second Motion to Compel (DKT #118), although they did not provide Mr. Wilson a copy of either the Motion or Response. Mr. Wilson also was not made aware of the oral argument on this second Motion to Compel, held January 24, 2025 (DKT #120). |
| F. | "Defendants were not even aware that there was a dispute over the production of documents" | See Items A-E above. Ms. Chang made clear that a refusal to produce audited financials could lead to contempt proceedings. Mr. Wilson produced them, following her email. MLG did not notify Mr. Wilson of the allegations in, or provide a copy of DKT #107, where Foundation asserted that the lack of financials warranted terminating sanctions. That document, styled "Plaintiff Foundation Auto Holdings, LLC's Motion for Leave to File; Request for Further Sanctions" was pending when Ms. Chang began emailing on December 6, 2024 with Mr. Wilson, but she neither provided it nor made reference to it. Based on my discussions with Mr. Wilson, my prior litigation experience with him, and his response when I explained the significance of DKT # 107, I believe that he was unaware of this and prior motions. |
| G. | "Defendants did not know what specific requests had been made" | Jaburg Wilk supplied Mr. Wilson, via email, with the full Set No. 2 of Foundation's RFP on March 5, 2025. In follow up discussions with him, he explained that he had never seen this RFP. I found that statement to be credible, based on my exposure to the case at that time. |

18

| Statement | Explanation |
|---|---|
| | My office specifically asked MLG for information on when the actual discovery was provided to the client, or when specific requests were sent.  We never received an answer, or a copy of a transmittal email. Even after reviewing Ms. Chang's email, I believed that the specific requests were not provided, and I did not see (even when I requested it) any evidence that would show the specific requests had been delivered to Mr. Wilson.  I consider Ms. Chang's December, 2024 emails to be a listing of general categories, as opposed to the specific discovery requested by Plaintiff and Intervenor, or the items called out by number in the various Motions to Compel. |

89.     I telephonically attended the April 24, 2025 hearing, and have reviewed the transcript of the hearing, as well as the Minute Order of this Court issued on April 24, 2025, directing me to "show cause why sanctions should not issue for making false statements of fact to the tribunal and failing to correct false statements of material fact previously made to the tribunal."

90.     Based upon the Minute Order and the transcript of the Hearing held April 24, 2025, I understand that the Court's concerns pertain to a number of statements in pleadings signed by me, with both my name and Mr. Allen's name on them, which the Court believes are false, based in part on the Chang emails.

91.     As set forth above, I never intentionally mislead the Court by providing any information that I understood at the time to be false, or by failing to later correct any information that I later learned to be false, and I apologize to the Court if it appears for any reason that I have done so.

DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

I declare under penalty of perjury and of the laws of the United States and of California that the foregoing is true and correct to the best of my knowledge.

DATED this 5th day of May, 2025

/s/ Thomas S. Moring
Thomas S. Moring

JABURG WILK
LAW FIRM

20
DECLARATION OF THOMAS S. MORING ISO RESPONSE TO ORDER TO SHOW CAUSE – Case No. 1:21-cv-00970-EPG

24377-24377-00001\DLA\TSM\6475326v4

# APPENDIX 13

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (SBN 075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **BRIEF IN SUPPORT OF CHRISTOPHER JOHN WILSON DECLARATION** |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | Honorable Erica P. Grosjean |
| Defendants. | |
| TEMPLETON MARSH, LTD., | |
| Plaintiff-in-Intervention, | |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |

JABURG WILK
LAW FIRM

24377-24377-00001\TSM\TSM\6477161v1

**RESPONSE TO ORDER TO SHOW CAUSE**

**I.      INTRODUCTION**

Defendant Christopher John Wilson is accused of submitting to the Court documents which contained knowingly false statements. The Court has suggested that he made these filings intentionally, with knowledge the statements were false, in an attempt to mislead the Court. The statements made by Mr. Wilson were based on his prior discussions, his recollection, and where available a review of the records in this case.  He did not knowingly make false statements, or attempt to mislead or deceive the Court.  There is no evidence demonstrating that Defendant acted with bad faith, improper purpose, or reckless disregard of the truth. The record before this Court, including the declarations of CJ Wilson (Attached as Exhibit A), and the concurrently filed declarations of Thomas Moring and David Allen, as well as the deposition transcripts of MLG counsel, does not establish a basis for sanctions. Sanctions under the Court's inherent authority, or Fed.R.Civ.P Rule 37 are appropriate only in exceptional circumstances involving clear evidence of willful misconduct or bad faith. That high standard has not been met here. Defendant's conduct, viewed in its full context, does not approach the threshold required for the imposition of sanctions.

**II.     STATEMENT OF FACTS**

**A.      Background**

Defendant Mr. Wilson ("Mr. Wilson"), along with two business entities under his ownership, are named defendants in Case No. 1:21-cv-00970-EPG. Mr. Wilson appeared telephonically at the hearing held on April 24, 2025, and has since carefully reviewed both the transcript of that hearing and the Court's Minute Order issued the same day. In that Order, the Court directed Mr. Wilson to show cause why sanctions should not be imposed for allegedly making false statements under penalty of perjury in two declarations—one submitted on March 3, 2025 (ECF No. 148-1), and the other on March 19, 2025 (ECF No. 164-1). The Court's concerns appear to arise from potential inconsistencies between those declarations and a series

JABURG WILK
LAW FIRM

of emails sent by Julie Chang of MLG between December 6 and 11, 2024 (the "MLG Emails"), on which Mr. Wilson was included. These emails are attached as Exhibit B.

**B.     History of Showing Good Faith**

Mr. Wilson never saw a copy of the Motion to Compel filed by Plaintiff, and was not informed that the Court had granted that motion on October 29, 2024. He was not told of the obligations under that Order, including a requirement to produce by November 28, 2024. Nor was Mr. Wilson told that Plaintiff had filed a motion for sanctions on December 5, 2024—before the MLG Emails were even sent. MLG employees testified that they did not recall sending him these pleadings or discovery requests, and he does not remember getting them. In in the December emails, he is not provided with a full picture of the serious nature of the discovery issues. He is merely told he has to provide additional information to MLG.  He responds on December 9 with the information requested by Ms. Chang, except the financial documents which he later produced. Ms. Chang does not explain how prior discovery rulings have impacted the case, she states in summary that not producing the financial documents (which Mr. Wilson did not want to turn over) could have possible future consequences, referencing motions that might be filed in the future.  She omits any reference to the Motion for Further Sanctions (DKT#107) that was already filed and served as of her December 6 email to Mr. Wilson, or the October 29 Order.

These were material developments that directly impacted Mr. Wilson's understanding of the discovery landscape. MLG's failure to explain these rulings, and the nature of the pending motions, left Mr. Wilson with a fundamentally incomplete picture of the progress of discovery, and of the allegations against Defendants related to discovery conduct.

Of particular note, a December 11, 2024 email from Ms. Chang does reference a "Motion to Compel," but that message (copied to Mr. Wilson), was addressed to Reggie Borkum, corporate counsel for Mr. Wilson's companies, and appeared to involve an attorney-client privilege dispute—not a general failure of Defendants to comply with discovery obligations. Her email indicates that MLG had objected to a third party Subpoena Duces Tecum served on MLG,

BRIEF IN SUPPORT OF                                                          Case No. 1:21-cv-00970-EPG
CJ WILSON DECLARATION                    3
24377-24377-00001\TSM\TSM\6477161v1

and that Foundation had filed a Motion to Compel MLG's compliance with the Rule 45 Subpoena. That email also indicates that Mr. Borkum had or would receive a similar Subpoena, and would have to respond since MLG represented Defendants- not Mr. Borkum. Mr. Wilson did not understand from that exchange that there was a Motion to Compel against Defendants, let alone that one had been granted. In the absence of any clarification from MLG, Mr. Wilson reasonably understood this reference to concern a legal issue being handled by counsel, not a broader issue implicating his personal conduct or noncompliance, or that of his companies.

Mr. Wilson relied in good faith on MLG to inform him of his legal obligations and to communicate important developments in the case. That is borne out in the Exhibit B, where Ms. Chang explains that he needs to produce financial information. He objects, and she explains why the documents are needed, the potential ramifications for not providing them, and offers a solution (in the form of a protective order) to address his concerns. Satisfied with that explanation, he directed the production of those financial records. This is the only time in the record reviewed to date when such an exchange occurred. Prior to that, Mr. Wilson did not recall any specific direction or advice from MLG regarding specific discovery requests, attempts to respond to discovery, whether through objection or otherwise, or being asked to review either the discovery or the discovery responses. In the one instance where that occurred, he reasonably believed he had answered all seven of the questions posed by Ms. Chang, and that the subsequent financial production addressed the open issues she had raised. He was not aware at that time of the other pending discovery motions, and was not provided with the previous rulings, including the waiver of attorney/client privilege discussed in Exhibit B.

Mr. Wilson was never provided with the underlying document requests, nor advised of the specific discovery deficiencies alleged in Plaintiff's filings. When he received the December 2024 emails identifying seven categories of requested documents, Mr. Wilson promptly took action to locate and produce those materials, or otherwise respond to the issues raised. He received no indication from MLG that his response was deemed insufficient, nor was he advised of any continued dispute or deficiency following his December production.

BRIEF IN SUPPORT OF
CJ WILSON DECLARATION        4
24377-24377-00001\TSM\TSM\6477161v1

Case No. 1:21-cv-00970-EPG

Mr. Wilson's sworn declarations reflect his genuine understanding of events at the time. He did not knowingly make any false statements, nor did he attempt to mislead the Court. His conduct following the transition to new counsel further supports this. Upon engaging Jaburg Wilk, Mr. Wilson worked closely with counsel to evaluate any outstanding discovery issues, identify any remaining documents, and ensure full compliance with all obligations. These efforts are detailed in his March 19, 2025 Declaration (ECF No. 164-1, ¶¶ 18–20).

Mr. Wilson paid MLG hundreds of thousands of dollars in legal fees over the course of this litigation. Despite that investment, his case was assigned to no fewer than ten different attorneys within the firm over the course of MLG's representation of defendants. This revolving-door representation contributed to breakdowns in communication and continuity and ultimately led to Mr. Wilson being deprived of essential information that he needed in order to make accurate and complete disclosures to the Court.

Mr. Wilson respectfully submits that there is no factual or legal basis to support a finding that he acted in bad faith or intentionally made false statements under penalty of perjury. The record demonstrates that he acted consistently in good faith, responded promptly to requests when made aware of them, and cooperated fully once the relevant facts were brought to his attention.

## III.    LEGAL STANDARDS

### A.    Federal Rules of Civil Procedure

#### 1.    Rule 11

Under Rule 11, by signing or filing pleadings, written motions or other papers, an attorney or a party certifies that, "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[.]" Fed. R. Civ. Proc. 11(b).

#### 2.    Rule 26(g)(3)

Rule 26(g)(3) governs sanctions for improper certification. If a certification violates the rule "without substantial justification," the court "must impose an appropriate sanction on the

BRIEF IN SUPPORT OF
CJ WILSON DECLARATION          5
24377-24377-00001\TSM\TSM\6477161v1

Case No. 1:21-cv-00970-EPG

signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." Fed. R. Civ. P. 26(g)(3).

### B. The Court's Inherent Authority

A court's inherent power to impose sanctions is a serious and narrow remedy, to be exercised only in exceptional circumstances. That power arises only where there is a clear finding that a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991). The Ninth Circuit has consistently held that "[b]efore imposing sanctions, the court must find that the conduct constituted or was tantamount to bad faith." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997). This high threshold may be met where a party knowingly misrepresents facts to the court. *See Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001).

Given the gravity of such sanctions, courts are instructed to use this inherent authority with "restraint and discretion." *Chambers*, 501 U.S. at 44; *Primus*, 115 F.3d at 650. Not every error or misstatement rises to the level of sanctionable conduct, and courts are cautioned against imposing sanctions absent compelling evidence of intentional wrongdoing. *United Steel, Paper & Forestry, Rubber Mfg. Energy, Allied Industrial & Service Workers Int'l Union, AFL-CIO, CLC v. Shell Oil Co.*, 549 F3d 1204, 1209 (9th Cir. 2008) (no "bad faith" sanctions imposed where defendants did not intentionally delay or disrupt litigation).

The standards governing perjury claims reinforce this point. Under 18 U.S.C. §§ 1621 or 1623, a perjury finding requires that the statement was knowingly false, material, and made willfully with the intent to mislead. California Penal Code § 118 similarly requires that the misrepresentation be knowingly false, material, and made with intent to induce belief in its truth. Mere mistakes, misunderstandings, or statements made without full context do not qualify. *See Chein v. Shumsky*, 373 F.3d 978 (9th Cir. 2004) (a statement must be "literally false"; misleading but literally true statements do not constitute perjury).

BRIEF IN SUPPORT OF
CJ WILSON DECLARATION                    6
24377-24377-00001\TSM\TSM\6477161v1

Case No. 1:21-cv-00970-EPG

"Bad faith" means a party or counsel acted "vexatiously, wantonly or for oppressive reasons." *Chambers*, 501 U.S. at 45–46. Bad faith "does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides*, the assertion of a colorable claim will not bar assessment of attorneys' fees." *Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th Cir. 1995) (internal quotation marks and citations omitted). Sanctions, then, are justified "when a party acts for an improper purpose—even if the act consists of making a truthful statement or a non-frivolous argument or objection." *In re Itel Sec. Litig.*, 791 F.2d 672, 675 (9th Cir. 1986).

Courts must distinguish between client and counsel misconduct. *Blixseth v. Yellowstone Mountain Club, LLC*, 854 F.3d 626, 630 (9th Cir. 2017). Sanctions should not be imposed where misconduct is attributable to counsel and not the client, particularly when the client has relied on that counsel in good faith.

The burden for imposing sanctions is high. Courts routinely deny sanctions where there is no evidence of intent to mislead or where parties acted on incomplete or flawed legal advice. *See Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Loc. 996*, 302 F.3d 998, 1012 (9th Cir. 2002); *Oliver v. In-N-Out Burgers*, 945 F. Supp. 2d 1126, 1130–31 (S.D. Cal. 2013); *Hollis v. York*, 2012 U.S. Dist. LEXIS 53151 (E.D. Cal. Apr. 16, 2012) (court declined sanctions where defendant failed to establish that plaintiff made fraudulent misrepresentations or falsified evidence; defendant offered no actual evidence supporting its allegations; "Court will not sanction a party based on speculation.").

## IV.    ARGUMENT

The Court should not issue sanctions for making false statements of fact under penalty of perjury, in the Declaration of Christopher John Wilson (ECF No. 148-1) and Declaration of Christopher John Wilson (ECF No. 164-1), because the record demonstrates that Mr. Wilson did not act in bad faith, did not knowingly make false statements, and relied in good faith on incomplete or misleading information provided by prior counsel.

BRIEF IN SUPPORT OF
CJ WILSON DECLARATION    7
24377-24377-00001\TSM\TSM\6477161v1

Case No. 1:21-cv-00970-EPG

**A.**   **Mr. Wilson Did Not Act in Bad Faith and Had No Intent to Mislead**

There is no factual or legal basis to conclude that Mr. Wilson acted in bad faith or knowingly made false statements under penalty of perjury. To the contrary, the record demonstrates that Mr. Wilson acted in good faith, relied on counsel, and took prompt and reasonable steps to comply with discovery obligations as he understood them. A finding of bad faith requires more than a mere error or misunderstanding—it requires proof that the party acted vexatiously, wantonly, or for an improper purpose. *Chambers* at 46; *Primus Auto. Fin. Servs., Inc.* at 648.

Mr. Wilson is not an attorney. His understanding of the legal and procedural posture of the case was necessarily informed by communications from his then-counsel, MLG. Those communications were vague, incomplete, and at times affirmatively misleading. Notably, MLG failed to inform him specifically that a Motion to Compel had been filed and granted on October 29, 2024, and also failed to inform him that Plaintiff had requested sanctions on December 5, 2024. The only reference to a Motion to Compel appears in a December 11, 2024, email copied to Mr. Wilson, but directed to his company's attorney, and even that reference appeared in the context of a dispute about attorney-client privilege—not document production and certainly not about Defendants' document productions.

Mr. Wilson's response to the MLG emails reflects diligence, not defiance. Upon receiving the December 2024 emails from MLG, Mr. Wilson promptly provided the requested financial documents, with the exception of those already in MLG's possession. He was never told that this production was deficient or that any further documents were required. At no point was he made aware that Plaintiff or Intervenor continued to believe critical documents were missing. His actions are entirely consistent with good-faith compliance, not concealment or obstruction.

In some instances, there are requests for documents that do not exist. For example, Foundation believes that Mr. Wilson conspired with his then-landlord to refuse an assignment of the lease to Foundation. There are no documents showing that, because that did not happen. Well after the termination of the APA, and independent of any obligations under the APA, Mr.

Wilson was told the landlord would not renew the lease when it expired in 2027, but none of that communication related to the assignment of lease that was a condition precedent for Foundation under the APA.

Once new counsel, Jaburg Wilk, entered the case, Mr. Wilson cooperated fully in reviewing all prior discovery and providing additional responsive documents., or noting where no responsive documents existed These efforts were detailed in his March 19, 2025, Declaration. The steps Mr. Wilson took, once properly advised, further demonstrate the absence of bad faith or any intent to mislead. Those steps are similar to what he did with Ms. Chang's seven requests in December, 2024- he did his best to provide information, even information he preferred not to disclose.

There is nothing sanctionable about promptly producing responsive documents. Nor is there anything sanctionable about appearing in a case where some evidence is unavailable. *Tobey v. Chibucos*, 890 F.3d 634, 655 (7th Cir. 2018) (affirming denial of sanctions motion where facts were not immediately available).

**B.    Mr. Wilson's Statements Were True or Based on a Reasonable Understanding**

Each of the statements the Court has identified must be assessed in its full factual and procedural context. To aid in this assessment, the attached Declaration of Christopher John Wilson is attached as Exhibit A, and contains a chart of the statements and an explanation for the good faith belief in each statement. When Mr. Wilson stated that he was not asked about specific document requests, those statements were truthful based on what had, and had not, been communicated to him. While Ms. Chang's emails referenced seven categories of documents, those categories were not tied to any particular identified discovery requests. Mr. Wilson was not at that time provided the specific RFP, nor the October 29, 2024, Order compelling production. His belief that his response to Ms. Chang and subsequent provision of financial reports met his obligations raised in the December 2024 emails was reasonable.

JABURG WILK
LAW FIRM

Likewise, Mr. Wilson's statement that he was unaware that Plaintiff or Intervenor viewed the prior production as deficient is supported by the record. Defendants made their first production in August, 2022, with several subsequent productions.  Until the emails from Ms. Chang, Mr. Wilson was not aware of any claims of deficiency.  MLG employees testified that they never told him about it, or sent him documents showing the disputes. In December, 2024 he was asked for additional information. After providing documents in response to the December 2024 MLG emails, Mr. Wilson received no further communications suggesting that his production was inadequate. His Declarations also expressly acknowledge the production and outline the additional steps taken once Jaburg Wilk entered the case. There is no contradiction or intent to mislead—only a straightforward account of events based on what Mr. Wilson knew and was told at the time.

His statement that he did not recall speaking with MLG about his deposition is likewise supported by the record. The emails reflect that he provided availability, but there is no evidence of follow-up or discussion. Any ambiguity in his recollection is far from perjury or bad faith; it is, at most, an ordinary understanding of the term.  Mr. Wilson has been deposed before, in cases where he was represented by Mr. Moring or Mr. Allen.  In those instances, specific dates and times were discussed, and there was a meeting arranged to prepare for the testimony.  Nothing like that ever happened in this instance. This prior deposition experience demonstrates Mr. Wilson was not acting in bad faith when he made comments that nobody discussed his deposition with him.

And finally, the law does not require perfection or clairvoyance. It requires honesty. Mr. Wilson's statements were made in good faith, were based on his understanding, and were not knowingly false. That standard has not been—and cannot be—met here.

C.    Failures by MLG Are Not Attributable to Mr. Wilson

Any misunderstanding Mr. Wilson may have had regarding the status of discovery or the implications of the Court's prior orders was the direct result of serious communication failures by his former counsel, MLG—not any bad faith or intent to mislead on Mr. Wilson's part. It is

BRIEF IN SUPPORT OF
CJ WILSON DECLARATION                    10
24377-24377-00001\TSM\TSM\6477161v1

Case No. 1:21-cv-00970-EPG

well established that sanctions must be grounded in a party's own bad faith, not the missteps or omissions of their attorneys. *See Blixseth v. Yellowstone Mountain Club, LLC*, 854 F.3d 626, 630 (9th Cir. 2017)(courts must distinguish between client and counsel misconduct).

Mr. Wilson is a layperson with no legal training. He relied in good faith on the legal expertise of MLG, a firm to which he paid hundreds of thousands of dollars in legal fees over the course of this litigation, and which had represented him in prior litigation. That reliance was not blind or unreasonable—Mr. Wilson retained a prominent law firm expecting competent and consistent representation. Instead, his case was shuffled among at least ten different attorneys within MLG, resulting in fragmented communication, inconsistent advice, and ultimately, critical omissions.

Among the most significant of these failures was MLG's lack of communication regarding the Court's October 29, 2024 Order granting Plaintiff's Motion to Compel. Mr. Wilson was also never advised that Plaintiff had filed a motion for further sanctions on December 5, 2024. These were material developments—had Mr. Wilson been informed of them, he could have taken steps to comply with any outstanding obligations or seek clarification from the Court. Instead, MLG's failure to disclose these facts left him unaware of the legal posture of the case.

Despite these internal breakdowns, when Mr. Wilson did receive communication from MLG—specifically the December 2024 emails—he acted promptly and in good faith by producing the requested financial documents. At no point was he told that this production was deficient, nor was he advised of any continuing dispute over document production. His actions reflected a good-faith effort to cooperate and comply, based on the limited and incomplete information provided to him.

To now impose sanctions on Mr. Wilson under these circumstances would be fundamentally unjust. It would punish a client who placed reasonable trust in his attorneys and followed their direction, only to be misled by their silence and disorganization. The law does not support sanctioning a party for this sort of failures of counsel, particularly when the record shows that the party acted diligently, honestly, and in good faith throughout.

BRIEF IN SUPPORT OF                                              Case No. 1:21-cv-00970-EPG
CJ WILSON DECLARATION                    11
24377-24377-00001\TSM\TSM\6477161v1

JABURG WILK
LAW FIRM

Here, the lack of communication from MLG misled Mr. Wilson and contributed to his erroneous, but honest, understanding of the discovery posture. That error is insufficient to justify sanctions under federal law, or to support a perjury finding under California Penal Code § 118.

## V.     CONCLUSION

For the foregoing reasons, the Court should find cause shown and should not issue sanctions against Mr. Wilson as described in DKT#178.

**DATED** this 5th day of May, 2025.

**Jaburg & Wilk, P.C.**

*/s/ Thomas S. Moring*
David L. Allen
Thomas Moring
Attorneys for Defendants

BRIEF IN SUPPORT OF                                                      Case No. 1:21-cv-00970-EPG
CJ WILSON DECLARATION          12
24377-24377-00001\TSM\TSM\6477161v1

**CERTIFICATE OF SERVICE**

I hereby certify that on 5th day of May, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci
HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
david.holtzman@hklaw.com
daniel.kappes@hklaw.com
andrew.klair@hklaw.com
isabella.granucci@hklaw.com
*Attorneys for Plaintiff*

Forrest Booth
forrest.booth@kennedyslaw.com
Camille Zuber
Camille.Zuber@Kennedyslaw.com
KENNEDYS CMK LLP
101 California Street, Suite 1225
San Francisco, CA 94111
*Attorneys for Plaintiff-in-Intervention*

*/s/ Ana M. Canby*

JABURG WILK
LAW FIRM

# EXHIBIT A

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (SBN 075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**FRESNO DIVISION**

| | |
|---|---|
| Foundation Auto Holdings, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **DECLARATION OF CHRISTOPHER JOHN WILSON** |
| vs. | |
| Weber Motors, Fresno, INC. d/b/a BMW Fresno, a California corporation; CJ'S Road To Lemans Corp. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and Christopher John Wilson, an individual and resident of the State of California, | (Assigned to Hon. Erica P. Grosjean) |
| Defendants. | |

Templeton Marsh, LTD.,

       Plaintiff-in-Intervention,

       vs.

Weber Motors, Fresno, INC. d/b/a BMW Fresno, a California corporation; CJ'S Road To Lemans Corp. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and Christopher John Wilson, an individual and resident of the State of California,

       Defendants.

DECLARATION OF CHRISTOPHER JOHN WILSON ISO RESPONSE TO ORDER TO SHOW CAUSE - Case No. 1:21-cv-00970-EPG

I, Christopher John Wilson, hereby declare under penalty of perjury:

1.    I am over the age of 18.

2.    I am competent to testify to the matters set forth herein.

3.    If called to testify I would testify in conformity with the information contained herein.

4.    The matters set forth herein are true and correct, and based on my personal knowledge.

5.    I make and sign this declaration freely and voluntarily.

6.    I, along with two entities that I own, are the Defendants in Case No. 1:21-cv-00970-EPG.

7.    I telephonically attended the April 24, 2025 hearing, and have reviewed the transcript of the hearing, as well as the Minute Order of this Court issued on April 24, 2025, directing me to "show cause why sanctions should not issue for making false statements of fact under penalty of perjury, in the Declaration of Christopher John Wilson (ECF No. 148-1) and Declaration of Christopher John Wilson (ECF No. 164 -1)."  Based upon the Minute Order and the transcript of the Hearing held April 24, 2025, I understand that the Court's concerns pertain to a number of statements in my Declarations, which the Court believes are false, as evidenced by a series of emails dated December 6-11, 2024 (the "MLG Emails") from Julie Chang of MLG, copies of which were sent to me contemporaneously with their issuance.  See Exhibit A, attached.

8.    I have further reviewed in detail both the MLG Emails and my Declarations dated March 3, 2025 (ECF No. 148-1) and March 19, 2025 (ECF No. 164-1).  In so doing, I  have considered the facts and considered the surrounding facts and circumstances, including without limitation the information that was provided to me and information that I now know was known to MLG as of the date of the MLG Emails and was not disclosed to me.

2

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

9.     I originally provided documents to MLG in August, 2022.  Between August 2022 and November, 2024, I do not recall anyone at MLG requesting additional documents from me., However, during that time my attorney Reggie Borkum was in contact with MLG and was asking for updates on the litigation.  This included asking for status on the discovery being propounded to Foundation, and my desire to make sure information was requested.

10.     In August, 2024, MLG provided us with a status update on the case, via email.  In that update, there was no mention of any discovery disputes, discovery deficiencies, or any request for additional documents, above and beyond what I had produced in August 2022. I reviewed my email correspondence with MLG for the time period of May 1, 2024 to October 31, 2024, and I did not see anything sending me any pleadings or requesting specific documents.

11.     In May, 2024, MLG was emailing with me about the results of the Audi dispute with the California New Motor Vehicle Board, including what my lawyer at MLG refers to as milestone defaults. I expected that that MLG would be getting information related to the Audi dispute, as they were my counsel in that matter. Given that they were receiving that information in summer of 2024, I expected that they would respond to any requests regarding the Audi dispute. I specifically brought that to their attention in the December emails, where I reminded Ms. Chang that MLG had represented me in the Audi dispute and had any responsive documents.

12.     In November, 2024, although I do not recall the exact date, I recall a call with MLG personnel, including Julie Chang.  At that point she indicated that Foundation had a right to file a Motion to Compel.  She did not explain that any Foundation motion was fully briefed, and did not tell me that the Court had issued a ruling on the Motion on October 29, 2024.  I now know that this Order followed a hearing on October 24, 2024, that I was not invited to attend and was not aware was occurring,

13.     I did not receive a copy of the October 29, 2024 Order and was not aware that the Court had ordered  that documents requested by Foundation be produced by November 28, 2024.

3

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

14.    I was involved in a phone call with Ms. Chang and my counsel Mr. Borkum in November, 2024. I have reviewed the situation with my counsel and now note that there was a discussion in November, 2024. I remember in that call being advised that the Court had ruled that the attorney/client privilege had been waived, but I understood that was just between me and Mr. Borkum. Even at that time, MLG did not provide copies of any of the Court documents at that time, but provided me a copy of the discovery my lawyers had served on Foundation, but I still did not get copies of any discovery served on Defendants.

15.    I was not aware that Foundation on December 5, 2024 had submitted a further Request for Sanctions, based upon Defendants' purported "collective refusal to comply with the Court's Order, and the settled nature of the instant discovery dispute."  The failure of MLG to disclose these matters caused many of the statements made in the MLG Email, such as that the failure to produce audited financial statements and profit and loss statements "may lead to contempt proceedings" (Exhibit A at JC18) to be materially misleading.

16.    In addition, while it is true that Ms. Chang states in her email of 12/11/24 that "a Motion to Compel has been filed by Foundation," that statement was not made to me, but rather was made to my companies' attorney Reggie Borkum, and in the context of the accompanying language appears to refer solely to a disagreement regarding attorney-client privilege:

> If I am not mistaken, the subpoena to you was the same as the subpoena to MLG. *We have objected on the grounds of attorney client privilege and a Motion to Compel has been filed by Foundation.*

Exhibit A at JC16.  I did not interpret that sentence in an email sent to Mr. Borkum as an indication that disputes existed regarding the sufficiency of our document production or that the Motion to Compel accused me of withholding documents other than with respect to the issue of attorney-client privilege, which my attorney was handling.

17.    Based upon my review of the MLG Emails, and their context, and my Declarations as set forth above, as well as my personal recollection, I believe that, with minor

4

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

exceptions, all of the statements in my Declarations, considered in context and recognizing that I am not an attorney and have no legal training, were and are true and accurate in all material respects. Without limiting the foregoing, I did not, and would not intentionally lie to or attempt to mislead this Court.

18. The following table shows (1) the statements identified by the Court as being false, and (2) my explanation as to each statement, demonstrating (except where specifically noted) that the statements were truthful in light of my knowledge at the time the Declarations were signed and were made in good faith and without any intent to mislead the Court.

| | Statement | Comments |
|---|---|---|
| A. | "nor did any MLG attorney ever ask me or any other representative of Defendants any questions about any specific document request" | The point I was attempting to make here is that I was never provided copies of any of the formal Document Requests, which is absolutely true. While Ms. Chang set forth in the MLG Emails a list of 7 categories of documents being requested (Exhibit A at JC20), those categories are not tied to any specific Document Request, and I was not aware of the context of the requests. |
| B. | "neither I nor any other representative of Defendants were ever asked by MLG to provide any documents in addition to those that I had already provided to them" | In context, this statement is true and correct. I originally provided documents in August, 2022, with subsequent productions in September, 2022. I learned about this from the Declaration of Douglas Schenk, which I learned of after my initial Declarations in this case. Prior to March, 2025, I was not aware of what MLG had, or had not, produced, and I was not provided copies of any Responses to RFP served on Foundation.. . Upon my receipt of the Emails (beginning with the December 6, 2024 email from Ms. Chang), that understanding changed, and I immediately undertook to provide to MLG all documents within the 7 enumerated categories. That included directing them to turn over any |

5

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

| | Statement | Comments |
|---|---|---|
| | | documents pertaining to the Audi dispute, which were already in the possession of MLG, who represented my companies in that matter. In any event, this statement cannot reasonably be taken out of context to demonstrate misleading statements on my part, as I went on to state in my March 19, 2025 Declaration: "In December 2024, MLG instructed Defendants to provide financial documents relating to the operations of the dealerships. Defendants provided MLG with that financial information." Once those documents were provided, I heard nothing further from MLG about document production requests, and, specifically, was not advised that the document production was insufficient, and was in fact never asked by MLG to provide any further documents in addition to those that I had already provided to them. |
| C. | "nor did any MLG attorney ever ask me or any other representative of Defendants any questions about any specific document request" | It is correct that there is a single reference in the MLG Emails to a "Motion to Compel." I was never advised by MLG of the significance of the Motion to Compel or of the specific documents (or categories) that were at issue under the Motion. I did not see a copy of the October 29, 2024 Order, and was not asked to provide documents that comply with that Order. See also Par. 8, above. |
| D. | "I was not aware that the Plaintiff and Intervenor had requested specific documents, and that they were claiming the documents had not been provided" | See Items A, B and C, above. My Declaration shows that I was aware, and acknowledged, that, as of the date of the MLG Emails, documents had been requested (only) as described in the 7 enumerated categories. After receiving those emails, I promptly provided financial documents to MLG and was never advised by MLG that additional items were being demanded to respond to those seven categories, or that Plaintiff and Intervenor |

6

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

| | Statement | Comments |
|---|---|---|
| | | were claiming that requested documents had not been provided. |
| E. | "None of these MLG attorneys informed or otherwise communicated with me regarding any pending motions to compel production of documents, nor was I ever informed of the serious nature of the failure to comply with discovery requests" | Again, this statement considered in context is true and correct. As noted above, I was advised in the MLG Emails that "if we do not produce the financial statements (audited), and profit and loss statements, this may be (sic) lead to contempt proceedings." However, as also indicated above, I immediately complied with the request for financial documents and was never advised by MLG that there were any further issues regarding document production. Likewise, MLG gave me no information regarding the possible effect of non-compliance. Among other things, I now know that on October 29, 2024, the Court entered an Order granting Plaintiff's Motion to Compel; however, I was never informed by MLG of the granting and content of that Order, or of the potential consequences, and did not become so aware until I hired my current counsel. |
| F. | "I was not aware that Plaintiff and/or Intervenor ever claimed any prior production of documents was incomplete, non-responsive, or otherwise deficient" | As of the dates of my Declarations, this statement is true and correct. To reiterate, while I was told in passing that a Motion to Compel had been filed, I was not provided a copy of the Motion; nor was it explained to me that my companies and I were being accused of withholding documents, or that our prior document productions (which were handled by our attorneys) were "incomplete, non-responsive, or otherwise deficient." If I had been provided the October 29, 2024 Order I would have worked to respond to it. |
| G. | "nor did any MLG attorney ever ask me or any other representative of Defendant any questions about any specific document request" | See Item A. I did discuss documents and document production with Ms. Chang, but phone and email, in November and December, 2024. While Ms. Chang provided a list of 7 categories of documents being requested (Exhibit A at JC20), those categories are not tied to any specific |

7

| | Statement | Comments |
|---|---|---|
| | | Document Request, and I was never provided copies of the Document Requests themselves. |
| H. | "Other than the request for financial documents in December 2024, I was unaware that specific requests for documents were being made" | See Item A. While Ms. Chang provided a list of 7 categories of documents being requested (Exhibit A at JC20), those categories are not tied to any specific Document Request, and I was never provided copies of the Document Requests themselves. I responded to Ms. Chang with answers to all seven categories, and we later produced financial documents. I am now aware that on December 13, 2024, MLG filed additional responses to RFP. I did not realize when I filed my declarations that they did not include the Audi documents that I had authorized MLG to release, since those documents were in MLG's possession. |
| I. | "Neither I nor any other representative of Defendants was aware of any motions to compel the production of documents" | See Items C, D, E, above, and Par. 16, above. I was aware of what I understood to be a Motion to Compel directed at MLG and/or Mr. Borkum's office. I did not have copies of the October 29, 2024 Order, and did not realize it was the product of a prior Motion to Compel. Until Jaburg Wilk was engaged, I did not have a copy of the December 5, 2024 Foundation Motion for Further Sanctions.. |
| J. | "None of these MLG attorneys informed or otherwise communicated with me regarding any pending motions to compel production of documents, nor was I ever information of the serious nature of the failure to comply with discovery requests" | See Items E and I, above. I was not made aware of any motions until after they were ruled on, and even then was not provided with an explanation of the full impact, or with copies of the Court documents themselves. |
| K. | "I do not recall speaking with anyone at MLG regarding my deposition" | In the MLG Emails, I was asked to, and promptly did provide potential dates for my deposition. To the best of my recollection, there were no follow-up communications, and I never spoke with anyone at MLG regarding my deposition. |

JABURG WILK
LAW FIRM

8

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

| | Statement | Comments |
|---|---|---|
| L. | "Until the change in counsel I was not informed of any claim that documents produced were incomplete, or non-responsive, or that specific additional documents had been requested" | This statement is correct. While I was asked to, and did, provide financial documents under the MLG Emails, I was never informed that the documents produced were incomplete, or non-responsive, or that specific additional documents had been requested. See Items B-F, I, J, above. |

19.    Foundation has suggested that I have failed to turn over communications between myself and the landlord, and indicated on the record at the April 24, 2025, hearing that I have failed to disclose communications where it is suggested that I requested the landlord not approve the lease assignment. Under Section 5.18 of the APA, titled "Leases" it requires "Buyer and Seller will work together to finalize how to approach the landlord(s) either negotiate new leases between the Buyer and the landlord(s) or to entered into acceptable assignments with the landlord(s), in each case on terms acceptable to the Buyer in its sole discretion."

20.    Attached to this Declaration is the Declaration of Al Monjezab (landlord) as **Exhibit 1**. I believe these Declarations show that I did not have communication with the landlord regarding approval of Foundation as an assignee of the Lease, beyond an initial introduction, and have no additional responsive documents to this category of document.

21.    In addition to the foregoing, my statements should properly be read in light of the following statements in my March 19, 2024, Declaration, which demonstrate clearly that I have acknowledged that, once my current attorneys entered the case, I became aware of the need to supplement Defendants' document disclosures in this matter:

> Once the Defendants were represented by Jaburg Wilk, I have worked with Jaburg Wilk to review all discovery requests and have provided information showing where the documents Defendants have already produced are responsive to the open discovery.

ECF No. 164 -1, ¶ 18.

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                          Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

I have also conducted an additional search related to the open Requests for Production and determined that Defendants have additional responsive documents.

ECF No. 164 -1, ¶ 19.

I have provided the additional responsive documents to Jaburg Wilk.

ECF No. 164 -1, ¶ 20.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: May 5, 2025                    */s/ Christopher John Wilson*
                                       Christopher John Wilson

10

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

# EXHIBIT 1

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants,
Weber Motors Fresno, Inc. d/b/a BMW Fresno,
CJ's Road to Lemans Corp. d/b/a Audi Fresno and Porsche Fresno
and Christopher John Wilson

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware Limited Liability Company; | Case No.: 1:21-cv-00970-EPG |
| Plaintiff, | Assigned To Hon. Mag. Judge Erica P. Grosjean |
| v. | **DECLARATION OF AL MONJAZEB** |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | |
| Defendants. | |

I, Al Monjazeb, hereby declare and state as follows:

1.      At all times relevant hereto, I am the owner of Palm Bluff Investments, LLC ("Palm Bluff"), the entity that owns three parcels of commercial real property located at 7121, 7151 and 7171 North Palm Avenue, Fresno, California, where Christopher John Wilson (hereafter "Mr. Wilson") operates three automobile dealerships, CJ's Road To Lemans Corp., dba Audi Fresno and dba Porsche

1

Fresno, and Weber Motors, Fresno, Inc., dba BMW Fresno. I have personal knowledge of the facts stated in this declaration and can and will testify thereto if called upon to do so.

2. Palm Bluff leased the real property located at 7121 North Palm Avenue to CJ's Road To Lemans Corp. subject to a written lease commencing on February 1, 2017, for a term of ten years, with no option to extend. Paragraph 15.1 of the lease provides as follows:

> "15.1  Transfers.  Except as otherwise provided herein, Tenant shall not, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, assign mortgage, pledge, hypothecate, encumber, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, permit any assignment, or other transfer of this Lease or any interest hereunder by operation of law, sublet the Premises or any party thereof, or permit the use of the Premises by any persons other than Tenant and its employees (collectively 'Transfer')."

3. Palm Bluff leased the real property located at 7151 and 7171 North Palm Avenue to Weber Motors, Fresno, Inc. subject to a written lease commencing on February 1, 2017, for a term of ten years, with no option to extend. The lease to Weber Motors, Fresno, Inc. for the real property located at 7121 No. Palm Avenue, includes the same term at paragraph 15.1 requiring prior written consent of Landlord for any assignment of any interest under the lease.

4. I have over three decades of experience in the automotive industry operating multiple luxury dealerships in the Pacific Northwest and in California, and I currently operate dealerships in Bellevue and Lynnwood, Washington.

5. In or about mid-January 2021, I learned that Mr. Wilson had entered into an Asset Purchase Agreement (hereafter "APA") with Foundation Auto Holdings, LLC ("Foundation") for the purpose of selling Mr. Wilson's interests in the three dealerships to Foundation. I also learned that the terms of the APA called for an assignment of the above-referenced leases to Foundation as tenant.

6. Upon learning of the proposed assignment of the leases, I instructed my attorney, Richard Aaron, to draft a letter to the parties of the APA to apprise the parties of my position with respect to the proposed assignment and to describe the materials that I would need to review in order to determine whether or not to consent to the assignments. A true and correct copy of my attorney's letter of

2

DECLARATION OF AL MONJAZEB                                                    CASE NO. 1:21-CV-00970-EPG

February 4, 2021, to BT Advisors, counsel for Mr. Wilson and his dealerships, is attached hereto as **Exhibit A**.

7. I instructed my attorney to inform the parties that I was very unlikely to agree to the assignments if not backed by the personal guarantees of the ownership group, just as I had required a personal guarantee from Mr. Wilson. As set forth in Mr. Aaron's February 4, 2021 letter, I instructed my attorney to request that Foundation provide the following materials for my review:

a. Financial statements for the last three years of each of the dealerships operated by Foundation;

b. Financial statements for the last three years for any holding company or affiliated entity related to any of the dealerships owned or controlled by Foundation;

c. Identification of each owner of Foundation, including percentage ownership;

d. CPA prepared personal financial statements for each owner, preferably as of December 31, 2020; and

e. A brief biographical history of each of the owners.

8. In late February 2021, I received and reviewed audited 2019 financial statements for Foundation Auto US Corp and for Foundation Auto Corp. I also received and reviewed draft internal consolidated financial statements for Foundation Auto US Corp.

9. Following my review of the foregoing financial statements, I informed Mr. Aaron that I felt that the statements did not exhibit the financial strength I was looking for, and that I was very unlikely to agree to the assignments if not backed by the personal guarantees of the ownership group, just as I had required a personal guarantee from Mr. Wilson, and asked Mr. Aaron to obtain the personal financial statements of Foundation's two principals, Kevin Kutschinski, CEO, and Charles Kramer, CFO.

10. At my request, on March 1, 2021, Mr. Aaron sent an email to Mr. Beaton informing him that if he is "willing to provide personal financial statements for the principal owners, Mr. Monjazeb will be happy to consider whether he would approve the assignments based upon obtaining satisfactory personal guarantees." Mr Aaron went on to inform Mr. Beaton that based upon the financial and historical information for Foundation provided thus far, Mr. Monjazeb "respectfully declines to approve the request for his consent to [the] assignment of the lease from Mr. Wilson's corporations to

3

DECLARATION OF AL MONJAZEB                    CASE NO. 1:21-CV-00970-EPG

[Foundation]." A true and correct copy of Mr. Aaron's March 1, 2021 email to Mr. Beaton is attached hereto as **Exhibit B**.

11. In late March 2021, I received and reviewed personal financial statements for Kevin Kutschinski and Charles Kramer, who together owned more than 75% of Foundation Auto US Corp's Class A shares. Such financial statements were not CPA-prepared, as had been requested; however, I proceeding to review them anyway. I was also informed that both Mr. Kutschinski and Mr. Kramer were willing to provide personal guarantees of the assignee's (Foundation's) obligations under the leases.

12. Following my review of the person financial statements provided, I informed Mr. Aaron, by email dated March 22, 2021, that based upon the minimal liquidity of Mr. Kutschinski and Mr. Karmer, and the absence of hard assets that could be easily valued and perhaps used to secure performance, that I cannot approve the assignment. In coming to that conclusion, I noted that Mr. Kutschinski, the CEO, had only $146,000 of cash, and that Mr. Kramer, the CFO, had only $380,000 of cash. Mr. Kramer also listed $4.5 million of "marketable securities," but gave no further description. I also noted that two-thirds of each of their respective net worth consisted of their stock in Foundation.

13. In early June 2021, I received and reviewed the latest year-end financial statements from Foundation. After careful review and consideration of all the financial and other materials that Foundation had provided to me for review, I decided that I would not consent to the assignment of the dealership leases to Foundation. In my professional judgment, developed over thirty years as a landlord and premium car dealer, I was not willing to lease to a group with little to no experience in the luxury car market, with no local ties to the Fresno community, and with less than robust corporate and personal financial positions. In particular, I told Mr. Aaron that I found the financial condition of Foundation to be "weak," in that there was only $33 million of equity, notwithstanding $68 million of goodwill; all automotive inventory was floored and potentially out of trust; and finally, they showed only one percent of net income, which is far less than the minimum margin even public buyers expect, which is typically five percent or more. I further noted that Foundation had no premium brands of automobiles, and to the

4

DECLARATION OF AL MONJAZEB                                             CASE NO. 1:21-CV-00970-EPG

contrary had a number of weak brands, such as Chrysler Dodge Jeep Ram, Suzuki, and Mitsubishi. Additionally, I noted that it looked like all of the Foundation stores were located in small markets.

14.     After early June 2021, I did not receive any further communications or documentation from Foundation, either directly or through Mr. Aaron, regarding Foundation's request for an assignment of the leases. I therefore assumed that after my March 1, 2021 declination, along with my subsequent determination that the personal financial statements were unacceptable, and my ultimate assessment of the final Foundation financials and their weak dealership portfolio, that Foundation realized that they were not going to obtain my consent to the proposed lease assignments, which is true, and that it ceased its efforts to obtain such consent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: April 22nd, 2025.

AL MONJAZEB

24377-24377-00001\DLA\\6457216v1

5

DECLARATION OF AL MONJAZEB                                    CASE NO. 1:21-CV-00970-EPG

# EXHIBIT 2

## RE: Foundation v. Wilson - Additional Documents

**From: Julie Chang <jchang@defectattorney.com>**          Wed, Dec 11, 2024 at 1:52 PM PST (GMT-08:00)
To: Reggie Borkum <rborkum@btadvisor.com>; CJ Wilson <cj.wilson@porschefresno.com>
Cc: Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan <Jwhelan@defectattorney.com>; Sabrina Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>; Henry Huang <hhuang@defectattorney.com>

Reggie,
As mentioned, I believe the subpoenas issued to you/ your firm were not objected to by our office since MLG does not represent you/your firm.

Clovis relocation – Foundation is contending that CJ planned to relocate the dealerships prior to termination of the APA.  Foundation's argument for the reason for CJ's premature termination of the APA.

Financial statements – These documents are sough to determine damages and to determine CJ's compliance with financial obligations under the APA.  Again, if there is a privacy concern we can move for protective order.

The email you provided yesterday is helpful and we will produce to Foundation.

Thank you,
Julie



**Julie C. Chang, Esq. | Chief Legal Officer**
DefectAttorney.com
**MLG Attorneys at Law**
600 Anton Blvd. | Suite 1200 | Costa Mesa, CA 92626
M. 949.284.9047 | T. 949.581.6900 | F. 949.581.6908
PRACTICE AREAS  LOCATIONS  TEAM  RESULTS

**From:** Reggie Borkum <rborkum@btadvisor.com>
**Sent:** Wednesday, December 11, 2024 12:19 PM
**To:** Julie Chang <jchang@defectattorney.com>; CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan <Jwhelan@defectattorney.com>; Sabrina Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>; Henry Huang <hhuang@defectattorney.com>
**Subject:** Re: Foundation v. Wilson - Additional Documents

Why is MLG not objecting on behalf of CJ and the dealerships regarding the subpoenas issued to me and my firm?

Also, regarding financial statements, would they only be relevant if the court were to determine CJ was in breach?  Is this something relevant to the current claimed breach?

Just trying to determine what is absolutely necessary to turn over and what can be objected to.

JC15

JC15

**EXHIBIT**

2

I am also curious if you feel the email I provided yesterday is something we would want to give to Foundation's counsel now

Please let me know a good time for a call to discuss all of this

--

Reggie Borkum, Esq.

BT Advisors
3021 McGraw Street
San Diego, California 92117
E-Mail: rborkum@btadvisor.com

Cellular:    (619) 857-2710
Facsimile:   (858) 815-4575

---

NOTICE: This e-mail (including any files transmitted with it) is being sent by a law firm. It is intended only for the individual or entity to which it is addressed and may contain information that is proprietary, privileged, confidential or otherwise exempt from disclosure under applicable Federal or State Law. If you are not the named addressee or the employee or agent responsible for delivering this e-mail to the named addressee, be advised that you have received this e-mail in error and you are prohibited from any dissemination, distribution or copying of this e-mail. If you have received this e-mail in error, please immediately contact the sender by reply e-mail, telephone, or facsimile.

--

**From:** Julie Chang <jchang@defectattorney.com>
**Date:** Wednesday, December 11, 2024 at 11:13 AM
**To:** Reggie Borkum <rborkum@btadvisor.com>, CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Ann Zimmerman <ann.zimmerman@bmwfresno.com>, John Whelan <Jwhelan@defectattorney.com>, Sabrina Markarian <smarkarian@defectattorney.com>, MLG LC <LC@defectattorney.com>, Henry Huang <hhuang@defectattorney.com>
**Subject:** RE: Foundation v. Wilson - Additional Documents

Reggie,
This follows my VM today.  Sorry we are playing phone tag.

Please let me introduce attorney Henry Huang (Drew is working on another team) who will be assisting on the case.

If I am not mistaken, the subpoena to you was the same as the subpoena to MLG.  We have objected on the grounds of attorney client privilege and a Motion to Compel has been filed by Foundation. We will provide you with our documents that are responsive.

As mentioned in my VM, what are your thoughts in filing a Motion for Protective Order regarding audited financial statements and profit and loss statements to address CJ's privacy concerns.

Here are a few other documents that we need:

JC16

1. Initial consents, approvals or waivers from any Manufacturer relating to the acquisition, opening or transfer of any automotive dealerships in or around Fresno, CA.

Sincerely,
Julie

**Julie C. Chang, Esq. | Chief Legal Officer**

Image removed by sender. DefectAttorney.com

Image removed by sender. MLG Attorneys at Law Logo

**MLG Attorneys at Law**
600 Anton Blvd. | Suite 1200 | Costa Mesa, CA 92626
M. 949.284.9047 | T. 949.581.6900 | F. 949.581.6908
PRACTICE AREAS   LOCATIONS   TEAM   RESULTS

---

**From:** Reggie Borkum <rborkum@btadvisor.com>
**Sent:** Tuesday, December 10, 2024 9:37 AM
**To:** Julie Chang <jchang@defectattorney.com>; CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan <Jwhelan@defectattorney.com>; Drew Morgan <dmorgan@defectattorney.com>; Sabrina Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>
**Subject:** Re: Foundation v. Wilson - Additional Documents & Depo Date

Julie:

We are trying to determine how these requests are relevant to whether or not CJ breached the PSA or if Foundation failed to perform under the PSA.

Regarding the discovery request propounded on me and my firm, do you, as CJ and the dealerships' counsel, not want to object on the grounds of attorney/client privilege?  Have you received what they are asking me to produce? I have been given until December 19 by opposing counsel in which to respond.

Reggie

--

Reggie Borkum, Esq.

BT Advisors
3021 McGraw Street

JC17

San Diego, California 92117

E-Mail: rborkum@btadvisor.com

Cellular:     (619) 857-2710
Facsimile:   (858) 815-4575

---

NOTICE: This e-mail (including any files transmitted with it) is being sent by a law firm. It is intended only for the individual or entity to which it is addressed and may contain information that is proprietary, privileged, confidential or otherwise exempt from disclosure under applicable Federal or State Law. If you are not the named addressee or the employee or agent responsible for delivering this e-mail to the named addressee, be advised that you have received this e-mail in error and you are prohibited from any dissemination, distribution or copying of this e-mail. If you have received this e-mail in error, please immediately contact the sender by reply e-mail, telephone, or facsimile.

--

**From:** Julie Chang <jchang@defectattorney.com>
**Date:** Tuesday, December 10, 2024 at 9:24 AM
**To:** CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Reggie Borkum <rborkum@btadvisor.com>, Ann Zimmerman <ann.zimmerman@bmwfresno.com>, John Whelan <Jwhelan@defectattorney.com>, Drew Morgan <dmorgan@defectattorney.com>, Sabrina Markarian <smarkarian@defectattorney.com>, MLG LC <LC@defectattorney.com>
**Subject:** RE: Foundation v. Wilson - Additional Documents & Depo Date

CJ,
Thank you for your email and response.  John is out of the office this week, and we need to respond to the request for production of documents so this is where I'm trying to pick up the pieces.  Please send us documentation as to approval to relocate to Clovis; any documentation is acceptable.

If we do not produce the financial statements (audited), and profit and loss statements, this may be lead to contempt proceedings.  I just want you to be aware of that risk.   So, if you are able to provide *audited* financials, then please send.

████████████████████████████████████████████████████

Thank you for your availability in January 2025; we will advise the other side.

Sincerely,
Julie

**Julie C. Chang, Esq. | Chief Legal Officer**
Image removed by sender. DefectAttorney.com
**MLG Attorneys at Law**
600 Anton Blvd. | Suite 1200 | Costa Mesa, CA 92626
M. 949.284.9047 | T. 949.581.6900 | F. 949.581.6908
PRACTICE AREAS  LOCATIONS  TEAM  RESULTS

**From:** CJ Wilson <cj.wilson@porschefresno.com>
**Sent:** Monday, December 9, 2024 6:08 PM
**To:** Julie Chang <jchang@defectattorney.com>
**Cc:** Reggie Borkum <rborkum@btadvisor.com>; Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan

JC18

<whelan@defectattorney.com>; Drew Morgan <dmorgan@defectattorney.com>; Sabrina Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>

**Subject:** Re: Foundation v. Wilson - Additional Documents & Depo Date

Julie, John  I am not sure why I am being asked to provide all of these things- I am comfortable with the following statements and backing them up:

*I am the sole shareholder/person of control for all the dealerships.  I have no financial partners, equity partners, or additional shareholders.*

*The BMW technicians are the only unionized employees on our payroll.*

*Regarding the relocation, we have been approved by the city of Clovis to relocate.   We have purchased the land, gotten entitlements and are in the initial phases of construction grading.*

*We have been approved by Audi, BMW and Porsche to relocate.  We have submitted various plans to the manufacturers and have had them approved and will be relocating ASAP.*

*I am confused as to the request for settlement documents with AoA/VW- as your firm was the one that handled all of those negotiations.   The main driver of that settlement was my willingness or request to move into the new facilities.  I am on a completely accelerated timeline on a much larger spend because of Audi's insistence on this.*

I am not comfortable sending foundation or anyone my financials at this time- in one of the other (among many) lawsuits that foundation is involved in- the court unsealed, or refused to seal, many financial documents.  I do not want my information becoming public.   I don't consent to that, and I think it's plain to say that this is a completely malicious attempt to make me and my family targets for bad actors.   I cannot believe I have to justify that statement in writing.

For that matter- I am STILL waiting for the access I requested months ago- which is everything you have on Foundation.  I have paid your firm hundreds of thousands of dollars and I should own all of that discovery so that I can conduct my own private investigation into the fraudulent nature of their business and financing.  How much did they borrow from BMO Harris?  Who else do they owe millions of dollars to?  Did they produce the documents that they submitted to the DMV?  Did they produce the documents that they sent to Porsche, Audi, BMW?

How is MLG ensuring that they are producing the proper documentation?   I have it on good authority from within the industry that Foundation is completely getting torn apart from their recent legal issues and bad operation.

The fact that they are in a lawsuit with Chuck Kramer (who was their former Chief Operating Officer 'genius insider' when we were talking) is wild.

January I would aim for the 2nd week for availability.

---

**From:** "Julie Chang" <jchang@defectattorney.com>
**To:** "Reggie Borkum" <rborkum@btadvisor.com>, "CJ Wilson" <cj.wilson@porschefresno.com>
**Cc:** "Ann Zimmerman" <ann.zimmerman@bmwfresno.com>, "John Whelan"

JC19

<Jwhelan@defecattorney.com>, "Drew Morgan" <dmorgan@defectattorney.com>, "Sabrina Markarian" <smarkarian@defectattorney.com>, "MLG LC" <LC@defectattorney.com>
**Sent:** Friday, December 6, 2024 6:08:11 PM
**Subject:** Foundation v. Wilson - Additional Documents & Depo Date

Reggie and CJ,

Good evening.  I left a VM for both of you earlier today.  We will need to respond to additional discovery requests propounded by Foundation and provide some available dates for CJ's deposition.

Do you have the following documents in your possession that you can provide:
1. Audited financial statements from January 1, 2020 to present.
2. Profit and loss statements from January 1, 2020 to present.
3. Aside from I.A.M. National Pension Fund, any documents relating to liability to any other multi-employer union pension fund.
4. Documents to identify all shareholders/owners (and the number of shares) with equity interest in CJ's Road to Lemans Corp. dba Audi Fresno and Porsche Fresno.
5. Documents to show equity ownership of CJ's Road to Lemans Corp. dba Audi Fresno and Porsche Fresno by any Trust.
6. Documents regarding relocation of the dealership to Clovis.
7. Settlement agreement with Audi in CJ's Road to Lemans Corp. v. VWGoA, Inc.  and documents submitted to CA New Motor Vehicle Board in connection with the matter.

CJ – Please provide 2-3 dates in January 2025 that are available at this time.

Please send the documents and dates to our office early next week.

Thank you and have a great weekend.

Best regards,
Julie

**Julie C. Chang, Esq. | Chief Legal Officer**

**MLG Attorneys at Law**
600 Anton Blvd. | Suite 1200 | Costa Mesa, CA 92626
M. 949.284.9047 | T. 949.581.6900 | F. 949.581.6908
PRACTICE AREAS  LOCATIONS  TEAM  RESULTS

--
**CJ Wilson**
Owner/ Collector Car Specialist
BMW Fresno

tel: 559.447.6700
m: 602.918.3626
CJ.Wilson@bmwfresno.com

BMW Fresno
7171 N. Palm Ave.
Fresno, CA 93650

JC20

map | yelp | instagram | facebook

**bmwfresno.com**

JC15

JC21

# APPENDIX 14

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (SBN 075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## FRESNO DIVISION

| | |
|---|---|
| Foundation Auto Holdings, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **DECLARATION OF CHRISTOPHER JOHN WILSON** |
| vs. | |
| Weber Motors, Fresno, INC. d/b/a BMW Fresno, a California corporation; CJ'S Road To Lemans Corp. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and Christopher John Wilson, an individual and resident of the State of California, | (Assigned to Hon. Erica P. Grosjean) |
| Defendants. | |
| Templeton Marsh, LTD., | |
| Plaintiff-in-Intervention, | |
| vs. | |
| Weber Motors, Fresno, INC. d/b/a BMW Fresno, a California corporation; CJ'S Road To Lemans Corp. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and Christopher John Wilson, an individual and resident of the State of California, | |
| Defendants. | |

DECLARATION OF CHRISTOPHER JOHN WILSON ISO RESPONSE TO ORDER TO SHOW CAUSE - Case No. 1:21-cv-00970-EPG

I, Christopher John Wilson, hereby declare under penalty of perjury:

1.    I am over the age of 18.

2.    I am competent to testify to the matters set forth herein.

3.    If called to testify I would testify in conformity with the information contained herein.

4.    The matters set forth herein are true and correct, and based on my personal knowledge.

5.    I make and sign this declaration freely and voluntarily.

6.    I, along with two entities that I own, are the Defendants in Case No. 1:21-cv-00970-EPG.

7.    I telephonically attended the April 24, 2025 hearing, and have reviewed the transcript of the hearing, as well as the Minute Order of this Court issued on April 24, 2025, directing me to "show cause why sanctions should not issue for making false statements of fact under penalty of perjury, in the Declaration of Christopher John Wilson (ECF No. 148-1) and Declaration of Christopher John Wilson (ECF No. 164 -1)." Based upon the Minute Order and the transcript of the Hearing held April 24, 2025, I understand that the Court's concerns pertain to a number of statements in my Declarations, which the Court believes are false, as evidenced by a series of emails dated December 6-11, 2024 (the "MLG Emails") from Julie Chang of MLG, copies of which were sent to me contemporaneously with their issuance.  See Exhibit A, attached.

8.    I have further reviewed in detail both the MLG Emails and my Declarations dated March 3, 2025 (ECF No. 148-1) and March 19, 2025 (ECF No. 164-1).  In so doing, I  have considered the facts and considered the surrounding facts and circumstances, including without limitation the information that was provided to me and information that I now know was known to MLG as of the date of the MLG Emails and was not disclosed to me.

2

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

9. I originally provided documents to MLG in August, 2022. Between August 2022 and November, 2024, I do not recall anyone at MLG requesting additional documents from me., However, during that time my attorney Reggie Borkum was in contact with MLG and was asking for updates on the litigation. This included asking for status on the discovery being propounded to Foundation, and my desire to make sure information was requested.

10. In August, 2024, MLG provided us with a status update on the case, via email. In that update, there was no mention of any discovery disputes, discovery deficiencies, or any request for additional documents, above and beyond what I had produced in August 2022. I reviewed my email correspondence with MLG for the time period of May 1, 2024 to October 31, 2024, and I did not see anything sending me any pleadings or requesting specific documents.

11. In May, 2024, MLG was emailing with me about the results of the Audi dispute with the California New Motor Vehicle Board, including what my lawyer at MLG refers to as milestone defaults. I expected that that MLG would be getting information related to the Audi dispute, as they were my counsel in that matter. Given that they were receiving that information in summer of 2024, I expected that they would respond to any requests regarding the Audi dispute. I specifically brought that to their attention in the December emails, where I reminded Ms. Chang that MLG had represented me in the Audi dispute and had any responsive documents.

12. In November, 2024, although I do not recall the exact date, I recall a call with MLG personnel, including Julie Chang. At that point she indicated that Foundation had a right to file a Motion to Compel. She did not explain that any Foundation motion was fully briefed, and did not tell me that the Court had issued a ruling on the Motion on October 29, 2024. I now know that this Order followed a hearing on October 24, 2024, that I was not invited to attend and was not aware was occurring,

13. I did not receive a copy of the October 29, 2024 Order and was not aware that the Court had ordered that documents requested by Foundation be produced by November 28, 2024.

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

3

JABURG WILK
LAW FIRM

14.     I was involved in a phone call with Ms. Chang and my counsel Mr. Borkum in November, 2024. I have reviewed the situation with my counsel and now note that there was a discussion in November, 2024. I remember in that call being advised that the Court had ruled that the attorney/client privilege had been waived, but I understood that was just between me and Mr. Borkum. Even at that time, MLG did not provide copies of any of the Court documents at that time, but provided me a copy of the discovery my lawyers had served on Foundation, but I still did not get copies of any discovery served on Defendants.

15.     I was not aware that Foundation on December 5, 2024 had submitted a further Request for Sanctions, based upon Defendants' purported "collective refusal to comply with the Court's Order, and the settled nature of the instant discovery dispute." The failure of MLG to disclose these matters caused many of the statements made in the MLG Email, such as that the failure to produce audited financial statements and profit and loss statements "may lead to contempt proceedings" (Exhibit A at JC18) to be materially misleading.

16.     In addition, while it is true that Ms. Chang states in her email of 12/11/24 that "a Motion to Compel has been filed by Foundation," that statement was not made to me, but rather was made to my companies' attorney Reggie Borkum, and in the context of the accompanying language appears to refer solely to a disagreement regarding attorney-client privilege:

> If I am not mistaken, the subpoena to you was the same as the subpoena to MLG. **We have objected on the grounds of attorney client privilege and a Motion to Compel has been filed by Foundation.**

Exhibit A at JC16. I did not interpret that sentence in an email sent to Mr. Borkum as an indication that disputes existed regarding the sufficiency of our document production or that the Motion to Compel accused me of withholding documents other than with respect to the issue of attorney-client privilege, which my attorney was handling.

17.     Based upon my review of the MLG Emails, and their context, and my Declarations as set forth above, as well as my personal recollection, I believe that, with minor

4

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

exceptions, all of the statements in my Declarations, considered in context and recognizing that I am not an attorney and have no legal training, were and are true and accurate in all material respects. Without limiting the foregoing, I did not, and would not intentionally lie to or attempt to mislead this Court.

18. The following table shows (1) the statements identified by the Court as being false, and (2) my explanation as to each statement, demonstrating (except where specifically noted) that the statements were truthful in light of my knowledge at the time the Declarations were signed and were made in good faith and without any intent to mislead the Court.

| | Statement | Comments |
|---|---|---|
| A. | "nor did any MLG attorney ever ask me or any other representative of Defendants any questions about any specific document request" | The point I was attempting to make here is that I was never provided copies of any of the formal Document Requests, which is absolutely true. While Ms. Chang set forth in the MLG Emails a list of 7 categories of documents being requested (Exhibit A at JC20), those categories are not tied to any specific Document Request, and I was not aware of the context of the requests. |
| B. | "neither I nor any other representative of Defendants were ever asked by MLG to provide any documents in addition to those that I had already provided to them" | In context, this statement is true and correct. I originally provided documents in August, 2022, with subsequent productions in September, 2022. I learned about this from the Declaration of Douglas Schenk, which I learned of after my initial Declarations in this case. Prior to March, 2025, I was not aware of what MLG had, or had not, produced, and I was not provided copies of any Responses to RFP served on Foundation.. . Upon my receipt of the Emails (beginning with the December 6, 2024 email from Ms. Chang), that understanding changed, and I immediately undertook to provide to MLG all documents within the 7 enumerated categories. That included directing them to turn over any |

5

| | Statement | Comments |
|---|---|---|
| | | documents pertaining to the Audi dispute, which were already in the possession of MLG, who represented my companies in that matter. In any event, this statement cannot reasonably be taken out of context to demonstrate misleading statements on my part, as I went on to state in my March 19, 2025 Declaration: "In December 2024, MLG instructed Defendants to provide financial documents relating to the operations of the dealerships. Defendants provided MLG with that financial information." Once those documents were provided, I heard nothing further from MLG about document production requests, and, specifically, was not advised that the document production was insufficient, and was in fact never asked by MLG to provide any further documents in addition to those that I had already provided to them. |
| C. | "nor did any MLG attorney ever ask me or any other representative of Defendants any questions about any specific document request" | It is correct that there is a single reference in the MLG Emails to a "Motion to Compel." I was never advised by MLG of the significance of the Motion to Compel or of the specific documents (or categories) that were at issue under the Motion. I did not see a copy of the October 29, 2024 Order, and was not asked to provide documents that comply with that Order. See also Par. 8, above. |
| D. | "I was not aware that the Plaintiff and Intervenor had requested specific documents, and that they were claiming the documents had not been provided" | See Items A, B and C, above. My Declaration shows that I was aware, and acknowledged, that, as of the date of the MLG Emails, documents had been requested (only) as described in the 7 enumerated categories. After receiving those emails, I promptly provided financial documents to MLG and was never advised by MLG that additional items were being demanded to respond to those seven categories, or that Plaintiff and Intervenor |

6

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

| | Statement | Comments |
|---|---|---|
| | | were claiming that requested documents had not been provided. |
| E. | "None of these MLG attorneys informed or otherwise communicated with me regarding any pending motions to compel production of documents, nor was I ever informed of the serious nature of the failure to comply with discovery requests" | Again, this statement considered in context is true and correct. As noted above, I was advised in the MLG Emails that "if we do not produce the financial statements (audited), and profit and loss statements, this may be (sic) lead to contempt proceedings." However, as also indicated above, I immediately complied with the request for financial documents and was never advised by MLG that there were any further issues regarding document production. Likewise, MLG gave me no information regarding the possible effect of non-compliance. Among other things, I now know that on October 29, 2024, the Court entered an Order granting Plaintiff's Motion to Compel; however, I was never informed by MLG of the granting and content of that Order, or of the potential consequences, and did not become so aware until I hired my current counsel. |
| F. | "I was not aware that Plaintiff and/or Intervenor ever claimed any prior production of documents was incomplete, non-responsive, or otherwise deficient" | As of the dates of my Declarations, this statement is true and correct. To reiterate, while I was told in passing that a Motion to Compel had been filed, I was not provided a copy of the Motion; nor was it explained to me that my companies and I were being accused of withholding documents, or that our prior document productions (which were handled by our attorneys) were "incomplete, non-responsive, or otherwise deficient." If I had been provided the October 29, 2024 Order I would have worked to respond to it. |
| G. | "nor did any MLG attorney ever ask me or any other representative of Defendant any questions about any specific document request" | See Item A. I did discuss documents and document production with Ms. Chang, but phone and email, in November and December, 2024. While Ms. Chang provided a list of 7 categories of documents being requested (Exhibit A at JC20), those categories are not tied to any specific |

7

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

| | Statement | Comments |
|---|---|---|
| | | Document Request, and I was never provided copies of the Document Requests themselves. |
| H. | "Other than the request for financial documents in December 2024, I was unaware that specific requests for documents were being made" | See Item A. While Ms. Chang provided a list of 7 categories of documents being requested (Exhibit A at JC20), those categories are not tied to any specific Document Request, and I was never provided copies of the Document Requests themselves. I responded to Ms. Chang with answers to all seven categories, and we later produced financial documents. I am now aware that on December 13, 2024, MLG filed additional responses to RFP. I did not realize when I filed my declarations that they did not include the Audi documents that I had authorized MLG to release, since those documents were in MLG's possession. |
| I. | "Neither I nor any other representative of Defendants was aware of any motions to compel the production of documents" | See Items C, D, E, above, and Par. 16, above. I was aware of what I understood to be a Motion to Compel directed at MLG and/or Mr. Borkum's office. I did not have copies of the October 29, 2024 Order, and did not realize it was the product of a prior Motion to Compel. Until Jaburg Wilk was engaged, I did not have a copy of the December 5, 2024 Foundation Motion for Further Sanctions.. |
| J. | "None of these MLG attorneys informed or otherwise communicated with me regarding any pending motions to compel production of documents, nor was I ever information of the serious nature of the failure to comply with discovery requests" | See Items E and I, above. I was not made aware of any motions until after they were ruled on, and even then was not provided with an explanation of the full impact, or with copies of the Court documents themselves. |
| K. | "I do not recall speaking with anyone at MLG regarding my deposition" | In the MLG Emails, I was asked to, and promptly did provide potential dates for my deposition. To the best of my recollection, there were no follow-up communications, and I never spoke with anyone at MLG regarding my deposition. |

8

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

| | Statement | Comments |
|---|---|---|
| L. | "Until the change in counsel I was not informed of any claim that documents produced were incomplete, or non-responsive, or that specific additional documents had been requested" | This statement is correct. While I was asked to, and did, provide financial documents under the MLG Emails, I was never informed that the documents produced were incomplete, or non-responsive, or that specific additional documents had been requested. See Items B-F, I, J, above. |

19.    Foundation has suggested that I have failed to turn over communications between myself and the landlord, and indicated on the record at the April 24, 2025, hearing that I have failed to disclose communications where it is suggested that I requested the landlord not approve the lease assignment. Under Section 5.18 of the APA, titled "Leases" it requires "Buyer and Seller will work together to finalize how to approach the landlord(s) either negotiate new leases between the Buyer and the landlord(s) or to entered into acceptable assignments with the landlord(s), in each case on terms acceptable to the Buyer in its sole discretion."

20.    Attached to this Declaration is the Declaration of Al Monjezab (landlord) as **Exhibit 1**. I believe these Declarations show that I did not have communication with the landlord regarding approval of Foundation as an assignee of the Lease, beyond an initial introduction, and have no additional responsive documents to this category of document.

21.    In addition to the foregoing, my statements should properly be read in light of the following statements in my March 19, 2024, Declaration, which demonstrate clearly that I have acknowledged that, once my current attorneys entered the case, I became aware of the need to supplement Defendants' document disclosures in this matter:

> Once the Defendants were represented by Jaburg Wilk, I have worked with Jaburg Wilk to review all discovery requests and have provided information showing where the documents Defendants have already produced are responsive to the open discovery.

ECF No. 164 -1, ¶ 18.

9

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

I have also conducted an additional search related to the open Requests for Production and determined that Defendants have additional responsive documents.

ECF No. 164 -1, ¶ 19.

I have provided the additional responsive documents to Jaburg Wilk.

ECF No. 164 -1, ¶ 20.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: May 5, 2025         */s/ Christopher John Wilson*
                           Christopher John Wilson

JABURG WILK
LAW FIRM

10

DECLARATION OF CHRISTOPHER JOHN WILSON
ISO RESPONSE TO ORDER TO SHOW CAUSE                    Case No. 1:21-cv-00970-EPG

24377-24377-00001\TSM\DLA\0v0

# EXHIBIT 1

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants,
Weber Motors Fresno, Inc. d/b/a BMW Fresno,
CJ's Road to Lemans Corp. d/b/a Audi Fresno and Porsche Fresno
and Christopher John Wilson

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware Limited Liability Company;<br><br>Plaintiff,<br><br>v.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>Defendants. | Case No.: 1:21-cv-00970-EPG<br><br>Assigned To<br>Hon. Mag. Judge Erica P. Grosjean<br><br>**DECLARATION OF AL MONJAZEB** |

I, Al Monjazeb, hereby declare and state as follows:

1.    At all times relevant hereto, I am the owner of Palm Bluff Investments, LLC ("Palm Bluff"), the entity that owns three parcels of commercial real property located at 7121, 7151 and 7171 North Palm Avenue, Fresno, California, where Christopher John Wilson (hereafter "Mr. Wilson") operates three automobile dealerships, CJ's Road To Lemans Corp., dba Audi Fresno and dba Porsche

1

DECLARATION OF AL MONJAZEB                                         CASE NO. 1:21-CV-00970-EPG

Fresno, and Weber Motors, Fresno, Inc., dba BMW Fresno. I have personal knowledge of the facts stated in this declaration and can and will testify thereto if called upon to do so.

2.    Palm Bluff leased the real property located at 7121 North Palm Avenue to CJ's Road To Lemans Corp. subject to a written lease commencing on February 1, 2017, for a term of ten years, with no option to extend. Paragraph 15.1 of the lease provides as follows:

> "15.1  Transfers. Except as otherwise provided herein, Tenant shall not, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, assign mortgage, pledge, hypothecate, encumber, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, permit any assignment, or other transfer of this Lease or any interest hereunder by operation of law, sublet the Premises or any party thereof, or permit the use of the Premises by any persons other than Tenant and its employees (collectively 'Transfer')."

3.    Palm Bluff leased the real property located at 7151 and 7171 North Palm Avenue to Weber Motors, Fresno, Inc. subject to a written lease commencing on February 1, 2017, for a term of ten years, with no option to extend. The lease to Weber Motors, Fresno, Inc. for the real property located at 7121 No. Palm Avenue, includes the same term at paragraph 15.1 requiring prior written consent of Landlord for any assignment of any interest under the lease.

4.    I have over three decades of experience in the automotive industry operating multiple luxury dealerships in the Pacific Northwest and in California, and I currently operate dealerships in Bellevue and Lynnwood, Washington.

5.    In or about mid-January 2021, I learned that Mr. Wilson had entered into an Asset Purchase Agreement (hereafter "APA") with Foundation Auto Holdings, LLC ("Foundation") for the purpose of selling Mr. Wilson's interests in the three dealerships to Foundation. I also learned that the terms of the APA called for an assignment of the above-referenced leases to Foundation as tenant.

6.    Upon learning of the proposed assignment of the leases, I instructed my attorney, Richard Aaron, to draft a letter to the parties of the APA to apprise the parties of my position with respect to the proposed assignment and to describe the materials that I would need to review in order to determine whether or not to consent to the assignments. A true and correct copy of my attorney's letter of

2

DECLARATION OF AL MONJAZEB                                                    CASE NO. 1:21-CV-00970-EPG

February 4, 2021, to BT Advisors, counsel for Mr. Wilson and his dealerships, is attached hereto as **Exhibit A**.

7.      I instructed my attorney to inform the parties that I was very unlikely to agree to the assignments if not backed by the personal guarantees of the ownership group, just as I had required a personal guarantee from Mr. Wilson.  As set forth in Mr. Aaron's February 4, 2021 letter, I instructed my attorney to request that Foundation provide the following materials for my review:

a.  Financial statements for the last three years of each of the dealerships operated by Foundation;

b.  Financial statements for the last three years for any holding company or affiliated entity related to any of the dealerships owned or controlled by Foundation;

c.  Identification of each owner of Foundation, including percentage ownership;

d.  CPA prepared personal financial statements for each owner, preferably as of December 31, 2020; and

e.  A brief biographical history of each of the owners.

8.      In late February 2021, I received and reviewed audited 2019 financial statements for Foundation Auto US Corp and for Foundation Auto Corp.  I also received and reviewed draft internal consolidated financial statements for Foundation Auto US Corp.

9.      Following my review of the foregoing financial statements, I informed Mr. Aaron that I felt that the statements did not exhibit the financial strength I was looking for, and that I was very unlikely to agree to the assignments if not backed by the personal guarantees of the ownership group, just as I had required a personal guarantee from Mr. Wilson, and asked Mr. Aaron to obtain the personal financial statements of Foundation's two principals, Kevin Kutschinski, CEO, and Charles Kramer, CFO.

10.      At my request, on March 1, 2021, Mr. Aaron sent an email to Mr. Beaton informing him that if he is "willing to provide personal financial statements for the principal owners, Mr. Monjazeb will be happy to consider whether he would approve the assignments based upon obtaining satisfactory personal guarantees."  Mr Aaron went on to inform Mr. Beaton that based upon the financial and historical information for Foundation provided thus far, Mr. Monjazeb "respectfully declines to approve the request for his consent to [the] assignment of the lease from Mr. Wilson's corporations to

3

DECLARATION OF AL MONJAZEB                                                        CASE NO. 1:21-CV-00970-EPG

[Foundation]." A true and correct copy of Mr. Aaron's March 1, 2021 email to Mr. Beaton is attached hereto as **Exhibit B**.

11.    In late March 2021, I received and reviewed personal financial statements for Kevin Kutschinski and Charles Kramer, who together owned more than 75% of Foundation Auto US Corp's Class A shares. Such financial statements were not CPA-prepared, as had been requested; however, I proceeding to review them anyway. I was also informed that both Mr. Kutschinski and Mr. Kramer were willing to provide personal guarantees of the assignee's (Foundation's) obligations under the leases.

12.    Following my review of the person financial statements provided, I informed Mr. Aaron, by email dated March 22, 2021, that based upon the minimal liquidity of Mr. Kutschinski and Mr. Karmer, and the absence of hard assets that could be easily valued and perhaps used to secure performance, that I cannot approve the assignment. In coming to that conclusion, I noted that Mr. Kutschinski, the CEO, had only $146,000 of cash, and that Mr. Kramer, the CFO, had only $380,000 of cash. Mr. Kramer also listed $4.5 million of "marketable securities," but gave no further description. I also noted that two-thirds of each of their respective net worth consisted of their stock in Foundation.

13.    In early June 2021, I received and reviewed the latest year-end financial statements from Foundation. After careful review and consideration of all the financial and other materials that Foundation had provided to me for review, I decided that I would not consent to the assignment of the dealership leases to Foundation. In my professional judgment, developed over thirty years as a landlord and premium car dealer, I was not willing to lease to a group with little to no experience in the luxury car market, with no local ties to the Fresno community, and with less than robust corporate and personal financial positions. In particular, I told Mr. Aaron that I found the financial condition of Foundation to be "weak," in that there was only $33 million of equity, notwithstanding $68 million of goodwill; all automotive inventory was floored and potentially out of trust; and finally, they showed only one percent of net income, which is far less than the minimum margin even public buyers expect, which is typically five percent or more. I further noted that Foundation had no premium brands of automobiles, and to the

4

contrary had a number of weak brands, such as Chrysler Dodge Jeep Ram, Suzuki, and Mitsubishi. Additionally, I noted that it looked like all of the Foundation stores were located in small markets.

14.     After early June 2021, I did not receive any further communications or documentation from Foundation, either directly or through Mr. Aaron, regarding Foundation's request for an assignment of the leases. I therefore assumed that after my March 1, 2021 declination, along with my subsequent determination that the personal financial statements were unacceptable, and my ultimate assessment of the final Foundation financials and their weak dealership portfolio, that Foundation realized that they were not going to obtain my consent to the proposed lease assignments, which is true, and that it ceased its efforts to obtain such consent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: April 22nd, 2025.

AL MONJAZEB

24377-24377-00001\DLA\\6457216v1

5

DECLARATION OF AL MONJAZEB                                                    CASE NO. 1:21-CV-00970-EPG

# EXHIBIT 2

## RE: Foundation v. Wilson - Additional Documents

**From: Julie Chang <jchang@defectattorney.com>**            Wed, Dec 11, 2024 at 1:52 PM PST (GMT-08:00)
To: Reggie Borkum <rborkum@btadvisor.com>; CJ Wilson <cj.wilson@porschefresno.com>
Cc: Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan <Jwhelan@defectattorney.com>; Sabrina Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>; Henry Huang <hhuang@defectattorney.com>

Reggie,
As mentioned, I believe the subpoenas issued to you/ your firm were not objected to by our office since MLG does not represent you/your firm.

Clovis relocation – Foundation is contending that CJ planned to relocate the dealerships prior to termination of the APA. Foundation's argument for the reason for CJ's premature termination of the APA.

Financial statements – These documents are sough to determine damages and to determine CJ's compliance with financial obligations under the APA. Again, if there is a privacy concern we can move for protective order.

The email you provided yesterday is helpful and we will produce to Foundation.

████████████████████████████████████████████████

Thank you,
Julie


**Julie C. Chang, Esq. | Chief Legal Officer**
DefectAttorney.com
**MLG Attorneys at Law**
600 Anton Blvd. | Suite 1200 | Costa Mesa, CA 92626
MLG Attorneys at Law Logo    M. 949.284.9047 | T. 949.581.6900 | F. 949.581.6908
PRACTICE AREAS   LOCATIONS   TEAM   RESULTS

**From:** Reggie Borkum <rborkum@btadvisor.com>
**Sent:** Wednesday, December 11, 2024 12:19 PM
**To:** Julie Chang <jchang@defectattorney.com>; CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan <Jwhelan@defectattorney.com>; Sabrina Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>; Henry Huang <hhuang@defectattorney.com>
**Subject:** Re: Foundation v. Wilson - Additional Documents

Why is MLG not objecting on behalf of CJ and the dealerships regarding the subpoenas issued to me and my firm?

████████████████████████████████████████████████

Also, regarding financial statements, would they only be relevant if the court were to determine CJ was in breach? Is this something relevant to the current claimed breach?

Just trying to determine what is absolutely necessary to turn over and what can be objected to.

JC15

JC15

EXHIBIT
2

████████████████████████████████████████

I am also curious if you feel the email I provided yesterday is something we would want to give to Foundation's counsel now

Please let me know a good time for a call to discuss all of this

--

Reggie Borkum, Esq.


BT Advisors
3021 McGraw Street
San Diego, California 92117
E-Mail: rborkum@btadvisor.com

Cellular:    (619) 857-2710
Facsimile:   (858) 815-4575


---

NOTICE: This e-mail (including any files transmitted with it) is being sent by a law firm. It is intended only for the individual or entity to which it is addressed and may contain information that is proprietary, privileged, confidential or otherwise exempt from disclosure under applicable Federal or State Law. If you are not the named addressee or the employee or agent responsible for delivering this e-mail to the named addressee, be advised that you have received this e-mail in error and you are prohibited from any dissemination, distribution or copying of this e-mail. If you have received this e-mail in error, please immediately contact the sender by reply e-mail, telephone, or facsimile.


--


**From:** Julie Chang <jchang@defectattorney.com>
**Date:** Wednesday, December 11, 2024 at 11:13 AM
**To:** Reggie Borkum <rborkum@btadvisor.com>, CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Ann Zimmerman <ann.zimmerman@bmwfresno.com>, John Whelan <Jwhelan@defectattorney.com>, Sabrina Markarian <smarkarian@defectattorney.com>, MLG LC <LC@defectattorney.com>, Henry Huang <hhuang@defectattorney.com>
**Subject:** RE: Foundation v. Wilson - Additional Documents

Reggie,
This follows my VM today.  Sorry we are playing phone tag.

Please let me introduce attorney Henry Huang (Drew is working on another team) who will be assisting on the case.

If I am not mistaken, the subpoena to you was the same as the subpoena to MLG.  We have objected on the grounds of attorney client privilege and a Motion to Compel has been filed by Foundation. We will provide you with our documents that are responsive.

As mentioned in my VM, what are your thoughts in filing a Motion for Protective Order regarding audited financial statements and profit and loss statements to address CJ's privacy concerns.

Here are a few other documents that we need:

JC16

1. Initial consents, approvals or waivers from any Manufacturer relating to the acquisition, opening or transfer of any automotive dealerships in or around Fresno, CA.


Sincerely,
Julie


**Julie C. Chang, Esq. | Chief Legal Officer**

Image removed by sender, MLG Attorneys at Law Logo

Image removed by sender. DefectAttorney.com

**MLG Attorneys at Law**
600 Anton Blvd. | Suite 1200 | Costa Mesa, CA 92626
M. 949.284.9047 | T. 949.581.6900 | F. 949.581.6908
PRACTICE AREAS   LOCATIONS   TEAM   RESULTS

---

**From:** Reggie Borkum <rborkum@btadvisor.com>
**Sent:** Tuesday, December 10, 2024 9:37 AM
**To:** Julie Chang <jchang@defectattorney.com>; CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan <Jwhelan@defectattorney.com>; Drew Morgan <dmorgan@defectattorney.com>; Sabrina Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>
**Subject:** Re: Foundation v. Wilson - Additional Documents & Depo Date

Julie:

We are trying to determine how these requests are relevant to whether or not CJ breached the PSA or if Foundation failed to perform under the PSA.

Regarding the discovery request propounded on me and my firm, do you, as CJ and the dealerships' counsel, not want to object on the grounds of attorney/client privilege?  Have you received what they are asking me to produce? I have been given until December 19 by opposing counsel in which to respond.

Reggie

--

Reggie Borkum, Esq.


BT Advisors
3021 McGraw Street

San Diego, California 92117
E-Mail: rborkum@btadvisor.com

Cellular:    (619) 857-2710
Facsimile:  (858) 815-4575

---

NOTICE: This e-mail (including any files transmitted with it) is being sent by a law firm. It is intended only for the individual or entity to which it is addressed and may contain information that is proprietary, privileged, confidential or otherwise exempt from disclosure under applicable Federal or State Law. If you are not the named addressee or the employee or agent responsible for delivering this e-mail to the named addressee, be advised that you have received this e-mail in error and you are prohibited from any dissemination, distribution or copying of this e-mail. If you have received this e-mail in error, please immediately contact the sender by reply e-mail, telephone, or facsimile.

--

**From:** Julie Chang <jchang@defectattorney.com>
**Date:** Tuesday, December 10, 2024 at 9:24 AM
**To:** CJ Wilson <cj.wilson@porschefresno.com>
**Cc:** Reggie Borkum <rborkum@btadvisor.com>, Ann Zimmerman <ann.zimmerman@bmwfresno.com>, John Whelan <jwhelan@defectattorney.com>, Drew Morgan <dmorgan@defectattorney.com>, Sabrina Markarian <smarkarian@defectattorney.com>, MLG LC <LC@defectattorney.com>
**Subject:** RE: Foundation v. Wilson - Additional Documents & Depo Date

CJ,
Thank you for your email and response.  John is out of the office this week, and we need to respond to the request for production of documents so this is where I'm trying to pick up the pieces.  Please send us documentation as to approval to relocate to Clovis; any documentation is acceptable.

If we do not produce the financial statements (audited), and profit and loss statements, this may be lead to contempt proceedings.  I just want you to be aware of that risk.   So, if you are able to provide *audited* financials, then please send.

████████████████████████████████████████████████████████

Thank you for your availability in January 2025; we will advise the other side.

Sincerely,
Julie

**Julie C. Chang, Esq. | Chief Legal Officer**
Image removed by sender. DefectAttorney.com
**MLG Attorneys at Law**
600 Anton Blvd. | Suite 1200 | Costa Mesa, CA 92626
M. 949.284.9047 | T. 949.581.6900 | F. 949.581.6908
PRACTICE AREAS   LOCATIONS   TEAM   RESULTS

**From:** CJ Wilson <cj.wilson@porschefresno.com>
**Sent:** Monday, December 9, 2024 6:08 PM
**To:** Julie Chang <jchang@defectattorney.com>
**Cc:** Reggie Borkum <rborkum@btadvisor.com>; Ann Zimmerman <ann.zimmerman@bmwfresno.com>; John Whelan

JC18

<whelan@defectattorney.com>; Drew Morgan <dmorgan@defectattorney.com>; Sabrina Markarian <smarkarian@defectattorney.com>; MLG LC <LC@defectattorney.com>

**Subject:** Re: Foundation v. Wilson - Additional Documents & Depo Date

Julie, John  I am not sure why I am being asked to provide all of these things- I am comfortable with the following statements and backing them up:

*I am the sole shareholder/person of control for all the dealerships.  I have no financial partners, equity partners, or additional shareholders.*

*The BMW technicians are the only unionized employees on our payroll.*

*Regarding the relocation, we have been approved by the city of Clovis to relocate.   We have purchased the land, gotten entitlements and are in the initial phases of construction grading.*

*We have been approved by Audi, BMW and Porsche to relocate.  We have submitted various plans to the manufacturers and have had them approved and will be relocating ASAP.*

*I am confused as to the request for settlement documents with AoA/VW- as your firm was the one that handled all of those negotiations.   The main driver of that settlement was my willingness or request to move into the new facilities.  I am on a completely accelerated timeline on a much larger spend because of Audi's insistence on this.*

I am not comfortable sending foundation or anyone my financials at this time- in one of the other (among many) lawsuits that foundation is involved in- the court unsealed, or refused to seal, many financial documents.  I do not want my information becoming public.   I don't consent to that, and I think it's plain to say that this is a completely malicious attempt to make me and my family targets for bad actors.  I cannot believe I have to justify that statement in writing.

For that matter- I am STILL waiting for the access I requested months ago- which is everything you have on Foundation.  I have paid your firm hundreds of thousands of dollars and I should own all of that discovery so that I can conduct my own private investigation into the fraudulent nature of their business and financing.  How much did they borrow from BMO Harris?  Who else do they owe millions of dollars to?  Did they produce the documents that they submitted to the DMV?  Did they produce the documents that they sent to Porsche, Audi, BMW?

How is MLG ensuring that they are producing the proper documentation?   I have it on good authority from within the industry that Foundation is completely getting torn apart from their recent legal issues and bad operation.

The fact that they are in a lawsuit with Chuck Kramer (who was their former Chief Operating Officer 'genius insider' when we were talking) is wild.

January I would aim for the 2nd week for availability.

----------------------------------------------------------------

**From:** "Julie Chang" <jchang@defectattorney.com>
**To:** "Reggie Borkum" <rborkum@btadvisor.com>, "CJ Wilson" <cj.wilson@porschefresno.com>
**Cc:** "Ann Zimmerman" <ann.zimmerman@bmwfresno.com>, "John Whelan"

JC19

\<Jwhelan@defectattorney.com\>, "Drew Morgan" \<dmorgan@defectattorney.com\>, "Sabrina Markarian" \<smarkarian@defectattorney.com\>, "MLG LC" \<LC@defectattorney.com\>
**Sent:** Friday, December 6, 2024 6:08:11 PM
**Subject:** Foundation v. Wilson - Additional Documents & Depo Date

Reggie and CJ,

Good evening.  I left a VM for both of you earlier today.  We will need to respond to additional discovery requests propounded by Foundation and provide some available dates for CJ's deposition.

Do you have the following documents in your possession that you can provide:
1. Audited financial statements from January 1, 2020 to present.
2. Profit and loss statements from January 1, 2020 to present.
3. Aside from I.A.M. National Pension Fund, any documents relating to liability to any other multi-employer union pension fund.
4. Documents to identify all shareholders/owners (and the number of shares) with equity interest in CJ's Road to Lemans Corp. dba Audi Fresno and Porsche Fresno.
5. Documents to show equity ownership of CJ's Road to Lemans Corp. dba Audi Fresno and Porsche Fresno by any Trust.
6. Documents regarding relocation of the dealership to Clovis.
7. Settlement agreement with Audi in CJ's Road to Lemans Corp. v. VWGoA, Inc.  and documents submitted to CA New Motor Vehicle Board in connection with the matter.

CJ – Please provide 2-3 dates in January 2025 that are available at this time.

Please send the documents and dates to our office early next week.

Thank you and have a great weekend.

Best regards,
Julie

**Julie C. Chang, Esq. | Chief Legal Officer**

**MLG Attorneys at Law**
600 Anton Blvd. | Suite 1200 | Costa Mesa, CA 92626
M. 949.284.9047 | T. 949.581.6900 | F. 949.581.6908
PRACTICE AREAS   LOCATIONS   TEAM   RESULTS

--
**CJ Wilson**
Owner/ Collector Car Specialist
BMW Fresno

tel: 559.447.6700
m: 602.918.3626
CJ.Wilson@bmwfresno.com

BMW Fresno
7171 N. Palm Ave.
Fresno, CA 93650

JC20

map | yelp | instagram | facebook

**bmwfresno.com**

JC15

JC21

# APPENDIX 15

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring *Admitted Pro Hac Vice*
tsm@jaburgwilk.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, <br><br> Defendants. | Case No. 1:21-cv-00970-EPG <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** <br><br> **Date:** January 9, 2026 <br> **Time:** 10:00 a.m. <br> **Location:** 2500 Tulare Street <br> Fresno, CA 93721 <br> **Courtroom:** 10 <br> **Judge:** Erica P. Grosjean <br> **Date Filed:** June 21, 2021 <br> **Trial Date:** May 12, 2026 |

1

TEMPLETON MARSH, LTD.,

Plaintiff-in-Intervention,

vs.

WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,

Defendants.

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on January 9, 2026 at 10:00am, or as soon thereafter as counsel may be heard, before the Honorable Erica P. Grosjean, in Courtroom 10 of the above-entitled court, at 2500 Tulare Street, Room 1501, Fresno, CA 93721, Defendants Weber Motors Fresno, Inc., CJ'S Road To Lemans Corp., and Christopher John Wilson, through counsel undersigned move the Court for an order granting summary judgment under Federal Rule of Civil Procedure 56(a).

This motion is based on this notice of motion and motion, the memorandum of points and authorities, the concurrently filed appendix of evidence, all records, documents, and papers in the Court's file, and any written and oral argument presented at the hearing in this matter.

DATED this 12th day of November, 2025

**Jaburg & Wilk, P.C.**

/s/ David L. Allen
David L. Allen
Thomas Moring
Attorneys for Defendants

2

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................5

II.   LIMITED SCOPE OF MOTION ......................................................................6

III.  FACTUAL BACKGROUND...............................................................................6

    A.    THE DISCOVERY VIOLATON SANCTIONS .......................................7

    B.    THE APA CONDITIONS PRECEDENT .................................................9

    C.    THE BMW CONDITIONS PRECEDENT .............................................10

    D.    THE AUDI CONDITIONS PRECEDENT .............................................11

    E.    THE PORSCHE CONDITIONS PRECEDENT ....................................11

    F.    THE BMO HARRIS FINANCING CONDITIONS PRECEDENT .....11

IV.   LEGAL ARGUMENT .......................................................................................12

    A.    DEFENDANTS' BREACHES WERE NOT THE PROXIMATE CAUSE OF PLAINTIFF'S INABILITY TO PERFORM..........................................12

    B.    PLAINTIFF CANNOT PROVE THEY COULD PERFORM SO IT IS PRECLUDED FROM DAMAGES AND SPECIFIC PERFOMANCE ...............13

        1.    Plaintiff Cannot Recover the Lost Profits Damages If It Cannot Evidence its Ability to Perform. ...................................................................................14

        2.    Plaintiff Cannot Prove it Could Obtain the Lease for the Properties....................15

        3.    Because Plaintiff Could Not Obtain the Lease, It Could Not Obtain Manufacturer Approval.................................................................................16

        4.    Because Plaintiff Could Not Obtain Manufacturers' Approvals, It Could Not Obtain Financing From BMO Harris................................................................16

    C.    PLAINTIFF CANNOT PROVE ABILITY TO PERFORM AND IS THEREFORE PRECLUDED FROM SPECIFIC PERFORMANCE.................17

V.    CONCLUSION ..................................................................................................18

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT                  CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

# TABLE OF AUTHORITIES

**Case Law**

*Agam v Gavra,*
    236 Cal. App. 4th 91 (2015) ..................................................................................... 13
*Brandon & Tibbs v. George Kevorkian Accountancy Corp.,*
    226 Cal.App.3d 442 (1990) ...................................................................................... 15
*C. Robert Nattress & Associates v. CIDCO,*
    184 Cal. App. 3d 55 (1986) ...................................................................................... 18
*Dickey v. Kuhn,*
    (1930) 106 Cal.App. 300, 289 P. 242 ...................................................................... 15
*Ersa Grae Corp. v. Fluor Corp.,*
    1 Cal. App. 4th 613, (1991) .................................................................................. 5, 16
*Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists,*
    (1971) 14 Cal.App.3d 209 ........................................................................................ 15
*McDorman v. Moody,*
    (1942) 50 Cal.App.2d 136, 122 P.2d 639 ................................................................ 15
*Ninety Nine Investments v. Overseas Courier Service (Singapore) Private,*
    6 Cal. App. 4th 1118 (2003) .................................................................................... 18
*Southern Pac. Mill. Co. v. Billiwhack etc. Farm,*
    (1942) 50 Cal.App.2d 79, 122 P.2d 650 .................................................................. 15

**Rules**

Cal. Civ. Code § 3300 (West) ......................................................................................... 14
Civil Code § 3301 ................................................................................................... 13, 14

**Other Authorities**

77 Am.Jur.2d, Vendor and Purchaser, § 518, p. 647 ..................................................... 15
Rest.2d Contracts, § 254 ................................................................................................. 15

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR
SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

JABURG WILK
LAW FIRM

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Plaintiff asserted claims of breach and anticipatory breach of contract, and breach of the covenant of good faith and fair dealing and seeks either: (1) lost profits and enterprise value damages; or (2) specific performance. To be entitled to either the damages or specific performance remedy, Plaintiff must prove that the alleged breaches were the proximate cause of such damages. The breach must be the reason why the Plaintiff incurred the alleged damages, much like a "but for" analysis in a negligence claim.

To prevail on either the damages claim or the alternative remedy of specific performance, Plaintiff must prove that it could have timely performed in full pursuant to the terms of the agreement. While actual performance by Plaintiff is not necessary, it is well settled that Plaintiff must prove that it was able to timely perform all conditions required of it per the terms of the agreement. Barring that showing by Plaintiff, the claims fail, and Plaintiff cannot recover damages or, alternatively, a judgment for specific performance. *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 625, (1991). Plaintiff must still meet the burden to prove that it was able to timely perform the conditions required of Plaintiff per the terms of the contract, and that any breaches by the Defendants were the proximate cause of its alleged damages. In this instance, Plaintiff is unable to carry its burden to prove that, but for Defendants' alleged breaches, it would have been able to timely fully perform as required by the contract at issue.

In this case, the alleged breaches committed by Defendants were not the proximate cause of Plaintiff's inability to perform. Rather, Plaintiff failed to meet several conditions precedent to closing, and it is those failures that caused Plaintiff's damages, if any.  Plaintiff's inability to perform precludes it from recovering the remedies it seeks. Defendants are therefore entitled to summary judgment.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

## II.    LIMITED SCOPE OF MOTION

On June 2, 2025, this Court ordered, *inter alia,* as a discovery sanction, that "Defendants shall be prohibited from opposing Plaintiff's claims for breach of contract and anticipatory breach of contract. The case will proceed only on the question of damages and/or remedy for those claims." *See* ECF 187 pg. 31.

The arguments below are made only to address the issue of Plaintiff's alleged damages and are not set forth to argue, in violation to this Court's Order, that there was no breach, or anticipatory breach, of contract.[1] For purposes of establishing damages, their nature, or their amount, Plaintiff bears the burden to show some sort of proximate cause, such that the breaches that the Court found were the proximate cause of Plaintiff's alleged damages. Defendants set forth below their arguments as to how the alleged breaches, found in paragraphs 56 and 57 of the First Amended Complaint, were not the proximate cause of Plaintiff's alleged damages.

The same challenges are set forth to address Plaintiff's claim for specific performance.

To be clear, there is no argument below that Defendants did not breach or that Plaintiff's actions justified a breach; contrarily, the breaches are discussed only in the context of whether Plaintiff can prove that but for the breaches, it would have been able to fully and timely perform its contractual obligations, as required for it to be able to recover any of its alleged damages.

## III.    FACTUAL BACKGROUND

In 2020, Plaintiff and Defendants began negotiating the sale of three car dealerships owned and operated by the two Defendant entities; namely, Audi, BMW, and Porsche brands (collectively the manufacturers are referred to as Original Equipment Manufacturers or in this

---

[1] Nothing set forth herein should be construed as an admission or implied admission by Defendants that they did, in fact, breach the contract at issue; however, for the purposes of this Motion, Defendants acknowledge and adopt the Court's findings on breach of contract and anticipatory breach of contract.

6

Motion "OEMs"), located in Fresno, California. [Defendants' Statement of Undisputed Facts ("DSUF") ¶ 1.]  The BMW dealership was owned and operated by Weber Motors, Fresno, Inc., dba BMW Fresno. [DSUF ¶ 2]. The Audi and Porsche dealerships were owned and operated by CJ's Road to Lemans Corp., dba Audi Fresno and Porsche Fresno. [DSUF ¶ 3].  Both Weber Motors, Fresno, Inc. and CJ's Road to Lemans Corp. were owned solely by CJ Wilson, who worked full time operating the three dealerships. [DSUF ¶ 4].

Much of the negotiations between Plaintiff and Defendants centered on the retention of Mr. Wilson by Plaintiff following the acquisition; namely, agreeable terms of employment and of his future ownership of the dealerships, and of Foundation. [DSUF ¶ 5]. Mr. Wilson remaining as a part owner and the general manager of the dealerships was a specific requirement of the OEMs to Plaintiff obtaining the necessary approvals from the OEMs, which Plaintiff necessarily had to obtain in order to consummate the transaction. [DSUF ¶ 6].

On November 30, 2020, while negotiations on key details were ongoing, the parties executed the Asset Purchase Agreement ("APA"). [DSUF ¶ 7]. Even though the APA included as Exhibit C a "form" of an Employment Agreement, it was understood and agreed between the parties that the terms of Mr. Wilson's employment and his managerial role were to be negotiated as they moved toward closing. [DSUF ¶ 8]. The APA had an original closing date for the transaction of December 21, 2020, which was later changed to January 30, 2021. In the APA, there is a clause to extend that date by another one hundred and fifty (150) days, which resulted in the latest closing date of June 29, 2021. [DSUF ¶ 9].

A.     THE DISCOVERY VIOLATON SANCTIONS

The Court found, as sanctions for alleged discovery violations, that Defendants could not argue in defense of alleged breaches, and instead found that Defendants breached the APA as a matter of law. [DSUF ¶ 10]. The Court left open the issue of damages and the nature of the same. [DSUF ¶ 11].  While the Court did not provide any finding as to how, precisely, Defendants

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT                          CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

breached the APA, Plaintiff alleges the following in its First Amended Complaint as the Defendant Entities' purported breaches ("Entity Breaches"):

1.  Failure to provide written assurances of their intent to proceed to closing in good faith, and to comply with their obligations under the APA, in violation of Section 5.23 of the APA;
2.  Weber and Lemans' failure to disclose Wilson's pledge, in his capacity as trustee, of the Trust's equity ownership in Weber and Lemans to a creditor, in breach of applicable dealer sales and services agreements with the manufacturers;
3.  Failure to cause Wilson to agree to the non-compete agreement and the employment agreement, as attached to the APA;
4.  Failure to engage in any negotiations in good faith with respect to the form of amended and restated limited liability company agreements for each of the new entities, to be agreed to by the parties under Section 3.2(j) of the APA;
5.  Defendants' apparent lack of sufficient assets necessary to pay all amounts owing to creditors outstanding as of the closing date for all obligations not assumed by Foundation; and
6.  Wilson's failure to provide information with respect to his trust and his net worth as required by the manufacturers in connection with their approval of the subject transactions.

[DSUF ¶ 12].

Additionally, Plaintiff alleged that defendant Mr. Wilson in his individual capacity committed the following breaches ("Individual Breaches" and collectively with the Entity Breaches the "Breaches"):

1.  His refusal to agree to the non-compete agreement and the employment agreement, as attached to the APA;
2.  His failure to engage in any negotiations in good faith with respect to the form of amended and restated limited liability company agreements for each of the new entities, to be agreed to by the parties under Section 3.2(j) of the APA; and
3.  His discussions with other individuals regarding a potential deal for the BMW dealership, in violation of Section 5.13 of the APA.

8

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

[DSUF ¶ 13]

**B.     THE APA CONDITIONS PRECEDENT**

Plaintiff needed to obtain assignments and assume the leases for the dealership locations[2] under the APA. The APA also required OEM approvals, which were conditioned upon the assignment of the leases. [DSUF ¶ 14].  To be clear the APA provided that Plaintiff was required to obtain:

(m)     An assignment and assumption of the Leases, together with the required consents from the landlords under the Leases, or new leases between Buyer and the landlords thereunder, in each case acceptable to Buyer in its sole discretion (the "Lease Assignments");

[DSUF ¶ 15].

Plaintiff was unable to obtain the landlord's approval for an assignment of the leases, and therefore was unable to assume the leases. [DSUF ¶ 16].  More specifically, Mr. Monjazeb, the landlord, requested financials from Foundation and the individual principals of Foundation, and upon his review of such financial statements he initially "informed [his attorney] that [he] felt that the statements did not exhibit the financial strength [he] was looking for, and that [he] was very unlikely going to agree to the assignments if not backed by the personal guarantees of the ownership group…" [DSUF ¶ 17]. Then, after reviewing the personal financial statements of the principals who would be providing the personal guarantees, Mr. Monjazeb "decided that [he] would not consent to the assignment of the dealership leases to Foundation. In [his] professional judgment, developed over thirty years as a landlord and premium car dealer, [he] was not willing to lease to a group with little to no experience in the luxury car market, with no local ties to the Fresno community, and with less than robust corporate and personal financial positions." [DSUF ¶ 18]. Mr. Monjazeb's attorney, Richard Aaron, who was personally involved in the discussions between Plaintiff's representative and Mr. Monjazeb, also confirmed the same, stating "that

---

[2] There were two leases with the same landlord for the three dealerships, with BMW having its own building, and Porsche and Audi sharing an adjacent building.

9

based upon the minimal liquidity of Mr. Kutchinski and Mr. Kramer [Foundation's principals], and the absence of hard assets that could be easily valued and perhaps used to secure performance, that '[Mr. Monjazeb] could not approve the assignment." [DSUF ¶ 19]. Due to the foregoing, Mr. Monjazeb confirmed to Mr. Aaron that "at this point in time - early June 2021 – his decision that he would not consent to the assignment of the dealership leases to Foundation, which he concluded was a group with little to no experience in the luxury car market, with no local ties to the Fresno community, and with less than robust corporate and personal financial positions." [DSUF ¶ 20].

Plaintiff obtained only <u>conditional</u> approvals of the OEMs as of May 25, 2021, on which date the latest approval was received from Porsche. [DSUF ¶ 21]. The APA was originally to close on January 30, 2021, but would automatically be extended for an additional 150 days to June 29, 2021, by which date Plaintiff needed to obtain all of its necessary approvals, including the <u>non-conditional</u> OEM approvals, the Landlord approvals to the lease assignments, and the State of California approvals. [DSUF ¶ 22].

## C. THE BMW CONDITIONS PRECEDENT

BMW's Conditional Approval provided in April 2021 contained the most robust conditions precedent. The first paragraph makes the approval subject to satisfying "each of the specific conditions set forth below." Those conditions include that Mr. Wilson was to be "Center Operator." There was never an agreement entered into between Foundation and CJ satisfying this condition. At best, CJ and Foundation agreed negotiations would be ongoing. [DSUF ¶ 23].

There is an "initial owner's equity requirement" of at least $14,263,723; however, this money was never confirmed by Foundation to exist and indeed, Plaintiff confirmed that it would have trouble meeting this requirement unless and until they received mezzanine financing. [DSUF ¶ 24]. Finally, Foundation was required to use Praxis or Tricarico to design the new facility for BMW. [DSUF ¶ 25]. Praxis and Tricarico are both Architecture firms that were

10

specified by BMW as set forth in the BMW Conditional approval. *Id.* However, the only drawings obtained were for Porsche, not BMW. [DSUF ¶ 26].

### D. THE AUDI CONDITIONS PRECEDENT

The conditional approval provided by Audi on May 23, 2021, contained conditions precedent that formed the basis of the conditional approval. [DSUF ¶ 27]. The third paragraph makes the approval subject to the occurrence of the nine items which, of most importance, was the assignment and assumption of the lease with an extension making the lease term at least an additional 10 years. [DSUF ¶ 28]. This never happened, and per the landlord's declaration, never was going to happen. [DSUF ¶ 29].

### E. THE PORSCHE CONDITIONS PRECEDENT

The Porsche conditional approval dated May 25, 2021, provides in the first paragraph which makes the approval subject to compliance with certain conditions which included construction of a new facility subject to certain forth milestone deadlines, none of which were met. Indeed, only a drawing was exchanged. [DSUF ¶ 30]. Second, *iner alia,* Mr. Wilson is to be the "General Manager," however, the terms of an employment agreement were never agreed as the parties were still negotiating the terms. [DSUF ¶ 31].

### F. THE BMO HARRIS FINANCING CONDITIONS PRECEDENT

The financing from BMO Harris was predicated upon the OEMs approvals. [DSUF ¶ 32]. More specifically, the BMO Harris Letter provides that the following other terms must occur:

1. All three franchises to be acquired must be floored[3] with the Bank.
2. Sources and uses to be satisfactory to the Bank.
3. Satisfactory legal and Bank review of entity structure and flow of funds.
4. Covenant compliance on a pro-forma basis prior to close, which may require an equity injection depending on inventory levels.
5. Formal OEM approval of all franchises to be acquired.

---

[3] "Flooring" or floor financing is additional debt that a car dealer takes on to acquire inventory from OEMs, placing additional strain on Foundation's finances.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

6. Distributions and management fees above the Borrower's tax liability allowed up to pro-forma covenant compliance.

7. Proposal is subject to the Bank's standard due diligence and credit approval. At this time the Bank has not received such approval, and this proposal is for discussion purposes only.

[DSUF ¶ 33]. (emphasis added).

## IV. LEGAL ARGUMENT

Even in light of the Court's rulings on the Breaches, Plaintiff must still prove that but for the Breaches, it would have been able to timely satisfy the conditions precedent contained in the APA, conditional OEM approvals, and the BMO Harris financing proposal.

Because Plaintiff could not perform, it cannot recover lost profits damages, and it is not entitled to specific performance. Even after the Court's finding that Defendants breached the APA, Plaintiff's claims nevertheless fail.

### A. DEFENDANTS' BREACHES WERE NOT THE PROXIMATE CAUSE OF PLAINTIFF'S INABILITY TO PERFORM.

Plaintiff does not arrive at a damages analysis without evidencing it could timely perform the conditions placed on it. Stated differently, if a plaintiff seeks to purchase any business, and would not be able to close on the business by the deadline, it cannot recover damages unless plaintiff can meet its' burden of proof to show defendants' breach was the proximate cause of plaintiff's inability to perform. California codified the same in Civil Code § 3301, which states that "causation of damages in contract cases, as in tort cases, requires that the damages be *proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain*." *Agam v Gavra,* 236 Cal. App. 4th 91 (2015) (emphasis added) quoting Cal. Civ. Code § 3301. Plaintiff alleged the Breaches in the First Amended Complaint. [DSUF ¶¶'s 12-13]. None of the alleged Breaches precluded Plaintiff obtaining necessary financing or funding nor did it preclude Plaintiff from demonstrating cash reserves of $14,263,723 to satisfy one of many of BMW's conditions precedent. [DSUF ¶ 24]. And most important, it did not

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

preclude Plaintiff from obtaining the landlord's consent to the lease assignments. Plaintiff needed to show it had cash reserves of $14,263,723; Defendants had nothing to do with Plaintiff not having that cash reserve amount, which was wholly separate from any of the Breaches.

Additionally, the Audi conditional approval required "assignment and assumption of Dealer's lease of the Dealership Premises, with an extension making the lease term at least 10 years…" [DSUF ¶ 28]. Landlord states in his Declaration that he would not assign the leases to Plaintiff, let alone extend the lease term for at least another 10 years. [DSUF ¶¶'s 17-20]. The Breaches did not preclude Plaintiff from obtaining assignments of the leases. Rather, it was due to Mr. Monjazeb's analysis and decision that Plaintiff's financial health, including those of the principals, was not an enterprise which to risk his business. The failure of Foundation to obtain lease assignments did, however prevent OEM's approval.

The BMO financing was all illusory, since it was based on OEM approval that was never obtained. Even with Defendants' Breaches, Landlord's decision to not allow Plaintiff to assume the leases was not proximately caused by Defendants. The whole chain of events falls apart once it becomes apparent that Mr. Monjazeb would not agree to the first of the many conditions (lease assignment) on which the remaining deal was to be built. Plaintiff is solely responsible for those failures. That reality is enough to end Plaintiff's case.

**B.    PLAINTIFF CANNOT PROVE THEY COULD PERFORM SO IT IS PRECLUDED FROM DAMAGES AND SPECIFIC PERFOMANCE**

Damages for Plaintiff's cause of action require evidence that it *could* perform, not that it *did* perform, at the time of the breach. Plaintiff therefore has to prove that as of June 29, 2021 – the contractual closing date -- it could have met every condition precedent as required of each of the OEM's conditional approvals as well as the remining conditions in the APA. The same applies to specific performance. Without evidence that they could perform in full, then Plaintiff's alleged damages and remedies cannot be awarded.

13

1.      **Plaintiff Cannot Recover the Lost Profits Damages If It Cannot Evidence its Ability to Perform.**

As codified, "[t]o establish a breach of contract, there must be damages. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin." Cal. Civ. Code § 3301. The code further clarifies that "[f]or the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300 (West).

As applied to the instant case, "[l]oss of prospective profits may nevertheless be recovered if the evidence shows with reasonable certainty both their occurrence and the extent thereof." *Brandon & Tibbs v. George Kevorkian Accountancy Corp.* 226 Cal.App.3d 442 (1990) quoting *Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists* (1971) 14 Cal.App.3d 209, 221. However, before the lost profits analysis can even begin, Plaintiff must establish, *as its burden*, the following:

> The consequential damages must have been contemplated as part of the contract and be proved with reasonable certainty. If it was foreseeable that profits would be read into the contract and the purpose of the contract, then it could result in consequential damages. Although it is true that an anticipatory breach or repudiation of a contract by one party permits the other party to sue for damages without performing or offering to perform its own obligations (§ 1440), **this does not mean damages can be recovered without evidence that, but for the defendant's breach, the plaintiff would have had the ability to perform**. (*Dickey v. Kuhn* (1930) 106 Cal.App. 300, 303–304, 289 P. 242 ["elimination of the necessity of an offer of performance does not dispense with the proof of ability to perform when that is made an issue in the case"].)
>
> We reject Ersa Grae's contention that proof of the plaintiff's ability to perform is limited to actions for specific performance. *Dickey v. Kuhn, supra,* 106 Cal.App. 300, 289 P. 242, was an action for money damages, not specific performance. (See also *McDorman v. Moody* (1942) 50 Cal.App.2d 136, 140–141, 122 P.2d 639; *Southern Pac. Mill. Co. v. Billiwhack etc. Farm* (1942) 50 Cal.App.2d 79, 86–87, 122 P.2d 650.) As explained by Professor Corbin, in "an action for breach by an unconditional

14

JABURG WILK
LAW FIRM

repudiation it is still a condition precedent to the plaintiff's right to a *judgment for damages* that he should have the ability to perform all such conditions. If he could not or would not have performed the substantial equivalent for which the defendant's performance was agreed to be exchanged, he is given no remedy in *damages* for the defendant's non-performance or repudiation." (4 Corbin on Contracts (1951) § 978, pp. 924; emphasis added.)

Professor Williston agrees: " 'Where [one party] repudiates, there is no necessity for [the other party] to *allege* a tender, nor his readiness and willingness to perform. **He must, of course, *prove* that he would have been able to [perform], for otherwise he will fail in his proof of *damages*** ...' " (5 Williston on Contracts (1961) § 669, p. 353; emphasis added; see also Rest.2d Contracts, § 254, subd. (1) ["A party's duty to pay *damages* for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise"]; 77 Am.Jur.2d, Vendor and Purchaser, § 518, p. 647 [in the case of an anticipatory repudiation of a contract *by a seller, the buyer's right to sue for damages* is not conditioned on any further performance by the buyer, provided it appears the buyer was ready, willing and able to perform]; Cal. Real Property Sales Transactions (Cont.Ed.Bar 1981) § 12.10, pp. 687–688 [if financing is contemplated, the buyer must be able to demonstrate the availability of financing]; 12 Am.Jur. Proof of Facts 2d, Anticipatory Repudiation, § 9, p. 196.)

*Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 625, (1991) (emphasis added).

To reiterate, while Defendants do not argue that Plaintiff did not perform; for purposes of damages at issue here, it is settled that a party must provide admissible evidence it could have performed. Here, Plaintiff's burden is to prove that it *could have performed,* which it cannot do.

### 2.    Plaintiff Cannot Prove it Could Obtain the Lease for the Properties.

Plaintiffs place the proverbial cart before the horse in the sense that they could not obtain the lease approvals to operate each of the respective dealerships. Plaintiff incorrectly alleges that it had financing in place, and that it had approvals from Audi, BMW, and Porsche. What Plaintiff conveniently omits is that the approvals it obtained were only conditional, and the purported funding it had lined up was also only conditional, and both were predicated on, *inter alia,* obtaining assignment of the leases. [DSUF ¶¶'s 28, 31].

15

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

Obtaining the lease assignments is the predicate for all other approvals and discharge of those conditions. Even the FAC admits such that as of June 11, 2021, which was merely 18 days prior to the scheduled closing, Plaintiff was only in "discussions" to assume the leases. [DSUF ¶ 34]. "Discussions" do not amount to an agreement. The evidence shows exactly the opposite. The declarations evidence that Plaintiff had not, did not, and could not obtain assignments for the leases for the properties. Similarly, the BMO Proposal explicitly states that it is for discussion purposes only. [DSUF ¶¶ 31-33].

Not only is this evidence that Plaintiff could not perform as required by the terms of the APA, but it also evidences that it could not perform as to the OEMs' conditional approvals; and without those approvals, Plaintiff could not then obtain the financing. [DSUF ¶¶'s 22; 28; 31-33]. Financing was predicated on the manufacturer approval, manufacturer approval was dependent, *inter alia,* on the assumed leases. Without the assignment of the leases, there is nothing. Plaintiff ignores this critical requirement.

### 3. Because Plaintiff Could Not Obtain the Lease, It Could Not Obtain Manufacturer Approval.

The OEMs' conditional approvals all require assumption of the leases to operate at the respective locations.  A conditional approval is precisely that – conditioned on something predicate. Plaintiff could not obtain the first and most important part: assumption of the leases. Without assumption of the leases, the conditional approvals from the manufacturers are literally useless. They have no effect upon the parties. And, without the non-conditional OEM approvals – which were never obtained --the alleged financing, is simply a non-binding proposal and nothing more. [DSUF ¶¶'s 31-33].

### 4. Because Plaintiff Could Not Obtain Manufacturers' Approvals, It Could Not Obtain Financing From BMO Harris

Plaintiff disclosed the Proposal from BMO Harris which provides terms for floor financing, the purchase amount under the APA, and another senior existing Debt. [DSUF ¶ 35].

16

Importantly, which is again ignored by Plaintiff, is the "other terms" portion of the Proposal, which, *inter alia,* provides the following:

> …
> 2. Sources and uses to be satisfactory to the Bank
> 3. Satisfactory legal and Bank review of entity structure and flow of funds
> …
> 5. Formal OEM approval of all franchises to be acquired.
> …
> 7. Proposal is subject to the Bank's standard due diligence and credit approval. At this time the Bank has not received such approval, and **this proposal is for discussion purposes only**.

[DSUF ¶ 33 (emphasis added)].

The Proposal is dated February 1, 2021. So as of January 30, 2021, the initial closing date, Plaintiff lacked actual financing; it was still subject to review and approval. This Proposal was for "discussion purposes." *Id.* A discussion does not amount to performance. Plaintiff cannot provide admissible evidence that on the closing date of June 27, 2021, but for the Breaches it would have been ready to close on its acquisition of Defendants' three dealerships. Therefore, it cannot prove it could perform. Without the lease approvals, none of the other conditions precedent could be met. Therefore, Plaintiff was unable to timely perform its obligations per the terms of the APA.

**C.     PLAINTIFF CANNOT PROVE ABILITY TO PERFORM AND IS THEREFORE PRECLUDED FROM SPECIFIC PERFORMANCE**

A party seeking specific performance must generally prove its ready, willing, and able to perform as to the terms of the transaction. *Ninety Nine Investments v. Overseas Courier Service (Singapore) Private,* 6 Cal. App. 4th 1118, 1126 (2003) citing *C. Robert Nattress & Associates v. CIDCO,* 184 Cal. App. 3d 55, 64 (1986).

Plaintiff has alleged it was ready and willing, and has also alleged it was <u>able</u>. As detailed *supra,* Plaintiff cannot prove its <u>ability</u> to perform either at the closing date.  Without the Landlord approval, it could not obtain the OEMs' approval, which means it could not obtain the

17

BMO Harris financing. Plaintiff seeks upwards of $50 million in damages when it did not have a single document evidencing that it had callable money, actual cash that it could use to complete its acquisition, and not just a proposal. [DSUF ¶ 33].

## V.    CONCLUSION

Plaintiff cannot evidence that it could perform all conditions precedent of the APA. That is a requirement for the damages and the remedy it is pursuing against Defendants. None of Defendants' breaches precluded Plaintiff from meeting its necessary performance obligations. Plaintiff, therefore, cannot recover its damages or remedies. Defendants should be granted summary judgment for that reason.

DATED this 12th day of November, 2025.

**Jaburg & Wilk, P.C.**

/s/ David L. Allen
David L. Allen
Thomas Moring
Attorneys for Defendants

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

**CERTIFICATE OF SERVICE**

I hereby certify that on 12th day of November, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci
HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
david.holtzman@hklaw.com
daniel.kappes@hklaw.com
andrew.klair@hklaw.com
isabella.granucci@hklaw.com
*Attorneys for Plaintiff*

Forrest Booth
fbooth@nicollblack.com
Camille Zuber
czuber@nicollblack.com
Nicoll Black Altenbrun & Feig, PLLC
50 California Street, Suite 1616
San Francisco, CA 94111
*Attorneys for Plaintiff-in-Intervention*

*/s/ Brenda Ruiz*

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT                CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

JABURG WILK
LAW FIRM

# APPENDIX 16

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring *Admitted Pro Hac Vice*
tsm@jaburgwilk.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company,

Plaintiff,

vs.

WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,

Defendants.

TEMPLETON MARSH, LTD.,

Plaintiff-in-Intervention,

vs.

WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,

Defendants.

Case No. 1:21-cv-00970-EPG

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

**Date:** January 9, 2026
**Time:** 10:00 a.m.
**Location:** 2500 Tulare Street
Fresno, CA 93721
**Courtroom:** 10
**Judge:** Erica P. Grosjean
**Date Filed:** June 21, 2021
**Trial Date:** May 12, 2026

1

---

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS                    CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\KJK\\6599830v2

Defendants Weber Motors Fresno, Inc., CJ'S Road to Lemans Corp., and Christopher John Wilson, hereby submit the following Separate Statement of Undisputed Material Facts in support of its concurrently filed Motion for Summary Judgment pursuant Local Rule 260.

| No. | Undisputed Fact | Source | Opposing Party's Response |
|---|---|---|---|
| 1. | In 2020, Plaintiff and Defendants began negotiating the sale of three car dealerships owned and operated by the two Defendant entities; namely, Audi, BMW, and Porsche brands (collectively the "OEMs"), located in Fresno, California. | ECF 187 pg. 31. | |
| 2. | The BMW dealership was owned and operated by Weber Motors, Fresno, Inc., dba BMW Fresno. | ECF 42 ¶ 6; ECF 59 ¶ 6. | |
| 3. | The Audi and Porsche dealerships were owned and operated by CJ's Road to Lemans Corp., dba Audi Fresno and Porsche Fresno. | ECF 42 ¶ 6; ECF 59 ¶ 7. | |
| 4. | Both Weber Motors, Fresno, Inc. and CJ's Road to Lemans Corp. were owned solely by CJ Wilson, who worked full time operating the dealerships. | ECF 59 ¶ 8. | |
| 5. | Much of the negotiations between Plaintiff and Defendants centered on the retention of Mr. Wilson by Plaintiff following the acquisition; namely agreeable terms of employment. | *See* Email attached as **Exhibit A**. | |
| 6. | Mr. Wilson remaining as the general manager of the dealerships was a specific requirement of the OEMs to Plaintiff obtaining the necessary approvals from the OEMs, which Plaintiff necessarily had to obtain in order to consummate the transaction. | *See* Asset Purchase Agreement ("APA") attached as **Exhibit B** at pg. 5; ECF 43-4 at pg. 4; ECF 43-5 at pg. 3 ¶ 4; ECF 42-6 at pg.7 ¶ D(1). | |
| 7. | Ultimately on November 30, 2020, the parties executed the Asset Purchase Agreement ("APA"). | Exhibit A at pg. 1. | |
| 8. | Even though the APA included as Exhibit C a "form" of an Employment Agreement, it was understood and agreed between the parties that the terms of Mr. Wilson's | Exhibit A at pg. 1; Exhibit B. | |

2

| No. | Undisputed Fact | Source | Opposing Party's Response |
|---|---|---|---|
| | employment and his managerial role were to be negotiated as they moved toward closing. | | |
| 9. | The APA had an original closing date for the transaction of December 21, 2020; however, per the terms of the APA, that date was extended to January 30, 2021 with an additional one hundred and fifty day (150) extension. With the extension, the final date closing date was June 29, 2021. | Exhibit B pg. 4. | |
| 10. | The Court found, as sanctions for alleged discovery violations, that Defendants could not argue in defense of alleged breaches, and instead found that Defendants breached the APA as a matter of law. | ECF 187 pg. 31. | |
| 11. | The Court left open the issue of damages and the nature of the same. | ECF 187 pg. 31. | |
| 12. | While the Court did not provide any finding as to how, precisely, Defendants breached the APA, Plaintiff alleges the following in the First Amended Complaint as the Defendant Entities' purported breaches ("Entity Breaches"):<br><br>1. Failure to provide written assurances of their intent to proceed to closing in good faith, and to comply with their obligations under the APA, in violation of Section 5.23 of the APA;<br>2. Weber and Lemans' failure to disclose Wilson's pledge, in his capacity as trustee, of the Trust's equity ownership in Weber and Lemans to a creditor, in breach of applicable dealer sales and services agreements with the manufacturers;<br>3. Failure to cause Wilson to agree to the non-compete | ECF 42 at ¶ 56. | |

3

| No. | Undisputed Fact | Source | Opposing Party's Response |
|---|---|---|---|
| | agreement and the employment agreement, as attached to the APA; <br> 4. Failure to engage in any negotiations in good faith with respect to the form of amended and restated limited liability company agreements for each of the new entities, to be agreed to by the parties under Section 3.2(j) of the APA; <br> 5. Defendants' apparent lack of sufficient assets necessary to pay all amounts owing to creditors outstanding as of the closing date for all obligations not assumed by Foundation; and <br> 6. Wilson's failure to provide information with respect to his trust and his net worth as required by the manufacturers in connection with their approval of the subject transactions. | | |
| 13. | Additionally, Plaintiff alleged that defendant Mr. Wilson in his individual capacity committed the following breaches ("Individual Breaches" and collectively with the Entity Breaches the "Breaches"): <br> 1. His refusal to agree to the non-compete agreement and the employment agreement, as attached to the APA; <br> 2. His failure to engage in any negotiations in good faith with respect to the form of amended and restated limited liability company agreements | ECF 42 at ¶ 57. | |

4

24377-24377-00001\KJK\\6599830v2

| No. | Undisputed Fact | Source | Opposing Party's Response |
|-----|-----------------|--------|---------------------------|
| | for each of the new entities, to be agreed to by the parties under Section 3.2(j) of the APA; and<br>3. His discussions with other individuals regarding a potential deal for the BMW dealership, in violation of Section 5.13 of the APA. | | |
| 14. | Plaintiff needed to obtain assignments and assume the leases for the dealership locations[1] under the APA. The APA also required OEM approvals, which were conditioned upon the assignment of the leases. | Exhibit B at pg. 5; ECF 43-4 at pg. 2 ¶ 6. | |
| 15. | To be clear, the APA provided that Plaintiff was required to obtain "[a]n assignment and assumption of the Leases, together with the required consents from the landlords under the Leases, or new leases between Buyer and the landlords thereunder, in each case acceptable to Buyer in its sole discretion (the "Lease Assignments"). | Exhibit B at pg. 5. | |
| 16. | Plaintiff was unable to obtain the landlord's approval for an assignment of the leases, and therefore was unable to assume the leases. | *See* Declaration of Mr. Monjazeb attached as **Exhibit C** and Declaration of Mr. Richard Aaron attached as **Exhibit D**. | |
| 17. | More specifically, Mr. Monjazeb, the landlord, requested financials from Foundation and the individual principals, and upon his review of such financial statements, he initially "informed [his attorney] that [he] felt that the statements did not exhibit the financial strength [he] was looking for, and that [he] was very unlikely going to agree to the assignments if not backed by the personal | *See* Exhibit C at ¶ 9. | |

---

[1] There were two leases with the same landlord for the three dealerships, with BMW having its own building, and Porsche and Audi sharing an adjacent building.

5

24377-24377-00001\KJK\\6599830v2

| No. | Undisputed Fact | Source | Opposing Party's Response |
|---|---|---|---|
| | guarantees of the ownership group…" | | |
| 18. | Then, after reviewing the personal financial statements of the principals who would be providing the personal guarantees, Mr. Monjazeb "decided that [he] would not consent to the assignment of the dealership leases to Foundation. In [his] professional judgment, developed over thirty years as a landlord and premium car dealer, [he] was not willing to lease to a group with little to no experience in the luxury car market, with no local ties to the Fresno community, and with less than robust corporate and personal financial positions." | Exhibit C at ¶ 13. | |
| 19. | Mr. Monjazeb's attorney, Richard Aaron, who was personally involved in the discussions between Plaintiff's representative and Mr. Monjazeb, also confirmed the same, stating "that based upon the minimal liquidity of Mr. Kutchinski and Mr. Kramer, and the absence of hard assets that could be easily valued and perhaps used to secure performance, that '[Mr. Monjazeb] could not approve the assignment." | Exhibit D at ¶ 10. | |
| 20. | Due to the foregoing, Mr. Monjazeb confirmed to Mr. Aaron that "at this point in time - early June 2021 – his decision that he would not consent to the assignment of the dealership leases to Foundation, which he concluded was a group with little to no experience in the luxury car market, with no local ties to the Fresno community, and with less than robust corporate and personal financial positions." | Exhibit D at ¶ 13. ___ | |
| 21. | Plaintiff obtained only _conditional_ approvals of the OEMs as of May 25, 2021, on which date the latest approval was received from Porsche. | ECF 43-4 (Audi Conditional Approval; ECF 43-5 (BMW Conditional Approval); and 43-6 (Porsche Conditional Approval). | |

6

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS                    CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\KJK\\6599830v2

| No. | Undisputed Fact | Source | Opposing Party's Response |
|---|---|---|---|
| 22. | The APA was to close on January 30, 2021 but would automatically be extended for an additional 150 days to June 29, 2021, by which date Plaintiff needed to obtain all of its necessary approvals, including the non-conditional OEM approvals, the Landlord approvals to the lease assignments, and the State of California approvals. | Exhibit B at pg. 4. | |
| 23. | The first paragraph makes the approval subject to satisfying "each of the specific conditions set forth below." Those conditions include: (1) Mr. Wilson was to be "Center Operator." There was never an agreement entered into between Foundation and CJ satisfying this condition as indeed they agreed negotiations would be ongoing. | ECF 43-5 at pg.3 ¶ 4. | |
| 24. | There is an "initial owner's equity requirement" of at least $14,263,723; however, this money was never confirmed by Foundation to exist and indeed, Plaintiff confirmed that it would have trouble meeting this unless and until they received mezzanine financing | ECF 43-5 at pg. 3 ¶ 5; *See* Email attached as **Exhibit E** at pg. 2. | |
| 25. | Foundation was required to use Praxis or Tricarico to design the new facility for BMW. | ECF 43-5 at pg. 3 ¶ 6; *See also* Email attached as **Exhibit F**. | |
| 26. | Praxis and Tricarico are both Architecture firms that were picked by BMW as set forth in the BMW Conditional approval. However, the only drawings obtained were for Porsche, not BMW. | *Id. See also* Email with Porsche Schematic attached as **Exhibit I**. | |
| 27. | The conditional approval provided on May 23, 2021, from Audi contained conditions precedent that formed the basis of the conditional approval. | ECF 43-4 at pg.'s 3-4. | |
| 28. | The third paragraph makes the approval subject to the occurrence of the nine items which, of most importance was the assignment and assumption of the lease with an extension making the lease term at least an additional 10 years. | *Id.* | |

7

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS                    CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\KJK\\6599830v2

| No. | Undisputed Fact | Source | Opposing Party's Response |
|---|---|---|---|
| 29. | This never happened, and per the landlord's declaration, never was going to happen. | *See* Exhibits C-D generally. | |
| 30. | The Porsche conditional approval dated May 25, 2021, provides in the first paragraph which makes the approval subject to compliance with certain conditions which included construction of a new facility subject to certain forth milestone deadlines, none of which were met. Indeed, only a drawing was exchanged. | ECF 43-6 at pg. 4 ¶ C(1). | |
| 31. | Mr. Wilson is to be the "General Manager," however, the terms of an employment agreement were never agreed as the parties were still negotiating the terms. | Exhibit A, ECF 43-5 at pg. 3 ¶ 4; ECF 43-6 at pg. 7 ¶ D(1). | |
| 32. | The financing from BMO Harris was predicated upon the OEMs approvals. | See the BMO Harris Conditional Approval Attached as **Exhibit G** at pg. 4. | |
| 33. | More specifically, the BMO Harris Letter provides that the following other terms must occur: 1. All three franchises to be acquired must be floored with the Bank. 2. Sources and uses to be satisfactory to the Bank. 3. Satisfactory legal and Bank review of entity structure and flow of funds. 4. Covenant compliance on a pro- | *Id.* | |

8

24377-24377-00001\KJK\\6599830v2

JABURG WILK
LAW FIRM

| No. | Undisputed Fact | Source | Opposing Party's Response |
|-----|-----------------|--------|---------------------------|
|  | forma basis prior to close, which may require an equity injection depending on inventory levels. |  |  |
| 5. | Formal OEM approval of all franchises to be acquired. |  |  |
| 6. | Distributions and management fees above the Borrower's tax liability allowed up to pro-forma covenant compliance. |  |  |
| 7. | Proposal is subject to the Bank's standard due diligence and credit approval. Ata this time the Bank has not received such approval, and this proposal is for discussion purposes only. |  |  |

9

24377-24377-00001\KJK\\6599830v2

| No. | Undisputed Fact | Source | Opposing Party's Response |
|-----|----------------|--------|--------------------------|
| 34. | As of June 11, 2021, Plaintiff was only in discussions regarding assuming the leases with no approvals. | ECF 42 ¶ 11. | |
| 35. | Plaintiff disclosed the Proposal from BMO Harris which provides terms for floor financing, the purchase amount under the APA, and another senior existing Debt. | *See* Email attached as **Exhibit H** and Exhibit G at pg.'s 3-4. | |

DATED this 12th day of November, 2025.

**Jaburg & Wilk, P.C.**


*/s/ David L. Allen*
David L. Allen
Thomas Moring
Attorneys for Defendants

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS                    CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\KJK\\6599830v2

JABURG WILK
LAW FIRM

## CERTIFICATE OF SERVICE

I hereby certify that on 12th day of November, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci
HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
david.holtzman@hklaw.com
daniel.kappes@hklaw.com
andrew.klair@hklaw.com
isabella.granucci@hklaw.com
*Attorneys for Plaintiff*

Forrest Booth
fbooth@nicollblack.com
Camille Zuber
czuber@nicollblack.com
Nicoll Black Altenbrun & Feig, PLLC
50 California Street, Suite 1616
San Francisco, CA 94111
*Attorneys for Plaintiff-in-Intervention*


*/s/ Brenda Ruiz*

11

---

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS                    CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\KJK\\6599830v2



| | |
|---|---|
| **From:** | Chris Beaton </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AB987A4EE62C443D991A9F0D3EDC5B75-CBEATON> |
| **To:** | Reggie Borkum; CJ Wilson; martiin@templetonmarsh.com |
| **CC:** | Kevin Kutschinski |
| **Sent:** | 10/27/2020 11:04:17 PM |
| **Subject:** | RE: Fresno / Foundation - Additional DRAFT Agreements |

Hi Reggie,

Understood.  Looking forward to the chat tomorrow.
Chris

---

**From:** Reggie Borkum <rborkum@btadvisor.com>
**Sent:** October 27, 2020 3:17 PM
**To:** Chris Beaton <cbeaton@foundationauto.com>; CJ Wilson <cj.wilson@bmwfresno.com>; martiin@templetonmarsh.com
**Cc:** Kevin Kutschinski <kevink@foundationauto.com>
**Subject:** Re: Fresno / Foundation - Additional DRAFT Agreements

After a discussion with CJ, we do not believe the interim agreement is necessary.  We would manage and operate until the closing date.

Reggie Borkum, Esq.

**BT Advisors**
3021 McGraw Street
San Diego, California 92117
E-Mail: rborkum@btadvisor.com
Direct Dial: (853) 201-6753
Cell Phone: (619) 857-2710
Facsimile:  (858) 815-4575

---
NOTICE: This e-mail (including any files transmitted with it) is being sent by a law firm. It is intended only for the individual or entity to which it is addressed and may contain information that is proprietary, privileged, confidential or otherwise exempt from disclosure under applicable Federal or State Law. If you are not the named addressee or the employee or agent responsible for delivering this e-mail to the named addressee, be advised that you have received this e-mail in error and you are prohibited from any dissemination, distribution or copying of this e-mail. If you have received this e-mail in error, please immediately contact the sender by reply e-mail, telephone, or facsimile.

---

**From:** Chris Beaton <cbeaton@foundationauto.com>
**Date:** Tuesday, October 27, 2020 at 1:24 PM
**To:** CJ Wilson <cj.wilson@bmwfresno.com>, Reggie Borkum <rborkum@btadvisor.com>, "martiin@templetonmarsh.com" <martiin@templetonmarsh.com>
**Cc:** Kevin Kutschinski <kevink@foundationauto.com>
**Subject:** Fresno / Foundation - Additional DRAFT Agreements

CJ and Reggie,

Please find attached DRAFTs of our initial supporting documents for this transaction.  The documents are as follows:

1. Draft employment and confidentiality agreement
2. Draft non-competition agreement
3. Draft LLC Operating Agreement
4. Subscription Agreement for common Class B shares into Foundation Auto Corp.

Please note that these agreements are our starting frameworks that we use with all of our Foundation Partners and we expect that there are some clauses that you will want further discussion on.  For example, there is an "At Will Employment" clause in the employment agreement that will warrant some further discussion on what is fair and reasonable to all parties given CJ is a 25% partner going forward.  We have also built in specific to CJ the compensation structure as he discussed with Kevin.  There is also some language in the docs around the Used inventory and 60 day thresholds  - again, we would like to get our heads wrapped around the unique nature of the inventory at these stores (vs. our domestics) and I am confident we can come to agreement on how we handle these going forward.  Ultimately our objective is to have a fair and balanced agreements where everyone recognizes and shares in the risks and rewards.

We have also included a subscription agreement for our most recent raise in Foundation Auto Corp that we are holding open for CJ.  This is at approx $2.50 US (CDN $3.40) – we can provide you with more context on this tomorrow on our call.

One more document is coming – the Draft Management and Operations Agreement (for the interim period prior to closing).  We hope to have that to you later today or first thing tomorrow – we just had a last minute follow-up item with our Ops team that we needed clarified and I didn't want to hold up sending the rest of the docs for your review.  I will send that out as soon as its available.

Looking forward to our chat tomorrow.  Please watch for Zoom details to follow.
Chris

**Chris Beaton**

Foundation-0001281



## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of November 30, 2020 (the "Effective Date"), by and between FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, or its permitted assigns pursuant to Section 9.6 hereof ("Buyer"), and WEBER MOTORS, FRESNO, INC., a California corporation d/b/a BMW Fresno ("Weber Motors"), and CJ'S ROAD TO LEMANS CORP., a California corporation d/b/a Audi Fresno and Porsche Fresno ("Road to Lemans", and collectively with "Weber Motors", "Seller"). In this Agreement, Buyer and Seller are sometimes referred to individually as a "Party" and together as the "Parties."

## RECITALS

A.     Seller owns certain assets used or useful in the operation of BMW, Audi, and Porsche motor vehicle sales and service businesses (the "Dealerships") located at: (i) 7171 North Palm Avenue, Fresno, California 93650 (the "BMW Site"); and (ii) 7121 North Palm Avenue, Fresno, California 93650 (the "Audi/Porsche Site").

B.     Buyer wishes to buy, and Seller wishes to sell, substantially all of the assets used by Seller in connection with or related to each of the Dealerships located at the BMW Site and the Audi/Porsche Site upon the terms and conditions of this Agreement.

C.     The BMW Site and the facilities located thereon are collectively referred to herein as the "BMW Property".  The Audi/Porsche Site and the facilities located thereon are collectively referred to herein as the "Audi/Porsche Property".  Additionally, Seller leases that certain unimproved real property located in Fresno, California with APNs 405-560-49 & 405-560-50 (the "Unimproved Property", and collectively with the BMW Property and the Audi/Porsche Property, the "Property").

D.     The Property is leased by Seller pursuant to that certain leases, a true, correct and complete copy of which (including all amendments thereto) shall be delivered to Buyer within ten (10) days of the Effective Date (the "Leases").  Buyer desires to have direct leasing relationships with the landlords under the Leases.  Buyer and Seller desire to work together to accomplish this either through assignment of the Leases to Buyer or for Buyer to enter into new leases with the applicable landlords.

## AGREEMENT

Therefore, the Parties agree as follows:

**1.     PURCHASED ASSETS; EXCLUDED ASSETS; ASSUMPTION OF LIABILITIES.**

**1.1     Purchased Assets.**  Subject to the terms and conditions of this Agreement, on the Closing Date (as defined in Section 3.1), Seller will sell to Buyer, and Buyer will purchase from Seller, all of the assets listed on Schedule 1.1 in accordance with Schedule 1.1 (collectively, the "Purchased Assets"), free and clear of all security interests, liens, restrictions, claims, encumbrances or charges of any kind ("Encumbrances").  Buyer and Seller acknowledge and agree that the Purchased Assets shall include all of the assets determined in accordance with Schedule 1.1.  For the avoidance of doubt, Purchased Assets shall include all of the goodwill associated with, and the assets used in the operation of, all of the Dealerships.

**1.2     Excluded Assets**.  The Purchased Assets do not include those assets described on Schedule 1.2 (the "Excluded Assets").

**1.3     Liabilities Not Assumed**.  Except (i) as set forth in this Agreement or (ii) for those ongoing obligations on and after the Closing Date described in Schedule 1.3 which are specifically identified and agreed to be assumed by Buyer in its sole discretion prior to the Closing Date, but only to the extent that (A) such liabilities thereunder are required to be performed after the Closing Date, (B) were incurred in the ordinary course of business and (C) do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller prior to the Closing (the "Assumed Contracts"), Buyer shall not assume, or in any way be responsible or liable for, any liability, obligation, claim or expense of the Seller arising out of the operation of the Dealerships on or before the Closing Date, whether absolute, contingent, accrued, known or unknown, including, without limitation, any liabilities or obligations described in this Agreement or the schedules attached hereto or liabilities or obligations resulting from or arising out of (a) violations of any applicable law, regulation or ordinance relating to antitrust, monopoly or trade regulation, (b) violations of any applicable law, regulation or ordinance relating to labor or employment, (c) violations of, failure to comply with, or any obligation arising under, any applicable law, regulation or ordinance relating to any welfare, retirement, vacation or other benefit plan or any plan covered by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or the failure to comply with the continuation coverage requirements of Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, (d) chargebacks from the cancellation/termination of finance or insurance products on vehicles sold by the Seller prior to the Closing Date, (e) any taxes arising out of the operation of the Dealerships or the ownership of the Purchased Assets for any period ending on or prior to the Closing Date, (f) any pending or threatened law suit, claim or other action against the Seller, whether from personal injury, wrongful death or property damage, or whether arising out of employment or a contractual or alleged contractual right, (g) violations of any applicable Environmental Law (as defined below), (h) any accrued bonuses or salary of any Seller employee prior to the Closing Date, (i) Seller accrued workers' compensation payments, or (j) any contract or lease to which Seller is a party and that is not an Assumed Contract, including, without limitation, the BMW Fresno Collective Bargaining Agreement (as hereinafter defined) and the BMW Fresno Pension Fund Trust Agreement (as hereinafter defined) (collectively, "Seller's Obligations").  Notwithstanding the foregoing, subject to (ii)(A)-(C), inclusive, above, Buyer shall assume all contracts of Seller which were entered into by Seller in the ordinary course of business on arms-length terms in accordance with industry standards which are necessary to the conduct of the Business as currently conducted; provided, however, in no event shall Buyer assume the BMW Fresno Collective Bargaining Agreement or the BMW Fresno Pension Fund Trust Agreement, and such contracts are hereby expressly excluded from the definition of "Assumed Contracts".

**1.4     Assumed Contracts.**  Nothing in this Agreement will constitute an agreement to assign or an attempted assignment of any contract or other commitment for which any requisite consent or waiver to the assignment thereof has not been obtained.  To the extent permitted by applicable law, if any requisite consent or waiver has not been obtained on or prior to the Closing for any contract or commitment which Buyer desires to be an Assumed Contract, the applicable contract or commitment shall be held by Seller in trust for the benefit of Buyer and Buyer will perform the obligations of Seller thereunder and be entitled to receive all money becoming due and payable under and other benefits derived from the contract or other commitment immediately after receipt by Seller.

**2.     PURCHASE PRICE; PAYMENT; PRORATIONS; ALLOCATIONS; INVENTORY SETTLEMENT.**

**2.1     Purchase Price; Payment.**

(a)     The amount of consideration to be paid by Buyer to Seller for the Purchased Assets will be determined in accordance with Schedule 1.1 and will include Buyer's assumption of the Assumed Contracts and the Leases (collectively, the "Purchase Price").  The Parties shall work in

2

good faith to conduct any post-Closing reconciliations of the Purchase Price as may be necessary hereunder. All references to currency hereunder are to lawful money of the United States.

(b)      Buyer has delivered Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) (together with any interest thereafter earned thereon, the "Earnest Money Deposit") to First American Title Insurance Company, as escrow agent (the "Escrow Agent"). If the transaction contemplated by this Agreement shall be consummated, the Earnest Money Deposit shall be applied to the Purchase Price at the Closing (as defined below) and if this Agreement shall be terminated and the transaction contemplated hereby abandoned, then the Escrow Deposit shall be applied as set forth in Article VII. If requested by any Party hereto or the Escrow Agent, the Parties and the Escrow Agent shall enter into an escrow agreement in a form mutually agreeable to the Parties and Escrow Agent that will govern the escrow duties and rights of Escrow Agent; provided, however, that such escrow agreement shall not conflict with the provisions hereof.

(c)      The balance of the Purchase Price (i.e., the Purchase Price less the Earnest Money Deposit, which Earnest Money Deposit the Parties shall cause to be released to Seller in connection with the Closing), subject to adjustment in accordance with Section 2.2 below, shall be paid by Buyer to Seller at the Closing, by wire transfer of immediately available funds pursuant to wiring instructions delivered by Seller to Buyer in writing prior to the Closing Date, or other immediately available funds as Seller and Buyer may mutually agree.

**2.2      Prorations.** All sales taxes, personal property taxes (including, but not limited to, inventory taxes) and assessments which are past due or have become due upon any of the Purchased Assets or in connection with the operation of the Dealerships on or before the Closing Date will be paid by Seller at the Closing (as defined in Section 3.1), together with any penalty or interest thereon. Current personal property taxes will be prorated and adjusted between Buyer and Seller as of the Closing Date on a due date basis. If current tax bills are unavailable on the Closing Date, the prior year's tax bills will be used for proration purposes and taxes will be re-prorated between Buyer and Seller when the current year's tax bills are received. Any amounts owed by either Party with respect to such re-proration will be paid to the other Party within ten (10) days after the determination of such re-proration. All operating expenses (other than prepaid expenses) of the Dealerships for the month of Closing including, without limitation, rent payable under the Leases and utilities, will be prorated and adjusted between Buyer and Seller as of the Closing Date based on a thirty (30) day month. Seller shall pay any transfer, sales or similar tax due as a result of the transactions contemplated hereby.

**2.3      Allocations.** The consideration for the Purchased Assets will be allocated in accordance with Schedule 2.3, which Schedule will be completed by Buyer and Seller at the Closing. This allocation will be conclusive and binding for all purposes, and each Party will file all income or other tax returns in a manner consistent with such allocation. Buyer and Seller shall execute an agreement with respect to such allocation at Closing if desired by either Party.

**2.4      Inventory Settlement**.

(a)      In the event that record or beneficial ownership or possession of any Purchased Asset has been transferred to Buyer on the Closing Date without the corresponding amount determined in accordance with Schedule 1.1 for such items being added to the Purchase Price, then Buyer shall promptly transfer, or cause to be transferred, such items to Seller; provided that, to the extent that Buyer and Seller, acting reasonably, mutually agree to the value of such items, Buyer and Seller may mutually elect for Buyer to keep such items and Buyer shall pay such mutually agreed value to Seller in the next Inventory Settlement.

(b)    In the event that record or beneficial ownership or possession of any Purchased Asset has not been transferred to Buyer on the Closing Date but the corresponding amount determined in accordance with Schedule 1.1 for such items were added to the Purchase Price, then Seller shall promptly transfer, or cause to be transferred, such items to Buyer; provided that, if such items cannot be located or are not otherwise available to be transferred or the Parties (each in their sole discretion) mutually agree that Seller shall not transfer such item, the Seller shall pay to the Buyer the value of such items that were mutually agreed to in the next Inventory Settlement.

(c)    For a period of three (3) months following the Closing (the "Inventory Settlement Period"), the Parties shall use their commercially reasonable efforts and work in good faith to identify and resolve any inconsistencies between the Purchased Assets transferred or not transferred (as applicable) to Buyer at Closing, on the one hand, and the corresponding amount determined in accordance with Schedule 1.1 added to the Purchase Price, on the other hand. To the extent any amounts become due and payable from one Party to another pursuant to Section 2.4(a) and Section 2.4(b), the Parties shall periodically (and unless mutually waived by the Parties, at least once per calendar month) settle such payments on a "net" basis (each such settlement, the "Inventory Settlement"), with Buyer, at its option, having the right to set-off such amounts owing Buyer from any distributions due to the Seller Principal (as defined below) under the LLC Agreements (as defined below).

## 3.    CLOSING.

### 3.1    Closing Date.

(a)    Subject to the terms and conditions of this Agreement, the closing of the transactions (the "Closing") contemplated by this Agreement and any other agreement or instrument executed by the Parties pursuant to this Agreement (collectively, the "Related Agreements") will occur on a mutually agreeable date, at a mutually agreeable location, at 10:00 a.m. local time no later than thirty (30) days after all necessary Manufacturer (as defined below) and governmental approvals are received for the transactions contemplated under this Agreement so long as all other conditions set forth in this Agreement are satisfied (the date on which such Closing occurs, the "Closing Date").  The Closing Date shall occur no later than January 30, 2021 (the "Closing Date Deadline"); provided, however, the Closing Date Deadline shall automatically be extended without further action by either party for up to an additional one hundred fifty (150) days as may be necessary in connection with Manufacturer and State of California regulatory approvals as required under Section 6.1(c) and Section 6.1(e) below.

(b)    Buyer and Seller acknowledge and agree that all profits, or losses, relating to the Dealerships on the Closing Date shall be the property and responsibility of Buyer.

(c)    The Closing shall be deemed to be completed as of 12:01 a.m. on the applicable Closing Date.

### 3.2    Actions to be Taken at the Closing.  At the Closing, the Parties will take the following actions and deliver the following documents:

(a)    Seller and Buyer will execute and deliver a Bill of Sale, Assignment and Assumption Agreement in the form attached hereto as Exhibit A (the "Bill of Sale").

(b)    Seller will assign to Buyer all of its rights to receive termination assistance from (i) BMW of North America, LLC ("BMW"), with respect to Seller's BMW operations, (ii) Audi of America, Inc. ("Audi"), with respect to Seller's Audi operations, and (iii) Porsche Cars North

4

America, Inc. ("Porsche"), with respect to Seller's Porsche operations. BMW, Audi, and Porsche are sometimes referred to herein as the "Manufacturer".

(c)     Seller will provide evidence of Seller's voluntary termination of its dealer agreements with the applicable Manufacturer as they relate to the Dealerships.

(d)     Christopher J. Wilson (the "Seller Principal") will execute and deliver a non-compete, non-solicitation and no-hire agreement in the form attached hereto as Exhibit B (the "Non-Compete Agreement").

(e)     In the event Seller is not the direct tenant under any of the Leases, Seller and such direct tenant will execute and deliver terminations of any existing subleases or other subtenant occupancy rights relating to the Property (collectively, the "Existing Subleases").

(f)     Seller will deliver to Buyer all consents and approvals (including, without limitation, shareholders', members', managers' and directors' minutes) required for Seller to (i) enter into this Agreement and the Related Agreements and consummate the transactions described herein and therein and (ii) assign the Assumed Contracts, if any, to Buyer.

(g)     Seller will execute and deliver assignments to Buyer of Seller's assignable licenses and permits in form and substance reasonably acceptable to Buyer.

(h)     At or prior to Closing, Buyer shall assign its rights and obligations under this Agreement to the New Buyer Entities.

(i)     The Seller Principal shall have executed and delivered a Subscription Agreement to purchase membership interests in the New Buyer Entities (as defined in Section 9.6) in an amount equal to twenty-five percent (25%) of the aggregate equity investment to be made at Closing (which aggregate equity investment shall be equal to the Purchase Price less any debt incurred by or on behalf of Buyer in connection with the transactions contemplated hereby, including, without limitation, any floorplan financing, term debt financing (including any blue sky loan), and working capital financing) (the "Membership Interests"), which Subscription Agreement shall have been countersigned by the New Buyer Entities, in form and substance reasonably acceptable to Buyer.

(j)     The Seller Principal shall have executed and delivered a joinder agreement to the amended and restated limited liability company agreements of each of the New Buyer Entities (the "LLC Agreements"), in form and substance reasonably acceptable to Buyer.  The Seller Principal and Buyer shall mutually agree on the LLC Agreements during the Diligence Period.

(k)     The Seller Principal and Buyer will execute and deliver an employment agreement in the form attached hereto as Exhibit C.

(l)     Possession of the Property shall be delivered to Buyer.

(m)     An assignment and assumption of the Leases, together with the required consents from the landlords under the Leases, or new leases between Buyer and the landlords thereunder, in each case acceptable to Buyer in its sole discretion (the "Lease Assignments");

(n)     Buyer and Seller will deliver to each other closing certificates related to the representations and warranties set forth in this Agreement, organizational matters and authority of the respective Parties to consummate the transactions contemplated under this Agreement.

(o)     The Parties will take such other actions and will execute and deliver such other instruments, documents and certificates as are required by the terms of this Agreement and the Related Agreements or as may be reasonably requested by any Party in connection with the consummation of the transactions contemplated herein.

**4.     REPRESENTATIONS; WARRANTIES.**

**4.1     Seller Representations.**  Seller, jointly and severally, represents and warrants to Buyer that the following are true, complete and correct as of the Effective Date and shall be true, complete and correct as of the Closing Date:

(a)     Each entity comprising Seller is a corporation duly incorporated, validly existing and in good standing under the laws of its state of formation.  Seller has full power and lawful authority to (i) own and operate its assets, properties and business, (ii) carry on its business at the Dealerships, (iii) enter into this Agreement and all Related Agreements, and (iv) consummate the transactions contemplated by this Agreement and the Related Agreements.

(b)     This Agreement and the Related Agreements each constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with their terms, subject to the effects of bankruptcy, insolvency, reorganization, arrangement, moratorium, fraudulent conveyance or other similar laws affecting creditors generally.  Seller's execution, delivery and performance of this Agreement and the Related Agreements do not and will not (i) constitute a breach or violation of Seller's articles of incorporation or bylaws, (ii) constitute a breach or violation of any material agreement, indenture, deed of trust, mortgage, loan agreement or any material instrument, by Seller, to which Seller is a party or by which Seller, the Property or any of the Purchased Assets is bound or affected, (iii) constitute a violation of any order, judgment or decree by which Seller, any of the Purchased Assets or the Property is bound or affected, (iv) result in the creation of any lien or charge on the Purchased Assets, (v) result in the acceleration of any material debt owed by Seller, or (vi) except for the consent of those parties to the Assumed Contracts and Leases, require any authorization or consent of any third party.  Notwithstanding anything set forth in this Section 4.1(b), certain consents or waivers will be required by certain of Seller's lenders or landlords in order to consummate the transactions contemplated under this Agreement, as set forth in Schedule 4.1(o).

(c)     Except for the Assumed Contracts, if any, and Leases, Seller has, and at the Closing Buyer will receive, good and marketable title to the Purchased Assets, free and clear of all Encumbrances.  There are no Encumbrances on the leasehold estate or interest created by the Leases.  Seller is not leasing or holding on consignment any of the Purchased Assets.  There are no special assessments against any of the Purchased Assets.  The tangible Purchased Assets are in good working order, ordinary wear and tear excepted.  The Purchased Assets represent all of the assets and occupancy rights materially necessary for the operation of the Dealerships on or after the Closing Date, consistent with the operations of the Dealerships as conducted on the Effective Date.  The Material Agreements (as defined below) represent all of the contractual agreements materially necessary for the operation of the Dealerships as conducted on the Effective Date.  Seller has delivered to Buyer true, correct and complete copies of the Leases as of the Effective Date.

(d)     Except as set forth on Schedule 4.1(d), (i) there is no Person holding any claim of any nature against Seller, including claims arising out of or in connection with the operation of the Dealerships, Seller's obligations under any collective bargaining agreement to which it or any of its affiliates is a party (including, without limitation, the BMW Fresno Collective Bargaining Agreement), or any pension fund trust agreement (and related pension plan rules) to which Seller or any of its affiliates is bound (including, without limitation, the BMW Fresno Pension Fund Trust

6

Agreement), (ii) Seller does not know or have reasonable grounds to know of any dispute which adversely affects, or may adversely affect, the Purchased Assets, the Dealerships, or the Property, (iii) there is no present or threatened walkout, strike or labor disturbance involving any of Seller's employees, (iv) neither Seller, the Purchased Assets nor the Property is subject to any pending or threatened litigation, proceeding or administrative investigation, (v) Seller has not violated any federal, state or local law or ordinance or any rule, regulation order or decree of any governmental agency, court or authority having jurisdiction over it or over any part of its operations or assets, (vi) Seller and its affiliates have made all required contributions to any union pension plans to which it is obligated to make contributions, including, without limitation, the I.A.M. National Pension Plan, (viii) neither Seller nor any member of Seller's controlled group is subject to any withdrawal liability in the event Seller or any of its affiliates withdraws from a multi-employer pension plan, and (ix) Seller has maintained all licenses and permits and has filed all registrations, reports and other documents required by local, state and federal authorities and regulating bodies in connection with the Dealerships, and to the extent such licenses and permits are fully assignable to Buyer, they will have been assigned to Buyer on the Closing Date pursuant to the Bill of Sale or such other method as may be required of Seller under applicable law. As used in this Agreement, "Knowledge of Seller", "Seller's Knowledge", or any other similar knowledge qualification, means the actual knowledge, after making reasonable inquiry of appropriate Dealerships personnel, of the Seller Principal and Ann Zimmerman. As used in this Agreement, "BMW Fresno Collective Bargaining Agreement" means that certain Collective Bargaining Agreement entered into by and between BMW Fresno and Machinist Automotive Trades District Lodge 190 International Association of Machinists and Aerospace Workers. As used in this Agreement, "BMW Fresno Pension Fund Trust Agreement" means that certain Trust Agreement, dated May 1, 1960, as amended, creating the I.A.M. National Pension Plan and the Plan rules adopted by the Trustees of I.A.M. National Pension Fund.

(e)    Attached as Schedule 4.1(e) is a true and correct listing of any and all material written or oral agreements or instruments to which the Dealerships or the Purchased Assets are subject, and any and all related agreements, including, but not limited to, the Assumed Contracts and the Leases, and all leases, subleases, warranty agreements, sales agreements, service agreements, maintenance agreements, dealer or dealership agreements, loan agreements, promissory notes, collective bargaining agreements and partnership agreements (collectively, "Material Agreements"). Seller has delivered to Buyer a true and correct copy of each written instrument and a written summary of any oral agreement existing with respect to the Material Agreements. Each Material Agreement is valid and enforceable in accordance with its terms. Except as disclosed on Schedule 4.1(e), neither Seller nor, to the Knowledge of Seller, any other party thereto is in breach of or in default under any Material Agreement, nor has any notice or claim with respect to any breach or default thereunder been given by Seller or received by Seller.

(f)    Attached as Schedule 4.1(f) is a true and complete list of all employees, independent contractors or consultants of the Dealerships as of September 30, 2018, broken down by location, and their dates of hire or engagement, positions, base compensation and commission and/or bonus schedule (if applicable). Except for the BMW Fresno Collective Bargaining Agreement, Seller does not have, and has not had for the past three (3) years, any collective bargaining or union contracts or agreements and there is no union campaign presently being conducted to solicit employees to authorize a union to request a National Labor Relations Board certification election with respect to any of Seller's employees at the Dealerships. Seller has paid in full to all of its employees or adequately accrued for all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such employees.

7

(g)     Attached as Schedule 4.1(g) is a true and complete list of the types of tax returns (e.g., income, sales and use) that Seller has filed in the past three (3) years.  Seller has (i) filed, when due, with all appropriate governmental agencies, all tax returns, estimates, reports and statements required to be filed by it, all of which are true and correct in all material respects, and (ii) paid, when due and payable, all requisite income taxes, sales, use, property and transfer taxes, levies, duties, licenses and registration fees and charges of any nature whatsoever and workers' compensation and unemployment taxes, including interest and penalties thereon.  Seller has withheld all tax required to be withheld under applicable tax laws and regulations.  Seller has not waived any statute of limitations in respect of taxes or agreed to any extension of time with respect to a tax assessment or deficiency.  No adjustments relating to such tax returns has been proposed formally or informally by any governmental authority (insofar as either relates to the activities or income of Seller or could result in a liability of Seller on the basis of joint and/or several liability) and, to the Knowledge of Seller, no basis exists for any such adjustment.  No claim has ever been made by a governmental authority in a jurisdiction where Seller does not file tax returns that Seller may be subject to taxation in that jurisdiction, and Seller has not conducted operations in jurisdictions other than California or created a taxing nexus with any jurisdiction other than California.

(h)     Attached as Schedule 4.1(h) is a list of each Existing Sublease.  Seller enjoys and has the right to peaceful and undisturbed possession of the Property subject to the terms and provisions of the Existing Subleases.  Except as set forth on Schedule 4.1(h), Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy the Property or any portion thereof.  Seller's operations on the Property, including improvements thereon, do not violate any applicable building code, zoning requirement or classification, or pollution control ordinance or statute relating to the Property or to such operations, or any other applicable law, regulation or ordinance.  The use and operation of the Property in the conduct of the Business of Seller does not violate in any material respect any covenant, condition, restriction, easement, license, permit or agreement.  Seller has all licenses and permits necessary to own and operate the Dealerships.  There are no liens or other encumbrances on the leasehold estate or interest created by any Existing Sublease.  As used in this Agreement, "Business" means the ownership and operation of the Dealerships.

(i)     Except as disclosed in Schedule 4.1(i) to Buyer by Seller, the Property, the use thereof, and any operations now or heretofore conducted at the Property, are, and have been, so long as Seller has occupied the Property, to the best Knowledge of Seller, in compliance with all applicable Environmental Laws (as hereinafter defined); all federal, state and local permits, licenses, registrations and authorizations required for the use of and operations at the Property have been obtained and, further, there are currently no violations of such permits, licenses, registrations or authorizations; there are no claimed, alleged or threatened violations of or liabilities under any Environmental Laws with respect to the Property, nor are there any present or planned discussions or negotiations with any agency regarding the release of any Hazardous Substances (as hereinafter defined), and the Property has not been used for the treatment, storage or disposal of any Hazardous Substances as such treatment, storage or disposal may be regulated under the Resource Conservation and Recovery Act, 42 U.S.C. 6901 *et seq*. or its state counterparts, as amended and/or reauthorized, and regulations promulgated thereunder.  None of the following exists at any of the Property locations: (i) underground storage tanks, (ii) asbestos-containing material in any form or condition, (iii) materials or equipment containing polychlorinated biphenyls, (iv) groundwater monitoring wells, drinking water wells, or production water wells, or (v) landfills, surface impoundments, or disposal areas.  To the Knowledge of Seller, neither this Agreement nor the consummation of the transactions contemplated hereby will result in any obligations for site investigation or cleanup, or notification to or consent of government agencies or third parties,

8

pursuant to any applicable Environmental Laws, including the so-called "transaction-triggered" or "responsible party transfer" Environmental Laws.

"Environmental Laws" means all federal, state and local laws, whether common laws, court or administrative decisions, statutes, rules, regulations, ordinances, court orders and decrees, and administrative orders and all administrative policies and guidelines concerning action levels of a governmental authority (federal, state or local) now or hereafter in effect relating to the environment, public health, occupational safety, industrial hygiene, any Hazardous Substance (including, without limitation, the disposal, generation, manufacture, presence, processing, production, release, storage, transportation, treatment or use thereof), or the environmental conditions on, under or about the Property, as amended and as in effect from time to time (including, without limitation, the following statutes and all regulations thereunder as amended and in effect from time to time:  the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq*.; the Superfund Amendments and Reauthorization Act of 1986, Title III, 42 U.S.C. §§ 11001, *et seq*.; the Clean Air Act, 42 U.S.C. §§ 7401 *et seq*.; the Safe Drinking Water Act, 42 U.S.C. §§ 300(f), *et seq*.; the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, *et seq*.; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §§ 1801, *et seq*.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901, *et seq.;* the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§ 1251, *et seq*.; the Toxic Substances Control Act of 1976, 15 U.S.C. §§ 2601, *et seq*.; and the Occupational Safety and Health Act, 29 U.S.C. §§ 651, *et seq*.; and any successor statutes and regulations to the foregoing.

"Hazardous Substances" means (I) all chemicals, materials and substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar import, under any applicable Environmental Law; and (II) all other chemicals, materials and substances, exposure to which is prohibited, limited or regulated by any governmental authority, including, without limitation, asbestos and asbestos-containing materials in any form, lead-based paint, radioactive materials, polychlorinated biphenyls ("PCB's"), and substances and compounds containing PCB's.

(j)     Attached as Schedule 4.1(j) is a list of each Employee Benefit Plan (as defined below) of Seller.  Each Employee Benefit Plan of Seller and each related trust, insurance contract, or fund, has been maintained in material compliance with all applicable laws, including, but not limited to, ERISA, and the Internal Revenue Code of 1986, as amended (the "Code").  To the extent any such Employee Benefit Plan is not in material compliance with all applicable laws, such noncompliance is not material with respect to the transactions contemplated hereunder.  "Employee Benefit Plan" means an "employee benefit plan," within the meaning of Section 3(3) of ERISA, and which is currently maintained by Seller.  Each Employee Benefit Plan of Seller is in writing and the Buyer has been furnished a complete and accurate copy of such Employee Benefit Plan, any amendments to such Employee Benefit Plan, and a complete and accurate copy of each material document prepared in connection with each Employee Benefit Plan.  There are no other employee benefit plans, programs, arrangements, perquisites or agreements, whether formal or informal, whether in writing or not, to which Seller is a party, with respect to which Seller has any obligation or which are maintained, contributed to or sponsored by Seller for the benefit of any current or former employee, independent contractor, officer, manager or director of Seller.

(k)     Except for the matters disclosed on Schedule 4.1(k), Seller will have sufficient assets to pay, and will pay, all amounts owing to the creditors of Seller outstanding as of the Closing Date for all obligations not assumed by Buyer.

9

(l)    Attached hereto as Schedule 4.1(l) is a list of all the financial statements Seller has delivered to Buyer (collectively the "Financial Statements"). The Financial Statements (including the notes thereto) have been prepared in accordance with applicable Manufacturer accounting principles applied on a consistent basis throughout the periods covered thereby, present fairly and accurately the financial condition of the Seller as of such dates and the results of operations of Seller for such periods, are correct and complete, and are consistent with the historical books and records of Seller (which books and records are correct and complete).  Except as set forth on Schedule 4.1(l), there has been no material adverse change in the business, financial condition, operating results, assets, employee, customer, vendor or supplier relations of Seller relating to the Dealerships.

(m)    All material assets, properties and risks of Seller are, and for the past five (5) years have been, covered by valid and, except for insurance policies that have expired under their terms in the ordinary course, currently effective insurance policies or binders of insurance (including general liability insurance, property insurance and workers' compensation insurance) issued in favor of Seller, in such types and amounts and covering such risks as are consistent with customary practices and standards of companies engaged in businesses and operations similar to those of Seller, as the case may be. To Knowledge of Seller, with respect to each insurance policy: (A) the policy is legal, valid, binding, enforceable, and in full force and effect; (B) the policy will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby; (C) Seller is not, nor is any other party to the policy, in breach or default (including with respect to the payment of premiums or the giving of notices), and no event has occurred that, with notice or the lapse of time, would constitute such a breach or default, or permit termination, modification, or acceleration, under the policy; and (D) no party to the policy has repudiated any provision thereof. Seller has been covered during the past five (5) years by insurance in scope and amount reasonably equivalent to what is maintained by Seller as of the Effective Date.  Attached as Schedule 4.1(m) is a list of all insurance policies of Seller in effect as of the Effective Date.

(n)    Seller either owns or is otherwise entitled to use all Proprietary Rights (as defined below) necessary to conduct the business of the Dealerships as presently conducted.  For purposes of this Agreement, "Proprietary Rights" means all (i) patents, patent applications, patent disclosures and improvements thereto, (ii) trademarks, service marks, trade dress, logos, trade names and corporate names and registrations and applications for registration thereof, (iii) copyrights and registrations and applications for registration thereof, (iv) mask works and registrations and applications for registration thereof, (v) computer software data and documentation, (vi) trade secrets and confidential business information (including ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information), (vii) other proprietary rights or any intellectual property, and (viii) copies and tangible embodiments thereof (in whatever form or medium).  Attached as Schedule 4.1(n) is a list of all Seller Proprietary Rights.

(o)    Except as set forth on Schedule 4.1(o), no permit, consent, approval or authorization of, or declaration or notice to, or report or filing with, any governmental or regulatory authority or any other Person is required in connection with the execution, delivery or performance of this Agreement or any Related Agreement by Seller or the consummation by Seller of any other transaction contemplated hereby or thereby. Upon completion of Schedule 1.3 (Assumed

10

Contracts), Seller shall update Schedule 4.1(o) to enumerate which Assumed Contracts require consent to be assigned.

(p)    Except as set forth on Schedule 4.1(p), Seller has no liability (and there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any liability) arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product manufactured, sold, leased, or delivered by Seller.

(q)    Except as set forth on Schedule 4.1(q), and except for notices which are no longer applicable, no Manufacturer has: (i) notified Seller of any deficiency in dealership operation, including, but not limited to, the following areas: (a) brand imaging, or (b) facility conditions;  (ii) otherwise advised Seller of a present or future need for facility improvement or upgrades in connection with Seller's business; (iii) notified Seller of its intent or desire to relocate the location of or close the applicable Dealership; (iv) notified Seller of its intent to relocate any other dealership or establish or award a new franchise for a dealership to a location that could have a material adverse impact on the applicable Dealership; (v) protested any action taken or proposed to be taken by the applicable Dealership; or (vi) notified Seller of any Manufacturer chargebacks.  Seller has not been assessed any material chargebacks relating to any Manufacturer audit matters, including, but not limited to, matters related to the export of motor vehicles in violation of Manufacturer policies.  As of the Effective Date, the Dealership sites identified in Recital A to this Agreement are operated in material compliance with applicable Manufacturer image requirements.  Seller has not received any written notice from a Manufacturer concerning open point opportunities, Manufacturer market realignments, or any other actions within a 200 mile radius of any Dealership that could reasonably be expected to have an effect on the Business of Seller and operations of the Dealerships of Seller.  Seller has operated the Dealerships in compliance with applicable Manufacturer warranty and leasing guidelines other than as disclosed in writing to Buyer.  Seller has disclosed to Buyer all active Manufacturer programs available credits to Buyer in connection with the operation of the Dealerships.

(r)    Neither this Agreement, nor any Related Agreement, Schedule or other document, certificate or item delivered by Seller or at Seller's direction pursuant to this Agreement, or any Related Agreement, contains any untrue statement of a material fact or omits to state a material fact necessary to make each statement contained herein or therein not misleading.  There is no fact which has not been disclosed to Buyer of which Seller is aware and which has a material adverse effect on the business, financial condition, operating results, assets or employee, customer or supplier relations of Seller relating to the Dealerships.

(s)    Schedule 4.1(s) contains a complete list of all names by which Seller, or any of Seller's related predecessors-in-interest, if applicable, have conducted business.

(t)    Except as set forth on Schedule 4.1(t), in the last five (5) years, Seller has not participated, and currently does not participate, in customer marketing plans such as "tires for life", "batteries for life", "lifetime oil changes", "lifetime warranties", customer coupon programs, or similar programs.

(u)    To the Knowledge of Seller, except as set forth on Schedule 4.1(u), none of the New Vehicles (as defined in Schedule 1.1) to be conveyed hereby has sustained prior mechanical trouble or body damage such that the applicable Dealership is required under California law to make a disclosure to a customer.

(v)    To the best Knowledge of Seller, Seller has complied with the Gramm-Leach-Bliley Act with respect to customer information received by Seller, including, if applicable, responsibility for providing any notice required, and Seller has implemented and maintained privacy practices to protect any financial information received by Seller from its customers.

(w)    To the Knowledge of Seller, neither it nor any of its respective directors, members, officers, agents, representatives or employees (in their capacity as directors, members, officers, agents, representatives or employees) has: (A) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity in respect of the Business of Seller; (B) directly or indirectly, paid or delivered any fee, commission or other sum of money or item of property, however characterized, to any finder, agent, or other party acting on behalf of or under the auspices of a governmental official or governmental authority, in the United States or any other country, which is in any manner illegal under any law of the United States or any other country having jurisdiction; or (C) made any payment to any customer or supplier of Seller or any officer, director, partner, employee or agent of any such customer or supplier of Seller for any unlawful reciprocal practice, or made any other unlawful payment or given any other unlawful consideration to any such customer or supplier of Seller or any such officer, director, partner, employee or agent of any such customer or supplier of Seller, in respect of the Business of Seller.

(x)    Seller has taken all commercially reasonable steps to safeguard the information technology systems utilized in the operation of the Business of Seller, including the implementation of procedures to reasonably ensure that such information technology systems are free from disabling codes or instructions, timer, copy protection device, clock, counter or other limiting design or routing and any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus," or other software routines or hardware components, which in each case may permit unauthorized access or the unauthorized disablement or unauthorized erasure of data or other software by a third party and, to the Knowledge of Seller, to date there have been no successful unauthorized intrusions or breaches of the security of the information technology systems. Seller has complied with and, as the Business of Seller is presently conducted, is in compliance in all material respects with, all data laws, rules and regulations. Seller has complied in all material respects with, and is presently in compliance in all material respects with, its policies applicable to data privacy, data security, and/or personal information as well customer collection practices in compliance with the Fair Credit Reporting Act and any Consumer Finance Protection Bureau policies or regulations. Seller has not experienced any incident in which personal information or other data was or may have been stolen or improperly accessed. Seller is not aware of any facts suggesting the likelihood of the foregoing, including without limitation, any breach of security or receipt of any notices or complaints from any Person regarding personal information or other data.

(y)    Except as set forth in Schedule 4.1(y), since January 1, 2018, the Business of Seller has been conducted in the ordinary course and consistent with past practice. Except as set forth in Schedule 4.1(y), since January 1, 2018, Seller has not:

(i)    permitted or allowed any of the Purchased Assets to be subjected to any encumbrance, other than floorplan inventory encumbrances;

(ii)    made any change in any method of accounting or accounting practice or policy used by Seller, other than such changes required by GAAP;

(iii)    amended, terminated, cancelled or compromised any material claims of Seller or waived any other rights of substantial value to Seller;

(iv)    made any capital expenditure or commitment for any capital expenditure in excess of $50,000 individually or $100,000 in the aggregate;

(v)    failed to pay any creditor any amount owed to such creditor when due;

(vi)    made any material changes in the customary or historic methods of operations of Seller, including practices or policies relating to purchasing, maintaining inventories, extending payables, accelerating receivables, marketing, selling and pricing;

(vii)    entered into any agreement, arrangement or transaction with Seller's directors, officers, employees, members or managers (or with any relative, beneficiary, spouse or Affiliate of such Persons);

(viii)    suffered any casualty loss or damage with respect to any of the Purchased Assets which in the aggregate have a replacement cost of more than $100,000, if such loss or damage is not covered by insurance; or

(ix)    threatened or filed claims or litigation which could reasonably be expected to result in a material adverse effect on Seller.

(z)    Except as set forth in Schedule 4.1(z), Seller has no liabilities other than liabilities (i) reflected or reserved against on the Financial Statements or expenses related to the transactions contemplated under this Agreement, or (ii) incurred since January 1, 2018, consistent with past practice of Seller, and which do not and could not have a material adverse effect on Seller.

**4.2    Buyer Representations.**  Buyer represents and warrants to Seller as follows:

(a)    Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.  As of the Closing Date, Buyer (or its permitted assignee) will be qualified to do business in the State of California.  Buyer has the full power and lawful authority to (i) enter into this Agreement and the Related Agreements and (ii) to consummate the transactions contemplated by this Agreement and the Related Agreements.

(b)    Prior to the Closing, this Agreement and each Related Agreement will have been duly authorized by all necessary member or manager action on the part of Buyer.  This Agreement and the Related Agreements each constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

**4.3    Mutual Representations and Warranties.**

(a)    Seller engaged Templeton Marsh ("Broker") as a broker in this transaction. For these services, Seller shall pay to Broker, at the Closing, all amounts due to Broker in connection with the consummation of the transactions contemplated by this Agreement.  Except for Seller's engagement of Broker, Seller and Buyer each hereby represents and warrants to the other that its sole contact with the other or with the Purchased Assets and the Property has been made without the assistance of any broker or other third party and that no fees are payable to any broker or third party in connection with the consummation of the transactions contemplated by this Agreement. Buyer and Seller shall each indemnify, defend and hold the other Party, each Affiliate of such Party, and their respective members, partners, venturers, directors, officers, stockholders, agents, employees, spouses, legal representatives, successors and assigns, harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, reasonable attorneys' fees) resulting from the breach by the indemnifying Party of the

13

representation and warranty set forth above in this <u>Section 4.3(a)</u> or for any action by such Party's representative for payment or commissions.  The mutual representations and warranty contained in this <u>Section 4.3(a)</u> will survive the Closing.

(b)    Seller and Buyer each hereby represents to the other that the inclusion of all of the Purchased Assets, including but not limited to all of the goodwill associated with, and assets used in the operation of, all of the Dealerships, in the transactions contemplated herein is a material inducement for such Party to enter into this Agreement.  The removal of any Purchased Asset from the transactions contemplated herein would negate the intent of the Parties hereto and render this Agreement void in its entirety.

**4.4    Schedules.**  The Schedules provided under <u>Section 4.1</u> shall be annexed and incorporated into this Agreement as if delivered on the Effective Date with no further action required by the Parties.  Within ten (10) days of the Effective Date, Seller shall prepare and deliver to Buyer all Schedules to this Agreement.  All Schedules shall be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Agreement.  Without limiting the foregoing, each Schedule shall identify with particularity and describe in relevant detail all relevant facts to be described thereunder; the listing of (or inclusion of a copy) of a document or other item shall be deemed adequate to disclose an exception to a representation or warranty made by Seller herein provided that Seller has provided Buyer with a complete copy of the document (unless the representation or warranty has to do with the existence of the document or other item itself).  The date the Schedules have been delivered in full compliance with this <u>Section 4.4</u> shall be the "<u>Schedule Delivery Date</u>".

**4.5    Survival.**  The representations and warranties of the Parties contained in <u>Section 4.1</u> and <u>Section 4.2</u> shall survive the Closing for a period of twenty-four (24) months; <u>provided</u>, <u>however</u>, that the representations and warranties under <u>Section 4.1(a)</u> and <u>Section 4.1(c)</u> shall survive indefinitely, and the representations and warranties under <u>Section 4.1(g)</u>, <u>Section 4.1(i)</u> and <u>Section 4.1(j)</u> shall survive for a period of time equal to ninety (90) days after the completion of the applicable statute of limitations (giving effect to any waiver, mitigation or extension thereof) for the subject matter laws relating to such representations and warranties.  No claim for indemnification pursuant to <u>Section 5.3</u> may be asserted after the date on which such representation or warranty expires except to the extent that such claim is based upon fraud or willful misconduct of the Party making such representation and warranty, in which case it may be asserted at any time prior to the expiration of the statute of limitations applicable thereto.

**5.    CERTAIN COVENANTS.**

**5.1    Access to Property and Records; Inspection.**  For a period of sixty (60) days following the Schedule Delivery Date (the "<u>Diligence Period</u>"), upon reasonable notice to Seller, Buyer and its counsel, accountants and other representatives will be given full and complete access during normal business hours to all of the properties, personnel contracts, commitments, employee files and other information and records of Seller, including, without limitation, such access as is needed to (a) conduct a physical and environmental inspection of the Property satisfactory to Buyer, (b) with the prior approval of Seller, which may not be unreasonably withheld or delayed, evaluate and interview employees, and (c) jointly with Seller, as set forth herein, determine the Purchase Price of the Purchased Assets.  Seller shall also make available appropriate accountants, legal counsel, and other agents and representatives of Seller not employed by Seller or located at the Property.  Buyer shall have the right to have its diligence review updated following the expiration of the Diligence Period and prior to the Closing to ensure there was no material change in the operation of the Dealerships prior to the Closing.  In addition to the foregoing, Buyer's computer consultants and parts and service personnel will be provided full access to the Dealerships, including, with the prior approval of Seller, which may not be unreasonably withheld, all personnel of Seller at or related to the Dealerships, at least two (2) weeks prior to Closing.  Seller will, and

will cause all of its in-house and outside accountants, counsel and other personnel to, fully cooperate with Buyer, Buyer's Affiliates and its counsel, accountants and other representatives and to fully support all actions contemplated by this Section 5.1, including Buyer's evaluation and analysis of the above-referenced material.  Buyer shall have the right to terminate this Agreement for any reason during the Diligence Period upon written notice to Seller.

**5.2     Operation of Dealerships.**  Between the Effective Date and the Closing Date, Seller will: (a) operate its business in the ordinary course; (b) use its best efforts to preserve its Dealerships' operations so that Buyer will obtain the benefits intended to be afforded by this Agreement; (c) not take or permit any action which would result in any representation or warranty of Seller becoming incorrect or untrue in any respect; (d) obtain the prior written approval of Buyer in connection with all material decisions affecting the business, operations, assets and liabilities of the Dealerships; and (e) notify Buyer in writing promptly after Seller becomes aware of the occurrence of any event that might result in any of Seller's statements, representations and warranties under this Agreement or any Related Agreement being or becoming untrue. Seller shall keep all ratios, including, but not limited to inventory levels, in accordance with a 12-month rolling average.  Seller shall not enter into any agreements from and after the Effective Date which have a during in excess of 30 days, or which cannot be cancelled by Seller upon 30 days' prior written notice without penalty or cost.  Seller shall not enter into any agreement from and after the Effective Date which has a capital cost to Seller in excess of Ten Thousand Dollars ($10,000) without the prior consent of Buyer. Seller shall maintain all insurance policies in existence as of the Effective Date in force, current, and fully paid.

**5.3     Indemnification.**

(a)     Seller will indemnify, defend and hold Buyer, its Affiliates (as defined below) and their respective members, partners, venturers, stockholders, directors, officers, employees, spouses, legal representatives, agents, successors and assigns (the "Buyer Indemnified Parties") harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, losses or expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by the Buyer Indemnified Parties (collectively, "Losses") arising from or directly or indirectly relating to:

(i)     any breach or non-fulfillment by Seller of any term, covenant or provision of this Agreement or any Related Agreement, including, but not limited to, any representation and warranty set forth in Section 4.1 of this Agreement;

(ii)     any Excluded Asset;

(iii)     Seller's operation of the Dealerships prior to the Closing Date, including, but not limited to, Seller's Obligations (as defined in Section 1.3), any Seller tax liabilities accruing prior to the Closing Date, any refunds issued by Buyer or its Affiliates (including any Seller profit component) as a result of any cancellations of any service warranties or insurance products, and any liabilities to employees of the Dealerships or any union pension fund, including, without limitation, the I.A.M. National Pension Fund, that arise as a result of actions or omissions of Seller prior to the Closing Date; or

(iv)     withdrawal liability assessed against Seller or any member of Seller's controlled group arising from a withdrawal from a multi-employer pension plan, including without limitation, the I.A.M. National Pension Fund, arising out of or related to this transaction.

15

"Affiliate" of any Person (as hereinafter defined) means any Person that controls, is controlled by or is under common control with such Person, together with its and their respective members, partners, venturers, directors, officers, stockholders, agents, employees and spouses. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise. "Person" means an individual, partnership, limited liability company, association, corporation, or other entity.

(b)     Buyer will indemnify, defend and hold Seller, its Affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, spouses, legal representatives, agents, successors and assigns (the "Seller Indemnified Parties") harmless from and against any and all Losses incurred by the Seller Indemnified Parties arising from or directly or indirectly relating to:

(i)     any breach or non-fulfillment by Buyer of any term, covenant or provision of this Agreement or any Related Agreement, including, but not limited to, any representation and warranty set forth in Section 4.2 of this Agreement; or

(ii)     Buyer's operation of the Dealerships on and after the Closing Date.

(c)     If any claim is made against a Party which, if sustained, would give rise to a liability of the other hereunder, the Party seeking indemnification (the "claiming party") shall, as soon as practicable, cause notice of the claim to be delivered to the other Party (the "non-claiming party") and shall afford the non-claiming party and its counsel, at its sole expense, the opportunity to defend or settle the claim (provided that the claiming party and its counsel may participate at their sole cost and expense). Any notice of a claim shall state specifically the representations, warranty, covenant or agreement with the alleged basis for the claim, and the amount of liability asserted against the other Party by reason of the claim. If such notice and opportunity are not given, or if any claim is compromised or settled without notice to and consent of the non-claiming party, no liability shall be imposed on the non-claiming party by reason of such claim; but if notice is given and the non-claiming party receiving the notice fails to assume the defense of the claim or fails to admit in writing its responsibility as between the Parties to this Agreement with respect to such claim, the claim may be defended, compromised or settled by the claiming party without its consent and the non-claiming party shall remain liable hereunder. Notwithstanding anything contained herein to the contrary, the claiming party may retain control over the defense of any claim hereunder if such claim is non-monetary or is for injunctive or other equitable relief.

(d)     If Seller receives notice from Buyer of a request for indemnification and Seller does not dispute its indemnification obligation in connection therewith, Buyer may, at its sole option, only after complying with the procedure described herein, set-off such amounts owing Buyer in respect of such indemnification obligation from any distributions due to the Seller Principal under the LLC Agreements. Prior to exercising its right of set-off hereunder, Buyer shall notify Seller in writing of the matter in dispute together with all material facts and circumstances reasonably necessary for Seller to determine the basis for such claim or asserted obligation. If, after receiving such written notice, Seller agrees that such claim is valid, offset may be made against the distributions to Seller Principal as stated above. If Seller disputes such claim, Seller shall notify Buyer of such dispute in writing, including the basis therefor, and the New Buyer Entities shall continue to hold said distributions in escrow pending resolution of the matter by the Parties. The prevailing party in such dispute shall be entitled to recover from the non-prevailing party the reasonable attorney's fees and costs incurred in any proceeding instituted to resolve such dispute. Buyer shall have the option, in its sole discretion, to seek all or any portion of the amounts owed

16

in respect of Seller's indemnification obligation directly from Seller rather than exercising its set-off rights hereunder.

(e)     Subject to the limits contained herein, the foregoing indemnification provisions are in addition to, and not in derogation of, any statutory, equitable, or common law remedy any Party may have with respect to the transactions contemplated by this Agreement.

(f)     For purposes of this Section 5.3, any inaccuracy in or breach of any representation or warranty shall be determined with regard to any materiality or similar qualification contained in or otherwise applicable to such representation or warranty contained herein; provided, however, upon establishment of such inaccuracy or breach a Buyer Indemnified Party or Seller Indemnified Party, as applicable, shall be entitled to recovery of its Losses in accordance with this Section 5.3 irrespective of the materiality of such Losses.

5.4     **Notices.**  Buyer and Seller will promptly notify the other in writing if it receives any notice, or otherwise becomes aware, of any action or proceeding instituted or threatened before any court or governmental agency by any third party to restrain or prohibit, or obtain substantial damages in respect of, this Agreement or any Related Agreement or the consummation of the transactions contemplated by such agreements.

5.5     **Employees and Employee Benefits**.

(a)     For purposes of this Section 5.5, the term "Employee" shall mean an individual who, immediately prior to the Closing Date, is included on Seller's payroll records as a common law employee, including but not limited to any such individual who is on a leave of absence or otherwise not actively working on the Closing Date.  On the Closing Date, Seller shall terminate all of its Employees.  At the time of termination, Seller will pay to such Employees all vacation, sick leave, PTO and other similar benefits, which are accrued and unpaid, to which they are entitled with respect to their employment up to the Closing Date, including all salary and wages due on the date of termination, bonuses and incentives, and all other employee benefits to which said employees are entitled at the time of their termination.  Seller shall provide each terminated Employee with a notice in accordance with applicable laws.

(b)     From the date of this Agreement through the Closing Date, Seller will not amend the pay plans in place at the Dealerships as of the date of this Agreement relating to any of its employees, except only for (i) wage increases required by applicable law; (ii) pay plan amendments to which Seller committed prior to the date of this Agreement and which are disclosed on Schedule 4.1(f) hereto; or (iii) short term Seller sponsored incentive plans.

(c)     Subject to the last sentence of this Section 5.5(c), Buyer may, in its sole discretion, offer employment to certain employees of Seller as of the Closing Date on terms and conditions set by Buyer in its sole discretion.  All such persons so employed by Buyer will be considered as "new hires" by Buyer.  Employees who accept employment with Buyer shall be referred to as "Retained Employees."  If, as of the Closing Date, an Employee is on a leave of absence or vacation granted by Seller, Buyer's offer of employment shall allow the Employee to remain on a leave of absence or vacation on substantially the same terms as applied prior to the Closing Date.  All Employee records shall be retained by Seller subsequent to the Closing Date.  Buyer shall be entitled to request copies of the records of Retained Employees.  Notwithstanding anything set forth above, Buyer will rehire the applicable number of employees at the Dealerships to meet the exclusion requirements for compliance with the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. Sections 2101-2109, or the applicable state equivalent that is applicable.

17

(d)    Buyer will not assume or be deemed to have assumed any past or future obligations of Seller to Retained Employees, or any employees of Seller who are not hired by Buyer. Nothing in Section 5.5, expressed or implied, shall limit Seller's right to terminate the employment before the Closing Date of any Employee as it may deem reasonable in the normal operation of its business.

**5.6    Benefit Plans**.

(a)    Effective as of the close of business on the last day of the month that the Closing Date occurs, coverage for all Retained Employees and their covered dependents under Seller's health care programs (the "Health Care Plans"), including all plans subject to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), shall terminate.

(b)    Seller shall retain the responsibility for providing payment of all (i) claims of Seller's employees under any Employee Benefit Plan for claims incurred prior to the Closing Date, and (ii) claims incurred under any life insurance plans for deaths prior to the Closing Date. With respect to Seller's Health Care Plans, effective as of the close of business on the date immediately prior to the Closing Date, coverage for all Employees who are not Retained Employees and their covered dependents under the Health Care Plans shall terminate. Any claim or expense incurred by an Employee or a covered dependent prior to the Closing Date shall continue to be the responsibility of Seller's Health Care Plans in accordance with their terms. Seller agrees to appropriately notify all Employees of the manner in which expenses prior to the Closing Date are to be submitted to the Seller's Health Care Plans for reimbursement. Seller agrees to timely provide the applicable COBRA notices with respect to the Health Care Plans.

**5.7    Consents and Approvals**.

(a)    Seller will obtain prior to Closing, in writing and without penalty to or payment by Buyer, all necessary approvals and consents required for Seller to authorize, approve and execute this Agreement and the Related Agreements and to consummate (i) the assignment to Buyer of the Assumed Contracts, if any, and the Leases, and (ii) the sale of the Purchased Assets to Buyer.

(b)    Buyer will use its commercially reasonable efforts to obtain, no later than the Closing Date, (i) all necessary approvals from the Manufacturers to operate as a retail sales and service dealer, (ii) all necessary approvals from the State of California and any regulatory body thereof to serve as a new and used automotive dealer under California law, and (iii) all necessary permits and approvals from the State of California and any local regulatory body thereof to operate the Dealerships under California, or applicable local, law. Buyer will provide the Manufacturers, federal regulatory bodies and the State of California and any local regulatory body thereof with any and all information necessary to procure such approvals. Seller shall provide its best efforts to assist Buyer's efforts under this Section 5.7(b). Notwithstanding the foregoing, if one or more of the Manufacturers exercises its right of first refusal or option to purchase the applicable Dealership and the associated Purchased Assets, then, either: (1) with the consent of both Buyer and Seller, Buyer will purchase the remaining Dealerships and Purchased Assets at new negotiated purchase prices if mutually agreed to by Buyer and Seller; or (2) this Agreement will be terminated.

**5.8    Vehicle Inventories.** Seller shall not engage in any inventory adjustments, inter-company movement or dealer trades of new or used vehicles that is outside the ordinary course of its historical practices prior to the Closing Date and shall use its commercially reasonable best efforts to not increase inventory levels or floorplan expenditure at the Dealerships.

**5.9    Run Out of Books; Post Closing Seller Computer Access.**

18

(a)     Buyer will cooperate with Seller in the maintenance of Seller's accounting records for a period twelve (12) months following the Closing Date (the "Run Out Period"). To reasonably ensure Seller's accounting records are accurately stated for the Run Out Period, Buyer will turn over to Seller all payments, mail, invoices, general correspondence, and any other business-related items ("Residual Transactions") related to Seller's business operations prior to the Closing Date received by Buyer.  Buyer and Seller will also work closely to ensure that all Residual Transactions between Buyer and Seller will be reconciled, reviewed, and settled on a weekly basis for the first month, on a bi-weekly basis for the second month, and on a monthly basis thereafter during the Run Out Period.  Buyer's obligations under this Section 5.9 shall be a courtesy to Seller, and any costs incurred by Buyer in compliance shall be de minimus in nature, and Seller shall not request that Buyer provide substantial time and effort to Seller under this Section 5.9.  Furthermore, Seller shall make available to Buyer for the Run Out Period access to personnel and systems not present at the Property in order to achieve a smooth and timely transition of operations for Buyer, at no charge.

(b)     Seller agrees to deliver to Buyer on the Closing Date the Records (as defined on Schedule 1.1) in their "as-is" condition.  To the extent the Records are in a digital form, Buyer and Seller acknowledge and understand that the transfer of a copy of a digital form of the Records involves a joint and collaborative effort of the parties along with the Seller's DMS (Dealership Management System) vendor and requires the cooperation of the Parties and the vendor.  Seller agrees to contact its DMS vendor and arrange for the transfer of a copy of its Records that are in digital form on its DMS to Buyer on or before the Closing, through transfer of a copy of the Records to a location of Buyer's choice, it being contemplated that Buyer shall have all necessary access to these Records immediately after the Closing.  Should Buyer obtain access to the Records prior to the Closing, Buyer shall hold the Records subject to Section 5.15.  In the event the transactions contemplated by this Agreement do not close, any Records in Buyer's possession or control shall be destroyed and Buyer shall be enjoined from using or disclosing the Records or information learned therefrom for any purpose.  Buyer shall pay the cost chargeable to Seller by its DMS vendor for transfer of the Records.  Furthermore, subsequent to the Closing Date, Buyer and its Affiliates shall be permitted access to Seller's computer system in order to obtain Dealership records purchased as part of the transactions under this Agreement.  Seller shall cooperate with Buyer to provide downloads of Dealership financial information necessary for Buyer to establish its books as of the Closing Date.  Buyer's access as contemplated under this Section 5.9(b) shall be upon reasonable notice and shall not unreasonably utilize Seller employees after the Closing.  Seller shall cooperate in good faith to provide the information and access contemplated under this Section 5.9(b).

**5.10**    **Access to Records.**  For so long as is required by the applicable state or federal law, Seller shall have access to any records transferred to Buyer in connection with this transaction.  Such access shall be limited to reasonable intervals during normal business hours, and shall be for bona-fide, non-competitive business purposes only.

**5.11**    **Sales Tax.**  To the extent such letters or notices are available from the State of California, Seller will obtain, and deliver to Buyer, a sales tax clearance letter or notification from the taxing authority of the State of California responsible for the collection of sales and use taxes indicating that all such taxes have been reported, collected, and remitted in accordance with the applicable tax laws of the State of California.

**5.12**    **Health Care Continuation Coverage.**  Seller shall retain the responsibility for providing employees who experience "qualifying events" prior to the Closing Date and their dependents ("Qualified Beneficiaries," within the meaning of COBRA) with the opportunity for continuation of group health care

19

coverage required by COBRA. For purposes of this provision, references to COBRA (as set forth within the Code and ERISA) shall include references to any provision of such statutes as they may be amended from time to time.

**5.13    Non-Solicitation; Exclusivity**. Seller and the Seller Principal will not directly or indirectly solicit or encourage any inquiries or proposals from (or enter into any agreements with) any Person other than Buyer for the purchase of the capital stock or other equity of Seller, the Purchased Assets or the Property and will not assign the Assumed Contracts or the Leases, or enter into discussions with, or furnish any non-public information concerning Seller, its assets or business, to any such other Person in connection with such proposal, until this Agreement is terminated. Seller shall promptly notify Buyer of any such proposal or inquiry received by Seller or any of its representatives.

**5.14    Confidentiality.** From and after the Effective Date, each of the Parties to this Agreement shall, and shall cause its Affiliates and its or their respective representatives and agents, to hold, in confidence, any and all information, whether written or oral, concerning the transactions contemplated under this Agreement, except (i) the disclosure that a transaction is occurring, but not any specific deal or economic terms, and (ii) to the extent that Party can show that such information (a) is generally available to and known by the public through no fault of the disclosing Party, any of its Affiliates or its or their respective representatives and agents; or (b) is lawfully acquired by the disclosing Party, any of its Affiliates or its or their respective representatives and agents from and after the Effective Date from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If any Party or any of its Affiliates or their respective representatives and agents are compelled to disclose any information by judicial or administrative process or by other requirements of applicable law, such party shall promptly notify the other Parties to this Agreement in writing and shall disclose only that portion of such information which such disclosing Party is advised by its counsel in writing is legally required to be disclosed, provided that such disclosing Party shall use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**5.15    Website/Lead Source Redirection**. Seller shall cooperate and work with Buyer's information technology personnel to ensure that, following the Closing, all traffic on Seller's Dealerships websites and from other lead source channels are redirected to the applicable Buyer websites and lead source systems.

**5.16    Bulk Transfer Laws**. Seller will fully comply with all applicable requirements of the Uniform Commercial Code and other laws of the State of California relating to bulk transfers.

**5.17    Franchised Motor Vehicle Dealer License**. Buyer agrees to use its commercially reasonable best efforts to obtain a California franchised motor vehicle dealer license and a California Bureau of Automotive Repair license (collectively, the "Dealer License") with respect to the operation of the Dealerships. Should the State of California fail to issue Buyer the Dealer License on or before the Closing Date, Seller shall permit Buyer to use Seller's Dealer License, dealer number, and dealer tags for up to ninety (90) days ("License Usage Period") after the Closing Date, so as to enable Buyer to enjoy the benefits of its purchase of Seller's operating assets and goodwill, and so as to provide products and continuing service to customers. Should Buyer use Seller's Dealer License, Buyer agrees to indemnify and hold Seller (and its officers, directors and members) harmless from and against any and all claims, demands, losses, damages, penalties, fines, costs or expenses (including, but not limited to, all reasonable attorney's fees, whether such fees are incurred in any pretrial, trial, appellate or bankruptcy proceedings) whatsoever, as the same in any way relate to or arise out of the Buyer's use of Seller's Dealer License, dealer number or dealer license plates. During the License Usage Period, Buyer shall use continued commercially reasonable best efforts to obtain its Dealer License. Promptly after Buyer receives its Dealer License or the

20

expiration of the License Usage Period, whichever occurs first, Buyer shall return Seller's Dealer License, license number and dealer license plates, and Buyer shall cease using same. During the time in which Buyer uses Seller's license, Buyer shall cause its insurer to list Seller as an additional insured under its policy and Buyer shall provide to Seller proof of same. At the election of either Party, the other Party shall work in good faith to negotiate reasonably requested documentation to be executed at the Closing to reflect the provisions of this Section 5.17.

**5.18     Leases**. During the Diligence Period, provided that Buyer has not previously terminated this Agreement, Buyer and Seller will work together to finalize how Buyer will obtain rights to use and occupy the Property. Buyer and Seller will work together to determine how to approach the landlord(s) to either negotiate new leases between the Buyer and the landlord(s) or to enter into acceptable assignments with the landlord(s), in each case on terms acceptable to Buyer in its sole discretion. Seller represents and warrants that the copies of the Leases it will provide to Buyer in accordance with the terms hereof are true, correct and complete copies of the Leases.

**5.19     Erroneous Payments**. The Parties shall in good faith work together and use their commercially reasonable efforts to ensure that (i) amounts paid by Seller but owed by Buyer as a result of Manufacturers or vendors erroneously billing Seller for items arising out of or in connection with the operation of the Business following Closing shall be paid over to Seller promptly, and (ii) amounts paid by Buyer but owed by Seller as a result of Manufacturers or vendors erroneously billing Buyer for items arising out of or in connection with the operation of the Dealerships prior to Closing shall be paid over to Buyer promptly.

**5.20     Dealer Trades**. From the Effective Date through the Closing Date, Seller agrees not to transfer any of its New Vehicle inventory to any new vehicle dealer outside of Seller's historical business practices.

**5.21     No Interference**. Seller shall not to take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier, Employee, or other business associate of the Business, or Seller, from maintaining the same business relationships with the Business and Buyer after the Closing Date as they maintained with the Business and Seller prior to the Closing. Seller will refer all customer inquiries relating to the Business to Buyer from and after the Closing Date.

**5.22     Unemployment Rate Factor; Worker's Compensation Experience Factor**.

(a)     Buyer, at its election, may utilize Seller's State of California unemployment rate factor to the full extent allowed under law. Seller agrees to assist and cooperate with Buyer in such efforts.

(b)     Buyer, at its election, may utilize Seller's worker's compensation experience factor to the full extent allowed under California law. Seller agrees to assist and cooperate with Buyer in such efforts.

**5.23     Further Assurances**. Each Party will execute and deliver any further instruments or documents, and take all further action, reasonably requested by the other Party to carry out the transactions contemplated by this Agreement and the Related Agreements.

**5.24     Survival.** Except as otherwise stated, the covenants of the Parties contained in this Article 5 will survive the Closing.

6.     **CONDITIONS PRECEDENT.**

6.1     **Conditions to Buyer's Obligations.**  Buyer's obligations under this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Buyer:

(a)     Seller will have fully complied with and performed all its obligations under this Agreement, including, but not limited to, Section 3.2 and the Related Agreements.  Seller will also have caused the Seller Principal to have fully complied with and performed all of his obligations under this Agreement, including, but not limited to, Section 3.2 and the Related Agreements.

(b)     Seller will have paid any and all current and delinquent contributions it or a member of Seller's controlled group is obligated to pay to the I.A.M. National Pension Fund and any other union pension plan.

(c)     Seller will have paid any and all withdrawal liability it or a member of Seller's controlled group is obligated to pay as a result of withdrawal from the I.A.M. National Pension Fund or another multi-employer union pension fund where the withdrawal arose out of or relates to this transaction.

(d)     All representations of Seller in this Agreement and the Related Agreements will be true and complete as of the date when given and on the Closing Date.

(e)     Buyer will have received all necessary approvals from the Manufacturers including, but not limited to, the appointment of Buyer's representative as the dealer principal, and the execution and delivery by Buyer and the applicable Manufacturer of the appropriate dealer agreements and related documentation; and Buyer shall be satisfied in its sole discretion with any facility or relocation demands or obligations that any Manufacturer conditions approval of Buyer upon.  Notwithstanding the foregoing, if one or more of the Manufacturers exercises its right of first refusal or option to purchase the applicable Dealership and the associated Purchased Assets, then, either: (1) with the consent of both Buyer and Seller, Buyer will purchase the remaining Dealerships and Purchased Assets at new negotiated purchase prices if mutually agreed to by Buyer and Seller; or (2) this Agreement will be terminated.

(f)     Buyer will have secured the necessary financing required to complete the transactions contemplated hereby and by the Related Agreements, with the terms and structure to be deemed acceptable by Buyer in its sole discretion.

(g)     Buyer will have received all necessary approvals from the State of California and any regulatory body thereof to operate the Dealerships.

(h)     Buyer will have completed its due diligence investigations of the Dealerships, the Property and the Purchased Assets as of the Closing Date in accordance with Section 5.1 above and the relevant provisions of the Related Agreements, and will be satisfied with such investigations in its sole discretion and shall not have terminated this Agreement due to such due diligence investigations.

(i)     Buyer shall be satisfied in its sole discretion that the operation of the Business and the Property complies with all applicable laws, including, without limitation, municipal by-laws and zoning by-laws, and that the Buyer may continue to operate the Business in compliance with such laws post-Closing.

22

(j)    Buyer and the Seller Principal shall have executed and delivered a Non-Compete Agreement for Seller Principal.

(k)    Buyer and the applicable landlord(s) of the Property shall have executed and delivered the Lease Assignments.

(l)    All of the Purchased Assets shall be transferred to Buyer, or a permitted Buyer assignee, simultaneously on the Closing Date.

(m)    No material adverse change (as defined in Section 7.2 hereof) shall have occurred.

(n)    All consents, approvals and waivers required to consummate the transactions contemplated by this Agreement and the Related Agreements and allow Buyer to operate the Business will have been obtained in writing by Buyer and Seller, as applicable, including, without limitation, any workers' compensation legislation.

**6.2    Condition to Seller's Obligations.**  Seller's obligations under this Agreement are subject to the satisfaction, on or prior to the Closing Date, of the following conditions, which may be waived by Seller:

(a)    Buyer will have fully complied with and performed all its obligations under this Agreement, including, but not limited to, Section 3.2 and the Related Agreements.

(b)    All representations of Buyer in this Agreement and the Related Agreements will be true and complete as of the date when given and on the Closing Date.

(c)    The New Buyer Entities shall issue the Membership Interests to the Seller Principal.

(d)    All of the Purchased Assets shall be transferred to Buyer, or a permitted Buyer assignee, simultaneously on the Closing Date.

(e)    All consents, approvals and waivers (including the approval by the Manufacturers) required to consummate the transactions contemplated by this Agreement and the Related Agreements will have been obtained in writing by Buyer and Seller, as applicable.

**6.3    Timing**.  The Parties shall undertake to finalize all Closing documents and to satisfy all conditions precedent set forth in this Section 6 at least seven (7) days prior to the Closing to allow for an orderly Closing.

**7.    TERMINATION OF AGREEMENT; EFFECT OF TERMINATION.**

**7.1    Termination.**  This Agreement may be terminated at any time before the Closing as follows:

(a)    By Buyer, by notice to Seller, if any of Buyer's conditions precedent to Closing have not been satisfied as of the Closing Date or has become incapable of being satisfied by the Closing Date through no breach hereof by Buyer.

(b)    By Seller, by notice to Buyer, if any of Seller's conditions precedent to Closing have not been satisfied as of the Closing Date or has become incapable of being satisfied by the Closing Date through no breach hereof by Seller.

(c)    Subject to Section 3.1 above, by Buyer or Seller, by notice to the other, if the Closing does not take place on or before the Closing Date Deadline (as automatically extended in accordance with Section 3.1(a)); provided that a Party will not be entitled to terminate this Agreement pursuant to this Section 7.1 if such Party's willful breach of this Agreement or any Related Agreement or intentional misrepresentation under this Agreement or any Related Agreement has prevented the Closing from taking place before such date.

**7.2    Effect of Termination.**    Upon a termination in accordance with Section 7.1, this Agreement will have no further force or effect.  The Parties' rights under this Article 7 are cumulative and are in addition to the other rights and remedies available to them under the Related Agreements or any other agreement.  If Seller fails to consummate the transactions described herein as a result of a breach by Buyer of its obligations hereunder or under the Related Agreements, Seller shall have the right to terminate this Agreement upon written notice to Buyer and retain the Earnest Money Deposit.  If Buyer fails to consummate the transactions described herein as a result of (i) a breach by Seller of its obligations hereunder or under the Related Agreements, (ii) the results of Buyer's diligence review of the Dealerships and the Property being unsatisfactory to Buyer for any reason whatsoever, (iii) as a result of the non-fulfillment of one or more conditions set forth in Section 6.1(c) or Section 6.1(e), or (iv) the occurrence of a "material adverse change" after the Effective Date and prior to the Closing Date with respect to Seller, the Dealerships, the Purchased Assets, or the Property ((i)-(iv), collectively, the Refund Conditions"), Buyer shall have the right to terminate this Agreement upon written notice to Seller (which, in the case of (ii), such written notice shall have been provided on or prior to the expiration of the Diligence Period) and have the Earnest Money Deposit refunded to Buyer, or pursue any applicable remedies available under law or equity, including specific performance and reimbursement of attorneys' fees and all costs of collection incurred by Buyer.  If Buyer fails to consummate the transactions described herein for any reason other than the Refund Conditions, Seller shall retain the Earnest Money Deposit.  For purposes of this Section 7.2, a "material adverse change" shall mean an event, circumstance, development or condition that, either individually or in the aggregate, has had or could be reasonably expected to have a material adverse effect on the ability of Buyer to operate the Dealerships, the Purchased Assets, or the Property after the Closing Date as Seller operates the Dealerships, the Purchase Assets, and the Property prior to the Closing Date.

**8.    RISK OF LOSS.**

If, prior to the Closing Date, the Purchased Assets or any portion thereof, are destroyed by fire or other casualty, then Buyer will have the option, to be exercised within ten (10) days following the notification of such destruction, but in any event prior to the Closing Date, to either (a) deduct from the Purchase Price the value of those Purchased Assets which were so destroyed as is mutually agreed to by Buyer and Seller or, in the event of disagreement, in the amount determined by an arbitrator or appraiser mutually agreed to by Buyer and Seller, and to otherwise consummate this transaction at such reduced Purchase Price, (b) consummate this transaction without any deduction, in which event Buyer will be entitled to receive all casualty insurance proceeds payable to Seller due to such destruction, if any, and Seller will assign such proceeds (or the right to receive such proceeds) to Buyer, or (c) terminate this Agreement and have the Earnest Money Deposit returned to Buyer.  If, prior to the Closing Date, the Property or any portion thereof, are destroyed by fire or other casualty, or a condemnation occurs or is threatened in writing to occur, then Buyer will have the option, to be exercised within ten (10) days following the notification of such destruction or condemnation, but in any event prior to the Closing Date, to terminate this Agreement and have the Earnest Money Deposit returned to Buyer.

9.    **MISCELLANEOUS.**

    **9.1**    **No Waiver.**  No waiver of any breach of any provision of this Agreement will be deemed a waiver of any other breach of this Agreement.  No extension of time for performance of any act will be deemed an extension of the time for performance of any other act.

    **9.2**    **Severability.**  The provisions of this Agreement will be deemed severable, and if any provision of this Agreement is held illegal, void or invalid under applicable law, such provision may be changed to the extent reasonably necessary to make the provision legal, valid and binding.

    **9.3**    **Entire Agreement; Amendment.**  This Agreement, the Related Agreements and the schedules, exhibits and attachments to such agreements contain the entire agreement of the Parties with respect to the purchase and sale of the Purchased Assets and the other transactions contemplated by such agreements.  This Agreement may be amended only by an instrument in writing signed by Buyer and Seller. The headings in this Agreement are solely for convenience of reference and will not affect the interpretation of any provision of this Agreement.  The Schedules to this Agreement are incorporated as a part of this Agreement.

    **9.4**    **Applicable Law.**  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.

    **9.5**    **Time is of the Essence.**  The Parties to this Agreement acknowledge and agree that time is of the essence with respect to the consummation of the transactions contemplated by this Agreement and each Related Agreement.

    **9.6**    **Binding Agreement, Assignment.**  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Buyer and Seller, as applicable; provided, however, that Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates or to an entity or entities to be formed by Buyer or an Affiliate of Buyer (the "New Buyer Entities") and (ii) designate one or more of its Affiliates or one or more New Buyer Entities to perform its obligations hereunder.

    **9.7**    **Expenses.**  Each Party will pay all of its expenses, including attorneys' and accountants' fees in connection with the negotiation of this Agreement or any Related Agreement, the performance of its obligations hereunder or thereunder, and the consummation of the transactions contemplated by this Agreement or any Related Agreement; provided that in any proceeding or other attempt to enforce, construe or to determine the validity of this Agreement or any Related Agreement, the nonprevailing Party will pay the reasonable expenses of the prevailing Party, including reasonable attorneys' fees and costs.

    **9.8**    **Notices.**  All notices, demands or other communications required or permitted to be given hereunder will be in writing, and any and all such items will be deemed to have been duly delivered upon personal delivery; or as of the third business day after mailing by United States mail, certified, return receipt requested, postage prepaid, addressed as follows; or as of the immediately following business day after deposit with Federal Express or a similar overnight courier service, addressed as follows; or as of the business day if by facsimile to the facsimile number set forth below:

        Notices to Seller:

        Weber Motors, Fresno Inc.

7121 North Palm Avenue
Fresno, California 93650
Attn: Christopher J. Wilson
Phone:  (602) 918-3626
Email: cj.wilson@bmwfresno.com

With copies to:

BT Advisors
3021 Mcgraw St.
San Diego, California 92117
Attn: Reggie Borkum
Phone:  (858) 201-6753
Email: rborkum@btadvisor.com

Notices to Buyer:

Foundation Auto Holdings, LLC
211 Highland Cross Drive, Suite 260
Houston, Texas 77073
Attn: Derek Slemko
Phone: (832) 280-5340
Email: dereks@foundationauto.com

With copies to:

Holland & Knight LLP
1801 California Street, Suite 5000
Denver, Colorado 80202
Attention:  Stephen Dietrich
Phone:  (303) 974-6550
Email: stephen.dietrich@hklaw.com

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient.  Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

    **9.9**    **Counterparts.**  This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one Party, but all such counterparts taken together will constitute one and the same instrument.  This Agreement may also be executed by facsimile or "PDF" counterparts.  In the event facsimile or "PDF" counterparts are used to execute this Agreement, Buyer and Seller shall timely deliver to the other original counterparts for their respective records.

    **9.10**    **Press Releases.**  No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement prior to the Closing without the prior written approval of Buyer and Seller; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable law or any listing or trading agreement concerning its publicly-traded

26

securities, if any (in which case the disclosing Party will use its reasonable best efforts to advise the other Party prior to making the disclosure). In the event Section 5.15 above conflicts with the provisions of this Section 9.10, this Section 9.10 shall prevail.

**9.11    Tax Cooperation.**  Buyer and Seller will provide the other with such information and records and make such of its officers, directors, employees and agents available as may reasonably be requested by Buyer or Seller in connection with the preparation of any tax return, audit, tax contest or other proceeding that relates to the Dealerships or Seller.  Buyer and Seller agree that each will report the federal, state and local income and other tax consequences of the purchase and sale contemplated by this Agreement in a manner consistent with the calculation of the Purchase Price pursuant to Schedule 2.3, including the preparation and filing of Forms 8594 as required by Section 1060 of the Code with their respective federal income tax returns for the taxable year which includes the Closing Date.  Neither Party will take any position inconsistent with such allocation unless otherwise required by applicable law.  Each Party will provide the other Party with a copy of any information to be furnished to the Secretary of the Treasury as required by Section 1060 of the Code.

**9.12    Arm's Length Negotiations; Construction.**  Each Party herein expressly represents and warrants to all other Parties hereto that (a) before executing this Agreement, such Party has fully informed itself of the terms, contents, conditions and effects of this Agreement; (b) such Party has relied solely and completely upon its own judgment in executing this Agreement; (c) such Party has had the opportunity to seek and has obtained the advice of counsel before executing this Agreement; (d) such Party has acted voluntarily and of its own free will in executing this Agreement; (e) such Party is not acting under duress, whether economic or physical, in executing this Agreement; and (f) this Agreement is the result of arm's length negotiations conducted by and among the Parties and their respective counsel.  Further, it is the mutual intent of the Parties that the transactions contemplated in this Agreement pertain to the sale by Seller and purchase by Buyer of all of the Purchased Assets, which includes but is not limited to, all of the Dealerships and any assets required to operate the Dealerships.  The conveyance of all of the Purchased Assets is a material inducement for the Parties to enter this agreement.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**9.13    Submission to Jurisdiction**.  Each of the Parties submits to the jurisdiction of any federal or state court in the State of California, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court.  Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.  Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.8.  Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

27

The Parties have executed and delivered this Agreement on the date set forth in the introductory paragraph of this Agreement.

**BUYER:**

FOUNDATION AUTO HOLDINGS, LLC,
a Delaware limited liability company

By: _____

Name: _Kevin Kutschinski_____

Title: _President/ CEO_____

**SELLER:**

WEBER MOTORS, FRESNO, INC.,
a California corporation

By: _____

Name: ___CHRISTOPHER J WILSON_____

Title: ___PRESIDENT_____

CJ'S ROAD TO LEMANS CORP.,
a California corporation

By: _____

Name: ___CHRISTOPHER J. WILSON_____

Title: ___PRESIDENT_____

The undersigned hereby acknowledges, agrees, and executes as to Section 2.4(c), Section 3.2, Section 5.3(d), Section 5.13 and Section 5.14 above as of the Effective Date.

_____
Christopher J. Wilson, Individually

28

## LIST OF EXHIBITS AND SCHEDULES

### EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale and Assignment |
| Exhibit B | Form of Non-Compete Agreement |
| Exhibit C | Form of Employment Agreement |

### SCHEDULES

| | | |
|---|---|---|
| Schedule 1.1 | — | Purchased Assets |
| Schedule 1.1(H) | — | Fixed Assets |
| Schedule 1.2 | — | Excluded Assets |
| Schedule 1.3 | — | Assumed Contracts |
| Schedule 2.3 | — | Allocation of Purchase Price |
| Schedule 4.1(d) | — | Litigation |
| Schedule 4.1(e) | — | Material Agreements |
| Schedule 4.1(f) | — | Employees |
| Schedule 4.1(g) | — | Types of Tax Returns |
| Schedule 4.1(h) | — | Existing Subleases, Licenses and other Rights of Occupancy |
| Schedule 4.1(i) | — | Environmental Conditions |
| Schedule 4.1(j) | — | Employee Benefit Plans |
| Schedule 4.1(k) | — | Debt |
| Schedule 4.1(l) | — | Financial Statement List |
| Schedule 4.1(m) | — | Insurance Policies |
| Schedule 4.1(n) | — | Proprietary Rights |
| Schedule 4.1(o) | — | Approvals |
| Schedule 4.1(p) | — | Product Liability |
| Schedule 4.1(q) | — | Manufacturer Matters |
| Schedule 4.1(s) | — | Prior Operational Names |
| Schedule 4.1(t) | — | Business Marketing Plans |
| Schedule 4.1(u) | — | No Damaged Vehicles |
| Schedule 4.1(y) | — | Operation of Business |
| Schedule 4.1(z) | — | Liabilities |

**EXHIBIT A**

**FORM OF BILL OF SALE AND ASSIGNMENT**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into as of the _____ day of _____, 20___, by WEBER MOTORS, FRESNO, INC., a California corporation d/b/a BMW Fresno ("Weber Motors"), and CJ'S ROAD TO LEMANS CORP., a California corporation d/b/a Audi Fresno and Porsche Fresno ("Road to Lemans", and collectively with "Weber Motors", "Seller"), to and for the benefit of [_____], LLC, a Delaware limited liability company ("Buyer").

**RECITALS**

A.      Seller owns and operates the following dealerships (the "Dealerships"): (i) a BMW dealership located at 7171 North Palm Avenue, Fresno, California 93650 (the "BMW Dealership"); (ii) an Audi dealership located at 7121 North Palm Avenue, Fresno, California 93650 (the "Audi Dealership"); and (iii) a Porsche dealership located at 7121 North Palm Avenue, Fresno, California 93650 (the "Audi Dealership").

B.      Seller and Foundation Auto Holdings, LLC, a Delaware limited liability company ("Foundation Auto"), as "Buyer," are parties to that certain Asset Purchase Agreement dated as of [_____], 2020, as amended (the "Purchase Agreement"), regarding the acquisition of assets related to Seller's motor vehicle dealerships, including the Dealerships.  Capitalized terms not otherwise defined in this Agreement have the meanings given them in the Purchase Agreement.

C.      Foundation Auto has assigned all of its rights and obligations under the Purchase Agreement relating to the [REFERENCE SPECIFIC FRANCHISE] Dealership to Buyer under the terms of that certain Assignment and Assumption Agreement dated _____, 20__, between Foundation Auto and Buyer, including the right to receive, own and hold title to the Purchased Assets (as defined below).

D.      Under the Purchase Agreement, Seller is to sell and Buyer is to purchase certain of Seller's assets used or useable by Seller in connection with or related to the [REFERENCE SPECIFIC FRANCHISE] Dealership, as more particularly described on Schedule 1 attached hereto (the "Purchased Assets").  In connection with the conveyance of the Purchased Assets, Seller also desires to assign, and Buyer desires to assume, all of Seller's right, title and interest in and to those contracts listed on Schedule 2 attached hereto and made a part hereof (the "Assumed Contracts").

**AGREEMENT**

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Assignment.  Subject to the terms and conditions of the Purchase Agreement, Seller does hereby sell, convey, assign, transfer and deliver to Buyer, its successors and assigns, free and clear of all security interests, liens, restrictions, claims, encumbrances or charges of any kind (other than

A-1

any liabilities specifically assumed in writing by Buyer), all of Seller's right, title and interest in and to the Purchased Assets.

TO HAVE AND TO HOLD all such Purchased Assets hereby sold, conveyed, assigned, transferred and delivered unto Buyer, its successors and assigns, for its and their own use, benefit and behalf forever.

This Agreement is executed and delivered in connection with the Purchase Agreement and notwithstanding anything set forth herein, nothing herein shall in any way vary the covenants, representations and warranties of Seller and Buyer as set forth in the Purchase Agreement.

2.     Assumption.  Buyer hereby expressly assumes and agrees to perform all of the obligations of Seller under the contracts set forth at Schedule 2 (the "Assumed Contracts") to be performed from and after the date hereof.  Except as expressly assumed pursuant to this Section 2, Buyer assumes no obligations, liabilities or debts of Seller, contingent or otherwise, presently existing or arising after the date hereof.

3.     Obligations.  Other than as specifically stated above or in the Purchase Agreement as assigned, Buyer assumes no debt, liability or obligation of Seller, and it is expressly understood and agreed that all debts, liabilities and obligations not assumed hereby by Buyer shall remain the sole obligation of Seller, its successors and assigns

4.     Further Assurances.  Seller covenants and agrees that it will at any time and from time to time do, execute, acknowledge, and deliver any and all other acts, deeds, assignments, transfers, conveyances, powers of attorney, or other instruments that Buyer deems reasonably necessary or proper to carry out the assignments, conveyances and assumptions intended to be made hereunder.

5.     Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

6.     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

***[Signature Page Follows]***

A-2

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**SELLER:**

WEBER MOTORS, FRESNO, INC.,
a California corporation


By: _____
Name: _____
Title: _____


CJ'S ROAD TO LEMANS CORP.,
a California corporation


By: _____
Name: _____
Title: _____

**BUYER:**

_____, LLC,
a Delaware limited liability company


By: _____
Name:  _____
Title: _____

## SCHEDULE 1 TO BILL OF SALE

**PURCHASED ASSETS**

A-4

## SCHEDULE 2 TO BILL OF SALE

**ASSUMED CONTRACTS**

## EXHIBIT B

### FORM OF NON-COMPETE AGREEMENT

(SEE ATTACHED)

NONCOMPETITION AND NONSOLICITATION AGREEMENT

THIS NONCOMPETITION AND NONSOLICITATION AGREEMENT (this "Agreement") is entered into as of the ___ day of _____, 2020 (the "Effective Date"), by and among FA CA FRESNO-B, LLC, a Delaware limited liability company ("BMWCo"), FA CA FRESNO-A, LLC, a Delaware limited liability company ("AudiCo"), FA CA FRESNO-P, LLC, a Delaware limited liability company ("PorscheCo", and together with BMWCo and AudiCo, each a "Buyer" and collectively, the "Buyers"), and CHRISTOPHER J. WILSON, an individual resident of the State of California (the "Individual").

W I T N E S S E T H:

WHEREAS, the Individual is associated with CJ'S ROAD TO LEMANS CORP., a California corporation, doing business as Audi Fresno and Porsche of Fresno, and WEBER MOTORS, FRESNO, INC., doing business as BMW Fresno (collectively, "Seller"), which Seller owns certain assets used or useful in the operation of BMW, Audi, and Porsche motor vehicle sales and service businesses (collectively, the "Dealerships") principally located at: (i) 7171 N Palm Ave, Fresno, CA 93650; and (ii) 7121 N Palm Ave, Fresno, CA 93650 (collectively, the "Dealership Properties");

WHEREAS, the Individual has been involved in the business of Seller;

WHEREAS, the Buyers have agreed to purchase the Purchased Assets (as defined in the Purchase Agreement) pursuant to that certain Asset Purchase Agreement dated _____, 2020, by and among the Seller and Foundation Auto Holdings, LLC, a Delaware limited liability company ("Foundation"), as assigned by Foundation to each Buyer by those certain Assignment and Assumption Agreements each dated on or about the date hereof, and as may be further assigned in part (as amended, the "Purchase Agreement");

WHEREAS, the involvement by the Individual in a business in competition with the Dealerships or the Buyers would diminish the value of the Purchased Assets; and

WHEREAS, as an inducement to the Buyers to consummate their respective purchases of the Purchased Assets, the Individual has agreed not to compete with the Dealerships or the Buyers and to refrain from making disclosures to the extent set forth below.

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

Section 1.     Definitions.  All terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

Section 2.     Restrictive Covenants.  As a material inducement for Buyers to consummate the transactions under the Purchase Agreement, the Individual agrees that the Individual shall not, directly or indirectly:

#79526555_v1

(a)     For a period beginning on the Effective Date and continuing through the date which is two (2) years following the Separation Date (such period, the "Restricted Period"), own (including, without limitation, as a partner, joint venturer, director, officer, consultant, agent, member or stockholder) a business located within a 75-mile radius of the Dealership Properties that operates as (i) a Porsche, Audi, or BMW automotive sales and service business, or (ii) any other branded or franchised automotive sales and service business which is the same line-make as any Additional Dealership. For illustration purposes only, if an affiliate of Buyer acquired a Toyota automotive sales and service business within 75 miles of any Dealership Property after the Effective Date but prior to the Separation Date, the foregoing restriction in subclause (ii) shall prevent Individual from owing a business that operates as a Toyota automotive sales and service business within 75 miles of any Dealership Property during the Restricted Period. The restrictions in this Section 2(a) shall not apply to Individual's ownership in Buyers, or an affiliate of Buyers, if any. For purposes of clarity, the restrictions under this Section 2(a) shall specifically not permit Individual to engage in new or used motor vehicle sales or service operations. For purposes of this Agreement, the latest date upon which Individual ceases to be employed by any Buyer or any affiliate of any Buyer shall be referred to as the "Separation Date". For purposes of this Agreement, any branded or franchised automotive sales and service business any Buyer or any affiliate of any Buyer acquires following the Effective Date, but prior to the Separation Date within 75 miles of the Dealership Properties shall be referred to as an "Additional Dealership", and collectively, the "Additional Dealerships".

(b)     For a period beginning on the Effective Date and continuing through the Restricted Period, (i) solicit from the Dealerships or any Additional Dealerships any business with any customer or account of the Dealerships or any Additional Dealerships with which the Individual had any contact or association; (ii) solicit, induce or attempt to solicit any customers from the current Sellers or from any Buyer or its affiliates who will own and manage the Dealerships or any Additional Dealerships following Closing; provided, however, that any general advertising of business operations shall not be a violation of this subclause (ii); (iii) solicit or otherwise induce to leave the employ of any Buyer or its affiliates any employees or associates from the current Sellers or from any Buyer or its affiliates who will own and operate the Dealerships or any Additional Dealerships following Closing; or (iv) hire any employees or associates from the current Sellers or from any Buyer or its affiliates who will own and operate the Dealerships or any Additional Dealerships following Closing unless approved by the Buyers. The provisions of this Section 2(b) shall not apply in the event a restricted employee independently approaches Individual for work outside of a radius of 75 miles from the Dealership Properties.

For purposes of Section 2(a) above, the phrase "own a business" shall be deemed to include engaging in any of the following activities if it occurs within the applicable restricted geographic area set forth in such Section or if it is in connection with any business, as defined in 2(a), located within the applicable restricted geographic area set forth in Section 2(a): (i) accepting designation by any automotive manufacturer as an authorized automobile dealer (whether in connection with the establishment of additional dealer representation by such manufacturer or otherwise) that is a violation of 2(a), (ii) submitting an application to an automotive manufacturer for consideration of designation as an

2

authorized automobile dealer by such manufacturer that is in violation of 2(a) above, (iii) executing an agreement to purchase or acquire any automotive franchise or operating assets of an automotive franchise that is a violation of 2(a) above, or (iv) engaging in any action in preparation for or connection with, or related or incidental to, the prohibited actions described in clauses (i), (ii) or (iii) above.

Further, for purposes of Section 2(a) above, the defined term "Dealership Properties" shall be deemed to include any replacement location where the Dealerships are operated during the applicable time period under Section 2(a).

Section 3.    Specific Performance.    The parties hereto agree that their rights hereunder are special and unique and that any violation thereof would not be adequately compensated by money damages, and each grants the other the right to specifically enforce (including injunctive relief where appropriate) the terms of this Agreement in any state court sitting in Fresno County, State of California, or any Federal Court sitting in the State of California, without the obligation of posting any bond.  The parties consent to such jurisdiction, agree that venue will be proper in such courts and waive any objections based upon forum non conveniens. The choice of forum set forth in this Section 3 shall not be deemed to preclude the enforcement of any action under this Agreement in any other jurisdiction.

Section 4.    Notices.    Any notice, request, consent or communication (collectively a "Notice") under this Agreement shall be effective only if it is in writing and (i) personally delivered, (ii) sent by certified or registered mail, return receipt requested, postage prepaid, (iii) sent by a nationally recognized overnight delivery service, with delivery confirmed, or (iv) emailed, with receipt confirmed, addressed as follows:

Notices to the Individual:

C.J. Wilson

_____

_____
Attn: _____
Phone:  _____
Email:  _____

With copies to:

[Insert]

Notices to Buyers:

c/o Foundation Automotive Corp.
#520, 2424- 4th Street SW
Calgary, AB T2S 2T4
Attn: Derek Slemko
Phone: (403) 452-5734
Email: dereks@foundationauto.com

3

#79526555_v1

With copies to:

Holland & Knight LLP
1801 California Street, Suite 5000
Denver, Colorado 80202
Attention:  Stephen Dietrich
Phone:  (303) 974-6550
Email: stephen.dietrich@hklaw.com

or such other persons or addresses as shall be furnished in writing by any party to the other party. A Notice shall be deemed to have been given as of the date when (i) personally delivered, (ii) five (5) days after the date when deposited with the United States mail properly addressed, (iii) when receipt of a Notice sent by an overnight delivery service is confirmed by such overnight delivery service, or (iv) when receipt of the facsimile is confirmed, as the case may be, unless the sending party has actual knowledge that a Notice was not received by the intended recipient.

Section 5.     Assignment.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by the Individual.  The Individual hereby acknowledges, consents to and ratifies any future assignment of this Agreement by any Buyer to its successors and assigns, including, without limitation, any lender of any Buyer or any affiliate of any Buyer.

Section 6.     **LITIGATION.  THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA, AND NO DOCTRINE OF CHOICE OF LAW SHALL BE USED TO APPLY ANY LAW OTHER THAN THAT OF CALIFORNIA, AND NO DEFENSE, COUNTERCLAIM OR RIGHT OF SET-OFF GIVEN OR ALLOWED BY THE LAWS OF ANY OTHER STATE OR JURISDICTION, OR ARISING OUT OF THE ENACTMENT, MODIFICATION OR REPEAL OF ANY LAW, REGULATION, ORDINANCE OR DECREE OF ANY FOREIGN JURISDICTION, BE INTERPOSED IN ANY ACTION HEREON.  THE PARTIES AGREE THAT ANY ACTION OR PROCEEDING TO ENFORCE OR ARISING OUT OF THIS AGREEMENT MAY BE COMMENCED IN ANY STATE COURT SITTING IN FRESNO COUNTY, CALIFORNIA, OR IN ANY FEDERAL COURT SITTING IN NORTH DAKOTA.  THE PARTIES CONSENT TO SUCH JURISDICTION, AGREE THAT VENUE WILL BE PROPER IN SUCH COURTS AND WAIVE ANY OBJECTIONS BASED UPON FORUM NON CONVENIENS.  THE CHOICE OF FORUM SET FORTH IN THIS SECTION 6 SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT OF ANY ACTION UNDER THIS AGREEMENT IN ANY OTHER JURISDICTION.**

Section 7.     Severability.  Each Buyer and the Individual believe the covenants against competition contained in this Agreement are reasonable and fair in all respects, and are necessary to protect the interests of the Buyers.  However, in case any one or more of the provisions or parts of a provision contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or

<div align="center">4</div>

unenforceability shall not affect any other provision or part of a provision of this Agreement or any other jurisdiction, but this Agreement shall be reformed and construed in any such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction.

Section 8.    Neutral Interpretation.  This Agreement constitutes the product of the negotiation of the parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any party based upon the source of the draftsmanship hereof.

Section 9.    Waiver of Compliance; Consents.  Any failure of the Individual to comply with any obligation, covenant, agreement or condition herein may be waived only in writing by the Buyers, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  No failure or delay by any Buyer in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  Whenever this Agreement requires or permits consent by or on behalf of the Buyers, any such written consent given by the Buyers shall be deemed given in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 9.  No notice to or demand on the Individual in any case shall entitle the Individual to any other or further notice or demand in related or similar circumstances requiring such notice.

Section 10.    Miscellaneous.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  This Agreement embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein and may not be modified orally, but only by a writing subscribed by the party charged therewith.  There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

**[SIGNATURES ON FOLLOWING PAGE]**

5

#79526555_v1

IN WITNESS WHEREOF, the parties hereto have made and entered into this Agreement the date first hereinabove set forth.

**BUYERS**:

**FA CA FRESNO-B, LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**FA CA FRESNO-A, LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**FA CA FRESNO-P, LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**THE INDIVIDUAL**:

_____
Christopher J. Wilson, Individually

#79526555_v1

**EXHIBIT C**

**FORM OF EMPLOYMENT AGREEMENT**


(SEE ATTACHED)

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made and entered into on _____, 2020 (the "Effective Date"), by and between, on the one hand, [FA CA Fresno-B, LLC, a Delaware limited liability company] (the "BMW Company"), and, on the other hand, Christopher J. Wilson ("Employee"), an individual. The Company and Employee may be referred to herein jointly as "the parties" or individually as "the party."

**WHEREAS**, the BMW Company desires to employ the Employee as (i) [General Manager] of the [BMW Fresno] dealership owned and operated by the BMW Company, (ii) [General Manager] of the [Audi Fresno] dealership owned and operated by the BMW Company's affiliate, FA CA Fresno-A, LLC, a Delaware limited liability company (the "Audi Company"), and (iii) [General Manager] of the [Porsche of Fresno] dealership owned and operated by the BMW Company's affiliate, FA CA Fresno-P, LLC, a Delaware limited liability company (the "Porsche Company", and collectively with the BMW Company and the Audi Company, the "Companies", and each, a "Company"), in each case on an at-will basis.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, and for good and valuable consideration receipt of which is hereby acknowledged, the BMW Company and Employee agree as follows:

1. **Job Duties and Responsibilities**

Beginning on the Effective Date, the BMW Company agrees to employ Employee for the positions set forth in the recitals. The recitals are incorporated herein by reference as if fully set forth herein. The BMW Company classifies these positions as overtime exempt positions. Employee shall perform functions, duties, and responsibilities as are reasonably required in the performance of Employee's positions, or as may be assigned from time to time by the Companies. Employee is encouraged, but not required to participate in outside events that promote the Companies (the "Outside Events"). At the Outside Events, Employee shall endeavor to wear Company dealership logos, subject to restrictions related to each such engagement. Employee shall not be entitled to any additional compensation from any Company with respect to the Outside Events. Employee shall not engage in any Outside Event which would result in a breach by Employee of that certain Non-Competition and Non-Solicitation Agreement dated of even date herewith by and among Employee and the Companies.

2. **At-Will Employment**

Employee's employment with the BMW Company will be "at-will". Employee and the BMW Company retain the right to terminate the employment relationship at will, at any time, with or without cause or prior notice. Any change to the at-will employment relationship must be by a specific, written agreement signed by Employee and the LLC Manager of the BMW Company. By signing this Agreement, Employee acknowledges and represents that no official of any Company has made any verbal or written promise or representation that is contrary to the at-will nature of Employee's employment by the BMW Company. For the avoidance of doubt, if Employee is deemed to be an employee of any Company other than the BMW Company,

Employee's employment with such Company will be "at-will", such that Employee and the applicable Company retain the right to terminate the employment relationship at will, at any time, with or without cause or prior notice.  In the event the Employee's employment with the BMW Company or its affiliates terminates for any reason whatsoever, the put and call rights set forth in that certain Amended and Restated Limited Liability Company Agreement of the BMW Company, as the same may be amended, restated, modified and/or supplemented from time to time (including, without limitation, Sections 10.4 and Section 10.13 thereof) shall apply.

3.     **Work Location**

The principal place of Employee's employment shall be at (i) 7171 N Palm Ave, Fresno, CA 93650; and (ii) 7121 N Palm Ave, Fresno, CA 93650, provided that, Employee may be required to travel on business on behalf of one or more of the Companies.

4.     **Compensation**

4.1     Base Salary. As compensation for all services to be rendered by Employee, and the performance of Employee's job duties and responsibilities, the BMW Company agrees to pay Employee Sixteen Thousand Dollars ($16,000) per month base salary, less legally required withholdings and deductions, in accordance with the BMW Company's customary payroll practices and applicable wage payment laws ("Base Pay"). Base Pay shall be prorated for any partial months worked. The Employee's compensation in Section 4 may be adjusted from time to time at the Companies' sole discretion. However, Employee's Base Pay may not be decreased without constituting Good Reason (as defined below), unless the Company simultaneously decreases the compensation of similarly-situated employees.

4.2     Net Profits Bonus.  The BMW Company shall pay Employee a monthly bonus of 10% of the net monthly profit of BMW Fresno, Audi Fresno, and Porsche of Fresno ("Net Profit Bonus"). Employee's Net Profit Bonus will be calculated using generally accepted accounting principles and paid on the first payroll date following completion of the month end manufacturer financial statements. However, the decision to provide any Net Profit Bonus and the amount and terms of any Net Profit Bonus shall be in the sole and absolute discretion of the Companies.

4.3     Year-End Bonus.  The BMW Company shall pay Employee a yearly bonus of 5% of the net annual profit of BMW Fresno, Audi Fresno, and Porsche of Fresno ("Year-End Bonus"). Employee's Year-End Bonus will be calculated using generally accepted accounting principles and paid on the first payroll date following completion of all of the Companies' yearly manufacturer financial statements, but no later than May 31st of the year after year to which the Year-End Bonus relates. However, the decision to provide any Net Profit Bonus and the amount and terms of any Net Profit Bonus shall be in the sole and absolute discretion of the Companies.

4.4     F&I Bonus.  The BMW Company shall pay Employee a monthly bonus of: (a) $25.00 for every warranty sold; and (b) $10.00 for every ancillary product sold including: wheel and tire, theft protection, paintless dent repair, key replacement, Vantage Protection bundle(s), windshield replacement/repair, and Paint and Fab, but expressly excluding ELO GPS and pre-paid maintenance products ("F&I Bonus"). The F&I Bonus will be based warranties and ancillary

products sold from BMW Fresno, Audi Fresno, and Porsche of Fresno.  Employee's F&I Bonus will be paid on the first payroll date following completion of the previous month end in which the F&I Bonus was earned.

5.     **Benefits**

5.1     Benefit Plans.  Employee shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the BMW Company, as in effect from time to time (collectively, "Employee Benefit Plans"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The BMW Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

5.2     Vacation. Employee shall be entitled to two (2) weeks of paid vacation days per calendar year (prorated for partial years) in accordance with the BMW Company's vacation policies and applicable law, as in effect from time to time.

5.3     Company Vehicle.  Employee shall be entitled to one demonstrator vehicle for personal use and one demonstrator vehicle for family use.  Employee will be taxed in accordance with IRS Rules governing this fringe benefit.  Employee agrees to be bound to and abide by the BMW Company's policy (or, if BMW Company does not have such a policy, Foundation Auto Holdings, LLC's policy) regarding demonstrator vehicles.

6.     **Termination.**

6.1     By the BMW Company without Cause or Due to Death or Disability.  The BMW Company may terminate Employee's employment with the BMW Company at any time for any reason other than Cause (as defined below). Employee's employment under this Agreement and any obligations of Employee hereunder will terminate automatically upon the date of Employee's death. The BMW Company will have the right to terminate Employee's employment under this Agreement for permanent or long-term disability of Employee. For purposes of this Agreement, Employee is disabled under the preceding sentence if he is determined to be disabled under the BMW Company's long-term disability plan.

6.2     By the BMW Company with Cause or Termination by Employee.  The BMW Company may terminate Employee's employment with the BMW Company at any time for Cause. The Employee may terminate his employment with the BMW Company at any time with two weeks' notice to the BMW Company.  If the BMW Company terminates Employee's employment for Cause, or if Employee terminates his employment with the BMW Company without Good Reason (as defined below), Employee shall be entitled to receive his Final Compensation (defined in Section 6.3(a) of this Agreement) through the effective date of Employee's termination. Termination for "Cause" shall mean termination by the BMW Company of Employee for any one or more of the following reasons: (i) theft, dishonesty, or falsification of any employment record or any of the Companies' or any of its Affiliates' records; (ii) habitual neglect of Employee's duties or wanton negligence by Employee in the performance of Employee's duties; (iii) material breach by Employee of this Agreement or any written policy of any of the Companies; (iv) conviction of

Employee of any felony or crime involving moral turpitude (excluding minor offenses unrelated to work or qualifications of work, such as traffic or parking violations or like); (v) a judicial or arbitral decision that Employee acted in an intentionally tortious or otherwise unlawful manner toward any of the Companies or any of their Affiliates, another employee or client or customer of any of the Companies or any of their Affiliates; (vi) a breach of any of Employee's fiduciary duties to any of the Companies; or (vii) illegal drug or substance abuse by Employee or illegal drug or substance addiction on Employee's part; provided, however, to the extent an action by Employee (or an omission to act) which constituted "Cause" for purposes of termination of employment hereunder (A) was not grossly negligent, (B) did not constitute willful misconduct and (C) can be cured within a period of thirty (30) days, then the BMW Company shall provide Employee written notice thereof and Employee may cure such action or omission to the reasonable satisfaction of the BMW Company within thirty (30) days of receipt of such notice.

6.3    Payments Upon Termination of Employment.

(a)    Accrued Compensation. Upon termination of Employee's employment for any reason hereunder, the Company will be obligated to pay, and Employee will be entitled to receive: (i) the Base Salary earned through the date of termination and which has not yet been paid; (ii) accrued but unused vacation pay; and (iii) any business expenses incurred by Employee but unreimbursed as of the date of termination, provided that such expenses are submitted in accordance with the BMW Company policy (collectively, "Final Compensation"). Final Compensation (other than expenses not yet submitted) shall be paid to Employee on the next regularly scheduled payroll date, unless otherwise required by applicable law. In addition, (x) Employee will be entitled to any vested benefits to which Employee is entitled under the terms of any applicable benefit plan or program, which such entitlement shall be determined by the terms of any such plan or program, and (y) to continue, at Employee's own cost, participation in the BMW Company's health insurance pursuant to COBRA or other applicable law.

(b)    Death; Disability. Upon termination of Employee's employment upon the death of Employee or upon Employee's becoming disabled, the BMW Company will be obligated to pay, and Employee will be entitled to receive all of the amounts and vested benefits described in Section 6.3(a).

(c)    Severance; Release.  If Employee's employment is terminated by the BMW Company without Cause or terminated by the Employee with Good Reason (as defined below), then in addition to Employee's entitlements provided for in Section 6.3(a), the BMW Company will be obligated to pay and Employee will be entitled to receive an amount equal to Employee's then current Base Salary for a period of twelve (12) months (such period, the "Severance Period," and such amount, the "Severance Amount"), paid out in equal installments in accordance with the regular payroll schedule of the BMW Company commencing within sixty (60) days of Employee's date of termination. Notwithstanding the foregoing, payment of the Severance Amount is conditioned upon Employee executing and not revoking a separation agreement and general release in a form to be provided by the BMW Company (the "Release") such that the Release is effective no later than sixty (60) days following the Employee's date of termination. Notwithstanding the foregoing, to the extent the period for Employee to execute the Release spans two (2) calendar years, in no event will the installments commence prior to the first regularly

scheduled payroll period in the second taxable year. Termination for "Good Reason" shall mean, without Employee's written consent, (i) a material reduction by the BMW Company of Employee's Base Salary, unless the Company simultaneously decreases the compensation of similarly-situated employees or (ii) a material diminution in the authority, responsibilities or duties of the Employee. A termination of employment by Employee for Good Reason shall be effectuated by giving the BMW Company written notice ("Notice of Termination for Good Reason"), not later than fifteen (15) days following the initial occurrence of the circumstance that constitutes Good Reason. The Company shall be entitled, during thirty (30) day period following receipt of a Notice of Termination for Good Reason, to cure the circumstances that gave rise to Good Reason (the "Cure Period"). If, during the Cure Period, such circumstance is reasonably remedied, Employee will not be permitted to terminate employment for Good Reason as a result of such circumstance. If, at the end of the Cure Period, the circumstance that constitutes Good Reason has not been reasonably remedied, Employee will be entitled to terminate employment for Good Reason during the thirty (30)-day period that follows the end of the Cure Period. If Employee does not terminate employment during such thirty (30)-day period, Employee will not be permitted to terminate employment for Good Reason as a result of such event. For the avoidance of doubt, in no event shall Employee be entitled to receive any Severance Amount from the BMW Company in the event Employee is terminated for Cause or if Employee terminates his employment with the BMW Company without Good Reason.

7.    **Tax Matters**.

(a) Withholdings. Employee's compensation under this Agreement will be subject to such withholding as may be required by law, as determined by the BMW Company.

(b) Section 409A. Each payment under this Agreement, including each payment in a series of installment payments, is intended to be a separate payment for purposes of Treas. Reg. §1.409A-2(b), and is intended to be: (i) exempt from Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), the regulations and other binding guidance promulgated thereunder ("Section 409A"), including, but not limited to, by compliance with the short-term deferral exemption as specified in Treas. Reg. § 1.409A-1(b)(4) and the involuntary separation pay exception within the meaning of Treas. Reg. §1.409A-1(b)(9)(iii), or (ii) in compliance with Section 409A, including, but not limited to, being paid pursuant to a fixed schedule or specified date pursuant to Treas. Reg. § 1.409A-3(a) and the provisions of this Agreement will be administered, interpreted and construed accordingly, including any ambiguity herein. If, nonetheless, this Agreement either fails to satisfy the requirements of Section 409A or is not exempt from the application of Section 409A, then the parties hereby agree, to the extent permitted by Section 409A, to amend or to clarify this Agreement in a timely manner so that this Agreement either satisfies the requirements of Section 409A or is exempt from the application of Section 409A, provided, however, that, to the greatest extent possible, no such amendment or clarification shall reduce the economic benefit that Employee was to derive from this Agreement prior to such amendment or clarification. Notwithstanding any provision of this Agreement to the contrary, in no event will Employee directly or indirectly designate the calendar year of a payment and any Severance Amount conditioned on a Release that is deemed to be deferred compensation under Section 409A and that could be made in more than one taxable year shall be made in the later taxable year. A termination of employment shall not be deemed to have occurred for purposes of

any provision of this Agreement providing for the payment of any amounts or benefits considered "nonqualified deferred compensation" under Section 409A upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." If Employee is deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment or the provision of any benefit that is considered nonqualified deferred compensation under Section 409A payable on account of a "separation from service," such payment or benefit shall be made or provided at the date which is the earlier of (i) the expiration of the six (6)-month period measured from the date of such "separation from service" of Employee, and (ii) the date of Employee's death (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this subsection (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed on the first business day following the expiration of the Delay Period to Employee in a lump sum and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein. With regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A, (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, (ii) the amount of expenses eligible for reimbursement, or in-kind benefits, provided during any taxable year shall not affect the expenses eligible for reimbursement, or in-kind benefits, to be provided in any other taxable year, and (iii) such payments shall be made on or before the last day of Employee's taxable year following the taxable year in which the expense occurred.

(c)    Section 280G.    If any payment or benefit Employee would receive (directly or indirectly) from the BMW Company or otherwise ("Payment") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code; and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "Excise Tax"), then such Payment shall be equal to the Reduced Amount. The "Reduced Amount" shall be either (x) the largest portion of the Payment that would result in no portion of the Payment being subject to the Excise Tax; or (y) the largest portion, up to and including the total, of the Payment, whichever amount, after taking into account all applicable federal, state and local employment taxes, income taxes, and the Excise Tax (all computed at the highest applicable marginal rate), results in Employee's receipt, on an after-tax basis, of the greater amount of the Payment. Any reduction made pursuant to this Section 7(c)(i) shall be made in accordance with the following order of priority: (i) Full Credit Payments (as defined below) that are payable in cash, (ii) non-cash Full Credit Payments that are taxable, (iii) non-cash Full Credit Payments that are not taxable, (iv) Partial Credit Payments (as defined below), and (v) non-cash employee welfare benefits. In each case, reductions shall be made in reverse chronological order such that the payment or benefit owed on the latest date following the occurrence of the event triggering the excise tax will be the first payment or benefit to be reduced (with reductions made pro-rata in the event the same priority payments or benefits are owed at the same time). "Full Credit Payment" means a payment, distribution or benefit, whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, that if reduced in value by one dollar reduces the amount of the parachute payment (as defined in Section 280G of the Code) by one dollar, determined as if such payment, distribution or benefit had been

Page **6** of **8**

paid or distributed on the date of the event triggering the excise tax. "Partial Credit Payment" means any payment, distribution or benefit that is not a Full Credit Payment. At the option of the BMW Company, (i) the Payment will be reduced to the Reduced Amount pursuant to Section 7(c)(i) of this Agreement, or (ii) the BMW Company shall submit the Payment for stockholder approval in accordance with the requirements of Section 280G of the Code and the regulations promulgated thereunder; provided that Employee acknowledges and agrees that, in connection with the stockholder approval process, Employee is required to waive Employee's right to receive and/or retain all or a portion of the Payment in the event the requisite number of stockholder(s) do not validly approve the payments as required by Section 280G.

8. **Severability**

If any provision (or portion thereof) of this Agreement is declared by an arbitrator or court of competent jurisdiction to be invalid or unenforceable, the remaining provisions (or portions thereof) shall remain in full force and effect and, to the extent possible, the disputed provision (or portion thereof) shall be construed so that it may be valid and enforceable.

9. **Waiver**

No failure or delay in exercising any right, power or privilege in respect of the Agreement shall act as a waiver to a later demand for full and complete performance.

10. **Governing Law**

Construction and interpretation of the Agreement shall at all times and in all respects be governed by the laws of the State of California, without regard to the rules or principles of conflicts or choice-of-law that might look to any jurisdiction outside of California.

11. **Entire Agreement**

With the exception of Employee's obligations under that certain Asset Purchase Agreement, dated [date], that certain Confidential Information and Assignment of Inventions Agreement dated of even date herewith, and the Non-Competition and Non-Solicitation Agreement dated of even date herewith, which remain in place, this Agreement constitutes the entire agreement and understanding between Employee and the Companies, and supersedes any prior verbal or written contracts, agreements and/or obligations by and between Employee and the Companies. The terms of this Agreement may be changed only in writing, signed by both parties hereto.

12. **Miscellaneous**

10.1   Employee understands that, except for Employee employment at-will status, the BMW Company reserves the right, on behalf of itself and the other Companies, to revise, modify, add to, or delete, any and all policies, procedures, work rules, benefits, or terms and conditions of your employment, upon reasonable advanced notice. As provided in Section 2 of this Agreement, any change to the at-will employment relationship must be by a specific, written agreement signed by Employee and the LLC Manager of the BMW Company.

10.2    Employee's continued employment with the BMW Company is conditioned on (1) Employee's initial verification, and continued maintenance, of Employee's legal right to work in the United States, (2) Employee's signing of the BMW Company's Confidential Information and Assignment of Inventions Agreement, attached hereto as Exhibit "1"; (3) Employee's acknowledgment of the BMW Company's Employee Handbook.

10.3    The parties agree that this Agreement shall be binding on, and inure to the benefit of, each of the Companies' successors and assigns.  The BMW Company reserves the right to assign or transfer any or all of its or their rights and responsibilities under this Agreement to another party or entity.

10.4    This Agreement and any rights herein granted are specific to Employee and shall not be assigned, sublicensed, or subcontracted without the BMW Company's prior written consent. Any assignment, sublicense encumbrance or subcontract in violation of the terms herein shall be void.

**IN WITNESS WHEREOF**, this Agreement has been duly executed by the parties.

Dated: [Date]                      **CHRISTOPHER J. WILSON**


By:    _____
              Christopher J. Wilson


Dated: [Date]                      [**LEGAL EMPLOYING ENTITY**]


By:    _____

Title:    _____

Page **8** of **8**

# EXHIBIT "1"

## CONFIDENTIAL INFORMATION AND ASSIGNMENT OF INVENTIONS AGREEMENT

This Confidential Information and Assignment of Inventions Agreement (the "Agreement") is made and entered into on [Date], by and between, on the one hand, [FA CA Fresno-B, LLC, a Delaware limited liability company] (the "Company"), and, on the other hand, Christopher J. Wilson ("Employee"), an individual.  The Company and Employee may be referred to herein jointly as "the parties" or individually as "the party."

In consideration for Employee's initial and continued employment with the Company, Employee's receipt of compensation (including, but not limited to, salary, commissions, or bonuses), Employee's access to the Company's confidential information and other benefits associated with Employee's employment, and other good and valuable consideration, the receipt of which Employee acknowledges, Employee agrees as follows:

1.   **Competitive Business**.  Employee acknowledges that the business and services of the Company and its affiliates are highly specialized, the identity and particular needs of the Company's and its affiliates' customers, suppliers, and independent contractors are not generally known, and the documents, records, and information regarding the Company's and its affiliates' customers, suppliers, independent contractors, services, methods of operation, policies, procedures, sales, pricing, and costs are highly confidential information and constitute trade secrets.  Employee further acknowledges that the services rendered to the Company by Employee have been or will be of a special and unusual character which have a unique value to the Company and its affiliates and that Employee has had or will have access to trade secrets and confidential information belonging to the Company and its affiliates, the loss of which cannot be adequately compensated by damages in an action at law.

2.   **Confidential Information**.  Employee agrees to not use for any purpose or disclose to any person or entity any Confidential Information, except as required in the performance of Employee's duties to the Company. "Confidential Information" means information that the Company or any of its affiliates has obtained in connection with its present or planned business, including information Employee developed in the performance of Employee's duties for the Company or its affiliates, the disclosure of which could result in a competitive or other disadvantage to the Company or its affiliates.  "Confidential Information" includes, but is not limited to, all information of Company and its affiliates to which Employee has had or will have access, whether in oral, written, graphic or machine-readable form, including without limitation, records, lists, specifications, operations or systems manuals, decision processes, policies, procedures, profiles, system and management architectures, diagrams, graphs, models, sketches, technical data, research, business or financial information, plans, strategies, forecasts, forecast assumptions, business practices, marketing information and material, customer names, vendor lists, independent contractor lists, identities, or information, proprietary ideas, concepts, know-how, methodologies and all other information related to Company's business and/or the business of any of its affiliates, knowledge of the Company's or its affiliates' customers, suppliers, employees, independent contractors, methods of operation, trade secrets, software, software code, methods of determining prices.  Confidential Information shall also include all information of a third party to which Company and/or any of its affiliates have access and to which Employee has had or will have access.  Employee will not, directly or indirectly, copy, take, disclose, or remove

from the Company's or its affiliates' premises, any of the Company's or its affiliates' books, records, customer lists, or any Confidential Information. Employee acknowledges and understands that, pursuant to the Defend Trade Secrets Act of 2016: An individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade secrets to the individual's attorney and use the trade secret information in the court proceeding if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

3. **Return of Property**.  Upon the termination of Employee's employment with the Company for any reason, Employee shall promptly deliver to the Company all records, correspondence, drawings, blueprints, manuals, letters, notes, notebooks, reports, flowcharts, programs, proposals, and any documents or electronic data concerning the Company's and its affiliates' employees, independent contractors, customers or concerning products or processes used by the Company and/or its affiliates and, without limiting the foregoing, will promptly deliver to the Company any and all other documents, records, electronic data, or materials containing or constituting Confidential Information.

4. **Non-Solicitation of Employees During Employment**.  During the term of Employee's employment with the Company, Employee will not, either on Employee's own account or for any person, firm, partnership, corporation, or other entity (a) solicit, interfere with, or endeavor to cause any employee of the Company or its affiliates to leave employment with the Company or its affiliates; or (b) induce or attempt to induce any such employee to breach their obligations to the Company or its affiliates.

5. **Non-Solicitation of Employees After Employment**.  After Employee's separation from employment with the Company for any reason whatsoever, Employee will not, either on Employee's own account or for any person, firm, partnership, corporation, or other entity, use the Company's or its affiliates' trade secrets to (a) solicit, interfere with, or endeavor to cause any employee of the Company or its affiliates to leave employment with the Company or its affiliates; or (b) induce or attempt to induce any such employee to breach their obligations to the Company or its affiliates.

6. **Anti-Raiding of Employees**. Employee agrees that for a period of one year after Employee's separation from employment with the Company for any reason whatsoever, whether using the Company's or its affiliates' trade secrets or not, Employee shall not disrupt, damage, impair, or interfere with the Company's or its affiliates' business by raiding the Company's or its affiliates' employees.

7. **Non-Solicitation of Customers During Employment**.  During the term of Employee's employment with the Company, Employee will not solicit, induce, or attempt to induce any past or current customer of the Company or its affiliates (a) to cease doing business, in

whole or in part, with the Company or its affiliates; or (b) to do business with any other person, firm, partnership, corporation, or other entity which performs services similar to or competitive with those provided by the Company or its affiliates.

8.    **Non-Solicitation of Customers After Employment**.  After Employee's separation from employment with the Company for any reason whatsoever, Employee will not, either on Employee's own account or for any person, firm, partnership, corporation, or other entity, use the Company's or its affiliates' trade secrets to solicit, induce, or attempt to induce any past or current customer of the Company or its affiliates (a) to cease doing business, in whole or in part, with the Company or its affiliates; or (b) to do business with any other person, firm, partnership, corporation, or other entity which performs services similar to or competitive with those provided by the Company or its affiliates.

9.    **Remedies**.  In addition to all of the remedies otherwise available to the Company, the Company shall have the right to injunctive relief to restrain and enjoin any actual or threatened breach of Sections 2, 3, 4, 5, 6, 7, 8, and 9 of this Agreement. All of the Company's remedies for breach of this Agreement shall be cumulative and the pursuit of one remedy will not be deemed to exclude any other remedies.

10.    **Loyalty and Best Efforts**.  Employee agrees to be a loyal employee of the Company. Employee agrees to devote Employee's best efforts to the performance of Employee's duties for the Company, to give proper time and attention to furthering the Company's business, and to comply with all policies of the Company.  Employee further agrees that during Employee's employment with the Company, Employee shall not, directly or indirectly, engage in any business which would detract from Employee's ability to apply Employee's best efforts to the performance of Employee's duties.  Employee also agrees not to usurp any corporate opportunities of the Company or its affiliates.

11.    **At-Will Employment**. Employee acknowledges that Employee's employment is at-will, which means that either Employee or Company may end the employment relationship at any time and for any reason.  Neither Employee nor the Company has agreed upon employment for a specific period of time.  Nothing in this Agreement changes this at-will nature of Employee's employment.

12.    **Reasonable Restrictions**.    Employee has carefully read and considered this Agreement and agrees that the restrictions set forth in Sections 2, 3, 4, 5, 6, 7, and 8 are fair and reasonable and are reasonably required for protection of the Company's and its affiliates' Confidential Information, trade secrets, and goodwill. Employee represents and warrants that Employee's experience and capabilities are such that the restrictive covenants set forth herein will not prevent Employee from pursuing Employee's livelihood.

13.    **Assignment of Inventions**. Employee will promptly make full written disclosure to the Company any ideas, inventions, works of authorship (including but not limited to computer programs, software, and documentation), improvements, or discoveries, whether or not patentable or copyrightable ("Work Product"), which during the term of Employee's employment, Employee may conceive, make, develop, work on, or first reduce to practice, in whole or in part, either solely

or jointly with others, whether or not reduced to drawings, written description, documentation, models, or other tangible form.  All ideas, inventions, works of authorship (including but not limited to computer programs, software, and documentation), improvements, or discoveries, whether or not patentable or copyrightable ("Work Product") of Employee shall be deemed to be "works made for hire" owned by the Company. To the extent that any such Work Product is not deemed to be a "work made for hire", Employee hereby assigns to the Company, its successors and assigns, without further consideration, all right, title and interest therein, including without limitation, all patents, copyrights, mask works and other statutory and common law protection in any and all countries worldwide.  The provisions of this Section requiring the assignment of Work Product do not apply to any Work Product that qualifies under California Labor Code section 2870, *i.e.*, developed entirely on the Employee's own time without using the Company's equipment, supplies, facilities, or trade secret information, except for those inventions that either (i) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company, or (ii) result from any work performed by you for the Company.  California Labor Code section 2870 is reproduced in the attached Written Notification to Employee in Exhibit "A" (attached hereto). You further represent that the Schedule "A" (attached hereto) contains a complete list of all inventions made, conceived, or first reduced to practice by you, under your direction or jointly with others prior to your employment with the Company and which are not assigned to the Company hereunder ("Prior Work Product").  If there is nothing listed on the Schedule "A," you represent that there are no such Prior Work Product.

14.  **Successors and Assigns**. The parties agree that this Agreement shall be binding on, and inure to the benefit of, the Company's successors and assigns.  The Company reserves the right to assign or transfer any or all of its or their rights and responsibilities under this Agreement to another party or entity.

15.  **California Agreement**.  This Agreement is governed by the laws of the State of California. The federal and state courts in the State of California shall have jurisdiction over any dispute that arises under this Agreement, and each party submits and hereby consents to such court's jurisdiction.

16.  **Severability and Reformation**.  The provisions, or portions thereof, of this Agreement will be deemed severable, and the invalidity or unenforceability of any one or more of the provisions, or portions thereof, will not affect the validity or enforceability of any one or more of the other provisions, or portions thereof, herein.  If any provisions, or portions thereof, of this Agreement are deemed to exceed the time, geographic, or scope limitations permitted by applicable law, then such provisions, or portions thereof, shall be reformed to the maximum time, geographic, or scope limitations permissible.  The Company expressly reserves the right to limit the scope of these covenants unilaterally.

17.  **Obligations to Prior Employers**.  Employee represents to Company that Employee has no obligations to concurrent or former employers, or to any person or entity, that might restrict the Employee from performing Employee's duties to the Company.  Employee shall not improperly use or disclose any proprietary information or trade secrets of any concurrent or former employer with which Employees has an agreement or duty to keep in confidence.

18.  **No Modification Unless in Writing**.  No change or modification of this Agreement will be valid or binding unless the same is in writing and signed by the party against whom the waiver is sought to be enforced.

19.  **No Waiver**.  No valid waiver of any provision of this Agreement at any time deemed a waiver will be deemed a valid waiver of such provision at another time.

20.  **Entire Agreement**.  With the exception of Employee's obligations under that certain Asset Purchase Agreement, dated [date], that certain Employment Agreement of even date herewith, and the Non-Competition and Non-Solicitation Agreement dated of even date herewith, which remain in place, this Agreement contains the entire agreement and understanding by and between the Company and the Employee with respect to the subject matter of this Agreement.

**IN WITNESS WHEREOF**, this Agreement has been duly executed by the parties.

Dated: [Date]                      **CHRISTOPHER J. WILSON**

By:     _____
        Christopher J. Wilson

Dated: [Date]                      [**LEGAL EMPLOYING ENTITY**]

By:   _____

Title:   _____

**Exhibit "A" – Written Notification to Employee**

Reproduction of California Labor Code section 2870

2870.  (a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

   (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

   (2) Result from any work performed by the employee for the employer.

   (b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**Schedule "A" – List of Employee's "Prior Work Product"**

_____

_____

_____

_____

## SCHEDULE 1.1

### PURCHASED ASSETS

A.    <u>New Vehicles & Demonstrators</u>.

All new vehicle and demonstrator inventory with less than two hundred fifty (250) miles, not previously titled, registered or reported sold, of 2019 and newer model year BMW, Audi, and Porsche model cars and SUV/trucks located at the Property and owned by Seller as of the Closing Date ("New Vehicles"), shall be purchased at the cost to Seller of each such vehicle as reflected on the Manufacturer invoice less any factory holdback, factory rebates, factory discounts, factory incentives and carry-over model allowances, if paid to the Seller prior to Closing, or credited or to be credited to Seller's account, less any advertising credits, and any floor plan interest credits on those vehicles in stock at Closing, plus any additional equipment or accessories that has been installed in the ordinary course of business at Seller's net cost (including cost of labor), less any equipment or accessories removed in the ordinary course of business at Seller's net cost (including cost of labor), less any other items that should be reasonably deducted in order to establish Seller's actual net cost of each such vehicle.  The purchase price shall not include any other vehicle preparation charges, labor charges, or other dealer charges of any kind.

New Vehicles with less than 2,500 miles on the odometer but more than 250 miles as of the Closing Date will be reduced by $.50 per mile in excess of 250 miles ("Mileage Deductions"), and Buyer is not obligated to purchase more than ten (10) of such vehicles in the aggregate with Pre-Registered Vehicles having in excess of 250 miles (but less than 2,500 miles) on the odometer. New Vehicles with more than 2,500 miles on the odometer as of the Closing Date will be treated as Used Vehicles (as defined below).  Prior to Closing, Buyer shall inspect the New Vehicle inventory and notify Seller of any damaged New Vehicles. Notwithstanding anything herein to the contrary, if the cost of repairing the damage exceeds Eight Hundred United States Dollars ($800) at dealer cost or if as a result of the damage and repair, state or federal law requires that such damage or repair be disclosed to a retail buyer, then that vehicle shall be treated as a Used Vehicle for purposes of determining the Purchase Price. If the cost of repairing any damage is equal to or less than Eight Hundred United States Dollars ($800) at dealer cost and no notice to a retail Buyer will be required, then Buyer shall be obligated to purchase that vehicle as a New Vehicle, subject to an additional reduction in the purchase price of that vehicle by the actual net cost of repairing such damage ("Damage Deductions"). If Buyer and Seller are unable to agree upon the Damage Deductions, then Buyer and Seller shall select an independent, third party to determine the Damage Deductions. The independent determination shall be binding upon both Buyer and Seller and the cost of such third party shall be paid equally the Parties.

B.    <u>Pre-Registered Vehicles</u>.

All inventory with less than two-hundred fifty (250) miles which would otherwise constitute a New Vehicle but for the fact that it was previously registered, of 2019 and newer model year BMW, Audi, and Porsche model cars and SUV/trucks located at the Property and owned by Seller as of the Closing Date ("Pre-Registered Vehicles"), shall be valued in the same manner as New Vehicles in Section A above (including, without limitation, the Mileage Deductions for Pre-Registered Vehicles with up to 2,500 miles and the Damage Deductions), with an additional deduction of 2% off of the Seller's actual net cost of such vehicle per month for each month any such Pre-Registered Vehicle has been held in inventory at the Dealership. The purchase price shall not include any other vehicle preparation charges, labor charges, or other dealer charges of any kind.  Buyer is not obligated to purchase more than ten (10) Pre-Registered Vehicles with mileage in excess of 250 miles, but less than 2,500 miles, in the aggregate with New Vehicles having in excess of 250 miles (but less than 2,500 miles) on the odometer.  Pre-Registered Vehicles with more than 2,500 miles on the odometer as of the Closing Date will be treated as Used Vehicles (as defined below).

C.      Parts.

(i)     All new, unused, undamaged, non-obsolete OEM parts and accessories located on the Property or in transit to the Property on the Closing Date which are listed in the Manufacturer's current parts and accessories price book and that are eligible for return shall be purchased at the Manufacturer's current cost to dealer. A part or accessory shall be deemed obsolete if it has not shown a sale in the twelve (12) months prior to Closing, unless the part or accessory qualifies for a return and/or credit from the Manufacturer.

(ii)    All non-returnable, non-manufacturer, special order, non-stock, jobber and/or NPN parts and accessories located on the Property or in transit to the Property on the Closing Date may be purchased by Buyer at Seller's verified cost. However, Buyer will not be obligated to purchase any obsolete parts or accessories.

(iii)   All supplies on hand, including, gas, oil and grease inventory, shall be purchased at Seller's net cost, based upon a physical inventory to be made on the Closing Date. With respect to non-bulk oil, grease, fluids and solvents, Buyer shall only purchase such inventories that are in unopened containers.

(v)     All of Seller's return privileges concerning parts for any time periods prior to or after the Closing Date, as applicable, and any and all other assignable rights arising out of or under any express or implied warranties from suppliers with respect to the Purchased Assets shall be assigned by Seller to Buyer.

(vi)    Seller will remove from the Property any parts that are not purchased by Buyer, at Seller's sole expense, within sixty (60) days after the Closing Date. Buyer will accept no responsibility for any parts left on the Property after said period.

(vii)   An inventory list (the "Inventory") shall be prepared on or before the Closing Date by a third party firm mutually agreeable to the Parties. The Inventory (insofar as it relates to parts and accessories, supplies and work-in-process) shall be compared to the Manufacturer's approved system of inventory control and will show each item extended by its unit price. An independent inventory service shall be utilized to perform the actual count of the Inventory and will take place approximately one week prior to the scheduled Closing Date. Buyer and Seller shall split the cost of the inventory service evenly between Buyer and Seller.

D.      Used Vehicles.

Any vehicle not classified as a New Vehicle, Pre-Registered Vehicle, or Leased Vehicle and which has been in inventory sixty (60) or fewer days shall be deemed a used vehicle ("Used Vehicle"). The offer price for Used Vehicles shall be the lesser of (i) Seller's actual cost, and (ii) current market value as determined based on used black book values based on the Manheim Market Report ("MMR"). Any vehicle not classified as a New Vehicle, Pre-Registered Vehicle, Leased Vehicle or Used Vehicle (the "Other Vehicles") shall be purchased at a mutually agreed price between the Buyer and Seller. Seller shall provide Buyer with a detailed list of the Used Vehicles and Other Vehicles not less than fifteen

(15) days prior to Closing.  Buyer will provide Seller with an offer price for each of the Used Vehicles and Other Vehicles no later than seven (7) days prior to Closing.  Seller may elect, prior to Closing, to retain and dispose of any Used Vehicle and Other Vehicle for which the Parties cannot agree on a valuation.  Seller shall remove any such retained Used Vehicles and Other Vehicles from the Property no later than two (2) days after the Closing.

E.      Lease and Rental Vehicles.

Seller's lease and rental vehicles not classified as New Vehicles or Pre-Registered Vehicles (collectively, "Lease Vehicles") which are in stock on the Closing Date, shall be purchased by Buyer at: (i) with respect to non-Audi Lease Vehicles, the lesser of fair market value or the depreciated value as per Seller's financial statements, and (ii) with respect to Audi Lease Vehicles, the lease residual value as set by the Manufacturer.

F.      Fixed Assets.

All fixed assets relating to or used in connection with the Dealerships and owned by Seller, including, without limitation, machinery and equipment, signage, office supplies, computer hardware and software, furniture and other miscellaneous tangible items (but excluding leasehold improvements and Lease Vehicles), shall be purchased at the aggregate net book value of such assets.  Buyer and Seller shall conduct a physical inventory of the fixed assets subject to this Agreement in a timely manner so that the valuation of such fixed assets will be available for the Closing.  Seller shall obtain Buyer's prior written consent to purchase, prior to Closing, any item the cost of which exceeds $5000.

G.      Sublet Repair and Work-in-Process.

In connection with sublet repairs and work-in-process, Seller shall continue to intake such work using its historical standards between the date of this Agreement and the Closing Date.  So long as sublet repairs and work-in-process is done in a commercially reasonable manner for which Seller possesses an initial open repair order signed by the customer authorizing repairs, Buyer will purchase such items from Seller at a price equal to Seller's actual expended cost as of the Closing Date.  Buyer will have the opportunity to review all sublet repairs and work-in-process prior to Closing and Buyer and Seller shall negotiate in good faith any disagreements on the value of such items.

H.      New Vehicle Deposits.

As of the Closing Date, all signed, bona fide, arms-length unfulfilled contracts for the sale or lease of New Vehicles, Pre-Registered Vehicles, and Used Vehicles ("Sales Orders") will be transferred to Buyer upon transfer to Buyer by Seller of the deposit specified in each such Sales Orders (the "Vehicle Deposit") in full; provided that such Sales Orders have been entered into in the ordinary course of business and provide for a profit in accordance with the ordinary course of business of the Dealerships; and provided further, that Buyer has the right to approve, in its reasonable discretion, all proposed trade-in allowances on Used Vehicles to be taken in trade for New Vehicles, which will not be delivered by Seller prior to Closing. Buyer shall retain any profit on such sales.

I.      Other Deposits and Pre-Paid Expenses.

All other deposits collected by Seller that are not classified as Vehicle Deposits and any pre-paid expenses paid by Seller will be purchased by Buyer, on a dollar for dollar basis, provided that the Buyer retains the benefit of such deposit or pre-paid expense after Closing.  Any deposits or pre-paid expenses paid by Seller subsequent to the date of this Agreement shall be subject to the reasonable approval of Buyer.

J.    Assumed Contracts.

Buyer will assume the contracts set forth on Schedule 1.3, which contracts Buyer agrees to assume in accordance with Section 1.3 of this Agreement.

K.    Business Records.

Seller's sales journals, repair order files, parts files, customer lists (including, without limitation, all customer lists and contact information relating to the wholesale parts and service operations of the Dealerships), customer contacts, vendor lists, technical and repair data and manuals, and invoices (the "Records") will be transferred to Buyer for no additional compensation. In addition, Buyer will retain all retail customer files relating to the Dealerships and the associated Purchased Assets. Seller may request from Buyer copies of all or any portion of the Records, all expenses related to which will be borne by Seller alone. Buyer will provide storage of the Records at no cost to Seller for a period of seven (7) years from the Closing Date. All other records of Seller, including, but not limited to, perpetual inventory records and all other operating data and records used in connection with the Dealerships, such as books, records, order files, purchasing records, credit histories and supplier information shall be retained by Seller and removed from the Dealerships within one hundred eighty (180) days after the Closing Date.

L.    Goodwill.

Buyer shall pay Seller an amount equal to Sixteen Million and 00/100 Dollars ($16,000,000) for goodwill for the Seller's BMW, Audi, and Porsche franchises and all associated intangible assets (the "Intangible Asset Purchase Price"). The allocation of the Intangible Asset Purchase Price shall be to franchise value, blue sky or goodwill, as determined by Buyer and Seller and shall be reported consistently by Buyer and Seller for income tax purposes.

M.    We Owes.

The Parties shall deduct from the Purchase Price an amount equal to the sum of all outstanding we-owes issued by Seller to consumers prior to the Closing Date, which shall be reflected at the Closing on Schedule 1.1(M).

N.    Miscellaneous Assets.

Buyer shall purchase the following assets (collectively "Miscellaneous Assets") for a sum of $1:

(i)    The right to use secondary telephone number or numbers used by the Dealerships immediately prior to the Closing Date;

(ii)    Except for the Excluded Assets, all other property and rights, tangible and intangible (including domain names, urls, websites and other internet and social media based property), real, personal or mixed, which Seller owns, uses or is acquiring in connection with the BMW, Audi, and Porsche Business, wherever located and regardless of whether reflected on Seller's books and records, including, without limitation, the "BMW Fresno", "Audi Fresno", and "Porsche Fresno" names or any derivatives of the same.

Any other assets owned by Seller not listed above are not being acquired and shall be retained by Seller, including, but not limited to, cash, bank balances, monies in possession of banks and other depositories, term deposits, and similar cash items of Seller or held by or for the account of Seller, accounts receivable,

accrued earnings and holdbacks, health plans and other benefit programs, and corporate, accounting, tax and other records of Seller not relating exclusively or primarily to the Dealerships.   Notwithstanding the foregoing, Seller shall also have the right to retain any asset valued at $0 according to the above methodology, or on which the Parties have mutually agreed to be worth $0.

Notwithstanding the foregoing, any funds available through programs or credits from the Manufacturer shall be split between Buyer and Seller in a prorated manner.

**SCHEDULE 1.1(H)**

**FIXED ASSETS**

**[BUYER AND SELLER TO FINALIZE PRIOR TO CLOSING DATE]**

**<u>SCHEDULE 1.2</u>**

**EXCLUDED ASSETS**

1)    Cash, bank balances, money's in possession of banks and other depositories, term deposits and similar cash items of Seller or held by or for the account of Seller;

2)    Corporate, financial, tax, and other records of Seller not relating exclusively or primarily to the Business; and

3)    Any personal items of Seller identified below:

**[INSERT]**

**SCHEDULE 1.3**

**ASSUMED CONTRACTS**

**SCHEDULE 2.3**

**ALLOCATION OF PURCHASE PRICE**

**[TO BE COMPLETED BY BUYER AND SELLER AT CLOSING]**

Case: 26-1272, 03/04/2026, DktEntry: 2.1, Page 511 of 586

Case 1:21-cv-00970-EPG     Document 200-2     Filed 11/12/25     Page 72 of 120

## SCHEDULE 4.1(d)

## LITIGATION

## SCHEDULE 4.1(e)

### MATERIAL AGREEMENTS

**SCHEDULE 4.1(f)**

**EMPLOYEES**

**SCHEDULE 4.1(g)**

**TYPES OF TAX RETURNS**

## SCHEDULE 4.1(h)

**EXISTING SUBLEASES, LICENSES AND OTHER RIGHTS OF OCCUPANCY**

**SCHEDULE 4.1(i)**

**ENVIRONMENTAL CONDITIONS**

**SCHEDULE 4.1(j)**

**EMPLOYEE BENEFIT MATTERS**

**SCHEDULE 4.1(k)**

**DEBT**

## SCHEDULE 4.1(l)

**FINANCIAL STATEMENT LIST**

**<u>SCHEDULE 4.1(m)</u>**

**INSURANCE POLICIES**

## SCHEDULE 4.1(n)

## PROPRIETARY RIGHTS

**SCHEDULE 4.1(o)**

**APPROVALS**

**SCHEDULE 4.1(p)**

**PRODUCT LIABILITY**

## SCHEDULE 4.1(q)

### MANUFACTURER MATTERS

**SCHEDULE 4.1(s)**

**PRIOR OPERATIONAL NAMES**

## SCHEDULE 4.1(t)

### BUSINESS MARKETING PLANS

**SCHEDULE 4.1(u)**

**NO DAMAGED VEHICLES**

**SCHEDULE 4.1(y)**

**OPERATION OF BUSINESS**

**SCHEDULE 4.1(z)**

**LIABILITIES**



**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring (Admitted Pro Hac Vice)
tsm@jaburgwilk.com

Attorneys for Defendants,
Weber Motors Fresno, Inc. d/b/a BMW Fresno,
CJ's Road to Lemans Corp. d/b/a Audi Fresno and Porsche Fresno
and Christopher John Wilson

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware Limited Liability Company;<br><br>Plaintiff,<br><br>v.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>Defendants. | Case No.: 1:21-cv-00970-EPG<br><br>Assigned To<br>Hon. Mag. Judge Erica P. Grosjean<br><br>**DECLARATION OF AL MONJAZEB** |

I, Al Monjazeb, hereby declare and state as follows:

1.    At all times relevant hereto, I am the owner of Palm Bluff Investments, LLC ("Palm Bluff"), the entity that owns three parcels of commercial real property located at 7121, 7151 and 7171 North Palm Avenue, Fresno, California, where Christopher John Wilson (hereafter "Mr. Wilson") operates three automobile dealerships, CJ's Road To Lemans Corp., dba Audi Fresno and dba Porsche

1

Fresno, and Weber Motors, Fresno, Inc., dba BMW Fresno. I have personal knowledge of the facts stated in this declaration and can and will testify thereto if called upon to do so.

2.    Palm Bluff leased the real property located at 7121 North Palm Avenue to CJ's Road To Lemans Corp. subject to a written lease commencing on February 1, 2017, for a term of ten years, with no option to extend. Paragraph 15.1 of the lease provides as follows:

> "15.1   Transfers.  Except as otherwise provided herein, Tenant shall not, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, assign mortgage, pledge, hypothecate, encumber, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, permit any assignment, or other transfer of this Lease or any interest hereunder by operation of law, sublet the Premises or any party thereof, or permit the use of the Premises by any persons other than Tenant and its employees (collectively 'Transfer')."

3.    Palm Bluff leased the real property located at 7151 and 7171 North Palm Avenue to Weber Motors, Fresno, Inc. subject to a written lease commencing on February 1, 2017, for a term of ten years, with no option to extend. The lease to Weber Motors, Fresno, Inc. for the real property located at 7121 No. Palm Avenue, includes the same term at paragraph 15.1 requiring prior written consent of Landlord for any assignment of any interest under the lease.

4.    I have over three decades of experience in the automotive industry operating multiple luxury dealerships in the Pacific Northwest and in California, and I currently operate dealerships in Bellevue and Lynnwood, Washington.

5.    In or about mid-January 2021, I learned that Mr. Wilson had entered into an Asset Purchase Agreement (hereafter "APA") with Foundation Auto Holdings, LLC ("Foundation") for the purpose of selling Mr. Wilson's interests in the three dealerships to Foundation. I also learned that the terms of the APA called for an assignment of the above-referenced leases to Foundation as tenant.

6.    Upon learning of the proposed assignment of the leases, I instructed my attorney, Richard Aaron, to draft a letter to the parties of the APA to apprise the parties of my position with respect to the proposed assignment and to describe the materials that I would need to review in order to determine whether or not to consent to the assignments. A true and correct copy of my attorney's letter of

DECLARATION OF AL MONJAZEB                                           CASE NO. 1:21-CV-00970-EPG

February 4, 2021, to BT Advisors, counsel for Mr. Wilson and his dealerships, is attached hereto as **Exhibit A**.

7.    I instructed my attorney to inform the parties that I was very unlikely to agree to the assignments if not backed by the personal guarantees of the ownership group, just as I had required a personal guarantee from Mr. Wilson.  As set forth in Mr. Aaron's February 4, 2021 letter, I instructed my attorney to request that Foundation provide the following materials for my review:

a.  Financial statements for the last three years of each of the dealerships operated by Foundation;
b.  Financial statements for the last three years for any holding company or affiliated entity related to any of the dealerships owned or controlled by Foundation;
c.  Identification of each owner of Foundation, including percentage ownership;
d.  CPA prepared personal financial statements for each owner, preferably as of December 31, 2020; and
e.  A brief biographical history of each of the owners.

8.    In late February 2021, I received and reviewed audited 2019 financial statements for Foundation Auto US Corp and for Foundation Auto Corp.  I also received and reviewed draft internal consolidated financial statements for Foundation Auto US Corp.

9.    Following my review of the foregoing financial statements, I informed Mr. Aaron that I felt that the statements did not exhibit the financial strength I was looking for, and that I was very unlikely to agree to the assignments if not backed by the personal guarantees of the ownership group, just as I had required a personal guarantee from Mr. Wilson, and asked Mr. Aaron to obtain the personal financial statements of Foundation's two principals, Kevin Kutschinski, CEO, and Charles Kramer, CFO.

10.    At my request, on March 1, 2021, Mr. Aaron sent an email to Mr. Beaton informing him that if he is "willing to provide personal financial statements for the principal owners, Mr. Monjazeb will be happy to consider whether he would approve the assignments based upon obtaining satisfactory personal guarantees."  Mr Aaron went on to inform Mr. Beaton that based upon the financial and historical information for Foundation provided thus far, Mr. Monjazeb "respectfully declines to approve the request for his consent to [the] assignment of the lease from Mr. Wilson's corporations to

3

[Foundation]." A true and correct copy of Mr. Aaron's March 1, 2021 email to Mr. Beaton is attached hereto as **Exhibit B**.

11.     In late March 2021, I received and reviewed personal financial statements for Kevin Kutschinski and Charles Kramer, who together owned more than 75% of Foundation Auto US Corp's Class A shares.  Such financial statements were not CPA-prepared, as had been requested; however, I proceeding to review them anyway.  I was also informed that both Mr. Kutschinski and Mr. Kramer were willing to provide personal guarantees of the assignee's (Foundation's) obligations under the leases.

12.     Following my review of the person financial statements provided, I informed Mr. Aaron, by email dated March 22, 2021, that based upon the minimal liquidity of Mr. Kutschinski and Mr. Karmer, and the absence of hard assets that could be easily valued and perhaps used to secure performance, that I cannot approve the assignment.  In coming to that conclusion, I noted that Mr. Kutschinski, the CEO, had only $146,000 of cash, and that Mr. Kramer, the CFO, had only $380,000 of cash.  Mr. Kramer also listed $4.5 million of "marketable securities," but gave no further description.  I also noted that two-thirds of each of their respective net worth consisted of their stock in Foundation.

13.     In early June 2021, I received and reviewed the latest year-end financial statements from Foundation.  After careful review and consideration of all the financial and other materials that Foundation had provided to me for review, I decided that I would not consent to the assignment of the dealership leases to Foundation.  In my professional judgment, developed over thirty years as a landlord and premium car dealer, I was not willing to lease to a group with little to no experience in the luxury car market, with no local ties to the Fresno community, and with less than robust corporate and personal financial positions.  In particular, I told Mr. Aaron that I found the financial condition of Foundation to be "weak," in that there was only $33 million of equity, notwithstanding $68 million of goodwill; all automotive inventory was floored and potentially out of trust; and finally, they showed only one percent of net income, which is far less than the minimum margin even public buyers expect, which is typically five percent or more.  I further noted that Foundation had no premium brands of automobiles, and to the

4

contrary had a number of weak brands, such as Chrysler Dodge Jeep Ram, Suzuki, and Mitsubishi. Additionally, I noted that it looked like all of the Foundation stores were located in small markets.

14.    After early June 2021, I did not receive any further communications or documentation from Foundation, either directly or through Mr. Aaron, regarding Foundation's request for an assignment of the leases. I therefore assumed that after my March 1, 2021 declination, along with my subsequent determination that the personal financial statements were unacceptable, and my ultimate assessment of the final Foundation financials and their weak dealership portfolio, that Foundation realized that they were not going to obtain my consent to the proposed lease assignments, which is true, and that it ceased its efforts to obtain such consent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: April 22nd, 2025.

AL MONJAZEB

DECLARATION OF AL MONJAZEB                                    CASE NO. 1:21-CV-00970-EPG



**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring
tsm@jaburgwilk.com

Attorneys for Defendants,
Weber Motors Fresno, Inc. d/b/a BMW Fresno,
CJ's Road to Lemans Corp. d/b/a Audi Fresno and Porsche Fresno
and Christopher John Wilson

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware Limited Liability Company; <br><br> Plaintiff, <br><br> v. <br><br> WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, <br><br> Defendants. | Case No.: 1:21-cv-00970-EPG <br><br> Assigned To <br> Hon. Mag. Judge Erica P. Grosjean <br><br> **DECLARATION OF RICHARD M. AARON** |

I, Richad M. Aaron, hereby declare and state as follows:

1.    I am at attorney at law licensed to practice in all courts in the State of California.  At all times herein mentioned, I was and am the attorney for Al Monjazeb, the owner of Palm Bluff Investments, LLC ("Palm Bluff"), the entity that at all times relevant hereto owned three parcels of commercial real property located at 7121, 7151 and 7171 North Palm Avenue, Fresno, California, where Christopher John Wilson (hereafter "Mr. Wilson") operates three automobile dealerships, CJ's Road To

1

DECLARATION OF RICHARD M. AARON                                    CASE NO. 1:21-CV-00970-EPG

Lemans Corp., dba Audi Fresno and dba Porsche Fresno, and Weber Motors, Fresno, Inc., dba BMW Fresno. I have personal knowledge of the facts stated in this declaration and can and will testify thereto if called upon to do so.

2. In or about mid-January 2021, I was informed by Mr. Wilson's attorney, Reggie Borkum, that Mr. Wilson had entered into an Asset Purchase Agreement (hereafter "APA") with Foundation Auto Holdings, LLC ("Foundation") for the purpose of selling Mr. Wilson's interests in the three dealerships to Foundation. Mr. Borkum informed me that the terms of the APA called for an assignment of the above-referenced leases to Foundation as tenant.

3. Following consultation with Mr. Monjazeb, on February 4, 2021, I sent a letter to Mr. Borkum advising him that in order for Mr. Monjazeb to evaluate whether or not to accept an assignment of the leases to Foundation, he would need to be provided with financial statements of both Foundation and of the principals of Foundation, each of whom will be required to sign personal guarantees. A true and correct copy of my February 4, 2021 letter to Mr. Borkum is attached hereto as **Exhibit A**.

4. Per my February 4, 2021 letter, I requested that Foundation provide the following materials for Mr. Monjazeb's review:

   a. Financial statements for the last three years of each of the dealerships operated by Foundation;
   b. Financial statements for the last three years for any holding company or affiliated entity related to any of the dealerships owned or controlled by Foundation;
   c. Identification of each owner of Foundation, including their percentage ownership;
   d. CPA prepared personal financial statements for each owner, preferably as of December 31, 2020; and
   e. A brief biographical history of each of the owners.

5. Following my request, I was asked to execute a Confidentiality Agreement, which I promptly did execute and return.

6. Thereafter, by email dated February 19, 2021, Chris Beaton, Foundation's Vice-President of Mergers and Acquisitions, provided to me the 2019 financial statements for Foundation Auto US, the subsidiary, and of Foundation Auto Corp., the parent company. Also included were the draft 2020 financial statements for both entities. I promptly forwarded on all of the financial statements that I had received to Mr. Monjazeb for his review.

<center>2</center>

DECLARATION OF RICHARD M. AARON — CASE NO. 1:21-CV-00970-EPG

7.     After Mr. Monjazeb reviewed the foregoing financial statements, he told me that he felt that the statements did not exhibit the financial strength he was looking for, and that he was very unlikely to agree to the assignments if not backed by the personal guarantees of the ownership group, just as he had required a personal guarantee from Mr. Wilson, and he asked me to obtain the personal financial statements of Foundation's two principals, Kevin Kutschinski, CEO, and Charles Kramer, CFO.

8.     On March 1, 2021, I sent an email to Mr. Beaton informing him that if he is "willing to provide personal financial statements for the principal owners, Mr. Monjazeb will be happy to consider whether he would approve the assignments based upon obtaining satisfactory personal guarantees."  I went on to inform him that based upon the financial and historical information for Foundation provided thus far, Mr. Monjazeb "respectfully <u>declines to approve</u> the request for his consent to [the] assignment of the lease from Mr. Wilson's corporations to [Foundation]." A true and correct copy of my March 1, 2021 email to Mr. Beaton is attached hereto as **Exhibit B**.

9.     On March 17, 2021, I received an email from Mr. Beaton attaching the "personal net worth statements for both Kevin Kutschinski and Chuck Kramer."  Said financial statements were not CPA-prepared, as I had requested, but were instead internally prepared.  Mr. Beaton's email also stated that "no one else had ever requested CPA prepared financial statements," an assertion that I found surprising.  Nevertheless, Mr. Monjazeb agreed to review the not CPA-prepared financial statements of Mr. Kutschinski and Mr. Kramer provided by Mr. Beaton, which I emailed to him.

10.     Following his review of the person financial statements provided, Mr. Monjazeb informed me, by email dated March 22, 2021, that based upon the minimal liquidity of Mr. Kutschinski and Mr. Kramer, and the absence of hard assets that could be easily valued and perhaps used to secure performance, that "he cannot approve the assignment."  In coming to that conclusion, Mr. Monjazeb noted that Mr. Kutschinski, the CEO, had only $146,000 of cash, and that Mr. Kramer, the CFO, had only $380,000 of cash.  Mr. Kramer also listed $4.5 million of "marketable securities," but gave no further description.  Mr. Monjazeb also noted that two-thirds of each of their respective net worth consisted of their stock in Foundation.

DECLARATION OF RICHARD M. AARON                                    CASE NO. 1:21-CV-00970-EPG

11.     On or shortly after March 22, 2021, I shared the foregoing information with Mr. Beaton. After a few telephone calls with Mr. Beaton, I sent an email to Mr. Beaton on April 15, 2021, stating that "Mr. Monjazeb is not yet ready to consent," and that "once you've received factory approvals, he will take a deeper dive into your company financials." A true and correct copy of my April 15, 2021 email to Mr. Beaton is attached hereto as **Exhibit C**.

12.     By email dated June 7, 2021, Mr. Beaton provided to me the "final" 2019 and 2020 financial statements of Foundation.  I forwarded those financial statements on to Mr. Monjazeb and thereafter discussed them with him by telephone.  Mr. Monjazeb told me that he found the financial condition of Foundation to be "weak," noting that there was only $33 million of equity, notwithstanding $68 million of goodwill; all automotive inventory was floored and potentially out of trust; and finally, they showed only one percent of net income, which is far less than the minimum margin even public buyers expect, which is typically five percent or more.  Mr. Monjazeb further noted that Foundation had no premium brands of automobiles, and to the contrary had a number of weak brands, such as Chrysler Dodge Jeep Ram, Suzuki, and Mitsubishi.  Additionally, he noted that it looked like all of the Foundation stores were located in small markets.

13.     Based upon the foregoing, at this point in time – early June 2021 – Mr. Monjazeb confirmed to me his decision that he would not consent to the assignment of the dealership leases to Foundation, which he concluded was a group with little to no experience in the luxury car market, with no local ties to the Fresno community, and with less than robust corporate and personal financial positions.

14.     In reviewing my files prior to executing this declaration, I find no evidence of any attempt by Foundation to contract me regarding this matter after early June 2021.  Mr. Monjazeb and I therefore assumed that after the March 1, 2021 declination, along with Mr. Monjazeb's subsequent determination that the personal financial statements were unacceptable, and Mr.Monjazeb's ultimate assessment of the final Foundation financials and their weak dealership portfolio, that Foundation realized that it was not going to obtain the landlord's consent to the proposed lease assignments, which is true, and that it ceased its efforts to obtain such consent.

4

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: April 22, 2025.

RICHARD M. AARON

24377-24377-00001\DLA\DLA\6457240v1

5



| From: | Mike McMeeken </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=97E7A2AC8AB4407D94BCD547E8E0A37E-MIKEM> |
|---|---|
| To: | Derek Slemko |
| CC: | Samantha Wright |
| Sent: | 2/26/2021 9:57:52 PM |
| Subject: | RE: source of funds (bank statement proof) |

Derek,

Audi has requested bank statements showing where the $3.36MM is coming from for our sources and uses. They have requested 3 months of statements as well, but I think I can talk them through why we wont be able to provide this, as we never keep cash stagnant on the b/s and why its always moving around. But are we able to show something early next week for the $3.36MM?

Porsche has asked as well, but their request is on $1.9, so the Audi proof will be more than enough. BMW hasn't formally asked for proof of funds yet. Fingers crossed that they don't....

| AUDI | | Working Capital Requirement | $1,687,643 |
|---|---|---|---|
| Sources (including Debt) | | Uses (full cost - rounded) | |
| Managing Partner | $1,118,405 | Goodwill | $5,600,000 |
| Foundation Automotive Corp. | $3,355,215 | Parts Inventory | $314,397 |
| External Fixed Term Loan | $4,000,000 | Prepaid & Other | $214,241 |
| | | Fixed Assets | $120,978 |
| | | | |
| | | Working Capital | $2,224,006 |
| Total Sources | $8,473,621 | Total Uses | $8,473,621 |

| PORSCHE | | Working Capital Requirement | $1,365,019 |
|---|---|---|---|
| Sources (including Debt) | | Uses (full cost - rounded) | |
| Managing Partner | $637,749 | Goodwill | $2,400,000 |
| Foundation Automotive Corp. | $1,913,247 | Parts Inventory | $239,022 |
| External Fixed Term Loan | $2,000,000 | Prepaid & Other | $214,241 |
| | | Fixed Assets | $120,978 |
| | | | |
| | | Working Capital | $1,576,757 |
| Total Sources | $4,550,997 | Total Uses | $4,550,997 |

| BMW | | Working Capital Requirement | $2,521,253 |
|---|---|---|---|
| Sources (including Debt) | | Uses (full cost - rounded) | |
| Managing Partner | $3,565,931 | Goodwill | $8,000,000 |
| Foundation Automotive Corp. | $10,697,792 | Parts Inventory | $379,000 |
| External Fixed Term Loan | $6,000,000 | Prepaid & Other | $300,000 |
| | | Fixed Assets | $206,006 |
| | | Excess Cash | $8,071,464 |
| | | Working Capital | $3,307,253 |
| Total Sources | $20,263,723 | Total Uses | $20,263,723 |

Regards,

**Mike McMeeken**
Vice President of Corporate Development
D: 832-384-9710   211 Highland Cross Drive, Suite 260
C: 832-928-6355   Houston, TX 77073

CONFIDENTIAL

**FOUNDATION**
AUTOMOTIVE CORP

**From:** Samantha Wright <samanthaw@foundationauto.com>
**Sent:** February 17, 2021 11:39 AM
**To:** Derek Slemko <dereks@foundationauto.com>
**Cc:** Mike McMeeken <mikem@foundationauto.com>
**Subject:** source of funds

Derek,

Mike and I are wondering if we are able to show anything for source of funds at this time? This is one of the last remaining items for Audi and Porsche, Audi needs to see about $4.5MM (inclusive of the $1.1MM for CJ) and Porsche needs to see $2.6MM (inclusive of the $640k for CJ)

BMW being the highest at the $14.3MM, I am assuming this can not be done until we have the Mezz debt in place?

Thanks!

Samantha Wright
Acquisition & Finance Analyst
**FOUNDATION AUTOMOTIVE CORP**
Cell: 403-554-4524

CONFIDENTIAL



| | |
|---|---|
| **From:** | Mike McMeeken </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=97E7A2AC8AB4407D94BCD547E8E0A37E-MIKEM> |
| **To:** | Mike McMeeken |
| **Sent:** | 2/10/2021 5:33:27 PM |
| **Subject:** | FW: Fresno Facility Requirements - Acton Items |
| **Attachments:** | Dealer Relocation Plan - Porsche Fresno.pdf |

**Mike McMeeken**
Vice President Corporate Development
Foundation Automotive Corp.
C. 832.928.6355

*Sent from my phone.*

-------- Original message --------
From: Mike McMeeken <mikem@foundationauto.com>
Date: 1/29/21 3:35 PM (GMT-06:00)
To: Chris Beaton <cbeaton@foundationauto.com>
Subject: Fresno Facility Requirements - Acton Items

[let me know what you think about this]

All,

I have spoken to each of the 3 OEM's in the last two days regarding outstanding projects and timelines for the applications. We're looking good on all the typical application projects, however, all three have major milestones upcoming for image/facility requirements that we need to address right away. I will explain each OEM's requirements below to the best of my ability, based on the information that I have, but I think we need to set up a bit of a task-force with CJ to get started on these ASAP.

**Porsche:**
 • The relocation of the Porsche dealership has been approved by Porsche for the new Infiniti location, but CJ has still not submitted the formal Relocation Package yet.
 • Porsche is now recommending that we complete the package (instead of CJ) and submit as part of the Buy/Sell application, so we can present it for the interview on Feb 16th.
 • The relocation package has to be submitted and approved (with full design plans completed) by March 31st if we want to move forward with the Gen 4 design.
 • There is a good chance CJ has already completed a majority, if not all, of this project, but we need to identify what is still outstanding asap.
 • The package is attached, but the high-level items it requires are below:
   ○ Section A – Sites and Facilities:
     ▪ Identify planned renovations or improvements to the new proposed site
     ▪ Identify/explain any obligations and/or commitments to acquire the site
   ○ Section B – Plans and Timeline of Relocation:
     ▪ Acquisition of site(s) and/or facilities.
     ▪ Governmental Approval, including zoning and permitting.
     ▪ Submission of preliminary construction plans (e.g., blueprints) to Porsche
     ▪ Submission of final construction plans to Porsche
     ▪ Approval of Construction Financing.
     ▪ Commencement of Construction, Completion of Construction, and Relocation of Dealership Operations
   ○ Section C - Occupancy Expense:

Foundation-0013881

- Summarize the estimated occupancy expense (include: acquisition costs, Construction costs, mortgage payments including taxes and insurance and Proposed rent)
  - Identify sources of funds and provide lending letter for any borrowed funds
- Section D - Porsche Design and Image:
  - For each Porsche identification and directional sign planned for installation at the proposed site(s), the following should be described:
    - Type, size, planned location and visibility.
    - Source of each sign; e.g., new purchase or relocated from the current site. (If relocated, include photographs.)
    - Plans for removal of existing non-Porsche signs.

## BMW:

- We need the Design Intent Document for BMW completed by March 1st. This is the biggest priority with BMW for the whole buy/Sell application at the moment
- CJ has begun conversations and has worked with the prior preferred engineering/design company (Whitfield), but we need to move forward with the new preferred vendor (Tricarico or Praxis).
- Alex Walker (Regional Manager) is the point of contact for the design/image requirements, but my contact with the Buy/Sell said to connect with CJ first as likely he has already had those conversations with BMW and Alex on the new vendors.
- I believe CJ has got a good head start on this as well, but not sure if he has connected with the new designers yet or not

## Audi:

- We need to request from CJ ALL documentation that he has agreed to with Audi for image and facility obligations.
- Audi will not provide this information directly to us, but they did say the original agreement was signed in 2017 and it was amended in January 2019.
- This should have all the details of what CJ has already committed to with the OEM
- Audi did say they are flexible on timelines, especially with a buy/sell

Regards,

**Mike McMeeken**
Vice President of Corporate Development
D: 832-384-9710   211 Highland Cross Drive, Suite 260
C: 832-928-6355   Houston, TX 77073





Proposal prepared exclusively for Foundation Automotive Corp

February 1, 2021

**BMO** Harris Bank

We're here to help.™

CONFIDENTIAL

## BMO Harris Bank
## Financing Proposal

| Floorplan Loan Facility | |
|---|---|
| **Co-Borrowers:** | <ul><li>Foundation Automotive US Corp</li><li>Foundation Auto Holdings, LLC</li><li>FAF TX FD, LLC</li><li>FAF TX Chev, LLC</li><li>FAF TX Chrys, LLC</li><li>FAF TX Depot, LLC</li><li>Fresno BMW (legal name TBD)</li><li>Fresno Audi (legal name TBD)</li><li>Fresno Porsche (legal name TBD)</li></ul> |
| **Amount:** | <ul><li>New Vehicle Floorplan: $51,000,000 ($26,000,000 increase)<ul><li>Sublimit of $4,500,000 for completed upfit units</li></ul></li><li>Used Vehicle Floorplan: $13,000,000 ($8,000,000 increase)</li></ul> |
| **Interest Rate:** | <ul><li>Floor Plan: 30-day LIBOR + 165 basis points; LIBOR floor of 75 basis points</li><li>Fleet: 30-day LIBOR + 200 basis points; LIBOR floor of 75 basis points</li></ul> |
| **Advance Rates:** | 1. 100% advance on new units and all used units purchased at auction<br>2. Lesser of 90% of cost or NADA Clean Trade on used trade units<br>3. Used units up to 7 model years may be floored, with an $8,000 minimum flooring amount. |
| **Payoff Terms:** | Repayment due the earlier of 5 business days from receipt of cash or 10 business days from date of sale. |
| **Curtailments:** | 1. New units curtail 10% per month at the end of the 12th month with a maximum term of 18 months.<br>2. Used units curtail 5% per month at the end of the 3rd month with a maximum term of 6 months.<br>3. New demos and service loaners curtail at 2.5% per month. Maximum term is 24 months.<br>4. Used demos and service loaners curtail at 2.5% per month for three months, 5% thereafter, with a maximum term of 6 months.<br>5. Service loaners and demos to be floored under either the New or Used floorplan lines. |
| **Audits:** | At bank discretion. Provided, however, if no default occurred or is continuing, a maximum of 12 per year |

2

CONFIDENTIAL    Foundation-0010657

| New Senior Term Loan | |
|---|---|
| **Co-Borrowers:** | • Foundation Automotive US Corp<br>• Foundation Auto Holdings, LLC<br>• FAF TX FD, LLC<br>• FAF TX Chev, LLC<br>• FAF TX Chrys, LLC<br>• FAF TX Depot, LLC<br>• Fresno BMW (legal name TBD)<br>• Fresno Audi (legal name TBD)<br>• Fresno Porsche (legal name TBD) |
| **Amount:** | $12,000,000 |
| **Purpose:** | To facilitate the acquisition of BMW, Audi, and Porsche franchises located in Fresno, CA. |
| **Interest Rate:** | • 30 Day Libor + 300 basis points; LIBOR floor of 75 basis points<br>• Fixed rate options available through a swap<br>• 1.0% Up Front Fee ($120,000) |
| **Term / Amortization:** | • 45-day demand<br>• In the absence of demand, 5-year term with 7-year amortization schedule<br>• 25% net cash flow recapture annually on August 1st (beginning August 2022, using FYE 2021 financials) using consolidated annual CPA Reviewed net income of the Fresno dealership entities.<br>• Net cash flow shall be calculated as follows: EBITDA less i) distributions for tax purposes, ii) capital expenditures and iii) stated principal & interest payments on all debt of Fresno entities. |

| Existing Senior Term Loan | |
|---|---|
| **Co-Borrowers:** | • Foundation Automotive US Corp<br>• Foundation Auto Holdings, LLC<br>• FAF TX FD, LLC<br>• FAF TX Chev, LLC<br>• FAF TX Chrys, LLC<br>• FAF TX Depot, LLC<br>• Fresno BMW (legal name TBD)<br>• Fresno Audi (legal name TBD)<br>• Fresno Porsche (legal name TBD) |
| **Current Balance:** | $5,500,000.01 |
| **Purpose:** | To facilitate the acquisition of the Freestone stores |
| **Interest Rate:** | • 30 Day Libor + 300 basis points; LIBOR floor of 75 basis points<br>• Fixed rate options available through a swap |
| **Term / Amortization:** | • 45-day demand<br>• In the absence of demand, 5-year term with 7-year amortization schedule |

3

Foundation-0010658

| General Terms | |
|---|---|
| **Bank:** | BMO Harris Bank N.A. |
| **Financial Reporting:** | Quarterly company prepared financial statements<br>Quarterly compliance certificates<br>Quarterly consolidated financials<br>Annual CPA Reviewed consolidated financials<br><br>*To mirror existing reporting requirements* |
| **Quality of Earnings:** | Satisfactory Quality of Earnings report for underwriting purposes (received) |
| **Security:** | First security interest in all assets of the Borrowers. |
| **Subordinated Debt:** | Amounts owed to shareholders and affiliates to be subordinated to the Bank. Payments of principal and interest are allowed to the extent of covenant compliance. |
| **Financial Covenants:** | 1. Senior Indebtedness to EBITDA Ratio $\leq 2.75$x, with step-down to 2.25x on 12/31/21 and 2.00x on 12/31/22 and thereafter*<br>2. Minimum Current Ratio of 1.10x<br>3. Minimum Debt Service Coverage of 1.15x<br><br>* *Senior Indebtedness to EBITDA Ratio to be re-evaluated with formal approval based on revised financing structure* |
| **Checking Accounts:** | All operating accounts for the Borrowers to be maintained at BMO. |
| **Other Covenants:** | Usual and customary for financings of this type, including but not limited to limitation on additional indebtedness, liens, and operating and capital leases. Appropriate exceptions and baskets to be agreed upon. |
| **Offset Account:** | Up to 30% of new floorplan outstandings may be placed in an offset account with a rate equal to the floor plan rate. |
| **Call Provision:** | Absent a default, all loans presented in this proposal will have a call provision of 45 days. |
| **Oher Terms:** | 1. All three franchises to be acquired must be floored with the Bank.<br>2. Sources and uses to be satisfactory to the Bank.<br>3. Satisfactory legal and Bank review of entity structure and flow of funds.<br>4. Covenant compliance on a pro-forma basis prior to close, which may require an equity injection depending on inventory levels.<br>5. Formal OEM approval of all franchises to be acquired.<br>6. Distributions and management fees above the Borrower's tax liability allowed up to pro-forma covenant compliance.<br>7. Proposal is subject to the Bank's standard due diligence and credit approval. At this time the Bank has not received such approval, and this proposal is for discussion purposes only. |

4

CONFIDENTIAL

Foundation-0010659

<u>Acknowledgment and Acceptance</u>

We hereby accept the foregoing terms and conditions:

This 1st day of February, 2021.

**Foundation Automotive Corp.**

By:     _____

Title:  _____



**BMO Harris Bank**

By:     _____

Title:  Director

The terms and conditions herein contained are to be held confidential and may not be shared with third parties unless otherwise agreed to by the Bank in writing. This proposal is for discussion purposes only and is not a commitment to lend. Any credit is subject to the Bank's standard approval process and subject to typical loan provisions for facilities of this type. This proposal is subject to change and is being delivered under the assumption there are no material changes to the information received from the Borrower, no material changes to current economic conditions/forecasts and that the proposal is accepted within 15 days of delivery.

CONFIDENTIAL                                                    Foundation-0010660



| | |
|---|---|
| **From:** | Mike McMeeken </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=97E7A2AC8AB4407D94BCD547E8E0A37E-MIKEM> |
| **To:** | Kramer, Rick (PCNA-O1) |
| **Sent:** | 5/3/2021 4:51:21 PM |
| **Subject:** | FW: Fresno Proposal |
| **Importance:** | High |
| **Attachments:** | Foundation Fresno Proposal 2-1-21_bank signed.pdf |

Rick,

Please see attached the bank signed term sheet.

Still working on Todd's background check, but spoke with him this morning and he is going to the police station to get the background check done this afternoon. Fingers crossed they can get him the final certification back same day. I will keep you posted.

Regards,

**Mike McMeeken**
Vice President of Corporate Development
D: 832-384-9710   211 Highland Cross Drive, Suite 260
C: 832-928-6355   Houston, TX 77073



FOUNDATION
AUTOMOTIVE CORP

---

**From:** Dixon, Joel <Joel.Dixon@bmo.com>
**Sent:** May 3, 2021 11:48 AM
**To:** Derek Slemko <dereks@foundationauto.com>; Mike McMeeken <mikem@foundationauto.com>
**Subject:** Fresno Proposal

Derek & Mike,

I hope that your week is off to a good start. I signed the Fresno proposal for you (attached), which will hopefully help with your Porsche approval.

Mike, thank you for your call this morning, and I'm sorry that I missed you. Feel free to let me know if you need anything in addition to the attached.
Regards,

Joel Dixon
Director
BMO Harris Bank – Dealer Finance
111 W. Monroe St., 18W Chicago, IL 60603
312.461.3424
Joel.dixon@bmo.com
www.bmoharris.com/autodealer



| | |
|---|---|
| **From:** | Chris Beaton </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AB987A4EE62C443D991A9F0D3EDC5B75-CBEATON> |
| **To:** | Kevin Kutschinski; Chuck Kramer; Doug Keith; Patrick Allan; Mike McMeeken |
| **Sent:** | 2/1/2021 5:42:20 PM |
| **Subject:** | FW: G5 PV 200 Prototype |
| **Attachments:** | 2021-01-20 Porsche Gen5 200PV - Floor Plan.pdf |

As referenced on our call with CJ

**From:** CJ Wilson <cj.wilson@bmwfresno.com>
**Sent:** February 1, 2021 8:41 AM
**To:** Chris Beaton <cbeaton@foundationauto.com>
**Subject:** Fwd: G5 PV 200 Prototype

please distribute- this is Gen 5

-c.j. wilson

| Porsche Fresno |
| BMW Fresno |
| Audi Fresno |

1.602.918.3626

Begin forwarded message:

**From:** "Kramer, Rick (PCNA-O11-O14)" <rick.kramer@porsche.us>
**Date:** January 28, 2021 at 2:37:35 PM PST
**To:** cj.wilson@porschefresno.com
**Cc:** "Sanchez, Michael (PCNA-O11-O14)" <michael.sanchez@porsche.us>
**Subject: G5 PV 200 Prototype**

Best regards,



**Rick Kramer**
**Area West Network Development Manager**
Porsche Cars North America, Inc.
19800 South Main Street
Carson, CA 90745
Office:  770.290.7527
Mobile: 404.494.6911
Fax:     770.290.6268
Email:  Rick.kramer@porsche.us

CONFIDENTIALITY NOTICE:
The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. You are expressly prohibited from forwarding the contents of this communication to anyone without receiving prior permission from the sender to do so.  In no case shall the contents be forwarded outside of the Porsche

Dealer network. If you are not the intended recipient of this message, or this message has been addressed to you in error, please immediately alert the sender by reply email and delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

Foundation-0009223



2  200PV - Floor Plan - Mezzanine

1  200PV - Floor Plan - Level 1

| PRAXIS3 | PCNA | Porsche Gen5 DID<br>Atlanta, GA | Floor Plans | Project No. 19052 | 2021-01-20 | 200PV<br>A201 |

Foundation-0009224

# APPENDIX 17

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring
tsm@jaburgwilk.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>vs.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>    Defendants.<br><br>TEMPLETON MARSH, LTD.,<br><br>    Plaintiff-in-Intervention,<br><br>vs.<br><br>WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,<br><br>    Defendants. | Case No. 1:21-cv-00970-EPG<br><br>**DEFENDANTS' REQUEST FOR CLARIFICATION OF ORDER GRANTING PLAINTIFF'S MOTION FOR FURTHER SANCTIONS [DKT. 187]**<br><br>(Assigned to Hon. Erica P. Grosjean) |

1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Defendants hereby request that this Honorable Court clarify its Order granting Plaintiffs' Motion for Further Sanctions, dated June 2, 2025 ("the Sanctions Order") [ECF No. 187].

## I.      INTRODUCTION

On November 12, 2025, Defendants filed a Motion for Summary Judgment ("MSJ") [ECF No. 200], a true and correct copy of which is attached hereto as Exhibit A and incorporated herein. On November 13, 2025, counsel for Plaintiff sent an email to counsel for Defendants, setting forth their position that the filing of the MSJ was in contravention of the Sanctions Order [ECF No. 187], and requesting that Defendants withdraw the MSJ by no later than the following day, November 14.  Counsel for Defendants promptly responded to such email, advising that one of the two attorneys working on this matter on behalf of Defendants was then in trial, and that a response would be provided by no later than November 20.  Counsel for Plaintiff responded, stating that because their opposition is due by November 26, they must receive a response by November 14.

On November 14, counsel for Defendants sent an email to counsel for Plaintiff, offering to enter into a stipulation to extend Plaintiff's November 26 deadline for their opposition for a week to ten days, so that the parties would have some time to attempt to resolve the issue. Counsel for Plaintiff never responded to such offer.

On November 19, counsel for Defendants sent an email to counsel for Plaintiff, advising counsel for Plaintiff that before the MSJ was filed, counsel for Defendants had "carefully reviewed both Judge Grosjean's Sanction Order [ECF No. 187] and the applicable law," and explaining the basis for Defendants' good faith belief that the MSJ was properly filed and therefore would not be withdrawn.

The next day, on November 20, after further discussion amongst counsel for Defendants, counsel for Defendants sent a further email to counsel for Plaintiff, stating: "Upon giving this matter further thought, we are willing to enter into a stipulation with you that we will promptly

DEFENDANTS' REQUEST FOR CLARIFICATION OF
ORDER

CASE NO. 1:21-CV-00970-EPG

withdraw our motion for summary judgment without prejudice to our right to refile it at a later date.  We will then file a Motion for Clarification, asking Judge Grosjean to clarify whether by her sanctions order, in addition to finding as a sanction that Defendants breached the APA as a matter of law, she is also finding as a sanction that, as a matter of law, but for Defendants' breach Plaintiff could have fully and timely performed Plaintiff's obligations under the terms of the APA.  Depending upon her ruling, we may or may not thereafter proceed with the refiling of our motion for summary judgment."

Counsel for Plaintiff has not responded to the foregoing email sent by counsel for Defendants.  Therefore, Defendants are moving forward at this time with the withdrawal of the MSJ and the filing of this Request for Clarification by the Court of its Order Granting Plaintiff's Motion for Further Sanctions.

## II.    FACTUAL AND LEGAL BASIS FOR REQUEST

In its Sanction Order, the Court stated: "Defendants shall be prohibited from opposing Plaintiff's claims for breach of contract and anticipatory breach of contract.  The case will proceed only on the question of damages and/or remedy for those claims."  [ECF No. 187, p. 31 lines 23-25]. In compliance with the foregoing, Defendants do not argue in the MSJ that there was no breach by Defendants, or an anticipatory breach of the Asset Purchase Agreement ("APA"), which is the contract at issue.  Rather, Defendants only address and argue "the question of damages," as specifically set forth in the Order.

The "question of damages" in a breach of contract case consists of two distinct issues. The first issue is whether Plaintiff has incurred any damages at all, which is only the case if the Defendants' breach is the proximate cause of such damages.  Cal. Civil Code Sec. 3301; *Agam v. Gavra* 236 Cal. App. 4th 91 (2015).  Such proximate cause exists only if Plaintiff is able to prove that "but for" Defendants' breach, Plaintiff would have been able to timely perform its contractual obligations.  If Plaintiff is unable to provide the required "but for" proof, it cannot prevail on its breach of contract claim, notwithstanding Defendants' breach. *Ersa Grae Corp. v. Fluor Corp.,* 1 Cal. App. 4th 613 (1991).  Defendants' MSJ is premised upon there being

DEFENDANTS' REQUEST FOR CLARIFICATION OF ORDER

CASE NO. 1:21-CV-00970-EPG

undisputed facts showing that Plaintiff is unable to provide proof that but for Defendants' breach, Plaintiff would have been able to timely perform its contractual obligations.

The second damages issue, which is the amount of Plaintiff's damages, is only reached if Plaintiff is able to establish that but for Defendants' breach, Plaintiff would have been able to timely perform its contractual obligations. This second issue is not the subject of Defendants' MSJ.

The Sanctions Order issued against Defendants imposes the severe sanction of finding as a matter of law that Defendants breached the APA, thereby precluding Defendants from providing evidence at trial proving that they did not breach the APA, or that Foundation committed an anticipatory breach. Plaintiff is now arguing that the Sanctions Order should be interpreted to include a further, wholly separate but equally or more severe sanction. Specifically, Plaintiff asserts that the prior Sanctions Order operates as a finding by the Court that as a matter of law, Plaintiff does not need to prove that but for Defendants' breach, Plaintiff would have been able to timely perform its contractual obligations. Defendants believe that such a further sanction is neither just nor proper, and should not be imposed against Defendants. They also believe Plaintiff's reading is too expansive. In an effort to avoid actions the Court believes have been addressed by the Sanctions Order, Defendants have sought this clarification.

On page 20 of the Sanctions Order, the Court quotes from FRCP Rue 37(b)(2), in discussing the Court's authority to issue evidentiary discovery sanctions. In particular, the Court notes that: "First, any sanction must be 'just'; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." Citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 707 (1982).

While Defendant do not concede that the sanction imposed by the Court; namely, a legal finding that Defendants breached the APA, was warranted, such sanction is at least facially "related to the claim that was at issue in the order to provide discovery," inasmuch as the discovery at issue related to Defendants' performance. Such discovery, however, is not related to the ability, or inability of Plaintiff to meet Plaintiff's burden to demonstrate that Plaintiff had

DEFENDANTS' REQUEST FOR CLARIFICATION OF ORDER                    CASE NO. 1:21-CV-00970-EPG

the ability to timely perform its independent obligations under the APA, including, for example, its ability to obtain an assignment of the leases for the operation of the three car dealership businesses.  There could be nothing in Defendants' discovery responses that would have any bearing on Plaintiff being able – or not able – to prove its own ability to perform.  Put another way, such a sanction would not be "specifically related to the particular 'claim' which was at issue in the order to provide discovery."

Further, having already severely penalized Defendant by finding as a matter of law that Defendants breached, it would not be "just" to impose a further, and harsher penalty against Defendants, by ruling as a matter of law that based on Defendants' breach, Plaintiff no longer has to meet its burden to provide its own evidence to show Foundation's ability to timely perform its own independent contractual obligations.

## III.    CONCLUSION

Defendants respectfully request that this Court clarify that its Sanction Order does not include a sanction that the Court finds as a matter of law that but for Defendants' breach, Plaintiff would have been able to timely perform its contractual obligations under the APA, so that Defendants can refile their motion for summary judgment on such issue.

DATED this 21st day of November, 2025.

**Jaburg & Wilk, P.C.**

*/s/ David L. Allen*
David L. Allen
Thomas Moring
Attorneys for Defendants

JABURG WILK
LAW FIRM

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of November, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci
HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
david.holtzman@hklaw.com
daniel.kappes@hklaw.com
andrew.klair@hklaw.com
isabella.granucci@hklaw.com
*Attorneys for Plaintiff*

Forrest Booth
fbooth@nicollblack.com
Camille Zuber
czuber@nicollblack.com
Nicoll Black Altenbrun & Feig, PLLC
50 California Street, Suite 1616
San Francisco, CA 94111
*Attorneys for Plaintiff-in-Intervention*


*/s/ Brenda Ruiz*

24377-24377-00001\TSM\BXR\6749103v1

6

DEFENDANTS' REQUEST FOR CLARIFICATION OF ORDER                    CASE NO. 1:21-CV-00970-EPG

JABURG WILK
LAW FIRM

# EXHIBIT A

**Jaburg & Wilk, P.C.**
1850 N. Central Avenue, Suite 1200
Phoenix, AZ 85004
602.248.1000

David L. Allen (075673)
dla@jaburgwilk.com
Thomas Moring *Admitted Pro Hac Vice*
tsm@jaburgwilk.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, | Case No. 1:21-cv-00970-EPG |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California, | **Date:** January 9, 2026<br>**Time:** 10:00 a.m.<br>**Location:** 2500 Tulare Street<br>Fresno, CA 93721<br>**Courtroom:** 10<br>**Judge:** Erica P. Grosjean<br>**Date Filed:** June 21, 2021<br>**Trial Date:** May 12, 2026 |
| Defendants. | |

1

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR
SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

TEMPLETON MARSH, LTD.,

           Plaintiff-in-Intervention,

vs.

WEBER MOTORS, FRESNO, INC. d/b/a BMW Fresno, a California corporation; CJ'S ROAD TO LEMANS CORP. d/b/a Audi Fresno and Porsche Fresno, a California corporation; and CHRISTOPHER JOHN WILSON, an individual and resident of the State of California,

           Defendants.

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on January 9, 2026 at 10:00am, or as soon thereafter as counsel may be heard, before the Honorable Erica P. Grosjean, in Courtroom 10 of the above-entitled court, at 2500 Tulare Street, Room 1501, Fresno, CA 93721, Defendants Weber Motors Fresno, Inc., CJ'S Road To Lemans Corp., and Christopher John Wilson, through counsel undersigned move the Court for an order granting summary judgment under Federal Rule of Civil Procedure 56(a).

This motion is based on this notice of motion and motion, the memorandum of points and authorities, the concurrently filed appendix of evidence, all records, documents, and papers in the Court's file, and any written and oral argument presented at the hearing in this matter.

DATED this 12th day of November, 2025

**Jaburg & Wilk, P.C.**

/s/ David L. Allen
David L. Allen
Thomas Moring
Attorneys for Defendants

2

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................5

II.   LIMITED SCOPE OF MOTION ...................................................................6

III.  FACTUAL BACKGROUND...........................................................................6

    A.    THE DISCOVERY VIOLATON SANCTIONS .....................................7

    B.    THE APA CONDITIONS PRECEDENT ...............................................9

    C.    THE BMW CONDITIONS PRECEDENT ............................................10

    D.    THE AUDI CONDITIONS PRECEDENT ...........................................11

    E.    THE PORSCHE CONDITIONS PRECEDENT ....................................11

    F.    THE BMO HARRIS FINANCING CONDITIONS PRECEDENT ....11

IV.   LEGAL ARGUMENT ...................................................................................12

    A.    DEFENDANTS' BREACHES WERE NOT THE PROXIMATE CAUSE
         OF PLAINTIFF'S INABILITY TO PERFORM..................................12

    B.    PLAINTIFF CANNOT PROVE THEY COULD PERFORM SO IT IS
         PRECLUDED FROM DAMAGES AND SPECIFIC PERFOMANCE ...............13

        1.    Plaintiff Cannot Recover the Lost Profits Damages If It Cannot Evidence
            its Ability to Perform. ...............................................................................14

        2.    Plaintiff Cannot Prove it Could Obtain the Lease for the Properties.....................15

        3.    Because Plaintiff Could Not Obtain the Lease, It Could Not Obtain
            Manufacturer Approval...............................................................................16

        4.    Because Plaintiff Could Not Obtain Manufacturers' Approvals, It Could
            Not Obtain Financing From BMO Harris.................................................16

    C.    PLAINTIFF CANNOT PROVE ABILITY TO PERFORM AND IS
         THEREFORE PRECLUDED FROM SPECIFIC PERFORMANCE .................17

V.    CONCLUSION ..............................................................................................18

24377-24377-00001\DLA\\6599715v8

**TABLE OF AUTHORITIES**

**Case Law**

*Agam v Gavra,*
   236 Cal. App. 4th 91 (2015) .................................................................. 13
*Brandon & Tibbs v. George Kevorkian Accountancy Corp.,*
   226 Cal.App.3d 442 (1990) ................................................................... 15
*C. Robert Nattress & Associates v. CIDCO,*
   184 Cal. App. 3d 55 (1986) .................................................................. 18
*Dickey v. Kuhn,*
   (1930) 106 Cal.App. 300, 289 P. 242 ................................................... 15
*Ersa Grae Corp. v. Fluor Corp.,*
   1 Cal. App. 4th 613, (1991) ............................................................... 5, 16
*Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists,*
   (1971) 14 Cal.App.3d 209 .................................................................... 15
*McDorman v. Moody,*
   (1942) 50 Cal.App.2d 136, 122 P.2d 639 ............................................. 15
*Ninety Nine Investments v. Overseas Courier Service (Singapore) Private,*
   6 Cal. App. 4th 1118 (2003) ................................................................. 18
*Southern Pac. Mill. Co. v. Billiwhack etc. Farm,*
   (1942) 50 Cal.App.2d 79, 122 P.2d 650 ............................................... 15

**Rules**

Cal. Civ. Code § 3300 (West) ................................................................. 14
Civil Code § 3301 ............................................................................. 13, 14

**Other Authorities**

77 Am.Jur.2d, Vendor and Purchaser, § 518, p. 647 .............................. 15
Rest.2d Contracts, § 254 ......................................................................... 15

JABURG WILK
LAW FIRM

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR
SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

Plaintiff asserted claims of breach and anticipatory breach of contract, and breach of the covenant of good faith and fair dealing and seeks either: (1) lost profits and enterprise value damages; or (2) specific performance. To be entitled to either the damages or specific performance remedy, Plaintiff must prove that the alleged breaches were the proximate cause of such damages. The breach must be the reason why the Plaintiff incurred the alleged damages, much like a "but for" analysis in a negligence claim.

To prevail on either the damages claim or the alternative remedy of specific performance, Plaintiff must prove that it could have timely performed in full pursuant to the terms of the agreement. While actual performance by Plaintiff is not necessary, it is well settled that Plaintiff must prove that it was able to timely perform all conditions required of it per the terms of the agreement. Barring that showing by Plaintiff, the claims fail, and Plaintiff cannot recover damages or, alternatively, a judgment for specific performance. *Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 625, (1991). Plaintiff must still meet the burden to prove that it was able to timely perform the conditions required of Plaintiff per the terms of the contract, and that any breaches by the Defendants were the proximate cause of its alleged damages. In this instance, Plaintiff is unable to carry its burden to prove that, but for Defendants' alleged breaches, it would have been able to timely fully perform as required by the contract at issue.

In this case, the alleged breaches committed by Defendants were not the proximate cause of Plaintiff's inability to perform. Rather, Plaintiff failed to meet several conditions precedent to closing, and it is those failures that caused Plaintiff's damages, if any.  Plaintiff's inability to perform precludes it from recovering the remedies it seeks. Defendants are therefore entitled to summary judgment.

5

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

## II.      LIMITED SCOPE OF MOTION

On June 2, 2025, this Court ordered, *inter alia,* as a discovery sanction, that "Defendants shall be prohibited from opposing Plaintiff's claims for breach of contract and anticipatory breach of contract. The case will proceed only on the question of damages and/or remedy for those claims." *See* ECF 187 pg. 31.

The arguments below are made only to address the issue of Plaintiff's alleged damages and are not set forth to argue, in violation to this Court's Order, that there was no breach, or anticipatory breach, of contract.[1] For purposes of establishing damages, their nature, or their amount, Plaintiff bears the burden to show some sort of proximate cause, such that the breaches that the Court found were the proximate cause of Plaintiff's alleged damages. Defendants set forth below their arguments as to how the alleged breaches, found in paragraphs 56 and 57 of the First Amended Complaint, were not the proximate cause of Plaintiff's alleged damages.

The same challenges are set forth to address Plaintiff's claim for specific performance.

To be clear, there is no argument below that Defendants did not breach or that Plaintiff's actions justified a breach; contrarily, the breaches are discussed only in the context of whether Plaintiff can prove that but for the breaches, it would have been able to fully and timely perform its contractual obligations, as required for it to be able to recover any of its alleged damages.

## III.     FACTUAL BACKGROUND

In 2020, Plaintiff and Defendants began negotiating the sale of three car dealerships owned and operated by the two Defendant entities; namely, Audi, BMW, and Porsche brands (collectively the manufacturers are referred to as Original Equipment Manufacturers or in this

---

[1] Nothing set forth herein should be construed as an admission or implied admission by Defendants that they did, in fact, breach the contract at issue; however, for the purposes of this Motion, Defendants acknowledge and adopt the Court's findings on breach of contract and anticipatory breach of contract.

6

24377-24377-00001\DLA\\6599715v8

Motion "OEMs"), located in Fresno, California. [Defendants' Statement of Undisputed Facts ("DSUF") ¶ 1.] The BMW dealership was owned and operated by Weber Motors, Fresno, Inc., dba BMW Fresno. [DSUF ¶ 2]. The Audi and Porsche dealerships were owned and operated by CJ's Road to Lemans Corp., dba Audi Fresno and Porsche Fresno. [DSUF ¶ 3]. Both Weber Motors, Fresno, Inc. and CJ's Road to Lemans Corp. were owned solely by CJ Wilson, who worked full time operating the three dealerships. [DSUF ¶ 4].

Much of the negotiations between Plaintiff and Defendants centered on the retention of Mr. Wilson by Plaintiff following the acquisition; namely, agreeable terms of employment and of his future ownership of the dealerships, and of Foundation. [DSUF ¶ 5]. Mr. Wilson remaining as a part owner and the general manager of the dealerships was a specific requirement of the OEMs to Plaintiff obtaining the necessary approvals from the OEMs, which Plaintiff necessarily had to obtain in order to consummate the transaction. [DSUF ¶ 6].

On November 30, 2020, while negotiations on key details were ongoing, the parties executed the Asset Purchase Agreement ("APA"). [DSUF ¶ 7]. Even though the APA included as Exhibit C a "form" of an Employment Agreement, it was understood and agreed between the parties that the terms of Mr. Wilson's employment and his managerial role were to be negotiated as they moved toward closing. [DSUF ¶ 8]. The APA had an original closing date for the transaction of December 21, 2020, which was later changed to January 30, 2021. In the APA, there is a clause to extend that date by another one hundred and fifty (150) days, which resulted in the latest closing date of June 29, 2021. [DSUF ¶ 9].

A.     THE DISCOVERY VIOLATON SANCTIONS

The Court found, as sanctions for alleged discovery violations, that Defendants could not argue in defense of alleged breaches, and instead found that Defendants breached the APA as a matter of law. [DSUF ¶ 10]. The Court left open the issue of damages and the nature of the same. [DSUF ¶ 11]. While the Court did not provide any finding as to how, precisely, Defendants

7

breached the APA, Plaintiff alleges the following in its First Amended Complaint as the Defendant Entities' purported breaches ("Entity Breaches"):

1. Failure to provide written assurances of their intent to proceed to closing in good faith, and to comply with their obligations under the APA, in violation of Section 5.23 of the APA;
2. Weber and Lemans' failure to disclose Wilson's pledge, in his capacity as trustee, of the Trust's equity ownership in Weber and Lemans to a creditor, in breach of applicable dealer sales and services agreements with the manufacturers;
3. Failure to cause Wilson to agree to the non-compete agreement and the employment agreement, as attached to the APA;
4. Failure to engage in any negotiations in good faith with respect to the form of amended and restated limited liability company agreements for each of the new entities, to be agreed to by the parties under Section 3.2(j) of the APA;
5. Defendants' apparent lack of sufficient assets necessary to pay all amounts owing to creditors outstanding as of the closing date for all obligations not assumed by Foundation; and
6. Wilson's failure to provide information with respect to his trust and his net worth as required by the manufacturers in connection with their approval of the subject transactions.

[DSUF ¶ 12].

Additionally, Plaintiff alleged that defendant Mr. Wilson in his individual capacity committed the following breaches ("Individual Breaches" and collectively with the Entity Breaches the "Breaches"):

1. His refusal to agree to the non-compete agreement and the employment agreement, as attached to the APA;
2. His failure to engage in any negotiations in good faith with respect to the form of amended and restated limited liability company agreements for each of the new entities, to be agreed to by the parties under Section 3.2(j) of the APA; and
3. His discussions with other individuals regarding a potential deal for the BMW dealership, in violation of Section 5.13 of the APA.

8

[DSUF ¶ 13]

## B.      THE APA CONDITIONS PRECEDENT

Plaintiff needed to obtain assignments and assume the leases for the dealership locations[2] under the APA. The APA also required OEM approvals, which were conditioned upon the assignment of the leases. [DSUF ¶ 14].  To be clear the APA provided that Plaintiff was required to obtain:

> (m)      An assignment and assumption of the Leases, together with the required consents from the landlords under the Leases, or new leases between Buyer and the landlords thereunder, in each case acceptable to Buyer in its sole discretion (the "Lease Assignments");

[DSUF ¶ 15].

Plaintiff was unable to obtain the landlord's approval for an assignment of the leases, and therefore was unable to assume the leases. [DSUF ¶ 16].  More specifically, Mr. Monjazeb, the landlord, requested financials from Foundation and the individual principals of Foundation, and upon his review of such financial statements he initially "informed [his attorney] that [he] felt that the statements did not exhibit the financial strength [he] was looking for, and that [he] was very unlikely going to agree to the assignments if not backed by the personal guarantees of the ownership group…" [DSUF ¶ 17]. Then, after reviewing the personal financial statements of the principals who would be providing the personal guarantees, Mr. Monjazeb "decided that [he] would not consent to the assignment of the dealership leases to Foundation. In [his] professional judgment, developed over thirty years as a landlord and premium car dealer, [he] was not willing to lease to a group with little to no experience in the luxury car market, with no local ties to the Fresno community, and with less than robust corporate and personal financial positions." [DSUF ¶ 18]. Mr. Monjazeb's attorney, Richard Aaron, who was personally involved in the discussions between Plaintiff's representative and Mr. Monjazeb, also confirmed the same, stating "that

---

[2] There were two leases with the same landlord for the three dealerships, with BMW having its own building, and Porsche and Audi sharing an adjacent building.

9

based upon the minimal liquidity of Mr. Kutchinski and Mr. Kramer [Foundation's principals], and the absence of hard assets that could be easily valued and perhaps used to secure performance, that '[Mr. Monjazeb] could not approve the assignment." [DSUF ¶ 19]. Due to the foregoing, Mr. Monjazeb confirmed to Mr. Aaron that "at this point in time - early June 2021 – his decision that he would not consent to the assignment of the dealership leases to Foundation, which he concluded was a group with little to no experience in the luxury car market, with no local ties to the Fresno community, and with less than robust corporate and personal financial positions." [DSUF ¶ 20].

Plaintiff obtained only <u>conditional</u> approvals of the OEMs as of May 25, 2021, on which date the latest approval was received from Porsche. [DSUF ¶ 21]. The APA was originally to close on January 30, 2021, but would automatically be extended for an additional 150 days to June 29, 2021, by which date Plaintiff needed to obtain all of its necessary approvals, including the <u>non-conditional</u> OEM approvals, the Landlord approvals to the lease assignments, and the State of California approvals. [DSUF ¶ 22].

### C.    THE BMW CONDITIONS PRECEDENT

BMW's Conditional Approval provided in April 2021 contained the most robust conditions precedent.  The first paragraph makes the approval subject to satisfying "each of the specific conditions set forth below."  Those conditions include that Mr. Wilson was to be "Center Operator."  There was never an agreement entered into between Foundation and CJ satisfying this condition. At best, CJ and Foundation agreed negotiations would be ongoing. [DSUF ¶ 23].

There is an "initial owner's equity requirement" of at least $14,263,723; however, this money was never confirmed by Foundation to exist and indeed, Plaintiff confirmed that it would have trouble meeting this requirement unless and until they received mezzanine financing. [DSUF ¶ 24]. Finally, Foundation was required to use Praxis or Tricarico to design the new facility for BMW. [DSUF ¶ 25].  Praxis and Tricarico are both Architecture firms that were

10

specified by BMW as set forth in the BMW Conditional approval. *Id.* However, the only drawings obtained were for Porsche, not BMW. [DSUF ¶ 26].

### D.    THE AUDI CONDITIONS PRECEDENT

The conditional approval provided by Audi on May 23, 2021, contained conditions precedent that formed the basis of the conditional approval. [DSUF ¶ 27]. The third paragraph makes the approval subject to the occurrence of the nine items which, of most importance, was the assignment and assumption of the lease with an extension making the lease term at least an additional 10 years. [DSUF ¶ 28]. This never happened, and per the landlord's declaration, never was going to happen. [DSUF ¶ 29].

### E.    THE PORSCHE CONDITIONS PRECEDENT

The Porsche conditional approval dated May 25, 2021, provides in the first paragraph which makes the approval subject to compliance with certain conditions which included construction of a new facility subject to certain forth milestone deadlines, none of which were met. Indeed, only a drawing was exchanged. [DSUF ¶ 30]. Second, *iner alia,* Mr. Wilson is to be the "General Manager," however, the terms of an employment agreement were never agreed as the parties were still negotiating the terms. [DSUF ¶ 31].

### F.    THE BMO HARRIS FINANCING CONDITIONS PRECEDENT

The financing from BMO Harris was predicated upon the OEMs approvals. [DSUF ¶ 32]. More specifically, the BMO Harris Letter provides that the following other terms must occur:

1.    All three franchises to be acquired must be floored[3] with the Bank.
2.    Sources and uses to be satisfactory to the Bank.
3.    Satisfactory legal and Bank review of entity structure and flow of funds.
4.    Covenant compliance on a pro-forma basis prior to close, which may require an equity injection depending on inventory levels.
5.    Formal OEM approval of all franchises to be acquired.

---

[3] "Flooring" or floor financing is additional debt that a car dealer takes on to acquire inventory from OEMs, placing additional strain on Foundation's finances.

11

      6. Distributions and management fees above the Borrower's tax liability allowed up to pro-forma covenant compliance.

      7. Proposal is subject to the Bank's standard due diligence and credit approval. At this time the Bank has not received such approval, and this proposal is for discussion purposes only.

[DSUF ¶ 33]. (emphasis added).

## IV. LEGAL ARGUMENT

Even in light of the Court's rulings on the Breaches, Plaintiff must still prove that but for the Breaches, it would have been able to timely satisfy the conditions precedent contained in the APA, conditional OEM approvals, and the BMO Harris financing proposal.

Because Plaintiff could not perform, it cannot recover lost profits damages, and it is not entitled to specific performance. Even after the Court's finding that Defendants breached the APA, Plaintiff's claims nevertheless fail.

### A. DEFENDANTS' BREACHES WERE NOT THE PROXIMATE CAUSE OF PLAINTIFF'S INABILITY TO PERFORM.

Plaintiff does not arrive at a damages analysis without evidencing it could timely perform the conditions placed on it. Stated differently, if a plaintiff seeks to purchase any business, and would not be able to close on the business by the deadline, it cannot recover damages unless plaintiff can meet its' burden of proof to show defendants' breach was the proximate cause of plaintiff's inability to perform. California codified the same in Civil Code § 3301, which states that "causation of damages in contract cases, as in tort cases, requires that the damages be *proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain*." *Agam v Gavra,* 236 Cal. App. 4th 91 (2015) (emphasis added) quoting Cal. Civ. Code § 3301. Plaintiff alleged the Breaches in the First Amended Complaint. [DSUF ¶¶'s 12-13]. None of the alleged Breaches precluded Plaintiff obtaining necessary financing or funding nor did it preclude Plaintiff from demonstrating cash reserves of $14,263,723 to satisfy one of many of BMW's conditions precedent. [DSUF ¶ 24]. And most important, it did not

12

preclude Plaintiff from obtaining the landlord's consent to the lease assignments. Plaintiff needed to show it had cash reserves of $14,263,723; Defendants had nothing to do with Plaintiff not having that cash reserve amount, which was wholly separate from any of the Breaches.

Additionally, the Audi conditional approval required "assignment and assumption of Dealer's lease of the Dealership Premises, with an extension making the lease term at least 10 years…" [DSUF ¶ 28]. Landlord states in his Declaration that he would not assign the leases to Plaintiff, let alone extend the lease term for at least another 10 years. [DSUF ¶¶'s 17-20]. The Breaches did not preclude Plaintiff from obtaining assignments of the leases. Rather, it was due to Mr. Monjazeb's analysis and decision that Plaintiff's financial health, including those of the principals, was not an enterprise which to risk his business. The failure of Foundation to obtain lease assignments did, however prevent OEM's approval.

The BMO financing was all illusory, since it was based on OEM approval that was never obtained. Even with Defendants' Breaches, Landlord's decision to not allow Plaintiff to assume the leases was not proximately caused by Defendants. The whole chain of events falls apart once it becomes apparent that Mr. Monjazeb would not agree to the first of the many conditions (lease assignment) on which the remaining deal was to be built. Plaintiff is solely responsible for those failures. That reality is enough to end Plaintiff's case.

**B.    PLAINTIFF CANNOT PROVE THEY COULD PERFORM SO IT IS PRECLUDED FROM DAMAGES AND SPECIFIC PERFOMANCE**

Damages for Plaintiff's cause of action require evidence that it *could* perform, not that it *did* perform, at the time of the breach. Plaintiff therefore has to prove that as of June 29, 2021 – the contractual closing date -- it could have met every condition precedent as required of each of the OEM's conditional approvals as well as the remining conditions in the APA. The same applies to specific performance. Without evidence that they could perform in full, then Plaintiff's alleged damages and remedies cannot be awarded.

13

24377-24377-00001\DLA\\6599715v8

**1.     Plaintiff Cannot Recover the Lost Profits Damages If It Cannot Evidence its Ability to Perform.**

As codified, "[t]o establish a breach of contract, there must be damages. No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin." Cal. Civ. Code § 3301. The code further clarifies that "[f]or the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300 (West).

As applied to the instant case, "[l]oss of prospective profits may nevertheless be recovered if the evidence shows with reasonable certainty both their occurrence and the extent thereof." *Brandon & Tibbs v. George Kevorkian Accountancy Corp.* 226 Cal.App.3d 442 (1990) quoting *Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists* (1971) 14 Cal.App.3d 209, 221. However, before the lost profits analysis can even begin, Plaintiff must establish, *as its burden*, the following:

> The consequential damages must have been contemplated as part of the contract and be proved with reasonable certainty. If it was foreseeable that profits would be read into the contract and the purpose of the contract, then it could result in consequential damages. Although it is true that an anticipatory breach or repudiation of a contract by one party permits the other party to sue for damages without performing or offering to perform its own obligations (§ 1440), **this does not mean damages can be recovered without evidence that, but for the defendant's breach, the plaintiff would have had the ability to perform**. (*Dickey v. Kuhn* (1930) 106 Cal.App. 300, 303–304, 289 P. 242 ["elimination of the necessity of an offer of performance does not dispense with the proof of ability to perform when that is made an issue in the case"].)
>
> We reject Ersa Grae's contention that proof of the plaintiff's ability to perform is limited to actions for specific performance. *Dickey v. Kuhn, supra,* 106 Cal.App. 300, 289 P. 242, was an action for money damages, not specific performance. (See also *McDorman v. Moody* (1942) 50 Cal.App.2d 136, 140–141, 122 P.2d 639; *Southern Pac. Mill. Co. v. Billiwhack etc. Farm* (1942) 50 Cal.App.2d 79, 86–87, 122 P.2d 650.) As explained by Professor Corbin, in "an action for breach by an unconditional

14

24377-24377-00001\DLA\\6599715v8

repudiation it is still a condition precedent to the plaintiff's right to a *judgment for damages* that he should have the ability to perform all such conditions. If he could not or would not have performed the substantial equivalent for which the defendant's performance was agreed to be exchanged, he is given no remedy in *damages* for the defendant's non-performance or repudiation." (4 Corbin on Contracts (1951) § 978, pp. 924; emphasis added.)

Professor Williston agrees: " 'Where [one party] repudiates, there is no necessity for [the other party] to *allege* a tender, nor his readiness and willingness to perform. **He must, of course, *prove* that he would have been able to [perform], for otherwise he will fail in his proof of *damages* ...' "** (5 Williston on Contracts (1961) § 669, p. 353; emphasis added; see also Rest.2d Contracts, § 254, subd. (1) ["A party's duty to pay *damages* for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise"]; 77 Am.Jur.2d, Vendor and Purchaser, § 518, p. 647 [in the case of an anticipatory repudiation of a contract *by a seller, the buyer's right to sue for damages* is not conditioned on any further performance by the buyer, provided it appears the buyer was ready, willing and able to perform]; Cal. Real Property Sales Transactions (Cont.Ed.Bar 1981) § 12.10, pp. 687–688 [if financing is contemplated, the buyer must be able to demonstrate the availability of financing]; 12 Am.Jur. Proof of Facts 2d, Anticipatory Repudiation, § 9, p. 196.)

*Ersa Grae Corp. v. Fluor Corp.*, 1 Cal. App. 4th 613, 625, (1991) (emphasis added).

To reiterate, while Defendants do not argue that Plaintiff did not perform; for purposes of damages at issue here, it is settled that a party must provide admissible evidence it could have performed. Here, Plaintiff's burden is to prove that it *could have performed,* which it cannot do.

**2.      Plaintiff Cannot Prove it Could Obtain the Lease for the Properties.**

Plaintiffs place the proverbial cart before the horse in the sense that they could not obtain the lease approvals to operate each of the respective dealerships. Plaintiff incorrectly alleges that it had financing in place, and that it had approvals from Audi, BMW, and Porsche. What Plaintiff conveniently omits is that the approvals it obtained were only conditional, and the purported funding it had lined up was also only conditional, and both were predicated on, *inter alia,* obtaining assignment of the leases. [DSUF ¶¶'s 28, 31].

15

24377-24377-00001\DLA\\6599715v8

Obtaining the lease assignments is the predicate for all other approvals and discharge of those conditions. Even the FAC admits such that as of June 11, 2021, which was merely 18 days prior to the scheduled closing, Plaintiff was only in "discussions" to assume the leases. [DSUF ¶ 34]. "Discussions" do not amount to an agreement. The evidence shows exactly the opposite. The declarations evidence that Plaintiff had not, did not, and could not obtain assignments for the leases for the properties. Similarly, the BMO Proposal explicitly states that it is for discussion purposes only. [DSUF ¶¶ 31-33].

Not only is this evidence that Plaintiff could not perform as required by the terms of the APA, but it also evidences that it could not perform as to the OEMs' conditional approvals; and without those approvals, Plaintiff could not then obtain the financing. [DSUF ¶¶'s 22; 28; 31-33]. Financing was predicated on the manufacturer approval, manufacturer approval was dependent, *inter alia,* on the assumed leases. Without the assignment of the leases, there is nothing. Plaintiff ignores this critical requirement.

### 3. Because Plaintiff Could Not Obtain the Lease, It Could Not Obtain Manufacturer Approval.

The OEMs' conditional approvals all require assumption of the leases to operate at the respective locations.  A conditional approval is precisely that – conditioned on something predicate. Plaintiff could not obtain the first and most important part: assumption of the leases. Without assumption of the leases, the conditional approvals from the manufacturers are literally useless. They have no effect upon the parties. And, without the non-conditional OEM approvals – which were never obtained --the alleged financing, is simply a non-binding proposal and nothing more. [DSUF ¶¶'s 31-33].

### 4. Because Plaintiff Could Not Obtain Manufacturers' Approvals, It Could Not Obtain Financing From BMO Harris

Plaintiff disclosed the Proposal from BMO Harris which provides terms for floor financing, the purchase amount under the APA, and another senior existing Debt. [DSUF ¶ 35].

16

Importantly, which is again ignored by Plaintiff, is the "other terms" portion of the Proposal, which, *inter alia,* provides the following:

> …
> 2. Sources and uses to be satisfactory to the Bank
> 3. Satisfactory legal and Bank review of entity structure and flow of funds
> …
> 5. Formal OEM approval of all franchises to be acquired.
> …
> 7. Proposal is subject to the Bank's standard due diligence and credit approval. At this time the Bank has not received such approval, and ***this proposal is for discussion purposes only***.

[DSUF ¶ 33 (emphasis added)].

The Proposal is dated February 1, 2021. So as of January 30, 2021, the initial closing date, Plaintiff lacked actual financing; it was still subject to review and approval. This Proposal was for "discussion purposes." *Id.* A discussion does not amount to performance. Plaintiff cannot provide admissible evidence that on the closing date of June 27, 2021, but for the Breaches it would have been ready to close on its acquisition of Defendants' three dealerships. Therefore, it cannot prove it could perform. Without the lease approvals, none of the other conditions precedent could be met. Therefore, Plaintiff was unable to timely perform its obligations per the terms of the APA.

## C. PLAINTIFF CANNOT PROVE ABILITY TO PERFORM AND IS THEREFORE PRECLUDED FROM SPECIFIC PERFORMANCE

A party seeking specific performance must generally prove its ready, willing, and able to perform as to the terms of the transaction. *Ninety Nine Investments v. Overseas Courier Service (Singapore) Private,* 6 Cal. App. 4th 1118, 1126 (2003) citing *C. Robert Nattress & Associates v. CIDCO,* 184 Cal. App. 3d 55, 64 (1986).

Plaintiff has alleged it was ready and willing, and has also alleged it was <u>able</u>. As detailed *supra,* Plaintiff cannot prove its <u>ability</u> to perform either at the closing date. Without the Landlord approval, it could not obtain the OEMs' approval, which means it could not obtain the

17

24377-24377-00001\DLA\\6599715v8

BMO Harris financing. Plaintiff seeks upwards of $50 million in damages when it did not have a single document evidencing that it had callable money, actual cash that it could use to complete its acquisition, and not just a proposal. [DSUF ¶ 33].

## V. CONCLUSION

Plaintiff cannot evidence that it could perform all conditions precedent of the APA. That is a requirement for the damages and the remedy it is pursuing against Defendants. None of Defendants' breaches precluded Plaintiff from meeting its necessary performance obligations. Plaintiff, therefore, cannot recover its damages or remedies. Defendants should be granted summary judgment for that reason.

DATED this 12th day of November, 2025.

**Jaburg & Wilk, P.C.**

/s/ David L. Allen
David L. Allen
Thomas Moring
Attorneys for Defendants

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8

## CERTIFICATE OF SERVICE

I hereby certify that on 12th day of November, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David I. Holtzman
Daniel P. Kappes
Andrew Klair
Isabella Granucci
HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
david.holtzman@hklaw.com
daniel.kappes@hklaw.com
andrew.klair@hklaw.com
isabella.granucci@hklaw.com
*Attorneys for Plaintiff*

Forrest Booth
fbooth@nicollblack.com
Camille Zuber
czuber@nicollblack.com
Nicoll Black Altenbrun & Feig, PLLC
50 California Street, Suite 1616
San Francisco, CA 94111
*Attorneys for Plaintiff-in-Intervention*


*/s/ Brenda Ruiz*

19

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

CASE NO. 1:21-CV-00970-EPG

24377-24377-00001\DLA\\6599715v8